**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHESTER COUNTY EMPLOYEES' RETIREMENT FUND, Derivatively on Behalf of Nominal Defendant ABBOTT LABORATORIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> MILES D. WHITE, DUANE L. BURNHAM, JEFFREY LEIDEN, WILLIAM DEMPSEY, RICHARD A. GONZALEZ, H. LAURANCE FULLER, ROXANNE S. AUSTIN, W. JAMES FARRELL, SAMUEL C. SCOTT, III, GLENN F. TILTON, WILLIAM A. OSBORN, ROBERT J. ALPERN, M.D., K. FRANK AUSTEN, M.D., JACK M. GREENBERG, THOMAS R. HODGSON, DAVID A. JONES, THE RT. HON. LORD DAVID OWEN, ROBERT L. PARKINSON, JR., BOONE POWELL, JR., ADDISON BARRY RAND, W. ANN REYNOLDS, PH.D., ROY S. ROBERTS, WILLIAM D. SMITHBURG, JOHN R. WALTER, WILLIAM L. WEISS, <br><br> Defendants, <br><br> and <br><br> ABBOTT LABORATORIES, INC., <br><br> Nominal Defendant. | Case No. |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Chester County Employees' Retirement Fund ("Plaintiff"), by its undersigned

attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the

defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of nominal defendant Abbott Laboratories, Inc. ("Abbott" or the "Company") against certain of its current and former executive officers and members of its Board of Directors (the "Board") seeking to remedy their breaches of fiduciary duties, unjust enrichment, and other violations of law.  Despite the Company's public representations concerning its commitment to ethics, sound public policy, and the health and safety of its consumers, facts have recently come to light demonstrating that the Individual Defendants (as defined herein) have unscrupulously marketed and sold Depakote, an anti-epileptic drug known to cause deadly side effects, to treat serious medical conditions for which the drug is not, and has never been, approved as a safe and effective treatment.  Even more contemptible, the Individual Defendants knowingly targeted vulnerable patient populations, expending millions of dollars in Company assets for illegal bribes and national marketing campaigns designed to persuade medical professionals to prescribe Depakote for numerous off-label uses, including use as an illegal chemical restraint for elderly patients suffering from dementia and Alzheimer's.  Moreover, the Individual Defendants knowingly caused and/or allowed the Company to violate numerous federal and state laws by causing the submission of false claims to federal and state governments.  Indeed, after their independent investigations corroborated the allegations of former Company insiders regarding Abbott's illegal marketing practices and regulatory violations, the United States and 24 separate state governments began pursuing civil and criminal charges against the Company, joining existing *qui tam* actions that remained under seal and hidden from Company shareholders' purview until February 2011.  Less than nine months later, the Company disclosed that it would reserve **$1.5 billion** to cover the costs and expenses of a tentative settlement resolving the civil and criminal claims – the third largest pharmaceutical sales and marketing settlement in history.  Those

reserves ultimately will be used to cover $1.3 billion in civil and criminal penalties and other costs associated with the legal action.

2.     In 1983, the Food and Drug Administration ("FDA") approved Depakote for the treatment of simple and complex seizures associated with epilepsy in adults and children over the age of 10. Abbott later successfully sought FDA approval to market Depakote to treat additional types of seizures, manic episodes of bipolar disorder in adults, and prophylaxis of migraine headaches in adults.

3.     Despite these beneficial uses, the drug causes deadly side effects and carries a "black box" warning to notify consumers of its ability to cause life-threatening liver damage (*i.e.*, hepatotoxicity) and inflammation of the pancreas (*i.e.*, pancreatitis), as well as birth defects when taken by pregnant women.

4.     After Depakote received its initial FDA approval, new competing medications began to enter the market in its treatment spheres, causing Depakote's market share for on-label uses to suffer. Unwilling to accept the limited market share available for its on-label uses, Abbott implemented a wide-spread off-label marketing campaign orchestrated at the highest level of Company management.

5.     According to the *qui tam* actions that led to the $1.3 billion sanction, since at least 1998, the Company has expended significant sums of money in training programs for sales representatives and illegal kick-backs to physicians to promote various off-label uses of the drug.

6.     The Company's efforts were immensely successful. The off-label prescription of the Depakote and its derivatives caused sales to soar to over $1.4 billion per year, with total sales of $6.8 billion from 2000 to 2009. At the same time, the Company executives who implemented

the off-label marketing campaign pocketed millions of dollars in undeserved compensation stemming in no small part from Depakote's off-label success.

7.     According to the relators' allegations in the *qui tam* actions, despite the limited approved uses for the drug, Abbott sales representatives received training on marketing the product for numerous off-label purposes, including:

- treatment of mood disorders, attention deficit hyperactivity disorder ("ADHD"), bipolar depression, and developmental delay in children under the age of 18;

- adult bipolar depression, schizophrenia, and other psychological disorders;

- post-seizure stroke;

- addictive narcotic drug withdrawal; and

- epilepsy in children under 10 years old.

8.     The most egregious off-label use of the drug targeted perhaps one of the most vulnerable patient populations. Due to the mood altering effects of the drug, Abbott instructed sales representatives to market the product as a chemical restraint for elderly patients suffering from agitation associated with dementia and Alzheimer's. According to a former sales representative who worked in a special sales division that exclusively targeted geriatric care providers, Abbott sales employees received specialized training on marketing the drug as a replacement for physical restraints and an alternative to certain anti-psychotic medications used by long term care facilities to sedate elderly patients exhibiting "behavioral" issues associated with dementia and Alzheimer's.

9.     This targeted marketing campaign was one of several ways Abbott illegally pushed its product. In addition, Abbott also provided illegal kickbacks to physicians and caregivers to promote the Depakote's on-label and off-label uses. Abbott likewise made false statements to physicians concerning the efficacy and safety of the product.

10. These practices violated numerous state and federal laws, including the Federal False Claims Act, the Medicare Anti-Kickback Statute, the Medicare/Medicaid Self-Referral Statute, the Food Drug and Cosmetics Act, and numerous similar state statutes and laws.

11. In violation of their fiduciary obligations to the Company, the Individual Defendants each knowingly played a role in causing or otherwise allowing the Company to engage in the unlawful conduct that resulted in damages to the Company. Each must be held accountable for the harm their actions have caused.

## JURISDICTION AND VENUE

12. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs. In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because nominal defendant Abbott is headquartered in this District. Moreover, a substantial portion of the occurrences complained of herein occurred in this District. In addition, one or more of the Defendants either reside in, or maintain offices in, this District.

## PARTIES

14. Plaintiff, a citizen of Pennsylvania, is a shareholder of Abbott, was a shareholder of Abbott at the time of the wrongdoing complained of herein, and has been a shareholder of Abbott continuously since that time.

15. Nominal defendant Abbott is an Illinois corporation with its principal place of business in Abbott Park, Illinois, and thus is a citizen of Illinois. According to its public filings, Abbott's primary business is the "discovery, development, manufacture, and sale of a broad and

diversified line of health care products." Abbott reports revenues through four operating segments: Pharmaceutical Products, Diagnostic Products, Nutritional Products, and Vascular Products. Depakote, along with the Company's other prescription medications, is marketed and sold through by the Company's Pharmaceutical Products Division.

16.     Defendant Miles D. White ("White") is Abbott's Chief Executive Officer ("CEO") and Chairman of its Board. White took the CEO role in 1999 and became Chairman of the Board in 1999, having served as a director of the Company since 1998. White currently serves as a director of Caterpillar, Inc. and Northwestern Memorial Hospital. White served as a director of Motorola, Inc. from 2005 to 2009 and as a director of Tribune Company from 2005 to 2007. White also serves on the Board of Trustees at the Field Museum in Chicago. White is a citizen of Illinois.

17.     Defendant Duane L. Burnham ("Burnham") served as the CEO of Abbott from 1989 until White succeeded him in that role. He has served as a director of the Company since 1985, and served as Chairman of the Board from 1990 to 1999. Until 2007, Burnham also served as a director of Northern Trust Company. Burnham is a citizen of Illinois.

18.     Defendant Jeffrey Leiden, M.D., Ph.D. ("Leiden") is the former President and Chief Operating Officer ("COO") of Abbott's Pharmaceutical Products Division, having served in that role from 2001 until 2006. Leiden also served as a director of the Company from 1999 to 2006 and previously served as a director of TAP Pharmaceuticals, an Abbott joint venture. During part of his tenure on the Board, Leiden served on the Board's Public Policy Committee, which had oversight responsibilities for the Company's legal and regulatory compliance related to Abbott's sales and marketing activities. Leiden is a citizen of Illinois.

19.     Defendant William G. Dempsey ("Dempsey") is a former Abbott executive, serving in numerous senior leadership positions in the Pharmaceutical Products Division from 1982 to 2007.  From 2006 to 2007, Dempsey served as the Company's Executive Vice President for the Pharmaceutical Products Division.  Dempsey is a citizen of Illinois.

20.     Defendant Richard A. Gonzalez ("Gonzalez") currently serves as Abbott's Executive Vice President, Pharmaceutical Products Group, having taken that role in July 2010, after a brief retirement from the Company.  Gonzalez first joined Abbott in 1977 and held various management positions before retiring in 2007. During his tenure, he served as Abbott's President and Chief Operating Officer, President and Chief Operating Officer of Abbott's Medical Products Group, Senior Vice President and President of Abbott's former Hospital Products Division (now Hospira, Inc.), Vice President and President of Abbott's Health Systems Division, and Divisional Vice President and General Manager for Abbott's Diagnostics Operations in the United States and Canada.  Gonzalez served as a director of the Company from 2001 to 2007.  Gonzalez is a citizen of Florida.

21.     Defendant H. Laurance Fuller ("Fuller") has been a director of the Company since 1988.  Fuller has significant experience serving as a director and executive officer of large corporations subject to heavy government regulation.  Fuller was elected President of Amoco Corporation in 1983 and Chairman and CEO of Amoco Corporation in 1991.  As a result of the merger between British Petroleum, p.l.c. and Amoco Corporation in 1998, Fuller became Co-chairman of BP Amoco, p.l.c., serving in that role until April 2000.  Fuller also served as a director of Motorola, Inc. from 1994 to 2007.  Fuller is a citizen of Illinois.

22.     Defendant Roxanne S. Austin ("Austin") has been a director of the Company since 2000.  Austin has been a member of the Board's Public Policy Committee since at least

2003. Austin has significant experience serving as a director and/or executive officer of major publicly traded companies with multinational operations subject to heavy government regulation, including serving as the President and CEO of Move Networks, Inc. from July 2009 to July 2010, as the President and COO of DIRECTV, Inc. from June 2001 to December 2003, and as Vice President and CFO of Hughes Electronics Corporation from 1997 to June 2001. Austin is a citizen of California.

23.     Defendant W. James Farrell ("Farrell") has been a director of the Company since 2006. Farrell has significant experience serving as a director and/or executive officer of major publicly traded companies with multinational operations subject to heavy government regulation, including serving as the Chairman and CEO of Illinois Tool Works Inc. at times between 1995 and 2006, as a director of Kraft Foods, Inc. from 2001 to 2006, and as a director of Sears, Roebuck and Company from 1999 to 2005. Farrell currently serves as a director of Allstate Corporation, UAL Corporation, and 3M Company. Farrell is a citizen of Illinois.

24.     Defendant Samuel C. Scott, III ("Scott") has been a director of the Company since 2007. Scott has significant experience serving as a director and/or executive officer of major publicly traded companies with multinational operations subject to heavy government regulation, including serving as the President and CEO of Corn Products International from 1997 to 2009. Among other board memberships, Scott currently serves as a director of Motorola Solutions, Inc. (f/k/a/ Motorola, Inc.) and Northwestern Memorial HealthCare, the corporate parent of Northwestern Memorial Hospital. Scott is a citizen of Illinois.

25.     Defendant Glenn F. Tilton ("Tilton") has been a director of the Company since 2007. Tilton has significant experience serving as a director and/or executive officer of major publicly traded companies with multinational operations subject to heavy government regulation.

Tilton currently serves as the Non-executive Chairman of United Continental Holdings, Inc., and presumably served as Chairman, President, and CEO of UAL Corporation. Tilton also serves on the Board of Directors of Northwestern Memorial Hospital and as a trustee of the Field Museum in Chicago. Tilton is a citizen of Illinois.

26.     Defendant William A. Osborn ("Osborn") has been a director of the Company since 2008. Osborn has significant experience serving as a director and/or executive officer of major publicly traded companies with multinational operations subject to heavy government regulation. Osborn was Chairman of Northern Trust Corporation from 1995 to 2009 and was CEO of Northern Trust Corporation from 1995 to 2007. Osborn currently serves as a director of Caterpillar, Inc. and Tribune Company. Osborn is a citizen of Illinois.

27.     Defendant Robert J. Alpern, M.D. ("Alpern") has been a director of the Company since 2008. Alpern is a citizen of Connecticut.

28.     Defendant K. Frank Austen, M.D. ("Austen") served as a director of the Company from 1983 to 1999. Austen is a citizen of Massachusetts.

29.     Defendant Jack M. Greenberg ("Greenberg") served as a director of the Company from 2000 until 2007. Greenberg has also served as a director of Allstate Corporation for the past nine years. Greenberg is a citizen of Illinois.

30.     Defendant Thomas R. Hodgson ("Hodgson") served as President and COO of Abbott from 1990 until his retirement in December 1998. He served as a director of the Company from 1985 until 1998. Prior to that, he had been President of the Abbott International Division from 1983 to 1990 and President of Abbott's Hospital Products Division from 1978 to 1983. Hodgson held various other management positions with Abbott from 1972 to 1978. Hodgson is a citizen of Florida.

31.     Defendant David A. Jones ("Jones") served as a director of Abbott from 1982 until 2003, serving on the Board's Public Policy Committee from 1999 until 2002. Jones is a Citizen of Kentucky.

32.     Defendant The Rt. Hon. Lord David Owen CH ("Owen") served as a director of the Company from 1996 until 2011. Owen is a citizen of the United Kingdom.

33.     Defendant Robert L. Parkinson, Jr. ("Parkinson") is the former President and COO of Abbott, having served in these capacities from 1999 to 2001. Parkinson served as a director of the Company from 1998 until 2001. Parkinson currently serves as the Chairman and CEO of Baxter International, Inc. and as a director of Northwestern Memorial HealthCare. Parkinson is a citizen of Illinois.

34.     Defendant Boone Powell, Jr. ("Powell") served as a director of the Company from 1985 to 2009. Powell served on the Board's Public Policy Committee from 2004 until 2009. Powell is a citizen of Texas.

35.     Defendant Addison Barry Rand ("Rand") served as director of the Company from 1992 to 2006. Rand is a citizen of Connecticut.

36.     Defendant W. Ann Reynolds, Ph.D. ("Reynolds") served as a director of the Company from 1980 until 2010, having chaired the Board's Public Policy Committee from 2003 to 2010. Reynolds is a citizen of Florida.

37.     Defendant Roy S. Roberts ("Roberts") served as a director of the Company from 1998 until 2011. Roberts served on the Board's Public Policy Committee since 2000, chairing the Committee in 2010. Roberts is a citizen of Michigan.

38.     Defendant William D. Smithburg ("Smithburg") served as a director of the Company from 1982 until 2011. Smithburg chaired the Board's Public Policy Committee from

1999 until 2002. Smithburg also served as a director of Northern Trust Corporation and its subsidiary, Northern Trust Company, from 1981 until 2011. Smithburg is a citizen of Illinois.

39.     Defendant John R. Walter ("Walter") served as a director of the Company from 1990 until 2006, having served on the Board's Public Policy Committee from 2001 to 2005. Upon information and belief, Walter is a citizen of Florida.

40.     Defendant William L. Weiss ("Weiss") served as a director of the Company from 1984 until 2000. Weiss is a citizen of Florida.

41.     Defendants White, Burnham, Leiden, Dempsey, Gonzalez, Fuller, Austin, Farrell, Scott, Tilton, Osborn, Alpern, Austen, Greenberg, Hodgson, Jones, Owen, Parkinson, Powell, Rand, Reynolds, Roberts, Smithburg, Walter, and Weiss are collectively referred to herein as the "Individual Defendants."

## DUTIES AND RESPONSIBILITIES OF THE INDIVIDUAL DEFENDANTS

42.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

43.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the Company. Of paramount importance to a global pharmaceutical company such as Abbott are the Individual Defendants' obligations to ensure that the Company is operated in an honest and prudent manner, complying with all applicable federal and state laws, rules, regulations, and requirements. In short, it is their duty to ensure that the Company is operated in a lawful manner.

44.     As disclosed in the Company's most recent annual filing with the SEC: **"Abbott is subject to numerous governmental regulations and it can be costly to comply with these regulations and to develop compliant products and processes."** (emphasis in original.) Abbott's products are subject to rigorous regulation by the FDA, and numerous international, supranational, federal, and state authorities, including significant regulation over Abbott's advertising, sales, and marketing practices. Because significant portions of the Company's revenues are generated from transactions involving government entities, such as Medicaid and Medicare, Abbott also is subject to heavy regulation "pertaining to government benefit program reimbursement, price reporting and regulation, and health care fraud and abuse, including anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices." Abbott Laboratories, Inc., February 18, 2011, Form 10K SEC filing, at p. 10.

45.     The Company's regulatory compliance is not simply a matter of ethical business practices, but is required to prevent significant financial harm to the Company. Federal and state governments ensure compliance with their laws and regulations through the imposition of "criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs." *Id.* As demonstrated by the

substantial penalties levied on Abbott for its unlawful Depakote marketing practices, "violations of these laws, or allegations of such violations, [] disrupt Abbott's business and result in [] material adverse effect[s] on Abbott's revenues, profitability, and financial condition." *Id.*

46.     The Company portrays itself as a conscientious and compliant member of the pharmaceutical community by publicly touting its numerous policies and internal controls designed to provide the Board and executive officers with the means to stay apprised of, and address, regulatory compliance issues.

47.     The Company maintains a lengthy Code of Conduct (the "Code"), which addresses a gamut of legal and regulatory compliance policies and procedures to which each Abbott employee, officer, and agent is subject.  The Code sets forth several "Principles," many of which have been blatantly violated in connection with the Company's sale and marketing of Depakote.  For example, "Principle 1: Fair Dealing" requires honest and ethical dealing with Abbott's customers, and mandates that Abbott employees and officers "must not take unfair advantage of anyone through manipulation, concealment [or] misrepresentation of material facts."   "Principle 2: Avoiding Conflicts of Interest" enumerates several examples of inappropriate conflicts of interest and provides that Abbott employees and officers will not provide any inappropriate gifts or kickbacks to customers in violation of the Company's Meals, Gifts and Entertainment policy.  That policy, contained in Principle 4, provides that Abbott employees, officers, and agents "will not seek, accept, offer, promise, or give (directly or indirectly) anything of value—including payments, fees, loans, services, entertainment, favors, or gifts—from or to any person or firm as a condition or result of doing business with Abbott." Principle 5 of the Code deals with the "Accuracy and Integrity of Books, Records and Accounts"

and prohibits transactions and arrangements "structured to circumvent Abbott's internal control system" and the use of "false or artificial entries [] made for any purpose."

48. The Code further dedicates seven pages to Principle 8, "Compliance with Laws," providing in pertinent part:

> We are required to familiarize ourselves with all the laws, rules and regulations that apply in the areas within the scope of our work responsibilities, including, as applicable, the following areas. Contact the Legal Division for advice in any area where you have questions.
>
> **Food and Drug Laws**
> We must comply with all applicable laws, rules, regulations, consent decrees and other orders of the United States Food and Drug Administration and any other similar governmental authorities in other countries where Abbott does business governing research, development, manufacture, distribution and promotion of foods, drugs, medical devices, diagnostic products, nutritional products or biological products.
>
> * * *
>
> **Laws Relating to Government Health Care Programs**
> We must comply with the laws relating to government health care programs in each country where Abbott does business. In the United States, its territories and possessions, and Puerto Rico, many Abbott products are reimbursed or purchased by Federal Health Care Programs – programs that include Medicare, Medicaid, Department of Defense and Department of Veterans Affairs health care programs, and many other Federal or Federally-funded programs that pay for health care items and services. These programs are regulated through a variety of laws affecting the coverage and reimbursement of Abbott products, as well as the sale and marketing of those products. Abbott is committed to full compliance with all Federal Health Care Program requirements, including the following:
>
> **Federal Anti-kickback Statute**
> The laws that regulate these programs include the Federal anti-kickback statute, which applies both to our sales and marketing activities and to a broad range of other activities, including grants, research contracts, and consulting agreements. It generally prohibits offering or paying (or soliciting or receiving) cash or other benefits to induce the purchase, order, or recommendation of products eligible for payment by a Federal Health Care Program.
>
> . . . To ensure Abbott's compliance with the antikickback statute, we must carefully evaluate and properly structure any arrangements with parties in a position to prescribe, purchase or recommend Government-reimbursed products (for example, physicians, hospitals, nursing facilities, HMOs, PBMs, GPOs, or

pharmacies), and must always avoid any arrangements that could inappropriately influence treatment or purchasing decisions.

**False Claims Laws**
The civil False Claims Act and other statutes prohibit knowingly or recklessly submitting false claims to the Government, or causing others to submit false claims. . . . Abbott contracts with Government customers and must avoid submitting any claims for payments not properly due. While Abbott does not itself submit claims to insurance programs like Medicare and Medicaid, many of our customers do. We must avoid any conduct that could lead customers to submit false claims by following procedures carefully designed to ensure that any information we provide to customers about Medicare or Medicaid reimbursement for our products is accurate and otherwise proper.

**Civil Monetary Penalties Law**
This law authorizes the imposition of civil monetary penalties for a variety of conduct. . . .

Failure to adhere to Federal Health Care Program requirements, or to related Abbott standards, policies and procedures, can have a number of serious consequences, both for Abbott and for the individuals involved. The violation of legal requirements governing Federal Health Care Programs can potentially result in civil suits or criminal prosecutions under a number of Federal and State statutes. Any violation of these laws can subject both Abbott and individuals to administrative, civil, or even criminal fines and penalties. . . .

49.     The Code further contains certain reporting and investigation programs designed to keep the executive officers and Board informed as to any significant violations of the Code and other legal and regulatory compliance risks to the Company.

50.     Abbott maintains an Office of Ethics and Compliance ("OEC"). The Vice President and Chief Ethics and Compliance Officer ("CECO") manages the OEC and is responsible for development and enhancement of the Company's compliance program. The Company has maintained a CECO since at least 2000. According to the Company's website, the CECO "makes regular reports regarding compliance matters to the Chairman of the Board and the Chief Executive Officer, senior level leadership and Abbott's Board of Directors and committees." Thus, since at least 2000, the Board has been made aware of significant compliance issues, in part, through its meetings with the CECO and its access to the OEC.

51.     In addition, since at least 2003, the Company has maintained a Business Conduct Committee ("BCC") consisting of senior-level leadership and chaired by the CECO.  The BCC, which the Company established to assist in the implementation of Abbott's compliance program, reports directly to defendant White.  The BCC holds periodic meetings to discuss compliance issues, including the legal and regulatory environment, risk areas, best practices, and modifications to the compliance program.

52.     While the full Board maintains oversight responsibility with respect to legal and regulatory compliance, the Board delegates certain responsibilities in this regard to its Public Policy Committee, which has been in existence since at least 1999.  Defendants Austin, Smithburg, Jones, Leiden, Reynolds, Roberts, Walter, and Powell all served on the Public Policy Committee during portions of the period of wrongdoing at issue here.  The Public Policy Committee Charter provides:

> 1. *Purpose*. The Public Policy Committee of the Board of Directors shall assist the Board in fulfilling its oversight responsibility with respect to: public policy, regulatory (including regulation by the Federal Food and Drug Administration, as well as other domestic, foreign and international regulatory bodies) and government affairs and healthcare compliance issues that affect Abbott . . . by discharging the responsibilities set forth below.
>
> * * *
>
> 3. *Authority and Responsibilities*. To assist it in the conduct of its responsibilities, the Public Policy Committee shall consult with management and, to the extent it deems it necessary or appropriate, may seek advice and assistance from Abbott employees or others, and may retain legal counsel and other advisors. The Public Policy Committee shall report to the Board on a regular basis. . . .
>
> The Committee shall:
>
> * Review and evaluate Abbott's policies and practices with respect to maintaining legal, regulatory and healthcare compliance (recognizing that other board committees assist the Board of Directors in reviewing certain areas of legal and regulatory compliance), and review them with the Board as appropriate.

- Devise a process for the dissemination of information to the Committee from management with respect to regulatory and healthcare compliance matters, including, as appropriate, presentations to the Committee from management concerning the state of regulatory compliance and all issues with respect thereto.

- The Chief Ethics and Compliance Officer shall report to the Public Policy Committee on an as needed basis on any significant compliance issues. . . .

53.     These policies, procedures, and mechanisms are specifically designed to keep the Company's senior executive officers and directors fully aware of all significant legal and regulatory compliance risks, issues, or concerns, whether raised to their attention internally or externally. Thus, since at least 1999, if not earlier, the Board has had tools at hand to discover and eliminate legal and regulatory non-compliance whenever it arises.

54.     The ultimate responsibility for ensuring the Company's legal and regulatory compliance, and managing the risks associated therewith, lies with the Board and the Company's executive officers, who must satisfy this responsibility in accordance with their fiduciary obligations to the Company. As demonstrated by the wide-spread institutional malfeasance concerning the Company's sales and marketing of Depakote from 1998 to 2008, the Company's directors and top officers completely failed to do so. Instead, they deliberately caused and/or knowingly allowed the Company to actively violate federal and state law in pursuit of higher sales revenues, profits, and personal gain.

## FACTUAL ALLEGATIONS

55.     The Abbott pharmaceutical product known as "Depakote" is a form of valproate, a drug which has been used since the 1960s to treat epilepsy and bipolar disorder.

56.     Divalproex sodium delayed release tablets, marketed by Abbott as "Depakote DR," first received FDA approval in 1983 for use in treating complex partial seizures in adults and children (age 10 and over) and simple and complex absence seizures in adults. In or around

May 1995, the FDA approved Depakote DR for the treatment of manic episodes associated with bipolar disorder, referred to as "bipolar mania." In 1996, the FDA likewise approved Depakote DR to prevent migraine headaches in adults.

57. In 1989, Abbott received FDA approval to market Depakote Sprinklet Tablets ("Depakote Sprinklets"), another formulation of Depakote, for the treatment of simple and complex absence seizures.

58. In 2000, Abbott received approval for an extended release tablet form of Depakote, marketed as "Depakote ER," for use to treat prophylaxis of migraine headaches in adults. In 2002, the FDA further approved Depakote ER as a treatment for complex partial seizures in adults and simple and complex absence seizures in adults. In 2005, Depakote ER also received approval as a treatment for acute manic or mixed episodes associated with bi-polar disorder (with or without psychotic features).

59. Depacon is yet another formulation of valproate sodium, which can be delivered intravenously. The Company introduced and received FDA approval for Depacon in 1996 as an alternative for patients for whom oral administration of valproate products is temporarily unfeasible. Depacon's only approved uses are for the treatment for complex partial seizures and simple and complex absence seizures.

60. Depakote, in any of the foregoing formulations, is an extremely powerful drug, which can cause serious and deadly side effects, even when properly prescribed and administered. Accordingly, since 2000, the drug has carried "black box" warnings to notify consumers of the health risks posed by the drug. The serious health risks caused by Depakote include: (1) increased risk of suicidal thoughts or actions; (2) fatal liver failure (with an increased risk for children under the age of two, patients taking multiple anticonvulsant

medications, patients with congenital metabolic disorders, patients with severe seizure disorders and mental retardation, and patients with organic brain disease); (3) life-threatening cases of pancreatitis; and (4) birth defects, such as spina bifida, if used during pregnancy.

61.     Depakote also has side effects that present particular issues for elderly patients, who are more susceptible to serious physical injury from falls, such as general weakness, lethargy, nausea, and somnolence (defined as a condition of semi-consciousness approaching coma). The drug also causes appetite loss, changes in mental state, stomach pain, and vomiting in some patients. Some studies have further linked the drug to increased risk of polycystic ovary syndrome ("PCOS") in teenage girls with epilepsy, as compared to other anti-epileptic medications.

62.     Despite these serious side effects and health risks, the *qui tam* actions that ultimately led to the Company's $1.3 billion settlement with the government show that from at least 1998 through 2008, the Company engaged in a large-scale, illegal sales and marketing campaign to promote off-label sales of Depakote in its various formulations. This campaign included: (1) the maintenance of a special sales and marketing division responsible for marketing Depakote to geriatric care providers; (2) the payment of illegal kickbacks to medical care providers to boost Depakote prescriptions; and (3) the dissemination of false and/or misleading information to physicians concerning the product's safety and efficacy.

### Abbott Creates a Sales Division Specially Designed to Target Geriatric Care Providers to Boost Depakote's Off-Label Sales

63.     In or around 1998, Abbott created a special sales division, initially called the Long Term Care ("LTC") division, whose primary purpose was to market Depakote to the rapidly expanding geriatric care market – *i.e.*, long term care facilities, skilled nursing homes, and assisted living institutions. Meredith McCoyd, the relator in the lead *qui tam* action, worked

as a sales representative in this division from 1998 to 2007, and thus has direct knowledge of "Abbott's concerted and repeated efforts to market Depakote for off-label purposes." A copy of Ms. McCoyd's Amended Complaint is attached hereto as Exhibit A.

64. The LTC division grew from approximately 30 sales representatives in 1998 to approximately 180 as of June 2007. Until 2004, the LTC division was one of four divisions responsible for marketing Depakote. Around that time, the LTC division was merged with other sales divisions to form the Specialty Accounts ("SA") division. According to Ms. McCoyd, the highest levels of Company management designed and approved this reorganization in an effort to avoid the government's detection of Abbott's extensive off-label marketing campaign conducted by the LTC division.

65. Abbott LTC/SA sales representatives, like Ms. McCoyd, received specific training on marketing Depakote as an alternative to anti-psychotic medications used as off-label chemical restraints for elderly patients exhibiting agitation associated with dementia and Alzheimer's. According to Ms. McCoyd, LTC/SA representatives used a system called "Working the Wheel," through which the Company directed them to target physicians, geriatric psychiatrists, long term care facilities, and pharmacies likely to prescribe the drug to treat behavioral issues associated with dementia and Alzheimer's.

66. Ms. McCoyd also admitted to participating in off-site training sessions for LTC/SA sales representatives "focused on maximizing Depakote sales through off-label promotion." Abbott paid third-party consultants, such as PharmaCare Strategies, Inc., to conduct these training sessions. According to Ms. McCoyd, Abbott spent $2,000 per sales representative for each such training session.

67.    Abbott also conducted some off-label training in-house by having LTC/SA sales representatives who had proven their ability to drive off-label sales of Depakote conduct training for other LTC/SA sales representatives.  Ms. McCoyd admits to having been selected to conduct such training.  She states that her supervisors explicitly forbade her from preparing any written materials on the topics she covered to prevent any paper trail of the off-label marketing instruction.

68.    LTC/SA sales representatives also participated in "role plays" designed to improve their interactions with physicians.  During these role plays, LTC/SA staff were taught how to promote off-label uses of Depakote despite objections by physicians.

69.    LTC/SA sales representatives also were told to promote Depakote as a safer alternative to certain anti-psychotic medications without any scientific or reliable data to support such claims.

70.    Abbott developed marketing materials for Depakote that Abbott sales representatives used to promote off-label prescription of the product.  The marketing material focused on the symptoms of bipolar mania and served as a starting point for discussion of Depakote's off-label efficacy for treating agitation in patients with dementia and Alzheimer's, disease conditions which shared some of the same symptomatology as bipolar mania.

71.    LTC/SA sales representatives also were taught to educate physicians and long term care providers on circumventing the Federal Omnibus Budget Reconciliation Act of 1987 ("OBRA") by making fictitious diagnoses and prescribing Depakote rather than anti-psychotic drugs explicitly subject to strict use requirements under OBRA.

72.    Signed into effect in 1987, OBRA, also known as the "Federal Nursing Home Reform Act," provides a minimum set of standards of care and rights for people living in

certified nursing facilities. Among its many industry-changing provisions, OBRA mandated that every patient in a facility covered by OBRA had the right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for the purposes of discipline or convenience and not required to treat medical symptoms. Restraints, whether physical or chemical, are allowed under OBRA: (1) only to ensure the physical safety of the resident or other residents; and (2) only upon the written order of a physician that specifies the duration and circumstances under which the restraint may be used. As long term care facilities often used psychopharmacologic or anti-psychotic drugs such as Risperdal, Seroquel, Geodon, Abilfy, and Zyprexa to sedate elderly patients demonstrating "behavioral" issues, OBRA specifically regulated the use of such drugs in covered facilities. Accordingly, OBRA permits the use of these types of drugs only on the orders of a physician and as part of a drug plan designed to eliminate or modify the symptoms for which drugs are prescribed. Also, at least annually, an independent external consultant must review the appropriateness of the drug plan of each resident receiving such drugs.

73. Because Depakote is not an anti-psychotic or psychopharmacologic drug, but still has mood altering and sedative effects, Abbott instructed LTC/SA sales representatives to pitch Depakote to geriatric care providers as an alternative to medications explicitly subject to OBRA's coverage.

74. Abbott even purchased data that tracked prescription volume and diagnoses by health care providers across the country, detailing the prescriptions of anti-psychotic and psychopharmacologic drugs with which Depakote might compete. Abbott also purchased data detailing the prescription practices of health care providers specifically serving geriatric patient

populations. This data enabled Abbott sales representatives to target prescribers who were most likely to prescribe Depakote for off-label uses.

75.     By marketing Depakote for off-label use as a treatment for agitations associated with dementia and Alzheimer's, Abbott knowingly aided and abetted nursing home operators seeking to circumvent OBRA's express regulations and intended purpose.

76.     In or around September 2006, the Center for Medicare and Medicaid Services ("CMS") provided guidance on OBRA's restrictions on "unnecessary drugs," which implied that drugs like Depakote, when used to treat agitation associated with dementia or Alzheimer's, also would fall under certain OBRA regulations. According to Ms. McCoyd, in February 2007, Abbott held a nationwide conference call for its entire LTC/SA sales force, Depakote marketing staff, and upper level managers to discuss CMS's guidance. During that call, sales representatives were instructed to approach physicians regarding the CMS's guidance and to inform them that the regulation would not apply if their patients were coded as having bipolar conditions or seizure conditions. In other words, Abbott told its LTC/SA sales representatives to instruct physicians on how to miscode their elderly patients – many of whom received state or federal funding to pay their medical expenses – with fictitious diagnoses to manufacture a medical need for the drug that complied with its approved on-label uses.

77.     Such actions violate numerous federal and state laws that are intended to prevent the submission of false claims for payment to the government and plainly violate the Code, which explicitly states that Abbott employees "must avoid any conduct that could lead customers to submit false claims."

78.     In an effort to conceal the elaborate off-label marketing campaign, Abbott forbade its LTC/SA sales representatives from entering their call notes – *i.e.*, substantive descriptions of

their contacts with health care providers – into the Company's electronic repository for such notes. Rather, according to Ms. McCoyd, LTC/SA sales representatives were required to keep their call notes in paper form, transmitted to their supervisors by facsimile.

79. Abbott further attempted to conceal the off-label marketing activities of the LTC/SA sales team by manipulating the Company-wide computer system, called "MAX", to prevent the LTC/SA sales representatives from recording that their visits with geriatric care providers served any purpose other than to discuss on-label uses of the drug. Thus, any electronic record of a physician visit made by an LTC/SA sales representative would reflect only that the representative met with a particular physician to discuss Depakote's ability to treat epilepsy, migraines, or bipolar disorder, regardless of whatever Depakote uses the sales representative actually discussed with the care provider.

80. These actions clearly violate the Principle 5 of the Code, which prohibits transactions and arrangements "structured to circumvent Abbott's internal control system" and the use of "false or artificial entries [] made for any purpose."

81. According to Ms. McCoyd, following the re-organization of the various sales divisions for Depakote, LTC/SA sales representatives also were directed to, and received training to, promote Depakote for other off-label uses, including: (1) the treatment of bipolar depression in adults and children and the treatment of bipolar mania in children, even though the FDA only approved Depakote to treat bipolar mania in adults; (2) the treatment of ADHD, developmental delay, psychiatric disorders, and/or behavioral problems for children; (3) symptoms associated with narcotic drug withdrawal and addiction; and (4) psychosis.

82. The scope of the Company's efforts to promote the off-label use of Depakote to treat behavioral issues associated with dementia and Alzheimer's through the LTC/SA division,

and the demonstrable success of the program in driving off-label sales, shows that this off-label marketing campaign did not result from the actions of a small group of rogue employees. Rather, the creation of an entire sales division dedicated to targeting geriatric care providers, the expenditure of millions of dollars in training programs and marketing materials for that division, and the blatant manipulation of the Company's electronic records reflect a centrally-organized, institutional dedication to promote off-label uses of Depakote by geriatric care providers and long term care facilities, in violation of state and federal law and the Company's own Code of ethics and business conduct. In violation of their fiduciary obligations, the Individual Defendants knowingly caused and/or allowed these unlawful targeted marketing efforts to be implemented and to continue operating for years.

### The Individual Defendants Knowingly Caused and/or Allowed the Company to Pay Illegal Kickbacks to Physicians to Drive Depakote Sales

83. According to former Abbott insiders, Abbott furthered its off-label marketing campaign for Depakote through the payment of illegal bribes and kickbacks to medical professionals. Abbott routinely provided improper consulting fees, honoraria, speaker fees, gifts, grants, and research funding to physicians willing to promote Abbott's efficacy for various on-label and off-label uses, at times using the services of third-party intermediaries to funnel the illegal payments. These illegal payments violate Abbott's internal policies, as well as federal and state laws prohibiting unlawful kickbacks to physicians.

84. According to a *qui tam* action filed by Tamara Dietzler, a former Neuroscience Sales Representative ("NSR") working in Abbott's Neuroscience Division, Abbott routinely paid certain physicians whom Abbott believed were able to influence their peers to prescribe Depakote for on-label and off-label uses (known as "key opinion leaders") "consulting fees," which in reality served as "remuneration used for the marketing purpose of inducing and

rewarding recommendations of and prescriptions for Depakote." Abbott paid key opinion leaders and other favored health care providers fees ranging from $750 to $2,500 to attend all-expense paid meetings at high-end locations. Attendees at these meetings received education on topics that focused on Abbott's key on- and off-label marketing messages. A copy of Ms. Dietzler's Complaint is attached hereto as Exhibit B.

85.     Abbott similarly paid key opinion leaders, advisors, and "consultants" honoraria ranging from $750 to $10,000 to speak at national and regional meetings, where these individuals delivered Abbott's marketing messages to other health care providers. These speaker programs were organized primarily by sales representatives, who were expected to spend portions of their marketing and sales budgets to arrange speaker programs in which favored prescribers marketed Depakote to other physicians in their fields. These honoraria were intended to boost sales of Depakote by the attendees and to reward loyal prescribers for their continued use of Depakote to treat their patients.

86.     Similar to honoraria, "unrestricted education grants" ("UEGs") presented an effective way of rewarding care providers who demonstrated a willingness to promote Depakote's on-label and off-label uses to other physicians. Abbott used the UEGs to reward national key opinion leaders and other high prescribing physicians under the guise of research grants. The recipients, in turn, then gave presentations or wrote articles that inevitably promoted Depakote's on- and off-label uses. In addition, Abbott arranged UEGs for care providers to conduct continuing medical education programs ("CMEs") and prepare CME materials on topics pre-selected by Abbott employees. These CME programs and materials also promoted Depakote's on- and off-label uses consistent with the Company's marketing message. Abbott's

sales representatives then offered the CME programs and materials to physicians as another form of illegal kickback.

87.     To give these UEG payment arrangements the appearance of propriety, Abbott used third-party intermediaries, such as ABcomm, Inc. to funnel the UEG funds to physicians. However, Abbott selected the physicians who received UEG funds and dictated the subject matter of the physicians' presentations and/or research. Relator Dietzler notes that Abbott went so far as to provide a UEG to a physician simply to lend her name to a research article that Abbott "primarily prepared" on the benefits of Depakote ER over generic formulations.

88.     At least until Depakote's loss of patent protection as an epilepsy treatment in July 2008, Abbott likewise provided "scholarships" to physicians to attend education programs on epilepsy sponsored by Abbott. Sales representatives awarded these scholarships to their favored and best customers to incentivize and reward the physicians' prescriptions of Depakote.

89.     Ms. Dietzler also confirmed her participation in several "telephone conferences" in which favored prescribers were paid fees for "educating" Abbott sales representatives on uses for Depakote. These conferences, which were purportedly intended to benefit the Abbott sales team, also reinforced Abbott's key marketing messages for the presenters and provided the physicians with a fee for their participation in the telephone conference. Speakers received approximately $500 for their participation in these conference calls.

90.     All of the foregoing activities constitute illegal kickbacks under the Federal Anti-kickback statute and many of its state counterparts. Abbott provided these speaker fees, educational grants, and free gifts as an incentive and reward for the physician's continued utilization of Depakote, with the added benefit of having these care providers market Depakote's on-label and off-label uses to other medical professionals.

91.     These actions also had the effect of generating false claims for payment by government programs. Many of the medical providers who received these illegal kickbacks and correspondingly increased their prescription of Depakote because of the payments sought reimbursement from programs such as Medicare and Medicaid. According to Ms. Dietzler, she noticed demonstrable increases in Depakote prescriptions by providers primarily treating government-pay patients *after* they received illegal kickbacks in the forms described above.

92.     Considering the number of national and regional programs that the Abbott sales team was expected to conduct, this system of illegal kickbacks cost the Company millions of dollars paid either directly or indirectly to favored prescribers and key opinion leaders from 1998 to 2008. Such expenditures clearly could not have resulted absent a centralized, top-down directive to promote Depakote sales through unlawful means.

## Abbott Misrepresented Information Concerning Depakote's Safety and Efficacy to Boost Sales

93.     The relators in the *qui tam* actions similarly admitted to being instructed to provide false and/or misleading data in an effort to promote Depakote sales.

94.     According to Ms. McCoyd, Abbott instructed its sales representatives to mislead physicians concerning Depakote's effect on cholesterol, primarily relying on CME materials that Abbott paid to have produced. Abbott initially represented that Depakote lowered cholesterol based on some limited data demonstrating that effect. However, Depakote lowered levels of both "good" (HDL) and "bad" (LDL) cholesterol. In response to questions by care providers, Abbott instructed its LTC/SA sales representatives to state that Depakote was "metabolically neutral," in contradiction to its earlier claims. To support this new position, Abbott sales representatives were told to rely on CME materials generated at Abbott's request to demonstrate Depakote's "metabolically neutral" effect.

95.     Abbott further misrepresented the efficacy of Depakote ER as a replacement for Depakote DR. According to Ms. Dietzler, Abbott expected that Depakote ER, which contains the same active ingredient as Depakote DR, would retain its patent protection for longer than the delayed release formulation of the drug. Also, due to rebates offered on Depakote DR to government programs, Depakote ER was more expensive and hence more profitable than Depakote DR. Accordingly, it was important for Abbott to build brand loyalty amongst prescribers to the extended release formulation of the drug.

96.     In an effort to have physicians switch from Depakote DR to Depakote ER, Abbott instructed its sales representatives to market the new formulation as being "cheaper and better" than Depakote DR. Neither assertion, however, was true.

97.     Because Depakote DR and Depakote ER are not "bioequivalent," it takes more Depakote ER to produce the same effect as a smaller amount of Depakote DR. However, Depakote ER was not available in dosages that would provide exact bioequivalence between the two products. For example, Depakote ER was only available in 500mg and 250mg pills. Accordingly, a physician would need to prescribe more than one 500mg pill of Depakote ER to provide the same effect as one 500mg pill of Depakote DR. As a result, despite the fact that Depakote ER has a lower list price than Depakote DR, it cost more to switch a patient to a "bioequivalent" amount of Depakote ER because more of the medication is needed.

98.     In addition, because of the rebates offered to Medicaid on Depakote DR, Depakote ER was not less expensive to the government than Depakote DR.

99.     Abbott sales representatives were instructed to pitch transitions to Depakote ER on a one-to-one basis with Depakote DR. Once a physician made that switch, Abbott expected

that in time the physician would "updose" their prescriptions to achieve the same results they achieved with Depakote DR.

100. With regard to the pills' efficacy, Abbott sales representatives were instructed to pitch Depakote ER as a better product because it was "better tolerated" than the delayed release formulation. Abbott sales representatives were trained to inform physicians that Depakote ER would cause fewer and less severe side effects than Depakote DR. Abbott, however, lacked any clinical data backing such an assertion. Indeed, according to Relator Dietzler, the Company's own documents demonstrated that the assertion was simply false. Nevertheless, through CMEs paid for by Abbott, the Company created a litany of questionable clinical "authorities" for sales representatives to cite to physicians concerning Depakote ER's increased efficacy and tolerability.

101. These false assertions boosted sales of Depakote, often at the expense of the government, in violation of the False Claims Act and its state counterparts.

### The Company's Compensation Practices
### Incentivized Off-Label Marketing at All Levels

102. The Individual Defendants knowingly established and maintained compensation practices that incentivized and rewarded off-label marketing of Depakote at all levels of the Company.

103. According to the relators in the *qui tam* actions, Abbott encouraged off-label marketing of Depakote through compensation packages that either directly or indirectly rewarded sales representatives for their success in driving off-label sales of Depakote. For example, Relator McCoyd explained that she received bonuses based on the weight of Depakote (as measured in kilograms) prescribed at the facilities within her territory. As Ms. McCoyd was an LTC/SA sales representative who marketed the drug primarily for off-label purposes to

geriatric care providers, this compensation structure clearly rewarded and incentivized her off-label marketing practices. Relator Dietzler noted that NSRs similarly were rewarded for the success of their off-label marketing activities.

104.     Both McCoyd and Dietzler confirmed that the Company used metrics such as "quotas" to trigger certain incentive-based bonuses. Upon information and belief, these quotas did not reflect Depakote's on-label market share within the sales representatives' territories, but instead were focused on raw increases in Depakote prescriptions within each sales representative's geographic territory.

105.     Abbott likewise used sales contests, called "Special Performance Incentives for Field Forces" that provided money, trips, and other prizes for achievement of specifically defined goals in Depakote sales. These incentive awards were not based on Depakote's on-label limitations.

106.     Abbott sales representatives also received extra compensation for demonstrating their ability to promote Depakote's off-label use during mock role plays with their managers. These role plays then served as a teaching tool for other sales representatives to model their off-label sales pitch.

107.     At the executive level, the Individual Defendants maintained compensation practices that rewarded executives based, in part, on Depakote's off-label success, since the Board tied executive compensation almost exclusively to financial performance metrics. This focus on raw financial data created an even greater risk that executives would cause or otherwise allow off-label marketing practices.

108.     According to the Company's annual proxy filings, since at least 1999, the Compensation Committee, on which defendants Fuller, Farrell, and Osborn currently serve, has

placed great emphasis on performance-related compensation programs based on the achievement of the corporation's financial goals and bottom-line financial metrics such as earnings per share.

109.    As a result, the compensation of the Company's executive officers named as Individual Defendants here rose in direct relation to increases in net Depakote sales.  For example, from 2000 to 2007, CEO White's total annual compensation increased from approximately $3.71 million to $33.3 million.  Meanwhile, Depakote sales rose over that same time period from $776 million to $1.5 billion.  Since 2007, the last full year in which Depakote had patent protection, White's compensation has not surpassed his 2007 compensation awards, just as Depakote sales have not surpassed their 2007 levels.

110.    Similarly, during his tenure as President and COO of Abbott's Pharmaceutical Products Division, Leiden saw his compensation rise from $1.59 million in 2000 to $4.74 million in 2005, his last full year of employment as President and COO of the Pharmaceuticals Product Division.

111.    Defendant Dempsey received $5.47 million and $7.76 million in 2006 and 2007, respectively, while working as Abbott's Executive Vice President of the Pharmaceutical Products Division.  Prior to that time, Dempsey watched his compensation rise from $1.28 million to $1.98 million in the three years he served as Vice President of Pharmaceutical Operations for Abbott's U.S. operations from 2003 to 2005.

112.    In addition, because each of these executive's compensation packages relied heavily on stock options and awards, each had an incentive to raise and maintain the Company's stock price, regardless of whether that stock price was supported by the illegal conduct described herein.

113.    The Company's compensation policies and practices from 1998 to 2008 created unnecessary risks of legal and regulatory non-compliance and, indeed, were established and maintained by the Individual Defendants to promote increases in sales of the Company's products, such as Depakote, regardless of the products' on-label market limitations. The Board made executive compensation awards in knowing disregard for the risks their performance-based compensation structure created for legal and regulatory non-compliance. Defendants White, Leiden, and Dempsey – all of whom were directly involved in the oversight of the Company's Pharmaceutical Products Division during the period of wrongdoing – likewise established and maintained compensation policies for employees engaged in the sale and marketing of Depakote that similarly encouraged its off-label promotion.

114.    Defendants White, Leiden, and Dempsey personally benefited from the success of Abbott's off-label marketing practices, having been unjustly enriched through staggering increases in annual compensation driven in part by Depakote's off-label success.

**The Individual Defendants Were Fully Aware of the Off-Label Marketing Practices**

115.    Each of the Individual Defendants was fully knowledgeable of the Company's unlawful behavior.

116.    Since at least 1999, the Company has maintained reporting and investigation programs designed to keep the Board apprised of all compliance risks posed by the Company's marketing and sales efforts. Through the efforts of the OEC and BCC, the Board had access to all pertinent information concerning the illegal activities that ultimately led to the $1.3 billion sanction. Indeed, the CECO, who manages the OEC and sits on the BCC, reports directly to White as Chairman of the Board and makes regular reports to the full Board on the legal and regulatory compliance issues facing the Company. In addition, the Board empowered its Public Policy Committee with the authority and responsibility to identify and address significant issues

concerning legal and regulatory non-compliance with regard to the Company's sales and marketing practices. These internal controls over legal and regulatory compliance provided each of the Individual Defendants with knowledge of the illegal conduct described herein.

117. The Company's Board and executive officers have been aware of potential unlawful marketing practices for Depakote formulations since at least 1998. In a June 26, 1998 Warning Letter (attached hereto as Exhibit C), the Department of Health and Human Services ("DHS") notified former CEO and Board Chairman Burnham that the Company was disseminating false and deceptive promotional materials for its Depacon Injection product in violation of the Food, Drug, and Cosmetic Act. As recognized by the FDA Division of Drug Marketing, Advertising, and Communications ("DDMAC") through its monitoring and surveillance program, these materials promoted Depacon Injections for unapproved use to treat status epilepticus, a life-threatening neurologic disorder, even though the FDA only approved the product to treat certain, less severe seizure conditions. The DDMAC concluded that "the dissemination of these promotional materials raise significant safety issues regarding emergency treatment of a serious medical condition." The Warning Letter further took issue with the clinical studies underlying the promotional materials, stating in pertinent part:

> In disseminating reprints of publications that discuss the use of Depacon in the treatment of status epilepticus, Abbott has promoted an unapproved use of Depacon. Moreover, the reprints disseminated by Abbott do not appear to represent the type of adequate and well-controlled studies that would support a claim that Depacon is safe and effective for the treatment of status epilepticus. . . .

> Abbott has acknowledged that these reprints were provided to some regional managers, district managers, and sales representatives. However, these reprints were subsequently distributed, by Abbott representatives, to healthcare providers including hospital pharmacists.

> DDMAC is very concerned about Abbott's promotion of Depacon for status epilepticus, because it raises significant safety issues for this patient population. Status epilepticus is a neurological emergency that has a significant mortality risk. This emergency condition requires the administration of medications that are both

safe and effective. The goal of treatment is the rapid termination of clinical and electrical seizure activity. In the absence of substantial evidence of safety and effectiveness, Abbott's promotion of Depacon may place a vulnerable patient population at great risk.

118. Since 1997, the Company has received no less than thirteen Warning Letters from the DDMAC regarding improper or unlawful marketing materials that promoted off-label uses of Abbott products, failed to warn of significant health risks of certain drugs, and/or overstated the safety and efficacy of certain medications.

119. As recently as 2009, DDMAC found that the Company was still promoting Depakote formulations with false and misleading marketing materials. In a January 22, 2009 Warning Letter (attached hereto as Exhibit D), the DDMAC notified the Company that its "Depakote ER/Depakote Continuum Care Pharmacy Formulary Flashcard" for Depakote ER and Depakote DR was "misleading because it omits risk information for Depakote and Depakote ER, broadens the indication of Depakote ER, omits indication information for Depakote, and omits material information about Depakote ER." The DDMAC thus concluded that the promotional material "misbranded" the drug in violation of the Food, Drug, and Cosmetic Act. The DDMAC specifically found:

> The Flashcard is misleading because it presents numerous efficacy claims for Depakote and Depakote ER, but fails to include **any** risk information in the body of the Flashcard. . . .

> The Flashcard is misleading because it implies that Depakote ER is indicated for use in a broader range of mania patients than Depakote [DR], when this is not the case. . . .

> The Flashcard is misleading because it omits material contextual information regarding the clinical pharmacology of Depakote ER. . . . [T]he Flashcard misleadingly suggests that Depakote ER use will offer patients some clinical benefit due to "smother blood levels," when this has not been demonstrated.

(emphasis in original.)

120.    Consistent with allegations in the *qui tam* actions, the DDMAC also found that the promotional materials falsely suggested that Depakote ER offers an equal benefit to the same sized dose of Depakote DR, ignoring the lack of bioequivalence between the two formulations. As stated in the January 22, 2009 Warning Letter:

> Furthermore, the Flashcard claims that Depakote ER has "**All of the Benefits of Depakote With the Advantages of Extended Release**" (emphasis in original). This claim is misleading because it omits important contextual information regarding the clinical pharmacology of Depakote ER. Specifically, Depakote ER is not bioequivalent to Depakote [DR] at equally daily doses. Rather, as reflected in the CLINICAL PHARMACOLOGY, Pharmacokinetics section of Depakote ER's [product labeling], Depakote ER is 8-20% less bioavailable when compared to equal daily does [sic] of Depakote [DR]. Therefore, to obtain an equivalent bioavailable dose of Depakote, the Depakote ER dose must be increased by 8-20%. . . . By failing to include this material contextual information, the Flashcard misleadingly suggests that Depakote ER offers all of the benefits of an equal dose of Depakote [DR], when this is not the case.

121.    Developments in the pharmaceutical industry, some of which directly affected Abbott, further indicate the Board's knowledge of deficiencies in the Company's internal controls over legal and regulatory compliance during the period of wrongdoing alleged herein.

122.    For example, in 2001, TAP Pharmaceuticals, Inc. ("TAP"), a joint venture between Abbott and Takeda Chemical Industries ("Takeda"), agreed to pay $875 million in civil and criminal penalties and pled guilty to criminal charges over TAP's marketing practices for its cancer drug Lupron. These marketing practices resulted in significant overpayment by the federal government for TAP's cancer medication. At the sentencing hearing in the matter, the Federal judge presiding over the case enjoined Abbott from making any disparaging comments concerning the settlement, in an effort to further hold Abbott, along with TAP and Takeda, accountable for TAP's illegal sales and marketing practices. As Judge Young explained: "I don't want anyone forgetting about the fact that this company, not under present management, knowingly abused the public trust in a most, and I use my words carefully, despicable way. . . .

Now, how are you going to protect against that? I don't want some PR flak saying that this is all just a big misunderstanding and we don't want to have bleeding with the government over the years, so we pay $900 million."

123.    At a minimum, this hefty criminal penalty on one of the Company's subsidiary ventures put the Board on notice that internal policies and procedures established to prevent or facially discourage unlawful sales and marketing conduct may be ineffective to deter unlawful conduct.

124.    At the same time that Abbott was dealing with government investigations concerning TAP's sales and marketing of Lupron, the Company disclosed that it was undergoing six investigations regarding its marketing and pricing practices for certain unspecified Medicare and Medicaid reimbursable products. As disclosed in the Company's SEC Form 10K filed on February 15, 2001:

> Various state and federal agencies, including the United States Department of Justice and the California, Florida, Illinois, Nevada and Texas Attorneys General, are investigating the marketing and pricing practices of Abbott with respect to certain Medicare and Medicaid reimbursable products. These civil investigations seek to determine whether these practices violated any laws, including the Federal False Claims Act or constituted fraud in connection with the Medicare and/or Medicaid reimbursement paid to third parties.

125.    In addition, in its SEC Form 10K filings in 2005 and 2006, the Company disclosed similar investigations by the Department of Audit Control for the County of Albany, New York and the Attorney General of Idaho, respectively. In 2008, the Company further disclosed another federal investigation concerning Abbott's sales and marketing practices of Micardis, a drug Abbott co-promoted for Boehringer Ingelheim.

126.    As evidenced by the disclosure of these investigations in the Company's SEC filings, for nearly the entire period of wrongdoing alleged herein the Individual Defendants were aware of deficiencies in the Company's internal controls over legal and regulatory compliance

with regard to Abbott's sales and marketing practices, but chose not to take any action to end the Company's unlawful marketing campaign for Depakote.

127.    These investigations resulted, in part, from increased efforts of the federal and state governments to prevent unlawful marketing practices in the pharmaceutical industry. Indeed, many of Abbott's peer companies and competitors, all of which espouse similar commitments to ethical marketing practices and legal and regulatory compliance, paid substantial penalties for unlawful sales and marketing practices during the same time period that the Individual Defendants knowingly allowed the Company to continue to market Depakote for off-label uses.

128.    In October 2004, a division of Pfizer, Inc. agreed to plead guilty to two felony counts and pay $430 million in penalties to resolve criminal and civil charges raised in a 1996 *qui tam* action alleging that Pfizer promoted its anti-epileptic drug Neurontin, a direct competitor to Depakote, for off-label uses, including bipolar disorder, pain, migraine headaches, and drug and alcohol withdrawal.  At the time, this settlement represented the second largest criminal penalty imposed on any pharmaceutical company – second only to TAP's criminal penalties discussed above.

129.    Despite the fact that the world's largest drug company, Pfizer, publicly pled guilty to crimes involving the off-label marketing of a direct competitor to Depakote – which had annual sales approaching $1 billion by that point in time – the Board did not take any action to curb the illegal sales and marketing practices that were rampant at the Company.

130.    In addition to TAP and Pfizer, other pharmaceutical companies have paid substantial fines and penalties for illegal sales and marketing campaigns during the period of wrongdoing alleged in the *qui tam* actions, including, but not limited to:  (a) Schering Plough's

$345.5 settlement in 2004 to resolve claims concerning an illegal kickback scheme through which the company conspired with customers to defraud Medicaid by knowingly charging its customers less for its allergy medicine Claritin than the customers sought in Medicaid reimbursements; (b) Serono Labs' $700 million settlement in 2005 to resolve illegal kickback claims and unlawful marketing claims for its AIDS drug Serostim; (c) Eli Lilly and Co.'s $36 million fine in 2005 for falsely marketing its bone strengthening drug Evista as a treatment for breast cancer; and (d) Intermune, Inc.'s $30 million settlement in 2006 to resolve off-label marketing allegations regarding its lung disease drug Actimmune. Notably, Defendant Hodgson served as a director of Intermune Inc. from 1997 to 2006.

131. In 2007, Purdue Pharma agreed to pay $634.5 million to settle claims regarding its marketing practices for its powerful pain medication OxyContin. The claims alleged, among other things, that Purdue falsely marketed the product as being hard to abuse and less addictive than other pain medications. As Abbott disclosed in its SEC Form 10K filing in 2004, Abbott was named as a defendant in numerous lawsuits involving OxyContin because Abbott promoted the drug to certain specialty physicians under a co-promotion agreement with Purdue.

132. The sales and marketing investigations and settlements described above should have indicated to the Board that they had a duty to *actively* root out and eliminate illegal sales and marketing practices at the Company, rather than relying on internal controls that proved ineffective at other companies in the pharmaceutical industry. The Individual Defendants were aware that the government had begun investigating and prosecuting pharmaceutical companies aggressively for fraud and illegal sales and marketing practices, yet they consciously chose to do nothing to end Abbott's illegal sales and marketing campaign for Depakote.

133.    The size and scope of the illegal marketing campaign for Depakote further demonstrates the Individual Defendants' *knowing* allowance of the illegal sales and marketing practices at issue.  As alleged in the *qui tam* actions, the highest levels of Company management orchestrated and designed this campaign, in which Abbott designated an entire sales force to promote Depakote's off-label uses to long term care providers, used third-party intermediaries to funnel illegal kickbacks to doctors, and provided substantial funds to individual sales representatives to conduct speaker programs and presentations that promoted the off-label uses of the products.  These actions do not result from the independent efforts of one or two mid-level managers who wanted to boost sales within their geographic regions.  Rather, these actions reflect a centralized, top-down initiative to drive Depakote's off-label sales.

134.    As Ms. McCoyd alleged in the *qui tam* action with regard to one specific, though undisclosed, Abbott executive:

> [REDACTED], who took an active role in Abbott's marketing practices, thus personally benefitted from the wrongful conduct alleged in this Amended Complaint.  [REDACTED] knew or should have known that the sales of Depakote exponentially exceeded expectations for the drug's "on-label" uses or intended patient populations.  [REDACTED] massive compensation package was due, at least in part, to his own unlawful conduct, which included, among other things, condoning the establishment and perpetuation of an entire department of the Company whose goal was to off-label and otherwise illegally market Depakote.

135.    Also demonstrating that the illegal marketing campaign originated at the highest level of Company management, is the fact that Abbott only agreed to the $1.3 billion settlement after being forced to turn over years of deleted emails for defendants White, Leiden, and Dempsey pursuant to a government subpoena regarding the Company's off-label marketing practices.  In a March 10, 2010 order, Judge Samuel G. Wilson, the same judge presiding over the consolidated *qui tam* action that led to the $1.3 billion settlement, ordered Abbott to produce White, Leiden, and Dempsey's deleted emails after crediting the government's assertion that it

"ha[d] evidence that the off-label marketing of other FDA approved drugs may have followed a similar pattern to the off-label marketing of Depakote." *See* March 10, 2010 Order, attached hereto as Exhibit E. Notably, the federal government narrowed its original subpoena request, which initially requested the emails of 16 Abbott executives, to focus exclusively on these three individuals – a concession which indicates that the government's undisclosed "evidence" of wrongdoing at Abbott directly implicated White, Leiden, and Dempsey.

136.     Moreover, the existence of Depakote's off-label marketing campaign was readily apparent to the Individual Defendants, who were fully aware that Depakote's annual sales vastly exceeded the drug's market potential for on-label uses.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

137.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and other violations of the law.

138.     Plaintiff is a shareholder of Abbott, was a shareholder of Abbott at the time of the wrongdoings alleged herein, and has been a shareholder of Abbott continuously since that time.

139.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

140.     Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because a majority of the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

141.     As of the date of this complaint, the Board consisted of ten directors: (1) White (Chairman and CEO since 1998); (2) Fuller (director since 1988); (3) Austin (director since 2000); (4) Farrell (director since 2006); (5) Scott (director since 2007); (6) Tilton (director since

2007); (7) Alpern (director since 2008); (8) Osborn (director since 2008); (9) Edward M. Liddy ("Liddy") (director since 2010); and (10) Phebe N. Novakovic ("Novakovic") (director since 2010).

142.    Defendants White, Fuller, Austin, Farrell, Scott, Tilton, Alpern, and Osborn are all incapable of disinterestedly considering a demand to institute this litigation because each is substantially likely to be held liable for breaching their fiduciary obligations by knowingly causing and/or allowing the unlawful conduct at issue here.

143.    As a member of the Board's Public Policy Committee, Austin had an additional duty delegated to her by the Board to actively oversee the Company's legal and regulatory compliance with regard to its sales and marketing activities.  Accordingly, Austin is further likely to be held liable for her fiduciary breach.  Similarly, Austin cannot disinterestedly and independently consider a demand to institute litigation against other former members of the Board's Public Policy Committee, such as Defendants Smithburg, Jones, Leiden, Reynolds, Roberts, Walter, and Powell, many of whom served with Austin on the committee.

144.    White is also incapable of disinterestedly and independently considering a demand to institute this litigation because he personally benefited from the illegal marketing practices through compensation awards based, in part, on Depakote's off-label success.  Further, White earns substantial compensation from his role as Company CEO.  In 2008, 2009, and 2010, White earned $28.25 million, $26.21 million, and $25.56 million, respectively, in total annual compensation.  Accordingly, White cannot disinterestedly or independently consider a demand to institute litigation against Fuller, Farrell, or Osborn, all of whom serve on the Compensation Committee that determines White's annual compensation awards.

145.    Many of the current Board members are incapable of disinterestedly and independently instituting litigation against one another and other Individual Defendants because of their substantial ties to one another separate and apart from their involvement with Abbott. For example, White and Tilton both serve as directors of Northwestern Memorial Hospital in Chicago.    Scott and Parkinson serve on the Board of Northwestern Memorial HealthCare, the corporate parent of Northwestern Memorial Hospital.    White and Tilton also both serve on the Board of Trustees for the Field Museum in Chicago.    White and Osborn have served on at least three boards together, including Abbott, Caterpillar, Inc., and Tribune Company.    Likewise, White and Scott served together on the board of directors of Motorola, Inc. between 2005 and 2007.    Similarly, Farrell has served as a director for UAL Corporation since 2001, working closely with Tilton, who currently serves as the Non-executive Chairman of the UAL's board and previously served as UAL's Chairman, President, and CEO from 2002 to 2010.    Farrell also serves on the board of directors of 3M with non-defendant director Liddy.    Likewise, Liddy, Farrell, and Greenberg spent significant time serving together as directors for Allstate Corporation.    Defendants Farrell and Greenberg still serve on Allstate's board.    Osborn, the former CEO of Northern Trust Company, spent significant time working closely with, and at the discretion of, Defendants Burnham and Smithburg, both of whom served on the Board of Northern Trust with Osborn.

146.    In addition to these interlocking board memberships, many members of the Company's Board are current or former CEOs of large companies.    As such, they are incapable of properly considering a demand to bring suit against a fellow "C-level" executive, such as White.    For example, Fuller is the former CEO of Amoco Corporation.    Osborn is the former CEO of Northern Trust Corporation.    Scott is the former CEO of Corn Products International.

Tilton is the former CEO of UAL Corporation. Austin is the former CEO of Move Networks, Inc. and Farrell is the former CEO of Illinois Tool Works, Inc. Thus, Fuller, Osborn, Scott, Tilton, Austin, and Farrell are incapable of disinterestedly and independently considering a demand to institute litigation against White.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties (Unlawful Conduct)

147.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

148.   As alleged in detail herein, each of the Individual Defendants owed and owes fiduciary duties to Abbott and its shareholders. Pursuant to these duties, each was required to act with the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including the oversight of the Company's compliance with federal laws governing the marketing of Abbott pharmaceuticals. In addition, the Company's own internal governance documents and the Code impose additional duties and specific responsibilities on the Individual Defendants to ensure the Company's legal and regulatory compliance.

149.   The Individual Defendants acted in violation of these fiduciary duties by causing and/or knowingly allowing the Company to engage in the unlawful sales and marketing practices that led to the $1.3 billion settlement of the *qui tam* actions.

150.   As a direct and proximate result of the Individual Defendants' fiduciary breaches, the Company has sustained significant damages.

## COUNT II

### Against Defendants White, Leiden, and Dempsey for Unjust Enrichment

151.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152.    Defendants White, Leiden, and Dempsey were unjustly enriched by their receipt of compensation based in part on the success of the illegal marketing of Depakote.  Accordingly, it would be unconscionable to allow them to retain the benefits of the illegal conduct they caused and/or knowingly permitted.

153.    To remedy this unjust enrichment, the Company is entitled to the disgorgement of any ill-gotten gains that White, Leiden, and Dempsey recognized because of their conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding the Company the amount of damages it sustained as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Ordering defendants White, Leiden, and Dempsey to disgorge to the Company any and all of the compensation they received as a result of the success of the off-label marketing efforts described above;

C.    Granting further appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

D.    Awarding to Plaintiff the costs and disbursements of this Action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby requests a trial by jury.

Dated: November 14, 2011

**LASKY & RIFKIND, LTD.**
Leigh Lasky
Norman Rifkind
Amelia S. Newton
Heidi VonderHeide

/s/ Norman Rifkind
350 N. LaSalle
Suite 1320
Chicago, IL 60610
Tel: (312) 634-0057
Fax: (312) 634-0059

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Eric L. Zagar
Robin M. Winchester
Justin Reliford
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (267) 948-2512

*Counsel for Plaintiff*

**VERIFICATION**

I, Mark J. Rupsis, hereby verify that I have authorized the filing of the attached Verified

Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative

Complaint, and that the facts therein are true and correct to the best of my knowledge,

information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 11/9/11

Mark J. Rupsis, *Chief Administrative Officer*
Chester County Employees' Retirement Fund