# EXHIBIT A

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA (Abingdon)

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JUN 1 5 2010

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, and the States of CALIFORNIA, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO. | Filed Under Seal pursuant to 31 U.S.C. §3730(b)(2) |
| Plaintiffs, *Ex rel.* | JURY TRIAL DEMANDED |
| MEREDITH MCCOYD | AMENDED COMPLAINT |
| Plaintiff-Relator, | 1:07cv00081 |
| v. | |
| ABBOTT LABORATORIES, ▮▮▮▮▮ | |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .......................................................................................... 1

II.  JURISDICTION AND VENUE ....................................................................... 10

III. PARTIES ..................................................................................................... 11

IV.  STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO
     DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS ................................... 14

     A.   FEDERAL GOVERNMENT HEALTH PROGRAMS ............................. 14

     B.   THE FALSE CLAIMS ACT AND THE MEDICARE FRAUD &
          ABUSE/ANTI-KICKBACK STATUTE ............................................... 15

     C.   STARK LAW - THE MEDICARE/MEDICAID SELF-REFERRAL STATUTE ....... 18

     D.   FDCA AND FDA REGULATIONS ................................................... 19

V.   SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS ................. 22

     A.   ABBOTT'S PRESCRIPTION DRUG DEPAKOTE ............................. 22

          1.   Depakote's FDA-Approved Uses and Restrictions ................... 22

          2.   Safety Issues: Depakote's Black Box Warnings ...................... 24

          3.   Depakote's Other Warnings, Precautions and Serious Side
               Effects ................................................................................ 26

          4.   Abbott Marketed Depakote As Means to Circumvent
               Federally Mandated Oversight Required by OBRA and
               Federal Regulations ............................................................ 28

     B.   ILLEGAL MARKETING SCHEMES PERTAINING TO THE OFF-LABEL
          USE OF DEPAKOTE FOR BEHAVIOR DISORDERS RELATED TO
          DEMENTIA AND/OR ALZHEIMER'S DISEASE ............................. 35

          1.   In 1998, Abbott Created An Entire Sales Division To Off-
               label Market Depakote To Elderly Patients in Institutions ......... 35

          2.   Abbott Trained Its Sales Force To Off-Label Market
               Depakote For Elderly Patients ............................................. 42

3.  Kickbacks: Abbott Paid Physicians To Induce Prescriptions
    And Hijacked CME And Other Ostensibly Independent
    Educational and Scientific Programs For The Unlawful
    Promotion of Depakote ................................................................ 47

4.  Abbott Incentivized Defendants ████████████████
    To Assist in Promoting Depakote Off-Label For Nursing
    Home Patients With Dementia and To Steer Physicians and
    Consultant Pharmacists to Prescribe Depakote.......................... 56

5.  Abbott Misrepresented Study Data Concerning Depakote's
    Effect on Cholesterol ................................................................ 63

C.  ABBOTT OFF-LABEL MARKETED DEPAKOTE FOR A VARIETY OF
    OTHER ILLNESSES ................................................................ 64

    1.  Bipolar Depression in Adults and Children ................................ 64

    2.  Developmental Delay, Attention-Deficit Disorder and
        Psychiatric Disorders in Children Under 18 .............................. 70

    3.  Symptoms Associated With Narcotic Drug Withdrawal and
        Addiction........................................................................... 74

    4.  Psychosis.......................................................................... 74

D.  ABBOTT PROMOTED DOSING INSTRUCTIONS AND FORMULATIONS OF
    DEPAKOTE OUTSIDE DEPAKOTE'S PACKAGE INSERT.......................... 75

    1.  Depakote Sprinkle Capsules ...................................................... 75

    2.  "Rapid Loading" Dose of Depakote DR...................................... 78

    3.  Maintenance Dose for Elderly in Agitation Associated
        With Dementia ..................................................................... 80

VI.   CONCLUSION.......................................................................... 83

VII.  COUNTS.................................................................................. 83

COUNT ONE Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) Against All
    Defendants ............................................................................ 83

COUNT TWO Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) Against All
    Defendants ............................................................................ 84

COUNT THREE Federal False Claims Act, 31 U.S.C. § 3729 (a)(1)(C) Against
    All Defendants ......................................................................... 85

COUNT FOUR California False Claims Act., Cal. Gov't Code § 12651 *et seq.*
    Against All Defendants................................................................... 85

COUNT FIVE Connecticut False Claims Act., Conn. Gen. Stat. §§ 17b-301a -
    17b301p (2010 Supplement) Against All Defendants........................ 86

COUNT SIX Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201 *et seq.*
    Against All Defendants................................................................... 87

COUNT SEVEN Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*
    Against All Defendants................................................................... 88

COUNT EIGHT Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168
    *et seq.* Against All Defendants........................................................ 89

COUNT NINE Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq.*
    Against All Defendants................................................................... 90

COUNT TEN Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp.
    Stat. 175/1 *et seq.* Against All Defendants ...................................... 90

COUNT ELEVEN Indiana False Claims and Whistleblower Protection Act,
    Indiana Code § 5-11-5.5 Against All Defendants............................... 91

COUNT TWELVE Louisiana Medical Assistance Programs Integrity Law, La.
    Rev. Stat. Ann. § 46:439.1 *et seq.* Against All Defendants.................. 92

COUNT THIRTEEN Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, §
    5(A)-(0) Against All Defendants ...................................................... 93

COUNT FOURTEEN Michigan Medicaid False Claims Act, MCLA § 400.601 *et
    seq.* Against All Defendants ............................................................ 94

COUNT FIFTEEN Montana False Claims Act; Mont. Code Anno. §17-8-401 *et
    seq.* Against All Defendants ............................................................ 95

COUNT SIXTEEN Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq.*
    Against All Defendants................................................................... 96

COUNT SEVENTEEN New Hampshire Medicaid Fraud and False Claims Act,
    N.H. Rev. Stat. Ann. § 167:61-b, *et seq.* Against All Defendants...................... 96

COUNT EIGHTEEN New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq.*
    Against All Defendants................................................................... 97

COUNT NINETEEN New Mexico Medicaid False Claims Act, N.M. Stat.
    Ann.,1978, § 27-14-1 *et seq.* Against All Defendants ......................... 98

COUNT TWENTY New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.* Against All Defendants .......................................................................... 99

COUNT TWENTY ONE North Carolina False Claims Act, 52 N.C.G.S. § 1-605 *et seq.* Against All Defendants.......................................................................... 100

COUNT TWENTY TWO Oklahoma Medicaid False Claims Act; 63 Okl. St. § 5053 *et seq.* Against All Defendants................................................................ 101

COUNT TWENTY THREE Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 *et seq.* Against All Defendants .......................................................... 102

COUNT TWENTY FOUR Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.* Against All Defendants .............................................. 103

COUNT TWENTY FIVE Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.* Against All Defendants ........................................ 104

COUNT TWENTY SIX Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 *et seq.* Against All Defendants .............................................. 105

COUNT TWENTY SEVEN Wisconsin False Claims Act; Wis. Stat. § 20.931 *et seq.* Against All Defendants .......................................................................... 105

COUNT TWENTY EIGHT District of Columbia False Claims Act, D.C. Code § 2-308.14 *et seq.* Against All Defendants .......................................................... 106

COUNT TWENTY NINE City of Chicago False Claims Act, Chicago Mun. Code Chapter 1-22-010, *et seq.* Against All Defendants ............................................ 107

VIII.   PRAYER..................................................................................................... 108

REQUEST FOR TRIAL BY JURY ............................................................. 109

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

## I.  INTRODUCTION

1.  One of the most frightening and devastating diseases of our time is

Alzheimer's. It is simultaneously terrifying and heartbreaking.  It renders its victims

powerless, requiring them to rely upon the conscientiousness of those charged with their

care.  This case is about a company – Abbott Laboratories – that methodically and

recklessly endangered this vulnerable population – those with Alzheimer's and other

forms of dementia – through the illegal marketing of a drug that Abbott knew was

unapproved for the treatment of Alzheimer's, did not work to treat the disease, and was

actually dangerous for use by the elderly.  Incredibly, Abbott did not limit its wrongful

conduct to preying upon the elderly; it also unlawfully marketed its drug, Depakote, to an

array of patient populations, including children, placing them at risk for life altering

injury or illness.  Abbott's scheme, motivated by money as opposed to a legitimate

medical rationale, worked.  Sales of Depakote rocketed to over $1.4 billion per year and

compensation for senior executives soared as well.

2.  Accordingly, on behalf of the United States of America and on behalf of

California, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana,

Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico,

New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia,

Wisconsin, the District of Columbia and the City of Chicago, pursuant to the *qui tam*

provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and similar state

and municipal law provisions, Plaintiff and "Relator" Meredith McCoyd files this *qui tam*

Amended Complaint against Defendants and alleges:

**Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)**

3.      In violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and

similar state and municipal law provisions, Defendant Abbott Laboratories ("Abbott" or

the "Company"), acting alone and in concert with Defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮collectively with Abbott the

"Corporate Defendants"), knowingly presented or caused to be presented false or

fraudulent claims to be submitted in violation of the law for payment or approval by

federal and state agencies and/or programs by:

- systematically engaging in illegal off-label marketing of Abbott's anti-

  epileptic drug, Depakote (generic name divalproex sodium);

- furthering the unlawful off-label marketing of Depakote through the

  transformation of ostensibly independent and unbiased educational and

  scientific programs, including physician continuing medical education

  ("CME") programs, into promotional vehicles for Depakote; and

- unlawfully promoting Depakote in violation of the Anti-Kickback Statute,

  42 U.S.C. § 1320a-7b(b), as amended by the Patient Protection and

  Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g),

  and the Stark Law, 42 U.S.C. § 1395nn, and 42 C.F.R. § 411.350 *et seq.*

  by providing cash and other incentives to induce doctors to promote and

  prescribe Depakote, including for off-label uses.

4.      A substantial portion of Depakote prescriptions are paid for by Medicare,

Medicaid and other government-funded health insurance programs. Prescriptions for

uses other than those that are approved by the FDA or included in certain government-

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

approved compendia are not reimbursable. *See* 42 U.S.C. §§ 1369b(i)(10), 1396r-8(k), 1369r-8(g)(1)(B)(i).

5.     The schemes alleged in this complaint were orchestrated and condoned by the highest levels of Abbott's management, some of whom benefited financially.  In carrying out these plans which drained billions of health care dollars from public third party payors, Defendants knowingly placed at risk and caused injury to elderly and pediatric patient populations lacking the capacity to understand the dangers of their own pharmaceutical regimens.  Countless elderly nursing home residents and children across the country were given a dangerous drug as a result of marketing practices crafted to maximize Abbott's profitability at the expense of the medical welfare of vulnerable patient populations.

6.     Depakote is within the class of drugs known as anti-epileptics.  In 1983, the FDA first approved Depakote to treat "simple and complex partial seizures" in adults and children over the age of 10.  Since that time, the FDA approved Depakote to treat additional types of seizures for patients over 10 years of age, manic episodes of bipolar disorder for patients over 18 years of age, and for prophylaxis of migraine headaches in adults.  Since Depakote's approval for epilepsy in 1983, a number of other new generation anti-epileptics have crowded the market, making it more difficult for Depakote to compete.  The number of cases of epilepsy each year remains fairly stable, leaving few opportunities to expand Depakote's on-label sales.

7.     Depakote also has significant competition from a number of migraine drugs marketed by other companies.  There are also competing medications for bipolar disorder that treat a broader spectrum of the disease than Depakote's indication for acute

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

manic or mixed episodes associated with bipolar disorder ("bipolar mania"). Other

competing medications also contain FDA indications for the maintenance treatment of

mania associated with bipolar disorder, while Depakote's package insert states that the

"effectiveness of valproate for long-term use in mania, *i.e.*, more than 3 weeks, has not

been demonstrated in controlled clinical trials."[1]

8. In order to address the potential stagnation of profits and to exponentially

increase its revenue, Abbott embarked upon several centrally-organized, illegal

marketing schemes to convince physicians to prescribe Depakote for a number of

diseases and disorders for which the drug had (and continues to have) no FDA-approved

indication. Abbott's illegal marketing schemes were successful, resulting in the

Company posting blockbuster profits for Depakote. Total sales of Depakote in the

United States, from 2000 to 2009 were at least $6.8 billion. Abbott's unlawful practices,

as alleged herein, account for a substantial portion of these sales. Abbott's unlawful

marketing also benefited top Abbott managers as the Company's revenue growth

resulting from its illegal marketing schemes enabled the highest levels of Abbott

management to obtain disproportionately large compensation packages.

9. Abbott developed a number of other centrally organized schemes, carried

out by its existing sales force dedicated to marketing Depakote for epilepsy, migraine and

bipolar mania, to off-label market Depakote for a variety of psychological disorders (*i.e.,*

illnesses primarily diagnosed through substantially subjective measures) by blurring the

lines of Depakote's narrow indication for bipolar mania.

10. Abbott off-label marketed Depakote to treat:

---

[1] As part of their scheme, Abbott marketed Depakote, an anti-epileptic drug, as a mood stabilizer.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

(a)     elderly patients suffering agitation associated with dementia or

        Alzheimer's disease;

(b)     children under age 18 for treatment of mood disorders, ADHD,

        bipolar depression and developmental delay;

(c)     adult bipolar depression, schizophrenia, and other psychological

        disorders;

(d)     post-seizure stroke;

(e)     addictive narcotic drug withdrawal;

(f)     children under the age of 10 for epilepsy; and

(g)     elderly patients unable to swallow Depakote capsules by putting

        Depakote Sprinkles, only FDA-approved for epilepsy, through

        feeding tubes (a method of administration not included in

        Depakote's package insert).

11.     Starting in about 1998, Abbott embarked on perhaps its most brazen

scheme to off-label market Depakote. Abbott targeted elderly patients suffering from

Alzheimer's disease and dementia. Abbott seized upon the opportunity to tap into

America's aging population and the rapidly expanding geriatric markets (such as long

term care, skilled nursing homes and assisted living) by forming an entire sales division

devoted to market Depakote off-label to geriatric physicians, pharmacy providers, long

term care medical directors and other health care professionals engaged in treating elderly

nursing home patients with behavior disorders associated with dementia or Alzheimer's

disease. Abbott possessed full knowledge that devoting an entire sales division to

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

marketing Depakote to this population for unapproved uses placed countless elderly

patients across the nation at risk of serious injury, illness, and death.

12.    In furtherance of its scheme to off-label market Depakote to nursing

homes and in violation of 31 U.S.C. § 3729 *et seq*., Abbott paid and/or incentivized

Defendants ████████████████ through direct payments, rebates, and/or free

goods and services to assist Abbott in (a) promoting Depakote off-label for agitation

associated with dementia, and (b)████████████████████████████

████████████████████████████████████████

█████          █████████████████ In this way,

Defendants conspired to knowingly present or cause to be presented false or fraudulent

claims to be submitted in violation of the law for payment or approval by federal, state

and local governments or public health care programs.

13.    In furtherance of its unlawful marketing schemes, Abbott trained and

encouraged sales representatives to market the drug for off-label uses without proper

clinical evidence of its safety and efficacy for those off-label purposes. Along the same

lines, Abbott conspired with Defendants ████████████████ to increase sales of

Depakote for off-label uses in long term care facilities serviced by ████████████

████████ As a consequence of Defendants' wrongdoing, patients were harmed by

extensive off-label, and otherwise unlawful, marketing of Depakote and placed at risk of

numerous side effects, including serious liver problems and life-threatening pancreatitis

(inflamed pancreas). Children born to women taking Depakote were at risk of serious

birth defects.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

14.     Elderly patients likewise suffered serious physical and financial harm as a result of Defendants' unlawful conduct, including but not limited to, the disruption or discontinuation of stable treatment regimens and increased costs associated with treating side effects caused or exacerbated by Depakote, including but not limited to, falls associated with sedation and nausea.  Moreover, the use of Depakote for agitation in the elderly can be very dangerous if it is used without proper investigation of the causes of the patients' agitation.  For example, agitation in the elderly is often caused by physical ailments, such as pneumonia or urosepsis (bacteremia), which may be masked by Depakote's mood altering effects.  In such cases, physical conditions like an infection may go untreated, ultimately causing serious injury or death.

15.     Government health care payors including Medicare, Medicaid, Tricare, the Veteran's Administration and other public health care plans were harmed because they paid for unauthorized off-label, or otherwise unlawfully induced/caused Depakote prescriptions for which they would not have otherwise paid.  Moreover, these Government health care payors also incurred  the cost of treating Depakote's side effects.

16.     Elderly patients in long term care and skilled nursing facilities suffering from agitation associated with dementia are often eligible for Government health care assistance from Medicare and/or Medicaid and thus, all Defendants knew or should have known that Abbott's unlawful marketing schemes would foreseeably result in the submission of false claims to Government health care payors.  This includes payments on behalf of individuals receiving Veteran's Administration and Tricare benefits; moreover, virtually everyone over the age of 65 is eligible for Medicare, which pays for 60 days of care in a skilled nursing facility or a long term care facility and prescriptions through

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

Medicare Part D. Elderly patients who cannot care for themselves and exhaust their own

personal resources become eligible for free assistance at long term care facilities,

including prescription drugs, through Medicaid programs. Thus, Defendants knew that

their illegal marketing schemes were directed at individuals whose health care providers

would submit false claims to be paid by the Government.

17. Meanwhile, Abbott's profits soared and its top officials received

astronomical compensation packages including salary, stocks, and options, at least in

part, at the Government's expense. According to Abbott's 2010 Proxy Statement, senior

executives at Abbott are paid performance bonuses based on annual sales and participate

in a bonus pool made up of a percentage of the Company's net earnings. Similar

compensation policies and practices existed in prior years at the Company. Therefore,

boosting sales through off-label marketing directly translated (and still translates) to

higher bonuses for Abbott's top-level executives. In 2009, ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

18. ████████████, who took an active role in Abbott's marketing practices, thus

personally benefitted from the wrongful conduct alleged in this Amended Complaint.

████████████ knew or should have known that the sales of Depakote exponentially exceeded

expectations for the drug's "on-label" uses or intended patient populations. ████████████

massive compensation package was due, at least in part, to his own unlawful conduct,

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

which included, among other things, condoning the establishment and perpetuation of an

entire department of the Company whose goal was to off-label and otherwise illegally

market Depakote.

19.     Relator Meredith McCoyd has knowledge of Abbott's national scheme to

off-label market Depakote. Relator was part of a division, created by Abbott and initially

called the Long Term Care Division, whose primary purpose was the off-label marketing

of Depakote to physicians ███████████████████████████

███████████████ ███████████████ ███████████████

███████████ This division had representatives serving the entire nation, including the

states and municipalities encompassed by this Amended Complaint.

20.     Relator was routinely directed to engage in off-label marketing

promotions as part of Abbott's centralized national program. She participated in training

with Abbott representatives from across the country wherein she learned how to off-label

market Depakote. The training sessions were held in a variety of states, including

Illinois.

21.     Relator was directed and trained by Abbott to engage in a number of

tactics to maximize off-label sales of Depakote, including paying physicians to discuss

off-label uses of the drug at speaker's programs for other physicians. Abbott developed a

centralized process for funneling payments to physicians through intermediary medical

organizations, including the Alzheimer's Association, and a company called ABcomm.

ABcomm is an Illinois company which served exclusively as a conduit for Abbott to

further its unlawful conduct. Abbott referred to its practice of funneling money through

intermediaries as "washing the money."

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

22.     Through its illegal marketing activities, Abbott and Defendants 

significantly increased the market for Depakote, which resulted in

markedly increased revenue from that drug at the expense of federal, state and local

governments.  Abbott's off-label Depakote sales represented the fastest growing segment

of Abbott's Depakote market.  Had federal and state programs, including Medicare,

Medicaid, Tricare, Veteran's Administration and other public health care payors known

that such prescriptions were induced by illicit incentives or illegal off-label marketing to

physicians for non-approved purposes, they would not have reimbursed claims for

Depakote.

23.     Relator Meredith McCoyd discovered Defendants' wrongful conduct

while she was a sales representative employed by Abbott.  She conducted her own

investigation in furtherance of this False Claims Act *qui tam* action and disclosed her

findings to the United States Government and the States prior to filing this action.

**II.   JURISDICTION AND VENUE**

24.     Relator brings this action on behalf of herself and on behalf of the United

States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, the States, the

District of Columbia and the City of Chicago for violations of their False Claims Act

statutes.  This Court has federal subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts

relating to the States, the District of Columbia and the City of Chicago False Claims Act

statutes pursuant to 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over Defendants pursuant to 31

U.S.C. §3732(a) because Defendants can be found in and transact business in this

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

District. In addition, the acts prohibited by 31 U.S.C. §3729 occurred in this District, 31

U.S.C. §3732(a).

26.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because

Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. §

3729 occurred in this District.

27.     Relator's claims and this Amended Complaint are not based upon

allegations or transactions which are the subject of a civil suit or an administrative civil

money penalty proceeding in which the Government is already a party, as enumerated in

31 U.S.C. § 3730(e)(3).[2]

28.     To the extent that there has been a public disclosure unknown to the

Relator, she is the "original source" and meets the requirements pursuant to 31 U.S.C. §

3730(e)(4)(B).[3]

## III.   PARTIES

29.     Relator Meredith McCoyd was employed from February 1998 until June

2007 as a pharmaceutical sales representative for Abbott Laboratories, working in

Atlanta, Georgia and surrounding areas. Relator was a top performer, winning

commendations from Abbott for her sales performance. Working in Abbott's Long Term

Care division, which in or about 2004 became known as "Specialty Accounts," Relator

exclusively promoted the drug Depakote. Relator has direct knowledge of Defendant

Abbott's concerted and repeated efforts to market Depakote for off-label purposes, as

well as, all Defendants' illegal conduct as alleged herein.

---

[2] To the extent that conduct alleged in this Amended Complaint occurred prior to March 23,
2010, the prior versions of the False Claims Act are applicable (i.e., 31 U.S.C. § 3730 (e), as
amended, October 27, 1986 and May 20, 2009).

**Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)**

30.     Defendant Abbott Laboratories is incorporated in Illinois. Its headquarters and principal place of business is in Abbott Park, Illinois. Abbott engages in the global business of development, manufacturing, marketing, and sale of prescription drugs and other products for the prevention, diagnosis, and treatment of diseases. According to Abbott's Form 10-K filed with the Securities and Exchange Commission ("SEC") dated February 23, 2007, Abbott generated net revenue in excess of $1.7 billion in the fiscal year ending December 31, 2006. Total sales in 2006 amounted to $22.5 billion, with Depakote accounting for $1.2 billion of 2006 sales. A single tablet of Depakote costs $2.73 to $3.85, depending on its strength.

31.     Defendant



---

[3] *Ibid.*

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

32. Defendant



33. Defendant

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

IV.    STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO
       DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

       A.    FEDERAL GOVERNMENT HEALTH PROGRAMS

       34.    The federal, state and local governments, through their Medicaid,

Medicare, Tricare, Veteran's Administration and other Government health care payors,

are among the principal purchasers of Abbott's pharmaceutical products.

       35.    Medicare is a federal government health program primarily benefiting the

elderly that Congress created in 1965 when it adopted Title XVIII of the Social Security

Act. Medicare is administered by the Centers for Medicare and Medicaid Services

("CMS").

       36.    Congress created Medicaid at the same time it created Medicare in 1965

when Title XIX was added to the Social Security Act. Medicaid is a public assistance

program providing payment of medical expenses to low-income patients. Funding for

Medicaid is shared between the federal government and state governments. The federal

government also separately matches certain state expenses incurred in administering the

Medicaid program. While specific Medicaid coverage guidelines vary from state to state,

Medicaid's coverage is generally modeled after Medicare's coverage, except that

Medicaid usually provides more expansive coverage than does Medicare.

       37.    Medicaid has broad coverage for prescription drugs, including self-

administered drugs. Nearly every state has opted to include basic prescription drug

coverage in its Medicaid plan.

       38.    Tricare is the health care system of the United States military, designed to

maintain the health of active duty service personnel, provide health care during military

operations, and offer health care to non-active duty beneficiaries, including dependents of

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

active duty personnel and career military retirees and their dependents. The program

operates through various military-operated hospitals and clinics worldwide and is

supplemented through contracts with civilian health care providers. Tricare is a triple-

option benefit program designed to give beneficiaries a choice between health

maintenance organizations, preferred provider organizations and fee-for-service benefits.

Five managed care support contractors create networks of civilian health care providers.

39. Whereas Tricare treats active duty military and their dependents, the

Veterans Administration ("VA") provides health care and other benefits to veterans of the

military through its nationwide network of hospitals and clinics.

40. The Federal Employees Health Benefits Program ("FEHBP") provides

health insurance coverage for more than 8 million federal employees, retirees, and their

dependents. FEHBP is a collection of individual health care plans, including the Blue

Cross and Blue Shield Association, Government Employees Hospital Association, and

Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel

Management.

**B.** **THE FALSE CLAIMS ACT AND THE MEDICARE FRAUD & ABUSE/ANTI-KICKBACK STATUTE**

41. The Federal False Claims Act provides that any person who knowingly

presents or causes another to present a false or fraudulent claim for payment or approval

is liable for a civil penalty of up to $11,000 for each such claim, plus three times the

amount of the damages sustained by the government. 31 U.S.C. § 3729(a)(1)(A)&(B).

Twenty-four states, the District of Columbia and the City of Chicago have enacted False

Claims Act statutes that apply to Medicaid fraud and/or fraudulent health care claims

submitted for payment by municipal funds.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

42.     The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which also applies to the state Medicaid programs, provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program. The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

43.     The Balanced Budget Act of 1997 amended the Medicare Anti-Kickback Statute to include administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a).

44.     In accordance with the Anti-Kickback Statute, Medicare regulations directly prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals paid as a result of the volume or value of any referrals or business generated. *See* 42 C.F.R. § 1001.952(f).

45.     Such remunerations are kickbacks when paid to induce or reward physicians' prescriptions. Kickbacks increase government-funded health benefit program expenses by inducing medically unnecessary overutilization of prescription drugs and excessive reimbursements. Kickbacks also reduce a patient's healthcare choices, as physicians may prescribe drug products based on the physician's own financial interests rather than according to the patient's medical needs.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

46.    The Medicare Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3).  None of the statutory exceptions or regulatory safe harbors protects the Defendants' conduct in this case.

47.    Recently, the Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Medicare Anti-Kickback Statute or "Social Security Act," 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the False Claims Act.  The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of the Social Security Act's anti-kickback provisions, like violations of the False Claims Act, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." *Id.* at Sec. 6402(h).

48.    As detailed below, Abbott's marketing of Depakote repeatedly violated provisions of the Anti-Kickback Statute, which in turn resulted in violations of the False Claims Act because Abbott's improper kickbacks and incentives induced physicians to prescribe Depakote when they otherwise would not have and many of those prescriptions were paid for by Medicare, Medicaid and other government funded health insurance programs.

49.    Knowingly paying kickbacks to physicians (or others such as Defendants ▮▮▮▮▮▮▮▮▮▮ to induce them to prescribe a prescription drug on-label or off-label (or to influence physician prescriptions) for individuals who seek reimbursement for the drug from a federal government health program or causing others to do so, while certifying compliance with the Medicare Anti-Kickback Statute (or while

17

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

causing another to so certify), or billing the Government as if in compliance with these laws, violates municipal, state and federal False Claims Acts.

### C.   STARK LAW - THE MEDICARE/MEDICAID SELF-REFERRAL STATUTE

50.   The Medicare/Medicaid Self-Referral Statute, 42 U.S.C. § 1395nn, *et seq.*, known as the "Stark" law, prohibits a pharmaceutical manufacturer from paying remuneration to physicians for referring Medicaid patients to the manufacturer for certain "designated health services," including drug prescriptions, where the referring physician has a nonexempt "financial relationship" with that manufacturer. 42 U.S.C. § 1395nn(a)(1), (h)(6). The Stark law provides that the manufacturer shall not cause to be presented a Medicare or Medicaid claim for such prescriptions. The Stark law also prohibits payment of claims for prescriptions rendered in violation of its provisions. 42 U.S.C. §1395nn(a)(1), (g)(1).

51.   Knowingly paying physicians to induce them to prescribe a prescription drug on-label or off-label for individuals seeking reimbursement for the drug from a federal government health program or causing others to do so, while certifying compliance with the Stark law (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates municipal, state and federal False Claims Acts.

52.   Defendants' conduct repeatedly violated the Stark law, which in turn resulted in violations of the False Claims Act, because Defendants' unlawful payments and services to prescribing physicians induced (and still induces) those physicians to prescribe Depakote when they otherwise would not have done so. Many of those prescriptions were paid for by government funded health insurance programs.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

D.     FDCA AND FDA REGULATIONS

53.     The Food and Drug Administration ("FDA") regulates drugs based on the "intended uses" for such products. Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use. 21 U.S.C. § 331(d); 21 U.S.C. §§ 355(a).

54.     The FDA reviews pharmaceutical manufacturers' applications for new drugs to determine whether the drugs' intended uses are safe and effective. *See* 21 U.S.C. § 355. Once a drug is approved for a particular use, doctors are free to prescribe the drug for "non-indicated" or off-label purposes. While doctors may independently request information from drug manufacturers about such off-label uses, with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting drugs for uses, *i.e.* "indications," not approved by the FDA. As described above, "off-label" refers to the marketing of an FDA-approved drug for uses that have not undergone FDA review and approval, *i.e.*, for purposes not approved by the FDA.

55.     With the exception of purely scientific medical information provided by qualified medical professionals, sales and marketing presentations, promotions, or marketing to physicians for uses other than that approved by the FDA are considered off-label marketing or "misbranding" proscribed by the FDA. *See* 21 U.S.C. §§ 331(a)-(b), 352(a),(f). Additional proscribed marketing activity includes any attempts by pharmaceutical sales representatives to solicit discussions with physicians concerning off-label use.

56.     Strong policy reasons exist for strict regulation of off-label marketing. Off-label promotion bypasses the FDA's strict review and approval process and removes

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

the incentive to obtain definitive clinical study data showing the efficacy and safety of a product and, accordingly, the medical necessity for its use.

57.     Pursuant to the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301, *et seq.,* the FDA strictly regulates the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies to market and sell FDA-approved prescription drugs.

58.     The FDA interprets "labeling" in its regulations broadly to include items that are "1) descriptive of a drug; 2) supplied by the manufacturer or its agents; and 3) intended for use by medical personnel." 21 C.F.R. § 202.1. The FDCA defines both misleading statements and the failure to reveal material facts in a label or product labeling as "misbranding." 21 U.S.C. § 321(n). Labeling includes, among other things, brochures, booklets, detailing pieces, literature, reprints, sound recordings, exhibits and audio visual material. 21 C.F.R. § 202.1 (l)(2).

59.     FDA regulations deem "advertising" to include media-based activities that appear in magazines, newspapers, professional journals and on television, radio, and telephone communications systems. *See* 21 C.F.R. § 202.1(l)(1). Courts have consistently held that oral statements made by a company's sales representative relating to a pharmaceutical product constitute commercial advertising or promotion. *See Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 10 (7th Cir. 1992) (interpreting the Lanham Act).

60.     Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading "misbrand" a drug in

**Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)**

violation of the FDCA, 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371;  21 C.F.R. §

202.1(e)(6), (e)(7); 21 C.F.R. § 1.21.

    61.    Such violations exist where promotional marketing materials and

presentations (*i.e.*, advertisements) for an FDA approved drug, among other things:

- Minimize, understate, or misrepresent the side effects, contraindications and/or effectiveness of the drug;

- Overstate or misrepresent the side effects, contraindications, and/or effectiveness of competing drugs;

- Expressly or implicitly promote uses, dosages or combination usage of the drug that is not contained in the FDA approved labeling (*i.e.*, off-label uses);

- Fail to reveal material facts with respect to consequences that may result from the use of the drug as recommended or suggested in the advertisement;

- Contain representations or suggestions, not approved or permitted in the labeling, that the drug is better, more effective, useful in a broader range of conditions or patients, safer, or has fewer, or less incidence of, or less serious side effects or contraindications than demonstrated by substantial evidence or substantial clinical experience;

- Present information from a study in a way that implies that the study represents larger or more general experience with the drug than it actually does;

- Use a quote or paraphrase out of context to convey a false or misleading idea; and/or

- Are otherwise false, misleading or lacking in fair balance in the presentation of information about the drug being marketed or any competing drug.

*See* 21 C.F.R. § 202.1 (e)(4)(5)(6), (7).

    62.    Oral statements and written materials presented at industry-supported

activities, including lectures and teleconferences, provide evidence of a product's

intended use. If these statements or materials promote a use inconsistent with the

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

product's FDA-approved labeling, the drug is misbranded, as the statements and

materials fail to provide adequate directions for all intended uses.

63.     Abbott's unlawful marketing of Depakote repeatedly violated the FDCA,

which in turn resulted in violations of the False Claims Act, because Abbott's unlawful

activity induced physicians to prescribe Depakote, when physicians otherwise would not

have done so for prescriptions paid for by government funded health insurance programs.

*U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 53 (D. Mass. 2001).

Defendants ████████████████████ conspired with Abbott to violate the

FDCA. Had federal, state and local Governments known about the off-label uses for

which Depakote was prescribed they would not have paid for the prescriptions. *Id.*

## V.     SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS

### A.     ABBOTT'S PRESCRIPTION DRUG DEPAKOTE

#### 1.     Depakote's FDA-Approved Uses and Restrictions

64.     Divalproex sodium delayed release tablets marketed by Abbott under the

brand name "Depakote DR," were first approved by the FDA in 1983 for treating

epilepsy. This drug is approved to treat complex partial seizures in adults and children

age 10 and over and "simple and complex absence seizures in adults."

65.     In 1989, Abbott received FDA approval for Depakote Sprinkle Capsules

("Depakote Sprinkles"), as a monotherapy and adjunctive therapy, in the treatment of

simple and complex absence seizures, and adjunctively in patients with multiple seizure

types that include absence seizures. Depakote Sprinkles has not received approval for

additional indications.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

66.     In May 1995, the FDA issued an additional approval of Depakote DR for treatment of manic episodes associated with bipolar disorder ("bipolar mania"). A manic episode is a distinct period of abnormally and persistent elevated, expansive, or irritable mood. Typical symptoms of mania include "pressured speech," motor hyperactivity, reduced need for sleep, flight of ideas, grandiosity, poor judgment, aggressiveness and possible hostility. The FDA has not approved Depakote DR for the general treatment of bipolar disorder or depression associated with bipolar disorder.

67.     In 1996, the FDA further expanded on the approved indications of Depakote DR to include prevention of migraine headaches in adults.

68.     In 2000, Abbott introduced an extended-release tablet form of Depakote, called Depakote ER. It was approved by the FDA on September 4, 2000 "for prophylaxis of migraine headaches in adults." *See* FDA Approval Letter dated September 4, 2000.

69.     On December 12, 2002, the FDA issued approval for the additional indication of Depakote ER Tablets as monotherapy and adjunctive therapy in complex partial seizures in adults and in simple and complex absence seizures in adults. The FDA extended this usage on September 15, 2003, to include pediatric patients over age 10 for these types of seizures only.

70.     In December 2005, Depakote ER was approved for treating acute manic or mixed episodes associated with bipolar disorder, with or without psychotic features. In doing so, the FDA did not approve Depakote for the general treatment of bipolar disorder, depression associated with bipolar disorder, or as a maintenance therapy for bipolar disorder.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

71.    Depakote ER and Depakote DR have never been approved for use by children under age 10 (for any use), nor have they been approved for patients under age 18 for uses other than as a treatment for epileptic seizures.

72.    Depakote ER, Depakote DR and Depakote Sprinkle Capsules were never approved by the FDA for use in treatment of Alzheimer's disease, other types of dementia, agitation associated with dementia, sundowning, insomnia, post-stroke seizure, ADHD, schizophrenia, mood disorder, types of epilepsy not listed, or narcotic drug withdrawal.

73.    Depakote ER prescriptions average anywhere from $300 to $2,000 per year per patient.

74.    After Depakote DR's approval to treat bipolar mania in 1995, Depakote sales surpassed sales of lithium (FDA-approved for bipolar mania, bipolar depression and maintenance treatment of bipolar disorder generally), becoming the most-prescribed drug for treatment of bipolar mania.

### 2.    Safety Issues: Depakote's Black Box Warnings

75.    The FDA does not regulate physicians and, thus, does not prohibit them from prescribing Depakote for unapproved or off-label uses. FDA regulations, however, categorically proscribe and prohibit pharmaceutical companies from marketing their drugs to physicians for off-label uses.  To the extent a manufacturer learns about reported cases of severe side effects that are associated with any uses of a prescription drug, the FDA requires the manufacturer to report the side effects to the FDA and the FDA may issue warning letters to physicians and other health care providers.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

76.    A warning for all patients taking valproate products has been required in

product labeling since 1981. In July 2000, the FDA issued a more stringent "black box

warning" (the most urgent warning it can issue short of recall) regarding Depakote's

safety. The FDA required Abbott to change its product labeling and to send letters to

health care providers that warned of a life-threatening side effect. The black box warning

states in part:

> Cases of life-threatening pancreatitis have been reported in
> both children and adults receiving valproate. Some of the
> cases have been described as hemorrhagic with rapid
> progression from initial symptoms to death. Cases have
> been reported shortly after initial use as well as after
> several years of use. Patients and guardians should be
> warned that abdominal pain, nausea, vomiting, and/or
> anorexia can be symptoms of pancreatitis requiring prompt
> medical evaluation. If pancreatitis is diagnosed, valproate
> should ordinarily be discontinued. Alternate treatment for
> the underlying medical condition should be initiated as
> clinically indicated.

77.    In addition, Depakote is classified by the FDA as a pregnancy "Category

D" drug because it should be used by pregnant women only, if without it, the patient

would be placed at life threatening risk. The most serious teratogenic effects associated

with Depakote include spina bifida, intrauterine growth retardation, skeletal defects, cleft

palate, neural tube malformations, and fetal death.

78.    In 2007, a safety-related package insert was required warning women of

the dangers of birth defects while pregnant and taking this medication. The patient

information leaflet states in part:

> Before using any of these medications, women who can
> become pregnant should consider the fact that these
> medications have been associated with birth defects, in
> particular, with Spina Bifida and other defects related to
> failure of the spinal canal to close normally. Approximately

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

1 to 2% of children born to women with epilepsy taking
Depakote in the first 12 weeks of pregnancy had these
defects (based on data from the Centers for Disease
Control). The incidence in the general population is 0.1 to
0.2%. These medications have also been associated with
other birth defects such as defects of the heart, the bones
and other parts of the body. Information suggests that birth
defects may be more likely to occur with these medications
than some other drugs that treat your medical condition.

79.     The FDA's black box warnings on the use of Depakote remain in effect

today.

### 3.     Depakote's Other Warnings, Precautions and Serious Side Effects

80.     Depakote also poses certain risks to the reproductive systems of teenage

girls, but Abbott representatives were trained to downplay these risks. Specifically, some

studies indicate that Depakote causes polycystic ovary syndrome ("PCOS"), the

symptoms of which are obesity, irregular menstruation, acne, and excessive amounts or

effects of androgenic hormones (*i.e.* masculine hormones). Abbott trained its sales force

to discredit the studies that linked Depakote to PCOS and contrast Depakote with

Lamictal, another anti-epileptic drug, which is shown to interfere with oral

contraceptives. Depakote sales representatives were trained to pitch the purported safety

of Depakote for women of childbearing age over Lamictal, by pointing out that teenage

girls using oral contraceptives could become pregnant if prescribed Lamictal.

81.     Depakote also has a package insert warning for "somnolence in the

elderly." In a multi-center trial discussed in Depakote's package insert, a significantly

higher proportion of patients on Depakote had somnolence compared to those taking a

placebo, forcing discontinuation of the study.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

82.    Depakote's sedative effect, heightened when the levels are increased, poses a particular hazard to a geriatric population susceptible to serious life threatening injury associated with falls. Seniors are more likely to fall than younger people, because of slower reflexes, arthritis, reduced vision, and other problems associated with aging. Also, falls have more serious consequences in this population. Abbott specifically knew about the risk of falls in the geriatric population. Melissa Moore, an Abbott Long Term Care Specialist, prepared a PowerPoint training presentation explaining that falls are the second leading cause of death in the United States and "75% occur in older adults." This PowerPoint presentation noted that the Centers for Disease Control estimated that the cost of injuries related to falls would reach $32.4 billion by year 2020, and $240 billion for hip fractures by year 2040. While the PowerPoint presentation cited the side effects of prescription drugs as a factor in causing falls, the presentation only mentioned anti-psychotics and not Depakote.

83.    The Corporate Defendants knew that federal regulations require that a nursing home facility must ensure an environment free of accident hazard. 42 CFR §483.25(h). Abbott's marketing efforts, in conspiracy with Defendants ███████████ ███████████ actually increased hazard by causing residents to be placed on a drug that would diminish their coordination and attentiveness to danger, increasing their risk of falls. Accordingly, Defendants' acts in furtherance of their conspiracy caused nursing homes to violate federal regulations and in turn violate the False Claims Act to the extent they were receiving Federal and/or state monies; the receipt of which was premised on compliance with law.

Filed Under Seal Pursuant
*To 31 U.S.C. § 3730(b)(2)*

    **4.**    **Abbott Marketed Depakote As Means to Circumvent Federally Mandated Oversight Required by OBRA and Federal Regulations**

84. In addition, while marketing Depakote as an alternative to anti-psychotic drugs including Risperdal and Seroquel, which were also unlawfully marketed off-label, Abbott trained its sales force to use provisions of a federal statute, the Omnibus Budget Reconciliation Act of 1987 ("OBRA"), as a key selling point for Depakote in nursing homes and other facilities where elderly patients were treated. Specifically, Abbott sales representatives were told by the Company to "inform" geriatric physicians, nurses and consultant pharmacists that the use of Depakote, rather than anti-psychotics, would allow nursing homes to avoid the "use" and documentation requirements of OBRA.[4]

85. Beginning in the late 1960's, Haldol, an antipsychotic drug indicated for schizophrenia, was marketed off-label to nursing homes for use as sedative in lieu of physical restraints. Unfortunately, over the past three decades the off-label use of drugs in nursing homes has spun out of control as drugs with a sedative effect are being used as a substitute for proper staffing. From 1993-2003, the atypical antipsychotics -- including Risperdal, Seroquel, Geodon, Abilify and Zyprexa -- were introduced to the market and off-label marketed to the nursing home sector for their sedative effect. With the sales of these drugs in the geriatric market escalating dramatically, Abbott seized on the opportunity to off-label market its drug Depakote which is not even an antipsychotic but rather an antiseizure medication. In doing so, Abbott competed its drug for off-label use against the atypical antipsychotics which were themselves marketed and used off-label.

---

[4] The relevant portions of OBRA were codified within the Social Security Act, 42 U.S.C. § 1395i-3 and are sometimes referred to generally as the "OBRA requirements" or the "Nursing Home Reform Act."

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

The confluence of these major drug companies unlawfully competing these drugs against each other and marketing them to such a vulnerable patient population has defied the most basic medical ethics and placed patients at known risk for serious physical harm including death.

86.    In 1987, OBRA addressed this over utilization of drugs in nursing homes by mandating that nursing home patients be "free from restraints" including drugs used as "chemical restraints imposed for purposes of discipline or convenience and not required to treat ... medical symptoms." 42 U.S.C. § 1395i-3 (c)(1)(ii).   OBRA regulates the "[u]se of psychopharmacologic drugs" in  nursing homes and requires that "[p]sychopharmacologic drugs may be administered only on the orders of a physician and only as part of a plan... designed to eliminate or modify the symptoms for which the drugs are prescribed and only if, at least annually, an independent, external consultant reviews the appropriateness of the drug plan of each resident receiving such drugs." 42 U.S.C. 1395i–3 (c)(1)(D)

87.    The 1987 legislative history pertaining to OBRA indicated that Congress was concerned that "psychotropic drugs are being used to manage [nursing home] residents for the convenience of nursing facility staffs in a manner that is wholly inconsistent with high quality care of an adequate quality of life." H.R. Rep. 100-391(I), at 458 (1987), reprint in 1987 U.S.C.C.A.N. 23113-1, 2313-278.

88.    OBRA's implementing regulations mandate that each nursing home resident receive "the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being." 42 C.F.R. § 483.25. Within this context, the  regulations also mandate that "[e]ach resident's drug regimen be free

29

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

from unnecessary drugs." 42 C.F.R. §483.25(l).   The regulations make clear that an

"unnecessary drug" is "any drug" when used in excessive dose, for excessive duration,

without adequate monitoring, or without "adequate indications for its use," in the

presence of adverse consequences which indicate the dose should be reduced or

discontinued and/or any combination of these factors *Id.* While the OBRA regulations

specifically address the use of anti-psychotics in nursing homes, the regulations make

clear that any drug can be classified as "unnecessary." Despite the unambiguous

language in OBRA and its implementing regulations, Abbott trained its sales

representatives to tell physicians that Depakote was not within the category of drugs, *i.e.*,

"psychopharmacologic drugs," that were subject to the strict documentation and

monitoring requirements of OBRA because it was not a "antipsychotic drug." 42 U.S.C.

1395i–3 (c)(1)(D); 42 C.F.R. § 483.25

89.    Abbott's interpretation of OBRA not only conflicted with the plain

meaning of the statute, but the proposed policies of the Health Care Financing

Administration (HCFA), which later became the Centers for Medicare and Medicaid

Services (CMS).  At least as early as 2001, HCFA indicated in draft guidance that it

believed the prohibition against using "unnecessary drugs," included the use of

medications used as alternatives to antipsychotics when such drugs were used to manage

behavioral symptoms in patients with dementia.   In 2006, CMS issued final guidance

addressing the use of "unnecessary drugs," specifically stating that a

"'psychopharmacological medication' is any medication used for managing behavior,

stabilizing mood, or treating psychiatric disorders." *See*, State Operations Manual

Appendix PP - Guidance to Surveyors for Long Term Care Facilities (Effective 12-18-

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

06). At the same time, CMS added Depakote to a list of medications that "have the potential to cause clinically significant adverse consequences, that may have limited indications for use, require specific monitoring, and which warrant careful consideration of relative risks and benefit."

90. By employing a false sales pitch that Depakote's use by nursing homes would not trigger oversight pursuant to OBRA and that Depakote was an alternative to drugs that were subject to strict use requirements pursuant to OBRA, Abbott wrongfully increased Depakote's off-label use in facilities treating geriatric patients while aiding and abetting nursing home operators that understaffed their facilities. Abbott's argument that Depakote was not subject to OBRA but, at the same time, was a replacement for the anti-psychotics being used to treat elderly patients suffering from agitation associated with dementia, was not only disingenuous but also inconsistent, further under-scoring Abbott's unlawful conduct.

91. To ensure that its message about OBRA reached physicians at nursing homes and other long term care facilities, Abbott also told its sales force that OBRA did not apply to Depakote because Depakote was "so safe" and "did not have the same terrible side effects" associated with anti-psychotics. This representation was false and Abbott knew or should have known that it was false at the time it was made. Moreover, Abbott never provided its sales representatives with copies of OBRA, OBRA regulations or related agency guidelines. Instead, Abbott provided its sales force with a series of articles emphasizing the regulatory scrutiny given to anti-psychotics. Those articles included: (1) *Federal Regulation and the Use of Antipsychotic Medications in Nursing Homes*, Thomas W. Fredrickson, M.B.A., Chad Bolton, MD, M.P.H.; (2) *OBRA*

31

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

*Regulations and the Use of Psychotropic Drugs in Long Term Care Facilities, Impact and Implications for Geropsychiatric Care,* Alan Stoudmire, M.D. and David A. Smith, M.D.; and (3) *The New OBRA Enforcement Rule: Implications for Attending Physicians and Medical Directors,* Steven A. Levinson, M.D. In this way, Abbott focused its sales force and physicians on only one aspect of OBRA, the use of anti-psychotics.

92.    By encouraging its sales force to convert patients from antipsychotics or to add Depakote to an antipsychotic regimen, Abbott sought to have its drug Depakote replace drugs with different indications and different safety and efficacy criteria. Moreover, Abbott encouraged its sales force to compete against drugs that — themselves — were being unlawfully off-label marketed. In doing so, Abbott knowingly caused Depakote to be unlawfully off-label marketed.

93.



Abbott instructed Relator and other Depakote sales representatives to market Depakote, in these in-services, as a drug that could be prescribed to elderly patients suffering from behavioral problems associated with dementia that would "fly under the radar screen" of OBRA. Relator performed many of such in-services during her tenure at Abbott.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

94.     In February 2007, Abbott held a nationwide conference call for its entire

Depakote long term care sales force, Depakote marketing staff, and upper level

managers, including Wes Mathias, Abbott Regional Account Manager, to discuss the

Centers for Medicare and Medicaid Services' guidance issued in September 2006 related

to OBRA's restriction of "unnecessary drugs" in nursing homes.  During the conference

call, Mr. Mathias and an Abbott marketing employee, Anthony Cartwright, instructed

Depakote sales representatives to inform physicians treating elderly patients suffering

from agitation associated with dementia about methods to circumvent OBRA regulations,

such as 42 C.F.R. § 483.25(l), requiring long term care facilities to ensure that residents

do not receive drugs in (1) excessive dose, or (2) for excessive duration, or (3) without

adequate monitoring, or (4) without adequate indications for its use, or (5) in the presence

of consequences that indicate the dose should be reduced or discontinued or (6) any

combination of the above (*i.e.*, "unnecessary drugs").

95.     Mr. Mathias and other Abbott presenters leading the conference call

encouraged long term care representatives, including Relator, to actively approach

physicians to discuss the new CMS Guidance and inform them that Depakote would not

fall within OBRA's ambit if physicians coded patients as "late onset of bipolar" or

"underlying seizure disorder" in the elderly rather than as agitation associated with

dementia.  According to Abbott's presenters, the added benefit to physicians' mis-coding

"agitation associated with dementia" as other diseases or disorders, rather than a drug

used to control behavior, was that physicians would not be required to, *inter alia*, monitor

blood levels, assess the need for drug holidays or gradual dose reductions,

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

96.     Another sales representative from Relator's district took notes of the nationwide conference call on the CMS Guidance and circulated them to Mark Krummel, Abbott's National Sales Trainer for Neuroscience, and Suzanna Longnecker, an Abbott Regional Training Specialist, in an email dated February 9, 2007. Recounting Abbott's instructions on the call, Relator's colleague wrote, "[t]his conf call was very helpful – thank you for setting it up! After hearing this call I have a positive outlook on these changes instead of it being a negative thing for us." The attached notes from the call stated: "[u]se Abbott Medinfo.com to get off-label required information to the clinicians." The notes also record the following instructions from Abbott's Mathias: "[w]e know safety of Dpk Long Term! Most pts are on multiple meds. Do GDR [gradual dose reduction] on other meds first. Do GDR on Dpk last." Abbott's instructions to its LTC/SA representatives to encourage physicians to reduce the dosage of other drugs, before Depakote, in elderly populations in long term care facilities had no basis in Depakote's package insert.

97.     Defendants' attempt to circumvent the requirements of OBRA by counseling physicians to mis-code illnesses was a component of Defendants' overall scheme to maintain and increase sales of Depakote for off-label uses, such as agitation associated with dementia, in a climate where Government regulators were becoming increasingly concerned with the over-medication of patients and patient safety in long term care facilities.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

B.   **ILLEGAL MARKETING SCHEMES PERTAINING TO THE OFF-LABEL USE OF DEPAKOTE FOR BEHAVIOR DISORDERS RELATED TO DEMENTIA AND/OR ALZHEIMER'S DISEASE**

1.   **In 1998, Abbott Created An Entire Sales Division To Off-label Market Depakote To Elderly Patients in Institutions**

98.   In or about 1998, Abbott created the Long Term Care division ("LTC"), a separate nationwide division of sales representatives exclusively devoted to off-label marketing Depakote to long term care facilities and skilled nursing facilities, most of which overwhelmingly treated elderly patients on Medicare, Medicaid or other public assistance programs.  This division was created and/or maintained with the knowledge and consent of Abbott management including███████████

99.   Typically, long term care facility residents are over 65 and not appropriate candidates for "assisted living" settings because they have injuries and illnesses, including mental illness and dementia, rendering them unable to care for themselves. Moreover, the vast majority of long term care facility residents have exhausted their own personal funds and private insurance and, because of their age, qualify for Medicare and Medicaid funds.  Some long term care facilities are entirely Government-owned and run, including Georgia's War Veteran's Nursing Home, and state-owned hospitals, operating entirely on public money; however, even privately-owned long term care facilities primarily rely on payments from Medicare and Medicaid.

100.   At the inception of Abbott's LTC division in 1998, about 30 sales representatives were assigned to off-label market Depakote to long term care and skilled nursing facilities.  Up until at least 2007, Abbott continued to add off-label Depakote sales representatives each year until the number reached approximately 180 as of June 2007.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

101.    Until approximately 2004, Abbott utilized four divisions to market

Depakote: the LTC division (primarily targeting "agitation associated with dementia"),

the Neuroscience Sales division (targeting epilepsy), SR Sales division (targeting

psychiatric illnesses), and the Institutional Sales division (serving universities,

community mental health centers, and hospitals for a variety of diagnoses). Fearing that

regulators would detect its extensive efforts to off-label market Depakote in the LTC

division, Abbott combined its Depakote LTC division with other divisions to form what

was known as the Specialty Accounts division (hereafter "LTC/SA division").

Representatives working in the new division, including Relator, were known as Specialty

Account Executives ("SAEs"). This combination, done to avoid the scrutiny of

regulators, was accomplished with the knowledge and consent of ▮▮▮▮▮▮▮▮

102.    Relator was an Abbott sales representative in the LTC/SA from its

inception until 2007 when she left the Company. During her entire tenure at Abbott, as a

condition of her continued employment, Relator off-label marketed Depakote in the

LTC/skilled nursing setting for elderly patients suffering from a variety of symptoms

associated with dementia, such as kicking, screaming, biting, depression, etc.,

collectively known in the geriatric practice area as "agitation associated with dementia."

In 2004 when Abbott formed LTC/SA division, the Company also required Relator to

off-label market Depakote for a variety of illnesses primarily at public mental health

centers, which primarily served Medicaid patients, and VA hospitals, which are fully

funded by the federal Government.

103.    Abbott's Specialty Accounts division also had representatives marketing

Depakote for on-label illnesses, but all sales representatives in Specialty Accounts also

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

had responsibility for the off-label marketing of Depakote within their own territory. Depakote off-label sales were the fastest growing segment of business within the Depakote brand.

104.    Abbott encouraged off-label marketing of Depakote through compensation packages that either directly or indirectly rewarded representatives for the success of their off-label marketing activities. For example, Relator McCoyd exclusively marketed Depakote off-label and received bonuses based on the weight (kilograms) of Depakote prescribed at each of the facilities she covered in her territory. The Abbott incentive plan for its LTC/SA sales force in 2007 specifically discussed how bonuses were based on the attainment of "LTC and Non-LTC quota" by LTC/SA representatives and the "corporate product performance." While some of the prescriptions at nursing home facilities were for "on-label" diagnoses, the vast majority were not.

105.    In defining its market, Abbott instructed its sales representatives that Depakote's competitors were an array of psychopharmacological drugs, including but not limited to, Risperdal, Seroquel, Geodon, Trileptal, Lamictal, and Abilify. Abbott provided sales representatives with detailed data showing utilization of these drugs by particular physician and institution. Representatives were challenged by Abbott to "convert" physicians or institutions from prescribing these drugs to prescribing Depakote for patients suffering from agitation associated with dementia or encourage physicians to add Depakote to these drugs. Abbott encouraged the conversion from Risperdal, Seroquel, Geodon, Trileptal, Lamictal and Abilify to Depakote or the addition of Depakote to these drugs even though these drugs' indications and side effects are different from Depakote and were also being used off-label.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

106.    Abbott's definition of the market and its encouragement to its sales force

to convert utilization or cause the adding of Depakote to other drugs marked an extremely

dangerous marketing effort. First, the competitor drugs did not have the same

indications, side effects or dosing requirements. Second, while some of the atypical

antipsychotic mediations have indications to be used with Depakote for certain illnesses,

the use of Depakote with atypical antipsychotic medications has never been approved to

treat agitation associated with dementia.

107.    Relator McCoyd and other Abbott LTC/SA representatives used a system,

at least up until June 2007, called "Working The Wheel" or "account wheel," to target

Depakote off-label marketing to physicians and institutions which Abbott believed would

potentially yield the most off-label prescriptions of Depakote for agitation associated

with dementia. In this "Wheel" system, Abbott directed its LTC/SA representatives to

the "right customers," specifically those able to increase off-label use, including:

    (1)    medical directors and consultant pharmacists at large long term

        care facilities and state hospitals, with a lesser emphasis on the

        general practitioners and nurses working in these facilities;

    (2)    ██████████████████████████████

        ████████████████   ████████████████and

    (3)    geriatric psychiatrists, general practitioners, and nurse practitioners

        who devoted at least two-thirds of their practice to the elderly.

108.    In or about January 2004, in furtherance of targeting the "right customers"

to increase off-label sales, Abbott began purchasing prescription data from Health Market

Science, Inc., which tracked prescription volume and diagnoses data by medical

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

institution or institutional pharmacy. Abbott LTC/SA representatives nationwide

accessed this prescription data on-line in a spreadsheet format called the Functional

Institutional Market Report ("Functional IMR"). The Functional IMR, which was

regularly updated, provided Abbott LTC/SA representatives with, among other things:

> (1)    the quantity of prescriptions written by physicians at particular
>
> medical institutions and/or provided by long-term care pharmacy
>
> providers for Depakote, Risperdal, Seroquel, Zyprexa and other
>
> psychoactive drugs;
>
> (2)    the diagnoses codes for which these drugs were prescribed; and
>
> (3)    the relative national ranking of each medical institution or long-
>
> term care pharmacy based on the volume of Depakote
>
> prescriptions written.

109.    Abbott also purchased data from ███████████ called the LTC Key

Physician Tracker ("LTC KPT"), which Abbott LTC/SA representatives used to gather

prescribing information about physicians practicing in long term care facilities. Each

physician in the LTC KPT was identified by specialty, location and market volume of

prescriptions written for Depakote, compared with other drugs such as Haldol, Risperdal,

Seroquel and Zyprexa.

110.    In addition, ███████████ and Abbott developed a "metric" for evaluating

physician prescription data for each physician tracked by LTC KPT. The metric sorted

each physician into a particular category, which provided the means for Abbott LTC/SA

representatives to target long term care physicians, determine "call frequency and

messaging" for individual physicians, and "establish share goals" for individual

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

physicians (*i.e.*, Depakote sales goals for physicians). These physician categories were: "loyalist," "grower," "bleeder," "potential," "maintain," or "low/no." Abbott defined these categories as follows:

- "Loyalist" physicians frequently prescribed Depakote rather than other psychoactive drugs, such as antipsychotics, for off-label uses promoted by Abbott in the long term care market.

- "Grower" physicians were those Abbott believed would continue to increase prescribing off-label Depakote prescriptions in the long term care market.

- "Bleeder" physicians formerly prescribed Depakote for off-label uses regularly in the long term care market, but were, at that time, prescribing other drugs with more frequency.

- "Potential" physicians were those Abbott believed could be converted to using Depakote, over other comparable drugs, in the long term care market.

111.    In short, the LTC KPT's designations determined, in part, how Abbott LTC/SA representatives spent their time marketing Depakote off-label to physicians, nurses, medical directors and consultant pharmacists. These designations also assisted Abbott and ▮▮▮▮▮▮▮▮ joint efforts to prescribe Depakote off-label for agitation associated with dementia, as the designations provided LTC/SA representatives with physician specific prescribing habits rather than overall sales by institution.

112.    The data pertaining to the number of prescriptions written by each physician for other drugs in other classes, such as atypical antipsychotics, was used by

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

Abbott to incentivize its Depakote LTC/SA representatives to "convert" physicians using

other drugs such as Risperdal for agitation associated with dementia, even though

Risperdal is an antipsychotic and Depakote is an antiepileptic. The atypical

antipsychotics also do not have an indication for agitation associated with dementia, but

Abbott considered them to be "competitors" from which to capture business in the

nursing home setting. By defining these drugs -- which were not the same as Depakote

and were themselves marketed off-label -- as competitors, Abbott was furthering its

unlawful marketing conduct.

113.    In a concerted plan to conceal its wrongful conduct, Abbott forbade its

LTC/SA representatives from putting their "call notes" (*i.e.*, brief summaries of

discussions with doctors on sales calls, used by managers to track Abbott's sales force's

progress) into the Company-wide computer system used by all Abbott sales

representatives called "MAX." Instead, LTC/SA representatives were instructed to

record in MAX only the office visits with doctors, but to keep separate handwritten notes

detailing the subject matter of the calls on paper, which were later faxed to their

managers. Abbott's MAX system required sales representatives to document the

diagnosis discussed with a physician through use of a "drop-down menu" system. Only

diagnoses that fell within Depakote's indication were contained on the drop-down menu,

such as epilepsy, migraine and bipolar mania. Abbott managers instructed LTC/SA

representatives to document in MAX the physician's name, the date of the call, and one

of the on-label diagnoses, even though the sales representatives were primarily detailing

long term care physicians and physicians in community mental health centers about

illnesses, which were not within Depakote's label.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(h)(2)

2. **Abbott Trained Its Sales Force To Off-Label Market Depakote For Elderly Patients**

114.    In furtherance of a scheme to conceal its wrongful conduct, Abbott conducted "off site" (outside the Abbott Park location) training sessions for sales representatives. These training sessions focused on maximizing Depakote sales through off-label promotion. Because Abbott feared the implications of developing a standardized unlawful sales training program for Depakote held at Abbott's headquarters, off-label training was provided by outside consultants, including training conducted by Dana Saffel who was at the time of the improper marketing activities, the President & CEO of PharmaCare Strategies, Inc., located in Santa Rosa, Florida.

115.    Ms. Saffel was an approved Abbott Speaker and trainer, whose name appears on Abbott's official approved Speaker List starting in 2004. PharmaCare Strategies, Inc.'s website states that it is "a market development firm that specializes in assisting pharmaceutical manufacturers and pharmacy providers in positioning key products in specialty channels such as long-term care, managed care, Medicaid/Medicare and hospital markets." The website states that prior to starting PharmaCare Strategies, Inc., Ms. Saffel was the "Vice President of United Pharmacy Services, Inc., a long-term care pharmacy serving over 12,000 residents through Georgia, North Carolina and South Carolina." Abbott paid Ms. Saffel $2,000.00 per day for each sales representative being trained. Abbott provided each manager in the LTC/SA channel with funds to train their sales staff; Ms. Saffel's payments came from such funds. Unlike other Abbott training programs held at Abbott Park, Illinois, Ms. Saffel's training occurred in a variety of locations across the country.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

116.    Abbott Marketing Managers also hand-picked LTC/SA representatives
who had developed methods of marketing Depakote off-label to share their techniques
with other LTC/SA representatives at regional and national sales meetings.  At one such
meeting, while Relator and another LTC/SA representative were tapped by Abbott
Depakote Trainer, Suzanna Longnecker and District Manager, Jaynie Christensen, to
provide off-label sales training for the LTC market, they were explicitly forbidden from
preparing or distributing any written materials outlining the training topic.  In order to
maintain plausible deniability, Abbott upper level management, including Mark
Mularski, an Abbott product manager, attended Depakote sales training sessions but
purposefully left the room when the off-label training sessions began.  Relator was
repeatedly told by her managers that while upper level management at Abbott knew
about off label training sessions, they did not want to personally bear witness to these
sessions.

117.    As part of the Abbott training process, LTC/SA representatives were
required to memorize and practice "role plays," which were scripted sales calls developed
by Abbott to address physician objections to prescribing Depakote off-label for the
purposes that Abbott sought to promote.  LTC/SA representatives, including Relator
McCoyd, practiced the Abbott role plays with other representatives in mock sales
scenarios and were critiqued by Abbott managers.

118.    Even after the training sessions were completed, Abbott required LTC/SA
representatives to regularly practice role plays with supervisors over the telephone, so
that Abbott's scripted off-label messages about Depakote became standardized.  Abbott
required Relator, as well as other LTC/SA representatives, to perform telephone or

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

"voicemail role plays" at least once or twice a month. Abbott even held contests to

determine which representative had the best role play. The winning "voicemail role

play" would often be distributed throughout the Abbott organization as a model.

119.    Abbott further encouraged LTC/SA representatives to deliver Abbott's

carefully scripted message about the off-label use of Depakote by setting up monthly

contests, within each of Abbott's district sales areas, that rewarded representatives with

monetary awards based on, *inter alia*, message delivery, appropriate use of sales

materials, execution of speakers programs, and performance on "role plays" delivered

over the phone on "call-ins."

120.    Abbott also developed and trained its LTC/SA representatives to instruct

or "detail" physicians about agitation associated with dementia by using Company-

approved sales aids, ostensibly designed to promote Depakote's on-label uses. For

example, in 2004 Abbott provided its Depakote LTC/SA sales force with a Slide Kit and

Slide Notes (also reduced to a sales aid booklet) called "Make A Difference with

Depakote, Skilled Nursing Slide Kit." The front cover of the booklet shows an elderly

man in a wheelchair in pajamas, an elderly woman, and a middle aged man.  Slide 3

presents a table of symptoms for each of Depakote's on-label uses.  The symptoms listed

for bipolar mania are:  aggression, hostility, hypersexuality, elevated expansive mood,

extreme irritability,  verbal agitation, motor agitation, sleep-wake cycle disturbance,

flight of ideas, grandiosity and poor judgment. Abbott specifically designed the sales aid

to be used by its LTC/SA representatives in skilled nursing facilities where a large

number of elderly patients, who can no longer care for themselves, are being treated for

illnesses not primarily for epilepsy, migraine or bipolar mania (all relatively small

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

populations of patients in nursing homes). The Skilled Nursing Kit expanded on earlier

Depakote sales aids produced by Abbott, including a 1999 sales aid entitled "Recognize

the Symptoms," which Relator used in the same manner.

121. Abbott trained Relator to use the bipolar mania "symptoms" chart found

in these sales aids as a spring board to question physicians and other health care providers

about their patient populations. For example, Relator was instructed to point to the

symptoms chart and ask physicians: "Do you treat patients in this nursing home with

aggression, hostility etc.?" When the physician responded affirmatively, Relator was

taught to segue into an off-label discussion of Depakote's use for agitation associated

with dementia. In this way, Abbott trained its sales force to secure illegitimate sales of

Depakote by obscuring the differences between bipolar mania and agitation associated

with dementia, which have similar symptoms but are distinctly different diseases. By

way of example, a cough can be caused by the common cold or lung cancer — the

symptoms are the same but the diseases are so different as to make the focus on the

common symptoms irrelevant.

122. Some versions of Abbott's Depakote sales aids, including the Skilled

Nursing Kit, also include a variety of non-Depakote and non-drug related data, such as

disease statistics, to provide "cover" or as "pretext" for Abbott's promotion of Depakote

off-label in certain health care settings, such as skilled nursing homes, where the

likelihood of capturing significant legitimate Depakote prescriptions is highly unlikely.

123. For example, Slide 4 of the Skilled Nursing Slide Kit ostensibly addresses

"Epidemiology in Bipolar" and states that "5% to 12% of geriatric psychiatry admissions

are for bipolar disorder," "9.7% of nursing home patients have bipolar disorder," and

45

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

"10% of bipolar patients develop their illness after age 50." These statistics, hardly impressive enough to devote the resources of an entire sales force, were used by Abbott to justify its presence in skilled nursing and long term care institutions where they hoped to make it appear that Depakote sales representatives were promoting the drug for bipolar mania, when the true targets were patients suffering from agitation associated with dementia. The "epidemiology in bipolar" data presented in Abbott's sales aids was also misleading as it related to the use of Depakote, because the data did not indicate how many elderly patients suffer from manic or mixed episodes of bipolar disorder, which was the only FDA approved bipolar indication for Depakote ER.

124.    In addition to the Abbott approved sales aids for Depakote, Abbott trained the entire Depakote LTC/SA sales force, including Relator, to detail physicians about prescribing Depakote for agitation associated with dementia using expert consensus guidelines developed in 1998 by physicians and paid for partly by Abbott and other large pharmaceutical companies, which was distributed as a "Special Report" by a journal called "Postgraduate Medicine." Relator's trainers told her to tell physicians that Abbott had given an unrestricted grant to "Postgraduate Medicine" to assist in the development of the guidelines.

125.    Abbott trained Relator and the entire LTC/SA sales force to "cherry pick" the most useful information from these expert consensus or therapeutic guidelines and provided them with sample dialog to use with physicians.

126.    The same or similar expert consensus guidelines were also published in small booklets by Defendants ███████████████, through grants provided by Abbott. Abbott encouraged LTC/SA representatives to conduct training programs for

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

nurses in long term care and skilled nursing facilities served by ▮▮▮▮▮▮▮

▮▮▮▮▮▮ contracts, using these guidelines to promote Depakote for agitation

associated with dementia. Relator's manager directed her to make a PowerPoint

presentation using therapeutic guidelines for in-services with physicians and nurses.

127.    Also in furtherance of its illegal marketing of Depakote, Abbott

encouraged LTC/SA representatives to attend patient and/or caregiver support group

meetings, sponsored by third party organizations, providing patients with information

about treatment options and emotional support. Abbott encouraged LTC/SA

representatives to promote Depakote off-label uses in these support group meetings to

patients and caregivers directly. Abbott also paid for and provided materials, such as

brochures, for LTC/SA representatives to give directly to those attending these support

group meetings. For example, Relator promoted Depakote at programs given by the

Alzheimer's Association at various locations called "Doctors and Desserts," which was a

patient and caregiver support group meeting.

128.    Defendant Abbott's unlawful activities were inconsistent with legal

proscriptions against off-label marketing and with Abbott's written policies against off-

label promotion, which were little more than distractions, or window dressing, aimed at

misleading government enforcement officers.

3.    **Kickbacks: Abbott Paid Physicians To Induce Prescriptions
      And Hijacked CME And Other Ostensibly Independent
      Educational and Scientific Programs For The Unlawful
      Promotion of Depakote**

129.    Abbott's marketing strategy included the allocation of substantial

resources for its LTC/SA division to "educate" physicians and other health care

professionals about off-label uses Abbott promoted, including but not limited to, agitation

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

associated with dementia. These resources were allocated to each LTC/SA representative

and divided into two different funds: (1) the "war chest" and (2) the "ABcomm" funds.

Both funds were primarily used by LTC/SA representatives to pay physicians to spread

Abbott's off-label marketing message to other physicians at speaker's programs, dinner

lectures, Continuing Medical Education classes ("CMEs"), roundtables and other

functions. Relator received between $20,000 to $30,000 per year, collectively in war

chest and ABcomm funds, to pay for these promotional events.

130.   Abbott routinely set timetables for representatives to exhaust the war

chest, so as to ensure that representatives were devoting enough time and money to this

key component of Abbott's off-label message. Moreover, when LTC/SA representatives

failed to exhaust their war chest, they received admonishments from Abbott managers in

performance reviews.

131.   Abbott provided compensation to physicians who promoted Depakote,

either directly or indirectly, usually between $500 and $2000 per speech.

132.   A document entitled, "Abbott Laboratories, Long Term Care National and

Regional Speakers" list indicates, *inter alia*, that Dr. Anton Porsteinsson of the

University of Rochester was paid $2,000 per speech, Dr. Craig Nelson of the University

of California at San Francisco was paid $1,500 per speech, and Dr. Alan P. Siegal of Yale

University was paid $2,500 per speech.

133.   Abbott funneled monies through intermediaries, ▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ and associations, such as the

Alzheimer's Association, so as to disguise the direct payments to doctors and Abbott's

substantial and direct involvement in transforming ostensibly independent educational

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

events into promotional vehicles for Depakote. Relator's managers, including Candice

Scott, and other upper level Abbott personnel openly referred to Abbott's practice of

funneling money through intermediaries as "washing the money."

134.    In furtherance of concealing its scheme to promote Depakote's off-label

use through physician speaker's events, Abbott encouraged LTC/SA representatives to

approach an intermediary to suggest that Abbott fund a speaker's dinner or program to be

given by an Abbott selected local physician who routinely used Depakote off-label.

Abbott called such doctors "thought leaders" or "champions" when they agreed to speak

on off-label Depakote uses. Abbott provided compensation for the physician either

directly or indirectly as a payment to the intermediary, usually between $500 and $2000

per speech.

135.    For example, over Relator's nine year career, Abbott repeatedly directed

her to approach medical organizations to suggest that Abbott fund speakers for their

educational programs. In so doing, Abbott managers instructed the LTC/SA sales force

to suggest speakers handpicked by Abbott, such as Dr. Russell Brown and Dana Saffel

who were champions for Abbott. For example, at Abbott's direction, Relator routinely

approached Peachford Behavioral Health, Alzheimer's Association, and Georgia

American Medical Directors Association ("GAMDA"), among countless other

organizations, to suggest that Abbott sponsor a speaker on the use of Depakote to treat

elderly patients for agitation associated with dementia, as well as other off-label uses of

Depakote.

136.    Abbott also provided funds to intermediaries to pay for the meals of

physicians attending the lecture, often approaching or exceeding $100 per plate. Abbott

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

Operating Procedures for Program Funding, in effect in March 2006, allowed for up to

$125 per meal for attendees as long as there was a speaker.

137.    Abbott recruited physicians who "championed" Abbott's off-label

marketing efforts to be specially trained by Abbott's corporate marketing department.  At

the trainings, which typically occurred in luxury hotels in large cities such as New York

City, Chicago and Atlanta, Abbott marketing managers provided physicians with talking

points and other information over a three day period for use in lecturing at speaker's

programs.  Abbott rewarded these physicians by paying for travel, meals and the time

associated with training.  Abbott also conducted similar training sessions for physicians

called "fly aways," which were all expenses paid junkets to resort locations.

138.    As part of the speaker training, Abbott developed written material,

including PowerPoint presentations and slides, for use by physicians at speaker's

programs.  Abbott encouraged its sales force to provide the materials to speakers who

lectured on the off-label use of Depakote for agitation associated with dementia. The

materials were also available on a website (www.CENE.com) that doctors and LTC/SA

representatives could access called Council for Excellence In Neuroscience Education

"CENE," which was supported by Abbott.  These PowerPoint and slide presentations

featured off-label uses of Depakote, including the use of the drug to treat agitation

associated with dementia.

139.    Abbott directed LTC/SA representatives to "coach" physicians who were

newly selected to lecture at programs paid for, directly or indirectly, by Abbott.  Abbott

ensured that the physicians received "talking points," Abbott-prepared materials, and

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

other key information about off-label uses of Depakote that Abbott wanted to be provided

to the physicians attending the speaker's programs Abbott was promoting.

140. In a September 21, 1999 written evaluation of Relator McCoyd's

performance, Abbott manager Richard Robertson noted that "Meredith had to pick up

speaker at 2:30 (Garrett [sic.] Snipes)" and that she was to "spend time 'coaching' Dr.

Snipes before program."

141. In order to accomplish the coaching, Abbott encouraged its LTC/SA sales

force to personally pick-up speakers from airports or other locations so that the physician

could be reminded about Abbott's key selling messages. Though Abbott later forbade its

sales force from picking up physicians from airports and other locations prior to their

speaking engagements, coaching continued throughout Relator's tenure with Abbott.

142. The content of lectures given by Abbott's paid "champions" was so tightly

monitored and controlled that if a physician failed to promote Depakote in the way that

Abbott management desired, Abbott discontinued further speaking engagements for the

"champion."

143. For example, Dr. Larry Tune was designated by Abbott as a "champion"

of Depakote. Abbott trained Dr. Tune to give promotional lectures on behalf of

Depakote. Because Dr. Tune headed Emory University's Geriatric Hospital and

published several studies, Abbott believed Dr. Tune's national significance within the

geriatric care community would bolster sales of Depakote for use in long-term care

settings for agitation associated with dementia. When Dr. Tune refused to deliver the

message Abbott wanted (i.e., condemning atypical antipsychotic drugs in certain

regimens in favor of Depakote), an Abbott District Manager, Amy Iseckson, complained

**Filed Under Seal Pursuant**
**To 31 U.S.C. § 3730(h)(2)**

to Eric Thomas, Abbott's LTC Regional Manager. Mr. Thomas transmitted a Company-wide message in or about May 2006 condemning Dr. Tune and admonishing LTC/SA representatives from using him to speak about his use of Depakote. Consequently, Dr. Tune was never invited to speak by Abbott again.

144. In order to facilitate the Abbott-supported off-label speaker's programs, Abbott developed and/or contracted with an entity called "ABcomm," to help plan and execute speaker's programs. In addition to helping the sales representatives with the logistics of the speaker's program (such as location, menu selection, invitations, etc.), ABcomm also provided guidance on the appropriate procedures for representatives to follow, including securing approvals from Abbott corporate headquarters. ABcomm, however, did not independently monitor or limit the number of times physicians were paid to lecture, the proposed content of the physician's lecture (including off-label presentations), the LTC/SA representative's involvement in the selection of the speaker or content of the speaker's presentation. ABcomm was nothing more than a conduit for Abbott's unlawful promotion of Depakote for off-label uses through the use of educational and scientific programs.

145. Management staff at Abbott's Illinois corporate headquarters were fully aware of the off-label Depakote speaker's program activities and events that it underwrote financially. Abbott required its LTC/SA representatives to secure advanced approval from Abbott headquarters for payments for the events and the payments to doctors. For example, Relator personally filled out, in handwriting, a "CME Grant Request Form," which was addressed to ABcomm in Champaign, Illinois, for a request to have "Dr. Craig Nelson to speak" for $1500 on "Behav. Disturb. Alzheimers" at an

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

Annual Symposium in Gatlinburg, Tennessee. This is but one example of hundreds of

explicit requests Relator made to ABcomm or Abbott to pay physicians to promote

Depakote for agitation associated with dementia or other off-label uses of Depakote.

Over her nine year tenure, Abbott and/or ABcomm never once denied Relator's requests

to pay for these off-label promotional lectures based on the content of the physician's

proposed lecture. Simply put, even though Abbott had a written policy forbidding its

sales force from using CME and other speaker's programs as off-label promotional

vehicles for Depakote, Abbott never sought to enforce its own rules.

146. Abbott also required sales representatives to procure signed contracts from

the intermediaries whom Abbott paid directly in order to "wash the money." For

example, Abbott's Operating Procedures for Program Funding, dated March 2006, stated

"all arrangements [for professional services] must be reflected in one of the standard

agreements on the Office of Ethics and Compliance (OEC) Website or some other

agreement provided by Legal."

147. Abbott supervisors told Relator McCoyd and other LTC/SA

representatives that it was legal to orchestrate speaker's programs, through

intermediaries, as described above, including selecting and coaching the physician

speakers as long as the appropriate Abbott Letter of Agreement (or "LOA") was signed

by the physician and/or intermediary. Abbott's LOA states, *inter alia*, that the

intermediary or "provider," such as the Alzheimer's Association, "shall maintain full

control over the planning, content, audience and implementation of the Program and over

the selection of speakers, moderators, authors or other faculty of the program."

Significantly, while these LOA documents were developed by Abbott, they failed to

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

reveal the Company's actual involvement and control. In sum, the LOA's were no more

than window dressing concealing Abbott's unlawful conduct.

148.    To conceal the absolute control Abbott exerted over the off-label content

presented by its handpicked speakers at functions Abbott orchestrated through

intermediary organizations, Abbott's official procedures prohibited the conduct used by

Abbott's sales and marketing staff to promote Depakote. For example, the 2006 version

of Abbott's Operating Procedures for Program Funding requires that speaker program

content about Abbott products "must be within labeling."

149.    In addition to speakers programs organized by LTC/SA representatives,

Abbott's marketing department also paid for speaker events at large national meetings

including the symposia Abbott sponsored at the American Medical Directors Association

(AMDA) national meeting on March 7, 2003. AMDA is a national organization of

physicians who coordinate medical care at long-term care facilities. The topics

highlighted at the symposia were primarily directed to off-label uses of Depakote in

nursing homes, including the treatment of agitation associated with dementia. In an

email sent prior to the AMDA national meeting on February 18, 2003, Mary Richter, the

LTC Product Manager for Abbott, urged LTC/SA representatives to review the attendee

list for "targets" (physicians) in their territories and provide them with information about

the symposia. Abbott managers also instructed their respective sales force to set up and

pay for dinner meetings with "target" physicians during the symposia. Ms. Richter was a

manager in Abbott's marketing department in Abbott Park, Illinois.

150.    Abbott also paid some physicians to conduct studies within their own

patient populations as a reward for prescribing large amounts of Depakote or in situations

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

where Abbott managers believed the payment of physicians would encourage future

Depakote prescriptions.

151. For example, Abbott paid $8,0000 to $10,000 to Dr. Hubert "Booney"

Vance of Johnson City, Tennessee, to perform an off-label study of the use of Depakote

for patients who had received Coronary Artery Bypass Graft Surgery and suffered from

agitation associated with dementia. Abbott funneled money for this study and others like

it through the budget for its Medical Liaisons, in this instance, Abbott Medical Liaison

James Stewart. Like other pharmaceutical companies, Abbott employed a staff of

physicians and other medical professionals, called Medical Liaisons, whose purported job

function was to provide specialized scientific and medical information, which could not

be presented or was not known by Abbott's sales force, about Depakote to physicians

seeking information about the drug, including information about off-label uses. Instead

of using its Medical Science Liaisons to meet the legitimate needs of physicians seeking

important patient efficacy and safety information about Depakote, Abbott used its

Medical Science Liaisons to pay physicians to prescribe Depakote. Funding for Dr.

Vance's study, through Abbott's Medical Liaison budget, was nothing more than a means

to disguise an illegal *quid pro quo* payment to increase future Depakote prescriptions by

Dr. Vance.

152. Abbott provided physicians with tickets to entertainment events, such as a

Jimmy Buffett concert in Atlanta in April 2002, and stipends, sometimes as much as

$100.

153. Abbott engaged in these efforts despite Abbott's own policy, which

actually proscribed such conduct.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)



Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

156.    Throughout Relator's tenure, Abbott held on-going promotional

initiatives for Depakote with ▮▮▮▮▮▮▮▮▮▮▮▮▮ For example, Abbott provided

educational grant funding directly to ▮▮▮▮▮▮▮▮▮▮▮▮, to develop therapeutic

guidelines or disease state management programs for treating agitation associated with

dementia. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ The guidelines included, among other things, the

suggested use of Depakote to treat elderly patients exhibiting symptoms, such as kicking,

biting, and screaming in the nursing home setting.

157.    A June 14, 1999 email from Abbott District Manager, Richard Robertson,

discusses a ▮▮▮▮▮▮ "Disease State Management program that Abbott has funded."

Robertson stated "Our Objective in our involvement is to increase Depakote usage and

sales. Those accounts where progress is significantly made can be a windfall of

Depakote sales for your territory, your bonus dollars, and your All-Star ranking."

Robertson's email concluded by asking LTC/SA representatives to "identify 3-4 nursing

homes at each of our ▮▮▮▮▮▮▮▮▮ that are high in bed size, high in

antipsychotic use, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Robertson's hope

was that the nursing homes served by ▮▮▮▮▮▮ would allow Abbott LTC/SA

representatives to come into the nursing homes to train on the use of Depakote for

agitation associated with dementia and convince physicians to switch patients on atypical

antipsychotics to Depakote. Robertson wrote, "Ideally, we would love to have a home of

> 100 beds and .25-30% antipsychotic use ... [T]hese are the homes that are potentially

**Filed Under Seal Pursuant**
**To 31 U.S.C. § 3730(b)(2)**

in danger of warnings or fines until their use of antipsychotics decreases." Abbott's

strategy was to misrepresent the OBRA guidelines in order to drive sales of Depakote.

158.    As discussed above in this Amended Complaint, Abbott used the threat of

non-compliance with OBRA guidelines as a marketing tool to convert dementia patients

on other regimens to Depakote. ▮▮▮▮▮▮▮▮▮▮▮conspired with Abbott to

market Depakote as a "legal" method to avoid OBRA guidelines designed to protect

elderly nursing home residents from over-medication and unnecessary chemical

constraints.

159.



160.    A July 12, 2006 email from Abbott's National Account Manager, Peter G.

Warnes, announced a "multifaceted strategic initiative" between ▮▮▮▮▮ and Abbott,

which Warnes said "sets a new precedent with ▮▮▮▮▮Abbott Laboratories in terms

of dynamic corporate partnerships with the pharmaceutical industry." The email set out a

series of "bi-regional" and national meetings, teleconferences, newsletters and CD-

ROMS and workbooks to be provided to physicians, consultants and other health care

professionals working in institutions served by ▮▮▮▮▮ which concerned the use of

Depakote in long term care settings. According to Warnes' email, the live presentations

and teleconferences were given by Dr. John C. Toledo. While Dr. Toledo's presentations

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

were billed as "Management of Seizures in the Long Term Care Setting" and

"Appropriate Assessment & Documentation of Therapy For Epilepsy in the Long Term

Care Setting," it is well-known that the vast majority of patients being treated at long

term care facilities did not suffer from epilepsy. Moreover, to the extent the programs

focused on seizures not related to epilepsy, the information pertained to off-label uses of

Depakote. Here, Abbott and ▮▮▮▮▮▮▮ sought to blur the lines between seizures

outside Depakote's label and epileptic seizures within Depakote's label. As stated in this

Amended Complaint, while elderly patients did suffer from seizures, Abbott's marketing

of Depakote sought to blur the lines between seizures and/or bipolar disorder and

behavior associated with dementia to capture off-label prescriptions. The strategic

initiative between ▮▮▮▮▮▮ and Abbott here sought to accomplish the same goals.

161.    As discussed infra, long before the 2006 "strategic initiative" referenced

above, Abbott paid for and produced expert consensus "pocket guidelines" for use by

physicians, nurse practitioners, and pharmacists, which summarized the protocol for

agitation associated with dementia so that the information could be readily available to

those practicing in long term care facilities served by ▮▮▮▮▮▮▮▮▮▮▮ These

pocket guidelines contained ▮▮▮▮▮▮▮▮▮▮▮▮▮ but were paid

for by Abbott.

162.    Abbott encouraged its LTC/SA representatives to use the pocket

guidelines, essentially as sales aids, to off-label market Depakote to physicians, nurses

and ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Specifically, Abbott trained its LTC/SA

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

representatives to use the ███████████ "pocket guidelines" to: (1)

recommend Depakote's use for the symptoms related to agitation associated with

dementia; (2) suggest Depakote's dosing for the elderly; and (3) "educate" physicians,

nurse practitioners, consultant pharmacists and nursing home administrators about how

Depakote could be used to avoid OBRA and other federal regulations.

163.   The ████████ Abbott pocket guidelines also served as an approved

CME (physicians) and CE (for nurses) as it contained a written test at the very end of the

booklet.  The test had several questions about information contained in the pocket

guidelines, including at least one question about the benefit of using Depakote for

agitation associated with dementia.  Physicians and nurses could take the test and mail it

in for CME or CE credit.

164. ████████████ ████████████████

████████████████████████████████

████████████████████████████████

██████████ As part of the agreement, Abbott tasked its LTC/SA sales force with

performing hundreds of "in-services," such as dinner and lunch programs given by

Abbott's sales force, including Relator discussing the use of Depakote for agitation

associated with dementia, how Depakote could be used to avoid OBRA requirements,

and Depakote dosing regimens for elderly patients not within Depakote's package insert.

Abbott managers called these "in-services" and promotional efforts a "pull through,"

████████████████████████████████

████████████████████████████████

**Filed Under Seal Pursuant**
**To 31 U.S.C. § 3730(b)(2)**



167.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)



169. In April 2007, shortly before Relator's departure from Abbott, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

proscribing some of the conduct alleged in this Amended Complaint. For example, the

▮▮▮▮▮▮▮▮ forbids, with limited exception, discussions between ▮▮▮▮▮

employees and pharmaceutical representatives regarding the therapeutic interchange

programs, protocols ... or potential economic impact of any formulary or other clinical

initiative." The ▮▮▮▮▮▮ also prohibits, with limited exception, ▮▮▮▮▮

employees from providing pharmaceutical representatives with: (1) prescription

utilization data or market share data; (2) names of physicians who proscribe any drug for

any resident in any ▮▮▮▮▮▮ facility; (3) nursing facility lists or lists of names

of other key nursing facility personnel; (4) names of ▮▮▮▮ pharmacy unit or

consultant personnel. Written approval from ▮▮▮▮ Chief Clinical Officer is also

required for educational activities presented to ▮▮▮▮ employees, which are

sponsored by pharmaceutical companies, including speaker's bureau presentations

sponsored by pharmaceutical companies.

170. ▮▮▮▮▮▮▮ were transmitted by email to Abbott LTC/SA

representatives in Relator's sales district on May 14, 2007 by Abbott District Manager

Mark Krummel. Mr. Krummel stated, that ▮▮▮▮ and Abbott have developed an

exceptional working relationship at all levels of both organizations and these guidelines

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

should not prevent us from continuing our extremely effective partnership with

███████████

### 5. Abbott Misrepresented Study Data Concerning Depakote's Effect on Cholesterol

171. Abbott misrepresented that Depakote lowered cholesterol. Yet, while Abbott had some evidence that the drug lowered total cholesterol, Abbott's data indicated that Depakote lowered not only LDL (the "unhealthy" cholesterol) but also HDL (the "healthy" and necessary cholesterol). When physicians started to question Abbott's position, Abbott LTC/SA representatives, including Relator, were told by Abbott to say that the drug was "metabolically neutral" with regard to cholesterol levels.

172. Abbott encouraged LTC/SA representatives to detail doctors on the purported "metabolically neutral" side effect profile of Depakote by using February 2004 CME materials, including a booklet, sponsored by Abbott entitled "Metabolic Controversies in the Treatment of Psychiatric Disorders." Abbott sales representatives were encouraged to show the CME presentation at Abbott-sponsored physician lunches or dinners and use the booklet to detail physicians on Depakote's cholesterol data. The 2004 CME, *inter alia*, summarized data gathered in studies of Depakote in combination with Olanzapine ("Zyprexa") or Risperidone ("Risperdal") for patients experiencing an acute exacerbation of schizophrenia, an off-label use of Depakote. The CME showed only "total cholesterol" data, rather than HDL and LDL data.

173. Abbott also provided and trained its LTC/SA representatives to detail physicians using a study it sponsored to study Depakote in combination with Olanzapine or Risperdal experiencing an acute exacerbation of schizophrenia, entitled, "Effect of Divalproex Combined with Olanzapine or Risperdone in Patients with an Acute

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

Exacerbation of Schizophrenia," Daniel E. Casey *et al.*, *Neuropsychopharmacology*

(2003) 28, 182-192. The study stated that total cholesterol levels of participants in the

study "tended to be elevated with antipsychotic monotherapy, but were unchanged or

decreased in the combination therapy groups [*i.e.*, combination of Depakote and

Risperdone or Olanzapine]." *Id.* This is the language Abbott taught its LTC/SA

representatives to focus physician attention upon, though the Casey study also noted the

significance of the cholesterol findings and other similar studies' findings merited further

study.

174. Many of Abbott's sales aids also featured the "total" cholesterol data. For

example, a 2004 Depakote sales aid stated, "Metabolic Effects Are Important When

Choosing Bipolar Therapy: Depakote Did Not Increase Cholesterol in Clinical Trials."

Abbott's promotion of Depakote as "metabolically neutral" drug was misleading and,

thus, misbranded the drug.

C. ABBOTT OFF-LABEL MARKETED DEPAKOTE FOR A VARIETY OF OTHER
     ILLNESSES

1. Bipolar Depression in Adults and Children

175. Abbott encouraged its sales force to unlawfully promote Depakote for

childhood and adult bipolar depression. Depakote is indicated for mania associated with

bipolar disorder in adults, but not depression associated with bipolar disorder ("bipolar

depression") or maintenance therapy of bipolar disorder. Depakote is not indicated for

children with any type of bipolar disorder. A pediatric study to evaluate the efficacy of

Depakote ER for mania in patients aged 10-17 years of age, which is discussed in some

detail in Depakote's Prescribing Information, failed to establish efficacy of Depakote for

this patient population.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

176.    Bipolar patients "cycle" between "manic" and "depressed" states.

Statistically, "bipolar disorder I" patients spend more time in the "depressed" phase than

in the "manic" phase.  Because the market for treating the "depressed" phase of "bipolar

I" was larger than the market for treating the "manic" phase of "bipolar I," Abbott seized

the opportunity to off-label market Depakote DR and Depakote ER for the non-indicated

bipolar depression, primarily to community mental health centers where the drug

Lamictal was being used.

177.    Lamictal is indicated for maintenance treatment of "bipolar I disorder," to

delay the time to occurrence of mood episodes (depression ("bipolar depression"), mania

("bipolar mania"), hypomania, and mixed episodes), while Depakote ER is indicated for

acute manic and mixed episodes associated with bipolar disorder.  Depakote ER is not

indicated for "maintenance" of bipolar mania.  The package insert states that efficacy for

bipolar mania has not been studied for periods greater than three weeks of use.

178.    Abbott's primary competition for bipolar disorder is and was Lamictal.

Abbott directed Relator McCoyd to convince Cobb County Mental Health and Peachford

Mental Health in Georgia, as well as other community mental health centers in her sales

territory, to use Depakote off-label for bipolar depression, as a first line treatment, over

Lamictal, even though Depakote does not have the indication for bipolar depression.  For

example, Abbott provided sales data to Relator showing that Cobb County Mental Health

prescribed much more Lamictal than other anti-epileptic or antipsychotic drugs.  Abbott

required its Depakote sales force, including Relator, to "grow" Depakote in the bipolar

depression "market."  Abbott included Lamictal sales data in each LTC/SA

representatives' functional Institutional Market Report ("IMR") and specifically required

65

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

Abbott's sales force to "capture" or "convert" Lamictal sales to Depakote sales. Lamictal

was placed in Relator's IMR for Cobb County Mental Health, a public health center,

created by Georgia law to provide mental health, developmental disability, and substance

abuse services primarily to Medicare and Medicaid eligible patients. Cobb County

Mental Health does not treat epilepsy. .

179.    An Abbott sales representative, covering the community mental health

centers around Atlanta before they were assigned to Relator, noted: "AED's [anti-

epilepsy drugs] also on the rise here [Peachford] - Lamictal with bipolar depression

indication has increased use... ." The plan was to use studies to off-label market Depakote

for maintenance of bipolar disorder, so as to "separate Dep[akote] as the foundation for

the bipolar pt. [patient]."

180.    Abbott also paid Dr. Gami of Emory University $2,000 to $3,000, either

directly or indirectly, to provide a lecture to physicians at Peachford Mental Health about

prescribing Depakote off-label for bipolar depression.

181.    Abbott paid Dr. Joseph Bona $1,500 to discuss bipolar depression at the

Cobb County Community Service Board. Dr. Bona was selected to speak by Abbott

because he was the clinical director at the Dekalb Community Service Board, a public

provider of services for patients experiencing mental illnesses, developmental disabilities,

and addiction illnesses that had over 20 locations in the metropolitan Atlanta area. Dr.

Bona was selected by LTC/SA sales representatives, approved and paid by Abbott, but

like many physicians paid to promote Depakote, Abbott had no formal vetting process to

determine physician qualifications, training, experience and/or whether the physicians

had received any disciplinary action. Abbott managers rarely requested information

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

about local or regional speakers, as long as LTC/SA representatives believed that the speaker would promote Depakote. However, managers occasionally requested that Relator and other LTC/SA representatives provide the physician's Curriculum Vitae and the number of patients the physician treated.

182. Relator and other LTC/SA representatives were trained to off-label market Depakote for bipolar depression through use of "role plays" developed by Abbott. Using guided questions and answers, the "role plays" showed Abbott representatives how to overcome physician objections to using Depakote off-label over Lamictal.

183. Also as a result of Lamictal's success in the child psychiatric market, Relator's manager, Jaynie Christensen, arranged for Kim Dahmen, a Depakote sales representative who previously marketed the drug in Abbott's Neuroscience Division, to train all Depakote sales representatives in Relator's sales district about how to compete with Lamictal in the pediatric and adult psychiatric markets. Ms. Dahmen likely received her training through Abbott national and district meetings focused on marketing Depakote in the psychiatry specialty areas.

184. Abbott believed that Lamictal was selling better than Depakote in the bipolar market because patients typically did not seek treatment when they were in the "manic phase" of bipolar disorder (*i.e.*, at the time the patient felt euphoric). Abbott, therefore, sought to capitalize on the notion that just treating the depressive phase of bipolar disorder with Lamictal was not sufficient because, eventually, the patient would swing into the manic phase of bipolar disorder.

185. Ms. Dahmen trained Relator and other Depakote sales representatives, formerly in Abbott's LTC division, to characterize Depakote as a "true bimodal

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

medication" based upon a study conducted by Dr. Charles L. Bowden, which found that

Depakote was more effective than lithium in preventing bipolar patients from cycling into

depression. *See* Charles L. Bowden, M.D. *et al.*, "A Randomized, Placebo-Controlled

12-Month Trial of Divalproex and Lithium in Treatment of Outpatients with Bipolar I

Disorder," Arch. Gen. Psychiatry, Vol. 57, May 2000.

186.    The statement that Depakote is "bimodal" is not approved by the FDA and

the Bowden study was not a "head to head" study between Depakote and Lamictal.

Moreover, the Bowden study was not technically approved for use by Abbott's

compliance department even though Relator and many other sales representatives were

given official Abbott re-prints and encouraged to use the materials for use in detailing

psychiatrists for bipolar depression.

187.    For children, Depakote sales representatives were trained to focus on a

negative side effect of Lamictal, *i.e.*, Stevens-Johnson syndrome, a life-threatening skin

disease that is akin to having body-wide third degree burns.

188.    Realtor was  taught to deal with objections by psychiatrists to using

Depakote to treating children with bipolar disease.  At Cobb County Mental Health

Center ("Cobb County"), Drs. Glover and Carter explained to Relator that they used

Lamictal for children suffering from bipolar disease because Lamictal is indicated for use

in children over age two with epilepsy and for adult bipolar depression.  Relator urged

Drs. Glover and Carter try Depakote instead of Lamictal because Depakote was indicated

for children 10 years and older for epilepsy and, therefore, the drug was safe because it

was "the same molecule, just a different indication." Abbott taught its LTC/SA

representatives to use the term "different indication," in order to obscure the truth (*i.e.*,

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

that Depakote did not have any indication for use in bipolar depression, ADHD, and/or

other psychiatric or behavioral issues in children).

189.    Relator and other sales representatives were also trained  to cite a study by

Dr. Cameron Quanbeck, *et al.*, called "Clinical and Legal Correlates of Inmates with

Bipolar Disorder at Time of Arrest," which indicates that at the time of criminal arrest

74% of bipolar patients are in the manic phase of bipolar disorder. *See J. Clin. Psychiatry*

2004; 65(2); 198-203.  This data was also included in a May 2006 Abbott Sales Aid

called "Grounded In Dependability."

190.    Ms. Dahmen's "Role Play: 5 Minute Call" notes indicate that the

Depakote sales representative should provide the arrest information in the Quanbeck

study and ask the physician, "What do you to do to prevent mania?"  Ms. Dahmen's Role

Play notes indicated, "[i]f doctor is using Lami[ctal] alone – pts are at risk of risky

behaviors that might lead to Arrest during the manic phase of their illness."  The Role

Play also noted that Depakote sales representatives were encouraged to solicit physicians

to "sign/ask for med [Abbott Medical Affairs] info (Bipolar Depression)," even though

bipolar depression is outside Depakote's FDA-approved label.

191.    In addition to the Bowden and Quanbeck studies, which were provided to

relator by Abbott as re-prints, Relator and other sales representatives were trained to

"cherry pick" information from several other studies to discredit clinical trials cited in

GlaxoSmithKline's Lamictal sales aids in order to gain off-label market share for use of

Depakote in bipolar depression.

192.    Abbott was keenly aware that its off-label marketing would significantly

affect Medicare and Medicaid sales and attempted to capitalize on these sales by training

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

its Depakote sales force to inform psychiatrists and pediatric psychiatrists that Depakote

was a "tier III" drug, commonly reimbursed by private and government payors. An

Abbott sales aid specifically shows prescription drug coverage for Depakote under the

Medicare formulary.

193. Abbott sales representatives were encouraged to contrast Depakote's

lower cost and higher likelihood of reimbursement by private and Government payors

with Lamictal, which was much more costly and less likely to be reimbursed.

194. Abbott instructed its LTC/SA representatives to provide materials, such as

videotaped or recorded speaker programs (usually on compact disk) produced by Abbott

for CME lectures, that discussed the off-label use of Depakote in children. The physician

could obtain these materials directly from Abbott, by filling out request cards provided by

LTC/SA representatives (if initiated by the physician), but more frequently LTC/SA

representatives were directed to distribute these compact disks routinely to physicians

during sales calls.

### 2. Developmental Delay, Attention-Deficit Disorder and Psychiatric Disorders in Children Under 18

195. Abbott sought to increase Depakote sales by targeting children with

problems such as attention-deficit hyperactivity disorder ("ADHD"), developmental

delay ("DDD" formerly known as "MRDD"), psychiatric disorders and/or behavioral

problems. Depakote ER is indicated for children 10 and older for epilepsy, but not for

developmental delay, ADHD, psychiatric disorders or behavioral problems in children of

any age.

196. The direction and strategy for off-label marketing Depakote to children

with MR/DD came from Abbott's Marketing Department at the Company's headquarters.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

For example, documents and emails from April 2003 transmitted by Mary Richter,

Abbott's LTC Product Manager, to Relator and others, indicated that Cathy Shaw

Zeremba, from Abbott's marketing department, had begun "researching penetration in

MR/DD." Ms. Richter's email also stated that numerous Abbott marketing department

employees, such as Janet Hughes and Anthony Cartwright, were working to "develop and

test (strengths and weaknesses) [for] a complete training module and regular/scheduled

follow up for training for MRDD." Ms. Richter tapped Relator as a potential trainer for

this program.

197.    Abbott managers directed Relator McCoyd to off-label market Depakote

for use in children when the Company combined its Depakote Long Term Care Division

with the Depakote Neuroscience Division thereafter known as the Specialty Accounts.

With most of its Depakote sales force under one umbrella, Abbott assigned each sales

representative to market Depakote to a variety of medical providers, including but not

limited to, long term care facilities, psychiatrists, community mental health centers,

correctional facilities, and institutional pharmacies.

198.    Abbott assigned Relator a number of medical care professionals and

facilities who/which did not treat epilepsy, but primarily treated psychiatric disorders,

behavior problems and developmental delay in children and adults. The facilities in

Relator's territory included Cobb and Douglas County Mental Health, Central State

Hospital, Peachford Behavioral Health, Oconee Mental Health Center, Winn Way

Mental Health Center, and Kirkwood Mental Health ("Mental Health Centers").

199.    While the Mental Health Centers, such as those in Relator's territory,

specifically treated children for psychiatric disorders, behavioral problems, ADHD and

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

developmental delay, they did *not* treat epilepsy, the only on-label use for children.

Nevertheless, Abbott directed its sales representatives, including Relator, to pitch

Depakote's use for each Mental Health Center's entire population, knowing that these

efforts would cause Depakote to be prescribed off-label for pediatric use. Abbott's

Depakote sales pitch for prescriptions for children, treated at these mental health

facilities, was exclusively "off-label."

200. Abbott managers trained Relator to start with "on-label" promotions at

Mental Health Centers (such as adult bipolar mania), then move to "off-label"

promotions targeting children. As part of this strategy, Abbott directed Relator to deliver

Depakote samples to the adult division of a Mental Health Center, then ask the physician

signing for the samples whether the Child and Adolescent ("C&A") division used

Depakote samples. Once Relator made her way to the C&A section, Abbott trained her

(as well as its entire Depakote sales force) to prompt discussions about Depakote by

asking pediatricians how the C&A center used Depakote for children.

201. Consistent with its overarching pattern of wrongful conduct, Abbott

devised a "boot strap" strategy justifying the off-label marketing of Depakote for the

treatment of developmental delay in children. The strategy flowed from justifying the

use of a childhood epilepsy drug as a medication to address developmental delay. Abbott

knew that mental health centers treated children with developmental delay and, thus,

trained its Depakote sales force to detail the pediatricians with sales aids purportedly

demonstrating that "epilepsy occurs in 20% to 30% of children with

intellectual/developmental disabilities." The epilepsy statistics not only provided cover

for Abbott's off-label promotion to children served by community Mental Health

·Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

Centers, but also provided a spring board for Abbott's sales force to discuss Depakote's use in mitigating symptoms or behaviors associated with developmental delay, much in the same way that Abbott used the overlapping symptoms of bipolar mania and agitation associated with dementia to justify Depakote's off-label use for elderly patients.

202.  Abbott managers trained Relator to ask pediatric psychiatrists whether children with developmental delay treated in the Mental Health Centers exhibited starring, wandering, lip smacking, or screaming.  These "behaviors" are sometimes symptoms of Absence and Complex Partial seizures in epilepsy, which are also outlined in Abbott sales aids.  Once a pediatric psychiatrist discussed these "behaviors," Abbott encouraged its sales force to make a sales pitch for using Depakote by characterizing it as a "two for one" medication for children with developmental delay, meaning that Depakote would treat seizures and psychiatric disorders, behavioral problems, and/or ADHD.

203.  Abbott also sought "champions" or "thought leaders" to promote Depakote for developmental delay.  An Abbott marketing manager, at Abbott's headquarters, approached Relator, through Relator's supervisor, to discuss the prospects of using Dr. Theresa Courtney of Central State Hospital in Millidgeville, Georgia, a state psychiatric hospital, as a speaker for Depakote because she treated a large number of patients suffering from both developmental delay and seizures and was a high prescriber of Depakote.  In response, Relator approached Dr. Courtney who eventually was trained by Abbott to speak on behalf of Depakote's use in developmental delay.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

### 3. Symptoms Associated With Narcotic Drug Withdrawal and Addiction

204. Abbott directed Relator McCoyd and other LTC/SA representatives to off-label market Depakote for symptoms associated with narcotic drug withdrawal and addiction.

205. At Cobb County Mental Health Center, Abbott provided funding for at least one off-label speaker event where a physician, Dr. Christopher Riddell from WellStar Behavioral Health, LLC, was paid either directly or indirectly by Abbott to advocate the use of Depakote for treating symptoms associated with narcotic drug withdrawal.

206. Abbott produced a slide presentation and/or CME materials on Depakote's off-label use for narcotic drug withdrawal symptoms, available by CD Rom and Abbott's CENE.com website. This slide presentation and CME materials were also provided by Abbott to physicians when being paid to lecture on Depakote's off-label uses.

207. Abbott also paid Dr. Tommie Richardson to provide a CME on the "Use of Anticonvulsants in Detoxification from Alcohol and Drugs," which was given on April 5, 2005 at the Cobb Community Services Outpatient Services Center in Marietta, Georgia.

### 4. Psychosis

208. Abbott trained its LTC/SA representatives to off-label market Depakote for psychosis, which is not indicated on Depakote's label. In several Abbott sales aids, including one entitled "Grounded In Dependability," published in September 2005, Abbott presented a study analyzing Depakote vs. Olanzapine in a "psychotic subgroup."

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

Abbott directed LTC/SA representatives to use the data in this sales aid be used to off-label market Depakote for psychosis.

209.     Abbott also provided its LTC/SA representatives, including Relator, with an approved reprint of a study Abbott sponsored entitled, "Effect of Divalproex Combined with Olanzapine or Risperdone in Patients with an Acute Exacerbation of Schizophrenia," Daniel E. Casey, *et al. Neuropsychopharmacology* (2003) 28, 182-192, to use in detailing physicians treating patients with psychosis or schizophrenia. The study examined the use of divalproex with an antipsychotic agent (*i.e.*, Risperdone or Olanzapine) in patients hospitalized for acute exacerbation of schizophrenia.

210.     Abbott trained its LTC/SA representatives to use the Casey study to promote Depakote's adjunct use with either Olanzapine or Risperdal to treat psychosis or schizophrenia even though Depakote is not FDA-approved for these disorders.

**D.     ABBOTT PROMOTED DOSING INSTRUCTIONS AND FORMULATIONS OF DEPAKOTE OUTSIDE DEPAKOTE'S PACKAGE INSERT**

**1.     Depakote Sprinkle Capsules**

211.     Depakote Sprinkle Capsules or "Sprinkles" were formulated by Abbott primarily for children over 10 who suffered from epilepsy. The formulation is FDA-approved for the treatment of complex partial seizures that occur either in isolation or in association with other types of seizures for adults and children over age 10 and the treatment of simple and complex absence seizures for adults and children over age 10. The Package Insert for Sprinkles states that the formulation has "not been evaluated for safety and efficacy" in the treatment of manic episodes associated with bipolar disorder or prophylaxis of migraine headaches. *See* Depakote Sprinkle Capsules Package Insert (2003) at page 14.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

212. Abbott trained and encouraged LTC/SA representatives to off-label
market Depakote' s Sprinkle formulation for elderly patients who were either unable or
unwilling to take Depakote in the pill formulation.

213. Specifically, Abbott LTC/SA representatives, as directed by Abbott sales
management, made representations to physicians, nurses and consultant pharmacists that
Depakote Sprinkles could safely be put down feeding tubes for patients who could not
swallow and could safely be placed in the food of those who would not take medications.
Depakote Sprinkles do not have an FDA-approved dosing regimen for administration
through a feeding tube. During the period of Abbott's improper activities related to
Depakote Sprinkles, The Patient Information Guide, contained in the Sprinkles Package
Insert, directed patients to "[p]lace all the sprinkles onto a small amount (about a
teaspoon) of soft food such as applesauce or pudding." *See* 2003 Package Insert for
Sprinkles, page 17. Abbott's promotion of the administration of Depakote Sprinkles
through a feeding tube misbranded the drug in violation of the FDCA.

214. Abbott LTC/SA representatives were directed by Abbott managers to use
sales aids or instruction pamphlets demonstrating to physicians and nurses the "correct"
method for placing sprinkles in feeding tubes (including "G-tubes," "NG-tubes" or
"PEG-tubes"). Abbott professionally produced and distributed, by the thousands, one
such instruction pamphlet in conjunction with ▉▉▉▉ which depicted the use of G-
tubes to administer Sprinkles. The instruction pamphlet was funded by Abbott, but
contained both the ▉▉▉▉ and Abbott logos. Abbott and ▉▉▉▉ believed the
pamphlet would increase the sales of Depakote Sprinkles to elderly patient populations
whom ▉▉▉▉ served. Abbott encouraged its LTC/SA representatives to use the

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

instruction pamphlets to instruct physicians, nurses and consultant pharmacists about the use of Sprinkles primarily for elderly people experiencing agitation associated with dementia who could not swallow.

215.    Another sales aid describing the method of administering Sprinkles through an NG-tube or PEG-tube was a home-made sales aid created by Abbott LTC/SA representatives, Jeff Lynch and Joanie Rosenfeld, entitled "Protocol For Administering Depakote Sprinkles." This sales aid was distributed to many LTC/SA representatives, including Relator, for demonstration purposes on sales calls to nursing home doctors and nurses. Relator recalls the sales aid being used for 5 or 6 years, beginning about 1998. Contrary to the ▉▉▉▉▉▉▉ instruction pamphlet above, this sales aid stated, "Do NOT use Sprinkles if administering through a G-tube with a 'button' or J-tube. The sprinkles are too large to pass through the 'button' and will not dissolve in the jejunum."

216.    At some point, these sales aids and instruction pamphlets, including the one produced for ▉▉▉▉▉▉▉▉▉ were discontinued by Abbott, but LTC/SA representatives were nonetheless directed by Abbott to continue to market Depakote Sprinkles to physicians and pharmacies serving the elderly.

217.    Abbott also trained its LTC/SA representatives to suggest that long term care health care providers place Depakote Sprinkles in nursing home patient's foods such as apple sauce in order to trick patients, adverse to taking medications, into taking Depakote. At least one long term care physician questioned Relator about running afoul of medical ethics concepts such as "informed consent" by tricking patients in this manner.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

218.    Depakote Sprinkle sales were a significant portion of Depakote sales and were tracked closely on the Functional IMR by Abbott LTC/SA sales managers. The primary competitive product to Depakote Sprinkles was a non-Abbott product known as valproate syrup, used for those patients who have difficulties swallowing pills. Abbott issued sales goals, based on the Functional IMR data that required its sales force to encourage physicians to switch from valproate syrup to Depakote Sprinkles. Abbott wanted physicians to switch patients from valproate syrup to Depakote Sprinkles because Abbott did not receive profit from the sales of valproate syrup which is manufactured by another company. Once the physician became comfortable with Depakote Sprinkles, Abbott directed the LTC/SA representatives to encourage the physician to move patients from Depakote Sprinkles to Depakote ER by claiming that the pill was "slippery" and could be swallowed by just about anyone. Abbott wanted Depakote ER to be prescribed rather than Depakote Sprinkles because "ER" is sold at a higher profit.

219.    Clearly the lack of data concerning the safety and efficacy of administering Sprinkles to the elderly in feeding tubes or as directed for non-indicated purposes such as agitation associated with dementia was completely overshadowed by Abbott's desire to improperly grow the sales of Depakote at any cost, including the cost of patient safety.

        2.    "Rapid Loading" Dose of Depakote DR

220.    Abbott LTC/SA representatives were trained to provide "rapid loading dose" instructions for Depakote DR in treating acute mania, where the patient was exhibiting extreme symptoms. This typically occurred in hospitals or acute care settings where patients with acute psychiatric problems were treated and Depakote ER was not

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

available to physicians, but Depakote DR was available. Abbott LTC/SA representatives,

including Relator, were trained by Abbott to use sales aids and CME materials, originally

produced by Abbott as educational materials for physicians, as sales aids to convince

physicians to "rapid load" Depakote DR even though there have never been dosing

instructions in Depakote's package insert for "rapid loading."

221.   For example, Relator was trained to detail physicians on rapid loading by

using a February 2003 CME material (on Audio CD and accompanying booklet ) entitled

"Bipolar Disorder: Treatment Guidelines and Their Implications for Your Practice" by

Dr. Robert M.A. Hirschfeld. The CME materials discussed using 30 milligrams per

kilogram of body weight for patients suffering from acute manic episodes. As a chart on

page 17 of the CME booklet showed, a 150 pound person would receive a loading dose

of 2000 mg of Depakote DR. After the loading dose, CME also discussed tapering the

medication thereafter. Hirschfeld's findings were later published in a scientific journal,

which LTC/SA representatives also used to detail rapid loading. Depakote DR's package

insert, however, did not suggest this "rapid loading" dose. The information that Abbott

provided concerning "rapid loading" was potentially harmful to patients, especially

because rapid loading had not been adequately studied or vetted through the FDA

approval process.

222.   Abbott's CENE.com website for physicians provided rapid loading dose

instructions, used by its sales force to promote off-label uses. Abbott managers and

trainers instructed LTC/SA representatives to use the off-label information, even when

the physician did not solicit it. For example, Relator detailed Dr. Alan Weinberg, who

worked with the Dekalb County Services Board, on "rapid loading," with the Abbott

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

CENE off-label information. Suzana Longnecker, an Abbott regional trainer, was with Relator during this visit to Dr. Weinberg.

223. Up until December 2005, Abbott also trained its Depakote sales force to compete with Zyprexa by suggesting that psychiatrists use "rapid loading" of Depakote DR as an alternative to Zyprexa for patients experiencing acute psychiatric disturbances requiring immediate attention. A "rapid loading dose" of regular Depakote for acute psychiatric disturbances is not an indicated dosing regimen approved by the FDA and, thus, misbrands Depakote in violation of the FDCA. Abbott's sales pitch occurred up until December 2005, when Depakote ER received an indication for acute manic or mixed episodes with or without psychotic features.

224. Abbott also paid Dr. Stephen Stall from California to produce a CME Video on Depakote "rapid loading." Part of Dr. Stall's presentation discussed how public health care providers are able to save money using Depakote over atypical antipsychotics for acutely manic patients. Relator and a colleague presented the CME to a pharmacist at Peachford Mental Health Center to discuss the use of Depakote DR for rapid loading in or about 2004 and 2005.

### 3. Maintenance Dose for Elderly in Agitation Associated With Dementia

225. Abbott trained its sales force to provide instructions for maintenance dosing of Depakote for agitation associated with dementia, even though there is no FDA approved dose of Depakote for this disorder. Abbott based its suggested dose on a study, purportedly calculating a therapeutic dose of Depakote Sprinkles at 845 milligrams, entitled "Valproate Therapy for Agitation in Dementia," A.P. Porsteinsson, *et al.*, *Am J Geriatr Psychiatry*, 2003; 11:4.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

226.   If the physician chose to use Depakote DR, Abbott instructed its LTC/SA

representatives to suggest an approximate dose of Depakote DR, which was also 845

milligrams, even though the formulations of Depakote DR and Depakote Sprinkles are

not identical.

227.   After 2000, when Depakote ER was first approved only for prophylaxis of

migraine, Abbott directed LTC/SA representatives to use the Porsteinsson data on

Sprinkles (suggesting 845 milligrams), but to promote an increased dose of Depakote ER

of approximately 1000 milligrams.  Abbott trained its sales force to represent a suggested

dose of Depakote ER at 1000 milligrams per day, even though this dose caused elderly

patients to sleep all day.

228.   Here, Abbott seized upon legitimate dosing conversion (converting

Depakote DR to Depakote ER) approved for on-label uses of Depakote, which required

an increased dose of Depakote ER when switching a patient from Depakote DR.  For on-

label indications, the increased dose of Depakote ER was necessary because Depakote

ER was not as strong as Depakote DR – the Depakote ER formulation released more

slowly over time than Depakote DR.  While there was no support for up-dosing elderly

patients suffering from agitation associated with dementia when converting from

Depakote DR to Depakote ER (or starting a new patient on Depakote ER), Abbott told

physicians that the 1000 milligram dose of Depakote ER was efficacious.

229.   As discussed above, Depakote's package insert contained (and still

contains) a warning regarding somnolence in the elderly based on a study that increased

dosage of Depakote from 125 milligrams per day to a target dose of 20 milligrams per

kilogram per day.  Using the study guidelines, a 150 pound patient would receive

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

approximately 1364 milligrams of Depakote a day, a dosage just slightly higher than the 1000 milligrams Abbott promoted for elderly patients suffering from agitation associated with dementia.

230.    Dr. Larry Tune and Dr. Russell Brown also told Relator that they believed a 1000 mg of Depakote ER was too high a dose for elderly patients, preferring a dose closer to 500 milligrams per day.

231.    Notwithstanding Depakote's package insert warning, Abbott developed a promotional "tag line" for Depakote ER "dosing" for elderly patients suffering from agitation associated with dementia, which was "start low, go slow ... but go." Abbott managers told Relator that physicians were not providing elderly patients with doses of Depakote that were therapeutic unless the dose reached 1000 milligrams. Therefore, Abbott instructed Realtor to pitch a low starting dose of Depakote ER, for agitation associated with dementia, but to constantly challenge physicians to push the drug's dose higher. Relator did not feel comfortable making this sales pitch.

232.    Relator was chastised by Abbott management for failing to promote to physicians the 1000 milligram Depakote ER dose.

233.    Like many of Abbott's promotional exploits pertaining to Depakote alleged in this Amended Complaint, the call to physicians to increase Depakote ER dosing for agitation associated with dementia was nothing more than a desire to increase profits at the expense of elderly patients whose health care costs are overwhelmingly paid for by federal, state and local Governments.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

## VI.    CONCLUSION

234.    The schemes alleged in this Amended Complaint were orchestrated and condoned by the highest levels of Abbott's management, some of whom benefited handsomely. In order to effectuate their wrongdoing which drained billions of scarce health care dollars from public third party payors, Defendants knowingly placed at risk and caused injury to elderly and pediatric patient populations lacking the capacity to fully understand the dangers of their pharmaceutical regimen. Therefore, while this Amended Complaint sets forth overt acts, names and dates, what should not be forgotten is the impact of Defendants' conduct on countless elderly nursing homes residents and children across the country who were given a dangerous drug as a result of proscribed marketing crafted to maximize the economic utility of a drug company and its leadership.

## VII.    COUNTS

### COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[5]
### Against All Defendants

235.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

236.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

237.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented, or caused to be

---

[5] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(1).

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

presented false or fraudulent claims for improper payment or approval of prescriptions

for Depakote.

238. The United States, unaware of the falsity or fraudulent nature of the claims

that Defendants caused, paid for claims that otherwise would not have been allowed.

239. By reason of these payments, the United States has been damaged, and

continues to be damaged in a substantial amount.

COUNT TWO[6]
Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
Against All Defendants

240. Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

241. This is a claim for treble damages and civil penalties under the False

Claims Act, 31 U.S.C. § 3729(a)(1)(B).

242. By virtue of the kickbacks, misrepresentations and submissions of non-

reimbursable claims described above, Defendants knowingly made, used, or caused to be

made or used false records or statements material to a false or fraudulent claim.

243. The United States, unaware of the falsity or fraudulent nature of the claims

that Defendants caused, paid for claims that otherwise would not have been allowed.

244. By reason of these payments, the United States has been damaged, and

continues to be damaged in a substantial amount.

---

[6] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be
deemed to include violations of the Federal False Claims Act prior to its recent amendments, e.g.
31 U.S.C. § 3730 (a)(2).

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

## COUNT THREE[7]
### Federal False Claims Act, 31 U.S.C. § 3729 (a)(1)(C)
### Against All Defendants

245.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

246.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

247.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A) and/or (a)(1)(B).

248.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

249.     By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT FOUR
### California False Claims Act., Cal. Gov't Code § 12651 *et seq.*
### Against All Defendants

250.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

251.     This is a claim for treble damages and civil penalties under the California False Claims Act. Cal. Gov't Code § 12651 *et seq.*

252.     By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be

---

[7] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730 (a)(3).

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

presented to the California Medicaid Program (*i.e.*, Medi-Cal) false or fraudulent claims

for payment or approval and/or knowingly accomplished these unlawful acts by making,

using, or causing to be made or used a false record or statement.

253.    Moreover by virtue of the kickbacks, misrepresentations and submissions

of non-reimbursable claims described above, Defendants conspired to commit violations

of the California False Claims Act.

254.    The California Medicaid Program, unaware of the falsity or fraudulent

nature of the claims caused by Defendants, paid for claims that otherwise would not have

been allowed.

255.    By reason of these payments, the California Medicaid Program has been

damaged, and continues to be damaged in a substantial amount.

## COUNT FIVE
### Connecticut False Claims Act.,
### Conn. Gen. Stat. §§ 17b-301a -17b301p (2010 Supplement)
### Against All Defendants

256.    Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

257.    This is a claim for treble damages and civil penalties under the

Connecticut False Claims Act, Conn. Gen. Stat. §§ 17b-301a – 17b-301p (2010

Supplement).

258.    By virtue of the kickbacks, misrepresentations and submissions of non-

reimbursable claims described above, Defendants knowingly presented or caused to be

presented to the Connecticut Medicaid Program false or fraudulent claims for payment or

approval and/or knowingly accomplished these unlawful acts by making, using, or

causing to be made or used a false record or statement.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

259.   Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Connecticut False Claims Act.

260.   The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

261.   By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT SIX
### Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201 et seq.
### Against All Defendants

262.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

263.   This is a claim for treble damages and civil penalties under the Delaware False Claims Act. Del Code Ann. tit. 6, § 1201 et seq.

264.   By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Delaware Medicaid program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

265.   Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Delaware False Claims Act.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

266. The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

267. By reason of these payments, the Delaware Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT SEVEN
### Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*
### Against All Defendants

268. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

269. This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*

270. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

271. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Florida False Claims Act.

272. The Florida Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

273.    By reason of these payments, the Florida Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT EIGHT
### Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168 *et seq.*
### Against All Defendants

274.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

275.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, GA. Code Ann. § 49-4-168 *et seq.*

276.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

277.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Georgia False Medicaid Claims Act.

278.    The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

279.    By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

## COUNT NINE
### Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 *et seq.*
### Against All Defendants

280.    Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

281.    This is a claim for treble damages and civil penalties under the Hawaii

False Claims Act, Haw. Rev. Stat. § 661-22 *et seq.*

282.    By virtue of the kickbacks, misrepresentations and submissions of non-

reimbursable claims described above, Defendants knowingly presented or caused to be

presented to the Hawaii Medicaid Program false or fraudulent claims for payment or

approval and/or knowingly accomplished these unlawful acts by making, using or

causing to be made or used a false record or statement.

283.    Moreover by virtue of the kickbacks, misrepresentations and submissions

of non-reimbursable claims described above, Defendants conspired to commit violations

of the Hawaii False Claims Act.

284.    The Hawaii Medicaid Program, unaware of the falsity or fraudulent nature

of the claims caused by Defendants, paid for claims that otherwise would not have been

allowed.

285.    By reason of these payments, the Hawaii Medicaid Program has been

damaged, and continues to be damaged in a substantial amount.

## COUNT TEN
### Illinois Whistleblower Reward and Protection Act,
### 740 Ill. Comp. Stat. 175/1 *et seq.*
### Against All Defendants

286.    Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

287. This is a claim for treble damages and civil penalties under the Illinois

Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. 175/1 *et seq.*

288. By virtue of the kickbacks, misrepresentations and submissions of non-

reimbursable claims described above, Defendants knowingly presented or caused to be

presented to the Illinois Medicaid Program false or fraudulent claims for payment or

approval and/or knowingly accomplished these unlawful acts by making, using, or

causing to be made or used a false record or statement.

289. Moreover by virtue of the kickbacks, misrepresentations and submissions

of non-reimbursable claims described above, Defendants conspired to commit violations

of the Illinois Whistleblower Reward and Protection Act.

290. The Illinois Medicaid Program, unaware of the falsity or fraudulent nature

of the claims caused by Defendants, paid for claims that otherwise would not have been

allowed.

291. By reason of these payments, the Illinois Medicaid Program has been

damaged, and continues to be damaged in a substantial amount.

## COUNT ELEVEN
### Indiana False Claims and Whistleblower Protection Act,
### Indiana Code § 5-11-5.5
### Against All Defendants

292. Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

293. This is a claim for treble damages and civil penalties under the Indiana

False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

294. By virtue of the kickbacks, misrepresentations and submissions of non-

reimbursable claims described above, Defendants knowingly presented or caused to be

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

presented to the Indiana Medicaid Program false or fraudulent claims for payment or

approval and/or knowingly accomplished these unlawful acts by making, using, or

causing to be made or used a false record or statement.

295.     Moreover by virtue of the kickbacks, misrepresentations and submissions

of non-reimbursable claims described above, Defendants conspired to commit violations

of the Indiana False Claims and Whistleblower Protection Act.

296.     The Indiana Medicaid Program, unaware of the falsity or fraudulent nature

of the claims caused by Defendants, paid for claims that otherwise would not have been

allowed.  By reason of these payments, the Louisiana Medicaid Program has been

damaged, and continues to be damaged in a substantial amount.

### COUNT TWELVE
Louisiana Medical Assistance Programs Integrity Law,
La. Rev. Stat. Ann. § 46:439.1 *et seq.*
Against All Defendants

297.     Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

298.     This is a claim for treble damages and civil penalties under the Louisiana

Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 *et seq.*

299.     By virtue of the kickbacks, misrepresentations and submissions of non-

reimbursable claims described above, Defendants knowingly presented or caused to be

presented to the Louisiana Medicaid Program false or fraudulent claims for payment or

approval and/or knowingly accomplished these unlawful acts by making, using, or

causing to be made or used a false record or statement.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

300.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Louisiana Medical Assistance Programs Integrity Law.

301.    The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

302.    By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT THIRTEEN**
**Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(0)**
**Against All Defendants**

303.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

304.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(0).

305.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

306.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Massachusetts False Claims Act.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

307.    The Massachusetts Medicaid Program, unaware of the falsity or fraudulent

nature of the claims caused by Defendants, paid for claims that otherwise would not have

been allowed.

308.    By reason of these payments, the Massachusetts Medicaid Program has

been damaged, and continues to be damaged in a substantial amount.

## COUNT FOURTEEN
### Michigan Medicaid False Claims Act, MCLA § 400.601 *et seq.*
### Against All Defendants

309.    Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

310.    This is a claim for treble damages and civil penalties under the Michigan

Medicaid False Claims Act, MCLA § 400.601 *et seq.*

311.    By virtue of the kickbacks, misrepresentations and submissions of non-

reimbursable claims described above, Defendants knowingly presented or caused to be

presented to the Michigan Medicaid Program false or fraudulent claims for payment or

approval and/or knowingly accomplished these unlawful acts by making, using, or

causing to be made or used a false record or statement.

312.    Moreover by virtue of the kickbacks, misrepresentations and submissions

of non-reimbursable claims described above, Defendants conspired to commit violations

of the Michigan Medicaid False Claims Act.

313.    The Michigan Medicaid Program, unaware of the falsity or fraudulent

nature of the claims caused by Defendants, paid for claims that otherwise would not have

been allowed.

94

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

314.    By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

### COUNT FIFTEEN
Montana False Claims Act; Mont. Code Anno. §17-8-401 *et seq.*
Against All Defendants

315.    . Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

316.    This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Anno. § 17-8-401 *et seq.*

317.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Montana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

318.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Montana False Claims Act.

319.    The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

320.    By reason of these payments, the Montana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

## COUNT SIXTEEN
### Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq.*
### Against All Defendants

321.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

322.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq.*

323.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Nevada Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

324.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Nevada False Claims Act.

325.    The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

326.    By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT SEVENTEEN
### New Hampshire Medicaid Fraud and False Claims Act,
### N.H. Rev. Stat. Ann. § 167:61-b, *et seq.*
### Against All Defendants

327.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

328.    This is a claim for treble damages and civil penalties under the New

Hampshire Medicaid Fraud and False Claims Law, N.H. Rev. Stat. Ann. § 167:61-b, *et*

*seq.*

329.    By virtue of the kickbacks, misrepresentations and submissions of non-

reimbursable claims described above, Defendants knowingly presented or caused to be

presented to the New Hampshire Medicaid Program false or fraudulent claims for

payment or approval and/or knowingly accomplished these unlawful acts by making,

using, or causing to be made or used a false record or statement.

330.    Moreover by virtue of the kickbacks, misrepresentations and submissions

of non-reimbursable claims described above, Defendants conspired to commit violations

of the New Hampshire Medicaid Fraud and False Claims Act.

331.    The New Hampshire Medicaid Program, unaware of the falsity or

fraudulent nature of the claims caused by Defendants, paid for claims that otherwise

would not have been allowed.

332.    By reason of these payments, the New Hampshire Medicaid Program has

been damaged, and continues to be damaged in a substantial amount.

### COUNT EIGHTEEN
New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq.*
Against All Defendants

333.    Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

334.    This is a claim for treble damages and civil penalties under the New Jersey

False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

335.   By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

336.   Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New Jersey False Claims Act.

337.   The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

338.   By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

COUNT NINETEEN
New Mexico Medicaid False Claims Act,
N.M. Stat. Ann.,1978, § 27-14-1 *et seq.*
Against All Defendants

339.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

340.   This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann., 1978, § 27-14-1 *et seq.*

341.   By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for payment

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

342.   Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New Mexico Medicaid False Claims Act.

343.   The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

344.   By reason of these payments, the New Mexico Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

### COUNT TWENTY
### New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*
### Against All Defendants

345.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

346.   This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*

347.   By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New York Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

348.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the New York False Claims Act.

349.    The New York Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

350.    By reason of these payments, the New York Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

### COUNT TWENTY ONE
### North Carolina False Claims Act, 52 N.C.G.S. § 1-605 *et seq.*
### Against All Defendants

351.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

352.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, 52 N.C.G.S. § 1-605 *et seq.*

353.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the North Carolina Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

354.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the North Carolina False Claims Act.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

355. The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

356. By reason of these payments, the North Carolina Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

### COUNT TWENTY TWO
### Oklahoma Medicaid False Claims Act; 63 Okl. St. § 5053 *et seq.*
### Against All Defendants

357. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

358. This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq.*

359. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be make or used a false record or statement.

360. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Oklahoma Medicaid False Claims Act.

361. The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

362.   By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY THREE
### Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 *et seq.*
### Against All Defendants

363.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

364.   This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*

365.   By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by using or causing to be used or made a false record or statement.

366.   Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Rhode Island False Claims Act.

367.   The Rhode Island Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

368.   By reason of these payments, the Rhode Island Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

## COUNT TWENTY FOUR
### Tennessee Medicaid False Claims Act,
### Tenn. Code Ann. § 71-5-181 *et seq.*
### Against All Defendants

369.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

370.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

371.    By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Tennessee Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

372.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Tennessee Medicaid False Claims Act and the Tennessee False Claims Act.

373.    The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

374.    By reason of these payments, the Tennessee Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

## COUNT TWENTY FIVE
### Texas Medicaid Fraud Prevention Act,
### Tex. Hum. Res. Code Ann. § 36.001 *et seq.*
### Against All Defendants

375. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

376. This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

377. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

378. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Texas Medicaid Fraud Prevention Act.

379. The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

380. By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

## COUNT TWENTY SIX
### Virginia Fraud Against Taxpayers Act,
### Va. Code Ann. §8.01-216.1 *et seq.*
### Against All Defendants

381.  Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

382.  This is a claim for treble damages and civil penalties under the Virginia

Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 *et seq.*

383.  By virtue of the kickbacks, misrepresentations and submissions of non-

reimbursable claims described above, Defendants knowingly presented or caused to be

presented to the Virginia Medicaid Program false or fraudulent claims for payment or

approval and/or knowingly accomplished these unlawful acts by making, using, or

causing to be made or used a false record or statement.

384.  Moreover by virtue of the kickbacks, misrepresentations and submissions

of non-reimbursable claims described above, Defendants conspired to commit violations

of the Virginia Fraud Against Taxpayers Act.

385.  The Virginia Medicaid Program, unaware of the falsity or fraudulent

nature of the claims caused by Defendants, paid for claims that otherwise would not have

been allowed.

386.  By reason of these payments, the Virginia Medicaid Program has been

damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY SEVEN
### Wisconsin False Claims Act; Wis. Stat. § 20.931 *et seq.*
### Against All Defendants

387.  Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

388. This is a claim for treble damages and civil penalties under the Wisconsin False Claims Act, Wis. Stat. § 20.931 *et seq.*

389. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Wisconsin Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

390. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Wisconsin False Claims Act.

391. The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

392. By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY EIGHT
### District of Columbia False Claims Act,
### D.C. Code § 2-308.14 *et seq.*
### Against All Defendants

393. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

394. This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code § 2-308.14 *et seq.*

395. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

presented to the District of Columbia Medicaid Program false or fraudulent claims for

payment or approval and/or knowingly accomplished these unlawful acts by using or

causing to be used or made a false record or statement.

396. Moreover by virtue of the kickbacks, misrepresentations and submissions

of non-reimbursable claims described above, Defendants conspired to commit violations

of the District of Columbia False Claims Act.

397. The District of Columbia Medicaid Program, unaware of the falsity or

fraudulent nature of the claims caused by Defendants, paid for claims that otherwise

would not have been allowed.

398. By reason of these payments, the District of Columbia Medicaid Program

has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWENTY NINE
### City of Chicago False Claims Act,
### Chicago Mun. Code Chapter 1-22-010, *et seq.*
### Against All Defendants

399. Relator re-alleges and incorporates by reference the allegations contained

in the preceding paragraphs of this Amended Complaint.

400. This is a claim for treble damages and civil penalties under the City of

Chicago False Claims Act, Chicago Municipal Code Chapter 1-22-010, et seq.

401. By virtue of the kickbacks, misrepresentations and submissions of non-

reimbursable claims described above, Defendants knowingly presented or caused to be

presented to the City of Chicago false or fraudulent claims for payment or approval

and/or knowingly accomplished these unlawful acts by using or causing to be used or

made a false record or statement.

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

402.    Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the City of Chicago False Claims Act.

403.    The City of Chicago, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

404.    By reason of these payments, the City of Chicago has been damaged, and continues to be damaged in a substantial amount.

## VIII.    PRAYER

WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

a.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the State False Claims Acts;

b.    Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount to the States and municipalities under similar provisions of their false claims acts;

c.    The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the state and municipal false claims acts;

d.    The Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

Filed Under Seal Pursuant
To 31 U.S.C. § 3730(b)(2)

e.    Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f.    Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

g.    The United States, the States, Municipalities and the Relator recover such other relief as the Court deems just and proper.


## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands a trial by jury.

DATED: June 14, 2010

Respectfully submitted,

John R. Mooney
[Va. Bar No. 22212]
Mooney, Green, Baker & Saindon, P.C.
1920 L. Street, N.W., Suite 400
Washington, D.C. 20036
Phone: 202-783-0010
Fax: 202-783-6088

Reuben A. Guttman*
Traci L. Buschner*
Grant & Eisenhofer P.A.
1920 L. Street, N.W., Suite 400
Washington, D.C. 20036
Tel: 202-386-9500
Fax: 202-350-5908

Jay W. Eisenhofer
Keith M. Fleischman*
Francis P. Karam
Grant & Eisenhofer, P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: 646-722-8500
Fax: 646-722-8501

John C. Kairis*
Grant & Eisenhofer P.A.
1201 North Market Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100

**COUNSEL FOR RELATOR**

* Entered *Pro Hac Vice* in this action.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Relator's Amended Complaint was served, via overnight mail, upon the following persons, this 14th day of June, 2010.

The States of California, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia and Wisconsin; the District of Columbia; and the City of Chicago will be served the Amended Complaint promptly after Relator's Counsel receives a file-stamped copy from the Clerk's Office.

_____
John R. Mooney

U.S. Attorney General Eric Holder
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Ms. Joyce R. Branda
Deputy Director
Commercial Litigation Branch –
Civil Fraud
U.S. Department of Justice
601 D Street, NW
Washington, DC 20530
Tel: 202-307-0231
Fax: 202-616-3085

Brian McCabe
Commercial Litigation Branch
Civil Division – Fraud Section
Patrick Henry Building, Room 9915
601 D. Street, N.W.
Washington, DC 20002

Mr. Timothy J. Heaphy
United States Attorney for the
     Western District of Virginia
c/o Mr. Rick Mountcastle, AUSA
310 First Street, SW, Room 906
Roanoke, VA 24011
Tel.: 540-857-2250
Fax: 540-857-2614

Attorney Gen. Kenneth T. Cuccinelli, II
Office of the Virginia Attorney General
c/o Ms. Erica Bailey, Ass. Attorney
General
900 East Main Street
Richmond, VA 23219
Tel: 804-786-2071