# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF DELAWARE, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF LOUISIANA, STATE OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF VIRGINIA, and STATE OF WISCONSIN | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**COMPLAINT**

FILED UNDER SEAL
PURSUANT TO
FALSE CLAIMS ACT,
31 U.S.C. § 3729 *et seq.*

**JURY TRIAL DEMANDED**

09CV2118
JUDGE HOLDERMAN
MAGISTRATE JUDGE SCHENKIER

*ex rel.* TAMARA L. DIETZLER,

   Plaintiff and Relator,

   vs.

ABBOTT LABORATORIES,

   Defendant.

**FILED**

APR 0 7 2009  TC

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

*Qui tam* plaintiff and relator, Tamara L. Dietzler ("relator"), brings this action against

defendant Abbott Laboratories ("Abbott") on behalf of the United States, alleging violations

81858

of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, as amended, and on behalf of the

following states, alleging violations of their state law counterpart:

- California (False Claims Act, Cal. Gov't Code § 12650 *et seq.*)
- District of Columbia (D.C. Code Ann. § 2-308.13 *et seq.*)
- Delaware (Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.*)
- Florida (Florida False Claims Act, Fla. Stat. ch. 68.081 *et seq.*)
- Georgia (State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*)
- Hawaii (Haw. Rev. Stat. § 661-21 *et seq.*)
- Illinois (Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*)
- Indiana (False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*)
- Louisiana (Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.*)
- Massachusetts (Mass. Gen. Laws ch. 12, § 5 *et seq.*)
- Michigan (The Medicaid False Claim Act, Mich. Comp. Laws § 400.601 *et seq.*)
- Montana (Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*)
- Nevada (Nev. Rev. Stat. 357.010 *et seq.*)
- New Hampshire (Medicaid Fraud and False Claims, N.H. Rev. Stat. Ann. § 167:61 *et seq.*)
- New Jersey (New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.*)
- New Mexico (Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.* and Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*)
- New York (New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*)
- Oklahoma (Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 *et seq.*)
- Rhode Island (State False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*)
- Tennessee (Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)
- Texas (Medicaid Fraud Prevention, Tex Hum. Res. Code Ann. § 36.001 *et seq.*)
- Virginia (Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*)
- Wisconsin (Wis. Stat. § 20.931 *et seq.*)

(collectively "the States and the District of Columbia"). Based on personal knowledge and

relevant documents, relator alleges the following:

## INTRODUCTION

1.      Since at least 2000, defendant Abbott Laboratories has engaged in a calculated and pervasive effort to improperly market its pharmaceutical Depakote, including to government-pay patients and the health care providers that serve them. Available in different formulations,[1] Depakote is a powerful drug approved by the Food and Drug Administration ("FDA") to treat seizure disorders, migraine headaches, and manic and mixed episodes related to bipolar disorder. The drug has a "black box" label required by the FDA indicating its potential to cause life-threatening adverse reactions and birth defects. Abbott's wrongful marketing of Depakote involved at least three illegal schemes that violated the False Claims Act.

First, despite the risks involved in taking this drug, Abbott has aggressively and successfully sought to convince physicians to prescribe Depakote for off-label, not medically accepted, uses. Abbott's illegal marketing efforts have included: pitching Depakote for off-label uses in adults such as schizophrenia, bipolar depression, and post-traumatic stress syndrome; targeting the vulnerable geriatric population by marketing Depakote for dementia and related behavioral symptoms; and requiring sales representatives to market the drug to psychiatrists treating children, even though Depakote was not approved for any non-epileptic pediatric populations. Abbott's off-label marketing effort has caused the submission of false claims for government payment in violation of state and federal laws limiting payment to prescriptions for FDA-approved and medically accepted uses.

---

[1] Depakote (divalproex sodium delayed-release tablets – called Depakote DR here), Depakote ER (divalproex sodium extended-release tablets), Depakote Sprinkle Capsules (divalproex sodium coated particles in capsules) and Depacon (valproate sodium solution for intravenous administration) (together "Depakote").

3

Second, Abbott has fraudulently induced physicians to prescribe Depakote ER (or "ER") or to "upgrade" prescriptions from Depakote DR (or "DR") to ER. Depakote ER is a modified formulation that allows the active ingredient to be released over a longer time, allowing the possibility of a once-a-day regimen rather than twice–a–day as typical with DR. Abbott had a strong financial motive for aggressively promoting Depakote ER – Abbott's obligation to pay rebates to the government was significantly smaller for ER than for DR, as well as Abbott's losing patent protection over DR. Consequently, Abbott knowingly marketed "benefits" from the "upgrade" to Depakote ER that lacked appropriate clinical support. Contrary to Abbott's marketing claims, Depakote ER was neither cheaper nor more effective.   Rather, Depakote ER needed to be updosed from 8% to 20% to achieve bioequivalence with DR, and thus was more expensive. Depakote ER also involved a smaller rebate to the government than DR under the Medicaid Drug Rebate Statute, 42 U.S.C. 1396r-8.  Abbott further instructed its sales agents to market Depakote ER as better than DR when in fact Abbott lacked appropriate clinical support to make such claims.  Abbott's misleading and improper marketing of the so-called "benefits" of Depakote ER resulted in the submission of false claims for ER prescriptions and government payment of those claims, as well as reverse false claims resulting from Abbott's use of false statements to decrease its obligation to pay rebates to the government.

Third, Abbott also has knowingly engaged in illegal kickbacks – disguised as consulting fees, honoraria, gifts, unrestricted educational grants and continuing medical education credits – to increase the number of prescriptions written for Depakote for both on- and off-label uses. Abbott trained, coached and expected sales representatives to participate in company-wide practices that used monetary payments and gifts to push prescriptions of

Depakote. The Company regularly had sham "consulting meetings" that were designed to reward Depakote-friendly physicians. The honoraria paid to key opinion leaders for presenting at Abbott-arranged CMEs or other events also was intended to reward and motivate physicians who promoted Depakote for off-label uses. Abbott also funneled improper gifts and unrestricted educational grants to physicians in violation of the legal restrictions. These kickbacks have induced the submission of false claims for government payment of Depakote prescriptions.

2.       The fraudulent and illegal practices alleged in this complaint are based upon non-public information relator obtained while employed by Abbott, including her personal observation of the conduct of Abbott and its employees and the conduct of the physicians and health care providers that were the subjects of Abbott's marketing conduct.

## THE PARTIES

3.       Relator, Tamara L. Dietzler, is a citizen of the United States and a resident of the state of Minnesota. Dietzler has a B.A. in Business and Economics, and a M.A. in Public Administration with a Business Concentration, both from Hamline University. After prior experience in sales and marketing, Dietzler began working at Abbott as a pharmaceutical sales representative on December 27, 1999. While there, she earned a Management Certificate from the Certified Medical Representative Institute. Dietzler sold the drug Depakote in its various forms throughout her tenure at the company until she left in June 2008.

4.       Defendant Abbott Laboratories describes itself as a "global broad-based health care company." It is a publicly-traded Illinois corporation with headquarters at 100 Abbott Park Road, Abbott Park, Illinois. Abbott conducts business and has offices throughout the

United States and abroad.   Abbott's sales of its pharmaceutical, medical and nutritional products in 2000 totaled $13.7 billion.  By 2008, Abbott's sales had grown to $29.5 billion. Abbott's investment in research and development for the entire company increased only from $1.4 billion in 2000 to $2.5 billion in 2007.

## JURISDICTION AND VENUE

5.        This Court has original subject matter jurisdiction over this civil matter pursuant to 28 U.S.C. §§1331 and 1345, as well as 31 USC. §3732 (a), which specifically confers jurisdiction on this court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367 and 31 U.S.C. § 3732(b).

6.        Venue is proper, and this district court has personal jurisdiction over the defendant, pursuant to 28 U.S.C. §1391(b) and 31 U.S.C. § 3732(a), because Abbott has its headquarters and transacts business in this District and defendant committed acts proscribed by 31 U.S.C. § 3729 in this District.

7.        With respect to 31 U.S.C. § 3730(e), no statutorily relevant public disclosure of the allegations or transactions in this Complaint have occurred.  Even if such a disclosure had occurred, relator is an "original source."  During her eight years at Abbott, relator acquired direct and independent knowledge of the information on which the allegations in this complaint are based and she has voluntarily provided this information to the government before filing this action.

8.        As required by 31 U.S.C. § 3730(b)(2), and the corresponding state statutory requirements, relator served the United States and the States and the District of Columbia

with a written Disclosure Statement providing all material evidence and information she possesses that support the allegations in this complaint.

## FACTUAL ALLEGATIONS

### ABBOTT'S PHARMACEUTICAL PRODUCTS DIVISION AND NEUROSCIENCE DIVISION

9.     In business since 1888, Abbott has over 68,000 employees in the United States and abroad.  In addition to medical and nutritional products, Abbott manufactures, markets, and sells pharmaceuticals worldwide.  Abbott's Pharmaceuticals business includes many prescription drugs in multiple therapeutic areas, including Depakote® (Neuroscience), Niaspan® and TriCor® (Cardiology), Humira® (Immunology), Synthroid® (Metabolic Diseases), and Kaletra®Aluvia® (Infectious Diseases).

10.    Abbott's pharmaceutical sales have grown from $2.6 billion in 2000 to $14.6 billion in 2007.  Depakote accounted for $1.5 billion of the sales in 2007.

11.    Abbott's Pharmaceutical Products Division ("PPD") is responsible for promoting Abbott drugs in the United States and Puerto Rico.  The PPD maintains a sales force that directs its primary marketing efforts toward increasing the number of prescriptions written for Abbott's pharmaceuticals.

12.    The PPD sales force has a number of separate divisions, each charged with marketing specific pharmaceutical products.  The Neuroscience Division markets Depakote throughout the United States and Puerto Rico.  The Division is headed by a Vice President and General Manager and generally had subdivisions responsible for sales, marketing, and clinical science activities.  Relator worked in the Neuroscience Division as a Neuroscience Sales Representative ("NSR").

13.     The sales component of the division in which relator worked was managed by a Sales Director, four Regional Sales Managers ("RSMs"), and a number of District Sales Managers ("DSMs") who supervise the NSRs. The NSRs are the sales representatives in the field who made contacts with physicians and others who prescribe drugs, including nurse practitioners and physician's assistants (together "physicians" or "prescribers"), as well as persons involved with entities that provide health care services ("health care providers"), to persuade them to prescribe Depakote. They do this by "detailing" or explaining uses and benefits of the drug and comparing it favorably to competing drugs.

14.     The NSRs were assigned territories. Relator and her counterpart Loren Carlson were responsible for "Minneapolis South" covering about half of Minnesota. This territory is in the Western Region. Relator was responsible for regularly contacting physicians in this territory, primarily neurologists (including epileptologists) and psychiatrists. Relator also had some responsibility for maintaining sales contacts with institutional health care providers such as Veterans Administration ("VA") hospitals, other hospitals, regional treatment centers, community-based mental health hospitals and correctional facilities, as well as the physicians who serviced them. These health care providers purchased and then dispensed Depakote based on internally-written prescriptions.

15.     Each region and district also had sales representatives directly assigned to the institutional health care providers described above, long-term care facilities, nursing homes, state-run group homes, and pharmacy buying groups. Previously called Long-term Care Representatives, their titles changed to Strategic Account Executives ("SAEs") in approximately 2004. NSRs and SAEs often worked together because of overlapping

responsibilities. For example, an NSR may call on a psychiatrist who had a private practice and provided services for a VA hospital that fell within an SAE's territory.

16.     The marketing component of the Neuroscience Division supported the NSRs and SAEs and generally was further subdivided into promotional and clinical functions. The promotional function provided the sales representatives with marketing materials, including sales aids and patient education materials, and training on how to use them. The clinical function focused more on so-called educational activities related to the clinical uses of Depakote and assisted the NSRs and SAEs in offering them within their territories. This function also had responsibility for generally providing information about uses of Depakote and arranging national, regional and individual meetings with influential physicians called "key opinion leaders," including physicians invited to be "advisors" and "consultants."

17.     The clinical science component of the Neuroscience Division had less direct interaction with the NSRs and SAEs, but made speakers available for events they organized within their territories. Earlier in relator's career at Abbott, this function was performed by persons called Medical Liaisons, who did not necessarily have advanced science degrees. In approximately 2004, the Medical Liaisons were replaced by Clinical Science Managers who generally had advanced degrees (*e.g.*, M.D., Pharm.D., Ph.D.). NSRs and SAEs also arranged speaking events involving Abbott's Neuroscience Research Scientist.

18.     Besides interacting with the marketing and clinical science components of their division, the NSRs and SAEs also interacted with Abbott's Government Affairs Division, which was responsible for negotiating Medicare and Medicaid accounts for individual state governments. During the entire time relator worked at Abbott, Michael Gonzales was the

Government Regulations and Policies Executive ("GRPE") responsible for Minnesota and several other Midwest states.

19.     Abbott's Neuroscience Division had a national Sales and Marketing Advisory Committee ("SMAC" until 2006, then "Platinum Team") charged with optimizing market growth of its products. Relator was selected to participate on this committee in 2003, 2004, 2006 and 2008.   It included various management representatives, marketing product managers, trainers, and field sales representatives from across the United States.  Through this group, Abbott's upper sales management obtained advice, feedback, and suggestions from people in the field about the company's marketing of Depakote.

## ABBOTT'S ABILITY TO TRACK DEPAKOTE SALES

20.     Abbott purchased data from IMS Health, a company that gathers and sells information derived from prescription sales.  The data purchased by Abbott included the identities of the prescribing physicians and their specialties, the number of prescriptions written for Depakote in its various forms and competing drugs,  whether the prescriptions were new or repeat, zip codes where the prescriptions were written, the number of prescriptions that were paid by government, third parties, or cash, and the identities of payors (*e.g.*, cash, government, third-party).

21.     Throughout her employment, Abbott regularly provided relator, and all other NSRs, with mandatory "Call Plans" that listed the names and specialties of physicians in her territory whom she was required to call on within a certain time period.  Relator understood that Abbott generated these lists based on its marketing goals for each territory.

22.     Abbott also used IMS data to track the success of its marketing efforts, to plan future marketing strategies, to determine the prescribing volume of physicians and health

care providers, including those treating government-pay patients, and to evaluate NSR performance for purposes of incentive pay and sales contests.

23.     The NSRs received reports generated from this data including Practitioner Prescribing Profiles providing weekly prescribing information for specific physicians, "snapshot" reports by territory showing volume and growth of sales by drug and by month and, starting in approximately 2006, Dashboard and Key Physician Tracker reports that could be customized to show a particular physician's prescribing patterns including for competing drugs over particular periods of time.

24.     At least by 2004, Abbott also routinely sent the NSRs lists of physicians in their territories who wrote the top number of prescriptions paid by the government.

25.     Similarly, the SAEs received reports about institutional health care providers that purchased drugs directly and filled prescriptions internally, including purchases on a kilogram basis and broken down by institution.

## DEPAKOTE

26.     The drugs designated in this case as "Depakote," are formulations of the drug valproate, found effective in the 1960s for treatment of epilepsy and bipolar disorder.  Abbott has developed and sought approval from the FDA for formulations of valproate for use in treatment of persons with epilepsy, manic and mixed episodes associated with bipolar disorder, and migraines.  Depakote generally is designated as an anticonvulsant, an anti-epilepsy drug ("AED") or a mood stabilizer.

27.     Abbott developed a delayed-release version of valproate in the form of divalproex sodium, called Depakote DR.   In the years stated, the Food and Drug

Administration (FDA) approved Depakote DR's distribution as safe and effective for treatment of:

- simple and complex absence seizures (1983)

- mania in bipolar disorder (1995)

- complex partial seizures in adults and children ages ten years and older (1996)

- migraine prophylaxis (1996)

28.     Depakote Sprinkle Capsules are another form of divalproex sodium consisting of coated particles in a pull-apart capsule designed to be taken intact or for its contents to be mixed with soft food to assist patients who have difficulty ingesting medications in tablet form. In 1989, the FDA approved the use of Depakote Sprinkle Capsules as safe and effective for treatment of:

- complex partial seizures that occur either in isolation or in association with other types of seizures;

- simple and complex absence seizures, and adjunctively in patients with multiple seizure types that include absence seizures.

29.     Abbott also developed an extended-release formulation of divalproex sodium called Depakote ER and introduced it in the U.S. in 2000. The FDA approved its use for treatment of:

- migraine prophylaxis (2000)

- simple and complex absence seizures, complex partial seizures and multiple seizure types that include absence seizures in adults (December 2002) and children ages ten years and older (September 2003)

- bipolar manic or mixed episodes with or without psychotic features (December 2005)

30. Depacon, a formulation of valproate sodium for intravenous injection, was introduced in 1996 as an intravenous alternative for patients for whom oral administration of valproate products is temporarily not feasible for treatment of:

- complex partial seizures (1996)

- simple and complex absence seizures (1996)

31. The FDA requires manufacturers of drugs that have life-threatening side effects to provide information about those risks in a box at the beginning of the drug label ("black box"). All four formulations of Depakote have mandated black boxes that warn the user of the following risks in using the drug:

- Hepatotoxicity: hepatic (liver) failure resulting in fatalities

- Teratogenicity: teratogenetic effects (birth defects) including spina bifida, such that "the use of Depakote tablets in women of childbearing potential requires that the benefits of its use be weighed against the risk of injury to the fetus"

- Pancreatitis: life-threatening pancreatitis that in some cases is described as hemorrhagic with a rapid progression from initial symptoms to death

32. Depakote DR and ER also are subject to an active FDA safety alert indicating that persons taking the drug have an increased risk of suicidal behavior and ideation.

33. Depakote also may cause other adverse effects, including but not limited to nausea, tremor, somnolence (sedation), dizziness, weight gain and alopecia (hair loss).

34. Unless specifically indicated, FDA-approved indications are for adults only. The only approved pediatric use of Depakote is for the treatment of the specified types of seizures in patients age ten and older, and that approval covers only Depakote DR and ER.

35. The labeling for Depakote DR, ER and Depacon indicates that particular care should be taken with respect to dosage in the geriatric population, including discontinuation

13

if excessive somnolence occurs. The Depakote ER labeling further indicates: no patients above 65 years old were included in clinical trials of mania associated with bipolar illness; excessive somnolence or sedation may be an issue in treating elderly patients with dementia; elderly patients had reduced capacity to eliminate valproate compared to younger adults; and for DR and ER, insufficient information is available to discern the safety and effectiveness of the drug for prophylaxis of migraines in patients over 65. The labeling further reports a case review study in which a higher percentage of patients above 65 years of age reported accidental injury, infection, pain, somnolence, and tremor.

36.     During the time relator worked at Abbott, Depakote had the highest sales volume of any of its drugs. When relator began in 2000, Abbott's Depakote sales were approximately $776 million. Depakote sales broke the $1 billion mark in 2005, and by 2007 had reached $1.5 billion.

37.     Abbott achieved its sales successes with Depakote by implementing at least three illegal schemes resulting in false claims. It successfully marketed off-label uses of Depakote to government-pay prescribers in violation of 31 U.S.C. § 3729(a)(1); it used false statements to persuade physicians to prescribe Depakote ER for off-label purposes, to write new prescriptions for ER, and to prescribe ER instead of DR to increase its profits in violation of 31 U.S.C. § 3729 (a)(2) and (a)(7); and it used illegal kickbacks to induce physicians to prescribe the drug in violation of 31 U.S.C. § 3729 (a)(1). Abbott's conduct further violates the equivalent provisions of the false claims acts of the states and the District of Columbia listed at the beginning of this complaint.

## ABBOTT'S OFF-LABEL MARKETING OF DEPAKOTE, CAUSING PRESENTATION OF FALSE CLAIMS FOR PAYMENT BY THE GOVERNMENT

38.    Abbott's Code of Business Conduct states that "many Abbott products are reimbursed or purchased by Federal Health Care Programs," and that the FCA required it to exercise care to ensure that it does not "submit any inaccurate or otherwise improper claims for payment to the government, or cause others to do so."

39.    Abbott failed to exercise care and instead engaged in a systematic and aggressive scheme to increase the sales of Depakote by marketing the drug for uses not approved or "indicated" by the FDA. This scheme was company-wide and approved by top management.

40.    During a June 2006 Leadership Development Summit training session held in California, a Seattle DSM, Justin Song, said he was leaving the company because the pressure from senior management to sell Depakote for indications that weren't medically accepted was unethical and a message he would not enforce with the people who reported to him. Sales Director Medgar Williams, Illinois DSM Kelly Moritz, and relator's DSM, Dan Jobin, heard the statement. Their response was words to the effect that it was up to Abbott's senior leadership to find a way to hit the company's numbers.

41.    Doctors may prescribe drugs for any use, but the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 355(a), prohibits drug manufacturers from marketing or promoting their drugs for uses or indications not approved by the FDA ("off-label use"). The purpose of FDA approval is to assure that drugs introduced into the marketplace are safe and effective for their intended use. Off-label marketing constitutes illegal introduction of "misbranded" or "adulterated" drugs into the marketplace. 21 U.S.C. § 331(a) and (d); § 352(a). government health programs similarly limit coverage only to drugs deemed safe and

effective. *See, e.g.,* 42 U.S.C. § 1396r-8(k)(2)(Medicaid); 42 U.S.C. § 1395w-102(e)(1)(A)
(Medicare); 32 C.F.R. 199.4(g)(15)(i) (Tricare). The Medicare statute further requires
physicians to assure that pharmaceuticals are "provided economically and only when, and to
the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1).

42.     Abbott marketed Depakote off-label to physicians and health care providers
who prescribed Depakote for government-pay patients. The federal and state programs that
paid the prescriptions for these patients include but are not limited to Medicaid, Medicare,
State Children's Health Insurance Program (SCHIP), Indian Health Service, Federal
Employees Health Benefits Program, (FEHBP), Tri-Care and the Veterans Health
Administration (VHA) (together, "government health care programs"). These programs
allow payment only for prescriptions that are "covered" by the program.

43.     Medicaid, Medicare, SCHIP, and Indian Health Service and others only cover
prescriptions written for a "medically accepted indication," defined as "any use for a covered
outpatient drug which is approved under the Federal Food, Drug, and Cosmetic Act or the
use of which is supported by one or more citations included or approved for inclusion in any
of the compendia described in subsection (g)(1)(B)(i)." 42 U.S.C. § 1396r-8(k)(6).

44.     Similar rules govern reimbursement of prescriptions by government health
programs for the uniformed services and veterans – Tri-Care and VHA. Tri-Care will only
pay for prescriptions if the prescribed use is FDA-approved or if the use is shown in the
medical literature to be both safe and effective. 32 C.F.R. § 199.4(g)(15)(i)(C). Tri-Care
further explains that the "medical literature" exception for off-label prescriptions is available
only if "reliable evidence shows that [the treatment] has been the subject of well-controlled
studies of clinically meaningful endpoints, which have determined its maximum tolerated

dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment."
32 C.F.R. § 199.4(g)(15)(i)(C). The VHA has a similar standard, excluding payment for
drugs that are "not medically or psychologically necessary" and that are "not provided in
accordance with accepted professional medical standards." *See* 38 C.F.R. 17.270(a);
17.272(a)(4) and (14).

45.     Relator's claims of off-label marketing leading to false claims in this complaint
are limited to uses of Depakote that reasonably cannot be characterized as "medically
accepted indications" or as supported by "reliable evidence" as defined in the program
regulations.

46.     Abbott's off-label marketing to government-pay prescribers was knowing,
intentional, and implemented by its national sales force, which viewed as a core marketing
message that "Depakote works well in many diagnoses."

47.     Abbott's direction to market Depakote off-label was communicated to groups
of sales representatives through sales meetings at national, regional, splinter (multiple
districts within a region) and local levels, telephone conference calls, consulting meetings
and other communications.

48.     Relator was instructed at one of her first sales meetings that one of the
"strategies to address business potential" was "to expand the use of Depakote into other
Psych markets."

49.     Abbott's direction to market Depakote off-label also occurred in one-on-one
interactions between NSRs and their supervising DSMs and RSMs. They trained and
coached the NSRs to promote off-label uses in their sales calls with physicians and in their
overall marketing plans.

50.     Abbott used a compensation structure that rewarded the success of NSRs who marketed Depakote off-label. Besides base pay, Abbott's compensation package typically included a base incentive plan each trimester that paid NSRs a field sales bonus if they met quotas determined for that period. The quotas generally involved both individual and national sales performance and emphasized sales of Depakote ER by offering more money for new prescriptions or conversions to the drug.

51.     Abbott used frequent sales contests called "SPIFFs" ("Special Performance Incentives for Field Forces") to motivate and reward NSRs. It gave money, trips, and other prizes for achievement of specifically defined goals, including goals related to government sales. Finally, Abbott had motivational programs such as the All Star program that honored and rewarded the top 5%-10% of the sales force.

52.     Abbott provided NSRs nationwide with promotional materials, including sales aids and journal articles to use when marketing Depakote. Included were materials that promoted off-label uses of the drug, such as Abbott publications and articles on off-label uses that were illegally given to and discussed with physicians. Some of the materials directly targeted physicians and facilities treating government-pay patients.

53.     Abbott trained and expected its sales force to offer promotional and claimed "educational" events as part of their overall marketing efforts. These included presentations by NSRs and SAEs, Abbott clinical and research personnel, and key opinion leaders and other doctors. Many of these presentations illegally included content that promoted Depakote for off-label uses. Abbott claimed many events as "educational" or "scientific exchanges" when, in fact, they were initiated and executed by NSRs for marketing purposes. NSRs were evaluated on and rewarded for organizing these events.

54.     Abbott used its unrestricted educational grants ("UEGs") to fund live continuing medical education programs ("CMEs") that supported off-label uses of Depakote. These CMEs were another form of illegal off-label marketing because Abbott typically controlled the selection of speakers, the topics, the venue, the invitees and the fees paid to the speakers. This violated the standards of the Accreditation Council for Continuing Medical Education ("ACCME") which allowed commercial organizations to provide educational grant money to CME providers for claimed educational purposes only if the accredited provider is *solely* responsible for "the content, quality and scientific integrity" of the CME activities.

55.     This control and use of live CMEs to achieve marketing goals, including off-label prescriptions, occurred company-wide. Abbott's marketing staff published lists of recommended speakers across the country that included notes about off-label topics for which they were well-suited. These speakers sometimes used Abbott-prepared slides for their presentations.

56.     Frequently, the CMEs that Abbott funded were offered by a CME provider called ABcomm, Inc. that was owned and operated by a previous Abbott employee. Other CME providers had affiliations with Abbott key opinion leaders. These relationships made it easy for Abbott to award UEGs for CMEs that served off-label marketing purposes.

57.     Abbott also used its UEGs to fund packaged CMEs (*e.g.*, booklets, videotapes, DVDs) that supported off-label uses of Depakote. These functioned as another type of illegal marketing tool. Generally, relator received a package of 50 copies of each packaged CME. She was expected to distribute all of them to physicians through her sales calls and was evaluated on her diligence in doing so.

58.     One of the marketing business plan templates provided for relator's use identified both "ABcomm" and "CME materials" as "resources" to be utilized by the NSRs. Abbott's vendor for marketing resources also had CMEs available for the NSRs to order.

59.     Abbott used the above company-wide methods and resources to market Depakote for the following off-label uses:

- disease states and symptoms that are not medically accepted indications

- disease states in children that are not medically accepted indications

- comorbidities that are not medically accepted indications

- adjunctive therapies that are not medically accepted indications

- disease states prior to FDA approval

**Abbott's Marketing of Depakote for Off-Label Disease States and Symptoms**

60.     Abbott illegally marketed Depakote for disease states other than those approved by the FDA or supported by compendia listings or reliable medical evidence. These include but are not limited to schizophrenia, dementia, unipolar depression, withdrawal from substance abuse, and acute migraines.   Abbott also illegally marketed Depakote for *symptoms* such as aggression, agitation, and impulsivity, regardless whether those symptoms were associated with a medically accepted indication.

61.     Abbott emphasized Depakote's function as a "mood stabilizer" to link the drug to a broad range of disease states and symptoms for off-label marketing.[2]  Abbott routinely trained its NSRs to focus on the symptoms of mania that Depakote treats as the basis of marketing the drug for broader psychiatric uses.  It gave NSRs a chart titled "Psychiatry Market Segmentation:   Depakote Target Segments" listing symptoms found in thirteen

---

[2] An Abbott training slide defines "mood stabilization" as "[a]ny medication that stabilizes acute manic, mixed and depressive symptoms, does not induce alternate mood symptoms and prevents against future relapses into manic, mixed or depressive symptoms or episodes."

psychiatric diagnoses including bipolar and indicating which symptoms were common to different diagnoses. Certain diagnoses with symptoms common to bipolar were highlighted, including SAD (schizoaffective disorder), schizophrenia, dementia, IED (intermittent explosive disorder), PTSD, and Cluster B. The message communicated was that NSRs should target segments of the psychiatric market that share the bipolar symptoms for which Depakote is indicated

62.     Abbott gave sales aids to the NSRs to assist in this marketing, including a laminated slide from about 2002, used for many years, showing that the symptoms of aggression, agitation, anxiety, mood swings, anger and psychotic thinking that are characteristic of bipolar disorder also are characteristic of other psychiatric diagnoses, specifically, IED, PTSD, borderline personality disorder, agitated depression and SAD. Another aid from approximately the fall of 2004, titled "Review of Manic Symptom-based Selling," lists symptoms of mania that may also appear in other illnesses. NSRs were instructed to carry this card with them to sales calls. Similar lists of symptoms were included in later sales aids titled "Grounded in Dependability" that were published in 2006 and 2007.

63.     Abbott also promoted Depakote as better for patients metabolically than other atypical antipsychotic drugs used to treat a broad range of psychiatric diagnoses Abbott trained NSRs to use the results from two studies (by Casey and Zajecka) to present Depakote as a drug that effectively treats a broad range of symptoms but with fewer adverse side effects and less metabolic risk as compared to atypical antipsychotic drugs.

64.     During a regional sales meeting in Chicago on October 5, 2004, Trey Benson, Psychiatry Promotional Support, stated that management wanted NSRs to target *all*

diagnoses and was only concerned about Depakote's total market share as compared to its competitors.

65.     Additional conduct demonstrating Abbott's illegal marketing for disease states and symptoms that are not medically indicated includes, but is not limited to, the following:

A.     Abbott trained and expected NSRs and SAEs to solicit information from physicians about their patients' typical symptoms and diagnoses, and then to adapt their Depakote sales pitch to make it attractive as a treatment for the disease states and symptoms of those patients.    This occurred regardless whether the treatments are medically accepted indications for Depakote or whether the uses would be covered by government health programs.

B.     Besides the symptom lists, Abbott produced sales aids that promoted or at least suggested the use of Depakote for not medically indicated indications.    A few examples are:    a glossy booklet in 2002 titled "Depakote A Spectrum of Treatment:    Past, Present and Future" that discusses potential effectiveness in a number of off-label uses, including for treatment of agitation in elderly patients with dementia, psychosis associated with schizophrenia, and Alzheimer's disease; a 2003 publication distributed for several years titled "A Pocket Guide to Dementia and Associated Behavioral Symptoms:    Diagnosis, Assessment and Management" that recommends divalproex for various dementia symptoms; and a 2005 sales aid called "Depakote ER:    Selecting Appropriate Patient Types" that profiled four "patients" with symptoms characteristic of off-label disease states.

C.     Abbott gave NSRs articles to disseminate to physicians that promoted the use of Depakote for off-label diagnoses and symptoms, including "Valproate as

an Antidepressant in Major Depressive Disorder," "Effect of Divalproex Combined with Olanzapine or Risperidone in Patients with an Acute Exacerbation of Schizophrenia," and "Safety and Tolerability of Divalproex in the Treatment of Signs and Symptoms of Mania in Elderly Patients with Dementia." Abbott management knew and expected that NSRs would initiate discussion of these articles with physicians.

D.     Abbott's NSRs and SAEs presented in-service programs in which they talked about uses of Depakote for non-indicated diagnoses and symptoms to physicians and their staffs, for example, "Use of Mood Stabilizers in Depression," a talk given in 2003 to staff at the St. Peter Regional Treatment Center in Minnesota, and a 2003 in-service at a long-term care facility, Elim Health Care in Princeton, Minnesota, on using Depakote ER to treat agitation, aggression and hostility in elderly patients.

E.     Abbott made clinical and research staff available for and expected NSRs to arrange talks characterized as "educational" that actually were promotional, including presentations to physicians by Abbott Neuroscience Research Scientist Michelle Collins on "Use of Anticonvulsants in Schizophrenia" and presentations by Abbott's clinical science managers in 2006 on "Agitation in the IDD Population," and "Management of Agitation in Elderly Dementia."

F.     Abbott funded promotional talks by key opinion leaders on non-indicated diagnoses and symptoms, including Dr. Lori Davis talking to the staff of the VA hospital in Minneapolis about using Depakote for treatment of PTSD in 2000, "Impulsivity and Aggression in Psychiatric Diagnosis," a 2003 presentation by Dr.

Suck Kim, and "Managing Disruptive Behaviors in the Developmentally Disabled Population," presented by Dr. Ronald Hardrict in 2007.

     G.    Abbott funded live and packaged CMEs promoting uses of Depakote for non-indicated disease states and symptoms, including but not limited to a live CME by Dr. Michael Farnsworth in 2006 titled "Bipolar and Unipolar Depression," a live CME by Dr. Dean Knudson in 2006 titled "Dementia, A Symptom Based Treatment Approach," and packaged CMEs on the subjects "New Data, Expert Opinion: Anticonvulsants' Impact in Bipolar Disorder & Schizophrenia (CD)," and "Alcohol Withdrawal and Alcohol Relapse Prevention: Implications for Clinical Practice."

     H.    Abbott intensified its targeting of the geriatric market when several atypical antipsychotic drugs commonly used to treat dementia (Zyprexa, Abilify, Risperdal, Seroquel, Clozaril, Geodon and Symbyax) came under scrutiny because of severe health risks to older patients, culminating in a required black box warning on several of the drugs in early 2005. Abbott expanded the number of SAEs who called on institutional health care providers such as VA hospitals, long-term care facilities and pharmacy groups. On essentially all their calls, SAEs were directed to persuade neurologists and psychiatrists to prescribe Depakote to treat dementia and psychosis in elderly long-term care patients. Similarly, when calling on physicians treating geriatric patients, NSRs were expected to deliver the message that Depakote was a mood stabilizer that treated the same dementia symptoms for which the physicians had been prescribing atypical antipsychotic drugs. Abbott further offered presentations, CMEs and packaged CMEs on using Depakote to treat dementia and its

symptoms. This marketing initiative primarily involved government-pay patients whose prescriptions were paid by Medicaid or Medicare.

I.      Abbott specially targeted the atypical antipsychotic market with the message that Depakote has been shown effective in treating symptoms like those in schizophrenia, schizoaffective disorder and PTSD, but is less expensive and has fewer side effects. Abbott gave physicians a DVD showing the savings achieved by prescribing Depakote in lieu of particular atypical antipsychotics and trained NSRs to emphasize that Depakote is better tolerated because it is "metabolically neutral." To motivate NSRs to increase government sales, Abbott sponsored a SPIFF focused on success in delivering the "antipsychotic message" to high Medicaid prescribers.

J.      Abbott specially targeted correctional facilities and claimed that Depakote is effective in treating behavioral symptoms at less cost than atypical antipsychotic drugs and with fewer side effects than less expensive drugs currently in use. Beginning in 2004, Abbott funded and distributed a CME video titled "The Revolving Door Between Institutions and the Department of Corrections" that includes a discussion of uses of Depakote for schizophrenia and psychosis.

K.      Abbott marketed intravenous Depacon, which is indicated only for seizures and only if oral administration of the drug is temporarily infeasible, as an off-label means of providing rapid relief for acute migraines and out-of-control behaviors. Emergency room physicians and neurologists who treated acute migraine patients were targeted, with the expectation that this would enhance the likelihood of achieving an ongoing prescription of Depakote ER for migraine prophylaxis or bipolar. Resources used to this end included articles such as "Intravenous Valproate

Loading in Acutely Manic and Depressed Bipolar I Patients," a "[c]omplete Depacon presentation including new labeling, status epilepticus, migraine and psych use" by Abbott research scientist Michelle Collins, and CMEs in 2005 by Dr. Harold Robbins that discussed Depacon as a treatment for prolonged moderate or severe headache.

66.     Abbott's off-label marketing of Depakote resulted in prescriptions written for disease states and symptoms that are not medically accepted indications and that were presented to and paid by the government.  Examples include but are not limited to the following:

A.     After Dr. Lori Davis' presentation at the Minneapolis VA Hospital on the use of Depakote in treating PTSD in September 2000, Depakote's market share at that facility went up by double digits (about 12%).  All VA patients are government-pay.

B.     On July 26, 2005, relator, her DSM Dan Jobin, and RSM Bill Axelsen called on Dr. Michael Farnsworth at his office at the Blue Earth County Community Mental Health Clinic in Mankato, Minnesota.  He told them he had been an early adopter of Depakote ER, including prescribing it for a variety of psychiatric conditions in his patients such as schizophrenia and unipolar depression.  The period he was referencing was from 2000 to 2003 when he was Administrative and Medical Director of the Minnesota Security Hospital and other programs delivering mental health services for mentally ill and dangerous, sex offender, and developmentally disabled populations.  All of the patients for whom these drugs were prescribed were government-pay.

C.     During sales calls with relator, including one at his office in Brainerd, Minnesota on June 28, 2006, geriatric psychiatrist Dr. Thomas Wittkopp stated that he frequently prescribed Depakote for geriatric and dementia patients who had been hospitalized due to severe behavioral issues.  His statement included patients whose prescriptions were paid by Medicaid or Medicare.

D.     The volume of Depakote sales increased at Elim Health Care in Princeton, Minnesota following the 2003 in-service presentation discussed above on using Depakote ER to treat agitation, aggression and hostility in elderly patients. This increase included prescriptions that were paid by Medicaid or Medicare.

E.     Another geriatric psychiatrist, Dr. Faruk Abuzzahab, stated during sales calls in his office in St. Louis Park, Minnesota sometime in 2006 that he prescribed Depakote to his dementia patients to get their agitation and aggression under control.  He said that this prescribing pattern was the result of information provided to him from Abbott sales representatives Cherie Moehling, Robert Arneson, and Tom Haik.  His statements included patients whose prescriptions were paid by Medicaid or Medicare.

F.     In the course of regular sales calls, Dr. Daniel Scott talked with relator about Depakote's applicability to his geriatric population and told them that he used Depakote as a treatment for "sundown syndrome" in his geriatric patients.  His statements included patients whose prescriptions were paid by Medicaid or Medicare.

G.     In 2005, Minnesota's Department of Human Services formed county Assertive Community Treatment Teams ("ACT Teams") to work with difficult-to-treat psychiatric patients, including house calls. Relator regularly met with the ACT

Teams' psychiatrists, nurse practitioners and support staff and offered in-service programs, including two in the fall of 2005 by a local key opinion leader, Dr. Ronald Hardrict, the first talking about using Depakote to treat patients with mental retardation and behavioral issues and the second comparing use of Depakote with atypical antipsychotics in treatment of psychosis in schizophrenia. Following those presentations, prescriptions for Depakote ER increased significantly. The patients serviced by the Act Teams were government-pay patients.

H.      Throughout her career at Abbott, relator made regular sales calls to psychiatrist Dr. John Kluznik who had worked at St. Peter Regional Treatment Center and other correctional facilities. He used Depakote for a variety of psychiatric diagnoses including schizophrenia, borderline personality disorder and psychosis. Prescriptions written in this context were government-pay.

I.      Relator marketed Depacon to psychiatrist Dr. Daniel Hanson, the Medical Director of the Minneapolis VA Hospital through approximately 2003. In sales calls at the hospital, Dr. Hanson told her that he often prescribed the drug for out-of-control psychiatric inpatients at the VA Hospital, and in fact, called it "Dr. Dan's Magic Potion." These were all government-pay patients.

**Abbott's Marketing of Depakote for Off-Label Disease States in Children**

67.     Abbott sought and received FDA-approval for pediatric use of Depakote only in connection with seizures. The FDA never approved Depakote for treatment of children with manic and mixed episodes associated with bipolar disorder, migraine prophylaxis, or any other non-epileptic diagnosis or symptom.

68.     Abbott illegally marketed Depakote for pediatric uses outside epilepsy including but not limited to bipolar disorder, migraines, ADHD, and behavior problems including agitation and aggression.

69.     Conduct demonstrating Abbott's illegal marketing for disease states in children other than seizures includes but is not limited to the following:

A.      Abbott routinely required NSRs, including relator, to make sales calls to child psychiatrists by listing them on mandatory call lists. Because Depakote has no on-label psychiatric indications for children, these calls could only have off-label sales as their purpose.

B.      NSRs included strategies in their business plans for increasing sales to psychiatrists treating children. Abbott expected them to execute such strategies, just as they did for sales to other physicians.

C.      Abbott participated in conferences involving child and adolescent psychiatrists. In 2003 its "tactical execution plan" included attendance at the conference of the American Academy of Child and Adolescent Psychiatry. Abbott supported and relator attended local psychiatric conferences about children and adolescents.

D.      Abbott disseminated and expected NSRs to discuss articles with physicians on using Depakote to treat a variety of pediatric diagnoses and symptoms. These articles included "Divalproex Treatment for Youth with Explosive Temper and Mood Lability," "Mania in Children and Adolescents: Recognition and Treatment," and "The Efficacy of Divalproex Sodium in the Prophylactic Treatment of Children with Migraine."

E.     Abbott made many resources available that NSRs used to market Depakote for treatment of non-epileptic disease states and symptoms in the pediatric population.   Researcher Michelle Collins gave presentations on "Use of Mood Stabilizers in Children and Adolescents." A list of recommended speakers distributed by marketing listed, for example, several doctors who were effective in talking about "adolescent psychiatry, aggression and violence," and another whose topic was "children and adolescents with ADHD and bipolar disorder." Abbott funded and offered many CME presentations through ABcomm that included discussion of Depakote as a treatment for childhood bipolar disease, including Dr. Kiki Chang's 2004 presentations in Minnesota, "Does Childhood Bipolar Disorder Exist?" and "Aggression and Violence in Youth:  Bipolar or Bad Kids?" Abbott's 2005 catalogue of sales materials included a packaged CME titled "Managing Bipolar Disorder in Children and Adolescents."  In 2006 Abbott funded and NSRs organized attendance at an audio CME by Dr. Charles Bowden titled "Bipolar Update:  New Insights on Maintenance Treatment and Bipolar Disorder in Youth."

70.     To extend its patent for Depakote ER, Abbott eventually engaged in clinical studies of the efficacy of Depakote ER for pediatric use in bipolar mania and migraine prophylaxis.  Those clinical studies were unsuccessful in establishing a basis for FDA approval. Abbott's own labeling for Depakote ER now states that efficacy was not established for indications of either mania or migraine in children.

71.     Abbott continued to require NSRs to market Depakote for not medically accepted indications in children even after the completion of its unsuccessful pediatric

clinical studies. Relator was required to call on pediatric psychiatrists through the end of her employment in June 2008.

72.      Abbott's off-label marketing of Depakote resulted in off-label prescriptions written for children that were presented to and paid by the government. Examples include but are not limited to the following:

A.      Throughout her tenure at Abbott, and as required by the company, relator regularly called on child psychiatrists, as well as psychiatrists and nurse practitioners who treated children. Many of these provided care to government-pay patients at community mental health clinics. The child psychiatrists who worked at community mental health clinics included Drs. Paul Renner, John Luehr, and Adam Fox. Relator made sales calls on nurse practitioners Terri Russell, Kathleen Lund, Mary Andersen, Angela Bastian, and Malinda Henderson, who also wrote prescriptions for child and adolescent patients in community mental health clinics. Relator called on child psychiatrists Drs. Lynda Barger and Charles Godfrey who worked for the Volunteers of America, believed to be 100% government-pay, as well as Dr. Carol Krush, a family medicine practitioner serving the Indian population in Minnesota, also believed to be government-pay. Literally every Depakote prescription written for a psychiatric or non-epilepsy disease state in a child who was a government-pay patient was for a not medically accepted indication.

B.      Following Dr. Kiki Chang's CME presentations in Minnesota on or about November 18, 2004, that discussed using Depakote to treat childhood bipolar disorder, prescriptions for Depakote by child psychiatrists in the state increased dramatically. Many of these psychiatrists treated government-pay patients.

C.     Relator regularly made sales calls on Dr. Leonard Sulik, child psychiatrist and Medical Director of the St. Cloud Centracare Hospital. Dr. Sulik prescribed Depakote for children with bipolar disorder. At a luncheon in 2004, Dr. Sulik said that, if a government program denied payment for a prescription, he changed the diagnosis from "childhood bipolar" to "NOS," or "not otherwise specified" and the government then covered the prescription. Dr. Sulik told relator she could use his name in providing this information to others who have had prescriptions returned by government programs. Dr. Joel Spalding is another child psychiatrist on whom relator regularly made marketing calls. He, too, successfully achieved government coverage of prescriptions for pediatric use of Depakote for mental illness by writing "NOS" on his government-pay prescriptions.

D.     Dr. Muhammad Azeem worked as a child psychiatrist at the Brainerd Regional Treatment Center, which serviced government-pay patients. As a result of sales calls by relator and SAE Tom Haik, including articles provided to him, he increased his Depakote prescriptions for disease states such as autism and ADHD, as well as for comorbidities. He used Depakote for pediatric patients who were bipolar with substance abuse issues and Intellectually Developmentally Disabled ("IDD") patients with behavioral problems.

E.     Relator regularly called on Dr. Lon Augdahl, who treated in-patient government-pay children and adolescents part-time at the Red Wing Detention Center. As a result of their discussions, he prescribed Depakote ER for treating the symptoms of agitation and aggression in his patients.

F.      Psychiatrist Dr. Brien Godfrey treated many government-pay children and adolescents in his work for Volunteers of America and Ramsey County, Minnesota.   As a result of sales calls with relator and other NSRs, he prescribed Depakote for bipolar depression and maintenance, and for borderline patients, as well as to treat aggression, agitation, symptoms of schizophrenia, and comorbidities.

**Abbott's Marketing of Depakote Off-Label for Comorbidities**

73.      Manufacturers may market a drug to simultaneously treat more than one disease state ("comorbidities") in a single patient as long as they have received FDA approval for that "dual duty" use.   Approval for comorbidities is accompanied by a recommended dosage of the drug because assumptions cannot be made that the proper dose for one indication will make the drug effective for more than one.

74.      The only dual-duty use or comorbidity for which the FDA approved Depakote is for simultaneous treatment of multiple seizure types in a single patient.

75.      Abbott trained the NSRs, including relator, to market Depakote for other comorbidities that had no FDA approval.   This includes for example, marketing for seizures combined with aggression, bipolar disorder and substance abuse, bipolar mania and dementia, and even bipolar mania and high cholesterol.   NSRs also cross sold Depakote for seizures and migraine, bipolar and migraine, and bipolar and seizures.

76.      No approved dosages exist for this type of off-label use of Depakote.   Abbott trained the NSRs to recommend "updosing" aggressively for comorbidities even though it had no evidence that the updose was safe or effective for that purpose.   Abbott trained NSRs to justify its updosing protocol by referring to a study by Allen (included in some sales aids) that showed greater effect size of the drug at higher serum valproate levels.   That study was

conducted on patients with a single disease state, acute mania, not comorbidities, undercutting its validity for determining proper dosage to prescribe for comorbidities.

77.    Although potentially dangerous, Abbott achieved increased sales through marketing to comorbidities with an updosing message.

78.    Additional conduct demonstrating Abbott's illegal marketing to comorbidities, includes but is not limited to the following:

A.    Abbott trained its NSRs that updosing was a key to achieving All-Star status and that pitching Depakote's effectiveness with comorbidities was one way to reach that goal.

B.    Abbott made resources available that promoted Depakote's use in treating comorbidities and expected NSRs to use them, which they did. These included researcher Michelle Collins speaking on "Depakote in Bipolar Disorder and Substance Abuse," CMEs through ABcomm on "Bipolar Disorder & ADHD," "Comorbidity of Migraines with Bipolar Disorder," and "The Complicated Bipolar Patient: Impulsivity, Substance Abuse and Suicide," and packaged CMEs including "Emerging Issues in Epilepsy: Epilepsy and Common Comorbidities in Pediatrics."

C.    Consistent with Abbott's directions, relator organized promotional presentations on Depakote's use with comorbidities including Medical Liaison Jennifer Hayden speaking at the Willmar Regional Treatment Center in 2004 on prescribing Depakote to reduce substance abuse problems in bipolar patients, a July 2005 in-service given by relator and a colleague on the use of Depakote ER to treat seizures and symptoms of dementia in geriatric patients, and presentations by epileptologist Dr. Joanne Rogin in 2008 on the benefits of Depakote for treating

epilepsy combined with behavioral issues, epilepsy and depression, or epilepsy and dementia.

       D.     In early 2008, NSR Jay Hutchison organized several talks by key opinion leader and epileptologist, Dr. Joanne Rogin, about Depakote ER and its use for comorbidities. Hutchison successfully suggested the inclusion of slides and commentary stating that Depakote had benefits for epilepsy plus behavioral disorders, epilepsy plus depression, and epilepsy plus dementia. Dr. Rogin emphasized Depakote ER as the drug the attendees should prescribe. Dr. Rogin's programs were targeted to the top five institutions in the district that had the highest number of government pay patients and the physicians who worked in those institutions.

       E.     In June of 2008, relator's DSM Jennifer Mortale forwarded a voice mail to relator and other NSRs in which an NSR recounted his success in persuading an epileptologist to switch a patient on two atypical antipsychotics solely to Depakote ER using the argument that it would treat an intellectually developmentally delayed ("IDD") patient with both seizures and behavioral problems, specifically aggression and hostility. Mortale's message was that this off-label sales pitch was a "success story" about selling Depakote for comorbidities that other NSRs should emulate.

79.     Abbott knew that it was illegal to market Depakote as a dual-duty drug. At an Advanced Sales Training workshop in December of 2006, Jennifer Trenn, then Senior Product Manager for Neuroscience, told a small group of NSRs that they shouldn't be marketing to comorbidities because Abbott did not have FDA indications for multiple disease states. Relator is not aware that Abbott ever communicated Trenn's position more broadly to

the sales force, and she never received any formal communication from Abbott or any of her managers to refrain from marketing to comorbidities.

80.    Abbott's off-label marketing of Depakote resulted in prescriptions written for comorbidities that are not medically accepted indications that were presented to and paid by the government. Examples include but are not limited to the following:

A.    Shortly after Jennifer Hayden's June 1, 2004 presentation on prescribing Depakote to reduce substance abuse problems in bipolar patients, Dr. James Beckman, the Medical Director of the Willmar Regional Treatment Center, and Dr. Louis Fulton began prescribing Depakote ER for a government-pay bipolar patient with co-morbid substance abuse issues. The Willmar Regional Treatment Center primarily treats government-pay patients.

B.    Child psychiatrist Dr. Leonard Sulik, Medical Director of St. Cloud Centracare Hospital, treated government-pay patients with Depakote ER based on comorbidity information provided by Abbott. He stated on August 22, 2005 that he had prescribed Depakote ER for a person with cerebral palsy and seizures who had previously been on Depakote DR and was having behavioral problems after being switched to a competing drug. Dr. Sulik converted her prescription to Depakote ER at a significantly higher dose based on Abbott's sales calls.

C.    Relator worked with SAE Tom Haik in December of 2006 to arrange a presentation by Dr. Fred Lux at the Belle Plaine Lutheran Home, a long-term care facility that primarily served Medicare/Medicaid patients. Dr. Lux talked about prescribing Depakote ER, for older patients with dementia, dementia symptoms, or comorbidities such as seizures and behavioral disturbances. The Depakote sales

numbers for that facility increased after this event. Dr. Lux's prescriptions for Depakote ER also increased by 5% in the 3 months after the event.

**Abbott's Marketing of Depakote Off-Label as an Adjunctive Therapy**

81.     FDA approval also is needed to market a drug for adjunctive therapy, meaning use of a drug in combination with another drug for treatment of a single disease state. Depakote was indicated for adjunctive therapy only for seizures, and its clinical trials resulted in indications only for adjunctive therapy with carbamazepine or phenytoin.

82.     Abbott trained its NSRs to promote Depakote adjunctively when a competing drug had a tight hold on market share or when it was difficult to persuade physicians to change from another drug to Depakote. This included marketing Depakote adjunctively as a less expensive substitute for one or more atypical antipsychotic medications in psychiatric patients on multiple drugs, as an adjunctive therapy in dementia when antipsychotic drugs are yielding only a partial response, and adjunctively with Lamictal, particularly when it was growing in market share as a monotherapy agent for epilepsy and as a maintenance drug in bipolar disorder. Abbott directed NSRs to pitch a synergistic effect: "if you try Lamictal alone and it doesn't work, add Depakote."

83.     As part of its Lamictal campaign, Abbott created and distributed a sales aid referred to as the "Lamictal Flashcard" that, among other things, suggests dosages for using the two drugs adjunctively. Abbott had no appropriate clinical studies to support its dosage recommendation.

84.     Additional conduct demonstrating Abbott's illegal marketing of Depakote as an adjunctive therapy, includes but is not limited to providing the following: sales aids to facilitate discussion of adjunctive treatments; presentations including Michelle Collins on

"Adjunctive Anticonvulsants in the Treatment of Psychosis" at the St. Peter Regional Treatment Center in 2002; packaged CMEs in 2003 on "Emerging Data and Cost Implications: Maximizing Synergies Between Mood Stabilizers and Atypical Antipsychotics"; and live CMEs in 2004 on "Combination Therapies in Bipolar Disorders" and "The Adjunctive Use of Mood Stabilizers/Anticonvulsants in the Treatment of Schizophrenia."

85.     The populations for which adjunctive therapies were promoted included groups likely to be government-pay, including patients who are chronically mentally ill, persons with epilepsy, and geriatric patients. Abbott's conduct resulted in prescriptions written for adjunctive uses of Depakote that are not medically accepted indications that were presented to and paid by the government.

### Abbott's Marketing of Depakote for Disease States Prior to FDA Approval

86.     Abbott marketed Depakote ER prematurely for disease states well before it knew whether the FDA would approve the drug for additional indications. As soon as the FDA approved Depakote ER in 2000 solely for migraine prophylaxis, Abbott began promoting it for seizures and bipolar mania as well. Abbott insisted that NSRs promote Depakote ER on sales calls regardless whether that doctor was treating any patients for migraine prophylaxis. A substantial part of NSR compensation was tied to sales of Depakote ER and Abbott tracked and reported new ER prescriptions and conversions from DR to ER.

87.     Abbott also made resources available to the NSRs to drive sales of Depakote ER over DR. Most sales aids highlighted Depakote ER and its claimed benefits. Training materials including role playing and call scripts similarly focused on how to pitch Depakote ER. Many talks were made available about the drug, and Abbott employees and key opinion

leaders were urged to emphasize Depakote ER when discussing the use of Depakote for any disease state or symptom. For example, in her June 2004 presentation about using Depakote to reduce substance abuse problems in persons with bipolar disorder, discussed above, Medical Liaison Jennifer Hayden also included remarks promoting Depakote ER as the treatment of choice. It had not yet been approved for bipolar mania. Relator, as directed by Abbott, regularly included remarks about the claimed benefits of Depakote ER in the presentations she made.

88.     From 2000 through December of 2005 when it was approved for manic and mixed episodes in mania, all government-pay prescriptions for Depakote ER written for psychiatric conditions including for bipolar mania were for off-label non-covered uses. Similarly, for the period from 2000 through December 2002 for adults and September 2003 for children, prescriptions for Depakote ER by epileptologists and neurologists for their government-pay seizure patients were for off-label non-covered uses.

89.     Examples of how Abbott's off-label marketing of Depakote resulted in off-label prescriptions written for disease states prior to FDA approval that were presented to and paid by the government, include the impact of Jennifer Hayden's 2004 presentation on Drs. Beckman and Fuller who, as discussed in ¶ 80.A. above, began prescribing Depakote ER for a government-pay bipolar patient with comorbidities well before it was approved for that use, and Dr. Farnsworth's statement recounted in ¶ 66.B. that he had been an "early adopter" of Depakote ER when treating government-pay psychiatric patients from 2000 to 2003. Similarly, another early converter to Depakote ER was Dr. Frederick Ferron, a state-employed psychiatrist and high Depakote prescriber on whom relator made regular sales

calls. He worked primarily with IDD government-pay patients at the Southern Cities Mental Health Clinic in Faribault, Minnesota.

### Abbott's Generation of False Claims and Unnecessary Cost and Risk to the Government Through Its Off-Label Marketing of Depakote

90.     Abbott's scheme to market Depakote across the country for off-label use was deliberate and included targeting government-pay patient populations.   These included persons with chronic debilitating mental illness, geriatric and IDD patients, persons in the correctional system, children and adults receiving services from community mental health clinics and regional treatment centers, and persons receiving health care for such diagnoses as PTSD, schizophrenia, and dementia from veterans or other armed services providers. Sales data and relator's experiences confirm that Abbott's marketing for government-pay populations was highly successful. It induced prescribers to write and the government to pay for likely hundreds of millions of dollars in fraudulent off-label prescriptions that the government would not have paid if it had known they were for off-label, not medically indicated uses.

91.     Abbott's targeted off-label marketing of Depakote resulted not only in enormous costs that federal and state governments would not have otherwise expended, but also in enormous risk for the patients and the government when a drug is taken for a not medically accepted purpose.  Depakote has its own black box warnings and its own deleterious side effects, with particular danger for children, women and girls of child-bearing age and elderly patients.  Neither the law nor these risks deterred Abbott from seizing opportunities for profit by engaging in conduct that caused false claims to be made to the government.

**ABBOTT'S FRAUDULENT MARKETING OF DEPAKOTE ER AS "BETTER AND CHEAPER" THAN DEPAKOTE DR, RESULTING IN FALSE CLAIMS PAID BY THE GOVERNMENT, AS WELL AS REVERSE FALSE CLAIMS**

92.     In late 2000, Abbott introduced a new formulation of Depakote, labeled Depakote ER.  Depakote ER contains the exact same active ingredient – divalproex sodium – as DR, but the formulation was modified to release the active ingredient over a longer period of time than the original Depakote DR, allowing the possibility of a once-a-day regimen rather than twice-a-day as typical with DR.

93.     As discussed above, from its launch in November of 2000, Abbott instructed NSRs to market Depakote ER aggressively across all specialty areas, including neurologists, epileptologists and psychiatrists.

94.     Relator was trained early in her career to focus on Depakote ER in her sales and to market the message that physicians should convert patients already taking Depakote DR to ER instead.  She further was coached to deliver this message when she was training new sales representatives.  Abbott also consistently used its bonus structure and spiffs to reward NSRs for driving Depakote ER sales.

95.     Abbott supported its core focus on Depakote ER with other sales strategies including requiring NSRs to pitch ER on every sales call, using its own speakers to give presentations on the claimed advantages of ER, and in about 2003, leaving samples only of ER and not DR in physician's offices.

96.     Relator understood that one reason for this focus was to cement brand loyalty to Depakote ER instead of DR or a generic version of DR because the DR patent would expire in 2008, and Abbott expected the ER patent to extend much further.  NSRs did not

know until the spring of 2008 that Abbott had not been successful in achieving the extended patent for Depakote ER.

97.     Relator understood that another reason for this focus was that the company made more money on Depakote ER than DR in prescriptions for government-pay patients subject to the Medicaid rebate program. Relator had learned that doctors were prescribing Depakote DR because it was less expensive for government-pay patients, and that even if ER were prescribed, the pharmacists were switching the prescription to DR based on cost. When relator brought this issue to Michael Gonzales, the GRPE responsible for negotiating Medicare and Medicaid contracts in Minnesota, he told her that government programs subject to the Medicaid rebate program typically paid less for Depakote DR than ER. The reason Gonzales gave to relator is that Abbott paid higher rebates to the government for Depakote DR than it did for ER, making DR ultimately less expensive for the government but also less profitable for the company.

98.     The Medicaid Drug Rebate Statute, 42 U.S.C. § 1396r-8, requires a drug manufacturer to enter into a rebate agreement with the government as a condition of eligibility for Medicaid coverage of that drug. 42 U.S.C. § 1396r-8(a)(1); 42 U.S.C. § 1396b(i)(10)(A). The rebate is calculated on a periodic basis using a formula based on the number of drugs purchased and the drug pricing over that period. For "single source"[3] drugs like Depakote DR and ER, the manufacturer pays an additional inflation rebate that is determined by the length of time the drug has been on the market, the number of units of sale over that time, and the extent to which the average manufacturer price for the rebate period exceeds the average manufacturer price for the quarter beginning July 1, 1990 adjusted for

---

[3] Single source drugs are brand-name drugs produced by a single manufacturer for which there is no generic equivalent available.

inflation using the consumer price index. *See* 42 U.S.C. § 1396r-8(c)(2). Relator believes

Gonzeles was talking about this inflation rebate when explaining to her that Abbott pays

larger rebates to the government in connection with Depakote DR as compared to the newer

drug ER.

99.     Abbott therefore had a significant financial stake in selling Depakote ER over

DR, particularly with respect to government-pay patients.

100.     To achieve its goal of increasing new prescriptions for Depakote ER, including

for off-label use, and to persuade physicians to convert ongoing prescriptions from DR to

ER, Abbott instructed NSRs to focus on the proposition that "newer is better" and to market

Depakote ER as cheaper and better than DR, which they did. This statement is false.

101.     Abbott's false statements about Depakote ER resulted in false claims against

the government for on- and off-label uses of Depakote because the false statements caused

the government to pay for prescriptions that were off-label or were not provided

economically or were not medically necessary, and because the false statements were used to

achieve sales of Depakote ER instead of DR, which lessened Abbott's obligations to pay

Medicaid rebates to the government.

**Abbott's False Marketing of Depakote ER as Less Expensive Than Depakote DR**

102.     NSRs, including relator, were told by trainers and managers to market

Depakote ER as cheaper than DR and they did so.

103.     Depakote ER is not less expensive than DR because the formulations for DR

and ER are not bioequivalent due to formula modifications needed to achieve the extended

release. In cost listings about which relator is aware, Depakote ER generally is slightly lower

in cost than the same mg tablet of DR. In a clinical study, Abbott determined that physicians

should updose from 8 to 20% to achieve bioequivalence when converting from Depakote DR to ER. Even if Abbott priced a Depakote ER tablet at the same price as the same milligram tablet of DR, a physician would have to prescribe another ER tablet to get the same effect as the former DR prescription. Since Depakote ER was only available in a 500mg tablet until 2003, and then 250 and 500 mg tablets after that, fine tuning the dosage was not possible. When bioequivalence was desired, the company "recommended" adding a 250 mg tablet to prescriptions formerly up to 2000 mg, and a 500 mg tablet for prescriptions that formerly were higher than 2000 mg.[4] This results in an overall higher cost for a bioequivalent dose.

104.    Abbott directed the NSRs to pitch a "one-to-one" conversion from Depakote DR to ER to psychiatrists and neurologists treating migraines. This dosage recommendation was inconsistent with Abbott's bioequivalence study and was not FDA approved. Abbott anticipated that physicians could be persuaded to convert, but eventually would have to "updose" patients with Depakote ER to reach the same results as they had with DR – which is what typically happened. This, in turn, generated increased profits for Abbott.

105.    Abbott generally focused on epilepsy when it discussed bioequivalence because of the risk of break-through seizures with an incorrect dosage, but at least one of Abbott's key opinion leaders trained new NSRs to recommend "one-to-one" conversion for epilepsy as well.

106.    In October 2007, an Abbott-funded study by Davis was published in the Journal of Clinical Psychiatry. That study, "A Pharmacokinetic and Clinical Evaluation of

---

[4] For example, in Abbott's "Pharmaceutical Products Catalog," March 2006, p. P-4, the wholesale acquisition cost for 500 mg of Depakote ER was $2.06, while 500 mg of DR cost $2.15. If a 250 mg tablet of Depakote ER costing $1.17 is added, the cost of the bioequivalent prescription for ER is $3.23 compared to $2.15 for DR. Similarly, using prices from "Depakote/Depakote ER: Grounded in Dependability," November 2007, p. 29, the wholesale acquisition cost for 500 mg of Depakote ER was $2.32, while the same mg of DR was $2.62. Adding a 250 mg ER tablet costing $1.32 made the bioequivalent does of ER is $3.64 compared to $2.62 for DR.

Switching Patients With Bipolar I Disorder From Delayed-Release to Extended-Release Divalproex," concluded that one-to-one conversion did not achieve the same results for psychiatric patients and recommended a larger dose if a psychiatrist was converting from Depakote DR to ER.

107.    A statement that Depakote ER was less expensive also was false when made to physicians prescribing Depakote for government-pay patients and institutional customers whose prescriptions were subject to Medicaid rebates.   As stated by GRPE Michael Gonzales, Depakote DR actually was less expensive to the government than ER because Abbott had to pay rebate amounts for DR that it did not have to pay for ER.  When relator raised this issue with her managers, they did not modify the "ER is cheaper" message.  They ratcheted up a "dispense as written" campaign to prevent pharmacists from substituting the less expensive Depakote DR for prescriptions for ER.

108.    To the extent that switching patients from Depakote DR to ER involved additional and otherwise unnecessary medical visits, tests or follow-up care, further increasing the costs to federal and state health care programs, this, too, was a way in which Abbott falsely marketed ER as less expensive.

### Abbott's False Marketing of Depakote ER as Better than Depakote DR Because It Is Better Tolerated

109.    Abbott could not claim that Depakote ER has greater "efficacy" than DR in treating migraines, seizures or bipolar mania because it did not do head-to-head studies for such a comparison and it did not need to do this for FDA approval.

110.    When it introduced Depakote ER in 2000, Abbott directed the NSRs to tell physicians that ER was better tolerated than DR – specifically that ER would cause fewer and less severe side effects than DR – and that this improved tolerability was the reason why

it was in the patient's best interest to switch.  However, Abbott lacked appropriate clinical studies to support this claim.

111.    The primary support that Abbott claimed for its better tolerability claim for all indications was its clinical study of Depakote ER for *migraine* against placebo that had better tolerability results than a much earlier migraine study of Depakote DR against placebo.  In sales aids, including "Take Control of Epilepsy" published in 2004, Abbott set up side-by-side tables showing the results of these two studies.  NSRs were coached to use these side-by-side tables to persuade physicians that Depakote ER was better than DR for all indications.

112.    This sales message was false and Abbott's own documents show that the company knew it was false.  Abbott's prescribing information for Depakote ER states at page 10 that "adverse reaction rates observed in the clinical studies of a drug cannot be directly compared to rates in the clinical studies of another drug" because of the "widely varying conditions" under which clinical studies are conducted.  In its 2002 publication "Depakote A Spectrum of Treatment:  Past, Present and Future," Abbott cited the conclusion from an epilepsy study by Uthman that "[n]o clinically important differences were observed among the regimens [DR and ER] with respect to tolerability."  A "publication bulletin" given to NSRs in February of 2005 states "[n]o clinical studies have been conducted to establish . . . reduced incidence of adverse events with divalproex sodium in the extended-release compared with the delayed-release formulations."  Finally, the Bowden study[5] published in 2006 that Abbott used to clinch FDA approval for bipolar mania stated that adverse effects with Depakote ER "are generally similar to other studies of divalproex in mania."

---

[5] "A Randomized, Placebo-Controlled, Multicenter Study of Divalproex Sodium Extended Release in the Treatment of Acute Mania." J. Clin. Psychiatry 2006:67:1501-1510.

113.    NSRs were nonetheless told repeatedly that they must deliver the message that the newer version of Depakote is better and should be prescribed.  For example a call script used for training contains this statement as part of the "ER Core Message & Close": "our newest formulation is the Depakote ER or Extended Release 500 mg tablet.  This is our once a day formulation that is our best tolerated formulation . . . ."

114.    Relator asked Abbott to do a head-to-head study to establish a basis on which to pitch the "ER is better" message and was told by managers that Abbott would not do it because it did not know what the outcome would be or if the outcome would be beneficial to the company.

115.    Instead Abbott provided NSRs with an alternative "study" that was similarly deceptive.  It consisted primarily of a retrospective review of self-reports from patients who were already taking Depakote DR and then switched to ER.[6]   Abbott research scientist, Michelle Collins was one of the authors, as was a national key opinion leader Dr. Michael Smith.  The conclusion favoring Depakote ER would be expected because patients already taking Depakote DR would have previously experienced the major side effects caused by *starting* on divalproex sodium.  A switch to ER would not be expected to re-start or exacerbate those side effects because it was the same drug.  Although the article stated that the results "must be considered highly tentative and preliminary," and "[l]arge, prospective, controlled trials of longer duration are required to validate these results," it was distributed at an American Epilepsy Society meeting in 2003 and NSRs were expected to quote the article to make the "better tolerability" claim to physicians.

---

[6] "Clinical comparison of extended-release divalproex versus delayed-release divalproex: pooled data analyses from nine trials," Epilepsy & Behavior July 7, 2004: 746-751.

116.    Another type of false statement made to sell Depakote ER was Abbott's pitch that Depakote ER's "smoother blood levels" resulted in better tolerability.  This claim was based on bioavailability studies that showed that the blood levels for Depakote ER were "smoother" with respect to peaks and troughs than with Depakote DR.  Abbott included a discussion of this feature in many of its sales aids and instructed its NSRs to market it as an added benefit of Depakote ER.  However, Abbott did not have appropriate clinical studies demonstrating that Depakote ER's smoother blood levels had any provable beneficial effect with respect to tolerability or incidence of side effects in persons with epilepsy, mania or migraines.

117.    To sell its message without clinical studies, Abbott created another type of false "data" by funding a packaged CME titled "Needs Assessment Survey Results:  Meta-Analysis of Efficacy and Tolerability Using Extended Release Divalproex."   Abbott researcher Michelle Collins and national key opinion leader Dr. Smith again teamed up to present a meta-analysis of the results of the epilepsy studies from the retrospective review discussed in ¶ 115 at the 2003 meeting of the American Epilepsy Society.   Then they reported the results of a biased survey about those results as a "national consensus" that extended release formulations confer benefits because of pharmacokinetic smoothing.  The CME further claims a consensus that smoother blood levels increase safety, tolerability and even efficacy.   These claims are not supported by the information about Depakote ER's adverse effects reported in ¶ 112. Abbott made the packaged CME available for distribution from Abbott's 2005 catalogue of sales materials so that NSRs could distribute it in sales calls, and Smith and others made presentations claiming that Depakote ER is better than DR based on this claimed "national consensus data."

### Abbott's False Marketing of Depakote ER as Better Than Depakote DR Because of Its "Convenient Once-Daily Dosing"

118.     Abbott also instructed the NSRs to tell physicians that Depakote ER is better than DR because prescribing a drug that may be taken once a day compared with the twice-daily regimen of Depakote DR increases compliance, that is, the likelihood that patients actually take the medication as prescribed.  Abbott's NSRs viewed "improved compliance" as a "core message" they were expected to deliver on their sales calls.

119.     This statement is false.  Abbott's own document shows it knew it was false.  A "publication bulletin" given to NSRs in February of 2005 states that improved compliance has not been clinically established with Depakote ER and includes this instruction: "If asked about differences in compliance. . . between Depakote and Depakote ER, the representative should inform the physician that comparative studies have not been conducted to specifically answer that question."

120.     Again, to bolster its marketing message, Abbott used the CME discussed above involving Michelle Collins and Dr. Smith to provide claimed "national consensus" data about increased compliance as a basis for saying that Depakote ER is better than DR. The survey questioned the doctors regarding their beliefs about compliance and from the responses, the authors claimed that a national consensus believes that extended release formulations "are associated with increased patient compliance."  This survey and resulting CME do not make true any claim by Abbott that Depakote ER's once-daily dosing makes the drug "better" than DR.

121.     Abbott's claimed compliance "benefit" was illusory for other reasons.  Most of the patients for whom Depakote was prescribed were taking multiple medications, at least some of which were twice-daily, and some medications required large doses that only could

be taken through multiple tablets. The lack of bioequivalence between Depakote DR and ER often resulted in the requirement of an additional tablet for Depakote ER. It was not uncommon in relator's experience for physicians to tell her that they instructed their patients to split their Depakote ER dose and take it twice a day because of the size of the dose and the number of pills involved.

### Abbott's Generation of False Claims, Reverse False Claims and Unnecessary Cost and Risk to the Government through Its Fraudulent Marketing of Depakote ER

122.     The FCA, among other purposes, is designed at 31 U.S.C. § 3729(a)(2) and (7) to prevent entities from benefitting financially from false statements made in the course of business with the government. Abbott falsely set up Depakote ER as a drug that claimed to provide much more than it actually delivered. Compared to Depakote DR, ER was neither provided economically nor medically necessary as required under Medicare and other health care programs – it was only newer with the possibility of once-daily dosing, a possibility that did not make it necessarily superior to Depakote DR.

123.     When Abbott used these false statements to induce prescribers to write off-label prescriptions for Depakote ER that the government would not have paid, but for the false statements, those false claims, as stated above, cost the government money it would not have spent and placed unnecessary risks on the patients and the government. When Abbott used false statements to induce prescribers to write prescriptions for Depakote ER instead of DR – although ER cost more for a bioequivalent dose and did not actually provide added benefits for government-pay prescribers – the resulting false claims and reverse false claims cheated the government of money it would not have spent and money it would have received in rebates had the false statements not been made and had the prescriptions been written for Depakote DR instead of ER.

124.     Abbott singled out government-pay prescribers for particular attention in this false marketing scheme.  For example, it inaugurated a program that provided high government prescribers with vouchers for Depakote ER only, that they could give to patients to pay for initial prescriptions for a period of time.  This provided an incentive for physicians to start new government-pay patients on Depakote ER and made it more likely that Abbott would have an ongoing ER prescription after the voucher period ended.  Abbott published and distributed specific government sales aids including, in 2004, a piece showing how to prescribe Depakote ER in the VA computer system, in 2005, a piece indicating that Depakote ER is on the Minnesota Medical Assistance Preferred Drug List and not mentioning DR at all, although it, too is on the preferred drug list, and similarly, in 2007, a sales aid showing that ER is on 100% of Minnesota formularies including Medicaid, but with no mention of DR.

125.     In the late summer and fall of 2005, relator and GRPE Gonzales teamed up for talks in five key zip codes where many government-pay prescriptions were written.  The stated purpose of the talks was for Gonzales to talk about the Medicare Part D prescription program.  Another goal was inducing government-pay physicians to make the switch to Depakote ER.  After Gonzales talked, an NSR or SAE talked about Depakote ER and its efficacy in multiple disease states, improved tolerability and lower cost.  They further used a formulary flashcard showing that Depakote ER was available as a preferred drug in 100% of the Medicare formularies, but said nothing about DR, which was similarly available as a preferred drug.  After the meetings, relator saw a significant increase in Depakote ER prescriptions in those zip codes, demonstrating that the false ER pitch was successful.

126. Other examples of the success of the false marketing of Depakote ER to government-pay prescribers include those prescribers who described themselves as "early adopters" of Depakote ER for psychiatric uses, such as Drs. Farnsworth and Ferron, identified in ¶¶ 66.B. and 89 above. In the fall of 2004, relator and SAE Bud Mutterer spoke at a luncheon for the staff at the St. Peter Regional Treatment Center/Minnesota Security Hospital about the advantages of prescribing Depakote ER for psychosis, depression and schizophrenia. At the end of the lunch, the Medical Director Bill Brauer told the group of 20 that if they weren't using Depakote ER yet, they should be, confirming that he had already made the switch and well before ER had a psychiatric indication. The SPIFF that GRPE Gonzales sponsored for Minnesota and Wisconsin based on growth of Depakote ER prescriptions among prescribers with high Medicaid prescription numbers achieved additional ER growth. These prescriptions were induced by Abbott's false statements about the claimed benefits of Depakote ER. Successful government-pay sales also are indicated in an April email 2008 from DSM Jennifer Mortale about a Minnesota NSR/SAE/GRPE meeting, in which she talked about the group's plan for "*continued success* surrounding Medicaid/Medicare patients as well as the DAW message in Minnesota"

127. The false claims and reverse false claims arising from every prescription for Depakote ER induced by Abbott's false claims about the illusory "benefits" of the drug, cost the government large amounts of money including the entire cost of off-label prescriptions that it would not have paid at all, the difference in cost between Depakote DR and bioequivalent doses of Depakote ER and the amount of rebate lost to the government each time Abbott persuaded a physician to prescribe Depakote ER instead of DR.

**ABBOTT'S USE OF ILLEGAL KICKBACKS TO INDUCE PHYSICIANS TO PRESCRIBE DEPAKOTE, THEREBY CAUSING PRESENTATION OF FALSE CLAIMS FOR PAYMENT BY THE GOVERNMENT**

128.     Abbott engaged in a systematic and aggressive scheme to increase sales by providing physicians with illegal monetary payments and other incentives to induce them to prescribe Depakote. These payments and incentives, commonly referred to as "kickbacks," are provided to physicians in forms including but not limited to consulting fees, honoraria, gifts, unrestricted educational grants, and CMEs and violate the Federal Anti-Kickback Statute ("FAKS"), 42 U.S.C. § 1320a-7b(b), and its state analogues:

- California (Cal. Welf. & Inst. Code § 14107 *et seq.*)
- District of Columbia (D.C. Code Ann. § 4-801 *et seq.*)
- Delaware (Del. Code Ann. tit. 31, § 1001 *et seq.*)
- Florida (Fla. Stat. ch. 409.920 *et seq.*)
- Illinois (305 Ill. Comp. Stat. § 5/8A-1 *et seq.*)
- Indiana (Ind. Code § 12-15-24 *et seq.*)
- Louisiana (La. Rev. Stat. Ann. § 14:70 *et seq.*)
- Massachusetts (Mass. Gen. Laws ch. 118E, § 39 *et seq.*)
- Michigan (Mich. Comp. Laws § 400.604)
- Montana (Mont. Code Ann. § 46-6-313)
- Nevada, (Nev. Rev. Stat. 422.560)
- New Hampshire (RSA 167:61-a)
- New Jersey (N.J. Stat. Ann. § 30:4D-17)
- New Mexico (N.M. Stat. Ann. § 30-44-1 *et seq.*)
- New York (N.Y. Soc. Serv. § 366-d)
- Oklahoma (Okla. Stat. tit. 56, § 1002 *et seq.*)
- Rhode Island (R.I. Gen. Laws § 40-8.2-1 *et seq.*)
- Texas (Tex Hum. Res. Code Ann. § 32.039 *et seq.*)
- Virginia (Va. Code Ann. § 32.1-315 *et seq.*)
- Wisconsin (Wis. Stat. § 49.49 *et seq.*)

(together with federal statute, "AKS").

129.     Abbott's scheme was knowing, intentional, company-wide, and implemented through its national marketing and sales operations. Many of the programs that constituted kickbacks were centrally funded and directed by high level managers.

130.     The FAKS prohibits using kickbacks in any "Federal health care program,"

defined as any program providing health benefits that is funded directly, in whole or in part

by the United States Government, (except for the FEHBP), and any "State health care

program."   42 U.S.C. § 1320a-7b(b)(2)(A) and (f).   State health care programs include those

approved under 42 U.S.C. §§ 1396 *et seq.* and child health plans approved under 42 U.S.C.

§§ 1397aa *et seq.*   They also include any programs receiving funds under or from an

allotment to a State under 42 U.S.C. §§ 701 *et seq.* or 42 U.S.C. §§ 1396 *et seq.*   Similarly,

state statutes prohibit using kickbacks in analogous state programs.

131.     Included in the targets for Abbott's kickbacks were physicians and health care

providers who prescribe or purchase Depakote for patients whose prescriptions are paid by

government health care programs.   Compliance with the FAKS is a necessary condition to

the right of physicians and health care providers to receive payments from government health

care programs including Medicare, Medicaid and Tri-Care.   State health care programs have

similar requirements.

132.     By paying kickbacks that induced prescriptions of Depakote presented to and

paid by the government, Abbott necessarily caused those prescribers and providers to make

false certifications that they did not accept illegal kickbacks.   This certification is material

because prescriptions for Depakote obtained through illegal kickbacks would be disqualified

for payment from the applicable government programs if the use of kickbacks in their

inducement were known.

133.     This certification was both implied and express.   By writing and submitting

prescriptions to government programs for payment, physicians and health care providers

have implicitly certified that the prescription complies with applicable laws and regulations,

including for example that it is provided economically and is medically necessary, covered by the applicable program, and not tainted by illegal kickbacks. Physicians and health care providers have expressly certified compliance with applicable laws through means such as provider agreements required by Medicare and signed by physicians and other providers, including pharmacies and institutions, certifying that they will comply with applicable laws including the FAKS and its state analogues (*e.g.*, Forms CMS 855A, 855B, and 855I). The certification includes an acknowledgement that compliance is a condition for receipt of payments from the government. Similarly, before reimbursement can occur, the Medicaid and SCHIP programs require states to submit forms, including Forms CMS 37 and 64, that include a certification that the expenditures for which payment is sought are allowable under applicable laws and regulations. In addition, hospitals and other health care facilities submit regular cost reports (*e.g.*, Form CMS 2552) to the government that certify as a condition of payment that the provider has not accepted financial inducements in violation of applicable statutes. State health care programs require similar certifications that the providers have complied with applicable laws to be eligible for payment.

134.    In its Code of Business Conduct, published on its public website, Abbott states that it is committed to full compliance with the AKS to "avoid any arrangements that could inappropriately influence treatment or purchasing decisions."

135.    Abbott spelled out its understanding of legal and illegal types of remuneration in a 2006 document titled "Operating Procedures for Program Funding," which stated conditions or requirements for funding particular activities. Those relevant to relator's claims include:

  ▪ For professional services: speakers may receive fees as long as they reflect fair market value and as long as the content is "within labeling."

- For educational activities:  programs including speakers' fees may be funded through third parties "where Abbott has no control over the content, implementation or selection of faculty."  In addition, with respect to CMEs, Abbott may not deliver accredited activities to learners or disseminate accredited material

- For all activities: "No quid pro quo," meaning that no type of remuneration may be "offered or given with the intent to induce or in exchange for an explicit or implicit agreement or understanding that Abbott products will be used, purchased, leased, ordered, prescribed, recommended, or arranged for or provided formulary or other preferential or qualifying status."

136.     Abbott's claimed Operating Procedures are consistent with the directions of the Office of the Inspector General ("OIG") of the Department of Health and Human Services, which is responsible for investigating fraud related to department programs, including kickbacks, and identifying appropriate safe harbors.  With respect to personal services, the FAKS requires a specific written, signed agreement for at least one year, with fair market value compensation determined in advance, and the services performed must not violate any state or federal law.  42 C.F.R. § 1001.952(d).  The OIG further looks at whether the services really have a marketing rather than educational purpose, whether persons are being paid for "scientific" studies of "questionable scientific value," 59 Fed. Reg. 65376, whether studies really are "a pretext to generating prescriptions of the drug," and whether "consultant" activity is primarily passive.  68 Fed. Reg. 23735, 23738.  For educational activities, the OIG examines whether a pharmaceutical manufacturer has controlled or influenced presenters and content, resulting in use of the programs for inappropriate marketing purposes.  *Id.*  For all other activities, the OIG examines intent because kickbacks may be found if "any *one* purpose of the remuneration may be to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program."  68 Fed. Reg. 23734 (emphasis in original).  The OIG finds "particularly suspect"

gifts or cash payments that are based on the value or volume of business generated by the provider receiving the gift. 59 Fed. Reg. 65376.

137.    Abbott's conduct violated its own Operating Procedures, the FAKS and OIG safe harbor for personal services, and other OIG guidelines. As articulated below, Abbott paid key opinion leaders and other physicians for promotional presentations that included illegal discussions of off-label uses of Depakote, paid for studies of questionable scientific value and studies done for the purpose of marketing Depakote, and paid for primarily passive "consulting" services, taking all of those functions outside any personal services safe harbor. Abbott controlled claimed "educational" programs and CMEs, making payment for those activities illegal kickbacks as well. Finally, all of the conduct alleged below had as at least one purpose inducing or rewarding prescribers for prescribing or recommending Depakote.

138.    Abbott engaged in corporate programs offering lucrative incentives to physicians to promote and prescribe Depakote. It also trained, coached and expected its NSRs to participate in company-wide programs and practices and to use individual territory budgets for monetary payments and gifts that would induce physicians to prescribe or recommend Depakote, including for government-pay patients. NSRs were trained and told that money available for marketing and UEGs should be used to reward high prescribers, motivate reluctant prescribers and deliver Abbott's marketing messages for Depakote, particularly Depakote ER. In these ways, Abbott used a variety of kickbacks for marketing purposes – to induce and sustain Depakote sales.

### Consulting Fees as Kickbacks

139.    Abbott used consulting fees to cultivate, reward and sustain physicians who also could influence their peers favorably about Depakote. Abbott used a multi-level

structure involving a group of national "key opinion leaders," "advisors" and "regional consultants." It paid them generous consulting fees to attend all expense-paid meetings in high-end locations. Besides rewarding high prescribers for their services, Abbott used these meetings to communicate marketing messages that were Abbott's focus at the time, provide face time between sales and clinical personnel and high volume prescribers, and determine the effectiveness of Abbott's marketing message regarding Depakote, including for off-label uses.

140.    National key opinion leaders and advisors were invited and paid to attend national advisory meetings each year, generally two each in neurology and psychiatry. The invitees were selected based on their prescribing data and Abbott marketing goals in the given year. Other national-level events occurred also such as "Key Opinion Leader Training Meetings."

141.    Regional consultant meetings also involved Abbott's selection of and payment to so-called "consultants" based on their prescribing data and Abbott's marketing goals in the given year. Abbott held several of these all expense-paid meetings a year in high-end locations. Usually the invitees arrived for a Friday evening dinner and then participated in a meeting the next day starting in the morning and ending no later than mid-afternoon. The "consultants'" activities were primarily passive, involving little more than answering oral questions or completing a survey. The meeting typically included marketing, clinical and key opinion leader/advisor presentations on topics that drove home Abbott's key marketing messages for the year. For example, at least one focus of a 2005 regional neurology consultants' meeting was conversion of seizure patients to Depakote ER. The letters of invitation said that the meeting was part of Abbott's "nationwide program . . . to share data

with regional consultants and obtain feedback regarding the *utility of Depakote ER* in the treatment of epilepsy among adults and children" (emphasis added). The 2005 psychiatry consultants' focus that year included use of Depakote in combination therapy – an off-label use. In 2006, one of the regional consulting meeting topics was "Comorbidities Associated with Epilepsy," another off-label topic.

142.     The regional attendees received their "consulting fee," ranging from about $750 to $2,500 at or shortly after the conclusion of the meeting.

143.     From the beginning of relator's tenure through at least 2007, NSRs either attended the regional consultant meetings or received reports from their managers about the topics discussed. They then received lists of the physicians/regional consultants who attended the meetings for purposes of making follow-up calls to reinforce the marketing message of the year by asking the attendees what "pearls" or "take-away messages" they got from the meeting. The RSM or DSM who attended the meeting also informed the NSRs whether any doctors in their territory had shown resistance to product use or had made negative comments. This allowed the NSRs to focus follow-up sales calls on overcoming those negative views and changing prescribing habits.

144.     These claimed consulting fees do not fall within any safe harbor because they are remuneration used for the marketing purpose of  inducing and rewarding recommendations of and prescriptions for Depakote.

### Honoraria as Kickbacks

145.     Abbott further pays its national key opinion leaders, advisors, and regional consultants to speak at national and regional meetings. Relator believes that the honoraria paid are in the range of $2,000 to at least $10,000 plus expenses.

146.     NSRs had a budget that they were expected to spend at least in part for speakers to drive sales, including national key opinion leaders, advisors and consultants, as well as other prescribers in their territories. Relator paid honoraria in the range of $750 to $2,500 to speakers for promotional events that she organized. These included local physicians as well as speakers from across the country, often identified from recommended speaker lists distributed by marketing personnel. NSRs were expected to work at building relationships that increased speaking opportunities for Depakote loyalists and were rewarded for doing so.

147.     NSRs used honoraria as a marketing tool. They included plans for using speakers as a part of their business plans. For example, a 2006 business plan template asked relator to state how she planned to involve "key influencers" in her territory and one strategy was to use them for speaking engagements. These honoraria do not fall within any safe harbor because they are remuneration used for marketing purposes.

148.     As alleged above, Abbott and the NSRs frequently arranged presentations in which key opinion leaders, advisors and consultants delivered off-label messages on the company's behalf. The honoraria paid for those presentations constitute kickbacks outside any "safe harbor" because the presentation violates federal law prohibiting misbranding.

**Telephone Conference Fees as Kickbacks**

149.     Abbott arranged to pay fees to targeted prescribers to participate in telephone conferences under the guise of having the doctor "educate" a group of NSRs regarding uses of Depakote. These conferences had a marketing rather than educational purpose making the honoraria, believed to be about $500, a kickback. They provided an opportunity for NSRs and sales executives to gain access to hand-picked, high volume Depakote prescribers, put

some illegal kickback money in their pockets, and freshly motivate them to maintain or increase their level of Depakote prescriptions.

150.    In one conference call on Feb. 2, 2006 in which relator participated, the person planning the call gave an "agenda" to the psychiatrist "educator" Dr. Simon. The agenda directed Dr. Simon to discuss bipolar marketing points that Abbott wanted the doctor to embrace:    focusing on bipolar symptoms, addressing comorbidities, and treating agitation and aggression in older patients. NSRs also planned questions ahead of time to ask Dr. Simon that would emphasize the message they wanted him to internalize. On June 8th of that same year relator participated in another similarly formatted telephone "conference" arranged by Illinois DSM Kelly Moritz with Dr. Lawrence Robbins from Chicago.

### Gifts as Kickbacks

151.    Abbott trained and directed NSRs to include gifts in their sales budgets and made gift items available company-wide to give to physicians. These included books on medical topics, internet-based drug subscriptions, and high-end medical equipment. Beginning in 2008, Abbott also gave free customized tamper-proof prescription pads to physicians prescribing to government-pay patients.

152.    NSRs were trained and directed to use these gifts for marketing purposes. They often had a limited number of the gifts to distribute and were directed to use them to gain access to and reward high prescribers. Abbott valued the marketing potential of the medical equipment gift program to such an extent that it tracked the NSRs' success in turning the gift offers into redemptions. Brochures offering these items stated that they were given "compliments of your Abbott Representative."

153.     Abbott sometimes used subterfuge to give the appearance of compliance with gift rules. When it appeared that the medical equipment offered through the Access Program in 2008, exceeded the $50.00 statutory gift limit in Minnesota, Abbott instructed Minnesota NSRs to give the gift brochure to a non-physician member of the targeted prescriber's office and have that person complete the form, of course with the presumption that the person selected would know what the physician wanted. When the gift was delivered, the NSRs handed it to the non-physician member of the office who had previously completed the form, again with the knowledge that the physician would ultimately receive the equipment.

**Unrestricted Educational Grants ("UEGs") as Kickbacks**

154.     Abbott used UEGs to pay key opinion leaders and other physicians to be presenters for live CMEs. The funds were channeled through a CME vendor like ABcomm, Inc., but came from the budget of the NSR planning the event. Because the NSRs selected the presenters and the subject matter, CME speaker fees provided opportunities to remunerate Depakote prescribers in the same manner as honoraria.

155.     Abbott used UEGs to fund packaged CMEs. Abbott decided whose work would be funded and for what topic. Many of the persons whose packaged CMEs were funded by Abbott UEGs were national key opinion leaders who also received remuneration for consulting, promotional presentations and live CMEs.

156.     Abbott also used UEGs to channel kickbacks to national key opinion leaders and other high prescribing physicians by funding research and writing of questionable scientific value or created as a pretext to generating Depakote prescriptions.

157.     One example is Abbott's use of a UEG to fund an article titled "Extended-Release Formulations: Simplifying Strategies in the Management of Antiepileptic Drug

Therapy" written by several Depakote key opinion leaders. The article states it resulted from "proceedings" of a "closed meeting" held on January 18, 2003 in Ixtapa, Mexico and discusses the advantages of Depakote ER compared to other anticonvulsants and the claimed benefits of simplifying anti-convulsant regimens through use of extended release formulations. It reviews other studies and existing information about extended-release anticonvulsants but contains no original clinical research. Its conclusion is similar to the message points that Abbott uses in its marketing of Depakote ER and states that "[s]tudies indicate that extended-release AED formulations provide several *potential* benefits for patients with epilepsy . . . ." (emphasis added). The article discusses another AED, carbamazepine, that is only available in a twice-a-day dose but does not mention Depakote DR. Abbott used this article to create a CME slide kit, video and monograph for use in regional consultant's meetings and other presentations in 2003 that had the goal of persuading neurologists to convert from Depakote DR to ER. Abbott then paid the authors of the article for many speaking engagements on the subject at least throughout 2003, providing them with additional kickback income either directly from Abbott or funneled through a CME provider.

158.     Abbott similarly used a UEG to pay another national key opinion leader Dr. Michael Smith to prepare the CME booklet titled "Meta-Analysis of Efficacy and Tolerability using Extended Release Divalproex." As discussed in ¶¶ 117 and 120 above, the purpose of this piece was marketing rather than science or education. Then Abbott had Dr. Smith give many presentations on the Abbott speaking "circuit" and remunerated him for reciting and explaining the article's conclusion that Depakote ER is better than DR.

159.    Relator is aware of at least one instance where Abbott used a UEG to remunerate a national key opinion leader in her territory for agreeing to list her name as an author for an article primarily prepared by Abbott on the benefits of Depakote ER compared to generics.

160.    Abbott also remunerated high prescribers with scholarships to the J. Kiffin Penry Epilepsy Education Programs.  NSRs and SAEs were the sole recruiters for the program, and invitations to Penry were included as part of the marketing strategy for specific physicians in relator's business plans.  NSRs followed up with physicians participating in the programs to emphasize Abbott's support of the program.  Abbott stopped supporting the program around the time its epilepsy drugs went off-patent.

161.    Abbott used UEGs to support programs with which it had little direct involvement, but that served other promotional goals.  This included, for example, grants for local events such as meetings of the Epilepsy Foundation of Minnesota attended by Abbott target physicians or where Depakote-friendly neurologists were invited to speak.

### CMEs as Kickbacks

162.    UEG-funded programs that offered free CME credits were another type of illegal remuneration Abbott gave to physicians.  The requirements vary by state.  In Minnesota, physicians must complete 75 credits every three years, and the gift law there does not require pharmaceutical manufacturers to report providing free CME credits as "gifts" to physicians regardless of value.  Nor does Abbott have to report meals provided with CMEs.

163.    NSRs and SAEs invited targeted prescribing groups to specially selected CME presentations, and Abbott picked up the tab for a meal that usually was provided. The CMEs were provided without charge to the physicians and served various marketing purposes

including promoting off-label uses of Depakote and promoting the advantages of Depakote ER over DR.

164.    As trained by Abbott, relator routinely included offering free CMEs in her business plans. The specific topics were selected based on Abbott's marketing goals and her evaluation of what was needed to increase sales by particular prescribers and health care providers.

165.    Abbott, through its NSRs, and sometimes in targeted mailings, gave selected physicians packaged CMEs, consisting of booklets, videotapes or DVDs that they could use to receive free CME credits. Delivering packaged CMEs allowed the NSR to give a gift to a physician that had a tailored marketing message that then was discussed with that physician.

### Research Funding as Kickbacks

166.    Relator was not privy to the inner workings of the research operations in the Neuroscience Division, but has observed that Abbott has funded physicians for research involving Depakote and then given them speaking and writing engagements if they achieved positive results. For example, Jennifer Hayden arranged funding for Dr. Ronald Hardrict, a local key opinion leader in relator's territory, to do a retrospective chart review involving the use of Depakote with IDD patients. After concluding in 2004 that Depakote is effective for the off-label use researched, he gave paid presentations all around the country.

### Abbott's Generation of False Claims and Unnecessary Cost and Risk to the Government through Its Use of Kickbacks

167.    Abbott used many types of kickbacks to induce prescriptions for Depakote, including prescriptions by government-pay prescribers. These prescriptions constituted false claims because they were induced by kickbacks, yet certified as compliant with applicable law, including the law prohibiting kickbacks.

168.    Sales data and relator's experiences in her own territory confirm the effectiveness of Abbott's kickback efforts and the resulting false claims. Examples include the 5% increase in Dr. Fred Lux's Depakote prescriptions for his geriatric and typically government-pay patients in the three months after he was paid to give a presentation on "Treating Geriatric Patients with AEDs." Relator used Dr. Farnsworth frequently as a paid speaker. His prescriptions for Depakote ER for his government-pay patients and his willingness to recommend the drug for many off-label uses stayed at a high level throughout relator's tenure at Abbott. Names appearing on a 2004 list of top government prescribers who also were paid for presentations include Drs. Hardrict, Knudson, Leppik, Penovich and Rogin. Many of these same physicians also were invited to national and regional meetings and given consulting fees for their participation. GRPE Michael Gonzales arranged and funded a presentation by Dr. Armantina Espinosa on seizures and behavioral issues for community health family practice physicians in Minneapolis. One goal of the presentation was to bolster Dr. Espinosa's prescribing numbers as well as to communicate to other government-pay prescribers her off-label message about using Depakote to treat ADHD. Dr. Espinosa's Depakote prescriptions increased after her talk, and she herself commented on how she was writing more prescriptions for her government-pay patients.

169.    In ¶¶ 66, 72, 80 and 89, relator has provided examples of physicians who have prescribed Depakote off-label to government-pay patients because of their interactions with her and other sales persons in her territory, resulting in false claims for prescriptions that were not medically indicated. These interactions also included regular invitations to CMEs and distribution of packaged CMEs and other gifts, resulting also in false claims that the prescriptions were not kick-back induced when they were. For example, as recounted above,

ACT Team program director Wendy Cox said that Dr. Hardrict's CME presentations that relator organized and offered to the Act Teams were influential in increasing Depakote prescriptions by the team for its government-pay patients.

170.     When a pharmaceutical company has used illegal kickbacks like those alleged above, the costs to the government and to the patients are greater than just the cost of the prescriptions that the government would not have paid, had it known of the kickbacks. Kickbacks adversely affect the quality of patient care because they compromise the physician's focus on patients' best medical interests. They also have strong potential to cause overutilization of products, increase costs, and create unfair competition by freezing out competitors who play fair. As with Abbott's off-label marketing and false representations about Depakote ER, neither the law nor the risks to the patients and the government associated with violation of the law deterred Abbott from seizing opportunities for profit by engaging in conduct that caused false claims to be made to the government.

## COUNT I
## Federal False Claims Act

171.     Relator realleges and incorporates by reference the allegations made in the paragraphs 1 through 170 of this Complaint.

172.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1), (2) and (7).

173.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

174.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, including the omission of material facts, to induce the government to approve or pay false and fraudulent claims.

175.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the government.

176.     Each prescription that was written or purchase of Depakote made as a result of Abbott's illegal marketing practices and/or illegal inducements, including illegal kickbacks, and each false statement made about Depakote ER constitutes a false or fraudulent record or statement.   And, each claim for reimbursement for such illegally induced prescriptions submitted to a government health insurance program constitutes a false or fraudulent claim for payment.   Finally, each claim submitted to decrease an obligation to pay money to the government constitutes a reverse false claim against the government.

177.     Relator has provided many specific examples of the alleged false claims and reverse false claims but cannot at this time identify all of the false claims for payment and reverse false claims that were caused by Abbott's conduct.   The false claims were presented by thousands of separate entities, across the United States, and over many years.   Relator has no control over or dealings with such entities and has no access to the records in their possession.

178.     The government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid if the truth were known about Abbott's illegal off-

label marketing practices, false statements about Depakote, illegal inducements, including kickbacks, and reverse false claims.

179.    By reason of the defendant's acts, the United States Government has been damaged, and continues to be damaged in substantial amount to be determined at trial. The government has paid many thousands of false claims for Depakote, amounting to many millions of dollars. Abbott also has wrongly deprived the government of the rebates it should have paid for many thousands of Depakote DR prescriptions, amounting to many millions of dollars.

180.    The United States Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott, and each reverse false claim against the government.

## COUNT II
## State of California

181.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

182.    This is a claim for treble damages and penalties under California's False Claims Act, Cal. Gov't Code § 12651(a)(1), (2) and (7) (2008).

183.    By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

184.    By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the California State Government to approve and pay false and fraudulent claims.

185.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the California State Government.

186.     The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

187.     By reason of the defendant's acts, the State of California has been damaged, and continues to be damaged in substantial amount to be determined at trial.

188.     The State of California is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT III
### District of Columbia

189.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

190.     This is a claim for treble damages and penalties the under the District of Columbia False Claims Act, D.C. Code Ann. § 2-308.14(a)(1), (2) and (7) (2009).

191.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

192.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the District of Columbia Government to approve and pay false and fraudulent claims.

193.    By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the District of Columbia Government.

194.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

195.    By reason of the defendant's acts, the District of Columbia has been damaged, and continues to be damaged in substantial amount to be determined at trial.

196.    The District of Columbia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT IV
## State of Delaware

197.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

198.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201(a)(1), (2) and (7) (2008).

199.    By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

200.    By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Delaware State Government to approve and pay false and fraudulent claims.

201.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Delaware State Government.

202.     The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

203.     By reason of the defendant's acts, the State of Delaware has been damaged, and continues to be damaged in substantial amount to be determined at trial.

204.     The State of Delaware is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT V
### State of Florida

205.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

206.     This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. ch. 68.082(2)(a), (b) and (g) (2008).

207.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

208.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Florida State Government to approve and pay false and fraudulent claims.

209.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Florida State Government.

210.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

211.     By reason of the defendant's acts, the State of Florida has been damaged, and continues to be damaged in substantial amount to be determined at trial.

212.     The State of Florida is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT VI
## State of Georgia

213.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

214.     This is a claim for treble damages and penalties under Georgia's State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(1), (2) and (7) (2008).

215.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

216.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Georgia State Government to approve and pay false and fraudulent claims.

217.    By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Georgia State Government.

218.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

219.    By reason of the defendant's acts, the State of Georgia has been damaged, and continues to be damaged in substantial amount to be determined at trial.

220.    The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT VII
### State of Hawaii

221.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

222.    This is a claim for treble damages and penalties under Haw. Rev. Stat. § 661-21(a)(1), (2) and (7) (2008).

223.    By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

224.    By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Hawaii State Government to approve and pay false and fraudulent claims.

225.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Hawaii State Government.

226.     The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

227.     By reason of the defendant's acts, the State of Hawaii has been damaged, and continues to be damaged in substantial amount to be determined at trial.

228.     The State of Hawaii is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT VIII
### State of Illinois

229.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

230.     This is a claim for treble damages and penalties under Illinois' Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3-(a)(1), (2) and (7) (2009).

231.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

232.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Illinois State Government to approve and pay false and fraudulent claims.

233.    By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Illinois State Government.

234.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

235.    By reason of the defendant's acts, the State of Illinois has been damaged, and continues to be damaged in substantial amount to be determined at trial.

236.    The State of Illinois is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT IX
### State of Indiana

237.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

238.    This is a claim for treble damages and penalties under the Indiana's False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-2(b)(1), (2), (6) and (8) (2008).

239.    By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

240. By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Indiana State Government to approve and pay false and fraudulent claims.

241. By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to avoid an obligation to pay money to the Indiana State Government.

242. The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

243. By reason of the defendant's acts, the State of Indiana has been damaged, and continues to be damaged in substantial amount to be determined at trial.

244. The State of Indiana is entitled to the maximum penalty of at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT X
### State of Louisiana

245. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

246. This is a claim for treble damages and penalties under Louisiana's Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:438.3(A), (B) and (C) (2008) and La. Rev. Stat. Ann. § 46:438.6(A)-(E) (2008).

247.    By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

248.    By virtue of the acts alleged above, Abbott knowingly engaged in misrepresentation to obtain, or attempt to obtain payment from the Louisiana State Government.

249.    By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Louisiana State Government.

250.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

251.    By reason of the defendant's acts, the State of Louisiana has been damaged, and continues to be damaged in substantial amount to be determined at trial.

252.    The State of Louisiana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XI
## State of Massachusetts

253.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

254.    This is a claim for treble damages and penalties under Mass. Gen. Laws ch. 12, § 5B(1), (2), (8) and (9) (2008).

255.   By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

256.   By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay false and fraudulent claims.

257.   By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Massachusetts State Government.

258.   The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

259.   By reason of the defendant's acts, the State of Massachusetts has been damaged, and continues to be damaged in substantial amount to be determined at trial.

260.   The State of Massachusetts is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XII
## State of Michigan

261.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

262.     This is a claim for treble damages and penalties under Michigan's The Medicaid False Claim Act, Mich. Comp. Laws § 400.607(1), (2), (3) and (4) and § 400.612(1) (2008).

263.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

264.     By virtue of the acts alleged above, Abbott knowingly made, and presented claims that falsely represented the goods for which the claim was made to induce the Michigan State Government to approve and pay false and fraudulent claims.

265.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Michigan State Government.

266.     The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

267.     By reason of the defendant's acts, the State of Michigan has been damaged, and continues to be damaged in substantial amount to be determined at trial.

268.     The State of Michigan is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XIII
## State of Montana

269.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

270.     This is a claim for treble damages and penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-403(1)(a), (b), (g) and (2) (2007).

271.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

272.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Montana State Government to approve and pay false and fraudulent claims.

273.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Montana State Government.

274.     The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

275.     By reason of the defendant's acts, the State of Montana has been damaged, and continues to be damaged in substantial amount to be determined at trial.

276.     The State of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XIV
### State of Nevada

277.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

278.     This is a claim for treble damages and penalties under the Nevada statute, Nev. Rev. Stat. 357.040(1)(a), (b) and (g) (2008).

279.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

280.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Nevada State Government to approve and pay false and fraudulent claims.

281.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Nevada State Government.

282.     The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

283.     By reason of the defendant's acts, the State of Nevada has been damaged, and continues to be damaged in substantial amount to be determined at trial.

284.     The State of Nevada is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XV
### State of New Hampshire

285.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

286.     This is a claim for treble damages and penalties under New Hampshire's Medicaid Fraud and False Claims, N.H. Rev. Stat. Ann. § 167:61-b(I)(a), (b) and (e).

287.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

288.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay false and fraudulent claims.

289.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the New Hampshire State Government.

290.     The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

291.     By reason of the defendant's acts, the State of New Hampshire has been damaged, and continues to be damaged in substantial amount to be determined at trial.

292.     The State of New Hampshire is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XVI
## State of New Jersey

293.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

294.    This is a claim for treble damages and penalties under the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-3(a), (b) and (g) (2009).

295.    By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

296.    By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the New Jersey State Government to approve and pay false and fraudulent claims.

297.    By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the New Jersey State Government.

298.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

299.    By reason of the defendant's acts, the State of New Jersey has been damaged, and continues to be damaged in substantial amount to be determined at trial.

300.    The State of New Jersey is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XVII
### State of New Mexico

301.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

302.     This is a claim for treble damages and penalties under New Mexico's Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-4(A), (C) and (E) (2008) and Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-3(A)(1), (2), (8) and (C) (2008).

303.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

304.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the New Mexico State Government to approve and pay false and fraudulent claims.

305.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the New Mexico State Government.

306.     The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

307.     By reason of the defendant's acts, the State of New Mexico has been damaged, and continues to be damaged in substantial amount to be determined at trial.

308.    The State of New Mexico is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XVIII
### State of New York

309.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

310.    This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. State Fin. Law § 189(1)(a), (b) and (g) (2008).

311.    By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

312.    By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the New York State Government to approve and pay false and fraudulent claims.

313.    By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the New York State Government.

314.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

315.    By reason of the defendant's acts, the State of New York has been damaged, and continues to be damaged in substantial amount to be determined at trial.

316.    The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XIX
### State of Oklahoma

317.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

318.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.1(B)(1), (2) and (7) (2008).

319.    By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

320.    By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay false and fraudulent claims.

321.    By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Oklahoma State Government.

322.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

323.    By reason of the defendant's acts, the State of Oklahoma has been damaged, and continues to be damaged in substantial amount to be determined at trial.

324.     The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XX
### State of Rhode Island

325.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

326.     This is a claim for treble damages and penalties under the Rhode Island's State False Claims Act, R.I. Gen. Laws § 9-1.1-3(1), (2) and (7) (2009).

327.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

328.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay false and fraudulent claims.

329.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Rhode Island State Government.

330.     The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

331.     By reason of the defendant's acts, the State of Rhode Island has been damaged, and continues to be damaged in substantial amount to be determined at trial.

332.     The State of Rhode Island is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XXI
### State of Tennessee

333.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

334.     This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A), (B) and (D) (2008).

335.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

336.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Tennessee State Government to approve and pay false and fraudulent claims.

337.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Tennessee State Government.

338.     The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

339.     By reason of the defendant's acts, the State of Tennessee has been damaged, and continues to be damaged in substantial amount to be determined at trial.

340.     The State of Tennessee is entitled to the maximum penalty of $25,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XXII
### State of Texas

341.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

342.     This is a claim for double damages and penalties under Texas' Medicaid Fraud Prevention Act, Tex Hum. Res. Code Ann. §§ 36.002(1), (4), (12) and 36.052 (2007).

343.     By virtue of the acts alleged above, Abbott knowingly made or caused to be made false statements and misrepresentations of material facts to permit persons to receive a benefit or payment under the Medicaid program that is not authorized.

344.     By virtue of the acts alleged above, Abbott knowingly made, induced, sought to induce or caused to be made false statements and misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

345.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Texas State Government. under the Medicaid program.

346.     The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

347. By reason of the defendant's acts, the State of Texas has been damaged, and continues to be damaged in substantial amount to be determined at trial.

348. The State of Texas is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

## COUNT XXIII
### State of Virginia

349. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

350. This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(1), (2) and (7) (2008).

351. By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

352. By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Virginia State Government to approve and pay false and fraudulent claims.

353. By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Virginia State Government.

354. The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

355.     By reason of the defendant's acts, the State of Virginia has been damaged, and continues to be damaged in substantial amount to be determined at trial.

356.     The State of Virginia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

**COUNT XXIV**
**State of Wisconsin**

357.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

358.     This is a claim for treble damages and penalties under Wis. Stat. § 20.931(2)(a), (b) and (g).

359.     By virtue of the acts alleged above, Abbott knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

360.     By virtue of the acts alleged above, Abbott knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay false and fraudulent claims.

361.     By virtue of the acts alleged above, Abbott knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the Wisconsin State Government.

362.     The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Abbott, paid and continues to pay the claims that would not be paid but for Abbott's illegal off-label marketing practices and illegal inducements.

363.     By reason of the defendant's acts, the State of Wisconsin has been damaged, and continues to be damaged in substantial amount to be determined at trial.

364.     The State of Wisconsin is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Abbott.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff/relator Tamara Dietzler and the United States of America and the States and District of Columbia pray for judgment against the defendant as follows:

1.     that defendant cease and desist from violating 31 U.S.C. § 3729, *et seq.* and the equivalent provisions of the statutes of the States and the District of Columbia as set forth above;

2.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the United States has sustained because of defendant's actions, plus the maximum civil penalty of $11,000 for each violation of 31 U.S.C. § 3729 and any other damages, awards, penalties and equitable relief available under the statute;

3.     that for each of the states and the District of Columbia on whose behalf this Complaint has been brought, this Court enter judgment against defendant, awarding to each state and the District of Columbia

  a.     an amount equal to the damages sustained because of defendant's conduct, multiplied by the maximum multiplier, if any, allowed by each state or the District of Columbia;

       b.      a penalty of the maximum statutory amount allowed for each violation of the equivalent false claims act of that state or the District of Columbia, and

       c.      any other damages, awards, penalties and equitable relief available under the equivalent false claims act of that state or the District of Columbia.

4.      that plaintiff and relator Tamara Dietzler be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act, and the equivalent provisions of the analogous statutes of the States and the District of Columbia set forth above;

5.      that plaintiff and relator Tamara Dietzler be awarded all costs of this action, including attorneys' fees and expenses; and

6.      that plaintiff recovers all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff and relator Tamara Dietzler hereby demands a trial by jury.

Dated:  April 7, 2009

Respectfully Submitted:

SPRENGER & LANG, PLLC

By: *[signature]*

Susan M. Coler

Susan M. Coler (IL Bar No. 6201012,
MN Bar No. 217621)
310 4th Avenue South, Suite 600
Minneapolis, MN 55415
scoler@sprengerlang.com
Tel/ 612-871-8910
Fax/ 612-871-9270

SPRENGER & LANG, PLLC
Steven M. Sprenger (DC Bar No. 418736)
1400 Eye Street, N.W., Suite 500
Washington, DC 20005
ssprenger@sprengerlang.com
Tel/ 202-265-8010
Fax/ 202-332-6652

*Designated Local Counsel*
SPRENGER & LANG / SWEETNAM LLC
William M. Sweetnam, (IL Bar No. 622623)
10 South La Salle Street, Suite 3500
Chicago, Illinois  60603
wsweetnam@sprengerlang.com
Tel/ 312-346-5100
Fax/ 312-606-0027

*Attorneys for Relator*