**IN THE UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHESTER COUNTY EMPLOYEES' RETIREMENT FUND, Derivatively on Behalf of Nominal Defendant ABBOTT LABORATORIES, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| MILES D. WHITE, DUANE L. BURNHAM, JEFFREY LEIDEN, WILLIAM DEMPSEY, RICHARD A. GONZALEZ, H. LAURANCE FULLER, ROXANNE S. AUSTIN, W. JAMES FARRELL, SAMUEL C. SCOTT, III, GLENN F. TILTON, WILLIAM A. OSBORN, ROBERT J. ALPERN, M.D., K. FRANK AUSTEN, M.D., JACK M. GREENBERG, THOMAS R. HODGSON, DAVID A. JONES, THE RT. HON. LORD DAVID OWEN, ROBERT L. PARKINSON, JR., BOONE POWELL, JR., ADDISON, BARRY RAND, W. ANN REYNOLDS, PH.D., ROY S. ROBERTS, WILLIAM D. SMITHBURG, JOHN R. WALTER, WILLIAM L. WEISS, | ) CASE NO. 1:11-cv-08114 ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| ABBOTT LABORATORIES, INC., | ) ) |
| Nominal Defendant. | ) ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**JACKSONVILLE POLICE & FIRE PENSION FUND'S**
**MOTION FOR APPOINTMENT OF LEAD PLAINTIFF AND LEAD COUNSEL**

## <u>TABLE OF CONTENTS</u>

I.      PRELIMINARY STATEMENT ........................................................................................1

II.     FACTUAL BACKGROUND ..........................................................................................2

III.    ARGUMENT ....................................................................................................................3

        A.      JACKSONVILLE POLICE & FIRE BEST SATISFIES THE RELEVANT
                FACTORS IN SELECTING THE LEAD PLAINTIFF .........................................3

                (1)     Significant Financial Interest ...................................................................4

                (2)     Preference for Institutional Investors.......................................................5

                (3)     Quality of the Pleadings............................................................................6

                (4)     Vigorousness of Prosecution of the Lawsuits...........................................7

                (5)     Attorney's Fees .........................................................................................9

        B.      SPECTOR ROSEMAN SHOULD BE APPOINTED LEAD COUNSEL AND
                SHH SHOULD BE APPOINTED LOCAL COUNSEL .........................................9

                (1)     Spector Roseman Has Extensive Experience and Success In
                        Shareholder Derivative Litigation and Other Forms of Complex
                        Shareholder Litigation ............................................................................10

                (2)     Spector Roseman Has Demonstrated Unparalleled Leadership In
                        Pharmaceutical Litigation .......................................................................13

        C.      THE PROCEDURES ESTABLISHED BY THE PROPOSED PRETRIAL
                ORDER NO. 1 WILL ASSURE JUDICIAL CONTROL
                AND ORDERLY AND EXPEDITIOUS PROGRESS OF THIS CASE..............14

IV.     CONCLUSION................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Abbott Laboratories Derivative Shareholder Litig.*,
    C.A. No. 99 C 07246 (N.D. Ill.) ...................................................................................10, 11

*In re Abbott Laboratories Sec. Litig.*,
    No. 92–C–3869, 1995 WL 792083 (N.D. Ill. July 3, 1995) ......................................................8

*In re Alltel Corp. Shareholder Litig.*,
    C.A. No. 2975-CC (Del. Ch.) ...............................................................................................10

*In re Atheros Communications, Inc. Shareholder Litig.*,
    C.A. No. 6124-VCN (Del. Ch.) ............................................................................................10

*In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*,
    MDL No. 1699 (N.D. Cal.).....................................................................................................14

*In re Bristol-Myers Squibb Derivative Litig.*,
    No. 02-CV-8571 (LAP) (S.D.N.Y.)......................................................................................10

*In re Comverse Tech., Inc. Deriv. Litig.*,
    No. 06-CV-1849, 2006 WL 3511375 (E.D.N.Y. Dec. 5, 2006)...............................................4

*In re Comverse Tech., Inc. Deriv. Litig.*,
    No. 06-CV-1849, 2006 WL 3761986 (E.D.N.Y. Sept. 22, 2006) ...........................................3

*In re DDAVP Antitrust Litigation*,
    C.A. No. 05 Civ. 2237 (S.D.N.Y.).........................................................................................14

*In re Ditropan XL Antitrust Litigation*,
    C.A. No. 06-1761-JSW (N.D. Cal.)........................................................................................14

*Dollens v. Zionts,*
    Nos. 01 C 5931, 01 C 2826, 2001 WL 1543524 (N.D. Ill. Dec. 4, 2001) ........................3, 4, 9

*In re Doral Fin. Corp. Sec. Litig.*,
    No. 05 MDL 1706, 2006 WL 1120491 (S.D.N.Y. Apr. 27, 2006)......................................3, 5

*Dutiel v. Tween Brands, Inc.*,
    Nos. 4743-CC, 4845-CC, 2009 WL 3208287 (Del. Ch. Oct. 2, 2009)....................................4

*In re Express Scripts, Inc., PBM Litigation,*
    Master Case No. 05-md-01672-SNL (E.D. Mo.)....................................................................14

*Felzen v. Andreas (Archer Daniels Midland Co. Derivative Litig.)*
    (C.D. Ill.)..........................................................................................................................10, 11

ii

*In re Foundry Networks, Inc. Deriv. Litig.*,
No. C-06-05598, 2007 WL 485974 (N.D. Cal. Feb. 12, 2007) ...............................................4

*Horn v. Raines*,
227 F.R.D. 1 (D.D.C. 2005) ....................................................................................................5

*In re Lipitor Marketing Litigation*,
C.A. No. 05-22658 (S.D. Fla.) ...............................................................................................14

*In re Lovenox Antitrust Litigation*,
Case No. CV05-5598 (C.D. Cal.) ...........................................................................................14

*In re Lupron Marketing and Sales Practices Litigation*,
MDL No. 1430 (D. Mass) .......................................................................................................13

*MacAlister v. Guterma*,
263 F.2d 65 (2d Cir. 1958) ......................................................................................................3

*In re Nanophase Technologies Corp. Litig.*,
Nos. 98-C-3450, 98-C-7447, 1999 WL 965468 (N.D. Ill. Sept. 30, 1999) ...........................14

*In re Parmalat Securities Litigation*,
No. 04 Civ. 0030 (LAK) (S.D.N.Y.) ................................................................................11, 12

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
MDL No. 1456 (D. Mass.).......................................................................................................13

*In re Provigil Antitrust Litigation*,
C.A. No. 06-1797 (E.D. Pa.)...................................................................................................14

*Shore v. Ukropina*, 94-55935 (C.D. Cal.) ...........................................................................10, 11

*Technology Limited Partnership v. Intermedia Communications, Inc.*,
Nos. 18336, 18289, 18293, 2000 WL 1654504 (Del. Ch. Oct. 17, 2000) ................................4

*In re TriCor Antitrust Litigation*,
C.A. No. 05-360 (D. Del.) .......................................................................................................14

*United States ex rel. Dietzler v. Abbott Laboratories*,
No. 09 CV 2118 (N.D. Ill.) .......................................................................................................6

*United States ex rel. McCoyd v. Abbott Laboratories*,
No. 1:07-cv-00081-SGW (W.D. Va.) ..................................................................................6, 10

*Welmon v. Chicago Bridge & Iron Co., N.V.*,
No. 06-CV-01283 (JES) (SDNY) ...........................................................................................12

**STATUTES**

Freedom of Information Act, 5 U.S.C. §55 *et seq.* ......................................................................7, 8

**FEDERAL RULES**

Federal Rule of Civil Procedure 16 ..............................................................................................15

**OTHER AUTHORITIES**

*Manual For Complex Litigation (Fourth)* §§10.1 and 10.11.........................................................14

## I.    PRELIMINARY STATEMENT

Plaintiff Jacksonville Police & Fire Pension Fund ("Jacksonville Police & Fire" or "Movant"), hereby submits this Memorandum of Law in Support of its Motion for Appointment of Lead Plaintiff and Lead Counsel in which it seeks: (1) to be appointed as Lead Plaintiff; (2) to have its counsel, the law firm of Spector Roseman Kodroff & Willis, P.C. ("Spector Roseman"), appointed as Lead Counsel; and (3) to have the law firm of Susman Heffner & Hurst LLP ("SHH") appointed as Local Counsel in this consolidated action.

For a number of reasons, Jacksonville Police & Fire is far and away best situated to prosecute this case on behalf of Abbott Laboratories ("Abbott" or the "Company"). *First*, it has by far the largest known financial interest of any of the plaintiffs – more than double that of Chester County's anticipated holdings. *Second*, it has already demonstrated its leadership in the case. This includes obtaining more than 2,000 pages of documents from the U.S. Food and Drug Administration ("FDA") pursuant to a Freedom of Information Act request to use in preparing a consolidated amended complaint and filing an authoritative complaint that correctly names the nominal defendant.[1] Moreover, two of the four other investors that filed complaints now support Jacksonville Police & Fire's motion. *Third*, it has selected highly competent counsel who have not only litigated numerous shareholder derivative actions, including companies in the pharmaceutical industry such as this, but have successfully prosecuted Abbott's directors for prior misconduct. No other movant brings to this action what Jacksonville Police & Fire and its counsel do.

---

[1] In its complaint, Jacksonville Police & Fire named the correct entity as the nominal defendant in this derivative action: Abbott Laboratories. As discussed more fully below, in its complaint, the Chester County Employees' Retirement Fund ("Chester County") incorrectly named Abbott Laboratories, *Inc.* as the nominal defendant. Abbott Laboratories, *Inc.* is a subsidiary of Abbott Laboratories.

## II.    <u>FACTUAL BACKGROUND</u>

This action alleges that, over the course of at least a decade, Abbott's directors (the "Director Defendants") breached their fiduciary duties by causing the Company to engage in illegal off-label marketing of the drug Depakote in violation of federal law. Beginning in 1998, Abbott illegally marketed Depakote for off-label uses, specifically targeting elderly patients suffering from Alzheimer's disease, as well as children. As a result of this off-label marketing, Abbott and the Director Defendants have profited substantially, with the Company making billions of dollars and the Director Defendants realizing a substantial personal benefit.

As a consequence of this wrongful conduct, the U.S. Department of Justice (the "DOJ") has pursued violations of the Federal False Claims Act, the Food, Drug, and Cosmetic Act, and the Anti-Kickback Statute in connection with Medicare and/or Medicaid reimbursement to third parties. On October 19, 2011, Abbott announced that it had reserved $1.5 billion "related to ongoing settlement discussions in the previously disclosed investigation by" the DOJ. Following this announcement, it was reported on or about October 21, 2011, that Abbott has tentatively agreed to pay at least $1.3 billion to settle claims brought by the United States government and twenty-four states.

The Director Defendants' sustained action and/or failure to act to protect the Company in the face of systematic violations of the law – the off-label marketing of Depakote – has resulted in what is to be the third largest settlement for illegal pharmaceutical marketing in United States history.

2

## III.   ARGUMENT

### A.   JACKSONVILLE POLICE & FIRE BEST SATISFIES THE RELEVANT FACTORS IN SELECTING THE LEAD PLAINTIFF

Courts both within this District and beyond have recognized that they possess "the authority to appoint a lead plaintiff and counsel in a derivative action in order to create an efficient case-management structure." *North Miami Beach General Employees Retirement Fund v. Parkinson*, Case No. 10-C-6514 (N.D. Ill.) (Chang, J.), Order dated July 5, 2011 at 1 (shareholder derivative action brought on behalf of Baxter International) (attached hereto as Exh. A to the Declaration of Andrew D. Abramowitz in support of this Motion (the "Abramowitz Declaration")). *See also In re Comverse Tech., Inc. Deriv. Litig.*, No. 06-CV-1849, 2006 WL 3761986, at *1 (E.D.N.Y. Sept. 22, 2006) (citing *MacAlister v. Guterma*, 263 F.2d 65, 68 (2d Cir. 1958)). Whether the Court uses the term "lead plaintiff" or "shareholder representative," there's no question that in a shareholder derivative action, "[t]he court should seek [an] appropriate leadership structure to coordinate the litigation and avoid duplication." *In re Doral Fin. Corp. Sec. Litig.*, No. 05 MDL 1706, 2006 WL 1120491, at *1 (S.D.N.Y. Apr. 27, 2006) (citing *MacAlister*, 263 F.2d at 68-69).

Courts in this District consider five factors when deciding who to appoint as lead plaintiff in shareholder derivative cases: (1) the movant's financial interest; (2) the judicial preference for institutional investors to lead a lawsuit; (3) the quality of the pleadings; (4) the vigorousness of the prosecution of the lawsuit; and (5) the movant's arrangement for the payment of attorney's fees. *See North Miami Beach, supra*, at 2 (citing *Dollens v. Zionts,* Nos. 01 C 5931, 01 C 2826, 2001 WL 1543524, at **5-6 (N.D. Ill. Dec. 4, 2001)) (Exh. A to Abramowitz Decl.). In the instant case, these factors overwhelmingly favor the appointment of Jacksonville Police & Fire as Lead Plaintiff.

**(1)      Significant Financial Interest**

The first and key criteria – the size of a movant's investment in the company's stock – is the ***only quantifiable, objective factor*** in the analysis[2] and is a highly germane consideration that corresponds to the lead plaintiff analysis under the Private Securities Litigation Reform Act ("PSLRA"). Here, Jacksonville Police & Fire is a long-time holder of Abbott stock and currently holds a substantial number of shares: ***99,500***, a current investment worth in excess of ***$5.5 million***.[3] This is more than double the expected reported holdings of Chester County, the only other plaintiff that has previously disclosed its holdings.

While the analysis in the derivative context differs from that under the PSLRA, where the most damaged shareholder is presumptively the lead plaintiff,[4] strong consideration of a plaintiff's financial interest is merited in derivative cases so as to steer courts away from rewarding those who have raced to the courthouse to file first, as Chester County did here. *See Dollens*, 2001 WL 1543524, at *5 (describing a judicial focus on the plaintiffs' financial interest, as well as whether they are institutional investors, "so that courts would not appoint lead plaintiffs simply based on who was first to file a derivative action.") (citing *Technology Limited Partnership v. Intermedia Communications, Inc.*, Nos. 18336, 18289, 18293, 2000 WL 1654504 (Del. Ch. Oct. 17, 2000)).

Not surprisingly, courts have paid particular attention to this factor when appointing lead derivative plaintiffs. *See North Miami Beach*, *supra*, at 2 (Judge Chang appointed a lead plaintiff "in light of [the plaintiff's] advantage in its *greater financial interest* and quality of pleadings") (Exh. A to Abramowitz Decl.) (emphasis added); *Dutiel v. Tween Brands, Inc.*, Nos. 4743-CC,

---

[2] The judicial preference for institutional plaintiffs is also objectively determined, but not susceptible to relative quantification between lead plaintiff movants.

[3] *See* Abramowitz Decl., at ¶8.

[4] *See In re Comverse Tech., Inc. Deriv. Litig.*, No. 06-CV-1849, 2006 WL 3511375, at *3 (E.D.N.Y. Dec. 5, 2006).

4

4845-CC, 2009 WL 3208287, at *2 (Del. Ch. Oct. 2, 2009) (appointing movant with the largest financial interest after "not[ing] the different levels of economic interest…. [T]his increase in economic stake is one of more than 1200 percent"); *In re Foundry Networks, Inc. Deriv. Litig.*, No. C-06-05598, 2007 WL 485974, at *1 (N.D. Cal. Feb. 12, 2007) (appointing the movant with the largest financial interest after stating that "financial stake has some relevance to the plaintiff's interest in a derivative action and the likelihood that the plaintiff will pursue the derivative claims vigorously.")

With its substantial investment – as noted above, 99,500 shares with a current value of $5.5 million – Jacksonville Police & Fire has much to gain or lose by this lawsuit and will be enormously impacted by its outcome, to a much greater extent than any of the other known plaintiffs. As such, its holdings no doubt demonstrate the degree to which Jacksonville Police & Fire is incentivized to litigate these claims in a vociferous manner.

### (2)    Preference for Institutional Investors

Institutional shareholders are favored as lead plaintiffs in derivative litigation. *See Horn v. Raines*, 227 F.R.D. 1, 3 (D.D.C. 2005); *see also Doral Fin. Corp.*, 2006 U.S. Dist. LEXIS, at *9. Jacksonville Police & Fire is not only a sophisticated institutional holder of Abbott stock, but it has held the stock throughout the time period covering the wrongs alleged to have occurred. Moreover, as a government instrumentality providing retirement benefits for tens of thousands of public safety employees, Jacksonville Police & Fire is well accustomed to acting in a fiduciary capacity. Importantly, it has substantial experience protecting the interest of shareholders as it has lead and aggressively prosecuted wrongdoers in a number of other actions.

(3)     **Quality of the Pleadings**

Jacksonville Police & Fire has filed a complaint that is thorough, highly detailed, and crafted with an eye toward comprehensive and efficient litigation of these claims, in contrast to Chester County which (as discussed below) sued on behalf of the wrong entity – the only movant that named the wrong nominal defendant. Prior to filing its lawsuit, Jacksonville Police & Fire and its counsel, Spector Roseman, undertook an extensive investigation into Abbott and the facts surrounding its illegal off-label marketing of Depakote. In particular, Spector Roseman reviewed, *inter alia*: the Company's filings with the Securities and Exchange Commission ("SEC"); the Company's Corporate Governance Principles and Code of Business Conduct; filings with the FDA; press releases, the Warning Letters received by the Company from the FDA; materials relating to the investigation launched by the DOJ; materials relating to the whistle-blower complaints filed against the Company, including *United States ex rel. McCoyd v. Abbott Laboratories*, No. 1:07-cv-00081-SGW (W.D. Va.), and *United States ex rel. Dietzler v. Abbott Laboratories,* No. 09 CV 2118 (N.D. Ill.); press releases; and news articles. Moreover, in consultation with Jacksonville Police & Fire, Spector Roseman thoroughly analyzed the Company's corporate governance structure and protocols, and has actively monitored the activity by governmental and regulatory bodies, such as the FDA. Additionally, Jacksonville Police & Fire and Spector Roseman continuously monitor various media sources and have been conducting additional research with a view toward serving discovery requests on the Director Defendants and relevant third parties at the appropriate time.

As noted above, Chester County brought its complaint on behalf of the wrong entity, naming "Abbott Laboratories, Inc.," asserting that it is an "Illinois corporation" that makes "public filings," "reports revenues through four operating segments," and sells and markets

6

Depakote through its Pharmaceutical Products Division.[5] Yet none of that is correct. Abbott Laboratories, *Inc*. is a ***Delaware*** corporation and is a ***subsidiary*** of Abbott Laboratories. It is Abbott Laboratories (not Abbott Laboratories, *Inc*.) that markets Depakote and issues public filings with the SEC.

Jacksonville Police & Fire assumes this sizeable error by Chester County was not intentional, although it does render its complaint defective and raises serious questions about the investigation that led to its filing. If, by contrast, Chester County and its counsel did mean to bring its lawsuit on behalf of "Abbott Laboratories, Inc.," then numerous jurisdictional and venue questions are raised, as that entity, which is not publicly traded, is incorporated under the laws of Delaware, not Illinois. Indeed, Chester County asserts that it is a "shareholder" of Abbott Laboratories, Inc.[6] If that is true, then Chester County and its counsel are suing on behalf of a different entity than Jacksonville Police & Fire and the other plaintiffs in this consolidated action – all of whom have specified that that this is a derivative action on behalf of Abbott Laboratories.

### (4)     Vigorousness of Prosecution of the Lawsuits

Although this case is in its infancy, Jacksonville Police & Fire has taken action on multiple fronts to try to put this case on the best possible track for moving forward efficiently and effectively.

***First***, in addition to filing a comprehensive and well-researched complaint, Jacksonville Police & Fire's counsel submitted a request for documents from the FDA pursuant to the Freedom of Information Act, 5 U.S.C. §55 *et seq*. ("FOIA") (attached as Exh. C to Abramowitz Decl.). This FOIA request sought a number of categories of relevant documents including, *inter alia*: inspection reports of Abbott facilities where Depakote was manufactured; documents

---

[5] *See e.g.*, Chester County Complaint at 1, 5-6 (attached as Exh. B to the Abramowitz Decl.).
[6] Chester County Complaint at 5 (Exh. B to Abramowitz Decl.).

concerning the approved uses of Depakote; requests for changes to the Depakote label; materials submitted by Abbott to the FDA to change or modify the indicated uses of Depakote; and analyses or investigations by the FDA in connection with the off-label marketing or use of Depakote.

As a result of Jacksonville Police & Fire's efforts, the FDA produced 89 documents, totaling **_nearly 2,000 pages_**, that will be highly useful, including in the preparation of an amended complaint. The documents obtained by Jacksonville Police & Fire and its counsel include, among numerous others: correspondence to the FDA regarding a petition to change Depakote's label or remove it from the market; clinical reviews of Depakote which include analyses of labeling and discussions as to changes to labeling; a petition submitted to the FDA to consider pulling Depakote from the market; general statements and comments by consumers regarding the marketing of Depakote; multiple correspondences from the FDA to Abbott regarding misleading information or the lack of information in Depakote "flashcard"; a memorandum by the FDA analyzing the recommended usages of Depakote in children and adolescents; and agendas, minutes, and transcripts from meetings of the Pediatric Advisory Committee at which Depakote was discussed. Jacksonville Police & Fire's efforts in this regard have clearly advanced Abbott's interests by broadening the factual and informational predicate upon which an amended complaint will be based. *See In re Abbott Laboratories Sec. Litig.*, No. 92–C–3869, 1995 WL 792083, at *2 (N.D. Ill. July 3, 1995) (noting the inclusion of documents obtained from the FDA through a FOIA request in an amended complaint that survived motions to dismiss).

***Second***, Jacksonville Police & Fire and its counsel have promoted efficient litigation from the outset. For example, Jacksonville Police & Fire's counsel, Spector Roseman, has

8

attempted to coordinate with all other plaintiffs so as to reduce duplication of effort and other inefficiencies. These efforts have been successful, as Jacksonville Police & Fire's counsel has obtained the support of plaintiffs Louisiana Municipal Police Employees Retirement System ("LAMPERS"), Warren Pinchuck, and Roy Sapir,[7] who agree that this case should be led by Jacksonville Police & Fire. They support this Motion and agree to assist as needed. The support of these plaintiffs behind Jacksonville Police & Fire's leadership will no doubt promote a more efficient prosecution of these claims. Indeed, already it has reduced the burden on the Court of reviewing additional lead counsel motions.

*Third*, Jacksonville Police & Fire has already effected service of the complaint on all defendants. The parties, therefore, are ready to proceed.

### (5)    Attorney's Fees

Jacksonville Police & Fire is a sophisticated institutional investor that has the negotiating power to have reached a fair, arm's-length agreement with its counsel, Spector Roseman. This agreement provides for a reasonable fee to be paid to counsel, subject to court approval, while maximizing recovery to the Company.

Thus, the totality of the circumstances weighs heavily in favor of appointing Jacksonville Police & Fire as Lead Plaintiff.

### B.    SPECTOR ROSEMAN SHOULD BE APPOINTED LEAD COUNSEL AND SHH SHOULD BE APPOINTED LOCAL COUNSEL

Lead plaintiffs "should be able to select their own counsel . . . ." *Dollens*, 2001 WL 1543524, at *6. Jacksonville Police & Fire has selected Spector Roseman as its proposed Lead Counsel and Susman Hefner as proposed Local Counsel. Spector Roseman is a well-established

---

[7] As noted above, these actions are: *Pinchuck, et al. v. White, et al.*, Case No. 1:11-cv-08499, filed on November 29, 2011, and *Louisiana Municipal Police Employees Retirement System, et al. v. White, et al*., Case No. 1:11-cv-08631, filed on December 5, 2011.

and successful law firm that has the resources and personnel necessary to pursue a case of this

magnitude, as it has demonstrated in numerous similar large-scale cases, _including against_

_Abbott_. The firm has the resources, commitment, and ability to successfully prosecute complex

shareholder litigation, including derivative actions, breach of fiduciary duty actions against

corporate boards, and class litigation in the pharmaceutical industry.

> **(1)   Spector Roseman Has Extensive Experience and Success In
> Shareholder Derivative Litigation and Other Forms of Complex
> Shareholder Litigation**

Spector Roseman is one of the preeminent law firms in shareholder litigation and has

been tremendously successful in achieving both monetary results and the implementation of

corporate reforms. Moreover, the firm is intimately familiar not only with pharmaceutical

companies, but with Abbott in particular, as it has served as Co-Lead Counsel in a separate

shareholder derivative action initiated on the Company's behalf in 1999. *In re Abbott*

*Laboratories Derivative Shareholder Litig.*, C.A. No. 99 C 07246 (N.D. Ill.) ("*Abbott I*"). That

action resulted in a heavily cited opinion by the Seventh Circuit Court of Appeals on the issue of

demand futility. *See Abbott Laboratories*, 325 F.3d 795 (7th Cir. 2003). That suit alleged that the

Board allowed Abbott to falsify FDA filings and fail to comply with regulatory orders, which

resulted in multi-million dollar fines, the closure of a manufacturing facility, and the forced

destruction of products. The Board's conduct cost Abbott hundreds of millions of dollars in lost

revenue. Spector Roseman's efforts led to a positive outcome. After the case was dismissed

twice and reversed on appeal, it settled for the implementation of substantial corporate

governance reforms funded with $27 million of the director defendants' money. The Seventh

Circuit's opinion in *Abbott I* remains a leading case on demand futility in this Circuit.

As illustrated in the firm's biography (Exh. D to Abramowitz Decl.), Spector Roseman

has exhibited its skill and leadership in numerous shareholder derivative cases and other breach of fiduciary duty actions involving corporate wrongdoing. *See e.g.*, *In re Atheros Communications, Inc. Shareholder Litig.*, C.A. No. 6124-VCN (Del. Ch.); *In re Alltel Corp. Shareholder Litig.*, C.A. No. 2975-CC, (Del. Ch.); *In re Bristol-Myers Squibb Derivative Litig.*, No. 02-CV-8571 (LAP) (S.D.N.Y.); *Felzen v. Andreas (Archer Daniels Midland Co. Derivative Litigation)* (C.D. Ill.); (*Shore v. Ukropina*, No. 94-55935 (C.D. Cal.) *(Pacific Enterprises, Inc.*).

In addition to obtaining considerable monetary recovery in breach of fiduciary duty actions, Spector Roseman has the most substantial track record of corporate governance advocacy of any plaintiffs' firm and for many years has been at the vanguard of using shareholder derivative actions, as well as securities class actions, to implement corporate governance changes. In negotiating for strong corporate therapeutics as part of a settlement, the firm promotes corporate responsibility and reduces the likelihood that wrongdoing will occur in the future. Significantly, Spector Roseman was one of the first law firms to effectively use governance therapeutics in investor fraud cases, and it has led the field ever since. For example, in a landmark shareholder derivative case brought in 1995 on behalf of Archer Daniels Midland ("ADM"), Spector Roseman, as Co-Lead Counsel, negotiated a settlement that, in addition to a monetary payout by the directors to the company, included powerful corporate governance measures that required ADM to, among other things, strengthen the independence of the board of directors, revise the structure and responsibilities of key committees of the Board, create corporate governance and regulatory oversight committees, and diversify the membership of the Board to include women and minorities. *Felzen v. Andreas (Archer Daniels Midland Co. Derivative Litigation)* (C.D. Ill.). At the time of this widely publicized settlement, Professor John Coffee of Columbia University School of Law observed that the corporate governance reforms

obtained in this case were "state of the art."

Substantial corporate governance reforms have been negotiated in numerous other cases led by Spector Roseman, and have resulted in: the implementation of protocols to ensure that directors were constantly aware of the state of compliance with FDA regulations governing in vitro diagnostics products (*Abbott I, supra*); a quasi-reorganization of a company and the implementation of guidelines on future diversification programs (*Shore v. Ukropina* (*Pacific Enterprises, Inc.*)); the reaffirmation of key corporate governance principles by third party defendants to prevent future deceptive financial transactions (*Parmalat*); and the adoption of guidelines for insider trading (*Welmon v. Chicago Bridge & Iron Co., N.V.,* No. 06-CV-01283 (JES) (SDNY)).

Spector Roseman has also been a leader in shareholder litigation in the non-derivative context. For example, the firm brought its considerable experience and innovativeness to bear in *In re Parmalat Securities Litigation*, No. 04 Civ. 0030 (LAK) (S.D.N.Y.). The *Parmalat* case – known as "Enron of Europe" due to the size and scope of the fraud – resulted in a substantial monetary recovery for the class of investors, as well as important corporate governance reforms. The firm, representing a group of institutional investor lead plaintiffs, secured more than $96.5 million in settlements with the defendants, which included the bankrupt company Parmalat. To accomplish this, Spector Roseman and its co-counsel devised a unique legal theory that applied Italian bankruptcy law to obtain funds not normally available to investors. Monies were also recovered from Parmalat's two auditing firms and two of its financial institutions. As for corporate therapeutics, as part of the settlements with two large European banks, American investors were able to extract the endorsement of each to adhere to key corporate governance principles designed to advance investor protection and to minimize the likelihood of future

deceptive transactions. *This was the first time in a securities fraud class action that shareholders were able to negotiate corporate governance measures from a defendant that was not the issuer.*

### (2) Spector Roseman Has Demonstrated Unparalleled Leadership In Pharmaceutical Litigation

Of equal importance under the present circumstances is Spector Roseman's history in pharmaceutical litigation. The firm is uniquely qualified to steer the claims brought in this action due to its unparalleled experience and knowledge obtained in pharmaceutical industry litigation, where it has been at the forefront of employing novel claims and unique strategies to benefit its clients. Most notably, Spector Roseman devised the legal theory in the highly-publicized cases against major pharmaceutical companies for using the Average Wholesale Price ("AWP") to inflate the price paid for certain drugs. As a result of over a year of investigation and analysis, Spector Roseman filed the very first, and was Lead Counsel in, a civil AWP lawsuit pertaining to the cancer drug Lupron (*In re Lupron Marketing and Sales Practices Litigation*, MDL No. 1430 (D. Mass)), which ultimately settled for $150 million. Spector Roseman has also filed and served as Lead Counsel in the prosecution of the massive AWP case that was brought against many of the largest pharmaceutical companies and which has resulted in over $300 million in class-wide settlements from the pharmaceutical companies. *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456 (D. Mass.). Indeed, the Attorney General of the State of Connecticut selected Spector Roseman, after a competitive bidding process, to serve as co-lead counsel in the State's litigation against pharmaceutical companies for manipulation of the market through the use of the Average Wholesale Price and other tactics. The firm has also represented employee benefit funds in these matters, such as the Pennsylvania Employees Benefit Trust Fund (covering 270,000 participants and dependents), the Health and Welfare Fund and the Retiree Health and Welfare Fund of the New York City Patrolmen's Benevolent

13

Association, and the Teamsters Health and Welfare Fund of Philadelphia and Vicinity.

Similarly, Spector Roseman is also a leader in challenging efforts by brand-named pharmaceutical companies to prevent generic drugs from entering the market. The firm's leadership in this type of Hatch-Waxman Act Antitrust/Patent litigation has resulted in the recovery of hundreds of millions of dollars on behalf of individuals and entities that pay for drugs. Spector Roseman has also been at the forefront of litigation relating to illegal marketing activities of pharmaceutical companies including massive off-label marketing schemes, as well as litigation regarding pharmacy benefit managers.[8]

Thus, as amply demonstrated in its firm biography, attached hereto, Spector Roseman's track record, especially in successfully prosecuting shareholder derivative litigation, is exemplary. *See* Exh. D to Abramowitz Decl. Likewise, SHH, based in Chicago, has actively litigated a number of securities class actions and shareholder derivative suits and is intimately familiar with the local practices of this Court. *See* Exh. E to Abramowitz Decl. As such, the firms are extremely well-suited to serve as Lead Counsel and Local Counsel in this case.

**C.  THE PROCEDURES ESTABLISHED BY THE PROPOSED PRETRIAL ORDER NO. 1 WILL ASSURE JUDICIAL CONTROL AND ORDERLY AND EXPEDITIOUS PROGRESS OF THIS CASE**

In complex litigation such as this, it is imperative that procedures be adopted at the outset which will assure efficient and vigorous prosecution. *See Manual For Complex Litigation (Fourth)* ("Manual" or "MCL4th") §§ 10.1 and 10.11. The proposed Pretrial Order No. 1 ("PTO") (attached as Exh. F to Abramowitz Decl.), does just that. The PTO, which sets forth

---

[8] Representative cases include: *In re TriCor Antitrust Litig.*, C.A. No. 05-360 (D. Del.); *In re DDAVP Antitrust Litig.*, C.A. No. 05 Civ. 2237 (S.D.N.Y.); *In re Provigil Antitrust Litig.*, C.A. No. 06-1797 (E.D. Pa.); *In re Express Scripts, Inc., PBM Litig.*, Master Case No. 05-md-01672-SNL (E.D. Mo.); *In re Ditropan XL Antitrust Litig.*, C.A. No. 06-1761-JSW (N.D. Cal.); *In re Lovenox Antitrust Litig.*, Case No. CV05-5598 (C.D. Cal.); *In re Bextra and Celebrex Marketing Sales Practices & Product Liability Litig.*, MDL No. 1699 (N.D. Cal.); *In re Lipitor Marketing Litig.*, C.A. No. 05-22658 (S.D. Fla.).

procedures that promote judicial economy and have been adopted by courts within this District and beyond. *See*, *e.g.*, *In re Nanophase Technologies Corp. Litig.*, Nos. 98-C-3450, 98-C-7447, 1999 WL 965468, *1 (N.D. Ill. Sept. 30, 1999). The PTO provides an initial set of ground rules to assure that this action proceeds efficiently and expeditiously, while also allowing the parties sufficient time to properly prepare and present their case. PTO will also materially assist the parties, the Court and the Court's staff in managing and processing the paper flow that this litigation will produce. Federal Rule of Civil Procedure 16 contemplates the use of case management procedures and scheduling orders in "complex" cases such as these.

## IV.    **CONCLUSION**

For all of the foregoing reasons, Jacksonville Police & Fire respectfully requests that: (1) it be appointed Lead Plaintiff, (2) its counsel, Spector Roseman, be appointed Lead Counsel, and (3) its local counsel, SHH, be appointed Local Counsel.

Dated: January 18, 2012                    Respectfully submitted,

**SUSMAN HEFFNER & HURST, LLP**


By: */s/ Matthew T. Heffner*
Matthew T. Heffner
20 South Clark Street, Suite 600
Chicago, Illinois 60603
Telephone: (312) 346-3466
Fax: (312) 346-2829

**SPECTOR ROSEMAN KODROFF**
      **& WILLIS, P.C.**
Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirarchi
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Tel.: 215.496.0300
Fax: 215.496.6611

Mark S. Willis
1101 Pennsylvania Avenue, NW
Suite 600
Washington, DC 20004
Tel: 202 .756.3600
Fax: 202.756.3602

Counsel for Plaintiff
Jacksonville Police & Fire
Pension Fund