**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

-------------------------------------------------------------------------x

| | | |
|---|---|---|
| **IN RE ABBOTT-DEPAKOTE SHAREHOLDER** | **:** | |
| **DERIVATIVE LITIGATION** | **:** | **CASE NO: 1:11-cv-08114** |
| | **:** | **Hon. Virginia M. Kendall** |

-------------------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

**[REDACTED PURSUANT TO THIS COURT'S ORDER DATED JUNE 7, 2012]**

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ......................................................................1

II.    FACTUAL ALLEGATIONS ........................................................................6

III.   ARGUMENT ................................................................................................8

     A.     The Legal Standards ...........................................................................8

     B.     Demand Is Excused Because A Majority Of The Board Faces A Substantial Likelihood Of Liability For Breaching The Duties Of Loyalty And Good Faith....9

          1.     A Majority of the Director Defendants Served on the Board During The Relevant Period of Wrongdoing ................................................................9

          2.     The Director Defendants Face a Substantial Likelihood of Liability ........14

               a.     Appropriate Monitoring and Reporting Systems Were In Place to Alert the Board to the Unlawful Off-Label Marketing of Depakote ................................................................15

               b.     The Director Defendants Ignored a Plethora of "Red Flags" ........19

                    i.     FDA Warning Letters .......................................................19

                    ii.     The *Qui Tam* and Government's Actions ..........................21

                    iii.     Government Scrutiny of Other Abbott Marketing Practices ..........................................................................22

     C.     The Director Defendants Are Not Protected By An Exculpatory Provision ........ 22

     D.     Demand Is Excused Because The Board Endorsed The Illegal Business Plan, Which Is Not Protected By The Business Judgment Rule (*Ultra Vires*) ..............23

IV. CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d
  244 (Del. 2000) ......................................................................................8, 9, 23, 24

*ATR-Kim ENG Fin. Corp. v. Araneta*,
  2006 WL 3783520 (Del. Ch. Dec. 21, 2006) .........................................................18

*Bronstein v. Austin,*
  2008 WL 4735230 (N.D. Ill. May 30, 2008) ...........................................................3

*Cal. Pub. Employees' Ret. Sys. v. Coulter*,
  CIV.A. 19191, 2002 WL 31888343 (Del. Ch. Dec. 18, 2002) ...............................24

*Conrad v. Blank*,
  940 A.2d 28 (Del. Ch. 2007).................................................................................18

*Desimone v. Barrows*,
  924 A.2d 908 (Del. Ch. 2007).................................................................................24

*Gordon v. Goodyear*,
  2012 WL 2885695 (N.D. Ill. July 13, 2012)..............................................................8

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003).............................................................................4, 24

*Hale v. China Online, Inc.*,
  2009 WL 2601357 (N.D. Ill. Aug. 21, 2009) ............................................................9

*Harris v. Carter*,
  582 A.2d 222 (Del. Ch. 1990)..................................................................................9

*In re Abbott Labs. Deriv. S'holders Litig.*,
  325 F.3d 795 (7th Cir. 2003) ....................................................................... *passim*

*In re Allergan, Inc. S'holder Deriv. Litig.*,
  2011 WL 1429626 (C.D. Cal. April 12, 2011) .......................................................11

*In re Am. Int'l Group, Inc. Consol. Deriv. Litig.*,
  976 A.2d 872 (Del. Ch. 2009)...................................................................................4

*In re Brocade Commc'ns Sys., Inc. Deriv. Litig.*,
  615 F. Supp. 2d 1018 (N.D. Cal. 2009) .................................................................20

*In re Caremark Int'l Inc. Deriv. Litig.*,
  698 A.2d 959 (Del. Ch. 1996)...................................................................................16, 18

*In re Citigroup S'holder Deriv. Litig.*,
  964 A.2d 106 (Del. Ch. 2009).............................................................................................13

*In re Countrywide Fin. Corp. Deriv. Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...........................................................................25

*In re Johnson & Johnson Derivative Litigation*,
  2011 WL 4526040 (D.N.J. Sept. 29, 2011) ......................................................................19

*In re Nuveen Fund Litig.*,
  1996 WL 328001 (N.D. Ill. June 11, 1996) .....................................................................9, 24

*In re Pfizer Inc. S'holder Deriv. Litig.*,
  722 F. Supp. 2d 453 (S.D.N.Y. 2010)............................................................................ *passim*

*In re Veeco Instruments, Inc. Sec. Litig.*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2006)...............................................................................18

*In re Walt Disney Co. Deriv. Litig.*,
  907 A.2d 693 (Del. Ch. 2005)...........................................................................................23

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991)...............................................................................................................1

*King v. Baldino*,
  648 F. Supp. 2d 609 (D. Del. 2009)..................................................................................11

*La. Mun. Police Employees' Ret. Sys. v. Pyott*,
  46 A.3d 313 (Del. Ch. 2012)........................................................................................ *passim*

*Markewich ex rel. Medtronic, Inc. v. Collins*,
  622 F. Supp. 2d 802 (D. Minn. 2009) ...............................................................................19

*McCall v. Scott*,
  239 F.3d 808 (6th Cir. 2001), *amended on denial of rehearing*, 250 F.3d 997 (6th Cir.
  2001) ..................................................................................................................................14

*McCall v. Scott*,
  250 F.3d 997 (6th Cir. 2001) .............................................................................................10

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*,
  854 A.2d 121 (Del. Ch. 2004)............................................................................................24

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) ............................................................................................3, 6, 9

iii

*Ryan v. Gifford,*
    2009 WL 18143 (Del. Ch. Jan. 2, 2009) ................................................................23

*Ryan v. Lyondell Chem. Co.,*
    2008 WL 4174038 (Del. Ch. Aug. 29, 2008) .........................................................15

*Stone v. Ritter,*
    911 A.2d 362 (Del. 2006) .......................................................................................16

*U.S. v. Abbott Laboratories,* Crim No. 1:12CR26 (W.D. Va.) .......................................4

*Wood v. Baum,*
    953 A.2d 136 (Del. 2008) .......................................................................................19

## STATUTES

805 Ill. Comp. Stat. § 5/7.75 ............................................................................................3

21 U.S.C. § 301 ................................................................................................................6

## GLOSSARY OF KEY TERMS AND ABBREVIATIONS

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| "1999 Consent Decree Derivative Litigation" | Derivative lawsuit in 2004 in connection with a Consent Decree of Permanent Injunction with the federal government in 1999 which mandated Abbott pay a $100 million civil fine to the FDA, withdraw 125 types of medical diagnostic test kits from the U.S. market, destroy certain inventory, and make a number of corrective changes in its manufacturing procedures after six years of federal law violations |
| "Abbott" | Abbott Laboratories is headquartered in Abbott Park, Ill and is a nominal defendant |
| "AKS" | The Medicare Anti-Kickback Statute, 42 U.S.C. §1320a—7b which prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program |
| "Complaint" | The Consolidated Verified Amended Shareholder Derivative Complaint filed by Lead Plaintiff Jacksonville Police & Fire Pension Fund and Plaintiffs Louisiana Municipal Police Employees Retirement System and Public School Retirement System of the School District of Kansas City, Missouri on June 1, 2012 |
| "CECO" | Abbott's Chief Ethics and Compliance Officer responsible for the management and operation of the Office of Ethics and Compliance and the development and enhancement of the compliance program |
| "CIA" | Corporate Integrity Agreements entered into by Abbott's Board of Directors in 2003 and 2012 |
| "CMEs" | Continuing Medical Education programs that assist those in the medical field to maintain competence and learn about new and developing areas |

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| "CPGs" | Clinical practice guidelines which are summaries of "expert opinions" that are often used to identify standards of care |
| "DDMAC" | FDA's Division of Drug Marketing, Advertising, and Communications which sent Abbott approximately thirteen Warning Letters regarding improper or unlawful marketing materials that promoted off-label uses of Abbott products, failed to warn of significant health risks of certain drugs, and/or overstated the safety and efficacy of certain medications |
| "Depakote Products" | Includes Depakote, Depakote ER, Depakote DR, Depakote Sprinkles, Depacon and Depakene and are generally included in the group of antiepileptic drugs ("AED") otherwise known as anticonvulsnats |
| "Detailing" | The one-on-one promotion of drugs to physicians by pharmaceutical sales representatives, usually through regular office visits, free gifts, and friendly advice, when drug representatives go directly to physicians' offices to describe the benefits of a specific drug |
| "Director Defendants" | Abbott's Board of Directors including defendants Miles D. White, Robert J. Alpern, M.D., Roxanne S. Austin, W. James Farrell, H. Laurance Fuller, William A. Osborn, Samuel C. Scott, III and Glenn F. Tilton |
| "FCA" | The federal False Claims Act, 31 U.S.C. §3729 *et seq.* which imposes civil liability upon "[a]ny person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the U.S. government |
| "FDA" | U.S. Food and Drug Administration |
| "FDCA" | The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* |

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| ███████ | ████████████████████████████████████████ |
| "IIS" | Investigator-initiated studies which are used by drug companies to encourage physicians and clinical investigators to study their products and publish or present their findings |
| "Individual Defendants" | All of the Director Defendants and certain former officers and directors of Abbott including defendants Duane L. Burnham, Jeffrey Leiden, M.D., Ph.D. and William G. Dempsey |
| "Key opinion leaders" | Physicians who can influence their peers' medical practice and their prescription habits |
| "Lead Plaintiff" | Jacksonville Police & Fire Pension Fund |
| "LTC" | Long Term Care division whose primary purpose was to market Depakote to the rapidly expanding geriatric care market such as long term care facilities, skilled nursing homes, and assisted living institutions |
| "LTCPPs" | Long Term Care Pharmacy Providers |
| "LTC Sales Force" | Sales persons part of the LTC division. In 2004, Abbott merged the LTC Sales Force into its hospital group and renamed the new, combined group as its Special Account Executive Institutional Sales Group |
| "Medical Education Requests" | Abbott's in-house term for a physician request for off-label information for one of Abbott's drugs |
| "NDA" | New Drug Application which is submitted to the FDA for disposition |
| "OBRA-87" | Omnibus Budget Reconciliation Act of 1987, also known as the "Federal Nursing Home Reform Act," provides a minimum set of standards of care and rights for people living in certified nursing facilities |
| "OEC" | Abbott's Office of Ethics and Compliance |

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| "Plaintiffs" | Lead Plaintiff, Louisiana Municipal Police Employees Retirement System and Public School Retirement System of the School District of Kansas City, Missouri |
| "PPD" | The Pharmaceutical Products Division which is responsible for promoting Abbott's drugs in the United States and Puerto Rico. |
| "*Qui Tam* Actions" | Collectively, the amended complaint filed in *United States ex rel. McCoyd v. Abbott Laboratories*, No. 1:07-cv-00081-SGW (W.D. Va.); the complaint filed in *United States ex rel. Dietzler v. Abbott Laboratories,* No. 09 CV 2118 (N.D. Ill.); the second amended complaint filed in *United States ex rel. Spetter v. Abbott Laboratories, Inc.*, No. 1:10-cv-6 (W.D. Va.); and, the amended complaint filed in *United States ex rel. Mulcahy, et al. v. Abbott Laboratories*, No. 1:08-cv-00054 (W.D. Va.) |
| "Ross" | Abbott's Ross Products Division which was involved in a federal criminal probe relating to certain illegal sales practices which Abbott paid $614.5 million to settle in 2003 |
| "Ross Derivative Litigation" | Derivative lawsuit by Abbott shareholders against the Board in June 2003 in connection with the settlement of the federal investigation into Ross' sales practices |
| "Settlement" | Abbott's settlement with the federal, state, and local governments for $1.6 billion including the U.S. government's criminal action in *United States v. Abbott Laboratories*, Criminal No. 1:12CR26 (W.D. Va.) |
| "TAP" | TAP Pharmaceutical Products Inc. which was an Abbott joint venture with Japan's Takeda Pharmaceuticals Company Ltd. and agreed to pay an $875 million fine to the federal government to settle allegations that TAP had implemented a marketing scheme through which TAP paid illegal kickbacks to healthcare professionals in order to increase sales of its prostate cancer drug Lupron |

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| "TAP Derivative Litigation" | Derivative action brought by Abbott shareholders against the Board in October 2001 for failing to take action to prevent improper marketing and pricing practices at TAP |
| "UEGs" | Unrestricted Educational Grants |
| "Warning Letter" | Correspondence from the FDA that notifies a regulated industry about violations that the FDA has documented during its inspections or investigations |

## <u>LIST OF EXHIBITS</u>

| EXHIBIT DESIGNATION | EXHIBIT TITLE |
|---|---|
| Exhibit A | ███████████████████████ |
| Exhibit B | ███████████████████ |
| Exhibit C | 1998 Strategic Marketing Plan entitled "Depakote-New Psychiatry Markets" |
| Exhibit D | 2001 LTC Strategic and Tactical Plan |
| Exhibit E | ████████████████████████ |
| Exhibit F | ██████████████ |
| Exhibit G | ██████████████ |
| Exhibit H | January 22, 2009 Warning Letter to Rick Leber, Regulatory Manager at Abbott |
| Exhibit I | ████████████████ |
| Exhibit J | ████████████████ |
| Exhibit K | June 26, 1998 Warning Letter to defendant Duane L. Burnham |

x

## I.     **PRELIMINARY STATEMENT**

Fiduciaries of an Illinois company are tasked with managing the business and affairs of the corporation.  In undertaking this responsibility, they have an affirmative obligation to act in good faith to advance the best interests of the corporation.  To cause the corporation to engage in unlawful activities, however, is fundamentally disloyal.  Few mechanisms can protect and compensate Abbott Laboratories ("Abbott") "from the misfeasance and malfeasance of 'faithless directors and managers.'"  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949)).  This shareholder derivative action is the only means of remedying the harm to the Company arising out of Abbott's current and former directors' and officers' acts of disloyalty by having implemented, overseen, and sanctioned an illegal off-label marketing scheme for its drug Depakote.  A scheme that, beginning in 1998 and continuing through 2011, allowed the Company to aggressively and illegally promote Depakote for off-label uses not approved by the U.S. Food and Drug Administration ("FDA") in order to drive up Abbott's revenue.  A scheme that led the Company to plead guilty and agree to pay criminal penalties and civil fines of *$1.6 billion* to the federal government and 49 state authorities—*the second largest illegal pharmaceutical marketing accord in United States history*.  A scheme that caused the Company to enter into a Corporate Integrity Agreement ("CIA") that required the implementation of additional, strict compliance measures (the "Settlement").  And, a scheme for which Abbott's faithless fiduciaries should now be held accountable.

For Abbott's Board, marketing Depakote off-label was a deliberate commercial strategy guided by greed, profits, and denial as to consequences.  This pervasive scheme took many forms, such as paying illegal kickbacks to physicians who prescribed Depakote for these off-

label uses in violation of Federal anti-kickback laws; providing illegal rebates to Long Term Care ("LTC") providers and other health care providers; improperly using scientific evidence to support off-label uses; intentionally misrepresenting information concerning Depakote's safety and efficacy; improperly using "in-services" to promote off-label uses of Depakote in nursing homes; improperly using Continuing Medical Education programs ("CMEs") to further promote off-label uses of Depakote; improperly exploiting Omnibus Budget Reconciliation Act of 1987 ("OBRA-87") limits; using misleading clinical studies; bribing "key opinion leaders," who are physicians deemed to have great influence over their peers; falsifying Medical Education Requests for off-label information about Depakote; and improperly using speaker presentations to promote off-label uses of Depakote.  ¶¶ 124-43; 149-72; 186-219.[1]

This gamble paid off for a long time, and the ill-gotten profits realized by the Company provided no incentive for the Board to end it.  Ultimately, after years of deliberately violating federal law, Abbott was forced to pay the piper.  With the help of several whistleblowers, the U.S. Department of Justice ("DOJ") brought both civil and criminal actions against the Company and certain executive officers.  Imposing the second largest penalty ever against a pharmaceutical company, the government lambasted the Company for "not only . . . engag[ing] in off-label promotion, but [for] target[ing] elderly dementia patients and downplay[ing] the risks apparent from its own clinical studies."

Defendants' protestations to the contrary, a majority of the Board is alleged to have clearly known of and approved Abbott's criminal business strategy.[2]  As a consequence of prior

---

[1] In this Memorandum, "¶" refers to the corresponding paragraph in the Complaint.  Capitalized terms have the same meaning as in the Complaint.  Certain defined terms are also listed in the "Glossary of Key Terms and Abbreviations" attached to this Memorandum and in the Complaint.

[2] "Defendants" refers to all defendants collectively.  "Director Defendants" refers to the Board as constituted on the date this action was initiated:  defendants White, Alpern, Austin, Farrell, Fuller, Osborn, Scott, and Tilton.

CIAs and shareholder litigation settlements, the Board received regular compliance reports and protocols mandated strict vigilance. The Board and its committees (such as the Public Policy Committee) were tasked with specific oversight of regulatory compliance through Abbott's formal corporate documents, by-laws, and committee charters. Importantly, these extensive reporting mechanisms are hardly even in dispute, as Defendants concede that "the Complaint is replete with allegations about the numerous controls in place at the company" and that "Abbott's board included multiple committees with responsibilities to oversee particular functions of the company." Defs. Br. at 16. These reporting procedures transmitted to the Board a multitude of "red flags"—Warning Letters from the FDA, the government's crackdown on off-label marketing by other pharmaceutical companies, among others—that should have commanded the Board's attention. ¶¶ 247-322. Yet in the face of all of these mechanisms and "red flags," Defendants chose to disregard the illegal conduct and abrogate their fiduciary responsibilities for the sake of their own selfish interests and short-term profits, certain to be eventually eclipsed by long-term harm.

Under applicable law,[3] no pre-suit demand is required of a derivative plaintiff where "the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband,* 634 A.2d 927, 932 (Del. 1993) ("[A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934). Based on the unique facts alleged in the Complaint—supported by Abbott's *own internal documents* obtained pursuant to 805 Ill. Comp. Stat. § 5/7.75, the Plea Agreement, Settlement Agreement,

---

[3] With respect to demand futility, Illinois law, under which Abbott is incorporated, follows Delaware law. *See In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 803 (7th Cir. 2003) ("*Abbott I*"); *Bronstein v. Austin,* 2008 WL 4735230, at *3 (N.D. Ill. May 30, 2008) (Kendall, J).

Agreed Statement of Facts ("ASF") and exhibits attached thereto in the matter *U.S. v. Abbott Laboratories*, Crim. No. 1:12CR26 (W.D. Va. May 7, 2012), the *Qui Tam* Actions, and documents obtained from the FDA (and the unprecedented harm to the Company and its stockholders resulting from Defendants' actions)—it strains credulity to believe that the Board could dispassionately and disinterestedly consider a pre-suit demand.

Directors who consciously allow illegal conduct to continue despite years of stern government warnings, and despite specific oversight duties imposed upon them, are not deemed to validly exercise business judgment, and cannot impartially consider a shareholder demand for action to correct harms resulting from the Board's own acts and omissions. Indeed, "one cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey." *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003). Accordingly, "it is generally accepted that a derivative suit may be asserted . . . against corporate fiduciaries who knowingly caused the corporation to commit illegal acts and, as a result, caused the corporation to suffer harm." *In re Am. Int'l Group, Inc. Consol. Deriv. Litig.*, 976 A.2d 872, 889 (Del. Ch. 2009); *see also La. Mun. Police Employees' Ret. Sys. v. Pyott,* 46 A.3d 313, 323 (Del. Ch. 2012) ("*Allergan I*"), *interlocutory appeal accepted* (Del. July 12, 2012).

Recognizing the abundance of well-pled allegations in the Complaint, Defendants resort to rewriting the pleading. Even though Plaintiffs allege that the Relevant Period is 1998 through 2011, Defendants unilaterally—and baselessly—declare that any culpable conduct ended in 2006, as that is the period defined in the Settlement between Abbott and the U.S. government. There's no surprise as to why Defendants make this argument. Since a majority of the current directors did not join the Board until after 2006, if they can convince the Court that no culpable conduct occurred after 2006, it would be mathematically impossible for Plaintiffs to establish

that a majority of the Board lacks independence and thus impossible for Plaintiffs to satisfy the demand futility requirements. Defs. Br. at 11, 14-15, 17. Yet Plaintiffs' Complaint cannot be tethered to the period of wrongdoing identified in an entirely separate action for which they had no input. Nor is there any basis to claim that no culpable conduct occurred after 2006, for Plaintiffs plead a wealth of allegations that show breaches of fiduciary duty continued well beyond 2006. Defendants' lack of support on this point is telling.

Beyond the pre-suit demand issue, there is a more fundamental, nullifying defect in Defendants' Motion. On the one hand, Defendants would have this Court believe that all of the unlawful conduct to which Abbott admits in the 24-page ASF occurred without the Board's knowledge. This would defy common sense—given the magnitude and duration of the wrongdoing—even without strong corporate governance and oversight. On the other hand, Defendants acknowledge Abbott's rigorous network of reporting and oversight mechanisms designed to carry precisely this type of information *to the Board*. *How can Defendants concede the existence of that monitoring machinery and simultaneously insist that the illegal conduct—to which Abbott has owned up—never reached the Board?* They can't. It is a tap dance rejected in other cases involving Pfizer and Allergan, and previously Abbott, and it should be rejected here, as well.

Taking the particularized factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor, it is a fair conclusion that a majority of the current Board was aware of Abbott's criminal misconduct and consciously condoned it in violation of its fiduciary duties of loyalty and good faith. These directors thus face a substantial likelihood of liability under the False Claims Act, the Federal anti-kickback statute and for breaches of fiduciary duty. This amply supplies "reasonable doubt" that the Board could independently and disinterestedly

consider a demand to bring these claims. *Rales*, 634 A.2d at 934. Demand is thus futile, and the motion to dismiss should be denied.

## II.     FACTUAL ALLEGATIONS

### Abbott's Extensively Regulated Business

Abbott's core business, the world-wide marketing of prescription drugs, is heavily regulated under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, *et seq.*, and includes oversight by the FDA. ¶ 57. Any marketing or promotion of a drug for "off-label" uses is illegal under the FDCA, and the dissemination of information or materials by a drug manufacturer regarding such off-label uses also violates the FDCA. ¶¶ 60-61. The use of incentives to provide gifts, money, and other motivations to doctors and LTC providers to encourage off-label prescriptions violate the federal anti-kickback statute. ¶¶ 65-67. Additionally, when reimbursements for prescription drugs are improperly obtained under federal health care programs, including Medicare and Medicaid, the Federal False Claims Act is triggered. ¶ 62. Repeated violations place a drug manufacturer at risk of incurring criminal and civil fines, as well as disqualification from federal health care programs. ¶¶ 43, 63-64.

### The Critical Importance of Depakote to Abbott's Bottom Line

Depakote has been one of Abbott's top-selling drugs and has constituted a major source of its revenue. ¶ 78. During the Relevant Period, Depakote was a key driver of Abbott's economic success, generating $13.8 billion in revenue. *Id.* Much of Depakote's success depended on reimbursements paid through federal government health care programs. ¶ 85.

**Defendants Consciously Condoned the Widespread Off-Label Marketing of Depakote**

Throughout the Relevant Period, almost fourteen years, Defendants were legally obligated to be aware of any regulatory violations perpetrated by Abbott. Indeed, numerous "red flags"—FDA Warning Letters, a government subpoena, industry-wide investigations into off-label marketing, multimillion dollar payments to settle past wrongdoing—alerted them to the ongoing and widespread off-labeling practices involving Depakote. ¶¶ 247-322. ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Notwithstanding all the information flowing to the Board, Defendants allowed the illegal conduct to persist.

Despite the marketing limitations imposed by the FDA, beginning in 1998, Abbott, with the Board's knowledge, began to actively promote Depakote to physicians and patients for off-label purposes in violation of federal law. ¶ 2. The *Qui Tam* Actions detail at length how, between 1998 and 2009, "[i]n order to address the stagnation of profits . . . Abbott embarked upon several centrally-organized, illegal marketing schemes to convince physicians to prescribe Depakote for a number of diseases and disorders for which the drug had (and continues to have) no FDA-approved indication." ¶ 6. Specifically, Abbott's strategic marketing plans called for the marketing of Depakote for the control of agitation and aggression in elderly patients with dementia. Implementation of this off-label marketing plan entailed: (1) creating a division whose primary purpose was to market Depakote to patients with dementia and incentivizing its sales force (through bonuses) to provide misleading information to medical professions (¶¶ 100-23); (2) knowingly using misleading clinical studies to support the unapproved off-label uses of

Depakote (¶¶ 124-43); (3) violating FDA regulations by inappropriately funding non-peer reviewed articles appearing in supplements to medical journals (¶¶ 144-48) and speaker presentations (¶¶ 153-54); (4) providing illegal kickbacks to physicians, caregivers, and Long Term Care Pharmacy Providers ("LTCPPs") (¶¶ 193-203); (5) training LTC sales representatives in violation of Company guidelines to state that by using Depakote, nursing homes would avoid the administrative burdens and cost of complying with OBRA-87 regulatory restrictions applicable to ATPs (¶¶ 186-92); and (6) submitting hundreds of thousands of false claims between 1998 and 2009 to federal and state health care programs by systematically and illegally promoting Depakote's off-label uses in long-term care and other health care facilities.  ¶ 89.

**The Settlement with the Government**

On May 7, 2012, Abbott announced that it had pled guilty and agreed to pay $1.6 billion ($800 million to resolve civil claims and $700 million in criminal penalties) to the federal government and 49 state authorities arising from the unlawful promotion of Depakote.  The Settlement also requires the Company to enter into another Corporate Integrity Agreement and thereby implement additional compliance measures.  ¶¶ 330-35.

### III.    ARGUMENT

**A.    The Legal Standards**

Delaware law requires that before a shareholder derivative action is instituted, a demand on the board must be made unless such a demand would be futile.  *See Gordon v. Goodyear*, 2012 WL 2885695, at *6 (N.D. Ill. July 13, 2012).  As the Supreme Court of Delaware articulated in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), demand is excused where:  (1) particularized facts show that "demand would be futile because the majority of the board of directors upon whom demand

would be made are not independent or disinterested," or (2) particularized facts "create a reasonable doubt that the challenged transaction was a product of a valid exercise of the directors' business judgment." *Hale v. China Online, Inc.*, 2009 WL 2601357, at *3 (N.D. Ill. Aug. 21, 2009) (Kendall, J.) (citing *Aronson*, 473 A.2d at 808). "Where a complaint does not address an action taken by the board, however, or alleges that the board failed to act," *id.*, the court applies the analysis articulated in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). In that instance, the inquiry is whether "as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934; *see Hale*, 2009 WL 2601357, at *3.

Under either *Aronson* or *Rales*, the test is whether the allegations, taken together, create a reasonable doubt concerning the disinterestedness and independence of a majority of the board. *See Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990). Moreover, all reasonable inferences must be drawn in Plaintiffs' favor and all well-pled allegations must be taken as true. *See In re Nuveen Fund Litig.*, 1996 WL 328001, at *2 (N.D. Ill. June 11, 1996). At the pleading stage, to sufficiently allege that a director faces a substantial likelihood of liability, "the plaintiff does not have to demonstrate a reasonable probability of success on the claim." *Allergan I*, 46 A.3d at 351. Plaintiffs need only "make a threshold showing, through the allegation of particularized facts, that their claims have *some merit*." *Rales*, 634 A.2d at 934 (emphasis added).

**B.  Demand Is Excused Because A Majority Of The Board Faces A Substantial Likelihood Of Liability For Breaching The Duties Of Loyalty And Good Faith**

### 1. A Majority of the Director Defendants Served on the Board During The Relevant Period of Wrongdoing

Demand is futile here because the vast majority of the Board at the time this suit was initiated—eight of the ten Board members—served during the critical period of wrongdoing.

Indeed, defendants White, Alpern, Austin, Farrell, Fuller, Osborn, Scott, and Tilton were all directors at various points from 1998 until at least the end of 2011 and, as such, face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith. *See Rales*, 634 A.2d at 936.[4]  Plaintiffs have determined the Relevant Period on the basis of Abbott's own internal business records, the complaints filed in the *Qui Tam* Actions, facts in the ASF, and documents obtained from the FDA.  Indeed, the Complaint alleges numerous instances of wrongdoing occurring *after* December 2006 (which implicate the current Board) and *before* 2006 *which do not appear in the ASF*. *See* ¶¶ 149-52, 158-59, 165-66, 193-212.  Thus, try as they might, Defendants cannot frame Plaintiffs' case in the limited terms of the government's case.[5] Defs. Br. at 15.  The Complaint—not the Plea Agreement with the DOJ—defines the Relevant Period.  *See Allergan I*, 46 A.3d at 356.

A wealth of facts in the Complaint show that the wrongdoing did not end in 2006.  For instance, the Board never took any steps to rescind the 1998 Strategic Marketing Plan—the undisputed blueprint for Abbott's scheme to promote Depakote for off-label uses—and instead chose to continually implement it.  ¶¶ 96-99; *see also* Exh. C hereto; 2001 LTC Strategic and Tactical Plan, attached hereto as Exh. D.  The impact of the perpetual implementation of the 1998 Strategic Marketing Plan can be seen well after 2006:  the Board was regularly informed about Abbott's success in selling Depakote, grossing nearly $14 billion in revenues from 1998

---

[4] *See also McCall v. Scott*, 250 F.3d 997, 1001 (6th Cir. 2001) (applying Delaware law, demand excused because directors faced substantial likelihood of liability for failing to intervene in a health care fraud based on the directors' prior experience, the existence of a federal investigation, civil allegations, and newspaper reports); *In re Pfizer Inc. S'holder Deriv. Litig*., 722 F. Supp. 2d 453, 460 (S.D.N.Y. 2010) (holding not only that demand was excused under the second prong of *Aronson*, but that demand was also not required because Pfizer's directors were interested because they faced "a substantial threat of personal liability").

[5] The ASF specifies that Abbott is immune from further prosecution for such wrongdoing through 2012. Why would Abbott seek immunity past 2006 if it had not committed any wrongdoing after that point?

through 2008, and the marketing strategies implemented to maintain its driving growth.[6] ¶¶ 78-84. Thus, the Board was keenly aware of the success of the off-label marketing program of Depakote and had, given the fruits of that illegal campaign, showed no interest in changing it.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[7]

Likewise, the expansion and training of the LTC Sales Force, which executed the marketing plan and promoted off-label uses of Depakote, continued beyond 2006. ¶¶ 100-01. In fact, the LTC Sales Force, specifically tasked with promoting Depakote off-label, swelled from 30 in 1998 to approximately 180 as of June 2007. ¶ 102. Thus, the LTC Sales Force did not reach its maximum number of sales representatives until mid-2007—six months *after* Defendants claim the misconduct ended.

---

[6] Completely ignoring the more recent Delaware Chancery Court *Allergan I* decision, Defendants rely on the Central District of California's opinion in a related case that dismissed claims against Allergan because the volume of off-label sales was not deemed sufficient to put the director defendants on notice that the company was engaging in illegal off-label marketing. *In re Allergan, Inc. S'holder Deriv. Litig.*, 2011 WL 1429626, at *3 (C.D. Cal. April 12, 2011) (*Allergan II*). But critical to the court's ruling in *Allergan II* was the fact that the plaintiffs "rely *solely* on the assertion that the Director Defendants should have inferred the use of illegal marketing *due to the high number of sales*." *Id.* (emphasis added). ████████ ████████████████████████████████████████████████████ Moreover, the Delaware Chancery Court expressly disagreed with the California court, and held that the plaintiffs "have alleged a direct connection between the Board and a business plan premised on illegal activity." *Allergan I*, 46 A.3d at 352. Defendants' reliance on *King v. Baldino*, 648 F. Supp. 2d 609 (D. Del. 2009), is similarly misplaced, as the complaint in that case was merely 21 pages containing block quotes of newspaper articles and boilerplate allegations.

[7] While Abbott's 1998 Strategic Marketing Plan ██████████████████ did not use such blatant terms as "off-label," ██████████████████████████ it was obvious that Abbott's Board was advised of the Company's off-label marketing scheme and that it was working, as demonstrated by Depakote's revenues consistently eclipsing a billion dollars each year through 2008. ¶ 84; *see, e.g.*, *Allergan I*, 46 A.3d at 357 (distinguishing the holding in *Allergan II*, and noting that "a plaintiff does not have to point to actual confessions of illegality by defendant directors"). Here, as in *Allergan I*, since off-label marketing is illegal, and the Board presumably is aware of its illegality, "it would be astounding if . . . any other board presentation actually used that term." *Id.*

Essentially, the Complaint is replete with allegations of illegal conduct which took place after 2006. For instance, there was a nationwide conference call in *February 2007* for the entire LTC Sales Force, Depakote marketing staff, and upper level managers where sales representatives were instructed to coach physicians on how to evade OBRA-87's restriction on "unnecessary drugs," which included Depakote. ¶¶ 116-18. Until at least June 2007, Abbott used the "Working the Wheel" tactic whereby Abbott targeted physicians and institutions that Abbott believed would produce the most off-label prescriptions of Depakote for agitation associated with dementia. ¶ 104. Until *approximately July 2008*, "scholarships" were provided to physicians to attend Abbott-sponsored education programs on epilepsy to reward and incentivize physicians to prescribe Depakote. ¶ 199.

Moreover, the LTC Sales Force was not disbanded until January 1, 2009, thus allowing the off-label promotion of Depakote to continue until that time and beyond. In fact, on January 22, 2009—more than two years after Defendants claim that the wrongdoing ended—the FDA's Division of Drug Marketing, Advertising, and Communications sent Abbott a Warning Letter admonishing that its "Depakote ER/Depakote Continuum Care Pharmacy Formulary Flashcard" was "misleading because it omits risk information for Depakote and Depakote ER, broadens the indication of Depakote ER, omits indication information for Depakote, and omits material information about Depakote ER." ¶ 292; *see also* January 22, 2009 Warning Letter to Rick Leber, Regulatory Manager at Abbott, attached hereto as Exh. H.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████



Defs. Br. at 20, 22.[8]  In reality, this Court would have to go out of its way to reach that conclusion.  In fact, by 2009, Abbott was feeling the noose tighten.

In fact, by no later than 2010, Abbott and the Board would be keenly aware that the federal government was seeking years of deleted emails for defendants White, Leiden, and Dempsey pursuant to a subpoena regarding Abbott's off-label marketing practices.  ¶ 299.

██████████████████████████████████

████████

Ultimately, the allegations in the Complaint make it abundantly clear that the wrongdoing continued well after December 2006. Defendants' invitation to the Court to end the Relevant Period at that time is not only contrary to motion to dismiss principles, but contrary to the evidence cited in the Complaint.

### 2. The Director Defendants Face a Substantial Likelihood of Liability

As made clear in the Complaint, the Director Defendants' conduct here did not simply cause the Company to disregard its own corporate policies, but also to violate various FDCA provisions and other federal law, as evidenced by Abbott's guilty plea. This wrongdoing, despite clear knowledge of its illegality, violated the duties of loyalty and good faith and exposes Defendants to a substantial likelihood of liability. *See Abbott I*, 325 F.3d at 806 (directors face a substantial likelihood of liability for acting in bad faith by failing to take steps to stop violations despite having knowledge of them); *In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 460 (S.D.N.Y. 2010) (directors deemed interested under Delaware law because it could be reasonably inferred that they knew of misconduct, but chose to disregard it, thus creating a substantial likelihood of liability); *McCall v. Scott*, 239 F.3d 808, 823 (6th Cir. 2001), *amended on denial of rehearing*, 250 F.3d 997 (6th Cir. 2001) ("When the particularized allegations are taken together, there are sufficient facts from which one could infer that the Board knew of or recklessly disregarded the allegedly improper policies and practices being systematically followed in Columbia's facilities nationwide. In fact, the *magnitude and duration of the alleged wrongdoing is relevant in determining whether the failure of the directors to act constitutes a lack of good faith*.") (emphasis added). In other words, Defendants' indifference to pervasive

14

illegal conduct constituted an "intentional dereliction of duty" and "a conscious disregard of one's responsibilities," each of which is "properly treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith." *Ryan v. Lyondell Chem. Co.*, 2008 WL 4174038, at \*3 (Del. Ch. Aug. 29, 2008) (internal quotation marks and citation omitted). Because the Complaint adequately alleges that each of the Director Defendants breached his or her fiduciary duties of loyalty and good faith, each of the Director Defendants faces a substantial likelihood of liability rendering demand futile.

Moreover, as the Complaint abundantly details, there was no shortage of warnings and protocols in place that should have alerted—or did, in fact, alert—the Director Defendants to the unlawful conduct, but which went unheeded, thus creating the substantial likelihood that the Director Defendants are liable for breaching their fiduciary duties. *See Abbott I*, 325 F.3d at 809 ("Given the extensive paper trail in *Abbott* concerning the violations and the inferred awareness of the problems, the facts support a reasonable assumption that . . . [the board] took no steps in an effort to prevent or remedy the situation . . . ."); *Pfizer*, 722 F. Supp. 2d at 461 (corporate integrity agreements "obligated Pfizer's chief Compliance Officer to report directly to the board the allegations of misconduct here at issue . . . . There is no reason to believe this reporting requirement was not fully complied with, thus guaranteeing that each member of the board was bombarded with allegations of continuing misconduct . . . .").

### a. Appropriate Monitoring and Reporting Systems Were In Place to Alert the Board to the Unlawful Off-Label Marketing of Depakote

As a direct result of prior shareholder litigation and agreements with the government for prior wrongdoing, Abbott had extensive corporate monitoring and reporting systems in place. ¶¶ 249-82. The Company's Corporate Governance Guidelines (¶ 249), Code of Business Conduct (¶¶ 250-52), Comprehensive Ethics and Compliance Program (¶ 253), and various

Board Committees (including the Nominations and Governance Committee and Public Policy Committee) (¶¶ 254-62) not only set the highest ethics and compliance ideals for the Company, but also ensured that, as a matter of affirmative obligation, key information was conveyed to the Board.[9]  The Complaint pleads in abundant detail the highly developed network of monitoring and reporting mechanisms, which arose out of both the 2003 CIA, as well as modifications to Abbott's Public Policy Committee charter as a result of other shareholder derivative litigation in 2004 and 2005.  ¶¶ 264-83.[10]

For instance, as required under the 2003 CIA, Abbott's Chief Ethics and Compliance Officer ("CECO") regularly reports to the Board and members of senior management regarding compliance issues.  ¶ 253.  Likewise, the 2003 CIA requires the CECO to develop and implement policies and procedures "designed to ensure compliance with the requirements" established by the 2003 CIA and by federal regulations.  ¶¶ 265-66.  Further, the Company must create an internal mechanism for *directly reporting compliance violations to the Board*, which must assume an active role in policing Abbott's compliance with the FDCA and the Anti-Kickback Act.  Also, under the 2003 CIA, the CECO must "make periodic (or at least semi-annual) reports regarding compliance matters *directly to the Board* . . . ."  ¶ 267 (emphasis added).

Importantly, by virtue of the 2003 CIA—in effect since 2003—the OEC must provide an annual memorandum to the Board as an update on compliance issues.  ¶ 269.  ████████████

████████████████████████████████████████████████████████████████

---

[9] Director Defendants readily acknowledge that they were aware of the regulatory compliance matters and prohibitions when they signed Abbott's Forms 10-K.  ¶¶ 285-289.

[10] This is not a case, therefore, premised upon a complete absence of a corporate monitoring and reporting system under *Caremark*, but rather, "having implemented such a system or controls, [the Board] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

The *Pfizer* decision speaks directly to this issue. There, Pfizer agreed in 2009 to pay $2.3 billion in fines and penalties arising from the off-label marketing of various drugs. 722 F. Supp. 2d at 454. This settlement came after prior settlements and corporate integrity agreements with the DOJ in 2002, 2004, and 2007, requiring Pfizer to implement compliance mechanisms that would transmit information about illegal marketing activities directly to the board. *Id.* at 455-56. The court found that a majority of the directors faced a substantial threat of liability based on the "large number of reports made to members of the board from which it may reasonably be inferred that they all knew of Pfizer's continued misconduct and chose to disregard it." *Id.* at 460. The court concluded that "[a]s illustrated by the sheer size of the 2009 fines, the wrongdoing here alleged was not only pervasive throughout Pfizer but also was *committed in the face of the board's repeated promises to closely monitor and prevent such misconduct*, as required by the 2002 and 2004 CIAs," *id.* at 461 (emphasis added), and that "the inference of deliberate disregard by each and every member of the board is entirely reasonable." *Id.* at 462.

Aside from the 2003 CIA, Board oversight over federal regulatory compliance was also strengthened through settlements in prior derivative litigation providing the Board with direct access to information. ¶ 278; *see* ¶ 281 (in Consent Decree Derivative Litigation, amending the Public Policy Committee charter to assist the Board in fulfilling its oversight responsibility with respect to regulatory matters); ¶ 282 (in TAP Derivative Litigation, amending the Public Policy Committee's charter requiring the committee to review Abbott's health care compliance policies

with the Board); *see also Abbott I*, 325 F.3d at 806 (directors had "direct knowledge [of the unlawful conduct] through the Warning Letters and as members of the Audit Committee"); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 277 (S.D.N.Y. 2006) (audit committee "was duty-bound to ensure that Veeco implemented an adequate system of internal controls"; demand deemed futile).

Thus, over the life of the Relevant Period, there is simply no question that monitoring and reporting was not merely a rote, perfunctory exercise for Abbott, but a key issue—one that had been addressed on numerous fronts and with a great deal of attention and specificity. Given the wealth of allegations regarding Abbott's long-standing and lucrative off-label marketing of Depakote, the Director Defendants clearly face liability for breach of the duty of loyalty. *See Allergan I,* 46 A.3d at 354 (given the board's monitoring of the increase in Botox sales, "one can reasonably infer at the pleadings stage" that the Board was aware of off-label marketing).[11] With all the flow of information concerning the marketing of off-label Depakote to the Board, they clearly knew, or should have known, of the illegal conduct.

Yet the Director Defendants argue that the service of various Director Defendants on certain committees whose obligations included conveying information to the Board—such as the Audit Committee and Public Policy Committee—does *not* establish Board knowledge of the illegal marketing of Depakote. Defs. Br. at 21; *see* ¶¶ 352-54. This is simply not the law. *See Veeco Instruments*, 434 F. Supp. 2d at 276-77 (applying Delaware law; "allegations create a reasonable doubt that [directors who also served on audit committee] were capable of making a disinterested decision regarding the prosecution of this litigation." *Id.* at 276); *see also Conrad*

---

[11] *See also ATR-Kim ENG Fin. Corp. v. Araneta*, 2006 WL 3783520, at *19 (Del. Ch. Dec. 21, 2006) ("One of the most important duties of a corporate director is to monitor the potential that others within the organization will violate their duties. Thus, 'a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board considers to be adequate, exists.'" (quoting *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996)).

*v. Blank*, 940 A.2d 28, 40 (Del. Ch. 2007) (demand excused with respect to directors serving on compensation committee since service on committee raised inference of knowledge).

It is untenable for Defendants to argue that the Board was blissfully unaware of any wrongdoing in the face of the previously imposed, well-developed internal reporting mechanisms. Defs. Br. at 21. At this stage, Plaintiffs are at least entitled to the reasonable inference that the internal controls conveyed the illegal conduct to the Board and the Board chose to look the other way so that the Company could profit from the illegal off-label marketing of Depakote. *See Allergan I*, 46 A.3d at 354 ("Although it is not the only possible inference, one can reasonably infer at the pleadings stage that the Board knew" of off-label marketing practices.).[12]

### b. The Director Defendants Ignored a Plethora of "Red Flags"

Abbott's robust reporting systems were, by no means, quiet. Throughout the Relevant Period, a number of "red flags" alerted the Board to the rampant—and ultimately costly—off-label marketing scheme; the Board just wasn't listening.

### i. FDA Warning Letters

As far back as 1997, and as recently as 2009, Abbott received Warning Letters from the FDA regarding off-label marketing. In fact, no less than 13 Warning Letters from the FDA have

---

[12] Nor is Director Defendants' authority at all persuasive. While *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008), holds that membership on an audit committee does not, by itself, give rise to an inference of scienter, the *Wood* court found that there were no particularized allegations of wrongdoing at all; thus it was questionable whether there was any misconduct for the board to learn about in the first place. That is a far cry from the instant action, where the Director Defendants do not dispute that the off-label marketing of Depakote occurred. The same is true of *Markewich ex rel. Medtronic, Inc. v. Collins*, 622 F. Supp. 2d 802, 811 (D. Minn. 2009), where the company expressly denied any wrongdoing. Significantly, while the Director Defendants rely on *In re Johnson & Johnson Derivative Litigation*, 2011 WL 4526040, at *15 (D.N.J. Sept. 29, 2011), for the proposition that knowledge cannot be inferred from committee membership alone, the District of New Jersey recognizes that some circuits – *such as this one* – "have looked solely to committee membership . . . ." *Id.* (citing *Abbott I*, 325 F.3d at 806). Thus, *the Director Defendants' own authority permits this Court to conclude that the Board was aware of the off-label marketing scheme simply on the basis that certain Director Defendants served on the Audit Committee and Public Policy Committee*. ¶¶ 352-54.

addressed improper marketing tactics that promoted off-label uses of Abbott products, including

Depakote. ¶ 290. For example, one such letter, dated June 26, 1998, notified defendant

Burnham—CEO and Chairman of the Board at the time—that the Company's promotional

materials for its Depacon Injection (a Depakote product) were in violation of the FDCA. ¶¶ 290-

91; *see also* Exh. K hereto. Likewise, in a January 22, 2009 Warning Letter addressed to Leber,

the FDA found that Depakote promotional materials were "misleading" and "misbranded" the

drug in violation of the FDCA. ¶¶ 292-93; *see also* Exh. H.[13] Even when Abbott was not

receiving Warning Letters about the off-label marketing of Depakote during the Relevant Period,

it was receiving them about other products. ¶ 295. It simply defies common sense, given the

mandates in place for the flow of information to the Board, to suggest that the Board would have

no reason to know about—or be vigilant about—Abbott's marketing improprieties regarding

Depakote. In the face of more than a dozen Warning Letters about off-label marketing—

*including those involving Depakote*—the Board should have been highly focused on preventing

this obviously widespread misconduct.

The Director Defendants suggest—untenably—that there is no indication that the two

Warning Letters that dealt directly with Depakote were conveyed to the Board. Defs. Br. at 18-

19. Yet this Court would have to go out of its way to conclude that Warning Letters from the

FDA—the agency that regulates the very business in which Abbott is engaged—would not reach

the Board, particularly when such Warning Letters were directed to the *CEO and Chairman of*

---

[13] The Director Defendants also argue that the multitude of Warning Letters regarding Abbott's off-label marketing of other products could have been ignored because they did not speak directly to Depakote. Defs. Br. at 19. Again, the Director Defendants seem to be asking the Court to embrace its own "tunnel vision," a "willful ignorance" of the wrongdoing, despite the numerous channels designed to carry such information to the Board. *See In re Brocade Commc'ns Sys., Inc. Deriv. Litig.*, 615 F. Supp. 2d 1018, 1048 (N.D. Cal. 2009) ("Brocade has adequately alleged multiple instances of willful ignorance on Defendants' part, so the *Caremark* standard is met. Plaintiff adequately pled that Defendants consciously failed to monitor the reporting systems."); *see also Abbott I*, 325 F.3d at 806.

*Abbott's Board* and to the *Regulatory Manager*. ¶¶ 290-292. The Seventh Circuit Court of Appeals addressed this issue in *Abbott I*. There, the Court found that FDA Warning Letters, along with other facts, taken together, "imply knowledge of long-term violations which had not been corrected." 325 F.3d at 806. The Court thus concluded that "[w]here there is a corporate governance structure in place, we must then assume the corporate governance procedures were followed and that the board knew of the problems and decided no action was required." *Id.; see also Pfizer*, 722 F. Supp. 2d at 457 (Given Pfizer's history of illegal marketing activities—even after receiving an FDA warning letter—the court observed that the complaint "alleges a rather blatant pattern of misconduct by Pfizer, *undertaken with the knowledge, approval, or, at the very least, conscious disregard, of Pfizer's board* and senior management." (emphasis added)).

### ii. The *Qui Tam* and Government's Actions

The allegations that appear in the *Qui Tam* Actions, as well as the ASF, overwhelmingly suggest that the Board must have been aware of the wrongdoing, particularly in light of its magnitude and duration. As the Complaint sets forth, the *Qui Tam* Actions implicate the highest levels of Company management, as the off-label marketing scheme involved an entire sales force, the use of third-party intermediaries to funnel kickbacks to physicians, and substantial funds for speaker programs and presentations in promotion of Depakote for off-label uses. ¶¶ 297-98. Tellingly, Abbott only agreed to the $1.6 billion Settlement after turning over, pursuant to subpoena, years of deleted emails of defendants White, Leiden, and Dempsey. ¶ 299. The court ordered those defendants to produce the emails because the government "ha[d] evidence that the off-label marketing of other FDA approved drugs may have followed a similar pattern to the off-label marketing of Depakote." *Id.*[14]

---

[14] The Director Defendants weakly assert that the *Qui Tam* Actions could not have been a red flag because Abbott was unaware of them until they were unsealed in February 2011. Defs. Br. at 18. This

### iii.     Government Scrutiny of Other Abbott Marketing Practices

The fact that Abbott had, on sundry prior occasions, attracted the U.S. government's attention for other marketing transgressions should have served as a warning to the Board that regulatory compliance must be at its highest. The Complaint is not short on details regarding previous government scrutiny. For instance, in 2001, TAP Pharmaceuticals, an Abbott joint venture with Takeda Pharmaceuticals, paid $875 million in penalties and pled guilty to criminal charges stemming from the marketing of Lupron. ¶ 303. In 2003, Ross Products, a division of Abbott, paid a settlement of $622 million in connection with a kickback scheme; as part of the settlement, Abbott entered into the 2003 CIA requiring it to *reform its sales and marketing practices*. ¶¶ 304-08. Thus, not only did these prior government investigations serve as clear red flags of potentially rampant marketing shenanigans elsewhere in the Company, which should have heightened the Board's awareness of a systemic problem, but the CIA specifically bound Abbott's Board to address these issues. The raft of indications went unheeded.[15]

### C.     The Director Defendants Are Not Protected By An Exculpatory Provision

Nor would the exculpatory provision in Abbott's Restated Articles of Incorporation preclude liability against the Director Defendants. A corporation cannot eliminate such liability for "breaches of the duty of loyalty and acts or omissions not in good faith or which involve

---

argument is unsustainable. Plaintiffs show that the subpoena served on defendants White, Leiden, and Dempsey in one of the *qui tam* actions was served *some time prior to the Court's March 2010 order* requiring production. *See* ¶ 299.

[15] Nor did the wave of sanctions imposed on other pharmaceutical companies for unlawful marketing practices cause the Board to raise its vigilance about regulatory compliance: (i) in 2004, Pfizer pled guilty and paid $430 million in penalties for the illegal promotion Neurontin (¶ 310); (ii) in 2005, Serono Labs paid $700 million in penalties for the unlawful marketing of Serostim (¶ 312); (iii) also in 2005, Eli Lilly paid a $36 million fine for falsely marketing Evista (¶ 312); (iv) in 2007, Purdue Pharma paid $634 million in fines for falsely marketing OxyContin. ¶ 313. The Director Defendants thus could not reasonably have been unaware of government scrutiny of the pharmaceutical industry's marketing practices, and their failure to take appropriate action to prevent the conduct that cost the Company $1.6 billion is nothing less than a breach of their fiduciary duties.

intentional misconduct." *Ryan v. Gifford*, 2009 WL 18143, at *7 n.27 (Del. Ch. Jan. 2, 2009).[16]

Here, contrary to the Director Defendants' assertion (Defs. Br. at 15), Plaintiffs have plainly

alleged that, during the entire Relevant Period, the Director Defendants refused to address

repeated warnings about the Company's off-label marketing of Depakote, which resulted in $1.6

billion in government fines. Such misconduct clearly constitutes a breach of the fiduciary duty

of loyalty and an abrogation of good faith, as opposed to merely a breach of the duty of care.

The Director Defendants will thus find in Abbott's exculpatory provision no shield against the

substantial threat of liability.

### D.    Demand Is Excused Because The Board Endorsed The Illegal Business Plan, Which Is Not Protected by the Business Judgment Rule (*Ultra Vires*)

Under the second prong of *Aronson*, demand is excused if a complaint's allegations

demonstrate that the protection provided by the business judgment rule is inapplicable to the

board majority approving the transaction or decision at issue. 473 A.2d at 815. Defendants,

mischaracterizing the Complaint, contend that the Board's approval of the 1998 Strategic

Marketing Plan for Depakote is the only affirmative board decision alleged. Defs. Br. at 23.

However, the gravamen of the Complaint is that the Board, having received a steady flow of

information, never acted to rescind the 1998 Strategic Marketing Plan, instead choosing to

continually endorse it and allowing the misconduct to continue for over a decade. *See, e.g.*,

*Abbott I*, 325 F.3d at 809 (finding directors' "conscious inaction" rendered demand futile). The

law is clear that an informed judgment to consciously allow and not intervene in ongoing

violation of the law cannot be characterized as a valid exercise of business judgment. *Desimone*

---

[16] Exculpatory provisions in articles of incorporation are intended to apply to instances "'when, despite the directors' good intentions, [the challenged transaction] did not generate financial success and . . . the possibility of hindsight bias about the directors' prior ability to foresee that their business plans would not pan out' could improperly influence a *post hoc* judicial evaluation of the directors' actions." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 752 (Del. Ch. 2005) (quoting *Prod. Res. Group, LLC v. NCT Group, Inc.*, 863 A.2d 772, 777 (Del. Ch. 2004)).

*v. Barrows*, 924 A.2d 908, 934-35 (Del. Ch. 2007), ("[I]t is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully," and "the knowing use of illegal means to pursue profit for the corporation is director misconduct.").[17] Thus, the Board's conduct outside the scope of its authority is not protected by the business judgment rule. *Cal. Pub. Employees' Ret. Sys. v. Coulter*, CIV.A. 19191, 2002 WL 31888343, at *11 (Del. Ch. Dec. 18, 2002); *see also Aronson*, 473 A.2d at 815 (business judgment rule does not protect actions of directors that are beyond their lawful powers); *In re Nuveen Fund Litig.*, 1996 WL 328001, at *5 (N.D. Ill. June 11, 1996) ("Transactions beyond the powers explicitly conferred by the articles of incorporation do not constitute an exercise of valid business judgment.").

Finally, in *Pfizer* and *Allergan I*, where both companies engaged in off-label marketing of prescription drugs achieved through the same deceitful tactics which were also used by Abbott, both courts ruled that "the inference of deliberate disregard by each and every member of the board is entirely reasonable." *Pfizer*, 453 F. Supp. 2d at 462; *see also Allergan I*, 46 A.3d at 356 ("a reasonable inference can be drawn . . . that the Board knowingly approved and subsequently oversaw a business plan that required illegal off-label marketing and support initiatives for Botox"). The Director Defendants, by their conduct, each bear responsibility for the illegal off-label marketing scheme, which cannot constitute a valid exercise of business judgment, thus excusing demand. *See Pfizer*, 722 F. Supp. 2d at 463.[18]

---

[17] The Director Defendants "cannot act loyally as [] corporate director[s] by causing the corporation to violate the positive laws it is obliged to obey." *Guttman v. Huang*, 823 A.2d 492, W506 n.34 (Del. Ch. 2003). Such conduct runs afoul of the principle under Delaware law that "a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004).

[18] *See also Abbott I*, 325 F.3d at 809 ("We find that six years of noncompliance, inspections, 483s, Warning Letters, and notice in the press, all of which then resulted in the largest civil fine ever imposed

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny in its

entirety Defendants' motion to dismiss the Complaint.

Dated:  August 30, 2012
 

**SUSMAN HEFFNER & HURST LLP**


By: /s/ Matthew T. Heffner
Matthew T. Heffner
30 N. LaSalle Street, 12th Floor
Chicago, IL 60602
Tel.:  312.346.3466
Fax:  312.346.2829

*Local Counsel*

**SPECTOR ROSEMAN KODROFF
    & WILLIS, P.C.**
Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirarchi
*rroseman@srkw-law.com*
*aabramowitz@srkw-law.com*
*dmirarchi@srkw-law.com*
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Tel.:  215.496.0300
Fax:  215.496.6611

Mark S. Willis
*mwillis@srkw-law.com*
1101 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004
Tel.:  202.756.3600
Fax:  202.756.3602

---

by the FDA and the destruction and suspension of products which accounted for approximately $250 million in corporate assets, indicate that the directors' decision to not act was not made in good faith and was contrary to the best interests of the company."); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1081-82 & n.42 (C.D. Cal. 2008) (finding demand was excused where the matters at issue "implicate a fundamental part of the part of the Company's business," and were "at the very core of [the company's] business model," and where the complaint contained allegations reflecting "a widespread Company culture that encouraged employees" to perpetuate the problem).

*Counsel for Lead Plaintiff,*
*Jacksonville Police & Fire Pension Fund*

Of counsel

KAHN SWICK & FOTI, LLC
Albert M. Myers
Melinda A. Nicholson
*Albert.myers@ksfcounsel.com*
*Melinda.nicholson@ksfcounsel.com*
206 Covington Street
Madisonville, LA
Tel.:  504.455.1400
Fax:  504.455.1498

*Counsel for Louisiana Municipal Police*
*Employees Retirement System*

LABATON SUCHAROW LLP
Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
*ckeller@labaton.com*
*ebelfi@labaton.com*
*mstocker@labaton.com*
140 Broadway
New York, NY 10005
Tel: 212.907.0700
Fax: 212.818.0477

Christine S. Azar
Charles B. Vincent
Peter C. Wood, Jr.
*cazar@labaton.com*
*cvincent@labaton.com*
*pwood@labaton.com*
300 Delaware Avenue, Suite 1225
Wilmington, DE  19801
Tel: 302.573.2530
Fax: 302.573.2529

*Counsel for Public School Retirement System*
*Of the School District of Kansas*
*City, Missouri*

26