**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

-----------------------------------------------------------------------------x

| | | |
|---|---|---|
| **IN RE ABBOTT-DEPAKOTE SHAREHOLDER** | : | **FILED UNDER SEAL** |
| **DERIVATIVE LITIGATION** | : | **PURSUANT TO ORDER** |
| | : | **DATED JUNE 7, 2012** |
| | : | **[DE 183]** |
| | : | **CASE NO: 1:11-cv-08114** |
| | : | **Hon. Virginia M. Kendall** |

-----------------------------------------------------------------------------x

**SECOND CONSOLIDATED VERIFIED AMENDED**
**SHAREHOLDER DERIVATIVE COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION AND OVERVIEW OF THE ACTION ........................................................2

JURISDICTION AND VENUE .................................................................................13

THE PARTIES ...................................................................................................13

    A.    Lead Plaintiff .......................................................................................13

    B.    Additional Plaintiffs ............................................................................13

    C.    Defendants ..........................................................................................14

        1.    The Current Board of Directors ...............................................14

        2.    Former Directors and Officers .................................................18

        3.    Persons Not Named as Defendants ..........................................19

THE FIDUCIARY DUTIES OF ABBOTT'S BOARD OF DIRECTORS...........................19

FACTUAL BACKGROUND AND THE UNLAWFUL CONDUCT .......................................23

    A.    Abbott's History of Illegal Marketing and Sales Practices Resulting in Criminal Guilty Pleas, Fines and Settlements with Its Shareholders...................23

        1.    TAP Pharmaceuticals and Ross Products Settle with the U.S. Government in connection with illegal marketing schemes ....................25

        2.    Abbott Shareholders file Derivative Lawsuits based on the TAP Pharmaceuticals and Ross Products settlements.......................................26

        3.    The 1999 Consent Decree Derivative Litigation ......................................26

    B.    The Regulation of Abbott's Business .................................................. 27

        1.    New Pharmaceutical Drugs are Prohibited From Being Marketed or Sold In the U.S. Without FDA Approval...................................................28

        2.    A Company's Off-Label Marketing of an FDA Approved Drug Violates the Federal False Claims Act and States' False Claims Acts ...........30

        3.    Abbott's Marketing of Depakote is Also Subject to the Federal Anti-Kickback Statute .....................................................................................31

    C.    The FDA's Approval of Depakote........................................................31

i

D.     Abbott's Illegal Off-Label Marketing Scheme for Depakote .........................38

    1.     Overview of the Illegal Scheme .........................................................38

    2.     Abbott's Strategic Plan to Illegally Market Depakote Off-Label ........42

    3.     The Off-Label Promotion of Depakote For The Control Of
         Agitation And Aggression In Elderly Dementia Patients ...................44

         a.     Abbott Creates the Long Term Care Sales Force
               Designed to Target Geriatric Care Providers to Laud
               Off-Label Uses of Depakote ......................................................44

         b.     Abbott's Improper Use of Misleading Clinical Studies to
               Support Unapproved Off-Label Uses of Depakote for the
               Control of Agitation and Aggression in Elderly
               Dementia Patients .....................................................................54

         c.     Abbott Improperly Promoted Off-Label Uses of
               Depakote With Journal "Supplements" and Reprints of
               Medical Journal Articles ...........................................................61

         d.     Abbott Bribed "Key Opinion Leaders" to Increase Sales
               of Depakote for Off-Label Uses.................................................63

         e.     Abbott Improperly Used Speaker Presentations to
               Promote Off-Label Uses of Depakote.......................................65

         f.     Abbott Improperly Used CMEs to Further Promote
               Depakote Off-Label...................................................................66

         g.     Abbott's Use of Rebates with LTC Pharmacy Providers .........69

         h.     Abbott Falsified Medical Education Requests for Off-
               Label Information About Depakote Products to Increase
               Sales for Such Off-Label Uses..................................................69

         i.     Abbott Improperly Generated Scientific "Evidence" to
               Support Off-Label Uses of Depakote........................................70

         j.     Abbott Uses In-Services to Promote Off-Label Uses of
               Depakote at Nursing Homes .....................................................71

k.      Abbott's Improper Detailing of Depakote Products to Health Care Professionals and Improper Targeting of Their Pharmacy and Therapeutics Committee ...........................72

l.      Abbott Funded the Development and Use of Clinical Practice Guidelines to Tout Off-Label Uses of Depakote and to Mislead Health Care Professional ...................................74

m.      Abbott Exploits OBRA-87 Limits to Promote its Depakote Products .....................................................................76

n.      Abbott's Illegal Kickbacks to Physicians to Increase Sales of Depakote for Off-Label Uses ......................................79

o.      Abbott Misrepresented Information Concerning Depakote's Safety and Efficacy to Boost Sales .......................83

4.      The Off-Label Promotion of Depakote for Schizophrenia ...................85

a.      Abbott's Improper Use of Misleading Clinical Studies to Support Off-Label Uses of Depakote for Schizophrenia ..........85

b.      Abbott's Illegal Off-Label Marketing of Depakote for Schizophrenia ...........................................................................88

5.      Abbott's Improper Marketing of Depakote Off-Label For Comorbidities ........................................................................................91

6.      The Company's Compensation Practices Incentivized Off-Label Marketing of Depakote Products at All Levels ..........................93

THE WRONGFUL CONDUCT AND THE CURRENT BOARD'S KNOWLEDGE THEREOF ...............................................................................................................96

A.      The Wrongful Conduct Which Occurred on the Current Board's Watch .......96

B.      The Current Board Was Aware of or Should Have Been Aware of the Wrongful Conduct Which Occurred on its Watch ...............................................102

1.      ████████████████████████████████████ ████████████████████████████████ ███████████████████████████ ...............................103

2.      The Target Letter From the U.S. Government ........................................105

3.      The Subpoenas from the U.S. Government ......................................108

4.      The FDA 2009 Warning Letter........................................................ 110

5.      The OEC Presentations ...................................................................112

6.      The Board was Informed or Should Have Been Informed of the Illegal, Off-Label Marketing of Depakote Through Abbott's Corporate Governance Structures ................................................... 117

        a.      Abbott's Corporate Governance Guidelines ...............................117

        b.      Abbott's Code of Business Conduct ...........................................117

        c.      The Board's Committees – Generally .........................................120

        d.      The Public Policy Committee ................................................. 122

7.      The Mandates of the 2003 Corporate Integrity Agreement............. 123

8.      At All Times, the Individual Defendants Knew that Off-Label Marketing of Prescription Drugs was Illegal and Would Result in Harm to the Company...................................................................128

9.      The Individual Defendants Were Put On Notice of the Use of Illegal, Off-Label Marketing of Depakote as a Result of Prior Government Investigations and Warnings Concerning Abbott's Other Marketing Practices and Therefore Should Have Been Vigilant When Provided Information from the PPD Concerning the Marketing and Promotion of Abbott's Drugs, Including Depakote ........................................................................................ 131

THE U.S. GOVERNMENT'S INVESTIGATION AND SETTLEMENT WITH ABBOTT FOR $1.6 BILLION .............................................................. 135

ADDITIONAL ILLEGAL MARKETING ACTIVITIES MAY PUT ABBOTT AT RISK OF EXCLUSION FROM FEDERAL PROGRAMS .............................. 142

DEMAND ON THE BOARD WOULD BE FUTILE................................................143

DAMAGES SUSTAINED BY THE COMPANY ............................................151

COUNT I DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTIES AGAINST THE INDIVIDUAL DEFENDANTS ....................................................151

COUNT II DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS ...................154

COUNT III DERIVATIVE CLAIM FOR MISMANAGEMENT AGAINST THE DIRECTOR DEFENDANTS ...................................................................................................155

COUNT IV DERIVATIVE CLAIM FOR GROSS MISMANAGEMENT AGAINST THE DIRECTOR DEFENDANTS ....................................................................................... 156

COUNT V DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO OVERSEE THE COMPANY AND MAINTAIN INTERNAL CONTROLS AGAINST THE DIRECTOR DEFENDANTS ......................................................156

COUNT VI DERIVATIVE CLAIM FOR UNJUST ENRICHMENT AGAINST DEFENDANTS WHITE, LEIDEN, AND DEMPSEY.................................................................158

PRAYER FOR RELIEF ...............................................................................................................158

DEMAND FOR JURY TRIAL ................................................................................................. 159

## GLOSSARY OF KEY TERMS AND ABBREVIATIONS

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| "010 Communication Plan" | Abbott's strategies for disseminating the favorable results of the M99-101 Study to health care providers |
| "1999 Consent Decree Derivative Litigation" | Derivative lawsuit in 2004 in connection with a Consent Decree of Permanent Injunction with the U.S. Government in 1999, which mandated Abbott pay a $100 million civil fine to the FDA, withdraw 125 types of medical diagnostic test kits from the U.S. market, destroy certain inventory, and make a number of corrective changes in its manufacturing procedures after six years of federal law violations |
| "2005 Tariot Study" | A study published by Dr. Pierre Tariot which found that Depakote Products showed "no benefit" for the treatment of agitation in dementia |
| "Abbott" | Abbott Laboratories is headquartered in Abbott Park, Ill. and is a nominal defendant |
| "ABcomm, Inc." | Third-party organization that Abbott contracted with to set up CME programs using clinical experts well recognized in their field |
| "ACCME" | Accreditation Council for Continuing Medical Education is the main accreditation board for CMEs |
| "ADCS Study" | A peer review study conducted by the Alzheimer's disease Cooperative Study from September 2000 to December 2002, which concluded that Depakote "did not show benefit over placebo in the treatment of agitation associated with possible or probable [Alzheimer's disease] in the nursing home residents included in this trial" |
| "AKS" | The Medicare Anti-Kickback Statute, 42 U.S.C. §1320a-7b, which prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program |
| "CECO" | Abbott's Chief Ethics and Compliance Officer responsible for the management and operation |

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| | of the Office of Ethics and Compliance and the development and enhancement of the compliance program |
| "CIA" | Corporate Integrity Agreements entered into by Abbott's Board of Directors in 2001, 2003 and 2010 |
| "CMEs" | Continuing Medical Education programs that assist those in the medical field to maintain competence and learn about new and developing areas |
| "CPGs" | Clinical Practice Guidelines, which are summaries of "expert opinions" that are often used to identify standards of care |
| "Current Board" (see also "Director Defendants") | Abbott's Board of Directors as of the filing of the first shareholder derivative complaint filed in this action on November 14, 2011 |
| "DDMAC" | FDA's Division of Drug Marketing, Advertising, and Communications, which sent Abbott approximately thirteen Warning Letters regarding improper or unlawful marketing materials that promoted off-label uses of Abbott products, failed to warn of significant health risks of certain drugs, and/or overstated the safety and efficacy of certain medications |
| "Depakote Products" | Includes Depakote, Depakote ER, Depakote DR, Depakote Sprinkles, Depacon, and Depakene and are generally included in the group of antiepileptic drugs ("AED") otherwise known as anticonvulsants |
| "Detailing" | The one-on-one promotion of drugs to physicians by pharmaceutical sales representatives, usually through regular office visits, free gifts, and friendly advice, when drug representatives go directly to physicians' offices to describe the benefits of a specific drug |
| "Director Defendants" (see also "Current Board") | Abbott's Board of Directors, including defendants Miles D. White, Robert J. Alpern, M.D., Roxanne S. Austin, W. James Farrell, H. Laurance Fuller, William A. Osborn, Samuel C. Scott, III and Glenn F. Tilton |
| "Drug label" | Includes all marketing and promotional materials relating to a specific drug |
| "FCA" | The federal False Claims Act, 31 U.S.C. §3729 |

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| | *et seq.* which imposes civil liability upon "[a]ny person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the U.S. government |
| "FDA" | U.S. Food and Drug Administration |
| "FDCA" | The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* |
| "Formularies" | Lists of preferred drugs maintained by health care organizations that can be prescribed by health care professionals in that organization or which are eligible for reimbursement by that organization |
| ███████ | ████████████████████████ ███████████████████████ █████ ████ ████ █████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ██████████ |
| "IIS" | Investigator-initiated studies, which are used by drug companies to encourage physicians and clinical investigators to study their products and publish or present their findings |
| "Individual Defendants" | All of the Director Defendants and certain former officers and directors of Abbott including defendants Duane L. Burnham, Jeffrey Leiden, M.D., Ph.D. and William G. Dempsey |
| "Key opinion leaders" | Physicians who can influence their peers' medical practice and their prescription habits |
| "Lead Plaintiff" | Jacksonville Police & Fire Pension Fund |
| "LTC" | Long Term Care division, whose primary purpose was to market Depakote to the rapidly expanding geriatric care market such as long term care facilities, skilled nursing homes, and assisted living institutions |
| "LTCPPs" | Long Term Care Pharmacy Providers |
| "LTC Sales Force" | Sales persons part of the LTC division |
| "M02-547 Study" | A study commenced by Abbott in March 2003 for Depakote ER combined with certain ATPs to treat acute schizophrenia, the results of which did not show a |

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| | statistically significant treatment difference between Depakote ER combination therapy and the ATPs alone |
| "M96-491 Study" | A double-blind multicenter trial of Valproate in elderly patients with dementia conducted by Abbott, which was prematurely terminated due to serious side effects caused by Depakote and which led to a change to Depakote's approved labeling to include a warning about somnolence |
| "M97-738" | A placebo-controlled, randomized study titled, "A Double-Blind Placebo-Controlled Study of Depakote in the Treatment of Signs and Symptoms of Mania in Elderly Patients with Dementia" submitted to the FDA on November 18, 1997 |
| "M98-817 Study" | A 2001 IIS authored by Dr. Anton Porsteinsson, but partially funded by Abbott |
| "M99-010 Study" | A study Abbott submitted an application to FDA to conduct in 1999 for the use of Depakote in combination with certain atypical antipsychotics to treat acute schizophrenia, the results of which were considered negative by the FDA because it failed to meet the predefined efficacy endpoint |
| "M99-082" | A clinical trial started by Abbott in 2000, but never completed because, among other reasons, definitive conclusions from the data were not possible |
| "Medical Education Requests" | Abbott's in-house term for a physician request for off-label information for one of Abbott's drugs |
| "Neuroscience Division" | A separate division of the PPD that markets Depakote throughout the United States and Puerto Rico |
| "NDA" | New Drug Application which is submitted to the FDA for disposition |
| "Non-Defendant Directors" | Certain former directors of Abbott that are relevant, but not named as defendants, including Edward M. Liddy and Phebe N. Novakovic |
| "NSR" | Neuroscience Sales Representatives who form part of the sales component of the Neuroscience Division |

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| "OBRA-87" | Omnibus Budget Reconciliation Act of 1987, also known as the "Federal Nursing Home Reform Act," provides a minimum set of standards of care and rights for people living in certified nursing facilities |
| "OEC" | Abbott's Office of Ethics and Compliance |
| "P&T Committee" | Pharmacy and Therapeutics Committee of organizations such as hospitals, institutional pharmacies, state Medicaid agencies, and managed health care organizations, that decides which drugs should be included in a formulary |
| PharmaCare Strategies, Inc. | Third-party consultant paid by Abbott to conduct off-site training sessions for the LTC Sales Force to maximize off-label sales of Depakote |
| "Plaintiffs" | Louisiana Municipal Police Employees Retirement System and Public School Retirement System of the School District of Kansas City, Missouri |
| "PPD" | The Pharmaceutical Products Division, which is responsible for promoting Abbott drugs in the United States and Puerto Rico |
| "Psychiatry Consultant Meetings" | Organized and funded by Abbott beginning in 2003, these were used to provide information about the results of the M99-010 Study to health care providers |
| "*Qui Tam* Actions" | Collectively, the amended complaint filed in *United States ex rel. McCoyd v. Abbott Laboratories*, No. 1:07-cv-00081-SGW (W.D. Va.); the complaint filed in *United States ex rel. Dietzler v. Abbott Laboratories,* No. 09 CV 2118 (N.D. Ill.); the second amended complaint filed in *United States ex rel. Spetter v. Abbott Laboratories, Inc.*, No. 1:10-cv-6 (W.D. Va.); the amended complaint filed in *United States ex rel. Mulcahy, et al. v. Abbott Laboratories*, No. 1:08-cv-00054 (W.D. Va.) |
| "Relevant Period" | Period of wrongdoing beginning in 1998 through the filing of the first-filed complaint in this action on November 14, 2011 |
| "Rochester Study" | A 56-patient study funded by the Alzheimer Association, the National Institute on Aging, and an unrestricted, investigator-initiated grant from Abbott |

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| "Ross" | Abbott's Ross Products Division, which was involved in a federal criminal probe relating to certain illegal sales practices that Abbott paid $614.5 million to settle in 2003 |
| "Ross Derivative Litigation" | Derivative lawsuit by Abbott shareholders against the Board in June 2003 in connection with the settlement of the federal investigation into Ross' sales practices |
| "Target Letter" | Letter alerting Abbott that the U.S. Government was conducting an investigation into the marketing practices of Depakote |
| "SAE" | Strategic Account Executives (previously Long Term Care Representatives) who are directly assigned to institutional health care providers including long term care facilities, nursing homes, state-run group homes and pharmacy buying groups |
| "Schizophrenia Strategic Plan" | Abbott marketing plan implemented in 2003, which called for the positioning of Depakote as the "ideal 1st line agent for adjunctive therapy for schizophrenia based upon proven clinical efficacy" by generating materials and funding programs that communicated the results of the M99-010 Study to doctors, training Abbott's Sales Force about the dissemination of CME materials with respect to the M99-010 Study, and developing a speakers bureau to deliver Abbott's message about the efficacy of the adjunctive use of the Depakote |
| "Settlement" | Abbott's settlement with the federal, state, and local governments for $1.6 billion including the U.S. government's criminal and civil actions in *United States v. Abbott Laboratories*, Criminal No. 1:12CR26 (W.D. Va.) and the Qui Tam Actions |
| "Special Account Executive Institutional Sales Group" | Created from 2004 merger between Abbott's LTC division and hospital division to disguise its off-label promotion of Depakote Products from regulatory bodies |
| "SPIFFs" | Special Performance Incentives for Field Forces, which provide money, trips, and other prizes for achievement of specifically defined goals, including goals related to government sales |

xi

| TERM/ABBREVIATION | DEFINITION |
|---|---|
| "TAP" | TAP Pharmaceutical Products Inc., which was an Abbott joint venture with Japan's Takeda Pharmaceuticals Company Ltd, which agreed to pay an $875 million fine to the U.S. Government to settle allegations that TAP had implemented a marketing scheme through which TAP paid illegal kickbacks to health care professionals in order to increase sales of its prostate cancer drug Lupron |
| "TAP Derivative Litigation" | Derivative action brought by Abbott shareholders against the Board in October 2001 for failing to take action to prevent improper marketing and pricing practices at TAP |
| "UEGs" | Unrestricted Educational Grants |
| "Warning Letter" | Correspondence from the FDA that notifies a regulated business about violations that the FDA has documented during its inspections or investigations |

Lead Plaintiff Jacksonville Police & Fire Pension Fund ("Lead Plaintiff" or "Jacksonville Police & Fire"), by its undersigned attorneys, and plaintiffs Louisiana Municipal Police Employees Retirement System ("LMPERS") and Public School Retirement System of the School District of Kansas City, Missouri ("KCPSRS" and collectively, "Plaintiffs"), submit this Second Consolidated Verified Amended Shareholder Derivative Complaint ("Second Amended Complaint" or "SAC") on behalf of Abbott Laboratories ("Abbott" or the "Company"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, including the investigation of counsel which involved, among other things, review of: business records obtained from Abbott pursuant to 805 Ill. Comp. Stat. § 5/17.75; the amended complaint filed in *United States ex rel. McCoyd v. Abbott Laboratories*, No. 1:07-cv-00081-SGW (W.D. Va.); the complaint filed in *United States ex rel. Dietzler v. Abbott Laboratories,* No. 09-cv-02118 (N.D. Ill.); the second amended complaint filed in *United States ex rel. Spetter v. Abbott Laboratories, Inc.*, No. 1:10-cv-00006 (W.D. Va.); the amended complaint filed in *United States ex rel. Mulcahy, et al. v. Abbott Laboratories*, No. 1:08-cv-00054 (W.D. Va.) (the *McCoyd*, *Dietzler*, *Spetter*, and *Mulcahy* actions being referred to collectively as the "*Qui Tam* Actions"); the Settlement Agreement with the U.S. Government concerning the *Qui Tam* Actions ("Civil Settlement Agreement"); the Plea Agreement, the Agreed Statement of Facts and exhibits thereto in the criminal matter of *United States v. Abbott Laboratories*, Cr. No. 1:12-cr-00026 (W.D. Va., May 7, 2012); Abbott's Securities and Exchange Commission ("SEC") filings; documents produced by the United States Food and Drug Administration ("FDA") pursuant to Lead Plaintiff's request under the Freedom of Information Act, 5 U.S.C. § 55 *et seq.*; and news reports, press releases, analysts' reports, investor conference calls, medical journals, and other publicly available documents regarding

1

Abbott.

## **INTRODUCTION AND OVERVIEW OF THE ACTION**

2.      This is a stockholder's derivative action brought by Plaintiffs on behalf of and for

the benefit of Abbott against Abbott's Board of Directors (the "Current Board" or "Director

Defendants") and certain former officers and directors of Abbott (collectively, with the Director

Defendants, the "Individual Defendants") for breaches of fiduciary duty, gross mismanagement,

unjust enrichment, and other causes of action arising from their intentional, knowing, and/or

reckless misconduct in connection with Abbott's violations of federal laws and regulations

governing the sale, marketing, and promotion of its drug Depakote.

3.      Depakote was approved by the FDA in 1983 for the treatment of epileptic

seizures in adults and children over 10, and was later approved to treat manic bipolar disorder

and migraine headaches in adults.  Notwithstanding these beneficial uses, the drug causes

deadly side effects and carries a "black box" warning to notify consumers of its ability to

cause life-threatening liver damage (*i.e.,* hepatotoxicity) and inflammation of the pancreas

(*i.e.,* pancreatitis), as well as birth defects.  Despite these limitations, and due to eroding

market share from competing medications for on-label uses, Abbott began to actively promote

Depakote to physicians and patients for off-label purposes in 1998 – specifically targeting

vulnerable populations such as elderly patients, institutionalized patients, and children

under ten years of age – in flagrant violation of federal law.[1]

4.      Pursuant to this scheme, Depakote was marketed as a treatment for, among

other things:  seizure and stroke; withdrawal from narcotics; epilepsy in children under 10;

---

[1]  "Off-label" marketing is the marketing of a drug for treatment of a condition for which it has not been approved by the FDA.  While doctors are permitted to use some discretion in drug prescription, drug manufacturers are not allowed to market drugs "off-label" under the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 355(a).

mood disorders; Attention Deficit/Hyperactivity Disorder ("ADHD"); bipolar disorder; schizophrenia; and even "developmental delay" in children under 18. None of these uses were approved by the FDA.

5.     The Current Board allowed the illegal off-label marketing of Depakote not only to continue but to thrive during its tenure. Abbott was apprised of a U.S. Government investigation when it received a formal notice (the "Target Letter") from the U.S. Government. This Target Letter alerted Abbott and the Board to the fact that it was the subject of an investigation by the U.S. Department of Justice ("DOJ") sometime after October 31, 2007 (when the first of four *Qui Tam* Actions was filed) and well before being served with a document subpoena from the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG-HHS"). The Target Letter precipitated what became a relentless government investigation followed by formal civil and criminal actions prosecuted by the U.S. Government and the governments of twenty-seven states and the District of Columbia. Yet the Current Board refused to rein in the conduct and allowed it to generate ill-gotten gains for the Company until at least the end of 2008.

6.     Ultimately, on May 7, 2012, Abbott announced that it had pleaded guilty and agreed to pay criminal and civil penalties in the aggregate of ***$1.6 billion*** to "U.S. federal and 49 state authorities, plus the District of Columbia, to resolve all outstanding issues" arising from the off-label marketing of Depakote (the "Settlement"). The Settlement represents the second largest illegal pharmaceutical marketing accord in United States history.[2]

---

[2]  The agreements, which were reached among Abbott executives, federal prosecutors, and state officials, will require Abbott to pay $800 million to resolve civil claims and $700 million in criminal penalties. The Company will also pay $100 million to several states to resolve various consumer protection matters.

7.     The settlement of the criminal action entailed an admission by the Company that it had violated the FDCA, 21 U.S.C. §§ 331(a), 333(a)(1), and 352. Specifically, as part of the Criminal Plea Agreement entered into by Abbott and the U.S. Government ("Criminal Plea Agreement"), the Company **admitted** in the Agreed Statement of Facts that, from 1998 to December 2006, Depakote had been misbranded because its labeling: (1) "lacked adequate directions for use for the control of agitation, aggression, and other behavioral symptoms exhibited by elderly patients with dementia"; (2) "lacked adequate directions for use for the treatment of schizophrenia"; and (3) "was misleading for use for the (a) control of agitation, aggression, and other behavioral symptoms exhibited by elderly patients with dementia and (b) treatment of schizophrenia." Importantly, Abbott admitted that the "FDA . . . never approved Depakote as safe and effective for the control of agitation and aggression in patients with dementia or for the treatment of schizophrenia" but that it nonetheless "promoted Depakote for these unapproved uses."

8.     The settlement of the civil *Qui Tam* actions with the U.S. Government, in which Abbott agreed to pay **$800 million**, arose from the same conduct for which Abbott admitted criminal liability, but for a period of time considerably longer than that covered by the Criminal Plea Agreement. The Civil Settlement addresses unlawful conduct alleged to have spanned the ten-year period of **January 1998 through December 31, 2008**, which includes the tenure of the Current Board. The wrongdoing covered by the Civil Settlement Agreement includes:

(a) **knowingly promoting the sale and use of Depakote for uses that were not approved** by the [FDA] as safe and effective ("unapproved uses"), including behavioral disturbances in dementia patients, . . . [and] schizophrenia. . . . This promotion included, in part,

(i) **making false and misleading statements about the safety, efficacy, dosing, and cost-effectiveness of Depakote** for some of these unapproved uses;

4

(ii) marketing Depakote to health care professionals to control behavioral disturbances in dementia patients in nursing homes by *claiming that Depakote was not subject to certain requirements of the Omnibus Budget Reconciliation Act of 1987 (OBRA)* designed to prevent unnecessary drugs in nursing homes and that this use of Depakote would help nursing homes avoid the administrative burdens and cost of complying with OBRA regulatory restrictions applicable to antipsychotics.

(b) *offering and paying illegal remuneration to health care professions and long term care pharmacy providers* to induce them to promote and/or prescribe Depakote and to improperly and unduly influence the content of company sponsored Continuing Medical Education programs, *in violation of the Federal Anti-Kickback Statute*, 42 U.S.C. § 1320a-7b(b).

As a result of the foregoing conduct, the United States alleges that Abbott *knowingly caused false and/or fraudulent claims* for Depakote to be submitted to, or caused purchases by, Medicare, Medicaid and the Other Federal Healthcare Programs.

9.     Significantly, in the Civil Settlement Agreement, Abbott specifically acknowledges that it committed Medicare and Medicaid fraud when it promoted Depakote (1) to health care providers in nursing homes for the control of agitation and aggression of dementia patients, and (2) for the treatment of schizophrenia. In connection with this conduct, Abbott unlawfully submitted hundreds of millions of dollars in claims, substantially boosting Depakote's revenues.

10.     As detailed throughout this Second Amended Complaint, Abbott worked its deception (including during the period that the Current Board sat) in an alarmingly high number of ways – employing cunning and surprisingly brazen tactics. For instance, the Company formed a special sales team, the Long Term Care Sales Force ("LTC Sales Force"), which was dedicated to promoting Depakote for the off-label purposes of treating agitation and aggression in elderly patients suffering from dementia. The LTC Sales Force held dinner meetings and "lunch 'n learns," and initiated a practice known as "Working the Wheel" through which certain health care providers, facilities, and pharmacies were

specifically targeted for off-label promotion. Abbott's sales representatives were even instructed to misrepresent the data from clinical trials to mislead physicians about Depakote's success in treating certain unapproved conditions.

11.    Abbott also effected its enduring and enormously lucrative scheme by providing financial incentives to health care professionals. Kickbacks, speaker honoraria, consulting agreements, and even dinner and golf engagements were some of the many ways that professionals were enticed into recommending Depakote for off-label uses. These tactics, which occurred on the watch of the Current Board and are covered by the Civil Settlement Agreement, are well-documented and persisted for well over a decade.

12.    The scheme to market and promote Depakote for off-label purposes was undertaken with the knowing participation of the Individual Defendants. The *Qui Tam* Actions, which form the basis of the U.S. Government's civil *and* criminal actions, detail at length how, between 1998 and 2009,[3] "[i]n order to address the stagnation of profits . . . Abbott embarked upon several centrally-organized, illegal marketing schemes to convince physicians to prescribe Depakote for a number of diseases and disorders for which the drug had (and continues to have) no FDA-approved indication." According to the Agreed Statement of Facts, these campaigns were calculated to drive up prescriptions of Depakote, even though the efficacy of the drug for the promoted uses was either unknown or known to be worthless. With full knowledge and awareness of the rampant – and ultimately costly – wrongdoing, the Board permitted it to abound and failed to rein it in.

13.    Throughout the Relevant Period, the Board of Directors was duty-bound to adhere to numerous corporate governance protocols and mandates compelling it to act with

---

[3] The *Qui Tam* Actions allege a period of wrongdoing stretching through 2009. Significantly, the complaints therein do not allege that the wrongdoing ended in 2009. Rather, 2009 was when the *qui tam* case was filed or when the relator concluded his or her employment with Abbott.

vigilance in overseeing the Company's compliance with federal and state laws, FDA regulations, and its own internal policies regarding the promotion and marketing of its products. These directives did not arise by happenstance. They were the direct consequence of strikingly similar prior illegal conduct – marketing improprieties involving other products – that resulted in the entry of Consent Decrees, Corporate Integrity Agreements, and the strengthening of various committee charters that required the Board and its committees to rigorously monitor for illegal conduct. In other words, this was familiar territory for Abbott, and thus had already assembled a rigorous network of devices designed to catch and report precisely this type of bad acting.

14. As a function of these protocols and mandates, the Board received various internal reports, memoranda, and presentations regarding the marketing of the Company's products (including Depakote) and the state of its compliance with all applicable laws and FDA regulations. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

15. Other machinations delivered such key information to the Board. The Board's Public Policy Committee, whose charter was revised and strengthened over the

course of the Relevant Period, was specifically delegated the obligation to ensure that members of the Board fulfilled their oversight responsibilities with respect to regulatory compliance (including the FDA) and "healthcare compliance" issues. This was not a passive Committee. To the contrary, one of the Public Policy Committee's chief functions was to "[d]evise a process for the dissemination of information to the Committee from management with respect to regulatory and healthcare compliance matters, including, as appropriate, presentations to the Committee from management concerning the state of regulatory compliance and all issues with respect thereto." Significantly, the CECO is required to "report to the Public Policy Committee on an as needed basis on any significant compliance issues."

16. ████████████████████████████████████

████████████████████████████████████████

████████████████████████    ████████████████

██ ████████ ██ ██████ ██ ██████ ████ ██████ ██ ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

17. Taken individually, each of the Company's corporate governance mechanisms was exceptionally robust. When such mechanisms are viewed collectively – as highly layered machinery – it is all the more true. Through the Company's various reporting protocols, the Current Board was *consistently aware* of the marketing strategies applicable to Depakote and each of Abbott's drugs. Thus, the Current Board either approved these illegal marketing strategies or, in dereliction of the oversight obligations imposed by the

2003 CIA and the strict corporate governance processes, failed to investigate the scope and legality of such marketing efforts. Despite the heightened vigilance with which the Current Board should have been operating – given Abbott's history of marketing improprieties – the Current Board knowingly permitted the Company to illegally market Depakote off-label in flagrant violation of federal and state law. Indeed, the Current Board allowed this widespread misconduct to flourish within the Company until the U.S. Government harshly censured it with fines and penalties of $1.6 billion.

18. ███████████████████████████████████████ the enhanced corporate governance mechanisms, and the strict reporting and monitoring requirements called for in the 2003 CIA, there are a number of specific and well-documented occasions on which the Current Board was directly notified of the illegalities of the scheme. First, as early as November 2007, but no later than mid-2008, the U.S. Government notified Abbott by letter "that it was conducting an investigation into the marketing and promotion of Depakote and instructed the Company to retain documents related to that topic" in anticipation of a subpoena. This Target Letter was either delivered to defendant Miles White as Chairman of the Board and CEO or, as it spoke directly to matters of compliance, it was or should have been provided to the CECO, *whose very role under the 2003 CIA was to make the Board aware of compliance issues*. Regardless of who received the Target Letter, the requirement that Abbott preserve documents related to the marketing and promotion of Depakote required Company-wide action, including instructions to maintain or preserve these documents. In other words, the U.S. Government's call to preserve documents related to the off-label promotion of Depakote in the Target Letter no doubt reached Abbott's Board, senior officers, and other employees in an effort to comply with the U.S.

Government's mandate.

19.     The Target Letter was but the first of several communications from the U.S. Government.  Indeed, the U.S. Government (through OIG-HHS) acted quickly and served upon Abbott the first of several subpoenas on July 10, 2008.  This subpoena sought documents related to Depakote studies and certain marketing and promotional practices from, among others, Abbott's officers, directors and employees.  Again, this subpoena was either transmitted to defendant White as Chairman of the Board and CEO or, as it spoke directly to matters of compliance, it was (or clearly should have been) provided to the CECO – who was then duty-bound to bring it to the Board's attention pursuant to the 2003 CIA.  Another subpoena followed in December 2008 seeking additional documents from the Company in connection with the illegal marketing campaign for Depakote, but this time the subpoena included a priority list for a rolling production of materials.  This subpoena specifically sought documents from, among others, defendant White – the Chairman of the Board himself.

20.     The U.S. Government's interest in Abbott's marketing of Depakote was obviously keen and its campaign unyielding: several more subpoenas were served on Abbott in 2009.  In addition to the flurry of subpoenas served by the U.S. Government (through the DOJ and OIG-HHS) by 2008 and 2009, the FDA issued a Warning Letter in early 2009 (the "2009 Warning Letter") concerning marketing improprieties surrounding Depakote. The FDA's Division of Drug Marketing, Advertising, and Communications ("DDMAC") determined that the Company was, *as of 2009 and thus during the tenure of the Current Board*, still promoting Depakote formulations with false and misleading marketing materials.  This resulted in DDMAC issuing the 2009 Warning Letter on January

10

22, 2009 to Rick Leber, Regulatory Manager at Abbott, notifying the Company that certain Depakote promotional materials *"misbranded"* the drug in violation of the FDCA.  The Current Board was made aware of this Warning Letter through the mandates imposed by the 2003 CIA and the robust network of reporting mechanisms.

21.     Given (a) the U.S. Government's aggressive and ongoing investigation (kick-started by the filing of the first *Qui Tam* action in October 2007); (b) the barrage of subpoenas from the U.S. Government, all of which emanated from the Target Letter; (c) the fact that these subpoenas culminated in a document production, which ultimately included a production directly from defendants White, Dempsey, and Leiden;[4] (d) the issuance of the 2009 Warning Letter; and (e) the internal reporting structures mandated by the 2003 CIA ████████████████████████████████████████ that would have caused this information to flow directly to the Board, the inescapable inference is that the Current Board was fully informed of the Company's illegal marketing of Depakote.  This knowledge required the Board, at a minimum, to undertake an investigation.  This was not done, as evidenced by the continuation of the illegal conduct well after that time.

22.     Abbott's Board began to belatedly curtail the illegal marketing of Depakote only when it became clear that the U.S. Government investigation would not end well for the Company, and the Board had been advised by its OEC that, not coincidentally, similar marketing misconduct at peer companies was under attack by the governmental authorities.  But by then it

---

[4]  In its February 5, 2010 opposition to the DOJ's motion to compel a response to the subpoenas issued in late 2009 (hereinafter, the "Opposition to the DOJ's Motion to Compel"), Abbott conceded that its "contacts with the government *over the past year and half* have made clear that the focus of the government's investigation is whether Abbott's marketing of Depakote ... violated federal laws."  In March 2010, in ruling on the DOJ's motion to compel, Judge Samuel G. Wilson of the U.S. District Court for the Western District of Virginia, ordered Abbott to produce the live and stored emails of defendants White, William Dempsey, and Jeffrey Leiden that had not already been produced.

was too late for Abbott, which was on its way toward entering into the Civil Settlement Agreement and Criminal Plea Agreement, resulting in the enormous fines attendant thereto.

23.     During the Relevant Period, the Individual Defendants had actual knowledge of, but consciously or recklessly disregarded the existence and scope of, the illegal marketing scheme involving Depakote – and its inevitable dire consequences to Abbott.  By approving and allowing the off-label promotion of Depakote to grow into a scheme of monstrous proportions, the Individual Defendants have caused substantial harm to Abbott.  The illegal scheme has already resulted in $1.6 billion in damages to the Company that it was required to pay in the Settlement.  This is separate and apart from tens of millions of dollars in legal, accounting, investigatory, and forensic expenses to defend the scores of legal actions related to Depakote.  In addition, Abbott has suffered and will continue to suffer reputational harm and loss of corporate goodwill for years to come because of a severely impaired ability to participate in Medicare, Medicaid, and various state health care programs that are critical to its continued financial viability.  Abbott's shareholder equity and its market capitalization have also plummeted.

24.     To fully remedy these harms, Plaintiffs, on behalf of Abbott and its shareholders, seek restitution, compensatory and other damages to be paid from the Individual Defendants to the Company, broad-scale corporate governance and managerial reforms to prevent future recurrences of the Individual Defendants' systemic dereliction of duty, and other relief.  Moreover, the Director Defendants are implicated in and legally responsible for the wrongdoing complained of here, and are thus interested and lack independence with respect to the wrongs complained of.  As each Director Defendant faces a substantial likelihood of liability under the False Claims Act and for breaches of fiduciary duty,

12

any demand on the Board by Plaintiffs would be futile.

## JURISDICTION AND VENUE

25.     This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.  This Court has jurisdiction under 28 U.S.C. § 1332(a)(1).  Plaintiffs and Defendants are citizens of different states and the amount in controversy between the Plaintiffs and the Defendants exceeds $75,000, exclusive of interest and costs.  This is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the improper conduct by the Individual Defendants in violating FDA rules and regulations and in the preparation and dissemination to shareholders of false and misleading information, occurred in this District.  In addition, one or more of the Individual Defendants either resides in, or maintains offices in, this District, and nominal defendant Abbott is headquartered in this District.

## THE PARTIES

### A.     Lead Plaintiff

27.     Plaintiff, Jacksonville Police & Fire, a citizen of the State of Florida, is a current shareholder of the Company, was a shareholder at the time of the misconduct complained of herein, and intends to continue to hold Abbott shares at least through the resolution of this action. As of the date of this Second Amended Complaint, Jacksonville Police & Fire holds 83,400 shares of Abbott and has held shares continuously since 1999.

### B.     Additional Plaintiffs

28.     Plaintiff LMPERS is an instrumentality of the State of Louisiana, is a current shareholder of the Company, was a shareholder at the time of the misconduct complained

of herein, and intends to continue to hold Abbott shares at least through the resolution of this action. As of the date of this Second Amended Complaint, LMPERS holds 36,250 shares of Abbott and has held shares continuously since at least 2005.

29. Plaintiff KCPSRS, a citizen of the State of Missouri, is a current shareholder of the Company, was a shareholder at the time of the misconduct complained of herein, and intends to continue to hold Abbott shares at least through the resolution of this action. As of the date of this Second Amended Complaint, KCPSRS holds 8,690 shares of Abbott and has held shares continuously since at least June 15, 2004.

### C. Defendants

30. Nominal Defendant Abbott is a citizen of the State of Illinois. Abbott is an Illinois corporation headquartered in Chicago, Illinois. As alleged herein, Abbott discovers, develops, manufactures, and markets products and services that span from prevention and diagnosis to treatment and cure. Abbott's principal businesses, which are heavily regulated by federal law and FDA regulations, are comprised of global pharmaceuticals, nutritional, and medical products, including diagnostic and cardiovascular devices. Abbott manufactures and markets Depakote and its family of products including Depakote ER, Depakote Sprinkle Capsules, Depacon, and Depakene (hereinafter referred to as the "Depakote Products"). Abbott's common shares are listed and traded on the New York Stock Exchange, and its shares are also listed and traded on the Chicago Stock Exchange and on various regional and electronic exchanges. Abbott's shares are also listed and traded on the London Stock Exchange and the SWX Swiss Stock Exchange.

### 1. The Current Board of Directors

31. Abbotts' Current Board met officially seven times in 2007, nine times in

14

2008, seven times in 2009, and seven times in 2010. Abbott's Board maintains five standing committees on which the directors serve: (i) the Executive Committee; (ii) the Audit Committee; (iii) the Compensation Committee; (iv) the Nominations and Governance Committee; and (v) the Public Policy Committee. During 2010, the Executive Committee met three times; the Audit Committee met seven times; the Compensation Committee met five times; and the Nominations and Governance Committee met two times. Tellingly, the Public Policy Committee, which has oversight responsibilities for the Company's legal and regulatory compliance related to Abbott's sales and marketing activities, met just once.

32. Defendant Miles D. White ("White") has been a director of the Company since April 1998 and has served as Chairman of the Board since 2000. Defendant White was elected Executive Vice President on February 13, 1990, and elected Chief Executive Officer ("CEO") in January 1999. As a direct result of the Company's off-label marketing of Depakote, which resulted in increased revenues and profits for the Company, defendant White's compensation grew exponentially. During the Relevant Period, White's salary was: $1,306,731 in 1999; $1,390,961 in 2000; $1,445,662 in 2001; $1,497,388 in 2002; $1,564,961 in 2003; $1,551,846 in 2004; $1,605,990 in 2005; $1,661,973 in 2006; $1,726,936 in 2007; $1,807,500 in 2008; $1,852,319 in 2009; and $1,893,371 in 2010. In addition, defendant White's "other annual compensation" significantly increased during the Relevant Period: $40,662 in 1999; $68,881 in 2000; $104,247 in 2001; $66,068 in 2002; $84,122 in 2003; $487,817 in 2004; and $439,387 in 2005. Additionally, defendant White's "All other compensation" during the Relevant Period was $855,233 in 2006; $1,048,661 in 2007; $850,893 in 2008; $709,770 in 2009; and $807,728 in 2010. This is not the first time that defendant White has faced serious charges that he breached his

fiduciary duty to Abbott's shareholders by failing to act in good faith to ensure Abbott's compliance with FDA regulatory orders. The plaintiffs in a 1999 shareholder action alleged that as a result of defendant White's and the Board's breaches of fiduciary duties, the Company violated FDA rules and regulations resulting in multi-million dollar fines, the closure of a manufacturing facility, and the required destruction of products resulting in hundreds of millions of dollars in lost revenue. *In re Abbott Laboratories Derivative Shareholders Litigation*, C.A. No. 99-C 07246 (N.D. Ill.) ("*Abbott I*"). The Seventh Circuit held that the plaintiffs in that action had adequately pleaded that defendant White and the Board, by ignoring numerous FDA Warning Letters, had not acted in good faith to ensure the Company's compliance with the law and, specifically, correct violations of the FDA regulations governing the manufacturing of certain Abbott products. *See* 325 F. 3d 795 (7th Cir. 2003). Defendant White is a citizen of the State of Illinois.

33. Defendant Robert J. Alpern, M.D. ("Alpern") has served on the Company's Board since October 2008. He has been a member of the Public Policy Committee since April 2010. In 2010, he received $114,000 in director fees and $106,960 in stock awards, with a total compensation of $230,830. Defendant Alpern is a citizen of the State of Connecticut.

34. Defendant Roxanne S. Austin ("Austin") has served as an Abbott director since December 2000. She has served on the Audit Committee since April 2001 and as Chairman since April 2007. She has also served on the Public Policy Committee since April 2003. In 2010, she received $132,000 in director fees and $106,960 in stock awards with a total compensation of $238,960. In *Abbott I*, the Seventh Circuit held that the plaintiffs had adequately alleged that the Board, including Austin, had not acted in good

16

faith to ensure the Company's compliance with the law and, specifically, correct violations of the FDA regulations governing the manufacturing of certain Abbott products. Defendant Austin is a citizen of the State of California.

35.     Defendant W. James Farrell ("Farrell") has served on the Company's Board since January 2006. He has been a member of the Compensation Committee and Nominations and Governance Committee since April 2006. In 2010, he received $114,000 in director fees and $106,960 in stock awards, with a total compensation of $235,613. Defendant Farrell is a citizen of the State of Illinois.

36.     Defendant H. Laurance Fuller ("Fuller") has been a director of Abbott since 1988. Since joining the Company, defendant Fuller has served on: the Compensation Committee, and was its Chairman from April 1997 until April 2003; the Board's Public Affairs Committee until April 1997; and the Nominations and Governance Committee, where he has served as its Chairman since April 2003. In *Abbott I*, the Seventh Circuit held that the plaintiffs had adequately alleged that the Board, including Fuller, had not acted in good faith to ensure the Company's compliance with the law and, specifically, correct violations of the FDA regulations governing the manufacturing of certain Abbott products. In 2010, he received $126,000 in director fees and $106,960 in stock awards, with a total compensation of $258,291. Defendant Fuller is a citizen of the State of Illinois.

37.     Defendant William A. Osborn ("Osborn") has been a director of Abbott since January 2008. Defendant Osborn has served on the Compensation Committee since April 2008 and the Nominations and Governance Committee since April 2010. In 2010, he received $114,000 in director fees and $106,960 in stock awards, with a total compensation of $223,854. Defendant Osborn is a citizen of the State of Illinois.

17

38.     Defendant Samuel C. Scott, III ("Scott") has been a director of the Company since April 2007.  He has also been a member of the Audit Committee since April 2007.  In 2010, he received $120,000 in director fees and $106,960 in stock awards, with a total compensation of $226,960.  Defendant Scott is a citizen of the State of Illinois.

39.     Defendant Glenn F. Tilton ("Tilton") has served as an Abbott director since April 2007.  He has served on the Audit Committee since April 2007.  In 2010, he received $120,000 in director fees and $106,960 in stock awards, with a total compensation of $255,519.  Defendant Tilton is a citizen of the State of Illinois.

**2.     Former Directors and Officers**

40.     Defendant Duane L. Burnham ("Burnham") served as the CEO of Abbott from 1989 until defendant White succeeded him in that role.  He served as a director of the Company from 1985 to 1999, and served as Chairman of the Board from 1990 to 1999. Defendant Burnham is a citizen of the State of Illinois.

41.     Defendant Jeffrey Leiden, M.D., Ph.D. ("Leiden") is the former President and Chief Operating Officer ("COO") of Abbott's Pharmaceutical Products Division, having served in that role from 2001 until 2006.  He also served as a director of the Company from 1999 to 2006 and previously served as a director of TAP Pharmaceuticals, an Abbott joint venture.  During part of his tenure on the Board, Leiden served on the Board's Public Policy Committee.  Defendant Leiden is a citizen the State of Illinois.

42.     Defendant William G. Dempsey ("Dempsey") is a former Abbott executive, serving in numerous senior leadership positions in the Pharmaceutical Products Division from 1982 to 2007.  From 2006 to 2007, Dempsey served as the Company's Executive Vice

President for the Pharmaceutical Products Division. Defendant Dempsey is a citizen of the State of Illinois.

43.     The defendants referred to in paragraphs 31 through 38 are collectively referred to hereinafter as the "Director Defendants." The defendants referred to in paragraphs 31 through 41 are collectively referred to hereinafter as the "Individual Defendants."

###     3.     Persons Not Named as Defendants

44.     Edward M. Liddy ("Liddy") has been an Abbott director since June 2010 and has served on the Audit and Compensation Committees since June 2010. In 2010, he received $58,000 in director fees. Liddy is a citizen of the State of New York.

45.     Phebe N. Novakovic ("Novakovic") has served as an Abbott director since June 2010. She has been a member of the Nominations and Governance Committee and Public Policy Committee since June 2010. In 2010, she received $57,000 in director fees. Novakovic is a citizen of the Commonwealth of Virginia.

### <u>THE FIDUCIARY DUTIES OF ABBOTT'S BOARD OF DIRECTORS</u>

46.     Under Illinois law, Abbott's directors and senior management have certain fiduciary duties to the Company and its shareholders, including the duties of loyalty, good faith, and care. To discharge their legal duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the Company's management, policies, practices, controls, and financial affairs. Pursuant to their fiduciary obligations, the Individual Defendants were required to use the same care and diligence as would an ordinary prudent person in a similar position.

47.     Additionally, the Director Defendants were and are required to act in furtherance

of the best interests of the Company and its shareholders so as to benefit "the long term and short term interests of the corporation," 805 Ill. Comp. Stat. 5/8.85, which includes the obligation that the Company act in compliance with the law and ethical good behavior. Furthermore, pursuant to 805 Ill. Comp. Stat. 5/8.75, which sets forth the grounds on which directors of Illinois corporations may be indemnified, each Director Defendant has a duty to "act in good faith and in a manner he or she reasonably believes[s] to be in or not opposed to the best interests of the corporation," and "with respect to any criminal action or proceeding, ha[s] no reasonable cause to believe his or her conduct was unlawful."

48. By virtue of the foregoing obligations, throughout the Relevant Period during which Abbott knowingly engaged in illegal off-label marketing of Depakote in violation of FDA rules and regulations, the Individual Defendants were required to, but failed to, among other things:

(a) Undertake a proper and adequate investigation once the decision was made to illegally market Depakote off-label;

(b) Act within the law and ensure that proper policies and procedures were in place to ensure Abbott's compliance with federal law and FDA regulations governing the marketing and sale of Depakote and the Company's other manufactured drugs;

(c) Set up protocols and procedures to properly monitor and ensure that the Company was in compliance with FDA rules and regulations governing the marketing and sale of Depakote and the Company's other manufactured drugs;

(d) Ensure that when protocols and procedures are in place that they are functioning;

(e) Prevent the waste of Abbott's valuable assets and to manage, conduct, supervise, and direct the business and affairs of Abbott carefully, prudently and in good faith, in

accordance with the laws, rules and regulations of the State of Illinois and the Articles of Incorporation and by-laws of Abbott;

(f)     Exercise necessary control and supervision over the officers and employees of Abbott, especially those responsible for making sure that the Company complies with FDA rules and regulations governing the marketing and sale of Depakote and the Company's other manufactured drugs;

(g)     Establish guidelines and policies to govern adequately the structure and organization of the Company's operations, including the manufacturing, marketing, and financial and disclosure practices;

(h)     Neither violate, nor knowingly or recklessly permit any officer, director or employee of Abbott to violate applicable federal rules and regulations, including FDA rules and regulations;

(i)     Upon receiving notice or information of the illegal marketing and sale of Depakote, make a reasonable investigation in connection therewith, and to take all necessary steps to correct that practice;

(j)     Establish and maintain systematic and accurate books and records of the business affairs of Abbott and procedures for the reporting of the business affairs to the Board of Directors and periodically to investigate, or cause an independent investigation to be made of, Abbott's books and records;

(k)     Implement and maintain an adequate and functioning system of internal management information systems such that Abbott's assets would be safeguarded, its financial statements and information would be accurately recorded and reported, and its corporate managers would be given prompt notice of serious problems or divergences so

21

that risk to the Company would be minimized;

(l)     Supervise the preparation and filing of any audited financial statements, reports and other information required by law from Abbott, including the Company's SEC Forms 10-K, 10-Q, and 8-K, annual reports and proxy materials and submissions to the FDA, and examine and evaluate any reports of examinations, audits and reports from FDA inspections, or other information required by federal or state law concerning the financial condition of Abbott and make full and accurate disclosures of all material facts concerning, *inter alia*, each of the subjects and duties set forth above;

(m)     Ensure that Abbott did not engage in unsafe, imprudent or unsound practices and become and remain informed as to how Abbott was, in fact, operating; and

(n)     Refrain from obtaining personal benefit at the expense of Abbott and its public shareholders.

49.     As a global pharmaceutical company operating in a heavily regulated industry, the Individual Defendants' obligations are to ensure that the Company is in complete compliance with all applicable federal and state laws, rules and regulations.  As disclosed in the Company's most recent annual filing with the SEC: **"Abbott is subject to numerous governmental regulations and it can be costly to comply with these regulations and to develop compliant products and processes."**  Abbott's February 21, 2012, SEC Form 10-K, at p. 11 (emphasis in original).  Abbott's products, including Depakote, are subject to rigorous regulation by the FDA and numerous international, federal and state authorities, including significant regulation over Abbott's advertising, sales, and marketing practices.  Because significant portions of the Company's revenues are generated from transactions involving government entities, such as Medicaid and Medicare, Abbott also is subject to heavy regulation "pertaining to government

22

benefit program reimbursement, price reporting and regulation, and health care fraud and abuse, including anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices."

50. Furthermore, as acknowledged by Abbott, failure to comply with federal and state laws and regulations can result in the imposition of "criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs." As demonstrated by the substantial penalties levied on Abbott for its unlawful Depakote marketing practices, "violations of these laws, or allegations of such violations, could disrupt Abbott's business and result in a material adverse effect on Abbott's revenues, profitability, and financial condition."

51. The ultimate responsibility for ensuring the Company's legal and regulatory compliance, and managing the risks associated therewith, lies with the Board and the Company's executive officers, who must satisfy this responsibility in accordance with their fiduciary obligations to the Company. As demonstrated by the wide-spread institutional malfeasance concerning the Company's sales and illegal marketing of Depakote from 1998 to at least December 31, 2008, the Company's directors and top officers completely failed to do so. Instead, they deliberately caused and/or knowingly allowed the Company to actively violate federal and state law in pursuit of higher sales revenues, profits, and personal gain.

## FACTUAL BACKGROUND AND THE UNLAWFUL CONDUCT

### A. Abbott's History of Illegal Marketing and Sales Practices Resulting in Criminal Guilty Pleas, Fines, and Settlements with Its Shareholders

52. The Company's recent history is rife with instances of conduct running afoul of federal law and FDA rules and regulations, resulting in numerous criminal guilty pleas, fines,

23

consent decrees, and other sanctions. There is also a well-documented history of shareholder litigation alleging breaches of fiduciary duties on the part of the Board in failing to oversee the Company's compliance with the law. In almost every instance, the Company was required to adopt, modify, and improve policies and procedures that were in effect during the Current Board's tenure, and to take other action to prevent future wrongdoing. Yet, notwithstanding this context, the Board, including the Current Board, allowed and/or failed to prevent the Company from violating federal law and FDA regulations with respect to the illegal off-label marketing of Depakote.

53.     The Settlement with the U.S. Government, state, and local governments for $1.6 billion marks the ***third major financial penalty*** for Abbott or an Abbott subsidiary ***since 2001***, and the ***second criminal guilty plea for illegal marketing and sales practices*** during the same period. The settlements with the U.S. Government in 2001 and 2003, as well as settlements with its shareholders in related derivative litigation (as discussed below in ¶¶ 58-62), have already cost the Company at least $1.8 billion in fines and payouts alone. An additional settlement in 2010 cost the Company nearly another $200 million.

54.     As a result of these earlier instances of misconduct, the Director Defendants had agreed, through the 2003 CIA, to establish and administer internal compliance mechanisms to directly inform the Board of the Company's compliance or non-compliance with drug marketing laws. Moreover, as a result of settlement agreements in shareholder derivative litigation, Abbott's Public Policy Committee was specifically tasked with creating and monitoring a reporting system designed to ensure that the Company remained in regulatory compliance, and if not, to alert the Company's Board.

1.      **TAP Pharmaceuticals and Ross Products Settle with the U.S. Government in connection with illegal marketing schemes**

55.      In 2001, TAP Pharmaceutical Products Inc. ("TAP"), an Abbott joint venture with Japan's Takeda Pharmaceuticals Company Ltd, agreed to pay an $875 million fine to the U.S. Government to settle allegations that a TAP marketing scheme involved illegal kickbacks to health care professionals so as to increase sales of Lupron, its prostate cancer drug.  The $875 million fine consisted of $290 million for TAP's criminal conduct, $559.5 million for False Claims Act liabilities for making fraudulent claims with the Medicare and Medicaid programs, and $25.5 million to the states for similar conduct.  As part of the settlement, TAP also entered into a CIA that imposed requirements as to how TAP supervised its sales and marketing staff, and further required the company to revise its Medicare and Medicaid reporting practices.

56.      Less than two years later, in 2003, Abbott paid $614.5 million to settle federal criminal claims relating to certain illegal sales practices.  A federal government sting operation netted Abbott employees in the Company's Ross Products Division ("Ross") who were offering kickbacks to undercover federal agents to purchase Ross' products, and advising them how to fraudulently bill the federal government for those items.  As part of the settlement, Abbott also entered into the 2003 CIA with the OIG-HHS that required Abbott's Board to establish and participate in regular training and education programs regarding compliance with federal health care programs (including the federal anti-kickback laws), as well as proper and improper promotion, marketing, and sales practices.

57.      Also, as previously stated, the 2003 CIA imposed heightened communication with the Board regarding ethics and compliance.  Indeed, the 2003 CIA tasked Abbott's OEC with providing the Board with periodic policy compliance memoranda and further tasked the CECO with at least semi-annual reporting duties to the Board.

58.     Thus, by 2003, Abbott had agreed to adopt a specific mechanism that reported any non-compliance with federal health care laws directly to the Board.

### 2.     Abbott Shareholders file Derivative Lawsuits based on the TAP Pharmaceuticals and Ross Products settlements

59.     In October 2001, following the settlement of the TAP investigation, Abbott shareholders brought derivative litigation against the Board alleging, among other things, that Abbott's Board members breached their fiduciary duties by failing to take action to prevent improper marketing and pricing practices at TAP (the "TAP Derivative Litigation").

60.     Likewise, beginning in June 2003, other Abbott shareholders filed derivative lawsuits against the Board in connection with the settlement of the Ross investigation (the "Ross Derivative Litigation"). These shareholder lawsuits also alleged that Board members breached their fiduciary duties in failing to stop the alleged improper business practices in the enteral nutritional business.

61.     On January 5, 2005, the parties agreed to settle the litigation involving the breaches of fiduciary duties alleged in the TAP Derivative Litigation. The then-current Board, which included defendants White, Fuller, and Austin, approved the terms of the settlement which included the amendment of the charter of the Public Policy Committee to address health care compliance issues. The next day, the parties in the Ross Derivative Litigation settled that matter. The settlement involved the creation of revisions to the charter of the Public Policy Committee similar to those created in the TAP Derivative Litigation settlement.

### 3.     The 1999 Consent Decree Derivative Litigation

62.     Additionally, Abbott settled a third shareholder derivative lawsuit in 2004 in connection with a Consent Decree of Permanent Injunction with the U.S. Government in 1999 (the "1999 Consent Decree Derivative Litigation"). As part of the 1999 Consent Decree, Abbott

paid a $100 million civil fine to the FDA, withdrew 125 types of medical diagnostic test kits from the U.S. market, destroyed certain inventory, and made a number of corrective changes in its manufacturing procedures after six years of federal law violations. Although the underlying allegations of the 1999 Consent Decree Derivative Litigation were not directly tied to fraudulent marketing practices, the settlement is nevertheless important to the Board's abdication of responsibility as alleged herein because the settlement of that litigation mandated further changes to the charter of the Board's Public Policy Committee arising from the 1999 Consent Decree as against defendant White when he was the president of Abbott's Diagnostic Division.

63.     Specifically, under the terms of the settlement in the 1999 Consent Decree Derivative Litigation, the Public Policy Committee charter was amended to task the Committee with the responsibility to "assist the Board in fulfilling its oversight responsibility with respect to: public policy, regulatory . . . and government affairs and healthcare compliance issues that affect Abbott." The functions of the Public Policy Committee were further enhanced less than a year later, in 2005, when Abbott settled derivative actions arising out of the conduct leading to the above-described TAP and Ross settlements.

64.     Thus, the settlement of these shareholder actions required Abbott to solidify strong reporting mechanisms through which management would inform the Board and the Public Policy Committee of health care compliance issues, including the misconduct at issue here that earned attention from and severe punishment by the U.S. Government.

### B.     The Regulation of Abbott's Business

65.     Abbott's drug business is subject to federal law and FDA regulations limiting the approval and marketing of its drugs for specific uses only upon establishing that the drug is safe and effective for the prescribed uses. Additionally, since many drug prescriptions, including

those for Depakote, are paid by federal health care programs including Medicaid and Medicare, Abbott is also subject to federal statutes including the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") and the Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS").

### 1. New Pharmaceutical Drugs are Prohibited From Being Marketed or Sold In the U.S. Without FDA Approval

66. Abbott's business is the focus of extensive regulation and regulatory oversight by the FDA. In addition to informing consumers about and protecting them from dangerous food and drug products, the FDCA prohibits drug manufacturers from marketing or promoting their drugs for uses not approved by the FDA, though physicians may prescribe drugs that have been approved by the FDA for any use. *See* 21 U.S.C. §§ 331, 352, 355; 21 C.F.R. § 314.81. Pursuant to 21 U.S.C. § 355, drug manufacturers must file an application with the FDA, which the FDA subsequently reviews to determine whether the drug's intended uses are "safe and effective." A drug manufacturer must receive FDA approval for a prescription drug before the drug manufacturer markets or sells it. *See* 21 U.S.C. §§ 331, 355.

67. To determine whether a drug is "safe and effective," the FDA relies on information provided by the drug manufacturer; it does not, itself, conduct any substantial analyses or studies. Applications for FDA approval (known as New Drug Applications or "NDAs") must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether or not such drug is effective in use." 21 U.S.C. § 355(b)(1)(A).

68. U.S. food and drug laws require that "adequate and well-controlled investigations" be used to demonstrate a drug's safety and effectiveness. *See* 21 U.S.C. § 355(d)(7). The FDA approves a drug if there are "adequate and well-controlled clinical investigations" that demonstrate a drug's safety and effectiveness for its intended conditions of

use.  *See* 21 U.S.C. § 355(d)(5) and (7).  The "conditions" for use of a drug are listed in the

drug's labeling, which is reviewed and approved by the FDA.  *See* 21 U.S.C. § 355(d)(1) and (2).

Indications for use that are not listed in a drug's labeling have not been approved by the FDA.

*See* 37 Fed. Reg. 16503 (1972).

      69.     Pursuant to the FDCA's regulation, drug labels may not describe intended uses

for the drug that have not been approved by the FDA.  21 U.S.C. § 331, 352; 21 C.F.R § 314.81.

The term "drug label" is broadly defined and includes all marketing and promotional materials

relating to that drug.  A misbranded drug includes a drug whose "labeling is false or misleading

in any particular."  21 U.S.C. § 352(a).  According to the statute, labeling does not have to be

physically attached to the drug and can include various written, printed, or graphic information

that describes the drug and is disseminated by or on behalf of the drug manufacturer.  Thus, a

drug manufacturer can violate the FDCA by distributing written, printed, or graphic information

about the drug that is false or misleading.  Illegal "misbranding" can result in civil and criminal

penalties.  *See* 21 U.S.C. § 333.

      70.     Absent an unsolicited request from a physician (21 U.S.C. § 360aaa-6), federal

laws prohibit any advertising that recommends or suggests an off-label use for an approved drug.

The FDA has interpreted "advertising" to include a significant amount of speech that would not

typically be considered advertising.  *See Final Guidance on Industry-Supported Scientific and*

*Educational Activities,* 62 Fed. Reg. 64074 (Dec. 3, 1997).  Specifically, any manufacturer's

speech explaining one of its products is considered to be an "advertisement" for the product and

is subject to the prohibitions against off-label marketing contained in 21 C.F.R. § 202.1.

2.      **A Company's Off-Label Marketing of an FDA Approved
Drug Violates the Federal False Claims Act and States' False Claims
Acts**

71.     Many drug prescriptions are paid for by federal health care programs such as Medicaid and Medicare and are therefore subject to the federal FCA. The federal FCA is the most frequently used of a handful of extant laws creating a form of civil action know as *qui tam*, which is an action by an individual not affiliated with the government asserting violations of federal law against a private entity. If successful, the *qui tam* plaintiff, or whistleblower, may collect a portion of the penalty assessed against the defendant.

72.     The federal FCA imposes civil liability upon "[a]ny person" who, *inter alia*, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the U.S. government. 31 U.S.C. § 3729(a). Currently, each violation of the federal FCA subjects the violator to a civil penalty of not less than $5,500 and not more than $11,000. In addition, a violator is liable for three times the amount of all damages sustained by the U.S. government.

73.     Federal government health care programs limit their reimbursements for prescription drugs to drugs that have been deemed safe and effective under the FDCA. *See, e.g.*, 42 U.S.C. § 1396r-8(k)(2) (Medicaid) and 42 U.S.C. § 1395w-102(e)(1)(A) (Medicare). Off-label marketing violates the federal FCA because it causes false claims for payment to be submitted to the government for prescriptions that are not supported by the medical evidence and have not been approved by the FDA. The off-label marketing strategies adopted by Abbott, as allowed by the Individual Defendants, fraudulently induced Medicare, Medicaid, and other federal programs to make billions of dollars in payments for Depakote prescriptions that were not approved as safe and effective under the FDCA and should not have been paid by Medicaid

or Medicare. As set forth in the *Spetter* Complaint, off-label marketing also violates numerous state FCA laws. These state FCA acts may be violated, for example, when a state-administered Medicaid program is induced to make a false payment for a drug because of off-label marketing.

>    **3.      Abbott's Marketing of Depakote is Also Subject to the Federal Anti-Kickback Statute**

74.      The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. Thus, drug companies may not offer or pay any remuneration, directly or indirectly, to induce physicians or others to order or recommend drugs that may be paid for by a federal health care program.

75.      Violation of the AKS subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§ 1320a(f), 1320a-7(a) and (b).

76.      Thus, the AKS prohibited Abbott from providing payments or gifts to physicians to induce them to prescribe Depakote Products.

>    **C.      The FDA's Approval of Depakote**

77.      The genesis of Depakote was the drug Valproate, which has been used since the 1960s to treat epilepsy and bipolar disorder. The active ingredient in Valproate and the different forms of Depakote is valporic acid.

78.      Depakote was initially approved by the FDA to treat certain types of epileptic seizures and bipolar mania and to prevent the onset of migraines. On March 10, 1983, the FDA approved Depakote DR, the delayed-release version of Depakote, for the treatment of simple and complex absence seizures in adults. On May 26, 1995, the FDA approved Depakote for manic episodes associated with bipolar disorder. On March 18, 1996, the

FDA approved Depakote for migraine prophylaxis and on June 20, 1996, the FDA further approved Depakote DR for the treatment of manic episodes in adults with bipolar disorder, complex partial seizures in adults, and children older than ten. Depakote was never approved by the FDA as a safe and effective treatment for the control of agitation and aggression in patients with dementia or for the treatment of schizophrenia.

79. On September 12, 1989, Abbott received FDA approval to market Depakote Sprinkle Tablets ("Depakote Sprinkle"), another formulation of Depakote which is produced in a pull-apart capsule so that its contents can be mixed with soft food to assist patients who have difficulty swallowing medications in tablet form, for the treatment of simple and complex absence seizures. On June 20, 1996, the FDA approved Depakote Sprinkle for complex partial seizures.

80. In 1996, the intravenous form of Depakote, Depacon, was approved for the (a) treatment of patients with complex seizures that occur either in isolation or in association with other types of seizures, (b) for use as a sole and adjunctive therapy in the treatment of patients with simple and complex absence seizures, and (c) adjunctive therapy in patients with multiple seizures that include absence seizures.

81. Depakote ER (extended release tablet form of Depakote) was originally approved by the FDA on August 4, 2000, for the treatment of prophylaxis of migraine headaches in adults. The labeling for Depakote ER for this use was agreed to on August 4, 2000, in a telephone conversation between representatives of Abbott and the FDA's Division of Neuropharmacological Drug Products. At that time, the label expressly stated that Depakote ER had "not been evaluated for the treatment of mania or epilepsy."

82. On December 20, 2002, the FDA gave additional approval for Depakote ER

for the treatment of complex partial seizures in adults and simple and complex absence seizures in adults. The approval letter to Abbott's Associate Director of PPD Regulatory Affairs from the FDA's Division of Neuropharmacological Drug Products noted that the final printed label must be identical to what was provided by the FDA and that "[m]arketing the product with [a final printed label] that is not identical to the approved labeling text may render the product misbranded and an unapproved new drug."

83.     On August 14, 2003, the FDA's Division of Neuropharmacological Drug Products extended the use of Depakote ER to pediatric patients (10 years or older) with epilepsy. On December 6, 2005, the FDA's Division of Psychiatry Products gave further approval for the treatment of acute manic or mixed episodes associated with bipolar I disorder, with or without psychotic features. Thus, according to the Agreed Statement of Facts, to date, Depakote Products have been approved for: (i) treatment of the manic episodes associated with bipolar disorder; (ii) monotherapy and adjunctive therapy in the treatment of patients with complex partial seizures that occur either in isolation or in association with other types of seizures; (iii) sole and adjunctive therapy in the treatment of simple and complex absence seizures, and adjunctively in patients with multiple seizure types that include absence seizures; and (iv) prophylaxis of migraine headaches. Depakote, Depakote Sprinkle, and Depakote ER were never approved by the FDA for any other uses.

84.     Despite these approvals, however, Depakote Products have serious and deadly potential side effects. Accordingly, following an Abbott double-blind multicenter trial of Valproate in elderly patients with dementia that was prematurely terminated due to serious side effects caused by Depakote (the "M96-491 Study"), Abbott implemented a change to Depakote's approved labeling to include a warning about somnolence. Thus, in

2000, the FDA required Abbott to have "black box" labels accompany the drugs, which are also available on the FDA's website, warning consumers of the health risks posed by Depakote. These risks include: (1) increased risk of suicidal thoughts or actions; (2) fatal liver failure (with an increased risk for children under the age of two, patients taking multiple anticonvulsant medications, patients with congenital metabolic disorders, patients with severe seizure disorders and mental retardation, and patients with organic brain disease); (3) life-threatening cases of pancreatitis; and (4) birth defects, such as spina bifida, if used during pregnancy.

85.     Depakote also has side effects that present particular issues for elderly patients, who are more susceptible to serious physical injury from falls, such as general weakness, lethargy, nausea, and somnolence (defined as a condition of semi-consciousness approaching coma). The drug also causes appetite loss, changes in mental state, stomach pain, and vomiting in some patients. Some studies have further linked the drug to increased risk of polycystic ovary syndrome in teenage girls with epilepsy, as compared to other anti-epileptic medications.

86.     Thus, it is axiomatic that Depakote, Depakote ER, Depakote DR, Depacon and Depakote Sprinkle Capsules *have not been approved by the FDA* for treatment of the following disorders:

- Alzheimer's disease or dementia or their side effects;

- disorders or symptoms other than epileptic seizures in patients under the age of eighteen;

- disorders or symptoms in children under the age of ten;

- schizophrenia;

- ADHD;

34

- insomnia;

- mood disorder;

- narcotic drug withdrawal;

- post-stroke seizures; and

- other forms of epilepsy.

87.     Depakote products have been a huge commercial success for Abbott, generating approximately $13.8 billion in revenues for the Company between 1998 and 2008.

88.



89.



90.

91.

92.

93.     Between 2005 and 2008, Depakote was a primary driver of Abbott's

36

economic success, accounting for billions in revenue and between 8% and 11% of Abbott's total domestic revenue. This was the case despite the fact that generic versions of the drug were introduced into the market in 2008 and significantly cut into Abbott's sales of Depakote. Thus, in 2008, sales of Depakote still managed to reach $1.30 billion. Without the aid of the off-label marketing, revenues for Depakote that year would have been significantly lower, given the introduction of generics into the market. This alone should have been a "red flag" to the Board.

**Domestic Sales of Depakote**

| Year | Depakote Sales (U.S.) | Abbott Total Sales (U.S.) | % of Total U.S. Sales Contributed by Depakote |
|------|----------------------|---------------------------|-----------------------------------------------|
| 2005 | $1 (billion) | $12.71 (billion) | 8% |
| 2006 | $1.2 (billion) | $12.00 (billion) | 10% |
| 2007 | $1.50 (billion) | $13.25 (billion) | 11% |
| 2008 | $1.30 (billion) | $14.50 (billion) | 9% |

94. Much of Depakote's success depended on reimbursements paid through federal government health care programs such Medicaid, Medicare Part D, VA, and FEHBP. According to the *Spetter* Complaint, Abbott collected almost $8 billion in Medicaid payments alone for prescriptions for Depakote Products, with the bulk of the reimbursements—almost $5 billion—concentrated between 1998 and 2008, a significant portion of the period when the Director Defendants were consciously allowing Abbott employees to engage in the illegal, off-label marketing.

95. The financial success resulting from the illegal off-label sales of Depakote Products, notwithstanding the serious side effects and health risk to consumers, was a direct result of the Company's large-scale, illegal sales and sophisticated marketing campaign – which spanned from 1998 through at least December 2008 – to promote off-label sales of Depakote in its various formulations with the Board's *imprimatur*.

37

96.     As set forth in the *Qui Tam* Actions that ultimately led to the Company's $1.6 billion settlement with the U.S. Government, this marketing program, which occurred from the period beginning in 1998 through *at least* December 31, 2008, included: (1) the maintenance of a special sales and marketing division responsible for marketing off-label Depakote to geriatric care providers; (2) the payment of illegal kickbacks to medical care providers to boost Depakote prescriptions; and (3) the dissemination of false and misleading information to physicians and other health care providers concerning Depakote's safety and efficacy.

### D.     Abbott's Illegal Off-Label Marketing Scheme for Depakote

#### 1.     Overview of the Illegal Scheme

97.     The *Qui Tam* Actions were brought by former sales representatives of Abbott. These whistleblowers detail a "widespread, centralized scheme" at Abbott to engage in off-label marketing of Depakote between 1998 and 2009 that was "condoned by the highest levels of Abbott management."

98.     The relators in the *Qui Tam* Actions made highly specific factual allegations that triggered criminal and civil actions by the U.S. Government (subsequently joined by numerous state authorities).   These actions resulted in the Civil Settlement Agreement (covering conduct from 1998 through December 31, 2008) and the Criminal Plea Agreement, through which Abbott paid a total of $1.6 billion to resolve charges that it engaged in the illegal off-label marketing and promotion of Depakote Products.  As a direct result of this illegal conduct, the Individual Defendants who created, implemented, and/or oversaw this scheme, breached their fiduciary duties.  For example, according to the *Qui Tam* plaintiffs:

• Abbott engaged in a scheme since January 1, 1998 and continuing into 2009 to "submit and/or cause to be submitted hundreds of thousands of false claims to federal and state health care programs by systematically and illegally promoting Depakote®, Depakote Sprinkles®, [and] Depakote ER® . . . for unapproved, off-label uses in long term care facilities, assisted living facilities, mental retardation/developmentally disabled . . . facilities and other facilities . . . throughout the United States . . . . These false claims cheated the federal and state Governments out of hundreds of millions of dollars that should not have been paid, thereby enriching the Defendants, and subject[ing] patients to non-approved, ineffective, and unsafe uses of the Depakote® products."

• "Abbott Laboratories . . . methodically and recklessly endangered . . . those with Alzheimer's and other forms of dementia—through the illegal marketing of [Depakote] *a drug that Abbott knew was unapproved for the treatment of Alzheimer's, did not work to treat the disease, and was actually dangerous for use by the elderly*. Incredibly, Abbott did not limit its wrongful conduct to preying upon the elderly; it also unlawfully marketed its drug, Depakote, to an array of patient populations, including children, placing them at risk for life altering injury or illness."

• The majority of the use of Depakote Products was off-label. For example, by 2000, an estimated *85 to 90 percent of the long term care use of Depakote Products was off-label.* Approximately 85 percent of this population was Medicare and Medicaid patients.

99. Ultimately, as enumerated throughout this Second Amended Complaint, during the Relevant Period, Abbott engaged in off-label promotion of its Depakote Products in myriad illegal ways. Specifically, according to the *Qui Tam* Actions, Abbott promoted its

Depakote Products off-label to treat various health issues and diseases, including:

- For the treatment of aggression in adults and children who were mentally retarded and/or developmentally disabled, although the FDA never approved Depakote to treat aggression in any patient population;

- For the treatment of psychiatric conditions in children and adolescents;

- For the adjunctive treatment of schizophrenia;

- For the management and treatment of substance abuse in bipolar disorder;

- For the treatment of post-traumatic stress disorder and intermittent explosive disorder;

- For the treatment of borderline personality disorder;

- For the treatment of bipolar depression;

- For the treatment of "symptoms of mania";

- Promoting Depakote ER for uses for which only Depakote had received approval; and

- For the treatment of agitation and aggression associated with dementia in the elderly.

100. Relator Spetter also maintained that Abbott also "regularly engaged in deceptive and misleading promotion of the safety of the Depakote® Products, even downplaying serious known health risks. Sales representatives were instructed to detail the fact that the Depakote® Products were safe to use and had fewer side effects than competing drugs" when there was no evidence that this was true. In fact, because Depakote is a black box drug, it needs to be closely monitored by the treating physician. However, "Abbott engaged in a widespread promotion of the Depakote® Products as safe to treat the elderly suffering from dementia despite having warnings on the label against the risks of such use."

101. According to the *Spetter* Complaint, "[s]ince at least 1998, Abbott's sales

representatives were to (and did) provide health care professionals nationwide with Abbott-approved materials to influence the off-label prescribing of the Depakote® Products, including 'approved' clinical studies, industry supplements, and [Continuing Medical Education] CME material." These off-label materials "were provided to healthcare professionals at one-on-one details, in-services, speaker programs (both CME and non-CME), advisory boards, conferences, dinners, sporting events, and cultural events." Executives at Abbott decidedly omitted a crucial step by disseminating the off-label materials while simply casting aside the regulatory requirement that Abbott submit such promotional materials to the FDA for approval. ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████     ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████

102.    Likewise, according to Relator Dietzler – who was employed by Abbott from December 1999 through June 2008, and who sold Depakote in her capacity as a sales representative – during a June 2006 Leadership Development Summit training session in California, a district sales manager from Seattle named Justin Song said he was leaving the company because of *pressure from senior management* to sell Depakote for indications that were not medically accepted.

103.    Abbott designed its promotional materials to influence physicians to write more prescriptions for Depakote Products, including for numerous off-label uses. Relator

Spetter stated that Abbott's sales representatives were trained such that they were selling both Depakote and the validity of Abbott's clinical study at the time.

104.    Relator Dietzler also stated that Abbott provided its sales representatives, including herself, with various sales aids that promoted the use of Depakote for unapproved indications.  Examples include:  a glossy booklet originally produced in 2002 titled "Depakote A Spectrum of Treatment:  Past, Present, and Future," which discusses the potential effectiveness of a number of off-label uses, including treatment of agitation in elderly patients with dementia, psychosis associated with schizophrenia, and Alzheimer's disease; a publication from 2003 titled "A Pocket Guide to Dementia and Associated Behavioral Symptoms:  Diagnosis, Assessment and Management"; and a 2005 sales aid called "Depakote ER:  Selecting Appropriate Patient Types," which profiles four patients with symptoms characteristic of off-label disease states.

105.    For the reasons set forth more fully below, the Individual Defendants knowingly caused Abbott to violate myriad federal and state laws and FDA regulations in the fraudulent, illegal marketing and promotion of Depakote Products for unapproved, off-label uses.  Additionally, the Individual Defendants caused Abbott to violate its own internal policies and procedures.

## 2.    Abbott's Strategic Plan to Illegally Market Depakote Off-Label

106.    In June 1997, Abbott developed, and the Board approved, its 1998 Strategic Marketing Plan entitled "Depakote-New Psychiatry Markets" (the "1998 Strategic Marketing Plan").  The 1998 Strategic Marketing Plan called for the "[e]arly establishment of clinical efficacy [which] may create standard treatment regimens in the absence of FDA approved pharmacotherapy" for the "two most promising markets-Behavior Disturbances Associated with Dementia and Schizoaffective Disorder."

42

107. The 1998 Strategic Marketing Plan noted four "key objectives": (1) penetrating the Long Term Care markets to drive Depakote's growth, which includes the education of key decision makers, physicians, consultant pharmacists and nurses, using new indications for Depakote in mania, complex partial seizures, migraine prophylaxis, and publishing clinical data that demonstrates Depakote's effectiveness in treating aggression/agitation in elderly patients with dementia; (2) obtaining FDA indication for dementia with behavioral disturbance by conducting clinical trials necessary to receive an NDA; (3) capitalizing on Omnibus Budget Reconciliation Act of 1987 ("OBRA-87") restrictions to position Depakote as the "drug of choice"; and (4) contracting with major LTCPPs, who have the ability to influence therapy for the treatment of aggression/agitation in the elderly through formulary control and treatment protocols, to drive Depakote's growth.

108. The 1998 Strategic Marketing Plan set forth a number of methods by which the foregoing would be accomplished, including, among others: (1) establishing relationships with, and agreements to be forged by providing Unrestricted Educational Grants ("UEGs") to, the providers in support of initiatives to educate pharmacists, physicians and nurses and (2) by providing unrestricted grants for the development of consensus guidelines on the diagnosis and treatment of aggression/agitation in the elderly.

109. The 1998 Strategic Marketing Plan also discussed the Company's overall positioning, strategy, and message in the illegal off-label marketing of Depakote. For example, the Plan's "core strategy" called for: Depakote to be the "first-line choice for dementia with behavioral disturbance, targeting education to high potential geriatric psychiatrists, medical directors, and other key customers; expanding the number and scope

43

of clinical studies to solidify Depakote's clinical role; establishing Depakote as first-line treatment in practice guidelines of key pharmacy providers and managed care plans; and reinforcing competitive advantages versus antipsychotics and benzodiazepines."

### 3. The Off-Label Promotion of Depakote For The Control Of Agitation And Aggression In Elderly Dementia Patients

110.    With the approval of the 1998 Strategic Marketing Plan, the Company began its off-label promotion of Depakote for the control of agitation and aggression in elderly dementia patients as outlined in the plan.

### a. Abbott Creates the Long Term Care Sales Force Designed to Target Geriatric Care Providers to Laud Off-Label Uses of Depakote

111.    In early 1998, the Neuroscience Franchise of the Pharmaceutical Division of Abbott created a special sales division, initially called the Long Term Care ("LTC") division, whose primary purpose was to market Depakote to the rapidly expanding geriatric care market — *i.e.*, long term care facilities, skilled nursing homes, and assisted living institutions.   Sales persons became part of the LTC Sales Force, which was created specifically to maximize off-label sales for agitation and aggression associated with the treatment of elderly patients with dementia, a symptom for which there was no evidence Depakote provided any relief.

112.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████   (*see infra*, ¶¶ 283, 285-289)  As the LTC sales force was a critical component of the marketing strategy of Depakote, and the PPD had oversight of and responsibility for the marketing of all pharmaceutical products, the existence and activities of the LTC were known to the Current Board through the ████████████████

44

███████████████

113.     According to the *Spetter* Complaint, the LTC Sales Force targeted elderly persons with dementia who were largely institutionalized, were particularly vulnerable to medicinal side effects, and required careful monitoring.  Members of the LTC Sales Force were expressly instructed to ignore previous instructions to only sell Depakote on-label. Instead, they were told that their primary sales opportunities would be to sell Depakote off-label for agitation and aggression in the treatment of dementia.

114.     When Abbott first introduced its LTC Sales Force in 1998 – in conjun*ction* *w*ith the 1998 Strategic Marketing Plan – it was comprised of approximately 30 members. Relator McCoyd observed that by June 2007, it comprised approximately 180 members. Relator Spetter correspondingly noted that, as the LTC Sales Force's promotion of Depakote's off-label uses increased, so too did the sales for off-label uses.  As the LTC Sales Force had its genesis in the 1998 Strategic Marketing Plan, which was ***expressly approved by the Board*** at the time, it follows that the Board continued to keep watch of the LTC Sales Force, particularly since it grew exponentially over the course of barely a decade and was a major component in the off-label marketing of Depakote.

115.     Initially, the LTC division was one of four divisions responsible for marketing Depakote.  However, in 2004, to disguise its off-label promotion of Depakote Products from regulatory bodies, Abbott merged the LTC Sales Force into its hospital group and renamed the new, combined group as its Special Account Executive Institutional Sales Group ("SA").[5]  The name change did not alter Abbott's course of illegal off-label promotion and marketing of Depakote; Abbott continued to promote illegal, off-label uses of Depakote.

---

[5]  For consistency, references to the LTC Sales Force will also include any off-label marketing of Depakote also conducted by the SA.

Relator McCoyd was a sales representative in the LTC/SA division from its inception until 2007 when she left Abbott.  During her entire tenure at Abbott, Relator McCoyd marketed Depakote off-label – as a condition of her continued employment – for elderly patients suffering from a variety of symptoms associated with dementia.  According to the *McCoyd* Complaint, the highest levels of Company management designed and approved this reorganization in an effort to avoid the government's detection of Abbott's extensive off-label marketing campaign conducted by the LTC division.

116.    Further, the *McCoyd* Complaint confirmed that Abbott's LTC sales representatives received specific training as to the marketing of Depakote as an alternative to anti-psychotic medications used as off-label chemical restraints for elderly patients exhibiting agitation associated with dementia and Alzheimer's.  For example, Relator McCoyd stated that LTC sales representatives used a system called "Working the Wheel," through which the Company directed them to target physicians, geriatric psychiatrists, long term care facilities, and pharmacies likely to prescribe the drug to treat behavioral issues associated with dementia and Alzheimer's.  According to Relator McCoyd, the "Working the Wheel" system was used ***at least through June 2007*** – thus during the tenure of the Current Board.  Relator McCoyd could only aver the existence of "Working the Wheel" through June 2007 because that is when she left the Company.

117.    Additionally, Abbott trained its LTC Sales Force to promote Depakote to doctors and other health care providers as safe and effective for its unapproved use.  In the Agreed Statement of Facts, Abbott admitted that it "gave its LTC sales force a Dementia Backgrounder, which informed the sales force that Depakote had been shown effective in preliminary clinical trials to treat behavioral disturbances in dementia patients and that

46

Depakote did not have some of the same side effects as antipsychotics for this unapproved use."

118. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

119. According to the *McCoyd* Complaint, the Company also provided off-site training sessions for LTC sales representatives "focused on maximizing Depakote sales through off-label promotion." Abbott paid third-party consultants, such as PharmaCare Strategies, Inc., to conduct these training sessions, spending $2,000 per sales representative for each such training session.

120. Abbott also conducted off-label training in-house by having LTC sales representatives who had proven their ability to drive off-label sales of Depakote conduct training for other LTC sales representatives. Sales representatives were explicitly forbidden by supervisors from preparing any written materials on the topics which were covered to prevent any paper trail of the off-label marketing instruction. While upper-level mangers knew about these off-label training sessions, they did not attend or witness them first-hand so as to keep the artifice of plausible deniability instead.

121. According to Relator McCoyd, an email on July 12, 2006, from Peter G. Warnes, Abbott's National Account Manager, announced a "multifaceted strategic initiative" involving national meetings, teleconferences, newsletters, and workbooks to be provided to

physicians, consultants, and other health care professionals concerning the use of Depakote in long term care settings. This initiative sought to blur the lines between epileptic seizures within Depakote's label and other types of seizures, bipolar disorder, and behaviors associated with dementia that were outside Depakote's label.

122. Likewise, certain training materials, such as "Evidence-Based Selling for Specialty Sales Forces: A Participant Guide," were distributed to the LTC division in 2006, and trained the sales force to "leverage" clinical information concerning uses – including off-label uses – when planning a sales call. Key findings in clinical studies were to be turned into "key selling messages," even if the findings were off-label.

123. Abbott intensified its targeting of the geriatric market when several atypical antipsychotic drugs commonly used to treat dementia (such as Zyprexa, Abilify, Risperdal, as well as others) came under scrutiny because of health risks to older patients – which culminated in a black box warning on several of those drugs in 2005. At that point, Abbott expanded the number of SAEs who were required to persuade neurologists and psychiatrists to prescribe Depakote to treat dementia and psychosis in elderly long term care patients. This marketing initiative involved government-pay patients whose prescriptions were paid by Medicaid or Medicare.

124. Further, Relator McCoyd provided that LTC sales representatives also participated in "role plays," which were scripted sales calls developed by Abbott to address physician concerns about prescribing Depakote off-label. During these role plays, LTC sales representatives were taught how to promote off-label uses of Depakote despite objections by physicians. LTC sales representatives also were told to promote Depakote as a safer alternative to certain anti-psychotic medications without any scientific or reliable

data to support such claims. In fact, even after the off-label training sessions were completed, the LTC/SA sales members were required to routinely continue role plays with supervisors over the telephone "so that Abbott's scripted off-label messages about Depakote became standardized." Abbott also required Relator McCoyd and other LTC representatives to perform such telephone or "voicemail role plays" at least once or twice each month. Abbott even held contests each month to reward representatives for the best performance.

125. According to Relator Spetter, Abbott also trained its LTC Sales Force to use the following techniques and/or enhancements to increase the sales of Depakote:

- Up-front discounts through a charge-back system to minimize customer outlays and avoid rebate calculations;

- Rebate contracts based on market share performance;

- Bundled product deals in connection with programs implemented to affect market share performance favorable for a particular product or products;

- Extended dating, which allowed pharmacy providers to improve cash flow by deferring payments;

- Price protection (purportedly within the scope of applicable state and federal rules); and

- Availability of specialized packaging intended for the LTC market.

126. Relator Spetter stated that Abbott further instructed its LTC Sales Force to provide a myriad of kickbacks to influence pharmaceutical market share in the nursing facility. This was accomplished through control over physician prescribing habits and access to nursing facility patients by providing value-added programs, including:

- Regional/local educational symposia for physicians and nurses;

- Nursing in-service programs;

- Market research;

49

- Clinical research;

- New product information;

- Advisory boards; and

- Support for clinical programs (formulary maintenance, therapeutic interchange programs, disease management programs, and targeted therapeutic recommendations).

127. According to the *McCoyd* Complaint, Abbott also developed marketing materials for Depakote that Abbott's sales representatives used to promote off-label prescription of the product. The marketing materials focused on the symptoms of bipolar mania and served as a starting point for discussion of Depakote's off-label efficacy for treating agitation in patients with dementia and Alzheimer's, which shared some of the same symptomatology as bipolar mania.

128. ███████████████████████████████████████

████████████████████████████████  ███████████████

████████████████████████████████████████

██████████████████████████  █████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████  █████████████████████

████████████████████████████████████████

██████████████████████

129. According to the *McCoyd* Complaint, Abbott even purchased data that tracked

prescription volume and diagnoses by health care providers across the country, detailing the prescriptions of anti-psychotic and psychopharmacologic drugs with which Depakote might complete.  Abbott also purchased data detailing the prescription practices of health care providers specifically serving patient populations.  This data enabled Abbott sales representatives to target prescribers who were most likely to prescribe Depakote for off-label uses.

130.    By marketing Depakote for off-label uses as a treatment for agitation associated with dementia, Abbott knowingly aided and abetted nursing home operators seeking to circumvent OBRA-87's express regulations and intended purpose.

131.    In or around September 2006, the Center for Medicare and Medicaid Services ("CMS") provided guidance on OBRA-87's restrictions on "unnecessary drugs," which implied that drugs like Depakote, when used to treat agitation associated with dementia or Alzheimer's, also would fall under certain OBRA-87 regulations.  This did not deter Abbott, and it continued to circumvent OBRA-87 restrictions.  In fact, in February 2007, Abbott held a nationwide conference call for its entire LTC Sales Force, Depakote marketing staff, and upper level managers to discuss CMS' guidance.  During that call, Relator McCoyd confirmed that sales representatives were instructed to approach physicians regarding the CMS guidance and to inform them that the regulation would not apply if their patients were coded as having bipolar conditions or seizure conditions.  In other words, Abbott told its LTC sales representatives to instruct physicians on how to miscode their elderly patients – many of whom received state or federal funding to pay their medical expenses – with fictitious diagnoses to manufacture a medical need for the drug that complied with its approval on-label uses.

132.    Such actions violate numerous federal and state laws that are intended to prevent the submission of false claims for payment to the government and plainly violate the Company's Code of Business Conduct (*see, infra,* ¶¶ 320-323*)*, which explicitly states that Abbott employees "must avoid any conduct that could lead customers to submit false claims."

133.    According to the *McCoyd* Complaint, in an effort to conceal the elaborate off-label marketing campaign, Abbott forbade its LTC sales representatives from entering their call notes – *i.e.*, substantive descriptions of their contacts with health care providers – into the Company's electronic repository for such notes.  Rather, LTC sales representatives were required to keep their call notes in paper form, transmitted to their supervisors by facsimile.

134.    Relator McCoyd noted that Abbott further attempted to conceal the off-label marketing activities of the LTC Sales Force by manipulating the Company-wide computer system, called "MAX," to prevent the LTC sales representatives from recording that their visits with geriatric care providers served any purpose other than to discuss on-label uses of the drug.  Thus, any electronic record of a physician visit made by an LTC sales representative would reflect only that the representative met with a particular physician to discuss Depakote's ability to treat epilepsy, migraines, or bipolar disorder, regardless of whatever Depakote uses the sales representative actually discussed with the care provider.

135.    These actions clearly violate Principle 5 of the Code of Business Conduct (*see, infra,* ¶ 322*)*, which prohibits transactions and arrangements "structured to circumvent Abbott's internal control system" and the use of "false or artificial entries[] made for any purpose."

136.    Following the re-organization of the various sales divisions for Depakote,

LTC sales representatives also were directed to, and received training to, promote Depakote for other off-label uses, including: (1) the treatment of bipolar depression in adults and children and the treatment of bipolar mania in children, even though the FDA only approved Depakote to treat bipolar mania in adults; (2) the treatment of ADHD, developmental delay, psychiatric disorders, and/or behavioral problems for children; (3) symptoms associated with narcotic drug withdrawal and addiction; and (4) psychosis.

137.    The scope of the Company's efforts to promote the off-label use of Depakote to treat behavioral issues associated with dementia through the LTC Sales Force, and the demonstrable success of the program, shows that this marketing campaign did not result from the actions of a small group of rogue employees.  Rather, the creation of an entire sales division dedicated to targeting geriatric care providers, the expenditure of millions of dollars in training programs and marketing materials for that division, and the blatant manipulation of the Company's electronic records reflect a centrally-organized, institutional dedication to promote off-label uses of Depakote by geriatric care providers and long term care facilities. With such widespread and enduring efforts – which ran afoul of federal and state law, and FDA regulations as well as the Company's own codes of conduct and the mandates of the 2003 CIA – the only way that the Board could have remained ignorant of the LTC Sales Force's activities is if it had turned a blind eye or if the entire Abbott reporting structure was completely non-functional.

138.    On January 1, 2009, Abbott eliminated the Special Account Executive Institutional Sales Group, *i.e.*, the LTC Sales Force.

139.    In violation of their fiduciary obligations, the Individual Defendants knowingly caused and/or allowed these unlawful targeted marketing efforts to be

implemented and continue operating for years.

b. **Abbott's Improper Use of Misleading Clinical Studies to Support Unapproved Off-Label Uses of Depakote for the Control of Agitation and Aggression in Elderly Dementia Patients**

140. As confirmed in the Agreed Statement of Facts – which, as part of the Criminal Plea Agreement, chronicles the unlawful marketing of Depakote to which Abbott admits – Abbott submitted in 1996 an application to the FDA to conduct a 15-patient study of Depakote to treat agitation in elderly dementia patients. This study was titled "A Double-Blind Placebo Controlled Study of Valproate in the Treatment of Behavioral Agitation Associated with Dementia" (the "M96-491 Study"). However, in a letter to the Company dated January 28, 1997, the FDA expressed its reservations about what inferences could be drawn from the study's outcome – namely, that Depakote was "safe and well-tolerated in the sample of elderly subjects with dementia."

141. Not deterred by the FDA's response to the M96-491 Study, Abbott funded the M97-738 Study: another placebo-controlled, randomized study which was submitted to the FDA on November 18, 1997, and titled, "A Double-Blind Placebo-Controlled Study of Depakote in the Treatment of Signs and Symptoms of Mania in Elderly Patients with Dementia." However, in a letter to the Company dated January 15, 1998, the FDA expressed reservations about Abbott obtaining FDA approval of a new or expanded use of Depakote for mania based on this study.

142. Notwithstanding the FDA's reservations, the M97-738 Study commenced in 1998. If this study produced favorable results, Abbott planned on using it in its application with the FDA to promote its Depakote Products for mania associated with dementia. According to Relator Spetter, instead of waiting for the final results and any FDA approval,

Abbott began promoting the results in advance. Abbott even released an internal update to its LTC Sales Force, detailing the M97-738 Study. To facilitate the M97-738 Study, Abbott dispatched a team of Neuroscience Medical Liaisons to visit all of the nursing home clinical sites to conduct in-services with the staff. These were, in fact, no more than off-label presentations for Abbott's Depakote Products.

143. According to Relators Spetter and Dietzler, the "advantage" of targeting nursing homes with elderly institutionalized patients for use of Depakote to, in effect, chemically sedate agitated patients was that such prescriptions could be filled on a "standing order" basis. That means that a physician need not see the patient every time the drug is prescribed. If the patient is perceived to be agitated, Depakote can be prescribed by a health care worker as a "standing order." While the advantage for sales figures of the use of "standing orders" is that it can drive the usage of Depakote very quickly, the obvious disadvantage for the elderly, an often frail population in nursing homes who are susceptible to side effects, is that they are often left without close medical monitoring.

144. According to the *Spetter* Complaint, the principal investigator for the M97-738 Study, Dr. Pierre Tariot, was a paid Abbott consultant. On July 21, 1998, during the 6th International Conference on Alzheimer's disease and Related Disorders in Amsterdam, Dr. Tariot touted the impressive ***preliminary*** results of the M97-738 Study, reporting that "[m]edicines commonly used to treat epilepsy and other seizure disorders appear to be effective at soothing the agitation in people with Alzheimer's disease and other forms of dementia" and that such medicines appear to be "as good as or better than the medicines physicians have available now to treat agitation."

145. Notwithstanding Dr. Tariot's initial conclusions, according to the Agreed

Statement of Facts accompanying the Criminal Plea Agreement, the M97-738 Study had to be terminated in March 1999 prior to its full enrollment due to an increased incidence of adverse events in the Depakote treatment group (excessive patient somnolence and weight loss). The results of the M97-738 Study also failed to show that Depakote was effective in treating the "signs and symptoms of mania" in elderly dementia patients.

146. As such, the M97-738 Study was considered "negative," and, therefore, it could not even be presented to the FDA in a formal application.



147. Nevertheless, Abbott executives steadfastly and stubbornly insisted that the M97-738 Study would be used to promote Depakote Products for off-label uses, specifically in the treatment of elderly patients with dementia who exhibited mania symptoms. Abbott provided thousands of copies of the "results" of its M97-738 Study to its LTC Sales Force for distribution in its off-label promotion.

148. Relator Spetter confirmed that Abbott's LTC Sales Force was instructed to laud the merits of the M97-738 Study even though Abbott executives knew that the M97-

56

738 Study was deemed "negative" due to its early termination. Yet, Abbott instructed the LTC Sales Force to explain that the M97-738 Study demonstrated "the safety, efficacy and ease of use in treating agitation and aggression in dementia patients." The LTC Sales Force was even instructed to misrepresent and try to "explain away" the somnolence and weight loss issues demonstrated by the Study. Again, this promotion was off-label and illegal, as the FDA had not approved the drug for treating agitation in elderly dementia patients.

149.    In addition to the failed M97-738 Study led by Dr. Tariot, Abbott employed investigator-initiated studies ("IIS"). IIS are used by drug companies to encourage physicians and clinical investigators to study their products and publish or present their findings. A legitimate IIS is generally structured such that a pharmaceutical manufacturer provides a monetary grant to a physician or clinical investigator who, in turn, designs and conducts a clinical study on the manufacturer's product. Conversely, an IIS that is driven by a company's marketing department triggers potential liability under the federal Anti-Kickback Act. In addition, a manufacturer that is overly involved with an IIS could be viewed as the true "sponsor" of the trial. Thus, the trial outcome would not be independent. This lack of independence would need to be disclosed in publications, presentations, and other discussions.

150.    In 2000, Abbott began another clinical trial, the M99-082 Study (the "M99-082 Study"), to evaluate Depakote's safety and effectiveness to treat agitation in elderly patients with dementia. The study protocol called for a lower dose of the drug for some patients than the dose used in the M97-738 Study. According to the Agreed Statement of Facts, Abbott started, but never completed, the M99-082 Study because, among other reasons, "[t]he study was seriously underpowered and definitive conclusions from the data

57

were not possible." The data from this study was disclosed to the FDA in June 2003 when Abbott submitted its final clinical study report. Significantly, this report was not published in any medical journal or disseminated by Abbott's sales force.

151. According to the *Spetter* Complaint, in 2001, Abbott partially funded the M98-817 Study (the "M98-817 Study"), an IIS authored by Dr. Anton Porsteinsson that, as with previous studies, sought to establish the efficacy of Depakote to treat agitation in elderly patients suffering from dementia. The actions taken by Abbott in connection with the M98-817 Study leave no question that Abbott was in reality the sponsor of the study. First, the U.S. Government alleged that Abbott's Marketing Department was responsible for the enrollment of patients, selection of nursing home sites for study participants, and communicating with physicians and study investigators. Second, Abbott's Marketing Department went so far as to promote a contest under which nursing homes that enrolled five or more patients in the M98-817 Study would receive a gift of their choice from Abbott. Third, Abbott's sales representatives hosted several in-services at study sites on the off-label use of Depakote Products. Finally, Abbott was in charge of the protocol, adverse event reporting and, all medical, monitoring, and regulatory issues relating to the M98-817 Study.

152. Abbott began promoting the off-label results of the M98-817 Study well in advance of its completion in order to increase the off-label uses of Depakote Products. When the results were published in 2001, however, the M98-817 Study could only state that the data "suggest, ***but do not prove,*** that this form of therapy can be associated with reduced agitation in some patients with dementia in the nursing home." (Emphasis added). Incredibly, Abbott provided thousands of reprints of the M98-817 Study to its LTC Sales Force to counter the negative aspects of the M97-738 Study.

153.    In the Agreed Statement of Facts, Abbott confirmed that, after 2001, it never conducted another clinical trial of Depakote for the control of agitation and aggression in elderly patients with dementia and never submitted a supplemental new drug application to the FDA seeking approval of Depakote for this use.

154.    Even independent peer review studies concluded that Depakote was not efficacious for agitation in dementia.   For example, the Alzheimer's Association, the National Institute on Aging, and an unrestricted, investigator-initiated grant from Abbott jointly funded a 56-patient "Rochester Study," which was published in two separate peer-review medical journal articles in 2001 and 2003.  According to the 2001 article, the results of the first phase of the study "suggest[ed], but did not prove" that the use of Depakote "can be associated with reduced agitation in some patients with dementia in the nursing home." The article stated that "[t]hese results support[ed] a larger, placebo-controlled trial definitively addressing the therapeutic potential of this agent."

155.    In the 2003 article, the results of the second phase of the Rochester Study were described as consistent with the results of the first phase of the study, "which suggested but did not prove that short-term [Depakote] therapy can result in decreased measures of agitation."  It stated that the results from a study being conducted at the time by the Alzheimer's Disease Cooperative Study ("ADCS") (discussed below) would "likely further clarify the potential role of [Depakote] for treatment of" agitation in elderly patients with dementia.

156.    Another peer review study which was conducted by the ADCS from September 2000 to December 2002 ("ADCS Study"), involved a 153-patient, randomized, well-controlled clinical trial of the use of Depakote for the treatment of agitation in elderly

patients with dementia. The results of the ADCS Study were published in the peer reviewed American Journal of Geriatric Psychiatry in November 2005. It concluded that "[t]reatment with [Depakote] *did not show benefit* over placebo in the treatment of agitation associated with possible or probable [Alzheimer's disease] in the nursing home residents included in this trial." The article also discussed the earlier studies, including Abbott's M97-738 Study and the Rochester Study, and stated that *"[n]one of the earlier placebo-controlled studies proved that [Depakote] is efficacious for agitation in dementia*, and none were sufficient to define practice."

157.    In May 2003, Abbott received an oral report on the preliminary results of the ADCS Study. The preliminary results did not show that Depakote reduced symptoms of agitation and aggression. However, Abbott's Associate Medical Director questioned whether the study was designed properly to show efficacy. The Associate Medical Director believed the results could still prove positive for the drug if "a 'trend' for Depakote is shown, that could be seen as favorable data – especially if the safety data looks good."

158.    In December 2004, Abbott received an advance copy of the to-be-published medical journal article about the ADCS Study. Here, Abbott learned that the ADCS Study reached the same conclusions about Depakote's lack of efficacy as the M97-738 and the Rochester Study.

159.    In 2005, Dr. Tariot published a study (the "2005 Tariot Study") which found that Depakote Products showed "no benefit" for the treatment of agitation in dementia. Despite Dr. Tariot's earlier M97-738 Study's suggestion that the Depakote products could be used in the treatment of agitation in dementia, the 2005 Tariot Study found that none of the earlier studies had proved that Depakote Products were "efficacious for agitation in

60

dementia," and that "[s]ome recommendations in consensus statements regarding possibly beneficial therapies are not supported by definitive evidence." Notably, at no time did Abbott provide reprints of the 2005 Tariot Study to sales representatives for distribution to health care professionals. Once again, regardless of Dr. Tariot's conclusions, the FDA had at no point approved Depakote for the uses for which the LTC Sales Force was marketing it.

160. Thus, as is plain from the foregoing, Abbott engaged in extensive off-label marketing of Depakote to treat agitation in elderly dementia patients despite a complete paucity of supportive research – and, more importantly, without FDA approval – long after Abbott itself had abandoned its studies of this use of the drug.

### c. Abbott Improperly Promoted Off-Label Uses of Depakote With Journal "Supplements" and Reprints of Medical Journal Articles

161. Abbott also used non-peer-reviewed articles appearing in supplements to medical journals to promote off-label uses of Depakote. These journal supplements were typically prepared in connection with a CME set up for Abbott by a Medical Education and Communication Company to present information that appeared to be, but was not, free from Abbott's influence. ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████ Nevertheless, three such articles were:

a) "Phenomenology and Treatment of Aggression Across Psychiatric Illnesses," a 1999 supplement to *The Journal of Clinical Psychiatry*. The authors, doctors Charles B. Nemeroff and Alan F. Schatzberg, were both paid Abbott consultants, funded by an Abbott UEG. This fact was not disclosed in the supplement;

b)      "Bipolar Disorder & Impulsive Spectrum Letter, a 2001 supplement to *Psychiatric Times*. The supplement included an article entitled "Treating Agitation in Dementia with Anticonvulsants."  The supplement was prepared by CME, Inc., and supported by a UEG from Abbott.  The article discussed a presentation by Dr. Alan Siegel, a paid Abbott consultant. However, the article failed to disclose Dr. Siegel's relationship with Abbott; and

c)      "New Strategies for Managing Dementia and Improving Medication Pass Outcomes," a 2004 supplement to the periodical *Geriatrics*.  The supplement was sponsored as a CME and included faculty member Tom Snader, a regular Abbott speaker. The supplement presented a case study of a patient who had been suffering from agitation related to dementia and was prescribed Depakote ER.

162.    According to Relator Spetter, Abbott's management also supplied the LTC Sales Force with reprints of the supplements for use in their promotion of the off-label use of Depakote Products to control agitation and aggression in elderly patients with dementia. For example, as confirmed in the Agreed Statement of Facts, Abbott trained its LTC Sales Force to use a reprint of an article based on a retrospective chart review of 22 nursing home patients in two nursing homes.  Although the article was not based on a randomized, blinded, and controlled clinical study, Abbott trained its LTC sales representatives to use it to promote Depakote for unapproved uses.

163.    According to the Agreed Statement of Facts, in 2001, the LTC Sales Force was provided with reprints of the 2001 medical journal article about Abbott's failed M97-738 Study and reprints of the 2001 medical journal articles about the Rochester Study. Sales representatives were told how to respond to inquiries about the M97-738 Study's

premature termination for safety reasons by advising health care providers that the dosages used in the study were started too high and increased too fast. Sales representatives were trained to promote Depakote as appropriate to control agitation and aggression in elderly patients with dementia at lower doses.

164. In 2003, Abbott made reprints of the 2003 medical journal article about the result of the second part of the Rochester Study available to its sales representatives and trained them to use it to promote the use of Depakote to control agitation and aggression in elderly patients with dementia.

165. Finally, Abbott continued to disseminate copies of reprints of the Rochester Study journal article to health care providers after receiving a report on the preliminary results of the ADCS Study in May 2003, and after receiving an advance copy of the article about the ADCS study in December 2004. Notwithstanding this, Abbott continued to disseminate this article about the Rochester Study without disclosing the conflicting preliminary result of the ADSC Study.

### d. Abbott Bribed "Key Opinion Leaders" to Increase Sales of Depakote for Off-Label Uses

166. Abbott's LTC Sales Force developed a core marketing strategy of identifying "key opinion leaders," who were physicians who would influence their peers' medical practice and especially their prescription habits. From 1998 through at least December 31, 2008, Abbott provided these "key opinion leaders" with a multitude of improper and illegal kickbacks, including sports tickets, dinners, golf outings, speaker honoraria, and long term consulting agreements. In exchange for these kickbacks, the "key opinion leaders" would provide advocacy and key market feedback and activities in support of Abbott's Depakote Products.

167.    This violated federal laws and FDA regulations and 

168.    Relator Spetter revealed that Abbott even grouped the "key opinion leaders" into three levels, depending on their status and role in marketing Depakote Products in LTC facilities.   In general, the higher the "key opinion leaders" level assigned to a given physician, the more valuable the kickback provided to the physician.  For instance, Relator Spetter explained that Level I KOLs – the highest level – were generally awarded long term consulting agreements with the Company, while Level II KOLs were hired on a short term basis.

169.    Relator Spetter provided that Abbott also relied on the "key opinion leaders" to develop standing orders – which authorize nurses and pharmacists to administer medications according to a physician-approved protocol *without first requiring the patient to undergo a physician exam* – recommending the first-line, off-label use of Depakote

Products to treat agitation and aggression related to dementia. As a result, numerous geriatric patients diagnosed with dementia that displayed agitation and aggression were subjected to Depakote Products in the absence of a determination mandating such treatment by an unbiased physician.

e. **Abbott Improperly Used Speaker Presentations to Promote Off-Label Uses of Depakote**

170. Promotional programs funded by pharmaceutical companies like Abbott are highly regulated by the FDA. Such programs must be for the FDA approved use of the drug, must contain a "fair balance" of information regarding the drug, and must be truthful and not misleading. ███████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████   ████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

171. According to the *Spetter* Complaint, beginning as early as 1998, Abbott, through its LTC Sales Force, set up hundreds of speaker programs for health care professionals during which illegal off-label promotional presentations were made for the use of Depakote to control agitation and aggression in elderly patients with dementia. For example, as confirmed in the Agreed Statement of Facts, Abbott selected and compensated the speakers. In other words, these speaker programs were another way that Abbott illegally and improperly developed "key opinion leader" product allegiance.

**f.    Abbott Improperly Used CMEs to Further Promote Depakote Off-Label**

172.    Continuing medical education courses, which usually consist of local medical lectures featuring "key opinion leaders," are a valuable source of information for physicians. The content of the CME programs is intended to be independent of drug companies. The standards promulgated by the Accreditation Council for Continuing Medical Education ("ACCME") require that CMEs be independent from drug companies. The ACCME and FDA guidelines also require that independent educational grants cannot be tied to the purchase, sale, prescription, or recommendation of the company's products, there can be no price concessions, and there can be no payments to ensure that the grant recipient markets the company's drugs during the education program. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

173.    In addition, responsibility for and control over the selection of content, faculty, educational methods, and venue belongs solely to the CME provider in accordance with their guidelines. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

174.    However, from 1998 through at least December 31, 2008, Abbott regularly violated the requirements set forth by the ACCME, its own guidelines, and the FDA guidance by manipulating the CME programs into blatant promotional events for off-label

uses of Depakote Products to control agitation and aggression in elderly patients with dementia.

175.    According to the *Spetter* Complaint, Abbott contracted with ABcomm, Inc. to set up CME programs using clinical experts well recognized in their field, *i.e.*, "key opinion leaders."  ABcomm served as the exclusive vendor handling all speaker events for Abbott. Indeed, until at least 2005, Abbott had exclusive control over which speakers were selected for the ABcomm CME programs.  Furthermore, Abbott had complete control over the topics and slides the speakers were permitted to use, as well as what audience would be invited to hear the presentations.  In other words, Abbott controlled these CME programs in every conceivable way.  It used these CME programs not to educate as to the approved uses of Depakote, but to promote its off-label uses and to influence medical care providers to use Depakote Products for dementia treatment.

176.    For instance, through grant monies provided by Abbott, ABcomm sponsored an online CME seminar, in force through November 11, 2009, titled "An Evidence-Based Approach to Treating Behavior Disturbances & Seizure Patients."   The purpose of this presentation, which was directed to physicians, nurse practitioners, and pharmacists, was to promote Depakote products off-label – specifically, to "compare and contrast antiepileptic drugs based on safety and efficacy profiles, as well as drug interactions, in older patients who often have complicated drug regimens."

177.    The motive behind Abbott's hiring of ABcomm is clear.  ABcomm was retained for the sole purpose of providing the appearance of an "arms-length" transaction between Abbott and the educational program it was funding.  In other words, in the event that discussions of off-label uses of Depakote Products arose – which Abbott ensured that

they did – ABcomm's presence would make such discussions appear to be unrelated to Abbott. ABcomm was well aware of its role and understood that its direct funding from Abbott in the form of educational grants was conditioned on the presentation of topics that interested Abbott and included speakers that spoke favorably of Depakote Products.

178. In the Agreed Statement of Facts, Abbott admitted that, in promoting Depakote Products for the control of agitation and aggression in elderly dementia patients, the LTC Sales Force in 2001 was provided with a document, which Abbott funded through a UEG, titled "A Pocket Guide to Dementia and Associated Behavioral Symptoms: Diagnosis, Assessment, and Management" (the "2001 Dementia Guide"). A private entity, accredited by ACCME, designated the 2001 Dementia Guide as a CME. Thus, physicians and other health care providers were able to earn CME credits free-of-charge by simply reviewing the 2001 Dementia Guide and taking a test which was at the end of the 2001 Dementia Guide.

179. As early as 2002, Abbott provided its LTC sales representatives with copies of the 2001 Dementia Guide to promote Depakote Products to treat agitation and aggression in elderly dementia patients. The sales representatives were specifically instructed to become familiar with the 2001 Dementia Guide and to promote it to doctors and other health care providers, and that the 2001 Dementia Guide should be a resource that physicians and pharmacists could use to obtain additional continuing education credits.

180. At no time did the 2001 Dementia Guide disclose the results of Abbott's M97-730 Study. Worse yet, although the somnolence and dosing issues identified in the M97-738 Study were disclosed in the approval labeling, the approval labeling was not attached to the 2001 Dementia Guide, nor did the 2001 Dementia Guide refer health care providers to the approval labeling.

68

181. Relator Dietzler provides additional perspective into Abbott's use of live and packaged CME events to promote Depakote for off-label uses. Relator Dietzler cites numerous examples, including a live presentation by Dr. Michael Farnsworth in 2006 titled "Bipolar and Unipolar Depression"; a live CME by Dr. Dean Knudson in 2006 titled "Dementia, a Symptom Based Treatment Approach"; and packaged CMEs titled "New Data, Expert Opinion: Anticonvulsants' Impact on Bipolar Disorder & Schizophrenia (CD)" and "Alcohol Withdrawal and Alcohol Relapse Prevention: Implications for Clinical Practice."

### g. Abbott's Use of Rebates with LTC Pharmacy Providers

182. According to the Agreed Statement of Facts, and covered by the Civil Settlement Agreement, Abbott entered into contracts with LTCPPs that included provisions regarding the payment of rebates to the LTCPPs based on the increased use of Depakote in the nursing home services provided by the LTCPP. Under these agreements, Abbott paid millions of dollars in rebates to the LTCPPs based on the increased use of Depakote in these facilities, including the use of Depakote in the treatment of agitation and aggression in elderly dementia patients.

183. Abbott also funded and created programs and materials to train LTCPPs' consultant pharmacists about the use of Depakote for the control and treatment of agitation and aggression in elderly dementia patients and to encourage them to recommend Depakote for this unapproved use.

### h. Abbott Falsified Medical Education Requests for Off-Label Information About Depakote Products to Increase Sales for Such Off-Label Uses

184. The *Spetter* Complaint described how Abbott also increased off-label promotion of Depakote Products by manipulating "Medical Education Requests" from the

Abbott Medical Information Department. A "Medical Education Request" is Abbott's in-house term for a physician request for off-label information for one of Abbott's drugs.

185. Not satisfied with the frequency at which these requests were made for Depakote Products, Abbott's management encouraged sales representatives to solicit Medical Education Requests to make it appear that physicians had asked for this information when, in reality, it was merely the sales representative generating the Request. Abbott even ran internal sales contests to see which sales representative could get the most Medical Education Requests. Thousands of these Medical Education Requests for off-label information about Depakote Products were improperly solicited from physicians. Abbott executives knew or should have known that this conduct was illegal and improper but because the practice generated increased sales of Depakote Products, Abbott encouraged it.

i. **Abbott Improperly Generated Scientific "Evidence" to Support Off-Label Uses of Depakote**

186. Abbott executives carefully crafted pre-determined, easily marketable "key messages" to support off-label uses of Depakote Products, instead of utilizing scientific evidence derived from unbiased scientific inquiry. One such example of this was Abbott's fraudulent promotion of the neuroprotective effects of Depakote Products, which Abbott trained its LTC Sales Force to utilize as a centerpiece of Abbott's fraudulent marketing scheme. An article entitled, "Neuroplasticity and cellular resilience in mood disorders," by Husseini K. Manji, was not peer-reviewed, did not involve a double blind study, and suggested that Abbott's Depakote Products exhibited neuroprotective effects. Notwithstanding the obvious flaws of the Manji article, Abbott instructed its LTC Sales Force to utilize it to support the Company's position of off-label uses of Depakote Products, especially for treatment of Alzheimer's.

70

187. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████ ███████████████████████████

██████████████████████████

188.     Finally, article reprints disseminated for "scientific exchange" and branded materials that are product-related and devised for promotion are subjected to even further scrutiny by the Code of Federal Regulations, *i.e.*, 21 C.F.R. § 314.81(b)(3)(i), which requires submission to the FDA, rather than a mere in-house review by the GPRA.

**j.     Abbott Uses In-Services to Promote Off-Label Uses of Depakote at Nursing Homes**

189.     Abbott's LTC Sales Force also conducted in-services for nursing home staff and consultant pharmacists.   At these in-services, Abbott sales representatives illegally promoted Depakote Products for off-label uses.   In fact, in October 2003, Abbott created its "Depakote Long Term Care-2004 Strategic Investment Proposal" which included the strategy to market Depakote for controlling agitation and aggression in elderly patients with dementia in LTC facilities, including nursing homes.

190.     In addition, Abbott funded a 1998 CME in-service on a CD, which included a

71

videotape entitled "Treatment of Aggression in Elderly Dementia Patients." The videotape presentations, funded by Abbott, depicted actors pretending to be nursing home residents suffering from dementia, then showed a round table discussion among physicians, primarily with financial ties to Abbott, concerning treatment options for the "patients." The physicians inevitably selected Depakote as the drug to best treat the elderly patient's aggression associated with dementia. This presentation, as well as the entire contents of the CD, promoted off-label uses of Depakote Products.

191.    Abbott created (and funded) other in-services on CDs that depicted similar situations to that discussed above. All of these presentations illegally promoted off-label uses of Depakote Products.

> **k.    Abbott's Improper Detailing of Depakote Products to Health Care Professionals and Improper Targeting of Their Pharmacy and Therapeutics Committee**

192.    According to the U.S. Government, from 1998 through at least December 31, 2008, Abbott also engaged in unlawful "detailing" of its Depakote Products. Detailing is the one-on-one promotion of drugs to physicians by pharmaceutical sales representatives, usually through regular office visits, free gifts, and friendly advice, when drug representatives go directly to physicians' offices to describe the benefits of a specific drug. Detailing can be a lawful practice when engaged in to promote the tested and FDA-approved uses of a drug, but can be abused as it was here. Accordingly, Abbott executives incentivized sales representatives, on a nationwide basis, to go well beyond the lawful boundaries of detailing. As part of their effort to increase sales of Depakote Products, Abbott's LTC Sales Force engaged in numerous off-label detailing activities including "lunch 'n learns," breakfasts, dinner meetings, preceptorships, grand rounds, mini-

fellowships, and in-service training for the purpose of disseminating Depakote Products' brand message of off-label uses.

193.    Many health care organizations, including hospitals, institutional pharmacies, state Medicaid agencies and managed health care organizations maintain lists of preferred drugs that can be prescribed by health care professional in that organization or which are eligible for reimbursement by that organization, which lists are commonly referred to as "formularies."  The Pharmacy and Therapeutics Committee ("P&T Committee") of such an organization decides which drugs should be included in a formulary.    These P&T Committees are designed to be independent and are in place specifically to look out for the best interests of patients.   P&T Committees are instructed to avoid conflicts when making formulary decisions.

194.    Relator Spetter explained that Abbott, through its LTC Sales Force, routinely engaged in making promotions to P&T Committees to add Depakote Products to their formularies.   Specifically, Abbott sales representatives: (1) singled out P&T Committee members for special attention to influence their decisions to add Depakote Products to their formularies; (2) provided details and in-services to P&T Committee members touting the off-label uses of the Depakote Products; and (3) called on P&T Committee members for special promotions when a formulary decision was pending to add Depakote ER, including unsupported superiority claims concerning Depakote ER.

195.    In fact, Abbott was aware of this improper conduct as it related to the promotion of Depakote ER to P&T Committees.   In January 2009, Abbott's Regulatory Manager, Rick Leber, received a Warning Letter regarding Abbott's use of a Flashcard for the promotion of Depakote to pharmacies.   The Warning Letter raised with Abbott the

impropriety of guiding pharmacies toward use of the extended-release product because it still had six months left of patent protection. (*see*, *infra*, ¶¶ 303-306).

> **l.** **Abbott Funded the Development and Use of Clinical Practice Guidelines to Tout Off-Label Uses of Depakote and to Mislead Health Care Professionals**

196.    Since the formation of the LTC Sales Force in 1998 through at least December 31, 2008, a vital aspect of Abbott's scheme for off-label promotion of its Depakote Products was the development and use of "clinical practice guidelines" ("CPGs"). CPGs are summaries of "expert opinions" that are often used to identify standards of care, an important source of drug information for physicians. CPGs are typically formulated by panels of experts who are, however, partially or fully supported financially by pharmaceutical manufacturers like Abbott. CPG expert panelists also often have economic ties to the drug industry through research grants or speaker fees.

197.    Abbott's financial ties to numerous physicians and organizations that published CPGs and its resulting ability to taint the outcome of these purportedly independent studies were integral to the fraudulent marketing scheme of Depakote. For example, in April 1998, with partial financial support from Abbott, McGraw-Hill published purportedly "independent" CPGs titled "Treatment of Agitation in Older Persons with Dementia, A Postgraduate Medicine Special Report." These CPGs were updated in 2001 and again in 2005 in a CME series on the treatment of dementia in the elderly, which were also funded by Abbott.

198.    The CPGs published by McGraw-Hill provided a set of dementia management guidelines for physicians treating the elderly. These CPGs required the use of the most expensive drugs on the market including Depakote, Depakote Sprinkles and (after FDA

74

approval in 2000) Depakote ER as first-line treatment for dementia patients, even though this was not a use approved by the FDA.

199.   Abbott's influence on the creation of the CPGs and the choice of Depakote as a first line treatment was unassailable.  The initial creation of these McGraw-Hill CPGs was underwritten by educational grants from Abbott and other pharmaceutical companies. Among the "Expert Consensus Panelists" were numerous physicians with financial relationships.  For example, one panelist, Dr. Tariot, was a frequent Abbott-paid speaker, consultant, and lead researcher and author on the use of Depakote for the off-label treatment of agitation and aggression in the elderly.

200.   Once these partially Abbott-funded CPGs were released with the headline Abbott wanted (Depakote as first line treatment for off-label uses), Abbott provided major funding to disseminate copies of these CPGs to health care professionals caring for LTC patients throughout the United States.  In one example, Abbott hired Insight Therapeutics, LLC to produce a "pocket" version of these CPGs to be used as part of the CME courses that Abbott sponsored.  Abbott sponsored this pocket guide through a UEG.  In essence, Abbott paid for this pocket guide, and then used it extensively to promote off-label uses of the Depakote Products.  Similarly, Insight Therapeutics also produced a CD version of these CPGs, again funded by an Abbott educational grant.  Abbott controlled all of the content in this CD, which promoted off-label uses of Depakote Products.

201.   These same CPGs were also transformed into a promotional piece entitled "Treatment of Dementia and Agitation:  A Guide for Families and Caregivers."  This piece, which was partially financially supported by Abbott, unabashedly promoted the off-label use of Depakote Products.

75

202.    Abbott's LTC Sales Force also regularly used the pocket guide and CD containing the CPGs in their promotion of off-label uses of Depakote Products to health care professionals, specifically as first-time treatment of the elderly suffering from agitation and aggression associated with dementia.

203.    Through these various CPG-related tools, all at least partially funded by Abbott, Abbott deliberately engaged in the illegal promotion of its Depakote Products for off-label uses. Abbott deliberately bypassed governmental safeguards and scientific review.

204.    As a result, sales of Abbott's Depakote Products soared.  By 2000, sales of Depakote Products nationwide grew such that an estimated 85 to 90 percent of LTC use of Depakote Products was off-label.  In turn, an estimated 85 percent of these off-label prescriptions were for Medicaid and Medicare patients.

### m.    Abbott Exploits OBRA-87 Limits to Promote its Depakote Products

205.    All LTC facilities participating in Medicare and Medicaid must receive certification for compliance with federal requirements.  Under OBRA-87, each LTC facility must employ an outside consulting pharmacist who is responsible for the quality of pharmaceutical service.  42 C.F.R. § 483.60.

206.    Signed into effect in 1987, OBRA-87, also known as the "Federal Nursing Home Reform Act," provides a minimum set of standards of care and rights for people living in certified nursing facilities.  Among its many industry-changing provisions, OBRA-87 mandated that every patient in a facility covered by it had the right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for the purposes of discipline or convenience and which is not required to treat medical symptoms.  Restraints, whether physical or chemical, are allowed

76

under OBRA-87 in limited situations: (1) only to ensure the physical safety of the resident or other resident; and (2) only upon the written order of a physician that specifies the duration and circumstances under which the restraint may be used. As long term care facilities often used psychopharmacologic or anti-psychotic drugs such as Risperdal, Seroquel, Geodon, Abilify, and Zyprexa to sedate elderly patients demonstrating "behavioral" issues, OBRA-87 specifically regulated the use of such drugs in covered facilities.

207. Accordingly, OBRA-87 permits the use of these types of drugs only on the orders of a physician and as part of a drug plan designed to eliminate or modify the symptoms for which the drugs are prescribed. Also, at least annually, an independent external consultant must review the appropriateness of the drug plan of each resident receiving such drugs. LTC residents who have not previously used anti-psychotic drugs are prohibited from receiving these drugs unless anti-psychotic drug therapy is necessary to treat a specific condition, as diagnosed and documented in the resident's clinical record. 42 C.F.R. § 483.25(1)(2).

208. From 1998 through at least December 31, 2008, Abbott trained its sales force to use OBRA-87 as a selling point for Depakote in nursing homes and other facilities where elderly patients were treated. Sales representatives were told to "inform" geriatric physicians, nurses, and pharmacists that using Depakote, rather than anti-psychotic drugs, would allow nursing homes to avoid the "use" and documentation requirements of OBRA-87.

209. As Abbott confirmed in the Agreed Statement of Facts, and covered by the Civil Settlement Agreement, LTC sales representatives were provided with training material titled "Maximizing the Long Term Care Market Opportunity," which trained them to

promote Depakote to health care providers and employees of nursing homes. Specifically, this marketing material demonstrated that it was more advantageous to prescribe Depakote over atypical antipsychotics ("ATPs") for controlling agitation and aggression in elderly dementia patients because Depakote was not subject to certain provisions of OBRA-87.

210. Abbott trained the LTC sales representatives to state that, by using Depakote, nursing homes would avoid the administrative burdens and cost of complying with OBRA-87 regulatory restrictions otherwise applicable to ATPs.

211. Consequently, according to the *Spetter* and *McCoyd* Complaints, Abbott's management developed an aggressive marketing campaign to promote the Depakote Products' off-label use as superior to psychotropic drugs – in particular, anti-psychotic drugs. Abbott's marketing campaign highlighted: (i) the off-label use of the Depakote Products as replacements for anti-anxiety medications; and (ii) the flexibility resulting from prescribing the Depakote Products off-label, which did not exist with traditional anti-psychotics that were subject to the OBRA-87 limits.

212. In or around September 2006, the CMS provided guidance on OBRA-87's restrictions on "unnecessary drugs," which implied that drugs like Depakote, when used to treat agitation associated with dementia or Alzheimer's, also would fall under certain OBRA-87 regulations. Despite this, Abbott evaded OBRA-87 restrictions by employing a false sales pitch that Depakote's use would not trigger OBRA-87 oversight and that Depakote was an alternative to drugs that were subject to strict use requirements under the act. In fact, according to Relator Spetter, Abbott told its sales force that OBRA-87 did not apply to Depakote because the drug was "so safe" and "did not have the same terrible side effects associated with anti-psychotics. This was an easy sell, since the Company did not

provide its sales representatives with copies of OBRA-87, OBRA-87 regulations or related agency guidelines, instead providing them with articles underscoring the regulatory scrutiny of antipsychotics.

213.    Moreover, in February 2007, Abbott held a nationwide conference call for its entire LTC Sales Force, Depakote marketing staff, and upper level managers to discuss CMS' guidance.   During that call, Relator McCoyd confirmed that sales representatives were instructed to approach physicians regarding the CMS guidance and to inform them that the regulation would not apply if their patients were coded as having bipolar conditions or seizure conditions.   In other words, Abbott told its LTC sales representatives to instruct physicians on how to miscode their elderly patients – many of whom received state or federal funding to pay their medical expenses – with fictitious diagnoses to manufacture a medical need for the drug that complied with its approval on-label uses.   Abbott's position that Depakote was not subject to OBRA-87 and yet, at the same time, was a replacement for the anti-psychotic drugs used to treat elderly patients suffering from agitation associated with dementia, was inconsistent and disingenuous.

214.    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

### n.    Abbott's Illegal Kickbacks to Physicians to Increase Sales of Depakote for Off-Label Uses

215.    According to former Abbott insiders, from 1998 through at least December 31, 2008, Abbott furthered its off-label marketing campaign for Depakote through the payment of illegal bribes and kickbacks to medical professionals.  Abbott routinely provided

improper consulting fees, honoraria, speaker fees, gifts, grants, and research funding to physicians willing to promote Abbott's efficacy for various on- and off-label uses, at times using the services of third-party intermediaries to funnel the illegal payments.

216.    These illegal payments violated ███████████████ as well as federal and state laws prohibiting unlawful kickbacks to physicians. ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████ ██████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████ █████████████████████

███████████████████████████████████████

███████████████████

217.    According to Relator Dietzler, Abbott routinely paid "consulting fees" to key opinion leaders who Abbott believed were able to influence their peers to prescribe Depakote Products for on- and off-label uses.  These "consulting fees," in reality, served as "remuneration used for the marketing purpose of inducing and rewarding recommendations of and prescriptions for Depakote."  Abbott paid key opinion leaders and other favored health care providers fees ranging from $750 to $2,500 to attend all-expense-paid meetings

at high-end locations. Attendees at these meetings received education on topics that focused on Abbott's key on- and off-label marketing messages.

218. Abbott similarly paid key opinion leaders, advisors, and "consultants" honoraria ranging from $2,000 to $10,000 to speak at national and regional meetings, where these individuals delivered Abbott's marketing messages to other health care providers. These speaker programs were organized primarily by sales representatives, who were expected to spend portions of their marketing and sales budgets to arrange speaker programs in which favored prescribers marketed Depakote to other physicians in their fields. These honoraria were intended to boost sales of Depakote by the attendees and to reward loyal prescribers for their continued use of Depakote to treat their patients.

219. Similar to honoraria, UEGs presented an effective way of rewarding care providers who demonstrated a willingness to promote Depakote's on- and off-label uses to other physicians. Abbott used the UEGs to reward national key opinion leaders and other high prescribing physicians under the guise of research grants. The recipients, in turn, then gave presentations or wrote articles that inevitably promoted Depakote's on- and off-label uses. In addition, Abbott arranged UEGs for care providers to conduct and prepare CME materials on topics pre-selected by Abbott employees. These CME programs and materials also promoted Depakote's on- and off-label uses consistent with the Company's marketing scheme. Abbott's sales representatives then offered the CME programs and materials to physicians as another form of illegal kickback.

220. To give these UEG payment arrangements the appearance of propriety, Abbott used third-party intermediaries, such as ABcomm, to funnel the UEG funds to physicians. However, Abbott selected the physicians who would receive UEG funds and

dictated the subject matter of the physicians' presentations and/or research. Abbott went so far as to provide a UEG to a physician simply to lend his or her name to a report on the benefits of Depakote ER over generic formulations that Abbott "primarily prepared."

221.    At least until Depakote's loss of patent protection as an epilepsy treatment in July 2008, Abbott likewise provided "scholarships" to physicians to attend education programs on epilepsy sponsored by Abbott. Sales representatives awarded these scholarships to their favored and best customers to incentivize and reward the physicians' prescriptions of Depakote.

222.    Abbott also used "Telephone conferences" in which favored prescribers were paid fees for "educating" Abbott sales representatives on the uses for Depakote. These conferences, which were purportedly intended to benefit Abbott's Sales Force, also reinforced Abbott's key marketing messages for the presenters and provided the physicians with a fee for their participation in the telephone conference. Speakers received approximately $500 for their participation in these conference calls.

223.    All of the foregoing activities constitute illegal kickbacks under the federal AKS and many of its state counterparts. Abbott provided these speaker fees, education grants, and free gifts as an incentive and reward for the physicians' continued utilization of Depakote Products, with the added benefit of having these care providers market Depakote's on- and off-label uses to other medical professionals.

224.    These actions also had the effect of generating false claims for payment by government programs. Many of the medical providers who received these illegal kickbacks from Abbott, and correspondingly increased their prescriptions of Depakote because of the payments, also sought reimbursement from programs such as Medicare and Medicaid.

According to Ms. Dietzler, she noticed demonstrable increases in Depakote prescriptions by providers primarily treating government-pay patients *after they received illegal kickbacks* in the forms described above.

225.     Considering the number of national and regional programs that the Abbott Sales Force was expected to conduct, this system of illegal kickbacks cost the Company millions of dollars, paid either directly or indirectly to favored prescribers and key opinion leaders, from 1998 to 2009.  Such expenditures clearly could not have occurred absent a centralized, top-down directive to promote Depakote sales through unlawful means.

> **o.     Abbott Misrepresented Information Concerning Depakote's Safety and Efficacy to Boost Sales**

226.     The relators in the *Qui Tam* Actions similarly admitted to being instructed to provide false and/or misleading data in an effort to promote Depakote sales.

227.     Abbott, for example, instructed its sales representatives to mislead physicians concerning Depakote's effect on cholesterol, primarily relying on CME materials that Abbott paid to have produced.  Abbott initially represented that Depakote lowered cholesterol based on some limited data demonstrating that effect.  However, the research actually revealed that Depakote lowered levels of both "good" (HDL) and "bad" (LDL) cholesterol.  In response to questions by care providers, Abbott instructed its LTC sales representatives to represent that Depakote was "metabolically neutral," in contradiction of its earlier claims.  To support this new position, Abbott sales representatives were told to rely on CME materials generated at Abbott's request to demonstrate Depakote's "metabolically neutral" effect.

228.     Abbott further misrepresented the efficacy of Depakote ER as a replacement for Depakote DR.  Abbott expected that Depakote ER, which contains the same active

ingredient as Depakote DR, would retain its patent protection for longer than the delayed release formulation of the drug. Also, due to rebates offered on Depakote DR to government programs, Depakote ER was more expensive and hence more profitable than Depakote DR. Accordingly, it was important for Abbott to build brand loyalty amongst prescribers of the extended release formulation of the drug.

229. In an effort to persuade physicians to switch from Depakote DR to Depakote ER, Abbott instructed its sales representatives to market the new formulation as being "cheaper and better" than Depakote DR. Neither assertion, however, was true.

230. Because Depakote DR and Depakote ER are not "bioequivalent," it takes more Depakote ER to produce the same effect as a smaller amount of Depakote DR. However, Depakote ER was not available in dosages that would provide exact bioequivalence between the two forms of Depakote products. For example, Depakote ER was only available in 500mg and 250mg pills. Accordingly, a physician would need to prescribe more than one 500mg pill of Depakote ER to provide the same effect as one 500mg pill of Depakote DR. As a result, despite the fact that Depakote ER has a lower list price than Depakote DR, it cost more to switch a patient to a "bioequivalent" amount of Depakote ER because more of the medication is needed. In addition, because of the rebates offered to Medicaid on Depakote DR, Depakote ER was not less expensive to the government than Depakote DR.

231. Abbott's sales representatives were also instructed to pitch transitions to Depakote ER on a one-to-one basis with Depakote DR. Once a physician made that switch, Abbott expected that in time the physician would "updose" their prescriptions to achieve the same results they achieved with Depakote DR.

232.    With regard to the pills' efficacy, Abbott's sales representatives were instructed to pitch Depakote ER as a better product because it was "better tolerated" than the delayed release formulation.  Abbott sales representatives were trained to inform physicians that Depakote ER would cause fewer and less severe side effects than Depakote DR. Abbott, however, lacked any clinical data backing such an assertion.   Indeed, the Company's own documents demonstrated that the assertion was simply false.  Nevertheless, through CMEs paid for by Abbott, the Company created a litany of questionable clinical "authorities" for sales representatives to cite to physicians concerning Depakote ER's increased efficacy and tolerability.

233.    Additionally, to extend its patent for Depakote ER, Abbott undertook clinical studies of the efficacy of Depakote ER for pediatric use in bipolar mania and migraine prophylaxis.  These studies were unsuccessful in establishing a basis for FDA approval, and Abbott's own labeling for Depakote ER states that efficacy was not established for indications of either mania or migraine in children.  Yet even after the unsuccessful pediatric clinical studies, sales representatives, including Relator Dietzler, were required to market Depakote ER unaccepted, off-label indications in children by calling on pediatric psychiatrists.   Relator Dietzler was required to do so through the end of her employment in June 2008.

234.    These false assertions boosted sales of Depakote, often at the expense of the government, in violation of the False Claims Act and its state counterparts.

### 4.    The Off-Label Promotion of Depakote for Schizophrenia

### a.    Abbott's Improper Use of Misleading Clinical Studies to Support Off-Label Uses of Depakote for Schizophrenia

235.    In addition to the illegal promotion of off-label uses of Depakote for the control of agitation and aggression in elderly patients with dementia, Abbott promoted

Depakote for the treatment of schizophrenia. To that end, the Company also conducted clinical trials studying the safety and effectiveness of Depakote and atypical antipsychotics together to treat patients with acute exacerbations of the symptoms of schizophrenia.

236. According to the Agreed Statement of Facts, in 1999, Abbott submitted an application to the FDA to conduct the M99-010 Study for the use of Depakote in combination with certain ATPs to treat acute schizophrenia. In January 2000, Abbott submitted the study's results to the FDA, which demonstrated that Depakote, in combination with the ATPs, did not result in statistically significant improvement in symptoms as early as day three and continuing through day twenty-one. Thus, the FDA informed Abbott that it considered the M99-010 Study a negative study because it failed to meet the predefined efficacy endpoint and, therefore, the results of the Study could not be used to support an application for a new indication for Depakote for schizophrenia.

237. However, a summary of a June 2002 meeting with an external Abbott consultant stated that the consultant viewed the M99-010 Study to be "a positive trial (the effect size is robust)." The consultant also told Abbott that while the M99-010 Study "does not support combination use (as defined strictly the combination being superior to each agent [*i.e.* ATP] alone), could still argue for study 010's applicability to add-on" therapy.

238. Beginning in 2003 and continuing at least through 2006, Abbott's sales force used a study by Daniel E. Casey titled *Effect of Divalproex Combined with Olanzapine or Risperidone in Patients with Acute Exacerbation of Schizophrenia*, 28 Neuropsychopharmacology 182 (2003) – which was funded by Abbott – to promote Depakote for off-label adjunctive treatment of schizophrenia. Sales representatives, including Relator Spetter, used the Casey study in promotions to psychiatrists and other health care professionals

as evidence that "a preliminary but growing body of literature suggests a role" for Depakote in the adjunctive treatment of schizophrenia.

239.    Well into 2006, Abbott conducted promotional programs throughout the United States at which speakers were retained to tout the Casey study as support for the off-label use of Depakote in the adjunctive treatment of schizophrenia.    Such activities persisted despite serious concerns as to whether the study could support such claims.    Indeed, follow-up studies, including a 2004 study by Citrome, undermined the conclusions reached in the Casey study.

240.    In March 2003, Abbott conducted the M02-547 Study of Depakote ER combined with certain ATPs to treat acute schizophrenia.    The results of the M02-547 Study, which was completed in August 2004, did not show a statistically significant treatment difference between Depakote ER combination therapy and the ATPs alone.    The data also showed that somnolence, weight gain, and urinary incontinence were significantly higher for patients receiving Depakote ER combined with one of the ATPs than those treated with one of the ATPs alone.    Patients treated with Depakote ER combination therapy also had a significant decrease in platelet counts compared to those treated with ATP alone.

241.    Finally, in August 2006, Abbott posted a synopsis of the M02-547 Study results on a public website (www.clinicalstudyresults.org).    In December 2008, the results of the M02-547 Study were published in an article in the peer-reviewed medical journal, *Neuropsychopharmacology*.    The article stated that there were no significant treatment differences between Depakote ER combination therapy and ATP monotherapy.

242.    Abbott never conducted another clinical trial of the use of Depakote to treat schizophrenia and never submitted a supplemental new drug application to the FDA seeking approval of Depakote to treat acute schizophrenia.

### b. Abbott's Illegal Off-Label Marketing of Depakote for Schizophrenia

243. Beginning in or about 2002, and continuing until about December 2006, Abbott misbranded Depakote by marketing it for the treatment of schizophrenia. Abbott used the M99-010 Study's secondary endpoints to promote Depakote Products to health care providers as a treatment for schizophrenia. This marketing campaign was based on the 2001 "010 Communication Plan," which set forth Abbott's strategies for disseminating the favorable results of the M99-010 Study to health care providers.

244. The 010 Communication Plan called for conducting frequent meetings with health care providers. For example, in 2002, Abbott held a "Depakote Psychosis Speaker/Faculty Development Meeting" to review with physicians the results of the M99-010 Study. The trainers for this meeting included an Abbott Product Manager. Physicians were paid $2,500 plus travel and lodging expenses to attend. Abbott's invitation to doctors noted "[a]fter participation in the meeting, you may be asked to present this data at various medical information programs in 2002."

245. In March 2002, Abbott provided its physician-speakers with a slide presentation regarding the M99-010 Study data for use in speaking engagements. Also in 2002, Abbott organized programs at an American Psychiatric Association ("APA") meeting to provide the M99-010 Study data to promote Depakote for the treatment of schizophrenia.

246. In 2003, Abbott funded and organized "Psychiatry Consultant Meetings," which were used to provide information about the results of the M99-010 Study to health care providers. For at least two of these meetings, Abbott's Sales Force helped to target 30 and 45 psychiatrists, respectively, from around the United States. Abbott paid a $500 "honorarium" and travel expenses for each psychiatrist's attendance.

247.  Also in 2003, Abbott implemented another marketing plan titled "Schizophrenia Strategic Plan," which called for the positioning of Depakote as the "ideal 1st line agent for adjunctive therapy for schizophrenia based upon proven clinical efficacy" by, among other things, generating materials and funding programs that communicated the results of the M99-010 Study to doctors.  This strategic plan also called for training Abbott's Sales Force concerning the dissemination of CME materials with respect to the M99-010 Study and developing a speakers bureau to deliver Abbott's message about the efficacy of the adjunctive use of Depakote to treat schizophrenia based on the data from the Study.

248.  Finally, in February 2003, Abbott made available to its sales representatives reprints of the published medical journal article about the M99-010 Study results.  The message to sales representatives was that they could use such materials to market Depakote for schizophrenia as long as they were not too obvious about it.

249.  However, according to the Agreed Statement of Facts, Abbott decided not to conduct the two additional clinical trials required to obtain FDA approval of Depakote for schizophrenia, instead deciding to conduct one additional study, the M02-547 Study, so as to generate only positive data to support the message that Depakote was safe and effective to treat schizophrenia.

250.  In August 2004, Abbott completed the M02-547 Study.  In November 2004, one of Abbott's vice presidents sent an email in which he stated that Abbott had concluded that the M02-547 Study did not show a statistically significant treatment difference between Depakote ER combination therapy and ATPs alone.  He further explained:

> We are confident that there are no systematic [sic] issues with
> the study itself . . . . [The] overall weight of the evidence from
> both studies [M99-010 and M02-547] suggest[ed] that there is
> not an obvious benefit of adding Depakote to ATPs in acute

schizophrenia.

251.   In a January 2005 Executive Project Status Report, the M02-547 Study was described as "[t]rial completed.  Results negative not confirming -010 trial."  This report also described the status of Abbott's development of Depakote as a treatment for schizophrenia, stating "[a] significant issue has been identified that most likely or definitively will negatively impact critical path, budget, or target product profile."

252.   Nevertheless, in November 2005, Abbott approved another reprint of the M99-010 Study medical journal article and made copies available to the LTC Sales Force for dissemination to doctors and other customers.  Abbott omitted any information about the results of the M02-547 Study.

253.   Abbott also undertook other initiatives in implementing its 010 Communication Plan.  For example, in early 2006, Abbott issued its T1 2006 Plan-O-Gram, which included the reprint of the M99-010 journal article among the "CORE SELLING MATERIALS – psychiatric resources available to all representatives," omitting any information about the M02-547 Study.  In addition, in August 2006, Abbott gave its sales representatives a Depakote ER T3/06 Plan-O-Gram that also included the reprint of the M99-010 medical journal article as an available sales resource — again omitting any information about the M02-547 Study.

254.   In August 2006, Abbott posted a synopsis of the M02-547 Study on the public website www.clinicalstudyresults.org.  The synopsis stated that "Depakote ER in combination with atypical antipsychotic therapy was as well tolerated as therapy with [certain ATPs] alone," despite the fact that the incidence of somnolence in the combination group of patients treated with an ATP and Depakote was more than twice as high as in the

ATP monotherapy group and that this difference was statistically significant.

255.    After it posted the results of the M02-547 Study on the public website, Abbott notified its LTC Sales Force of this posting through an e-mail, dated August 14, 2006, identified as Representative Awareness Literature.  This notification was the first time Abbott advised the LTC Sales Force that the M02-547 Study had failed and that its results were not consistent with the results of the M99-010 Study.

256.    Finally, as part of its scheme to promote the off-label use of Depakote for schizophrenia, Abbott sent medical information letters to health care providers who had requested information about the off-label use of Depakote for schizophrenia.  Through at least 2006, these letters disclosed the results of the M99-010 Study, but not the results of the M02-547 Study.

### 5.    Abbott's Improper Marketing of Depakote Off-Label For Comorbidities

257.    On information and belief, pharmaceutical companies are permitted to market a drug to simultaneously treat more than one disease state in a single patient – known as "comorbidities" – provided that the drug has been approved by the FDA for that "dual duty" use. Approval for comorbidities is accompanied by a recommended dosage of the drug because assumptions cannot be made that the proper dose for one indication will be safe and effective for more than one.  The only comorbidity for which the FDA has approved Depakote is for simultaneous treatment of multiple seizure types in a single patient.

258.    Abbott trained sales representatives, including Relator Dietzler, to market Depakote for other comorbidities for which the FDA had not approved it, such as seizures combined with aggression, bipolar disorder and substance abuse, bipolar mania and dementia, and bipolar mania and high cholesterol.  No approved dosages exist for this type of off-label use

of Depakote, and yet Abbott trained its sales representatives to recommend "updosing" aggressively for comorbidities even though it had no evidence that the updose was safe or effective for that "dual duty" use.

259.    Relator Dietzler was required to organize promotional presentations on Depakote's usage for comorbidities.  Such presentations included:  Medical Liaison Jennifer Hayden, at the Willmar Regional Treatment Center in 2004, presenting on the prescription of Depakote to reduce substance abuse issues in bipolar patients; a presentation given by Relator Dietzler and a colleague in July 2005 on the use of Depakote ER to treat seizures and symptoms of dementia in geriatric patients; and presentations by epileptologist Dr. Joanne Rogin in 2008 regarding the benefits of Depakote for treating epilepsy combined with behavioral issues, depression, or dementia.

260.    In 2008, sales representative Jay Hutchinson organized several speaking engagements for epileptologist Dr. Joanne Rogin regarding Depakote ER's use for comorbidities.  At those presentations, Dr. Rogin indicated that Depakote had benefits for certain comorbidities for which it did not have FDA approval, such as epilepsy plus behavioral disorders, epilepsy plus depression, and epilepsy plus dementia, and suggested that Depakote ER should be prescribed for those dual conditions.

261.    In June 2008, Relator Dietzler's district sales manager Jennifer Mortale forwarded a voicemail to Relator Dietzler and other sales representatives in which an Abbott sales representative recounted his success in persuading an epileptologist to switch a patient from two antipsychotic drugs to Depakote ER only.  Mortale forwarded this voicemail as a "success story" about off-label marketing of Depakote for comorbidities.

### 6. The Company's Compensation Practices Incentivized Off-Label Marketing of Depakote Products at All Levels

262.     According to the Agreed Statement of Facts, the Individual Defendants knowingly established and maintained compensation practices that incentivized and rewarded off-label marketing of Depakote at all levels of the Company.  Abbott paid its LTC Sales Force bonuses based on total sales of Depakote which included sales of Depakote Products for unapproved uses of the drug.

263.     According to the relators in the *Qui Tam* Actions, Abbott encouraged off-label marketing of Depakote Products through compensation packages that either directly or indirectly rewarded sales representatives for their success in driving off-label sales of Depakote Products.  For example, Relator McCoyd explained that she received bonuses based simply on the weight of Depakote (as measured in kilograms) prescribed at the facilities within her territory.  As Relator McCoyd was an LTC sales representative who marketed the drug primarily for off-label purposes to geriatric care providers, this compensation structure clearly rewarded and incentivized her off-label marketing practices.  Relator Dietzler noted that NSRs similarly were rewarded for the success of their off-label marketing activities.

264.     Both Relators McCoyd and Dietzler confirmed that the Company used "quotas" to trigger certain incentive-based bonuses.  These quotas were focused on raw increases – regardless of on-label or off-label – in Depakote prescriptions within each sales representative's geographic territory.  ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

265. Relator Dietzler stated that Abbott likewise used sales contests, called "Special Performance Incentives for Field Forces," that provided money, trips, and other prizes to spur the achievement of specifically defined goals in Depakote sales. These incentive awards were not based on Depakote's on-label limitations.

266. Similarly, Relator McCoyd confirmed that Abbott sales representatives also received extra compensation for demonstrating their ability to promote Depakote's off-label use during mock role plays with their managers. These role plays then served as a teaching tool for other sales representatives to model their off-label sales pitch.

267. At the executive level, the Director Defendants maintained compensation practices that rewarded executives based, in part, on Depakote's off-label success, since the Board of Directors tied executive compensation almost exclusively to financial performance metrics. This focus on raw financial data created an even greater risk that executives would cause or otherwise allow off-label marketing practices.

268. According to the Company's annual proxy filings, since at least 1999, the Compensation Committee, on which defendants Fuller, Farrell, and Osborn currently serve, has placed great emphasis on performance-related compensation programs based on the achievement of the corporation's financial goals and bottom-line financial metrics such as earnings per share.

269. As a result, the compensation of the Company's executive officers rose in direct relation to increases in gross Depakote sales. For example, from 2000 to 2007, defendant CEO White's total annual compensation increased from approximately $3.71 million to $33.3 million. Meanwhile, Depakote sales rose over that same time period from

$776 million to $1.5 billion. Since 2007, the last full year in which Depakote had patent protection, defendant White's compensation has not surpassed his 2007 compensation awards, just as Depakote sales have not surpassed their 2007 levels.

270.    Similarly, during his tenure as President and COO of Abbott's Pharmaceutical Products Division, defendant Leiden saw his compensation rise from $1.59 million in 2000 to $4.74 million in 2005, his last full year of employment as President and COO of the Pharmaceuticals Product Division.

271.    While working as Abbott's Executive Vice President of the Pharmaceutical Products Division, defendant Dempsey received $5.47 million and $7.76 million in 2006 and 2007, respectively. Prior to that time, Dempsey watched his compensation rise only from $1.28 million to $1.98 million in the three years he served as Vice President of Pharmaceutical Operations for Abbott's U.S. operations from 2003 to 2005.

272.    In addition, because Abbott's executives' compensation packages relied heavily on stock options and awards, these executives each had an incentive to raise the Company's stock price, regardless of whether that stock price was supported by on- or off-label revenues.

273.    The Company's compensation policies and practices from 1998 to 2008 created unnecessary risks of legal and regulatory non-compliance and, indeed, were established and maintained by the Director Defendants to promote increases in sales of the Company's products, such as Depakote, regardless of the products' on-label market limitations. The Board of Directors made executive compensation awards in knowing disregard for the risks their performance-based compensation structure created for legal and regulatory non-compliance. Defendant White, who was directly involved in the oversight of

the Company's PPD during the period of wrongdoing, likewise established and maintained compensation policies for employees engaged in the sale and marketing of Depakote Products that encouraged off-label promotion.

274.    Defendant White personally benefited from the success of Abbott's off-label marketing practices, having been unjustly enriched through staggering increases in annual compensation, driven in substantial part by Depakote's off-label success.

## THE WRONGFUL CONDUCT AND THE CURRENT BOARD'S KNOWLEDGE THEREOF

**A.    The Wrongful Conduct Which Occurred on the Current Board's Watch**

275.    As discussed above, the Current Board presided over a range of illegal conduct. The Company employed numerous elaborate tactics to market Depakote off-label so as to fill its coffers with profits obtained through violating federal and state laws.  This long and expensive campaign was extremely costly to the Company, to say the least.

276.    Abbott settled the civil claims of the U.S. Government and the *Qui Tam* Actions for engaging in the illegal marketing, promotion, and sale of Depakote between *January 1998 and December 31, 2008,* for a shocking $800 million.  The Civil Settlement Agreement specifically provides  that Abbott illegally marketed Depakote during the Current Board's tenure by:

> (a) knowingly promoting the sale and use of Depakote for uses that were not approved by the [FDA] as a safe and effective ("unapproved uses"), including behavioral disturbances in dementia patients, psychiatric conditions in children and adolescents, schizophrenia, depression, anxiety, conduct disorders, obsessive-compulsive disorder, post-traumatic stress disorder, autism, and other psychiatric conditions.  Some of these unapproved uses were not medically accepted indications for which the United States and state Medicaid programs provided coverage for Depakote.  This promotion included, in part:
>
> > (i) making false and misleading statements about the safety, efficacy,

dosing, and cost effectiveness of Depakote for some of these unapproved uses;

(ii) marketing Depakote to health care professionals to control behavioral disturbances in dementia patients in nursing homes by claiming that Depakote was not subject to certain requirements of the [OBRA-87] designed to prevent the use of unnecessary drugs in nursing homes and that this use of Depakote would help nursing homes avoid the administrative burdens and costs of complying with [OBRA-87] regulatory restrictions applicable to antipsychotics.

(b) Offering and paying illegal remuneration to health care professionals and long term care pharmacy providers to induce them to promote and/or prescribe Depakote and to improperly and unduly influence the content of company sponsored Continuing Medical Education programs, in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

277.    The decade-long period covered by the Civil Settlement Agreement underscores the magnitude and duration of the illegal marketing scheme.  The wrongful conduct, spelled out in great specificity in the Criminal Plea Agreement and Civil Settlement Agreement, is beyond dispute.

278.    The duration of the wrongdoing is further underscored by a July 12, 2006 email from Peter G. Warnes, Abbott's National Account Manager whose documents were sought by the U.S. Government.  This email announced the ***launch*** of a "multifaceted strategic initiative" calling for national meetings, teleconferences, newsletters, and workbooks to be provided to physicians, consultants, and other health care professionals in connection with the use of Depakote in long term care settings.  Clearly, far from winding down, new unlawful initiatives were being crafted and set in motion in 2006.

279.    As indentified in the Civil Settlement Agreement and discussed more fully above, the following illegal conduct – "knowingly promoting the sale and use of Depakote for uses that were not approved by the [FDA] as safe and effective" - occurred through ***at***

*least December 31, 2008*:

- Abbott knowingly aided and abetted nursing home operators in circumventing OBRA-87's restrictions on "unnecessary drugs," promulgated by CMS in September 2006, which continued through at least December 31, 2008. To facilitate this scheme, in February 2007, Abbott held a nationwide conference call for the entire LTC Sales Force and upper level managers to instruct sales representatives to coach target physicians on how to miscode their elderly patients with fictitious diagnoses so that the CMS guidance would not apply. (¶¶ 106, 129-130, 204-213, *supra*);

- Abbott established the LTC Sales Force in 1998, which, according to Relator McCoyd, had ballooned to 180 members by the time she left Abbott in June 2007, and continued to flourish. It was not eliminated until January 2009. (¶¶ 110-114, 137, *supra*). The LTC Sales Force was created with the specific intent of maximizing off-label sales of Depakote for agitation and aggression associated with the treatment of elderly patients with dementia. This was accomplished through various marketing and promotional schemes which occurred on the watch of the Current Board:

  - From its creation in 1998 through at least December 31, 2008, the LTC Sales Force engaged in substantial off-label detailing of Depakote through "lunch 'n learns," breakfasts, dinner meetings, preceptorships, grand rounds, mini-fellowships, and in-service training. (¶¶ 191-194, *supra*);

  - According to Relator McCoyd, a tactic known as "Working the Wheel" was used by the LTC Sales Force to target certain health care providers, long term care facilities, and pharmacies to prescribe

98

Depakote to treat behavioral issues associated with dementia and Alzheimer's disease. The "Working the Wheel" tactic was employed through at least June 2007, when Relator McCoyd left the Company, but there is no indication that the practice ended when she departed. (¶¶ 114-126, *supra*); and

- From January 1998 through at least December 31, 2008, the LTC Sales Force used Clinical Practice Guidelines, or CPGs, for the off-label promotion of Depakote. A pocket guide and CD containing the CPGs when promoted off-label uses of Depakote were frequently distributed to health care professionals. (¶¶ 195-203, *supra*);

• Abbott trained sales representatives to market Depakote for comorbidities not approved by the FDA, such as seizures combined with aggression, bipolar disorder and substance abuse, bipolar mania and dementia, and bipolar mania and high cholesterol. Indeed, Relator Dietzler documented multiple instances in which presentations and speaking engagements were organized to promote Depakote's usage for comorbidities at least through 2008. These involved, for instance, using Depakote for treating epilepsy combined with behavioral issues, depression, or dementia. (¶¶ 256-260, *supra*); and

• From January 1998 through at least December 31, 2008, Abbott personnel were instructed to promote Depakote for off-label uses by providing false or misleading data. In particular, Abbott instructed its sales representatives to mislead physicians about Depakote's positive effect on cholesterol. (¶ 226, *supra*);

• From January 1998 through at least December 31, 2008, Abbott personnel instructed sales personnel to misrepresent the efficacy of Depakote ER as a replacement for

Depakote DR because the former retained patent protection for a longer period of time and was more expensive, and therefore more profitable. (¶¶ 227-233, *supra*).

280.    In addition, Abbott was only too happy to induce health care professionals to facilitate off-label uses by doling out generous financial incentives. The Civil Settlement Agreement is replete with facts showing Abbott's "offer[ing] and pay[ing] illegal remuneration to health care professionals and long term care pharmacy providers to induce them to promote and/or prescribe Depakote" occurred through at least through December 31, 2008:

•    From 1998 through at least December 31, 2008, Abbott bribed "key opinion leaders" with illegal kickbacks, including sports tickets, dinners, golf outings, speaker honoraria and long term consulting agreements, to provide advocacy and key market feedback in support of off-label uses of Depakote.  "Key opinion leaders" were engaged to develop standing orders recommending the first-line, off-label use of Depakote to treat agitation and aggression related to dementia. (¶¶ 165-168, *supra*);

•    From 1998 through at least December 31, 2008, Abbott routinely paid "consulting fees" to these "key opinion leaders," who Abbott believed could persuade their peers to prescribe Depakote Products for off-label uses.   (¶¶ 165-168, *supra*);

•    From 1998 through at least December 31, 2008, Abbott: (i) paid "key opinion leaders" fees ranging from $750 to $2,500 to attend all-expense-paid meetings at posh locations; (ii) paid key opinion leaders, advisors, and consultants honoraria ranging from $2,000 to $10,000 to speak at regional and national meetings to deliver the Company's off-label message; (iii) provided Unrestricted Educational Grants, or UEGs, to health care providers as a remuneration for promoting off-label use of Depakote; (iv) provided

scholarships until at least July 2008 to physicians to attend education programs on epilepsy sponsored by Abbott; and (v) paid fees of approximately $500 to favored prescribers that participated in "telephone conferences" to educate Abbott sales representatives on the off-label uses of Depakote. (¶¶ 214-224, *supra*);

- From January 1998 through at least December 31, 2008, Abbott entered into contracts with Long Term Care Pharmacy Providers, or LTCPPs, that included payment of rebates to the LTCPPs based on the increased use of Depakote in nursing homes for, among other things, the treatment of agitation and aggression in elderly dementia patients. Likewise, during that same time period, Abbott also created and funded programs and materials to train LTCPPs' consultant pharmacists about off-label uses of Depakote for use in elderly dementia patients. (¶¶ 181-182, *supra*);

- From January 1998 through at least December 31, 2008, Abbott also manipulated "Medical Education Requests" for off-label information about Depakote by encouraging sales representatives to solicit such requests to make it appear that they came from physicians rather than members of the sales force. (¶¶ 183-184, *supra*); and

281. Moreover, Abbott "improperly and unduly influence[d] the content of company - sponsored Continuing Medical Education programs in violation of the Federal Anti-Kickback Statute []" through at least December 31, 2008. As set forth in paragraphs 171-180, Abbott regularly violated the independence requirements established by ACCME, its own guidelines, and FDA guidelines by manipulating CME programs into brazenly public promotional events for off-label uses of Depakote. In one instance, ABcomm, through funding from Abbott, sponsored an online CME that was to expire on November 11, 2009, the purpose of which was to direct health care providers to promote Depakote off-

label.

282.    Significantly, the Civil Settlement Agreement specifically states that Abbott *admitted* that it committed Medicare and Medicaid fraud when it promoted Depakote (1) to health care providers in nursing homes for the control of agitation and aggression of dementia patients and (2) for the treatment of schizophrenia, and submitted hundreds of millions of dollars in reimbursement claims to the government that inflated Depakote's revenues.

283.    In sum, the illegal practices which Abbott engaged in the off-label marketing of Depakote occurred during the period January 1998 through at least December 31, 2008 and during the time in which the Current Board was constituted.

**B.     The Current Board Was Aware of or Should Have Been Aware of the Wrongful Conduct Which Occurred on its Watch**

284.    The Current Board was fully aware of the Company's illegal off-label marketing of Depakote and - in light of the financial benefits of the wrong doing - failed to take any action.  It is beyond dispute that the Current Board received the following specific information concerning the illegal scheme:  (1) ███████████████████████

███████████████████████████████████████████████████████

███████████████████ (2) the U.S. Government's Target Letter notifying Abbott that it was conducting an investigation into the "marketing and promotion of Depakote"; (3) the subpoena by the U.S. Government in July 2008 demanding documents concerning Abbott's sales and promotion practices with respect to off-label marketing of its drugs beginning in 1998; (4) the FDA's January 22, 2009 Warning Letter sent to Abbott concerning flash cards for Depakote; and (5) reports from the OEC identifying wrongful conduct at other pharmaceutical companies employing similar illegal means of promoting off-label uses of

FDA approved drugs.

285.    In the alternative, in order to fulfill its oversight responsibilities with respect to the Company's compliance with laws and regulations governing the promotion and sale of prescription drugs, the Current Board and its Public Policy Committee should have been aware of, and/or diligent in undertaking an investigation of, the illegal conduct. Had they adequately performed their responsibilities and obligations as directors as required under law and imposed by the 2003 CIA and the charter of the Public Policy Committee, this rampant and multifaceted misconduct would have abundantly presented itself.

**1.** 

286.    During the Relevant Period, the Company's Pharmaceutical Products Division, or PPD, was responsible for promoting Abbott's drugs in its United States and Puerto Rico.  The PPD maintains a sales force that directs its primary marketing efforts toward increasing the number of prescriptions written for Abbott's pharmaceuticals.

287. Given the title of Leiden's report and the responsibilities of the PPD and its role in the marketing and promotion of Depakote, one can only infer that the unredacted document would reveal a discussion of the

PPD's marketing and promotion strategy for all of Abbott's drugs, including Depakote, for that year.

288. 

Based on the titles of these reports, the responsibilities of the PPD, and its role in the promotion of Depakote, one must infer that the unredacted document would show a discussion of the PPD's marketing and promotional strategy for all of Abbott's drugs including Depakote.

289.

Based on the responsibilities of the PPD and its role in the promotion of Depakote, a fair inference can be drawn that the redacted information (over 99% of the

document) must contain a discussion of the PPD's marketing and promotion strategy for all of Abbott's drugs, including Depakote, for that year.

290.     Thus, the Current Board was at all times fully aware of the illegal marketing and promotional strategies the PPD employed with respect to Depakote, and lent its *imprimatur* to them.  If the various illegal off-label marketing efforts of Depakote were not communicated to and approved by the Board, then the Board breached its fiduciary duties by failing to assure itself that the market strategies employed were not in violation of law and that the mandated protocols in place as a result of the 2003 CIA and changes to the charter of the Public Policy Committee were functioning.  Had the Board done so, it would have concluded that the strategies employed by the Company violated federal and state law.

### 2.        The Target Letter From the U.S. Government

291.     Prompted by the first *Qui Tam* complaint, which was filed on October 31, 2007, the U.S. Government notified Abbott in the Target Letter sometime after October 31, 2007, and well before July 10, 2008 (when the first subpoena was served on Abbott) that an investigation of Abbott had been initiated.  The Target Letter notified Abbott "that [the U.S. Government] was conducting an investigation into the marketing and promotion of Depakote and instructed the Company to retain documents related to that topic" in anticipation of a subpoena.  *In re Subpoenas*, Misc. Action No. 1:10mc00001 (W.D. Va. Mar. 10, 2010), Abbott Laboratories' Memorandum of Law in Opposition to the Government's Motion to Compel [Dkt. No. 8].   The Target Letter was the U.S. Government's first shot across Abbott's bow in its crackdown on the illegal marketing of Depakote, with the clear implication that more was to follow.

292.     Importantly, the U.S. Government's Target Letter required Abbott to act

affirmatively and would have undoubtedly triggered a Company-wide directive to maintain or hold documents related to the off-label promotion of Depakote that included Abbott's Current Board, senior officers, and other employees.

293. Despite receiving the Target Letter sometime after October 31, 2007, but well before July 10, 2008, Abbott did not disclose to investors the U.S. Government's investigation until November 6, 2009, when it filed its quarterly report on Form 10-Q for the period ending September 30, 2009. According to that disclosure, Abbott finally acknowledged that the DOJ, through the United States Attorney for the Western District of Virginia, was "investigating Abbott's sales and marketing activities for Depakote" and was "seeking to determine whether any of these activities violated civil and/or criminal laws, including the Federal False Claims Act, the Food and Drug Cosmetic Act, and the Anti-Kickback Statute in connection with Medicare and/or Medicaid reimbursement to third parties."

294. As discussed more fully below in paragraphs 319-343, 351-364, Abbott's Board knew that the Company received the Target Letter concerning the off-label promotion of Depakote. First, the Target Letter required Abbott to ensure that the entire Company, including directors and senior officers, preserved relevant documents. Second, this letter struck right at the heart of the investigation and reporting requirements mandated by the 2003 CIA, which required the Board to assure that Abbott was in complete compliance with the FDCA, FDA regulations, Medicaid, Medicare, and other applicable federal and state laws. As part of these reporting requirements, Abbott's CECO was obligated to provide timely and regular reports regarding compliance issues directly to the Board or its designated subcommittee – which would have included the Target Letter and subsequent subpoenas.

106

295. ████████████████████████████████████

████████████████████████████████████████

████████████ There is no basis to believe that the CECO did not timely advise the Board of the Target Letter, especially when this implicated one of Abbott's blockbuster products and in light of Abbott's tarnished history when it comes to the illegal marketing of its products – a history that included the entry of Consent Decrees, Corporate Integrity Agreements, financial penalties to the U.S. Government, costly shareholder litigation. In addition, the Company's CECO is required to "report to the Public Policy Committee on an as needed basis on any significant compliance issues."

296. The CECO was hardly the only layer of oversight and source of information to the Board that should have been triggered by the U.S. Government's Target Letter. The Board's Public Policy Committee was specifically delegated the obligation to ensure that members of the Board fulfill their oversight responsibilities with respect to, among other things, ensuring Abbott's compliance with FDA regulations and related health care laws. In order for the Board to be kept apprised of this, the committee was required to "[d]evise a process for the dissemination of information to the Committee from Abbott's management with respect to regulatory and health care compliance matters, including, as appropriate, presentations to the Committee from management concerning the state of regulatory compliance and all issues with respect thereto." This information concerning compliance matters at the managerial level would flow directly to the Board. Thus, such policies, procedures, and mechanisms were specifically designed with one aim in mind – to keep the Company's senior executive officers and directors fully aware of all significant legal and regulatory compliance risks, issues, or concerns.

297. Thus, under the various mandates and reporting protocols, the Board cannot

plausibly claim to have been ignorant of the U.S. Government's Target Letter involving one of its blockbuster drugs.

### 3. The Subpoenas from the U.S. Government

298. In connection with its investigation, the U.S. Government served its first subpoena on Abbott through OIG-HHS on July 10, 2008. This subpoena requested documents from the Company's employees, including its present and former officers, directors, and representatives from January 1, 1997 through the date of service. The categories of materials sought included, among other things: (i) Depakote studies and clinical trials, including Study M97-738, Study M98-817, Study M99-082, Study M99-002, and the ADCS; (ii) communications about any of these clinical trials/studies; (iii) all documents pertaining to marketing, promotional, educational, or continuing medical education materials based on the clinical trials/studies; and (iv) articles, reprints, abstracts, posters, monographs, and training materials provided by Abbott to sales and marketing employees regarding the use of Depakote to treat agitation, aggression, or any other condition or symptom associated with long term care residents or other elderly persons. Abbott acknowledged in its Opposition to the Motion to Compel that it received this subpoena on July 14, 2008.

299. The U.S. Government, through OIG-HHS, issued a second subpoena to Abbott on December 9, 2008. This subpoena sought documents related to Abbott's off-label marketing of Depakote for the period of January 1, 1997 through the date of service from the highest levels of management, *including defendant White while he was serving as Chairman of the Board*; Richard Gonzalez, President or COO of the PPD; Jeff Leiden, President or COO of the PPD; and James Steck, Director of Regulatory Affairs for the

PPD.

300.     The U.S. Government's investigation continued, and in 2009, several more subpoenas were issued to Abbott, all seeking documents related to the Company's off-label promotion of Depakote.  For example, on March 6, 2009, the DOJ served two subpoenas on Abbott seeking "[d]etailed records of sales of Depakote []" and "[r]ecords of all payments received relate*d to Depakote."*

301.     *On December 18, 2009, DOJ served Subpoenas 29 a*nd 30, and on December 23, 2009 served Subpoena 31 on Abbott's outside counsel.  According to Abbott, Subpoenas 29 and 30 sought all emails from thirteen current and former employees during a thirteen-year period.  Thereafter, the U.S. Government moved to compel Abbott's compliance with Subpoenas 29, 30, and 31.

302.     In a March 10, 2010 order, Judge Samuel Wilson of the U.S. District Court for the Western District of Virginia, the same judge presiding over the consolidated *Qui Tam* Actions, compelled Abbott to produce a multitude of documents and emails from the files of defendants White, Leiden, and Dempsey.  The Court so ruled in light of the U.S. Government's assertion that it "ha[d] evidence that the off-label marketing of *other* FDA approved drugs may have followed a *similar pattern to the off-label marketing of Depakote*."

303.     Through Abbott's corporate governance and reporting structures, as discussed more fully below in paragraphs 319-343, 351-364, Abbott's Board knew that the Company received the barrage of subpoenas targeting the off-label promotion of Depakote following receipt of the U.S. Government's Target Letter.  For example, the CECO was required to notify and report to the Chairman, CEO and the Board of Directors on matters

relating to legal and regulatory compliance in connection with FDA regulations, law, and health care compliance. Since the subpoenas related to the U.S. Government's investigation into Abbott's illegal, off-label marketing of Depakote, it follows that the subpoenas, like the Target Letter would have been brought to the attention of the Current Board and the Public Policy Committee, beginning with the one served in July 2008 – especially since one of its members was subpoenaed to produce responsive documents.

### 4. The FDA 2009 Warning Letter

304. The FDA's Division of Drug Marketing, Advertising, and Communications, or DDMAC, found in 2009 that the Company was still promoting Depakote formulations with false and misleading marketing materials, notwithstanding prior warnings. In a January 22, 2009 Warning Letter sent to Rick Leber, Regulatory Manager at Abbott, the DDMAC notified the Company that its "Depakote ER/Depakote Continuum Care Pharmacy Formulary Flashcard" was "misleading because it omits risk information for Depakote and Depakote ER, broadens the indication of Depakote ER, omits indication information for Depakote, and omits material information about Depakote ER." The DDMAC concluded that the promotional material "misbranded" the drug in violation of the FDCA, and requested that Abbott "immediately cease the dissemination of violative promotional materials for Depakote and Depakote ER such as those described above." The DDMAC specifically found that:

> The Flashcard is misleading because it presents numerous efficacy claims for Depakote and Depakote ER, but fails to include **any** risk information in the body of the Flashcard. . . .
>
> The Flashcard is misleading because it implies that Depakote ER is indicated for use in a broader range of mania patients than Depakote [DR], when this is not the case. . . .

> The Flashcard is misleading because it omits material contextual information regarding the clinical pharmacology of Depakote ER. . . . [T]he Flashcard misleadingly suggests that Depakote ER use will offer patients some clinical benefit due to "smoother blood levels," when this has not been demonstrated.

(Emphasis in original).

305. Consistent with allegations in the *Qui Tam* Actions, the DDMAC also found that the promotional materials falsely suggested that Depakote ER offers an equal benefit to the same sized dose of Depakote DR, ignoring the lack of bioequivalence between the two formulations. As stated in the January 22, 2009 Warning Letter:

> Furthermore, the Flashcard claims that Depakote ER has "**All of the benefits of Depakote with the Advantages of Extended Release".** This claim is misleading because it omits important contextual information regarding the clinical pharmacology of Depakote ER. Specifically, Depakote ER is not bioequivalent to Depakote [DR] at equal daily doses. Rather as reflected in the CLINICAL PHARMACOLOGY, Pharmacokinetics section of Depakote ER's [product labeling], Depakote ER is 8-20% less bioavailable when compared to equal daily dose [sic] of Depakote [DR]. Therefore, to obtain an equivalent bioavailable dose [sic] of Depakote, the Depakote ER dose must be increased by 8-20%. . . . By failing to include this material contextual information, the Flashcard misleadingly suggests that Depakote ER offers all of the benefits of an equal dose of Depakote [DR], when this is not the case. (Emphasis in original).

306. Through Abbott's corporate structure, the Board knew or should have known that the Company received the January 22, 2009 Warning Letter. For example, the CECO was required to notify and report to the Chairman, CEO, and the Board of Directors on matters relating to compliance with laws and FDA regulations. Since the Warning Letter was related to the off-label Depakote marketing scheme, which the U.S. Government was investigating, the Warning Letter, like the Target Letter, would have been brought to the attention of the Board.

307. Perhaps most importantly, the January 22, 2009 Warning Letter makes it clear that Abbott was still engaging in the off-label marketing of Depakote even as the U.S.

Government's noose was tightening around the Company's neck and the Target Letter and subpoenas were piling up at its door. Indeed, when viewed in the context of the Target Letter, the sundry subpoenas issued by the U.S. Government, and the ramping up of a governmental investigation – all against the history of prior marketing improprieties both within Abbott and at its competitors – it would have been an appalling failure of all reporting mechanisms within the Company for an FDA Warning Letter regarding Depakote not to have been communicated to the Board.

### 5. The OEC Presentations

308. Abbott was required under the mandates of the 2003 CIA to implement a Comprehensive Ethics and Compliance Program. According to the Company's website, the CECO, or Chief Ethics and Compliance Officer, was responsible for the management and operation of the OEC and the development and enhancement of the compliance program. Additionally, the CECO "makes regular reports regarding compliance matters to the Chairman of the Board and the Chief Executive Officer, senior level leadership and Abbott's Board of Directors and committees." Thus, under this program, defendant White and the other Director Defendants were or should have been aware of significant compliance issues, including the U.S. Government's Target Letter and subpoenas, in part, through meetings with the CECO and by having access to the OEC.

309. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

310. 

311.

312.

313.     Having been informed by the U.S. Government sometime after October, 31, 2007 but before July 2008 that Abbott was being investigated for illegal off-label marketing of

Depakote, and in reaction to the actions taken by the U.S. Government against Abbott's peers for engaging in like conduct, █████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████  ███████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████  ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████

314.    As the Company did when it was caught by the U.S. Government in 2003 for its illegal kickback scheme and sales and promotional practices at its Ross unit, in the entry of the 2003 CIA, ████████████████████████████████  ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

315.

316.

317. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████ ██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████

318. ███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

319.     Thus, in a direct reaction to the Target Letter, which the Company received over a year prior (and which was never publically disclosed in the Company's SEC filings), and recognizing the U.S. Government's tenacious, active prosecution of similar conduct by its peers, and having prolonged its decision to take action in order to milk the remaining revenue from the illegal conduct, the Board ultimately began to act, knowing full well that its day of reckoning was approaching.

6.      **The Board was Informed or Should Have Been Informed of the Illegal, Off-Label Marketing of Depakote Through Abbott's Corporate Governance Structures**

320.    The Company was required, as a result of numerous governmental investigations and shareholder lawsuits, to adopt numerous policies and internal controls designed to provide the Board with the means to be apprised of, and address, regulatory compliance issues. These include the Corporate Governance Guidelines, the Code of Business Conduct, the Ethics and Compliance Program, and the mandates contained in the Charter of the Public Policy Committee.

a.      **Abbott's Corporate Governance Guidelines**

321.    According to Abbott's Corporate Guidelines, the Board is required to "comply with all laws, rules and regulations applicable to their capacity as directors of Abbott," and to "report violations of laws, rules, regulations or the Code of Business Conduct to the Chairman of the Board and Chief Executive Officer, the Vice President and Chief Ethics and Compliance Officer, or any other appropriate Abbott personnel." Furthermore, the Corporate Governance Guidelines state "[e]ach director shall have complete access to Abbott's management. Abbott's management will make itself available to answer the directors' questions about Abbott between meetings."

b.      **Abbott's Code of Business Conduct**

322.    Abbott's Code of Business Conduct ("the Code") is applicable to Abbott's officers (including defendants White, Leiden, and Dempsey), employees, contract workers, and agents. As noted in his "Dear Colleague" letter on the Code of Business Conduct, defendant White emphasizes the importance of the core values of "honesty, fairness and integrity," especially as they pertain to illegal conduct:

> [A]t all times our actions must be guided by clear understanding of legal and
> regulatory requirements, our policies and procedures, and share ethical principles

and values.

* * *

The Code makes it clear that we do not tolerate illegal or unethical behavior in any of our business dealings.

* * *

The communication of this Code is part of our ongoing effort to ensure a workplace and workforce that are fully committed to honesty, fairness and integrity.

323. The Code sets forth several "Principles," many of which were flagrantly violated in connection with the Company's sale and marketing of Depakote. For example, "Principle 1: Fair Dealing" requires honest and ethical dealing with Abbott's customers and mandates that Abbott employees and officers "must not take unfair advantage of anyone through manipulation, concealment [or] misrepresentations of material facts or any other unfair dealing practices." "Principle 2: Avoiding Conflicts of Interest" enumerates several examples of inappropriate conflicts of interest and provides that Abbott employees and officers will not provide any inappropriate gifts or kickbacks to customers in violation of the Company's Meals, Gifts and Entertainment policy, which is discussed in Principle 4, and which provides that Abbott employees, officers, and agents "will not seek, accept, offer, promise, or give (directly or indirectly) anything of value—including payments, fees, loans, services, entertainment, favors, or gifts—from or to any person or firm as a condition or result of doing business with Abbott." "Principle 5: Accuracy and Integrity of Books, Records and Accounts" provides that "[a]ll assets and liabilities of Abbott must be properly recorded in the regular books of accounts" and prohibits transactions and arrangements "structured to circumvent Abbott's internal control system" and the use of "false or artificial entries[] made for any purpose."

324. The most extensive part of the Code is "Principle 8: Compliance with Laws,"

118

providing in pertinent part:

> We are required to familiarize ourselves with all the laws, rules and regulations that apply in the areas within the scope of our work responsibilities, including, as applicable, the following areas. Contact the Legal Division for advice in any area where you have questions.

**Food and Drug Laws**

> We must comply with all applicable laws, rules, regulations, consent decrees and other orders of the United States Food and Drug Administration and any other similar governmental authorities in other countries where Abbott does business governing research, development, manufacture, distribution and promotion of foods, drugs, medical devises, diagnostic products, nutritional products or biological products.

* * *

**Laws Relating to Government Health Care Programs**

> We must comply with the laws relating to government health care programs in each country where Abbott does business.

> In the United States, its territories and possessions, and Puerto Rico, many Abbott products are reimbursed or purchased by Federal Health Care Programs – programs that include Medicare, Medicaid, Department of Defense and Department of Veterans Affairs health care programs, and many other Federal or Federally-funded programs that pay for health care items and services. These programs are regulated through a variety of laws affecting the coverage and reimbursement of Abbott products, as well as the sale or marketing of those products.

> Abbott is committed to full compliance with all Federal Health Care Program requirements, including the following:

**Federal Anti-kickback Statute**

> The laws that regulate these programs include the Federal anti-kickback statute, which applies both to our sales and marketing activities and to a broad range of other activities, including grants, research contracts, and consulting agreements. It generally prohibits offering or paying (or soliciting or receiving) cash or other benefits to induce the purchase, order, or recommendation of products eligible for payment by a Federal Health Care Program.

> To ensure Abbott's compliance with the anti-kickback statute, we must

119

carefully evaluate and properly structure any arrangements with parties in a position to prescribe, purchase or recommend Government-reimbursed products (for example, physicians, hospitals, nursing facilities, HMOs, PBMs, GPOs, or pharmacies), and must always avoid any arrangements that could inappropriately influence treatment or purchasing decisions.

**False Claims Law**

The civil False Claims Act and other statutes prohibit knowingly or recklessly submitting false claims to the Government, or causing others to submit false claims. Accordingly, we must exercise care to ensure that we do not submit any inaccurate or otherwise improper claims for payment to the Government, or cause others to do so. Abbott contracts with Government customers and must avoid submitting any clams for payments not properly due. While Abbott does not itself submit claims to insurance programs like Medicare and Medicaid, many of our customers do. We must avoid any conduct that could lead customers to submit false claims by following procedures carefully designed to ensure that any information we provide to customers about Medicare or Medicaid reimbursement for our products is accurate and otherwise proper.

\* \* \*

**Civil Monetary Penalties Law**

This law authorizes the imposition of civil monetary penalties for a variety of conduct. . . .

Failure to adhere to Federal Health Care Program requirements, or to related Abbott standards, policies and procedures, can have a number of serious consequences, both for Abbott and for the individuals involved. . . [V]iolation of these laws may result in exclusion of Abbott or individual employees from participation in Federal Health Care Programs.

    c.    **The Board's Committees - Generally**

325.    According to the Company's Definitive Proxy Statement filed on Form DEF

14A with the SEC on March 15, 2011, the following was noted with respect to the Board's

and certain members' responsibility:

The board has risk oversight responsibility for Abbott and administers this responsibility both directly and with assistance from its committees. The board has determined that the current leadership structure, in which the offices of chairman and chief executive officer are held by one individual

and an independent director acts as lead director, ensures the appropriate level of oversight, independence, and responsibility is applied to all board decisions, including risk oversight, and is in the best interests of Abbott and its shareholders. The chairman of the nominations and governance committee acts as the lead director to facilitate communication with the board and presides over regularly conducted executive sessions of the independent directors or sessions where the chairman of the board is not present. It is the role of the lead director to review and approve matters, such as agenda items, schedule sufficiency, and, where appropriate, information provided to other board members. The lead director is chosen by and from the independent members of the board of directors, and serves as the liaison between the chairman and the independent directors; however, all directors are encouraged to, and in fact do, consult with the chairman on each of the above topics as well. The lead director, and each of the other directors, communicates regularly with the chairman and chief executive officer regarding appropriate agenda topics and other board related matters.

326.    The Company's previous proxy statements have similar explanations of the Board's oversight responsibility.

327.    As a matter of corporate governance in connection with Board meetings, senior officers of Abbott and/or members of the Company's committees prepared packages of relevant information concerning the business and financial position of the Company, including internal audit reports that detailed the functions of critical departments of the Company and litigation reports detailing pending or possible litigation or regulatory actions concerning the Company.  The Director Defendants, under existing principles of corporate law and governance, and the charters of the various Board committees, had the responsibility to ensure that Abbott had in place a reporting system that would enable them to determine if Abbott's activities complied with applicable law and whether proper reports were being generated.

328.    The Board has several committees to monitor specific aspects of Abbott's business. These committees have their own supplemental charters setting forth additional express duties for their respective members.  For example, the charter of the Audit

Committee provides that its members "shall assist the Board in fulfilling its oversight responsibility with respect to . . . legal and regulatory compliance as it relates to financial matters, including accounting, auditing, financial reporting, and securities law issues . . .; and Abbott's enterprise risk management, including major financial risk exposures . . ." In addition, the charter permits the Audit Committee, "to the extent it deems necessary or appropriate, conduct or authorize investigations into any matter within the scope of its authority and may retain legal counsel, accountants and others to assist it in the conduct of its responsibilities, including investigations."

### d.    The Public Policy Committee

329.    While the full Board maintains oversight responsibility with respect to legal and regulatory compliance, the Board delegates certain responsibilities in this regard to its Public Policy Committee, which has been in existence since at least 1999. As a result of the Consent Decree Litigation and the TAP Derivative Litigation brought by Abbott shareholders, the Public Policy Committee charter evolved over time, with each change subjecting the Director Defendants to additional notice requirements regarding compliance issues and problems with respect to compliance with regulations and laws. The settlements of those shareholder actions and the 2003 CIA created additional systems and protocols designed to inform the Board of problems with the Company's compliance with federal health care regulations and programs, such as those involving the Depakote Products.

330.    Abbott's Public Policy Committee is expressly charged with ensuring that the members of the Board fulfill their oversight responsibilities with respect to, among other things, Abbott's legal and regulatory compliance.

331.    The Public Policy Committee Charter provides as follows:

1. *Purpose.* The Public Policy Committee of the Board of Directors shall assist the Board in fulfilling its oversight responsibility with respect to: public policy, regulatory (including regulation by the Federal Food and Drug Administration, as well as other domestic, foreign and international regulatory bodies) and government affairs and healthcare compliance issues that affect Abbott . . . by discharging the responsibilities set forth below.

\* \* \*

3. *Authority and Responsibilities.* To assist it in the conduct of its responsibilities, the Public Policy Committee shall consult with management and, to the extent it deems it necessary or appropriate, may seek advice and assistance from Abbott employees or others, and may retain legal counsel and other advisors. The Public Policy Committee shall report to the Board on a regular basis. . . .

The Committee shall:

- Review and evaluate Abbott's policies and practices with respect to maintaining legal, regulatory and healthcare compliance (recognizing that other board committees assist the Board of Directors in reviewing certain areas of legal and regulatory compliance), and review them with the Board as appropriate.

- Devise a process for the dissemination of information to the Committee from management with respect to regulatory and healthcare compliance matters, including, as appropriate, presentations to the Committee from management concerning the state of regulatory compliance and all issues with respect thereto.

- The Chief Ethics and Compliance Officer shall report to the Public Policy Committee on an as needed basis on any significant compliance issues. . . .

332.     These policies, procedures, and mechanisms are specifically designed to keep the Company's senior executive officers and directors fully aware of all significant legal and regulatory compliance risks, issues, or concerns, whether raised to their attention internally or externally. Thus the Board has had tools at hand to discover and eliminate legal and regulatory non-compliance whenever it arises.

## 7.     The Mandates of the 2003 Corporate Integrity Agreement

333.     As noted above, Abbott's Board became subject to various requirements to

123

protect against misconduct relating to Medicare and Medicaid fraud, and to ensure compliance with all federal health care program requirements as part of the 2003 CIA.

334.    In 2001, Abbott's Ross Products Division was sued by the U.S. Government for a kickback scheme to encourage hospitals, nursing homes, and home-care providers to buy pumps and related supplies by giving the products away or providing steep discounting, but then billing the products at higher prices to, among others, Medicare. Abbott settled the claims related to its Ross Division in July 2003 for approximately $622 million.

335.    The 2003 CIA was executed on or about July 22, 2003, by two Abbott lawyers on behalf of the Company.  In addition to reforming its sale and marketing practices as alleged in the Ross litigation, the primary purpose of the 2003 CIA is to set up protocols and procedures and implement policies all geared towards "ensuring that Abbott's activities are in compliance with all Federal health care program requirements." Thus, Abbott's "current and future directors," who would receive regular training concerning, among other things, "proper and improper promotion, marketing, and sales practices," were on heightened alert and required to be vigilant with respect to Abbott's marketing and promotion of all of its products - not just the enteral nutrition items and services involved in the Ross litigation.  It would be a breach of the fiduciary duty of care for the Board to assume, without a proper investigation, that all other products, including Depakote, were being promoted in accordance with FDA regulation and law.

336.    The CIA required the Company to direct its Chief Compliance Officer to develop and implement written "policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with federal health care

program requirements." Additionally, Abbott was directed to revise and redistribute its Code of Business Conduct, which was required to set forth, in relevant part: "Abbott's commitment to full compliance with all Federal health care program requirements, including the federal anti-kickback statute"; "Abbott's requirements that all of its Covered Persons shall be expected to comply with all Federal health care program requirements"; and "the requirement that all of Abbott's Covered Persons shall be expected to report to the Chief Compliance Officer or other appropriate individual designated by Abbott suspected violations of any Federal health care program or of Abbott's own Policies and Procedures."

337. The 2003 CIA also required the Company to create an internal mechanism for directly reporting compliance violations to the Board and required active involvement by the Board in policing Abbott's compliance with the FDCA and the federal Anti-Kickback Act. For example, the 2003 CIA specifically required the Chief Compliance Officer to "make periodic (or at least semi-annual) reports regarding compliance matters directly to the Board of Directors of Abbott, or its designated subcommittee, in such form or manner as the Board of Directors of Abbott determines, and shall be authorized to report on such matters to the Board of Directors at any time."

338. Additionally, the 2003 CIA called for each Board member to receive annual training regarding the CIA, Abbott's Compliance Program, and specific training regarding (in addition to, among other things, proper methods of promoting, marketing, and selling enteral nutrition items and services for which federal health care program reimbursement may be made, in accordance with all applicable statutes, regulations, and requirements including, but not limited to, the federal AKS) "examples of proper and improper promotion, marketing, and sales practices." All of the Director Defendants who were

members of the Board during the pendency of the 2003 CIA received this training and thereby would have been aware of all compliance matters, including those involving the Depakote Products, as described herein.

339.    As described above, the Director Defendants knew that they were obligated under the terms of the 2003 CIA to ensure that they and Abbott at all times complied with the FDCA, FDA, Medicaid, Medicare, and other applicable federal and state laws. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████   █████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

340.    As required under the 2003 CIA, the OEC would periodically provide updates regarding Abbott policies and procedures that pertain to general issues and to health care compliance issues. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

341.

342.

343.

██████████████ This reporting procedure should have been triggered when Abbott received the Target Letter notifying it "that [the government] was conducting an investigation into the marketing and promotion of Depakote and which instructed the Company to retain documents related to that topic." ████████████████

████████████████████████████████████████████

████████████████

344.    Thus, between (1) the 2003 CIA requiring the Director Defendants to be proactive in ensuring that Abbott was at all times in compliance with federal and state regulations and laws governing the sale and promotion of its products, and imposing requirements for the Director Defendants to be regularly trained and updated on any illegal activity involving, among other things, Medicare and Medicaid fraud and illegal kickbacks, and (2) Abbott's corporate governance protocols, including the Public Policy Committee creating mechanisms for management to report illegal activity and violations of health care compliance rules and regulations to the Board, the Current Board knew or should have known at all times about possible health care compliance issues regarding the Depakote Products.

###    8.    At All Times, the Individual Defendants Knew that Off-Label Marketing of Prescription Drugs was Illegal and Would Result in Harm to the Company

345.    As described above, the overlapping prohibitions on off-label marketing imposed by the FDCA, the FCA, the AKS, regulations promulgated by the FDA, and the rules and FDA regulations governing Medicare/Medicaid were long-standing and prominent aspects of Abbott's pharmaceutical business, and each Individual Defendant was well aware of these prohibitions and the importance to the Company of compliance with

these laws.

346.    Each Individual Defendant was aware of the prohibition on off-label marketing.  For example, the Director Defendants (for the years in which they were directors) signed Abbott's Forms 10-K filed with the SEC each year during the Relevant Period and, in so doing, were required to assure themselves of the matters discussed therein and of Abbott's business, operations, and finances, that the Forms 10-K filed with the SEC were accurate.   Through this process, the Director Defendants were required to make themselves aware of Abbott's regulatory status and exposure, including the continuing illegal practices of the off-label marketing of Depakote and the Company's response to the FDA's Warning Letters.

347.    For example, by signing the Form 10-K for fiscal year ended December 31, 2010, filed on February 18, 2011, each Director Defendant represented its awareness of the following:

> **Regulation:** ***The development, manufacture, sale, and distribution of Abbott's products are subject to comprehensive government regulation.*** Government regulation by various federal, state, and local agencies, both domestic and international, which includes detailed inspection of, and controls over, research and laboratory procedures, clinical investigations, product approvals and manufacturing, ***marketing and promotion****, sampling, distribution, record keeping, storage, and disposal practices, and achieving compliance with these regulations, substantially increases the time, difficulty, and costs incurred in obtaining and maintaining the approval to market newly developed and existing products.  ***Government regulatory actions can result in*** delay in the release of products, seizure or recall of products, suspension or revocation of the authority necessary for their production and sale, and other ***civil or criminal sanctions, including fines and penalties. . . .***

348.    Similarly, the 2010 Form 10-K states:

> ***Abbott is subject to numerous governmental regulations and it can be costly to comply with their regulations and to develop compliant products and processes.***

*Abbott's products are subject to rigorous regulation by the U.S. Food and Drug Administration, and numerous international, supranational, federal, and state authorities. . . .*

\* \* \*

*Abbott must incur expense and spend time and effort to ensure compliance with these complex regulations. Possible regulatory actions could include warning letters, fines, damages, injunctions, civil penalties, recalls, seizures of Abbott's products and criminal prosecution.* These actions could result in, among other things, substantial modifications to Abbott's business practices and operations; refunds, recalls or seizures of Abbott's products; a total or partial shutdown of production in one or more of Abbott's facilities while Abbott or Abbott's suppliers remedy the alleged violation; the inability to obtain future pre-market clearances or approvals; and withdrawals or suspensions of current products from the market. Any of these events could disrupt Abbott's business and have a material adverse effect on Abbott's revenues, profitability and financial condition.

349. Likewise, the 2007 SEC Form 10-K acknowledged each Director Defendant's awareness of the regulations imposed by Medicaid and Medicare and the need for Abbott to comply with the anti-kickback and false claims laws:

*Laws and regulations affecting government benefit programs could impose new obligations on Abbott, require Abbott to change its business practices, and restrict its operations in the future.*

*Abbott's industry is also subject to various federal, state, and international laws and regulations pertaining to government benefit program reimbursement, price reporting and regulation, and health care fraud and abuse, including anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil* sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to evolving interpretations, which could require Abbott to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt Abbott's business and result in a material adverse effect on Abbott's revenues, profitability, and financial

condition.

350. The 2007 Form 10-K was signed by Director Defendants White, Alpern, Austin, Farrell, Fuller, Osborn, Scott, and Tilton, each presumably having investigated to assure himself or herself that the above descriptions were accurate and that Abbott was not in significant violation of any of the above laws and regulations which affect the Company's business.

351. The Company's Forms 10-K filed during the Relevant Period contain paragraphs similar to those above and were signed by the Director Defendants who served at the time.

**9. The Individual Defendants Were Put On Notice of the Use of Illegal, Off-Label Marketing of Depakote as a Result of Prior Government Investigations and Warnings Concerning Abbott's Other Marketing Practices and Therefore Should Have Been Vigilant When Provided Information from the PPD Concerning the Marketing and Promotion of Abbott's Drugs, Including Depakote**

352. The pharmaceutical industry has constantly been in the crosshairs of the federal and state governments as a result of regulatory violations and criminal conduct. A number of these situations directly involved Abbott, further establishing knowledge on the part of the Current Board of deficiencies in the Company's internal controls over regulatory and legal compliance.

353. For example, as discussed in greater detail above, in 2001, TAP agreed with fifty states and the District of Columbia to pay $875 million in civil criminal penalties for violating the Prescription Drug Marketing Act and False Claims Act, and pleaded guilty to criminal charges over TAP's marketing practices for its cancer drug Lupron. These marketing practices resulted in significant overpayment by the U.S. Government for TAP's cancer medication. At the sentencing hearing in the matter, the federal judge presiding

over the case explained: "I don't want anyone forgetting about the fact that this company, not under present management, knowingly abused the public trust in a most, and I use my words carefully, despicable way. . . ."

354.    On August 23, 2001, the *Chicago Tribune* reported that another division of Abbott, the Ross Products Division, was being investigated for a similar kickback scheme. At issue, according to the *Chicago Tribune,* was whether the medical product manufacturers engaged in a kickback scheme to encourage hospitals, nursing homes or home-care providers to buy pumps and related supplies used to feed seriously ill people by giving the products away or selling them at a discount. Some providers then allegedly billed the products at a higher price to either Medicare or Medicaid, .

355.    On July 23, 2003, Abbott settled the Ross investigation, incurring charges of approximately $622 million. As part of the settlement, C.G. Nutritionals, a division of Ross, pleaded guilty to a federal charge of Obstruction of a Criminal Investigation of Health Care Offenses, which was entered on October 27, 2003.

356.    The settlement also obligated Abbott to enter into a comprehensive CIA – The 2003 CIA - with the OIG-HHS that required Abbott to reform its sales and marketing practices. The 2003 CIA bound the current and future Abbott Directors to its terms. It was in effect until October 2008, and thus bound each of the Director Defendants.

357.    The requirements of the CIA further heightened the Director Defendants' awareness of the need to prevent off-label marketing. The CIA required Abbott to revise its Code of Business Conduct to make unmistakably clear that the Director Defendants and Abbott had to comply with the requirements of the FDCA, the FDA, Medicaid, Medicare, and other applicable statutes, and of the key role of the Board of Directors in ensuring

compliance with these laws by Abbott employees.

358.    Under the CIA, all of the Director Defendants were also required to certify in writing that they had "received, read, understood" this Code of Conduct and would "abide" by it.  Further, the CIA mandated that the Director Defendants receive "reasonable and appropriate general training" concerning the "requirement of the CIA" and Abbott's compliance program, including the mandate that Abbott and the Director Defendants comply with federal health care program requirements and the laws applicable to reimbursements made through federal health care programs, including the False Claims Act.

359.    These investigations resulted, in part, from increased efforts of the federal and state governments to prevent unlawful marketing practices in the pharmaceutical industry.  Indeed, many of Abbott's peer companies and competitors, all of which espouse similar commitments to ethical marketing practices and legal and regulatory compliance, paid substantial penalties for unlawful sales and marketing practices during the same time period that the Individual Defendants knowingly allowed the Company to continue to market Depakote for off-label uses.

360.    For example, in October 2004, a division of Pfizer, Inc. agreed to plead guilty to two felony counts and pay $430 million in penalties to resolve criminal and civil charges raised in a 1996 *qui tam* action alleging that Pfizer promoted its anti-epileptic drug Neurontin, a direct competitor to Depakote, for off-label uses, including bipolar disorder, pain, migraine headaches, and drug and alcohol withdrawal.  At the time, this settlement represented the second largest criminal penalty imposed on any pharmaceutical company— second only to TAP's criminal penalties discussed above.

133

361. Despite the fact that the world's largest drug company, Pfizer, publicly pleaded guilty to crimes involving the off-label marketing of a direct competitor to Depakote — which had sales approaching $1 billion by that point in time—the Individual Defendants did not take any action to curb the illegal sales and marketing practices that were rampant at Abbott.

362. In addition to TAP and Pfizer, other pharmaceutical companies have paid substantial fines and penalties for illegal sales and marketing campaigns during the period of wrongdoing alleged in the *Qui Tam* Actions including, but not limited to: (a) Schering Plough's $345.5 million settlement in 2004 to resolve claims concerning an illegal kickback scheme through which the company conspired with customers to defraud Medicaid by knowingly charging its customers less for its allergy medicine Claritin than the customers sought in Medicaid reimbursements; (b) Serono Labs' $700 million settlement in 2005 to resolve illegal kickback claims and unlawful marketing claims for its AIDS drug Serostim; (c) Eli Lilly and Co.'s $36 million fine in 2005 for falsely marketing its bone strengthening drug Evista as a treatment for breast cancer; and (d) Intermune, Inc.'s $30 million settlement in 2006 to resolve off-label marketing allegations regarding its lung disease drug Actimmune.

363. Finally, in 2007, Purdue Pharma agreed to pay $634.5 million to settle claims regarding its marketing practices for its powerful pain medication OxyContin. The claims alleged, among other things, that Purdue falsely marketed the product as being hard to abuse and less addictive than other pain medications. As Abbott disclosed in its SEC Form 10-K filing in 2004, Abbott was named as a defendant in numerous lawsuits involving OxyContin because Abbott promoted the drug to certain specialty physicians under a co-

promotion agreement with Purdue. Thus, the Individual Defendants could not reasonably have been unaware of these developments.

364. The sales and marketing investigations and settlements described above, and the reports generated by the OEC, were an unmistakable wake-up call to the Board that they had a duty to *actively* root out and eliminate illegal sales and marketing practices at the Company. Even when the Director Defendants were aware that the U.S. Government had begun investigating and prosecuting pharmaceutical companies aggressively for fraud and illegal sales and marketing practices, they consciously chose to do nothing to end Abbott's illegal sales and marketing campaign for Depakote.

365. The foregoing also shows that Abbott's practice of off-label marketing of its various products occurred despite receiving numerous FDA Warning Letters during the course of thirteen years, consent decrees, hundreds of millions of dollars in fines, CIAs, shareholder actions, and criminal and civil prosecution.

## THE U.S. GOVERNMENT'S INVESTIGATION AND SETTLEMENT WITH ABBOTT FOR $1.6 BILLION

366. As early as late 2007 and continuing through 2012, the U.S. Government continued to investigate potential violations of FDA regulations and law arising out of Abbott's illegal off-label marketing of Depakote as a treatment for agitation and aggression in the elderly and health care fraud arising out of that allegedly improper use—which included, upon information and belief, review of millions of pages of internal documents and emails as well as interviews with various current and former Abbott employees and personnel.

367. Abbott was notified of the U.S. Government's investigation upon receiving the Target Letter in either late 2007, after the filing the first *Qui Tam* action, or in early

2008, well before the service of the first subpoena from OIG-HHS in July 2008. Abbott did not disclose this investigation until November 6, 2009, when it reported in its Form 10-Q that the DOJ had begun an investigation into its sales and marketing of Depakote. According to the disclosure, "the government is seeking to determine whether any of these activities violated civil and/or criminal laws, including the federal False Claims Act, the Food and Drug Cosmetic Act, and the Anti-Kickback Statute in connection with Medicare and/or Medicaid reimbursements to third parties." While the content of the disclosure was accurate, in reality, the investigation had started well over a year before the Company first disclosed it to shareholders. Abbott continued using this same disclosure in each of the next two annual reports it filed with the SEC.

368. On July 10, 2008, the U.S. Government, through OIG-HHS, served its first subpoena on Abbott requesting documents related to Depakote studies and certain marketing and promotional materials from January 1, 1997 through the present. OIG-HHS issued a second subpoena on December 9, 2008, again seeking documents from Abbott related to its off-label marketing of Depakote for the period of January 1, 1997 through the date of service from the highest levels of management related to, among other things, "[c]ertain Abbott sales divisions that were responsible for Depakote; [t]he use of Depakote in treating behavior in certain patients; [a]rrangements regarding Depakote between Abbott and companies providing pharmacy services to long term care facilities; [c]omplaints, comments, or adverse events pertaining to off-label promotion of Depakote; and Depakote-related communication between Abbott and the FDA." In fact, by the end of 2009, the U.S. Government, through OIG-HHS and the DOJ, issued several more subpoenas to Abbott seeking documents related to the Company's off-label promotion of Depakote.

369.     On December 18, 2009, DOJ served Subpoenas 29 and 30, and on December 23, 2009, served Subpoena 31 on Abbott's outside counsel, to which Abbott balked at providing a response.  This discovery dispute ended up in court and a March 10, 2010 order by Judge Wilson of the U.S. District Court for the Western District of Virginia compelled Abbott to produce defendants White's, Leiden's and Dempsey's live emails and snapshot emails retrieved from backup tapes after crediting the government's assertion that it "ha[d] evidence that the off-label marketing of other FDA approved drugs may have followed a similar pattern to the off-label marketing of Depakote."

370.     Less than a week later, on March 15, 2010, Abbott filed a Form DEF 14A with the SEC, which disclosed that "in accordance with Abbott's articles of incorporation, ***Abbott has advanced defense costs on behalf of three former officers in connection with the United States Department of Justice's criminal and civil investigation of Abbott's Depakote sales and marketing activities***." (Emphasis added).  The Form DEF 14A also revealed that "Abbott has advanced defense costs on behalf of a current officer in connection with AMO [Advanced Medical Optics, Inc., a subsidiary of Abbott]."

371.     On February 4, 2011, the DOJ elected to intervene in a whistleblower lawsuit filed in late 2008 by former Abbott sales representatives and unsealed a redacted version of its Complaint against Abbott involving the Company's illegal scheme to promote Depakote Products.

372.     On October 19, 2011, Abbott filed a Form 8-K with the SEC, attaching as an exhibit a press release issued that day announcing Abbott's financial results for the third quarter ended September 30, 2011, and that it was splitting into two companies, one focused on   diagnostics   and   medical   devices   and   the   other   focused   on   research-based

pharmaceuticals.  In the press release, Abbott finally acknowledged that it had reserved $1.5 billion "related to ongoing settlement discussions in the previously disclosed investigation by the U.S. Department of Justice, through the U. S. Attorney for the Western District of Virginia, related to Depakote."  The press release noted that "[t]he discussions are ongoing, and until concluded, there can be no certainty about definitive resolution."

373.   In its Form 10-Q filed November 4, 2011, Abbott disclosed that "[d]iscussions to resolve potential civil and criminal claims arising from this matter have advanced to a point where Abbott believes a loss is probable and estimable and therefore, Abbott recorded a charge of $1.5 billion in the third quarter of 2011."

374.   Finally, on May 7, 2012, Abbott announced that it had pleaded guilty and agreed to pay $1.6 billion to "U.S. federal and 49 state authorities, plus the District of Columbia, to resolve all outstanding issues" arising from the Company's unlawful promotion of Depakote for uses not approved as safe and effective by the FDA.  The Settlement requires Abbott to pay $800 million to resolve civil claims for the negotiated period 1998 through December 31, 2008, and $700 million in criminal penalties for the negotiated period 1998 through December 21, 2006.  The criminal penalties include a $500 million fine, the forfeiture of $198.5 million to the U.S. Department of Treasury in lieu of the quantities of Depakote, Depakote ER, and Depakote Sprinkle that were introduced to interstate commerce and transferred or sold to third parties and which cannot be located upon the exercise of due diligence, and a $1.5 million payment to the Virginia Medicaid Fraud Control Unit's Program Income Fund.  Abbott will also pay $100 million to several states to resolve various consumer protection matters.

375.   Abbott's agreement to pay $1.6 billion is the ***second largest settlement for***

***illegal pharmaceutical marketing in United States history***, eclipsed only by Pfizer's $2.3 billion criminal and civil settlement concerning more widespread conduct than at issue here (the off-label promotion of four drugs and kickbacks involving nine separate drugs).

376.    The Settlement not only impacts Abbott's bottom line, but also requires the Company to implement additional compliance measures as part of its criminal plea agreement.  For example, the conditions of probation imposed on the Responsible Entity's[6] Chief Executive Officer call for the CEO to conduct a review of its Compliance Program as it relates to the marketing, promotion, and sale of pharmaceutical products during the preceding twelve month period and to submit to the probation office a signed certification regarding compliance.  It also requires the Responsible Entity's Board or a designated Committee of the Board to conduct a review of the Company's Compliance Program as it relates to the marketing, promotion and sale of pharmaceutical products and submit to the probation office a resolution adopted by the Board stating that the Responsible Entity had in effect policies and procedures to prevent violation of certain federal laws.

377.    Moreover, the compliance measures in the criminal plea agreement require, among other things, that: (i) the compensation structure of the Responsible Entity's U.S. sales representatives be designed to ensure that financial incentives do not motivate individuals to engage in off-label marketing promotion; (ii) CME grant-making decisions be approved by an organization separate from sales and marketing; (iii) a third-party CME provider maintain full responsibility over the CME programs; and (iv) clinical trials funded or controlled by the Responsible Entity be approved by Abbott's medical and/or scientific organizations and scientific research and any resulting publications foster increased understanding of scientific,

---

[6]    The "Responsibility Entity" refers to the corporate entity that bears the responsibility of the plea agreement after Abbott implements its plan to separate into two public companies.

clinical, or health care issues.

378.    Abbott also entered into a Corporate Integrity Agreement (the "Depakote CIA") with the OIG-HHS as part of the settlement.    The Depakote CIA will govern Abbott's compliance program for five years.

379.    Thus, the criminal and civil settlements were far-reaching and contained several different components that included a criminal fine, the forfeiture of ill-gotten gains by Abbott, and a civil resolution with not only the U.S. Government, but several states as well, demonstrated in the following chart:

| ACTION | SETTLEMENT TERM |
|---|---|
| Guilty Plea to Introduction of Misbranded Drug into Interstate Commerce, 21 U.S.C. §§ 331(a), 331(a)(1), 352(a) and 352(f)(1) | $500 million fine and five years probation (if probation is revoked, Abbott may be resentenced and a total aggregate fine up to the statutory maximum of $800 million may be imposed)<br><br>$1.5 million payment to the Virginia Medicaid Fraud Control Unit's Program Income Fund<br><br>Abbott consented to the Agreed Statement of Fact |
| Conditions of Probation (as outlined in the Plea Agreement) | (1) The Chief Executive Officer shall conduct a review of Abbott's Compliance Program as it relates to the marketing, promotion, and sale of pharmaceutical products during the preceding twelve month period and submit to the probation a signed certification regarding compliance; (2) Abbott's Board or a designated Committee of the Board shall conduct a review of the company's Compliance Program as it related to the marketing, promotion and sale of pharmaceutical products and submit to the probation office a resolution adopted by the Board stating that Abbott had in effect policies and procedures to prevent violation of certain |

| ACTION | SETTLEMENT TERM |
|---|---|
| | federal laws; (3) Fifteen days after the end of each calendar quarter, Abbott shall submit a report to the probation office whether any Reportable Events (relating to violations of certain federal laws) occurred during that period; (4) Abbott shall not commit any federal health care fraud offense, any offense under Titles 21 or 42 of the United States Code, or any felony during the term of probation |
| Compliance Measures (as outlined in the Plea Agreement) | (1) Compensation of Abbott's U.S. sales representatives be designed to ensure that financial incentives do not motivate individuals to engage in off-label marketing promotion; (2) CME grant-making decisions to be approved by organization separate from sales and marketing. A third-party CME provider is to maintain full responsibility over the CME programs; (3) medical information letters are to be accurate and unbiased; (4) clinical trials funded or controlled by Abbott are to be approved by Abbott's medical and/or scientific organizations and scientific research and any resulting publications foster increased understanding of scientific, clinical or healthcare issues. All investigators are to disclose Abbott's support for their research and financial relationships between Abbott and the investigators |
| Agreed to Order of Forfeiture | Forfeiture of $198.5 million to the U.S. Department of Treasury in lieu of the quantities of Depakote, Depakote ER and Depakote Sprinkle that were introduced to interstate commerce and transferred or sold to third parties and cannot be located upon the exercise of due diligence |
| Civil Settlement with the U.S. (Intervening in the *Qui Tam* Actions) | Abbott is required to pay the U.S. $560,851,357 |
| | |

| ACTION | SETTLEMENT TERM |
|---|---|
| Civil Settlement with the Medicaid Participating States | Abbott is required to pay collectively $239,148,643 |
| Civil Settlement with 44 states and the District of Columbia for consumer protection interests | Abbott is required to pay $100 million |
| Agreement between Abbott and Office of Inspector General of the Department of Health and Human Services | Abbott executed a Corporate Integrity Agreement |

380.    The magnitude and duration of the wrongdoing, coupled with the Company's billions of dollars of sales revenue attributable to sales of Depakote Products in the United States (a substantial portion of which were the result of off-label marketing), reflect the Individual Defendants' participation and/or approval of the wrongful conduct alleged herein, and/or reckless disregard of their fiduciary duties to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of the Company.

381.    Indeed, the Individual Defendants' sustained action and/or failure to act to protect the Company in the face of systemic violations of applicable law resulting from the off-label marketing of Depakote has resulted in the $1.6 billion Settlement.

## ADDITIONAL ILLEGAL MARKETING ACTIVITIES MAY PUT ABBOTT AT RISK OF EXCLUSION FROM FEDERAL PROGRAMS

382.    In 2010, Abbott settled two additional cases involving the Company's illegal marketing and sales practices.  The first, arising out of a whistleblower complaint filed by Ven-a-Care of the Florida Keys, involved additional allegations of marketing the "spread" for certain Abbott drugs and violating the False Claims Act with respect to the Company's pricing of one of its antibiotics and some of its generic, water-based solutions primarily

142

used to facilitate the intravenous infusion or injection of other drugs. In conjunction with this settlement, Abbott agreed to pay $126.5 million to resolve the claims.

383. The second case Abbott settled in 2010 involved an Abbott subsidiary, Kos Pharmaceuticals ("Kos"), which Abbott acquired in 2006. In that case, the DOJ alleged that Kos offered and paid doctors, other medical professionals, physician groups and managed care organizations illegal kickbacks in the form of money, free travel, grants, honoraria and other valuable goods and services, in violation of the Anti-Kickback Act to get them to prescribe or recommend Niaspan and Advicor. In conjunction with that settlement, Kos paid more than $41 million to resolve criminal and civil liability arising from conduct relating to its drugs Advicor and Niaspan.

384. As acknowledged by Abbott's Code of Business Conduct, any further illegal activity "may result in exclusion of Abbott . . . from participation in Federal Health Care Program," a penalty which would have disastrous consequences for Abbott shareholders.

## DEMAND ON THE BOARD WOULD BE FUTILE

385. Plaintiffs bring this action derivatively in the right and for the benefit of Abbott to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants as alleged herein, and to require the Company to undertake corporate governance reforms to prevent similar harm to the Company in the future.

386. Plaintiffs, who are institutional shareholders, will adequately and fairly represent the interests of Abbott and its shareholders in enforcing and prosecuting their rights, and they have retained counsel experienced in prosecuting shareholder litigation.

387. The conduct of the Director Defendants complained of herein involved a knowing and culpable violation of their duties and obligations as corporate directors, an absence of good

143

faith or business judgment on their part, and an intentional or reckless disregard for their fiduciary duties to the Company and its public shareholders. The Director Defendants were aware of, or should have been aware of through highly developed internal reporting protocols, the risk of serious damage to the Company caused by its failure to comply with federal law and FDA regulations through its illegal off-label marketing of Depakote.

388.    The Director Defendants ratified and/or endorsed the ongoing violations of law complained of herein, which resulted in the Company's repeated violations of the FDA's rules and regulations during the Relevant Period. That ratification and/or endorsement involved a knowing and culpable violation of the Director Defendants' obligations as corporate directors, an absence of good faith on their part, and a reckless disregard for their fiduciary duties to the Company and its public shareholders. The Director Defendants were aware of, or pursuant to reasonable inquiry, should have been aware of the ongoing violations of law in which Abbott was engaging and the risks of serious injury to Abbott as a result of those violations of law. The Director Defendants' conduct caused Abbott to waste its valuable assets having entered into the Criminal Plea Agreement and Civil Settlement Agreement and paying $1.6 billion to settle claims by the U.S. Government, forty-nine states, and the District of Columbia.

389.    At the time this action was initiated, the Board was comprised of ten (10) directors: White (Chairman and CEO since 1998), Alpern (director since 2008), Austin (director since 2000), Farrell (director since 2006), Fuller (director since 1988), Liddy (director since 2010), Novakovic (director since 2010), Osborn (director since 2010), Scott (director since 2007), and Tilton (director since 2007).

390.    As alleged in the section "The Wrongful Conduct and the Current Board's Knowledge Thereof" (¶¶ 274-364), Plaintiffs have not made a demand upon the Board prior to

instituting this action because such demand would be a futile and useless act because a majority of the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

(a)     The Current Board was on notice of, participated in, and/or allowed Abbott's illegal off-label marketing of Depakote in violation of FDA rules and regulations. These acts and omissions were not in good faith and, therefore, are not protected by the business judgment rule;

(b)     The acts and omissions complained of constitute violations of federal laws and regulations and acts of corporate waste that are incapable of ratification and that constitute flagrant violations of fiduciary duties.   Accordingly, the Board cannot independently and disinterestedly consider a demand to bring these claims;

(c)     The Current Board, by its action and inaction, is responsible for the Company being sued by several whistle-blowers, the U.S. Government, and forty-nine states, and the District of Columbia, and the resulting waste of corporate assets in the amount of $1.6 billion.   Indeed, as alleged throughout this Second Amended Complaint, and as shown by the Civil Settlement Agreement and the Agreed Statement of Facts significant amounts of the wrongful conduct occurred during the Current Board's tenure;

(d)     The Board of Directors knowingly or recklessly caused and/or allowed Abbott to engage in repeated and persistent violations of federal law and FDA regulations. This knowledge or recklessness is evidenced by the fact that the Current Board had been informed by its own PPD of the marketing and promotion strategies for Depakote, and yet took no steps to prevent it.   In addition, the Current Board also received actual notice of the U.S. Government's investigation into Abbott's marketing practices at least as early as late

2007 or early 2008, when it received the Target Letter. Notice is further established by the fact that Abbott was served with a U.S. Government subpoena in July 2008 demanding the production of documents with respect to the Company's marketing of Depakote;

(e)    Through the extensive corporate governance mechanisms in place and the mandates of the 2003 CIA and procedures implemented by the OEC, the Board should have received information which would have informed them of the violations of law. In that case, the Board knew about the violations of law involving off-label marketing of Depakote and failed to take any action. If the Board did not receive this information, then it was incumbent upon it, based on the mandates of the 2003 CIA and the governance of the Company, to satisfy itself that no violations occurred especially when presented with the PPD reports;

(f)    The Board also knew that the failure to comply with federal regulations governing the promotion and sale of Depakote Products would result in severe penalties, as set forth in the Company's SEC filings, yet chose not to bring a prompt halt to the improper conduct causing the non-compliance, reprimand those persons involved, or seek redress for Abbott for the serious damages it has and will sustain;

(g)    Eight Director Defendants, White, Fuller, Austin, Farrell, Scott, Tilton, Osborn, and Alpern, face a substantial likelihood of liability for consciously allowing Abbott to engage in off-label marketing of Depakote;

(h)    Although Abbott has been and will continue to be exposed to enormous expenses and losses in future revenue as a result of its illegal conduct, the Current Board has taken no action against itself or any other present or former employees of Abbott to attempt to recover for Abbott any portion of the damages and losses Abbott has already suffered or will

146

suffer; and

(i)     The duration of the wrongdoing and the magnitude of the $1.6 billion Settlement reflect a lack of good faith on the part of the Director Defendants.

391.     Additionally, and significantly, Abbott's conduct of non-compliance with FDA regulations with respect to the illegal sale of off-label drugs and the subsequent legal actions by whistle-blowers, the U.S. Government and forty-nine states and the District of Columbia, distinguish this derivative action distinct from most.  A typical corporate board might plausibly claim ignorance concerning compliance failures in general.  In this case, Abbott's Board was made specifically and uniquely accountable and responsible under its corporate governance structure and the imposed CIAs ensuring and enforcing the Company's compliance with FDA rules and regulations with respect to the manufacture and distribution drugs.

392.     As alleged herein, and pursuant to the Company's Corporate Governance Guidelines, Code of Business Conduct, the 2003 CIA and Illinois law, each of the Board members was also awash in other "red flags" that necessarily informed them of the illegal conduct, which resulted in the Company settling the various legal actions and agreeing to pay $1.6 billion in the Settlement.

393.     Given these duties placed on the Current Board, and the flow of internal and external information to it concerning the off-label promotion of Depakote Products, to the extent any of these Director Defendants did not have actual knowledge of the decision to sell and promote Depakote off-label in violation of the FDA's rules and regulations, such lack of knowledge constitutes a bad faith breach of their fiduciary duties.

394.     The Director Defendants were, moreover, required to act upon this information to protect the Company from continued regulatory and legal violations being committed.  Rather

147

than doing so, the Director Defendants, in violation of their legal obligations, consciously ignored the information presented to them and about which they were otherwise made aware concerning the Company's extensive regulatory and legal violations. As a result, each of the Director Defendants faces a substantial likelihood of liability for their conduct and demand is, therefore, excused.

395. In addition to the foregoing, a majority of the Board's current members face a substantial likelihood of liability arising from their conduct on specific committees of the Board.

396. Defendants Austin, Scott, and Tilton are further conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Audit Committee. Defendants Austin (chair of the Audit Committee), Scott, and Tilton have each served as directors on the Board during most of the Relevant Period and have also served as members of the Audit Committee. As set forth herein, the Audit Committee's charter imposes specific duties on its members to ensure compliance with laws, regulations, and internal procedures.

397. Further, defendants Alpern and Austin are further conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Public Policy Committee. Defendants Alpern and Austin have each served as directors on the Board during most of the Relevant Period and have also served as members of the Public Policy Committee at various times. Defendants Alpern and Austin are thus likely to be held liable for their fiduciary breach.

398. As noted previously, pursuant to the Public Policy Committee's charter, the members of the Public Policy Committee are specifically charged with ensuring that the members of the Board fulfill its oversight responsibilities with respect to, among other things,

Abbott's legal and regulatory compliance with regard to its sales and marketing activities.

399. Defendant White is also incapable of disinterestedly and independently considering a demand to institute this litigation because he depends for his livelihood on compensation from Abbott and personally benefited from the illegal marketing practices through compensation awards based, in part, on Depakote's off-label success. Further, defendant White earns substantial compensation from his role as Company CEO. In 2008, 2009, and 2010, White earned $28.25 million, $26.21 million, and $25.26 million, respectively, in total annual compensation. Accordingly, defendant White cannot disinterestedly or independently consider a demand to institute litigation against defendants Fuller, Farrell, or Osborn, all of whom serve on the Compensation Committee that determines White's annual compensation awards.

400. Demand is further excused because the Director Defendants face a substantial likelihood of liability under the FCA. The FCA imposes liability on "[a]ny person" who, *inter alia,* "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." Because the Director Defendants knew that Abbott's Pharmaceutical Products Group and its employees, including defendants Leiden and Dempsey, were engaging in off-label marketing that induced government health care programs to pay for Depakote prescriptions that were not medically justified, they may be subject to liability for "causing" false claims to be submitted to the U.S. Government. Each violation of the FCA subjects the violator to a civil penalty of not less than $5,000 and not more than $10,000 for each violation. In addition, a violator is liable for three times the amount of all damages sustained by the U.S. Government. Thus, the Director Defendants have a strong economic incentive to prevent the further investigation and exposure of their role in causing Abbott to violate the FCA. Indeed, *Spetter* Complaint which alleges off-

label marketing between January 1, 1998 and January 1, 2009, and FCA claims arising out of the same conduct, names as defendants John Does 1-100, the co-conspirators for the wrongdoing alleged therein.

401.    Many of the Current Board members are also incapable of disinterestedly and independently instituting litigation against one another because of their substantial ties to one another separate and apart from their involvement with Abbott.    For example, defendants White and Tilton both serve as directors of Northwestern Memorial Hospital in Chicago.    White and Tilton also both serve on the Board of Trustees for the Field Museum in Chicago.    Defendants White and Osborn have served on at least three boards together, including Abbott, Caterpillar, Inc., and Tribune Company.    Likewise, defendants White and Scott served together on the board of directors of Motorola, Inc. between 2005 and 2007. Similarly, defendant Farrell has served as director for UAL Corporation since 2001, working closely with Tilton, who currently serves as the non-executive Chairman of UAL's board and previously served as UAL's Chairman, President, and CEO from 2002 to 2010.    Farrell also serves on the board of directors of 3M with non-defendant director Liddy.    Likewise, non-defendant director Liddy and defendant Farrell spent significant time serving together as directors for Allstate Corporation.

402.    In addition to these interlocking board memberships, many members of the Company's Board are current or former CEOs of large companies who are incapable of properly considering a demand to bring suit against a fellow "C-level" executive, such as defendant White.    For example, defendant Fuller is the former CEO of Amoco Corporation. Osborn is the former CEO of Northern Trust Corporation.    Defendant Scott is the former CEO of Corn Products International.    Tilton is the former CEO of UAL Corporation.

Defendant Austin is the former CEO of Move Networks, Inc. Thus, defendants Fuller, Osborn, Scott, Tilton, Austin, and Farrell are incapable of disinterestedly and independently considering a demand to institute litigation against White.

403. Accordingly, demand on the Board is excused.

## DAMAGES SUSTAINED BY THE COMPANY

404. The Individual Defendants' actions and inactions have caused and will continue to cause the Company to incur hundreds of millions of dollars in damages and expenses, and lost revenue and have had, and will continue to have, devastating effects on the Company including loss of the Company's reputation in the business community and among regulators, federal and state law enforcement authorities, shareholders, the investing public, and the public at large. To date, as a result of agreeing to the Settlement with the U.S. Government and twenty-four states, the Company will pay $1.6 billion in damages.

## COUNT I

## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTIES
## AGAINST THE INDIVIDUAL DEFENDANTS

405. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

406. The Individual Defendants all owed and owe fiduciary duties to Abbott and its shareholders. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Abbott the highest obligation of good faith and loyalty in the administration of the affairs of Abbott, including the oversight of Abbott's compliance with federal laws governing the manufacturing, distribution and marketing of prescription drugs approved by the FDA. Moreover, the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles that, had they been discharged in accordance with the

Board's obligations, would have prevented the violations of law and the FDA's rules and regulations and consequent harm to the Company alleged herein.

407.    The Individual Defendants, in their roles as executives and/or directors of the Company, participated in the acts of mismanagement alleged herein, or acted in reckless disregard of the facts known to them, and failed to exercise due care to prevent the Company from repeatedly violating federal rules and regulations. The Individual Defendants became aware, or should have become aware through reasonable inquiry, of the facts alleged herein including, among others, that the Company was repeatedly violating the law and the FDA's rules and regulations since at least 1998. The Individual Defendants became aware, or should have become aware through reasonable inquiry and diligence, of the adverse facts alleged herein, but did nothing to correct them and thereby breached their duty of care, loyalty, accountability and disclosure to the shareholders of the Company by failing to act as an ordinarily prudent person would have acted in a like position.

408.    The Individual Defendants have been responsible for the gross and reckless mismanagement of Abbott in connection with approving the marketing and sale of the off-label use of Depakote, in violation of applicable law and the FDA's rules and regulations. The Individual Defendants abdicated their corporate responsibilities by mismanaging the Company in at least the following ways:

(a)    they caused and/or allowed the Company to continually violate the law and FDA's rules and regulations since 1998, failed to comply with the 2003 CIA and the FDA's Warning Letter, failed to take corrective action, and failed to implement adequate safeguards, investigation, consideration, or due diligence to prevent further violations and actions, including the discontinuance of the sale and marketing of off-label use of Depakote;

(b)     they subjected Abbott to adverse publicity, which greatly increased its costs to raise capital and impaired its earnings; and

(c)     they misused or permitted the misuse of Abbott's internal proprietary corporate information in violation of federal and state laws and corporate rules and policies, to the personal profit of certain corporate insider fiduciaries.

409.   As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Abbott has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damage included, among other things, the substantial penalties, fines, liabilities and expenses described herein.

410.   As a result of the Individual Defendants' wrongful conduct and wrongful actions, including allowing the Company to violate the law and the rules and regulations of the FDA governing the improper use of off-label drugs, Abbott has suffered and will continue to suffer considerable damage.  As detailed herein, the Individual Defendants caused and/or allowed the Company to violate federal regulations and/or failed to properly and adequately maintain a system of internal controls adequate to insure the Company's compliance with, among other things, federal regulations, in violation of their fiduciary duties. The Individual Defendants instituted a corporate culture that encouraged unlawful and irresponsible activity resulting in the loss of $1.6 billion.

411.   The Individual Defendants' conduct, as alleged herein, has also caused damage to the Company's goodwill and reputation due to the negative adverse publicity that their actions have generated, and they have impaired Abbott's ability to raise capital at a reasonable and/or low cost because the Company's credit rating has been adversely affected, and its cost of capital has, therefore, increased, harming the Company.

412.    All of the Individual Defendants, individually and in concert, engaged in the aforesaid conduct in the intentional breach and/or reckless disregard of their fiduciary duties to the Company and conspired to, and did, abuse the control vested in them by virtue of their high-level positions in the Company.

413.    Abbott and its shareholders have been injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.

414.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

415.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

416.    By virtue of their *ultra vires* actions in violation of law, the Individual Defendants caused Abbott to incur $1.6 billion as a result of the Settlement and might incur hundreds of millions in lost revenue as a result of Abbott's illegal conduct in the sale and marketing of off-label Depakote.  As a result, the Individual Defendants wasted Abbott's assets.

417.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, the Company has sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

418.    Abbott and its shareholders have been damaged by reason of the Individual Defendants' waste of corporate assets.

419.    As a result of the misconduct alleged herein, the Individual Defendants are liable

to the Company.

## COUNT III

### DERIVATIVE CLAIM FOR MISMANAGEMENT
### AGAINST THE DIRECTOR DEFENDANTS

420.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

421.    The Director Defendants had a duty to Abbott and its shareholders to prudently supervise, manage and control the operations and business of Abbott.

422.    The Director Defendants, by their actions and by engaging in the wrongdoing conduct described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Abbott in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Director Defendants breached their duties of due care, diligence and candor in the management and administration of Abbott's affairs and in the use and preservation of Abbott's assets.

423.    During the course of the discharge of their duties, the Director Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Director Defendants caused Abbott to engage in the improper conduct complained of herein which they knew had an unreasonable risk of damage to Abbott thus breaching their duties to the Company.  As a result, the Director Defendants grossly mismanaged Abbott.

424.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT IV

## DERIVATIVE CLAIM FOR GROSS MISMANAGEMENT
## AGAINST THE DIRECTOR DEFENDANTS

425.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

426.    The Director Defendants had a duty to Abbott and its shareholders to prudently supervise, manage and control the operations and business of Abbott.

427.    The Director Defendants by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Abbott in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Director Defendants breached their duties of due care, diligence and candor in the management and administration of Abbott's affairs and in the use and preservation of Abbott's assets.

428.    During the course of the discharge of their duties, the Director Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Director Defendants caused Abbott to engage in the improper conduct complained of herein which they knew had an unreasonable risk of damage to Abbott thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Abbott.

429.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT V

## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTIES FOR
## FAILING TO OVERSEE THE COMPANY AND MAINTAIN INTERNAL
## CONTROLS AGAINST THE DIRECTOR DEFENDANTS

430.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if

156

fully set forth herein.

431.    As alleged herein, each of the Director Defendants had a fiduciary duty to, among other things, prudently supervise, manage and oversee the operations, business and internal controls of Abbott.  Moreover, each of the Director Defendants had a duty, when put on notice of problems with the Company's business practices and operations, to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

432.    The Director Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Abbott in a manner consistent with the duties imposed upon them by Illinois law.  By committing the misconduct alleged herein, the Director Defendants breached their duties of due care, diligence and candor in the management and administration of Abbott's affairs.

433.    The Director Defendants willfully failed to monitor or ignored the obvious and pervasive problems with Abbott's internal control practices and procedures specifically relating to the Company's compliance with the law and the FDA's rules and regulations and failed to make a good faith effort to correct the problems or prevent their recurrence.

434.    As a direct and proximate result of the Director Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

435.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT VI

## DERIVATIVE CLAIM FOR UNJUST ENRICHMENT
## AGAINST DEFENDANTS WHITE, LEIDEN, AND DEMPSEY

436.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth therein.

437.   As alleged herein, defendants White, Leiden, and Dempsey were unjustly enriched by their receipt of compensation based in part on revenues from the illegal marketing of Depakote.  Accordingly, it would be unconscionable to allow them to retain the benefits of the illegal conduct they caused and/or knowingly permitted.

438.   To remedy this unjust enrichment, the Company is entitled to the disgorgement of any ill-gotten gains that defendants White, Leiden, and Dempsey realized because of their conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

(a)    Determining that this action is a proper derivative action maintainable under law and demand is excused;

(b)    Declaring that the Individual Defendants, and each of them, have committed breaches of their fiduciary duties to Abbott, abused their control, grossly mismanaged Abbott, and committed the illegal and clearly improper actions complained of herein;

(c)    Requiring the Individual Defendants to pay Abbott the damages sustained by the Company as a result of their breaches of fiduciary and contractual duties and to indemnify Abbott for any claims brought against it by any of its officers, directors, employees, or by a third party;

(d)     Entering equitable and/or injunctive relief as allowed by law, including disgorging all profits, benefits and other compensation obtained by certain Individual Defendants and attaching, impounding, and imposing a constructive trust on or otherwise restricting the value of the proceeds of Individual Defendants' other assets to ensure that Plaintiffs on behalf of Abbott have an effective remedy;

(e)     Directing Abbott to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

(f)     Awarding punitive damages;

(g)     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and expenses; and

(h)     Granting extraordinary equitable and/or injunctive relief as allowed by law, equity, and state statutory provisions sued hereunder, including enjoining the Individual Defendants, their agents, counsel, employees, and all persons acting in concert with them from further enriching themselves at the expense of the Company; and

(i)     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated:  December 6, 2012                       **SUSMAN HEFFNER & HURST LLP**

                                               By: /s/ Matthew T. Heffner
                                                   Matthew T. Heffner
                                                   30 N. LaSalle Street, 12th Floor
                                                   Chicago, IL 60602
                                                   Tel.:  312.346.3466
                                                   Fax:  312.346.2829

159

Local Counsel

**SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.**
Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirarchi
*rroseman@srkw-law.com*
*aabramowitz@srkw-law.com*
*dmirarchi@srkw-law.com*
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Tel.: 215.496.0300
Fax: 215.496.6611

Mark S. Willis
*mwillis@srkw-law.com*
1101 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004
Tel.: 202.756.3600
Fax: 202.756.3602

Counsel for Lead Plaintiff,
Jacksonville Police & Fire Pension Fund

Of counsel

KAHN SWICK & FOTI, LLC
Lewis S. Kahn
Michael A. Swick
Albert M. Myers
Melinda A. Nicholson
*Lewis.kahn@ksfcounsel.com*
*Michael.swick@ksfcounsel.com*
*Albert.myers@ksfcounsel.com*
*Melinda.nicholson@ksfcounsel.com*
206 Covington Street
Madisonville, LA
Tel.: 504.455.1400
Fax: 504.455.1498

BRANNON LAW FIRM, LLC
Paul M. Brannon

160

PMB@BrannonLawFirm.com
3500 North Hullen Street
Metairie, Louisiana 70002
Tel.: 504.456.8600
Fax: 504.456.8697

*Counsel for Louisiana Municipal Police*
*Employees Retirement System*

LABATON SUCHAROW LLP
Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
*ckeller@labaton.com*
*ebelfi@labaton.com*
*mstocker@labaton.com*
140 Broadway
New York, NY 10005
Tel.: 212.907.0700
Fax: 212.818.0477

LABATON SUCHAROW LLP
Christine S. Azar
Charles B. Vincent
Peter C. Wood, Jr.
*cazar@labaton.com*
*cvincent@labaton.com*
*pwood@labaton.com*
300 Delaware Avenue, Suite 1225
Wilmington, DE 19801
Tel: 302.573.2530
Fax: 302.573.2529

*Counsel for Public School Retirement System*
*Of the School District of Kansas*
*City, Missouri*

161

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on December 6, 2012, he caused true copies of the foregoing Second Consolidated Verified Amended Shareholder Derivative Complaint to be served upon all counsel of record using the Court's CM/ECF system.

*/s/ Matthew T. Heffner*
One of the Plaintiffs' Attorneys

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on January 31, 2013, he caused true copies of the foregoing **Second Consolidated Verified Amended Shareholder Derivative Complaint** to be served upon all counsel of record using the Court's CM/ECF system.

*/s/ Matthew T. Heffner*
One of the Plaintiffs' Attorneys