**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| IN RE ABBOTT DEPAKOTE SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) ) ) | Case No. 11-CV-08114  Judge Virginia M. Kendall |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT**

Daniel E. Reidy
Brian J. Murray
Jones Day
77 West Wacker Drive
Chicago, IL 60601
(312) 782-3939

Robert J. Kopecky
Sallie G. Smylie, P.C.
Sarah J. Donnell
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

*Attorneys for the Individual Defendants*

*Attorneys for Defendant Abbott Laboratories*

Dated: March 22, 2013

**INTRODUCTION**

Plaintiff concedes that its argument for demand futility is premised on alleged oversight liability (Resp. at 11-12), which is "the most difficult theory" under which a plaintiff might proceed against corporate directors. *In re Caremark Int'l Inc. Deriv Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). Under this theory, plaintiff must plead specific allegations of fact showing a majority of the board faces a substantial risk of liability for a sustained or systematic failure to exercise oversight. *Id.* Plaintiff carries an even greater pleading burden because Abbott's articles of incorporation exculpate a director from liability for breach of the duty of care. *In re Abbott Depakote S'holder Deriv. Litig.*, 2012 WL 5561268, at *5 (N.D. Ill. Nov. 15, 2012) ("*In re Depakote*"). Plaintiff thus must plead particularized facts showing a majority of the board breached their duty of loyalty – that is, "'intentionally' acted contrary to the corporation's interests, acted 'with intent to violate applicable positive law,' or demonstrated a 'conscious disregard' for their duties." *Id.* Plaintiff has not pled facts sufficient to meet this high threshold. Instead, its effort to establish demand futility rests on misrepresentation of documents cited in the complaint, unreasonable inferences, and arguments this Court has already rejected.

*First*, plaintiff contends it has cured the deficiency that led the Court to dismiss its prior complaint because it now alleges a majority of the board to whom a demand would have been made consciously allowed off-label marketing to occur through December 31, 2008. (Resp. at 2) In support of this allegation, plaintiff falsely states that Abbott **"*specifically admitted*"** in its Civil Settlement Agreement with the United States to engaging in off-label marketing of Depakote through this date. (*Id*. at 6) That Agreement, which is before the Court, contains no such admission – to the contrary, in it Abbott expressly **denied** allegations in the civil lawsuits that off-label marketing continued through 2008, admitting only to certain improper marketing conduct through December 31, 2006.

*Second*, plaintiff argues the Second Amended Complaint establishes demand futility with allegations about Abbott's corporate governance procedures, including a 2003 Corporate Integrity Agreement, which plaintiff argues should have notified the board of off-label marketing by employees. (*Id.* at 11) Plaintiff's response ignores the Court's prior ruling, which held that the existence of Abbott's corporate governance and reporting procedures, including the 2003 CIA, was insufficient to establish a substantial risk of liability. *In re Depakote*, 2012 WL 5561268, at \*9-10. Plaintiff's new complaint fails to remedy the defect previously identified by the Court because it contains no particularized allegations that the board received notice of off-label marketing through these corporate reporting mechanisms and allowed it to continue.

*Finally*, plaintiff argues that five purported "red flags" beginning in early 2008 placed the current board on notice of off-label marketing. As the Court previously held, most of these are not "red flags" at all, as they would not have alerted the board to ongoing wrongdoing. *Id.* at \*11-12. More fundamentally, plaintiff is unable to point to any particularized allegations in the complaint showing that the board received notice of any of them, let alone turned a blind eye.

In short, plaintiff's Second Amended Complaint suffers from the same deficiencies as its predecessor. It lacks particularized allegations showing demand should be excused because a majority of the current board acted in bad faith or consciously disregarded their duties and therefore faces a substantial risk of liability. The Second Amended Complaint thus should be dismissed with prejudice.

## ARGUMENT

### I.     THERE ARE NO PARTICULARIZED ALLEGATIONS THAT ABBOTT ENGAGED IN OFF-LABEL MARKETING THROUGH 2008.

Plaintiff argues that by incorporating the Civil Settlement Agreement, the Second Amended Complaint now provides a basis to find that a majority of the board faces a substantial

threat of liability. (Resp. at 2) Plaintiff asserts this is a "key" addition, the significance of which "cannot be overstated," because it allegedly demonstrates that illegal off-label marketing occurred on the current board's watch. (*Id.*)

But the Civil Settlement Agreement does not say what plaintiff says it does, perhaps explaining why plaintiff did not rely on this "key" document in its prior complaint.[1] The Agreement contains no admission that Abbott engaged in off-label marketing of Depakote through December 31, 2008, much less the detailed admissions of wrongdoing that plaintiff recites in its response brief. (*Id.* at 7) Rather, in the Agreement Abbott admitted only to what it admitted in the Agreed Statement of Facts attendant to its guilty plea, which covers conduct through December 31, 2006, and that Medicare and Medicaid paid for claims resulting from the use of Depakote in dementia and schizophrenia patients. (Mem. in Support of Mot. to Dismiss, Ex. E, Settlement Agreement at II.I)) In all other respects, the Agreement states, Abbott "denie[s] the allegations of the United States and the Relators as set forth herein and in the Civil Actions and denies that it engaged in any wrongful conduct in connection with the Covered Conduct," which is defined as certain "conduct concerning the marketing, promotion and sale of Depakote between January 1998 and December 31, 2008." (*Id.* at II.G & I) Contrary to plaintiff's repeated assertions, the Agreement nowhere states that Abbott is admitting wrongdoing through December 31, 2008.[2]

Plaintiff urges that even if Abbott did not admit to misconduct through December 31, 2008, plaintiff is still entitled to a "reasonable inference" that Abbott engaged in misconduct

---

[1] The Civil Settlement Agreement is not a new document. It was entered into the same time as Abbott's plea and was available to plaintiff in May 2012, before it pled its First Amended Complaint.

[2] Because plaintiff acknowledges the complaint "incorporates" this Agreement, the Court may properly consider the contents of the document itself, rather than plaintiff's mischaracterization of the document, in ruling on defendants' motion to dismiss. *See, e.g.*, *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

through this date. As plaintiff itself recognizes, however, a plaintiff is entitled only to reasonable factual inferences "that logically flow ***from the particularized facts alleged***." (Resp. at 9, quoting *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000) (emphasis added)). A plaintiff is not entitled to inferences that do not flow from particularized facts, or are contrary to the contents of documents referenced in the complaint. Here, there is no need to infer anything about the Agreement because the Court can simply read what it says. *See Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) ("The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material."). Nor does the complaint allege any factual basis for inferring that the Agreement means something other than what it says, or that its temporal scope reflects anything other than Abbott's negotiation of a release coinciding with the date through which the government *alleged* it had certain claims.

Plaintiff also misrepresents Abbott's argument regarding the criminal plea. Abbott is neither arguing that a company must be subject to criminal liability for there ever to be a finding of demand futility, nor that a derivative plaintiff is "stuck" with the period for which a company acknowledges misconduct. (Resp. at 9-10) Rather, Abbott has admitted that through December 31, 2006, the company engaged in certain actions constituting the misbranding of Depakote. Plaintiff thus can plead Abbott has admitted to wrongdoing through that date. But for allegations after December 31, 2006, there is no such admission. Moreover, as this Court has recognized, "[t]here is no allegation or admission in the Plea Agreement or the Statement of Facts that members of Abbott's board of directors had engaged in or approved any unlawful conduct by the company." *In re Depakote*, 2012 WL 5561268, at *2.

4

In sum, while plaintiff is not foreclosed from claiming demand futility based on events after 2006, it must support that claim with particularized allegations of fact that Abbott engaged in wrongful conduct *and* that a majority of the current board of directors face a substantial risk of liability based on that conduct. The government's allegation in a civil case that misconduct occurred at the company through December 31, 2008 does not meet plaintiff's burden. And plaintiff cannot rely on an "admission" that Abbott never made.

## II.    PLAINTIFF'S RELIANCE ON GOVERNANCE MECHANISMS AGAIN FAILS.

Plaintiff has alleged no particularized facts establishing that a majority of the current board received notice of Abbott's off-label marketing of Depakote and breached its duty of loyalty by condoning that conduct or consciously allowing it to continue. Plaintiff therefore resorts to arguing that through Abbott's 2003 CIA and other corporate governance mechanisms, the board must have learned of off-label marketing conduct at some unspecified point in time. (Resp. at 15) Plaintiff made this argument before, contending that "the Board must have learned about [post-April 2007 alleged conduct] because of its compliance mechanisms," and the Court rejected it. *In re Depakote*, 2012 WL 5561268, at *9. Neither the new allegations in the current complaint nor the arguments plaintiff makes in its brief present any basis for the Court to deviate from its prior legal ruling that "[p]leading the existence of compliance mechanisms is insufficient to establish knowledge or awareness." *Id.*

*First*, plaintiff repeatedly misrepresents the 2003 CIA, arguing it arose from "Abbott's **prior similar illegal conduct**" (Resp. at 2) (emphasis in original) and "was entered into for the specific purpose of preventing the very type of wrongdoing at issue here." (*Id*. at 12) Plaintiff's characterizations are not borne out by its complaint. Plaintiff does not allege, nor can it, that the 2003 CIA resulted from, or had anything to do with, the off-label marketing of an FDA-approved drug or Abbott's pharmaceutical products. Rather, the 2003 CIA resolved a government

5

investigation into practices by employees in Abbott's nutrition division, which makes nutritional products and devices. (SAC ¶¶ 56, 334-45)

*Second*, the few new factual allegations about Abbott's compliance mechanisms add nothing of substance to plaintiff's claims. Plaintiff does not plead any facts that the 2003 CIA imposed an obligation on Abbott's directors to affirmatively ferret out wrongdoing or undertake their own investigations. To the contrary, as made evident by what plaintiff does plead, the procedure in place required the Chief Ethics and Compliance Officer (CECO) to make periodic reports on compliance matters to the board. (Resp. at 13, 15) Plaintiff nowhere pleads that the CECO reported issues relating to Depakote off-label marketing to the board and thereafter the board failed to act.[3]

Plaintiff is thus left to rely on the mere existence of compliance mechanisms, which this Court has already held, consistent with governing law, is not enough to establish a substantial risk of liability, even if the misconduct arguably should have been reported to the board through those mechanisms. For example, in *Stone v. Ritter*, 911 A.2d 362, 372-733 (Del. 2006), the bank's directors had established numerous oversight procedures that were "designed to permit the directors to periodically monitor AmSouth's compliance with BSA and AML regulations," including annual presentations from a compliance officer, quarterly reviews by the audit committee of the compliance program, and board issuance of policies that required employees to immediately report suspicious transactions to the corporate compliance department or corporate security. *Id.* at 372. Plaintiff did not plead the board ever received notice of the illegal

---

[3] Plaintiff also pleads that the 2003 CIA required the board to receive annual training regarding the CIA, Abbott's compliance program and improper promotion, marketing and sales practice. (SAC ¶ 338) Plaintiff does not contend that these general training seminars alerted the board to off-label marketing of Depakote. Nor does plaintiff contend that the board received notice ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*Id.* ¶ 339)

transactions on which the derivative complaint was based, but nonetheless sought to hold the board personally liable for employees' failure (in contravention of governing law) to report those transactions to the government. The Delaware Supreme Court, affirming dismissal for failure to allege demand futility, recognized that "the directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability or both," *id*. at 373. As the court explained, "[a]lthough there ultimately may have been failures by employees to report deficiencies to the Board, there is no basis for an oversight claim seeking to hold the directors personally liable for such failures by the employees." *Id.*

Likewise, in *Huron Consulting Group, Inc. Shareholder Derivative Litig.*, 971 N.E.2d 1067, 1083 (Ill. App. 2012), the board's audit committee charter required it to "[r]eview[ ] the adequacy and effectiveness of [Huron's] accounting and internal control policies and procedures on a regular basis" and "[r]eview[ ] with management . . . reports determining the accounting treatment for payments to be made by" Huron. The company misreported income over a several-year period based on faulty accounting procedures. Nevertheless, the court held that members of the company's audit committee did not face a substantial risk of liability. "The reality is that plaintiff acknowledged that the directors had a reasonable information and reporting system in place. Although the reporting system may have failed in this case, without more, that cannot subject the directors to personal liability for failures by Huron's 'senior management' to report the improper accounting of retention payments." *Id.* at 1084.

The cases cited by plaintiff do not suggest a different result. In each of those cases, the complaint contained particularized allegations that directors received notice of potential

7

wrongdoing through the company's compliance mechanisms or otherwise.[4]  Thus, in *In re Pfizer*, the court excused demand when the plaintiff alleged with specificity "a large number of reports [of continued misconduct] made to members of the board" at a time when the board was obligated by prior corporate integrity agreements to monitor compliance issues, and when a majority of the relevant board served during "a period that covers the dates of every 'red flag'" alleged by plaintiff.  722 F. Supp. 2d 453, 460 (S.D.N.Y. 2010).  As this Court earlier concluded, these and other allegations distinguish *Pfizer* from the present case, where "there is no evidence that a majority of the 2011 Board was aware that Abbott engaged in any off-label marketing practices during its tenure."  *In re Depakote,* 2012 WL 5561268, at *10.

Plaintiff's other authorities are similarly inapposite.  In *McCall v. Scott*, 239 F.3d 808, 820 (6th Cir. 2001), the court did not rely on the existence of compliance mechanisms alone to find demand excused.  In that case, there were particularized allegations the audit committee and the chairman received reports containing evidence of wrongdoing occurring at the company.  *Id.* Similarly, in *Countrywide Financial Corp. Derivative Litigation*, the complaint included particularized allegations that, as part of their monitoring duties, certain board members in fact reviewed data specifically reflecting weaknesses and risks in the company's subprime lending practices.  554 F. Supp. 2d 1044, 1060-61, 1082 (C.D. Cal. 2008).  And, finally in *In re Abbott*, there were particularized allegations that certain directors had actual notice of continuing manufacturing violations, which, under corporate governance procedures, then would have been

---

[4] The other cases on which plaintiff relies are also distinguishable.  In *In re Biopure Corp. Derivative Litigation*, the court did not rely on compliance mechanisms, but rather that directors of a small company would have known about FDA action that affected the approval of its central product and the prospects of the company as a whole.  424 F. Supp. 2d 305, 308 (D. Mass. 2006).  In *Arbit v. Makrides*, the plaintiff made particularized allegations of actual board notice and repeated failures to respond despite the notice.  2012 WL 4344317 (M.D. Fla. Sept. 21, 2012).  And in *In re Veeco Instruments, Inc. Securities Litig.*, a majority of directors signed a Form 10-K acknowledging deficiencies in internal controls, but failed to implement new controls for well over a year.  434 F. Supp. 2d 267 (S.D.N.Y. 2006).

reported to other board members. 325 F.3d 795, 808 (7th Cir. 2003). Based on these and other allegations, this Court concluded *In re Abbott* was distinguishable. *In re Depakote*, 2012 WL 5561268, at *11.

Plaintiff's Second Amended Complaint still lacks any particularized allegations of reports of off-label marketing reaching any board member through the company's compliance procedures or otherwise.[5] Accordingly, plaintiff's attempt to impute knowledge to the board of off-label marketing through those compliance procedures is unsupported, factually and legally.

### III. PLAINTIFF'S SO-CALLED "RED FLAGS" DO NOT SUBJECT THE BOARD TO A SUBSTANTIAL RISK OF LIABILITY.

Plaintiff contends five supposed "red flags" after January 2008 reflect the board's awareness of ongoing off-label marketing of Depakote. (Resp. at 16) Most of plaintiff's "red flags" would not have put the board on notice of ongoing wrongful conduct, as the Court has previously recognized. And even if the "red flags" are considered collectively, as plaintiff urges, the sum of these legally deficient parts falls short of satisfying plaintiff's burden to plead particularized facts showing the board breached its duty of loyalty.

*First*, as plaintiff concedes, governing law requires that for something to be considered a "red flag," it must be "waved in one's face" or "be visible to the careful observer." (*Id.* at 16, *citing Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008)). The complaint does not allege that a majority of the board received actual notice of these "red flags," let alone that they were waved in its face. *Second*, these five events do not constitute "red flags" because the complaint does not allege that they would have alerted the board to any ongoing misconduct. *See King v. Baldino*,

---

[5] Plaintiff cites *Canadian Commercial Workers Indus. Pension Plan v. Alden*, 2006 WL 456786 (Del. Ch. Feb. 22, 2006) as purported support for its claim that the board was charged with proactively monitoring the company's activities for violations of the law. That case, however, nowhere states this proposition. And, it held that "bald conclusions" that employees were ignoring policies and procedures were insufficient to impose liability on the directors. *Id.* at *6.

409 Fed. Appx. 535, 538 (3d Cir. 2010) (plaintiff must plead that directors "ignored 'red flags'

*indicating misconduct* in defiance of their duties") (emphasis added)). *Finally*, the complaint

does not allege that, having supposedly received notice of these red flags, the board failed to act.

A.      **The Document Preservation Letter and Subpoenas Were Not "Red Flags" Putting the Directors on Notice of Illegal Off-Label Marketing.**

Plaintiff speculates an April 17, 2008 document preservation letter "had to be delivered to

the Board to alert it to the government's investigation and instruct the Current Board members to

maintain all documents related to the marketing and promotion of Depakote." (Resp. at 17)

Plaintiff assumes the letter reached the board, at some unspecified time, through the CECO's

"periodic reports" to the board or through the Public Policy Committee's oversight duties. (*Id.* at

17 n.16) Plaintiff makes the same assertion regarding document subpoenas that issued starting in

July 2008. But plaintiff has not alleged any facts supporting its assumption that the letter or

document subpoenas actually reached Abbott's board through these compliance mechanisms at

or near the time they were issued.

Plaintiff tries to rectify this deficiency by arguing that under the 2003 CIA the board

made "repeated promises to closely monitor and prevent such misconduct." (*Id.* at 20, citing

*Pfizer*) Plaintiff's borrowing of this phrase from *Pfizer* does not make it true here. There are no

particularized allegations that the 2003 CIA, which unlike the multiple CIAs at issue in *Pfizer*

did not arise from off-label marketing conduct, obligated the board to "closely monitor" day-to-

day marketing and sales activities, or required it to oversee the activities of a specific division.

(*Id.*, citing *Johnson & Johnson*).[6]

_____

[6] Plaintiff attempts to distinguish *Johnson & Johnson* by arguing that Abbott's actions involved its primary operations, rather than a "far-flung subsidiary." Resp. at 21, n.19. Plaintiff's argument is unavailing. Abbott, like Johnson & Johnson, is a large company with hundreds of products in its multiple divisions. By contrast, the company in *In re SFBC International, Inc. Securities & Derivative Litigation*, to which plaintiff attempts to analogize Abbott, was exclusively involved in clinical trials, and was faced

Even if the document preservation letter and document subpoenas reached the board at some point in time, that would not satisfy plaintiff's pleading burden. To establish a substantial risk of liability based on a breach of the board's duty of loyalty, plaintiff must allege the letter and subpoenas placed the board on notice of ongoing wrongdoing *and* that the board thereafter consciously allowed the wrongdoing to continue. *See King*, 409 Fed. Appx. at 538 (red flags must "indicat[e] misconduct"). As this Court recognized, when rejecting plaintiff's reliance on a government subpoena to Abbott and Judge Wilson's Order as supposed "red flags," such documents, even if provided to the board, did not satisfy plaintiff's burden because the complaint "is devoid of any allegations that the Board allowed off-label marketing to continue." *In re Depakote*, 2012 WL 5561268, at *12. Plaintiff's reliance on the document preservation letter and document subpoenas fails for the same reason. All these documents indicate is that there was an investigation into Depakote sales and marketing, not that illegal conduct was currently ongoing at Abbott. Indeed, while plaintiff attempts to blur the distinction between a document preservation letter and a "target letter" – a term of art indicating the target is under suspicion for a crime – this distinction is significant. (Resp. at 17) The document preservation letter did not assert that Abbott had committed or was under suspicion of committing a crime, as a target letter would have done.

Plaintiff's allegations regarding the document preservation letter and document subpoenas also fail to establish a substantial risk of liability because plaintiff alleges no facts showing that once the board received notice that Abbott was under investigation by the Department of Justice, the board consciously disregarded its duties or acted in bad faith. (*Id.* at 17-21) Thus, there are no particularized allegations of fact that the board, after being aware there

---

with alleged wrongful conduct in connection with that core business, including at a clinical trials facility located at headquarters. 495 F. Supp. 2d 477, 486 (D.N.J. 2007).

was reason to believe Abbott engaged in off-label marketing of Depakote, condoned or allowed such off-label marketing to continue. Plaintiff's failure to plead any such facts is fatal to its attempt to have demand excused. *In re Depakote*, 2012 WL 5561268, at \*12; *see also Wood*, 953 A.2d at 143 (pleading deficient when no allegations "defendants otherwise consciously and in bad faith ignored the improprieties alleged in the complaint"); *Markewich v. Collins*, 622 F. Supp. 2d 802, 811 (D. Minn. 2009) (demand not excused when, among other things, "[p]laintiff alleges no facts suggesting a conscious decision to take no action in response to red flags" (citation omitted)).

### B. The PPD Presentations Were Not "Red Flags."

Plaintiff's unsupported arguments regarding certain presentations allegedly made to the board by Abbott's Pharmaceutical Products Division (or "PPD") do not establish the current board received notice of Depakote off-label marketing or allowed it to continue thereafter. In particular, the complaint refers to " ████████████████████████████████ ████████████████████ (SAC ¶ 289) Contrary to the conclusory allegation that the PPD made presentations to the board "concerning its strategies for the off-label promotion of Depakote," plaintiff does not identify anything in these documents that reflects reports to the board of off-label marketing of Depakote. ████████████████████████████ ████████████████████████████ (*Id.* at ¶ 287)

Plaintiff nevertheless argues the court must accept its speculative contention that the *redacted* portions of the presentations refer to off-label marketing because this is an "objectively reasonable" inference. (Resp. at 22) It is fundamental, however, that a plaintiff must plead "particularized factual statements" to satisfy Rule 23.1's pleading requirements. *Brehm*, 746 A.2d at 254. Plaintiff cannot substitute "[c]onclusions, opinions or speculation" for such particularized allegations. *Id.* at 255. Further, plaintiff is only entitled to *reasonable* inferences

drawn from well-pleaded *factual* allegations; it is not entitled to inferences drawn out of thin air. *See id.* ("Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences.").

Here, plaintiff's "inferences" are baseless, and therefore, *un*reasonable. Plaintiff contends the Court should *assume* PPD presentations in 2008 and 2009 disclosed illegal marketing to the board because reports before 2008 had supposedly done so. (Resp. at 21-22) One fatal flaw in this argument is that the complaint does not allege anything in the pre-2008 PPD presentations about off-label marketing of Depakote. ███████████████████████ ████████████████████████████████████████ – all of which must be approved by the FDA. (*Id.* at 21 n.20) Seeking approval for new indications is not illegal or improper. Indeed, as plaintiff recognizes in its complaint, Abbott properly pursued and received FDA approval for several forms of Depakote and additional indications. (SAC ¶¶ 78-83) Nothing about Abbott's plan to continue doing this for Depakote and other products indicates Abbott engaged in off-label marketing, and nothing about these reports to the board would put it on notice of unlawful marketing. ████████████████████████████████ ██████████████, which are a prerequisite for gaining FDA approval of a new drug or a new indication. (Resp. at 21 n.20) Thus, the premise of plaintiff's argument that the Court can assume PPD presentations in 2008 and 2009 informed the board of off-label marketing because prior reports had supposedly done so is wholly unsupported.

Plaintiff has alleged no factual basis to infer that the contents of any PPD presentations, whether before *or* after 2008, refer to off-label marketing of Depakote. To the contrary, the redacted portions were redacted because they referenced Abbott products, divisions and

initiatives unrelated to Depakote.  Should the Court wish to confirm that the redacted portions

contain no discussion of Depakote off-label marketing, Abbott will make unredacted copies of

the documents cited in the complaint available for *in camera* review.  *See Sronkoski v.*

*Schaumburg Sch. Dist., No. 54*, 2009 WL 1940779, at *1 (N.D. Ill. July 1, 2009) (*in camera*

review of redacted documents to determine relevancy).

### C. The Office of Ethics and Compliance Presentations Were Not "Red Flags."

Plaintiff next retreads old ground by speculating that presentations made by the Office of

Ethics and Compliance to the board in 2009 "were made in direct reaction to the government's

investigation of Abbott" and thus constitute red flags.  (Resp. at 24)  The Court already rejected

plaintiff's argument, and with good reason.  *See In re Depakote*, 2012 WL 5561268, at *11.  As

plaintiff admits, Depakote is never mentioned in the presentations.[7]  (Resp. at 24 n.21)  Rather,

these were presentations about general pharmaceutical industry trends.  Far from being a red flag

about any Abbott product or actions, these presentations reflect the OEC appropriately keeping

the board apprised of FDA-related issues germane to the industry.  *In re Depakote*, 2012 WL

5561268, at *7, *11.  And, there are no allegations the board allowed or consciously disregarded

off-label marketing of Depakote *after* these 2009 presentations.

### D. The January 22, 2009 FDA Letter Was Not a "Red Flag."

Finally, plaintiff argues the January 22, 2009 FDA letter alleged in its original complaint

was a red flag, despite the Court's prior decision rejecting this argument.  (Resp. at 24)  As

before, plaintiff fails to make any "specific allegation that the Board learned of the letter the

---

[7] Plaintiff mistakenly relies on *Louisiana Municipal Police Employees' Retirement System v. Pyott*, 46 A.2d 313, 357 (Del. Ch. 2012)), for the proposition that a board presentation does not have to actually use the term "off-label marketing" to provide notice of off-label marketing.  In that case, the presentation specifically discussed maximizing sales of the company's principal product for unapproved diseases – *i.e.*, off-label marketing.  Here, the presentations discussed only general industry trends and were not specific to Depakote or any other Abbott product.

FDA sent," *In re Depakote*, 2012 WL 5561268, at *10, instead contending the board must have learned about it through Abbott's compliance and reporting mechanisms. As explained above, the mere existence of these mechanisms is insufficient to impute to the board notice of a letter sent to a regulatory manager complaining about one allegedly misleading "flashcard." There is no reason to believe such a letter would have been brought to the board's attention. Even if the board did learn of the letter, plaintiff's allegations remain deficient because, as with the prior complaint and as the Court recognized, "there is no allegation that Abbott failed to remedy the concerns the FDA raised in this letter." *Id.* Nor has plaintiff alleged that the board consciously allowed off-label marketing of Depakote after the date of this letter. (Resp. at 24-25) Accordingly, like plaintiff's other purported red flags, this letter fails to establish a substantial risk of liability of the majority of directors for consciously breaching their duty of loyalty.

## CONCLUSION

Because the Second Amended Complaint fails to show, through well-pled allegations, any basis for excusing demand on Abbott's board of directors, plaintiff thus lacks standing to bring this lawsuit, and the action should be dismissed with prejudice.

Dated: March 22, 2013                                  Respectfully submitted,


/s/ Daniel E. Reidy                                       /s/ Robert J. Kopecky

Daniel E. Reidy                                          Robert J. Kopecky
Brian J. Murray                                          Sallie G. Smylie, P.C.
JONES DAY                                               Sarah J. Donnell
77 West Wacker Drive                                 KIRKLAND & ELLIS LLP
Chicago, IL  60601                                     300 North LaSalle Street
(312) 782-3939                                          Chicago, IL  60654
                                                             (312) 862-2000


*Attorneys for the Individual Defendants*          *Attorneys for Defendant Abbott Laboratories*


15

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on March 22, 2013, he caused true copies of the foregoing REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT to be served upon all counsel of record using the Court's CM/ECF system.

/s/ Robert J. Kopecky