**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

----------------------------------------------------------------------------x

**IN RE ABBOTT-DEPAKOTE SHAREHOLDER**     **:**
**DERIVATIVE LITIGATION**                          **:**   **CASE NO: 1:11-cv-08114**
                                                    **:**   **Hon. Virginia M. Kendall**

----------------------------------------------------------------------------x


**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION
FOR RECONSIDERATION OF THE
COURT'S JUNE 5, 2013 ORDER**

## PRELIMINARY STATEMENT

In its well-reasoned June 5, 2013 Opinion (the "Opinion"), this Court found that Plaintiffs have satisfied the pleading standard for demand futility under Fed. R. Civ. P. 23.1. To read Defendants' Motion for Reconsideration, one might think the Court has already found Defendants liable. That is one of the fatal flaws in Defendants' invitation to have this Court revisit – yet again – arguments already considered and rejected. The Court's language is clear:

> Plaintiffs have alleged **_particularized facts_** demonstrating that a majority of the Board had notice that Abbott was engaging in illegal conduct, did nothing to remedy the situation, which resulted in a $1.6 billion loss to Abbott. Therefore, Plaintiffs have sufficiently raised a **_reasonable doubt_** that the Board's inaction will not be afforded the protection of the business judgment rule.

(Dkt. No. 241, 6/5/13 Op. at 17) (emphasis added).

Finally faced with the prospect of personal accountability for the grievous misconduct that resulted in Abbott paying $1.6 billion in criminal and civil penalties, and entry into yet another consent decree with the Government, Defendants ask the Court for a second bite at the apple to dismiss the Second Consolidated Verified Amended Shareholder Derivative Complaint (the "SAC"). This is nothing more than an attempt to resurrect and recast failed arguments. Defendants, because they are displeased with the result, "treat the Court's opinion as if it were a brief to which Defendant is entitled to respond." *Burns v. First Am. Bank*, 2007 WL 141175, at *1 (N.D. Ill. Jan. 12, 2007) (Kendall, J.). The Court should countenance none of it.

Putting aside the well-settled fact that Defendants' burden in seeking reconsideration here is onerous, their contentions are meritless. **_First_**, Defendants argue that this Court erred by contending that the April 17, 2008 document preservation letter and the July 10, 2008 subpoena served by the Government (the first of many) failed to allege any wrongdoing that would have

alerted Abbott's Current Board[1] of the illegal off-label marketing of Depakote or that the Current Board failed to act in their wake. Def. Mem. at 10-14.[2] Defendants advanced precisely this argument in their motion to dismiss, and the Court soundly rejected it, finding unequivocally that "[s]ince the Plaintiffs have alleged that Abbott engaged in a scheme to illegally market Depakote in an off-label manner and to and to pay illegal remuneration to physicians to prescribe and promote Depakote for eleven years, ***including for an entire year in which a majority of the 2012 Board served as directors,*** Plaintiffs have alleged a scheme of magnitude and duration substantial enough to ***warrant an inference that the Board was aware [of] it.***" (6/5/13 Op. at 17) (emphasis added) (citing *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 808-09 (7th Cir. 2003) ("*Abbott I*") ("[w]hen a derivative plaintiff alleges a particularized scheme of substantial magnitude and duration . . . courts infer that the board had notice of the scheme for purposes of assessing demand futility")). In other words, the Current Board's knowledge of wrongdoing through the numerous red flags identified by Plaintiffs only bolsters this Court's determination that the Current Board was aware of the wrongdoing because of the "magnitude and duration" of Abbott's off-label scheme to market Depakote. Defendants offer no new facts or law here to change that outcome.

This Court also determined that it was reasonable to infer that the Current Board had notice of the scheme through the Government's preservation letter and subpoenas that "specifically directed Abbott to collect responsive documents from its employees, including its present and former officers, directors, and representatives" from January 1, 1997 through the

---

[1] Capitalized terms are ascribed the same meaning as those provided in the SAC, filed on December 6, 2012.

[2] All references to Defendants' Memorandum in Support of Their Motion for Reconsideration of the Court's June 5, 2013 Order appear herein as "Def. Mem."

date of service. (6/5/13 Op. at 18). Because the preservation letter and subpoenas covered marketing and promotional materials provided to Abbott's sales force regarding the use of Depakote for off-label purposes, the Court concluded that the Current Board's knowledge had been sufficiently pleaded and that "any other conclusion would be preposterous." (6/5/13 Op. at 19). The distinction here that Defendants hope to obfuscate is that the Court did **not** conclude that the Current Board had knowledge of the Company's illegal marketing practices. Rather, it merely construed "all reasonable factual inferences that logically flow from the particularized facts alleged" in favor of Plaintiffs, and deemed knowledge sufficiently plead. *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000). Simply put, the question is not whether the Current Board had knowledge of the wrongdoing, but whether Plaintiffs have alleged a basis to reasonably conclude that it did.

**Second**, Defendants assert that the Civil Settlement Agreement ("CSA"), despite costing Abbott $800 million to resolve the Government's civil claims, is essentially meaningless and that this Court may not so much as acknowledge its existence. Def. Mem. at 6, 7. To do this, Defendants twist the meaning of the Court's decision to suggest that it simply endorses Plaintiffs' "rote" insertion of "through 2008 language to a dozen allegations." *Id.* at 6. To the contrary, the Court determined that the allegations in the CSA made it "now reasonable for this Court to infer that the off-label marketing scheme did not stop in 2006…." (6/5/13 Op. at 14). The Court viewed the broader time period alleged in that document *in conjunction with* "the myriad particularized allegations demonstrating that Abbott marketed Depakote for off-label uses[,]" including: the training of sales representatives to market Depakote for comorbidities not approved by the FDA; the bribing of "key opinion leaders" with illegal kickbacks; and the payment of rebates to Long Term Care ("LTC") Pharmacy Providers based on increased usage of

3

Depakote in nursing homes for the treatment of off-label uses such as agitation and aggression in elderly dementia patients. (*Id.* at 14-15). As the Court succinctly stated, the SAC "is **littered with these types of particularized allegations**." (*Id.* at 15) (emphasis added).

**Third**, Defendants inappropriately raise for the first time two new arguments. They contend that the lapse of time between July 10, 2008, when the first Government subpoena was issued, and December 31, 2008, when the illegal conduct allegedly ended under the terms of the CSA, was simply too short for a board to investigate and apply any remedial action. Def. Mem. at 12. This argument is unavailing and speculative at best. While Defendants suggest that six months does not present a sufficient period for the Current Board to take remedial measures to curtail the off-label marketing of Depakote, in the face of Plaintiffs' particularized facts, Defendants are unable to point to any action the Current Board **did take** to terminate the brazen, illegal conduct after it received the preservation letter or the July 10, 2008 subpoena. For this Court to make the opposite inference now – that the Current Board was alerted to corporate wrongdoing by these red flags, but did not have sufficient time to do anything – lacks any plausibility and would run afoul of Rule 23.1 pleading standards. *See Brehm,* 746 A.2d at 255.

Also for the first time, Defendants argue that this Court's acceptance of the CSA as a source of particularized facts will somehow have a chilling effect on future settlements between corporate wrongdoers and the Government. Def. Mem. at 9-10. Not only is this argument far-fetched, it is – not surprisingly – unsupported by Defendants' own authority.

Plaintiffs have thoroughly refuted each and every challenge by Defendants – new or otherwise – and Defendants should be foreclosed from raising new arguments in their motion for reconsideration that were available to them – and omitted – during initial briefing. *See Paine v.*

*Berglind*, 2012 WL 6727243, at *9 (N.D. Ill. Dec. 28, 2012) (Kendall, J.) ("Indeed, any arguments that are raised for the first time in a motion for reconsideration are waived.").

For the reasons set forth herein, this Court should reject Defendants' Motion for Reconsideration in its entirety.

## ARGUMENT

### I. Defendants Fail to Meet the Legal Standard for Seeking Reconsideration

As the party seeking reconsideration, Defendants bear a heavy burden. *See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.,* 90 F.3d 1264, 1270 (7th Cir. 1996). It is "well-settled that a motion to reconsider is not a proper vehicle to advance arguments or legal theories that could and should have been made before the Court entered its order or to present evidence that was available earlier." *Caine v. Burge*, 897 F. Supp. 2d 714, 717 (N.D. Ill. 2012) (Kendall, J.); *see also Goldman v. Gagnard*, 2012 WL 2397053, at *2 (N.D. Ill. June 21, 2012) ("[m]otions for reconsideration do not provide a party with the opportunity to take a second bite at the apple...."). To the contrary, the Seventh Circuit has repeatedly cautioned that "motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (quotation omitted). This Court defines a manifest error as "the wholesale disregard, misapplication or failure to recognize controlling precedent." *Harris v. U.S.*, 2008 WL 5612545, at *1 (N.D. Ill. Dec. 18, 2008) (Kendall, J.). Defendants have failed to identify any error, let alone manifest error, that warrants reconsideration and, instead, "merely attacks the Court's reasoning in reaching its decision." *Sperling & Slater, P.C. v. Hartford Cas. Ins. Co.*, 2012 WL 6720611, at *3 (N.D. Ill. Dec. 27, 2012) (Kendall, J.).

II.    **Defendants' Challenges Regarding the Current Board's Knowledge of the Wrongful
       <u>Conduct Have Already Been Rejected by This Court or Are Untimely</u>**

Defendants slickly attempt to repackage their stale arguments and, for the first time, raise new arguments about whether or not the Current Board was aware of Abbott's illegal marketing of Depakote. These arguments have already been rejected by this Court after having been raised in Defendants' motion to dismiss or are simply untimely and thus waived. In any event, they are entirely meritless.[3]

Defendants assert that Plaintiffs failed to allege particularized facts to support the allegation that both the Government's preservation letter (served on Abbott in April 2008) and subpoenas (the first of several served in July 2008) reached the Current Board and advised it of any alleged wrongdoing. Def. Mem. at 10-14. Defendants raised this same point in their motion to dismiss. (*See* Dkt. No. 226 at 9-11; Dkt. No. 234 at 10, 11-12). After considering the copious briefing, this Court soundly rejected this argument finding that, based on an eleven-year illegal scheme to market Depakote and pay illegal remuneration to physicians to prescribe Depakote, "Plaintiffs have alleged a scheme of magnitude and duration substantial enough to warrant the inference that the Board was aware." (6/5/13 Op. at 17). If that was not sufficient enough, this Court also determined, even without that inference, it was "reasonable to infer that the receipt of the document preservation letter and the subsequent subpoenas from the DOJ put the Board on notice that the off-label marketing practices were occurring in 2008 (*Id.* at 18-19). Likewise, the

---

[3] As a threshold matter, Defendants quibble with the Court's analysis under the test adopted in *Aronson v. Lewis*, 473 A.2d 804 (Del. 1984) as opposed to the theory of liability under *Rales v. Blasband*, 634 A.2d 934, 937 (Del. 1993), *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27, 67 (Del. 2006), and *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006), which is the appropriate standard under the alleged facts in this matter. Def. Mem. at 10. Under either test, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations and the directors failed to act in the face of a known duty to act. *See, e.g.*, *Stone*, 911 A.2d at 370. Whether this Court applies *Aronson* or *Stone*, Plaintiffs have met this burden at the pleading stage.

Court also found that it is "reasonable to infer that the Board was aware of subpoenas issued by the DOJ that specifically directed Abbott to collect responsive documents *from the Board*," including marketing and promotional materials provided to Abbott's sales force regarding the use of Depakote to treat agitation and aggression associated with long term care residents or elderly persons. (*Id.* at 19) (emphasis added). To be sure, "any other conclusion would be preposterous."[4] (*Id.* at 19). Nothing Defendants proffer now changes this outcome. Instead, Defendants are "merely attack[ing] the Court's reasoning in reaching its decision" and their argument should fail. *Sperling*, 2012 WL 6720611, at *3.

Defendants also argue for the first time that, assuming Abbott's directors did receive the July 2008 subpoena, it provided Defendants with only six months to investigate the relevant facts of the misconduct and take any necessary remedial actions to terminate it. Def. Mem. at 12. This, they argue, is not a sufficient period of time to conclude that the Current Board failed to act. *Id.* There is no legal precept which allows Defendants to raise this issue now, for the first time, as a basis for reconsideration, despite it being available to them during briefing on motions to dismiss. It is therefore waived. *Paine*, 2012 WL 6727243, at *9.[5] Indeed, since the time

---

[4] Defendants cite to *Rahbari v. Oros*, 732 F. Supp. 2d 367, 383 (S.D.N.Y. 2010) for the general proposition that a plaintiff must plead particularized facts to demonstrate a substantial likelihood of liability to excuse a demand. Def. Mem. at 11. There, the court ominously noted that the pleadings failed to allege: (i) any specific mechanism by which the board or audit committee were made aware of the change in the loan facility or that the financials were somehow inadequate; (ii) the board was involved in negotiating the change in the loan facility; (iii) there were any lawsuits "in play;" or (iv) longstanding or widespread fraud at the company. 732 F. Supp. 2d at 385. In contrast, here, as the Court correctly points out, an eleven-year scheme to illegally market Depakote was of a magnitude and duration to make Abbott's Board aware given the preservation letter and barrage of Government subpoenas that followed. Moreover, this Court noted, but did not need to further consider, the existence of corporate governance mechanisms resulting from instances of prior similar illegal conduct (6/15/13 Op. at 19) and the redacted PPD presentations made to the Board. (*Id.* at 20).

[5] *See also Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.4 (7th Cir. 1994) (recognizing that raising an "argument for the first time in the motion for reconsideration is not adequate to preserve the issue for appeal and definitively waives it").

Defendants first moved to dismiss the SAC and the instant motion, the facts supporting this argument have remained unchanged: Abbott's Board received the preservation letter in April 2008; the Government subpoenas were unleashed in July 2008; and Plaintiffs, citing to the CSA and other red flags, alleged that the illegal marketing of Depakote continued through at least December 31, 2008. Defendants somehow did not see fit to raise the argument when they first moved to dismiss the SAC; they should not be permitted to raise this argument now.[6] *See*, *e.g.*, *Publishers Res.*, 762 F.2d at 561 ("all of the evidence on [which defendant's] new arguments rest was available to it at the time it responded to plaintiff's summary judgment motion and [defendant] was obligated to make these arguments at that time").

    However, putting aside the tardiness of this argument, it is wholly without merit. First, the Court concluded that the Current Board's knowledge of wrongdoing was adequately pleaded

---

[6] Defendants previously argued that the preservation letter and the plethora of Government subpoenas did not connote that actual wrongdoing did occur. *Compare* Def. Mem. at 12 *with* Dkt. No. 226 at 11; *see also* Dkt. No. 234 at 11. As repeated often throughout this brief, this Court has already carefully considered and rejected this argument. In doing so, the Court determined that Plaintiffs "have now sufficiently alleged that the illegal off-label marketing of Depakote persisted until at least December 31, 2008, which is after a majority of the 2012 Board was appointed. These subpoenas were also issued while the illegal conduct continued to occur." (6/5/13 Op. at 20). *Kococinski v. Collins*, 2013 WL 1197676, at *11 (D. Minn. Mar. 25, 2013) and *In re Johnson & Johnson Derivative Litigation*, 865 F. Supp. 2d 545, 561-62 (D.N.J. 2011) ("*J&J*") are not to the contrary. Unlike in *J&J*, where the wrongdoing allegedly occurred only at one subsidiary (McNeil) out of 250, and where the court discounted the plaintiffs' subpoena allegations by stating that "it is not accurate to refer to McNeil as J&J or vice versa," 865 F. Supp. 2d at 574, here, the allegations involve Abbott's "primary or central operations," as opposed to some far-flung subsidiary. *Cf. id.* at 572; *see also In re SFBC Int'l, Inc. Sec. & Derivative Litig.*, 495 F. Supp. 2d 477, 486 (D.N.J. 2007) (wrongful conduct "was not merely decentralized activity by employees of a far-flung enterprise of the company, as was the case in *Caremark*," and, as a result, the "directors certainly should have known about the company's performance of its core business, and assuming the truth of Plaintiffs' allegations, about the particularly reprehensible manner in which it was done"). Moreover, unlike the defendants in *J&J*, the Current Board is subject to enhanced duties under the 2003 CIA – a point continuously ignored by Defendants. *See* 865 F. Supp. 2d at 570 (court acknowledged that the plaintiffs did not specify the contents of the CIA, but "[i]f the CIA placed an obligation on the Board to oversee [a division's] activities, that might suggest the individual directors could face a substantial likelihood of personal liability for failing to act in accordance with their contractual obligations"). Finally, *Kococinski* is similarly far afield and its reasoning was already rejected by this Court. There, the plaintiffs relied on a letter from Senator Grassley to the then-CEO and Chairman that *may* have been shared with the board requesting a list of physicians receiving payments from the Infuse subsidiary. 2013 WL 1197676, at *11. In contrast, here, the Government subpoenas "specifically directed Abbott to collect responsive documents from the Board." (6/5/13 Op. at 19).

because of the "***magnitude and duration***" of the "scheme to illegally market Depakote…for eleven years, including for an entire year in which a majority of the [Current] Board served as directors...." (6/5/13 Op. at 17) (emphasis added). Courts routinely find demand futility adequately pleaded where the complaint details a campaign of wrongdoing that is sizeable both in terms of scale and duration. (*Id.* at 17) (citing *Abbott I*, 325 F.3d at 808-09; *McCall v. Scott*, 239 F.3d 808, 823 (6th Cir. 2001)).[7] As this Court has already found, *Abbott I* is particularly compelling here "where a derivative plaintiff alleges a particularized scheme of substantial magnitude and duration that allegedly occurred when a majority of the board served as directors." (*Id.*). In doing so, the Court recognized that Abbott's eleven-year scheme to illegally market Depakote and pay physicians kickbacks and other improper remuneration to prescribe and promote Depakote, including for an entire year under the Current Board's tenure, "***warrant[s] the inference that the Board was aware [of] it.***" (*Id.*) (emphasis added). Accordingly, the Individual Defendants face a substantial likelihood of liability for their breaches of the fiduciary duties of loyalty and good faith.

Second, Defendants' argument that the six month span from receipt of the July 2008 subpoena until December 31, 2008 was not sufficient to investigate and curtail the illegal activity, is speculative at best. Defendants have not pointed to ***a single thing*** that the Board actually did to investigate the Company's off-label marketing of Depakote after it received the preservation letter and subpoena, or that it did ***a single thing*** to terminate the illegal practices. Defendants' own authority undermines their position. *See J&J*, 865 F. Supp. 2d 545, 561-62

---

[7] *See also In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 460-61 (S.D.N.Y. 2010) (applying Delaware law, noting the "sheer size" of fines and that the wrongdoing "was committed in the face of the board's repeated promises to closely monitor and prevent such misconduct, as required by the 2002 and 2004 [corporate integrity agreements]"); *In re Comverse Tech., Inc. Derivative Litig.*, 866 N.Y.S.2d 10, 16 (N.Y. Sup. Ct. 2008) (applying New York law, holding that "a demand is properly considered futile" when the illegal transactions are of sufficient magnitude and duration) (quotation marks omitted).

(D.N.J. 2011). There, the court emphasized that language in the next Form 10-K following receipt of government subpoenas indicated that J&J was cooperating with the DOJ's investigation. This critical fact led the court to acknowledge that it "cannot conclude that disclosure of the subpoenas indicated that, even if there was corporate misconduct, that it was continuing. To the contrary, this language suggests that the *corporation was responding appropriately and the directors did not need to respond at that point in time*." *Id.* at 566 (emphasis added).[8] In palpable contrast, here, Abbott did not disclose to investors the Government's investigation into the illegal marketing of Depakote until *November 6, 2009*, when it filed its quarterly report on Form 10-Q for the period ending September 30, 2009. SAC, ¶ 293.

## III. This Court Correctly Determined That Plaintiffs Alleged Multiple Particularized Allegations Of Conduct Through 2008

### A. The Government's Contentions That Abbott Continued to Illegally Market Depakote Through 2008 Render the Allegations in the SAC Plausible

In a retread of arguments made in their Motion to Dismiss, Defendants again insist that the CSA, despite resolving the Government's civil claims for the off-label marketing of Depakote, is essentially meaningless and that this Court may not so much as acknowledge its existence. Def. Mem. at 5-7. Positing that the Court can infer precisely nothing from the CSA – for which Abbott paid $800 million – Defendants seem to accuse the Court of misapprehending the import of that agreement. This Court's opinion reveals the fragility of Defendants' position.

In sustaining the claims in the SAC, this Court did not simply endorse Plaintiffs' "rote" insertion of the words "through 2008," as Defendants would have it. Def. Mem. at 6. Rather,

---

[8] Defendants also inaptly raise *J&J* for the proposition that the five months provided to J&J's board from the date of a settlement agreement with the government to the filing of the derivative complaint does not provide a sufficient basis for inferring director misconduct. Def. Mem. at 14. That court's decision hinged on a critical point: that the so-called settlement agreement was between the government and Omnicare. As the court underscored, "[t]his distinction is important because Omnicare is not a J&J subsidiary. Therefore, whatever admissions of liability that Omnicare made in its settlement with the DOJ cannot be imputed to J&J or the J&J subsidiaries." 865 F. Supp. 2d at 567.

the Court properly determined that the allegations in the CSA made it "now reasonable for this Court to infer that the off-label marketing scheme did not stop in 2006…." (6/5/13 Op. at 14).

The Court viewed the broader time period alleged in the CSA *in conjunction with* "the myriad particularized allegations demonstrating that Abbott marketed Depakote for off-label uses…." (*Id.*). These particularized allegations include: the training of sales representatives to market Depakote for comorbidities not approved by the FDA; the bribing of "key opinion leaders" with illegal kickbacks; and the payment of rebates to LTC Pharmacy Providers based on increased usage of off-label Depakote in nursing homes for the treatment of agitation and aggression in dementia patients. (*Id.* at 14-15). As the Court succinctly stated, the SAC "is *littered with these types of particularized allegations*." (*Id.* at 15) (emphasis added). The Court thus reasonably inferred from the CSA – which contains allegations of *specific wrongdoing* through December 31, 2008 (SAC, ¶ 276) – that the off-label marketing practices were ongoing through at least December 31, 2008, during the tenure of the Current Board. (*See* 6/5/13 Op. at 15 ("At this stage the Court is required to make all reasonable inferences in favor of the non-moving party.")). By incorporating into the pleading the facts contained in the CSA, it became "plausible" that the wrongful conduct occurred through the end of 2008. (*Id.* at 14).[9]

Curiously, while Defendants readily concede that the SAC pleads with particularity that the illicit conduct occurred at least through 2006, and likely through February 2007 (Def. Mem. at 5-6), they believe that they are entitled to the inference that this illegal conduct came to an abrupt halt immediately thereafter, notwithstanding what the Government alleged in the CSA. In other words, Defendants invite the Court to put blinders on and construe the allegations against Plaintiffs. For it is only by disregarding the "myriad" of well-pleaded facts throughout the SAC

---

[9] Defendants conveniently ignore that, as the Court noted, allegations of wrongful conduct at least through 2008 arise also from the *Qui Tam* Actions. (*See* 6/5/13 Op. at 3 (citing SAC ¶¶ 97-105)).

that this Court could conclude that the wrongful conduct magically stopped in 2006 or early 2007. And, it is only by disregarding all reasonable inferences which Plaintiffs are entitled to, *see Veeco*, 434 F. Supp. 2d at 274 – and the plain language of the CSA – that this Court could deny that the SAC pleads with particularity that Abbott illegally marketed Depakote off-label during the Current Board's watch. (6/5/13 Op. at 14). The Court correctly ruled that it "must credit those allegations as true in assessing the sufficiency of the Second Amended Complaint." (*Id.* at 16). This was hardly a "manifest error of law"; it was a proper application of the law.[10]

Perhaps most damningly – but not at all surprisingly – Defendants are unable to offer a single case that holds that the terms of a civil settlement agreement are mere "recitals," as opposed to particularized facts, and thus may not be considered by a court. *See* Def. Mem. at 6.

### B. This Court's Consideration of the CSA Is Not Contrary to Public Policy

Next, Defendants for the first time make the bold assertion that this Court's acceptance of the CSA as a source of particularized facts will somehow imperil future civil settlements between the Government and corporate wrongdoers. They jump to the illogical, unsupported conclusion that companies will fear that such agreements will be used against them in private litigation. Thus, Defendants contend, according any weight to the CSA will "chill" future settlements.[11] Def. Mem. at 2, 7. This inferential leap is wholly speculative and Defendants

---

[10] Nor do the cases Defendants' cite advance their cause. In *J&J*, the plaintiffs' allegations that an illegal kickback scheme occurred during a specified period of time did not sufficiently establish board knowledge. 865 F. Supp. 2d at 568. Likewise, in *Waber v. Dorman*, 2011 WL 814992 (N.D. Ill. Feb. 23, 2011), the court held that allegations of certain directors' membership on the audit committee and negotiations occurring during the particular period of time did not establish what the board knew or when it learned of it. *Id.* at *7. Neither case supports Defendants' assertion that the CSA cannot be deemed to give rise to particularized allegations.

[11] As a threshold matter, Defendants were well aware that Plaintiffs cited to the CSA in the SAC as another data point that forms the basis for particularized allegations from which this Court is permitted to draw reasonable inferences that Abbott engaged in misconduct through at least December 31, 2008. Since the facts were available for Defendants to raise this argument when they first moved to dismiss the

offer no legal or even anecdotal evidence in support for their untenable position that this Court's reference to the CSA will jeopardize the Government's ability in the future to reach negotiated resolutions with corporate wrongdoers out of fear that the corporation might be subjected to private litigation.[12]

Rather, Defendants misapprehend the weight the Court afforded the CSA and, as if repetition will make it true, again argue that Abbott entered the CSA in compromise of disputed claims. Def. Mem. at 7, 8. However, Defendants' contention that the CSA includes no admission of wrongdoing through December 31, 2008, is completely immaterial. Plaintiffs do not need the CSA to be an admission but, like all other indications of wrongdoing in the SAC, cite to it to form the basis for particularized allegations from which this Court is permitted to draw reasonable inferences and which Plaintiffs are entitled to prove at trial. This Court acknowledged this when it ruled that:

> *[t]he Government's specific contentions in the [CSA] that Abbott continued to market Depakote in an off-label manner and continued to illegally remunerate physicians to promote Depakote through 2008 makes Plaintiffs' allegations plausible. The Court must credit those allegations as true in assessing the sufficiency of the [SAC].* Accordingly, the Court finds Plaintiffs alleged multiple particularized allegations of illegal conduct occurring through 2008. This, in turn, means they have alleged that the illegal conduct continued to occur during the period a majority of the 2012 Board served as directors.

(6/5/13 Op. at 16) (emphasis added).

---

SAC, they were obligated to do so then. However, since Defendants raised this issue for the first time now, it is waived. *See, e.g., Paine*, 2012 WL 6727243, at *9.

[12] Defendants cite cases for the general proposition that courts not only promote, but encourage settlement, particularly in protracted cases – nothing more. *See* Def. Mem. at 9 (citing *Thomas v. Law Firm of Simpson & Cybak*, 244 F. App'x 741, 744 (7th Cir. 2007); *Webb v. James*, 147 F.3d 617, 620 (7th Cir. 1998); *Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400, 405 (7th Cir. 1974)). Accordingly, these cases simply do not lend any credence to the argument that reference to the CSA will jeopardize future settlements between the Government and corporate wrongdoers.

Nevertheless, Plaintiffs clearly are not attempting to rely on the CSA to **prove** Defendants' unlawful conduct. Defendants' assertion that it is improper for this Court to look to the CSA as another fact in support of Plaintiffs' allegations is not supported by Defendants' own authority. For example, in *U.S. v. Willis*, 43 F. Supp. 2d 873, 883 (N.D. Ill. 1999), the facts are wholly inapposite to this case. There, the convicted members of a large drug gang were seeking a new trial based, in part, on post-trial events involving a civil suit against one of the investigating drug enforcement agents. *Id.* at 882. The court acknowledged that the parties to the partial civil settlement did not admit liability and "[w]hat happened to [the agent] as a civil plaintiff after the [] trial would not 'probably lead to an acquittal in the event of a retrial.'" *Id.* at 883.[13] Unlike the cases cited by Defendants, here, Plaintiffs refer to the CSA as another fact to support their particularized allegations. *See*, *e.g.*, *ClearOne Commc'ns, Inc. v. Lumbermens Mut. Cas. Co.*, 2005 WL 2716297, at *8 n.10 (D. Utah Oct. 21, 2005) (even though no fine or penalty

---

[13] The other cases proffered by Defendants are equally inapposite. *See*, *e.g.*, *Ores v. Willow West Condo. Ass'n*, 1998 WL 852839, at *9-10 & n.10 (N.D. Ill. Nov. 30, 1998) (in indemnity action where claimant must prove it engaged in lawful conduct, the court, after noting that it did not receive a copy of the underlying settlement agreement for a related action from claimant, could not "infer from ***the fact of settlement*** that the cross-claimants acted unlawfully…neither can it infer that the cross-claimants acted lawfully…[the court] has no idea of the terms of the settlement, nor whether the settlement contains any statement of fault-or lack thereof.") (emphasis added); *In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *5 (N.D. Ill. Feb. 9, 2012) (granting motion to dismiss manipulation claim under Section 9(a) of the Commodity Exchange Act where plaintiffs attempted to demonstrate intent by merely parroting a CFTC Order for violations of position limits under Section 4(e), stating that the "Plaintiffs are trying to transform a position limit violation into a manipulation violation … two causes of actions [that] are comprised of distinctly different elements"); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (noting that "consent decrees, like pleas of *nolo contendere*, may not be used for purposes of ***collateral estoppel*** because the issues in the underlying action were not fully adjudicated) (emphasis added). It bears mentioning that, in *Lipsky*, the court was careful to note that courts should avoid striking allegations during the preliminary stages of litigation when the sole basis for doing so is that such evidence may eventually be deemed inadmissible or irrelevant at trial and further acknowledged that the SEC's opinion on the sufficiency of the various statements may be relevant and may be admissible. 551 F.2d at 894.

was assessed against the defendant, court considers the consent decrees entered into with the SEC only as part of the factual background of this case).[14]

In other words, what Plaintiffs are arguing, and this Court has appropriately credited, is that the CSA and the wealth of other information make Plaintiffs' particularized allegations plausible – which is all that was required to defeat Defendants' motion to dismiss. Thus, Plaintiffs have alleged that demand is futile not only on the basis of the CSA, but also based on *numerous other allegations* of wrongdoing and red flags during the Current Board's tenure which, taken together, satisfy the legal standard. *See e.g.,* ¶¶ 275-283. To infer nothing from the CSA would eviscerate the basic principles of Rule 23.1. *Allergan*, 46 A.3d at 317; *see also Brehm*, 746 A.2d at 255 ("Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged . . . .").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny in its entirety Defendants' motion for reconsideration of the Court's June 5, 2013 Order.

Dated:  July 8, 2013

SUSMAN HEFFNER & HURST LLP

By: /s/ Matthew T. Heffner
Matthew T. Heffner
30 N. LaSalle Street, 12th Floor
Chicago, IL 60602
Tel.:  312.346.3466
Fax:  312.346.2829

*Local Counsel*

---

[14] *See also Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 454 (S.D.N.Y. 2008) (defendant's motion to strike AMEX's delisting letters because they were not based on findings of fact resulting in a final adjudication was denied because "such evidence may be used as part of the factual background of a case"); *Johnson v. M & M Commc'ns, Inc.*, 242 F.R.D. 187, 190 (D. Conn. 2007) (allegations that reveal a Department of Labor Field Audit Unit's findings which "illustrate[d] the defendant's knowledge of its potential violations and its subsequent failure to take corrective action, which may be evidence of willful violations or bad faith," were not stricken from the complaint).

**SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.**
Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirarchi
*rroseman@srkw-law.com*
*aabramowitz@srkw-law.com*
*dmirarchi@srkw-law.com*
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Tel.: 215.496.0300
Fax: 215.496.6611


Mark S. Willis
*mwillis@srkw-law.com*
1101 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004
Tel.: 202.756.3600
Fax: 202.756.3602

*Counsel for Lead Plaintiff,*
*Jacksonville Police & Fire Pension Fund*

Of counsel

KAHN SWICK & FOTI, LLC
Albert M. Myers
Melinda A. Nicholson
*Albert.myers@ksfcounsel.com*
*Melinda.nicholson@ksfcounsel.com*
206 Covington Street
Madisonville, LA
Tel.: 504.455.1400
Fax: 504.455.1498

BRANNON LAW FIRM, LLC
Paul M. Brannon
PMB@BrannonLawFirm.com
3500 North Hullen Street
Metairie, Louisiana 70002
Tel.: 504.456.8600
Fax: 504.456.8697

16

*Counsel for Louisiana Municipal Police*
*Employees Retirement System*

LABATON SUCHAROW LLP
Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
*ckeller@labaton.com*
*ebelfi@labaton.com*
*mstocker@labaton.com*
140 Broadway
New York, NY 10005
Tel: 212.907.0700
Fax: 212.818.0477

Christine S. Azar
Charles B. Vincent
Peter C. Wood, Jr.
*cazar@labaton.com*
*cvincent@labaton.com*
*pwood@labaton.com*
300 Delaware Avenue, Suite 1225
Wilmington, DE  19801
Tel: 302.573.2530
Fax: 302.573.2529

*Counsel for Public School Retirement System*
*Of the School District of Kansas*
*City, Missouri*