**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

-----------------------------------------------------------------------x

**IN RE ABBOTT-DEPAKOTE SHAREHOLDER**      :

**DERIVATIVE LITIGATION**                                :     **CASE NO: 1:11-cv-08114**

                                                     :     **Hon. Virginia M. Kendall**

-----------------------------------------------------------------------x

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LEAD PLAINTIFF'S MOTION FOR
<u>PRELIMINARY APPROVAL OF SETTLEMENT</u>**

## <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT ................................................................1

II.    PROCEDURAL AND FACTUAL BACKGROUND ................................................3

    A.    The Derivative Actions ....................................................................3

    B.    The Settlement Process .....................................................................5

III.    SUMMARY OF PROPOSED SETTLEMENT.......................................................  8

    A.    The Maintenance of a Code of Business Conduct.............................................8

    B.    Senior Management Communications On Compliance Issues .......................9

    C.    Strengthening the Public Policy Committee's Oversight of Compliance ................................................................................  9

    D.    Enhancing the Role of the Lead Director ...................................... 10

    E.    Strengthening the Compensation Committee to Provide for Recoupment Adoption of a Compensation Recoupment Policy.................. 11

    F.    Strengthening Maintaining the Independence and Responsibilities of the Nominations and Governance Committee ............................................... 11

    G.    Formalizing the Reporting of Committees to the Board .............................. 12

    H.    Authorizing Board and Committee Retention of Independent Advisors.................................................................................. 12

    I.    Strengthening Maintaining the Business Conduct Committee's Role in Compliance ............................................................................ 12

    J.    The Authorization of Abbott To Take Disciplinary Action Against Employees for Violations of Health Care Programs and FDA Requirements................................................................ 13

    K.    The Development and Formalization of A Reporting System to Promote Compliance Oversight .................................................. 13

    L.    The Development of Continuing Education for Directors on Compliance Issues ........................................................................ 14

IV.    PRELIMINARY RELIEF SOUGHT AT THIS TIME ........................................... 14

i

V.      THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL ....... 16

    A.      Settlements Are Generally Favored ............................................................... 16

    B.      The Proposed Settlement Meets the Standard for Preliminary Approval ..................................................................................................... 17

        1.      The Strength of Lead Plaintiff's Case ................................................ 20

        2.      The Complexity of Trial .................................................................... 21

        3.      The Expense, Risk and Likely Duration of Continued Litigation............................................................................................. 22

        4.      The Opinion of Competent Counsel ................................................... 23

        5.      The Stage of Proceedings and Discovery Taken ............................... 24

VI.     THE PROPOSED NOTICE TO ABBOTT SHAREHOLDERS IS ADEQUATE.............................................................................................................. 25

VII.    CONCLUSION ........................................................................................................ 26

## TABLE OF AUTHORITIES

*In re Abbott Laboratories, Inc. Deriv. S'holder Litig.*
No. 99 C 7246 (N.D. Ill.) .......................................................................................................23

*Abrams v. Swift Boat Film LLC,*
No. 05-cv-2082, 2006 WL 337661 (S.D.N.Y. Feb. 10, 2006) ................................................26

*Am. Int'l Group v. ACE INA Holdings, Inc.*,
Nos. 07-cv-2898, 09-cv-2026, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ...........................18

*In re AOL Time Warner Shareholder Deriv. Litig.,*
No. 02 Civ. 6302, 2006 U.S. Dist. LEXIS 63260 (S.D.N.Y. Sept. 6, 2006) ..........................17

*Arace v. Thompson,*
No. 08 Civ. 7905, 2011 WL 3627716 (S.D.N.Y. Aug. 17, 2011) ..........................................26

*Armstrong v. Bd. of Sch. Dirs.,*
616 F.2d 305 (7th Cir. 1980), *overruled on other grounds, Felzen v. Andreas,* 134 F.3d
873 (7th Cir. 1998) ........................................................................................................ passim

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
270 F.R.D. 330 (N.D. Ill. 2010) .....................................................................................17, 18

*Bell Atlantic Corp.* v. *Bolger,*
2 F.3d 1304 (3d Cir. 1993) .....................................................................................................26

*Butler v. Am. Cable & Tel., LLC*,
No. 09 CV 5336, 2011 WL 2708399 (N.D. Ill. July 12, 2011) ..............................................18

*Cohn v. Nelson,*
375 F. Supp. 2d 844 (E.D. Mo. 2005) ..............................................................................17, 24

*In re Converium Holding (Switzerland) AG Litig.*,
No. 04 Civ. 07897 (DLC) (S.D.N.Y.) .....................................................................................23

*Cotton v. Hinton,*
559 F.2d 1326 (5th Cir. 1977) ................................................................................................17

*E.E.O.C v. Hiram Walker & Sons, Inc.,*
768 F.2d 884 (7th Cir. 1985), *cert. denied,* 478 U.S. 1004 (1986) ........................................16

*Felzen v. Andreas (Archer Daniels Midland Co. Deriv. Litig.),*
No. 95 C 3979 *(C.D. Ill.)* .......................................................................................................23

*Feuer v. Thompson*,
   Nos. 10-cv-00279 YGR, 12-cv-0203 YGR, 2012 WL 6652597 (N.D. Cal. Dec. 13,
   2012) ................................................................................................................26

*Freeman v. Berge*,
   68 Fed. Appx. 738 (7th Cir. 2003).........................................................................20, 23

*Granada Investments, Inc. v. DWG Corporations*,
   962 F.2d 1203 (6th Cir. 1992) ...............................................................................21

*Henry v. Sears Roebuck & Co.*,
   No. 98-cv-4110, 1999 WL 33496080 (N.D. Ill. July 23, 1999) ............................16

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) ...........................................................16, 18, 20, 22

*In re Johnson & Johnson Derivative Litig.*,
   900 F. Supp. 2d 467 (D.N.J. 2012) ........................................................................19, 21

*Kessler v. Am. Resorts Int'l Holiday Network, Ltd.*,
   Nos. 05 C 5944, 07 C 2439, 2007 WL 4105204 (N.D. Ill. Nov. 14, 2007)............18

*Klein ex rel. SICOR, Inc. v. Salvi*,
   No. 02 Civ. 1862, 2004 WL 596109 (S.D.N.Y. Mar. 30, 2004) ...........................26

*Kyriazi v. Western Elec. Co.*,
   647 F.2d 388 (3d Cir.1981) .....................................................................................26

*In re Lehman Brothers Holdings, Inc. Equity/Debt Sec. Litig.*,
   No. 08-cv-5523 (S.D.N.Y.)......................................................................................23

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir.1983) ....................................................................................24

*In re Parmalat Sec. Litig.*,
   No. 04 Civ. 0030 (LAK) (S.D.N.Y.) .......................................................................23

*In re Pfizer Inc. S'holder Deriv. Litig.*,
   780 F. Supp. 2d 336 (S.D.N.Y. 2011).....................................................................26

*Redman v. RadioShack Corp.*,
   No. 11 C 06741, 2014 WL 497438 (N.D. Ill. Feb. 7, 2014)...................................16

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
   No. 97 C 7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ................................23

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
   No. 01-1412, 2008 U.S. Dist. LEXIS 2569 (D.N.J. Jan. 14, 2008)........................19

*Schulte v. Fifth Third Bank,*
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ..........................................................................22, 23, 24

*Shimmel v. Goldman,*
    57 F.R.D. 481 (S.D.N.Y. 1973) ............................................................................................17

*Shlensky v. Dorsey,*
    574 F.2d 131 (3d Cir. 1978).................................................................................................19

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ...............................................................................................22

*Tucker v. Walgreen Co.,*
    Nos. 05-440, 07-172, 2007 WL 2915578 (S.D. Ill. Oct. 5, 2007) .........................................18

*Uhl v. Thoroughbred Tech. & Telecomms. Inc.,*
    309 F.3d 978 (7th Cir. 2002) ...............................................................................................18

*Unite Nat'l Ret. Fund v. Watts,*
    No. 04-CV-3603, 2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005) *("Shell
    Deriv.")*...........................................................................................................................19, 21

*Utah Retirement Systems v. Strauss (American Home Mortgage Sec. Litig.),*
    No. 09-cv-3221 (E.D.N.Y.) ..................................................................................................23

STATUTES

Freedom of Information Act, 5 U.S.C. § 55 *et seq.* .......................................................................5

OTHER AUTHORITIES

4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:41 at 87 (4th ed.
    2002) ..................................................................................................................................17

Fed. R. Civ. P. 23(e) and 23.1.....................................................................................................18

Federal Rule of Civil Procedure 23.1 ...................................................................1, 17, 18, 26

## I. PRELIMINARY STATEMENT

Pursuant to Federal Rule of Civil Procedure 23.1, Lead Plaintiff, Jacksonville Police & Fire Pension Fund ("Lead Plaintiff"), by and through undersigned counsel, respectfully submits this memorandum of points and authorities in support of its request for preliminary approval of the proposed settlement (the "Settlement"), set forth in the Stipulation and Agreement of Settlement (the "Stipulation") (attached hereto as Exhibit 1), as being fair, adequate, reasonable, and in the best interests of Abbott Laboratories ("Abbott" or the "Company") and its shareholders.

At this initial stage of the settlement review process, courts focus on whether a proposed settlement appears to be the result of serious, informed, and non-collusive negotiations, has no obvious deficiencies, and provides relief that falls within an acceptable range. Under this standard, preliminary approval of the proposed Settlement here is clearly warranted.

In the above-captioned consolidated derivative actions brought on behalf of and for the benefit of Abbott (the "Consolidated Derivative Actions"), Lead Plaintiff alleges that certain members of Abbott's Board of Directors (the "Board") and senior management (collectively, the "Individual Defendants")[1] breached their fiduciary duties by causing or allowing Abbott to engage in unlawful sales and marketing practices with respect to its drug Depakote. This alleged misconduct resulted in claims asserted by the U.S. government and a number of states alleging violations of federal and state law, which Abbott resolved in May 2012 by, *inter alia,* entering into criminal and civil settlements (which resolved certain *Qui Tam* and other actions), paying damages and penalties in amounts totaling approximately $1.6 billion, and by entering into a Corporate Integrity Agreement which, following the separation of

---

[1] The Individual Defendants include Miles D. White, Robert J. Alpern, Roxanne S. Austin, W. James Farrell, H. Laurance Fuller, William A. Osborn, Samuel C. Scott, III, Glenn F. Tilton, Duane L. Burnham, Jeffrey Leiden, and William G. Dempsey.

Abbott's research-based pharmaceutical business in January 2013, was transferred to and became binding on a separate entity.

Lead Plaintiff respectfully submits that the proposed Settlement of the Consolidated Derivative Actions provides substantial benefits to the Company and to its shareholders by maintaining or adopting certain governance and compliance policies and practices. Lead Plaintiff believes that the proposed Settlement will significantly improve the way Abbott approaches compliance, and it will ensure that the Board will remain consistently informed of all matters necessary to exercise meaningful oversight over Abbott's compliance with federal healthcare rules and regulations. Indeed, Lead Plaintiff believes that the proposed Settlement provides that the Board will maintain the necessary tools and the clear responsibility to oversee Abbott's legal and regulatory compliance efforts, and allows the Board to hold certain individuals responsible for misconduct that harms the Company. Specifically, and as provided in the Stipulation of Settlement, Abbott is required to adopt or maintain corporate governance policies, practices, and principles for at least a four year period that Lead Plaintiff believes will, among other things: promote a commitment to legal and regulatory compliance with federal healthcare programs; enact a compensation recoupment policy, enhance the role of the Lead Director, foster greater communication by Abbott's senior management on compliance issues; strengthen the role of the Chief Ethics and Compliance Officer ("CECO"); enhance or maintain the responsibilities and/or independence of the Nominations and Governance Committee, the Compensation Committee, the Business Conduct Committee, and the Public Policy Committee; and cultivate a reporting system designed to facilitate adherence to Abbott's compliance program.

As discussed in detail herein, the proposed Settlement was achieved after extensive

factual and legal investigation, hard-fought litigation over the course of nearly two years, arm's-length negotiations conducted over a five-month period, and significant discovery that lends overwhelming support to approval of this Settlement. It was reached by experienced counsel, both outside and in-house, and the input of an expert in the field of corporate governance. The substantive relief provided by the Settlement is well within the range of benefits that support "possible approval"[2] of a settlement given, *inter alia*, the scope and nature of the corporate governance and compliance reforms approved by courts in other major shareholder derivative actions, as well as the widely recognized value of governance relief in the resolution of derivative litigation. In sum, Lead Plaintiff believes that the proposed Settlement represents an outstanding resolution that is a credit to both Lead Plaintiff and Abbott and its Board of Directors.

Ultimately, the question before the Court on this Motion is straightforward and narrow: whether the proposed Settlement is sufficient to warrant preliminary approval, to disseminate notice to Abbott shareholders, and to schedule a time for a final approval hearing. Because the proposed settlement meets the standard for preliminary approval, the proposed Preliminary Approval Order should be entered, notifying Abbott shareholders of the proposed settlement and scheduling a final approval hearing.

## II.     PROCEDURAL AND FACTUAL BACKGROUND

### A.     The Derivative Actions

Between November 2011 and April 2012, seven separate shareholder actions were filed in this Court derivatively on behalf of and for the benefit of Abbott against members of Abbott's

---

[2] *Armstrong v. Bd. of Sch. Dirs.,* 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds, Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998).

Board, former directors, and certain current and former officers of the Company.[3]  Those

actions were consolidated before this Court and styled *In re Abbott-Depakote Shareholder*

*Derivative Litigation*.[4]   By order dated April 13, 2012, the Court appointed Jacksonville Police

& Fire Pension Fund as Lead Plaintiff, and Spector Roseman Kodroff & Willis, P.C. as Lead

Counsel ("Lead Counsel").

These actions allege that the Individual Defendants breached their fiduciary duties by

causing or allowing Abbott to engage in alleged illegal marketing and sales activities for its

Depakote drug.   Depakote was first approved by the U.S. Food and Drug Administration

("FDA") in 1983 for the treatment of epileptic seizures, and was subsequently approved for

the treatment of manic bipolar disorder and migraines.   The Consolidated Derivative

Actions allege that Abbott began to actively promote Depakote to physicians and patients

for off-label purposes in 1998, a practice which resulted in an investigation by the U.S.

Department of Justice ("DOJ"), subpoenas issued to it by the Office of Inspector General of

the U.S. Department of Health and Human Services ("OIG-HHS"), correspondence and

documents from the FDA, and the filing of several *Qui Tam* actions, resulting in

settlements with the U.S. Government and a number of States.   The Company ultimately

---

[3] These actions include:   *Chester County Employees Retirement Fund v. White, et. al.*, 1:11-cv-08114; *Jacksonville Police & Fire Pension Fund v. White, et al.*, 1:11-cv-08383; *Pinchuck, et al. v. White, et al.*, 1:11-cv-08499; *Louisiana Municipal Police Employees' Retirement System v. White, et al.*, 1:11-cv-08631; *Pipefitters Local Union 537 Pension Fund v. White, et al.*, 1:11-cv-08886; *Public School Retirement System of The School District of Kansas City, Missouri v. White, et al.*, 1:12-cv-00355; and *Pipefitters Local Union No. 120 Pension Fund v. White, et al.*, 1:12-cv-02624.

[4] These actions comprise the lawsuits previously defined herein as the Consolidated Derivative Actions. Additionally, two shareholder derivative actions were filed in the Circuit Court of Lake County, Illinois: *Patricia Goodman v. White, et al.*, No. 11CH5243, and *William Bojan v. White, et al.*, 11CH5498.   In November 2013, an eighth shareholder derivative action, *Montini Family Trust v. White, et al.*, 1:13-cv-08187 (the "Montini action"), was filed in this Court.   Lead Plaintiff, Abbott, and the Individual Defendants have jointly moved to consolidate the Montini action with the Consolidated Derivative Actions.   As of the filing of this Motion, that joint motion to consolidate is fully briefed and before the Court.

4

settled all Depakote-related claims for a total of approximately $1.6 billion in criminal and civil penalties, as well as entry into a Corporate Integrity Agreement.[5]

Following consolidation of the Consolidated Derivative Actions, Lead Plaintiff filed a Consolidated Verified Amended Shareholder Derivative Complaint on June 1, 2012. This pleading was the result of an extensive investigation which included: (i) independent factual and legal analysis; (ii) review of publicly available information, including news reports, analyst reports, and Abbott's public filings with the Securities and Exchange Commission ("SEC"); (iii) review of court filings and exhibits from other related actions, including the *Qui Tam* actions; (iv) review of documents produced by the FDA pursuant to the Freedom of Information Act, 5 U.S.C. § 55 *et seq.*; and (v) review of additional documents produced by Abbott to Lead Plaintiff.

After briefing on Abbott's and Individual Defendants' motion to dismiss, the Court dismissed that complaint with leave to amend by Order dated November 15, 2012. On December 6, 2012, Lead Plaintiff filed a Second Consolidated Verified Amended Shareholder Derivative Complaint ("Second Amended Complaint"). By Order dated June 5, 2013, the Court denied Abbott and the Individual Defendants' motion to dismiss the Second Amended Complaint and held that Lead Plaintiff had alleged with sufficient specificity that demand upon Abbott's Board should be excused as futile. Abbott and the Individual Defendants subsequently filed a motion for reconsideration of that ruling, which the Court denied by Order dated September 12, 2013.

### B. The Settlement Process

Beginning in late August 2013, the parties began to engage in discussions relating to a

---

[5] Following the separation of Abbott's research-based pharmaceutical business in January 2013, the Corporate Integrity Agreement was transferred to and became binding on a new and separate entity.

possible resolution of the Consolidated Derivative Actions. An extensive settlement process of arm's-length negotiations ensued, stretching over five months between August 2013 and January 2014. It included five in-person meetings at the offices of counsel for Abbott in Washington, DC, as well as sixteen telephonic meetings.

During this period, the parties undertook highly detailed negotiations regarding corporate governance and compliance issues. During this process, Lead Plaintiff was assisted by a distinguished expert on corporate governance who has written extensively on the board's role in corporate governance and who was retained to: (a) evaluate the corporate governance mechanisms in place at Abbott at the time this action was filed to identify, among other things, any potential enhancements to its internal controls and the Board's supervision of the Company, and (b) assist Lead Counsel in designing reforms to strengthen Abbott's Board oversight, particularly with regard to healthcare legal and regulatory compliance.

Working with the corporate governance expert, Lead Counsel designed detailed settlement proposals directed at both the Board and management levels. The parties engaged in protracted dialogue regarding relevant policies and practices in place at Abbott, and how the Company could further enhance or maintain Abbott's corporate governance policies and practices. Significantly, the Settling Parties did not engage in any discussions regarding the payment of attorneys' fees or expenses prior to having reached an agreement as to the terms of the proposed Settlement.

This robust and hard-fought process eventually resulted in a proposed Settlement consisting of the corporate governance provisions detailed below and attached as Exhibit A to the Stipulation (the "Corporate Governance Terms"). The parties then proceeded to negotiate the terms of a Memorandum of Understanding (the "MOU"), which was executed by Lead

Counsel and counsel for Abbott on January 21, 2014. The MOU set forth, *inter alia*, the Corporate Governance Terms, as well as the process by which the parties would seek preliminary approval of the proposed Settlement by the Court, notify shareholders of the proposed Settlement, conduct confirmatory discovery, and seek final judicial approval of the Settlement by the Court.

Thereafter, with the parties having reached an agreement in principle on the terms of the Settlement, Lead Plaintiff conducted confirmatory discovery to confirm the fairness and reasonableness of the Settlement and that it is in the best interests of Abbott and its shareholders. This confirmatory discovery consisted of: (1) the production by Abbott and the review by Lead Plaintiff of nearly 4,000 pages of documents including, but not limited to, minutes from Abbott's Board of Directors' meetings referencing Depakote and legal and regulatory compliance; correspondence with the FDA regarding Depakote marketing; guidelines governing the review and approval process for promotional materials; presentations to the Board by Abbott's CECO and others concerning Abbott's regulatory risks; and presentations and other materials concerning Depakote that were furnished to the Board by Abbott's Pharmaceutical Products Division during the Relevant Period[6]; (2) a Rule 30(b)(6) deposition of Abbott, which designated a Divisional Vice President and Associate General Counsel for Legal, Regulatory and Compliance, an eight-year veteran of the Company, to testify on its behalf on topics related to Abbott's ethics and compliance program and Board reporting and specifically with respect to Depakote; and (3) an extensive interview of the former Corporate Secretary and General Counsel of Abbott who was in attendance at all or nearly all Board meetings and meetings of Board committees during the Relevant Period.

---

[6] The Relevant Period is defined in the Second Amended Complaint as 1998 through the filing of the first-filed complaint in this action on November 14, 2011.

Based on the confirmatory discovery, as well as their ongoing investigation, consultations, and analysis, Lead Plaintiff and its Counsel concluded that settlement of the Consolidated Derivative Actions under the terms outlined in the Settlement confer substantial benefits upon, and is in the best interests of, Abbott and its shareholders.

## III.    SUMMARY OF PROPOSED SETTLEMENT

Following the five months of negotiations discussed above, the parties reached agreement on the corporate governance policies and practices set forth in the Stipulation and Exhibit A thereto.    At the center of the proposed Settlement is Abbott's agreement to maintain, enhance, or adopt these corporate governance policies and practices for at least a four-year period following approval of the Settlement.    Lead Plaintiff believes that the key features of the corporate governance policies and practices which are discussed below, go to the heart of its allegations in the Consolidated Derivative Actions and form the basis for the proposed Settlement.

### A.    The Maintenance of a Code of Business Conduct

Abbott agrees to maintain a Code of Business Conduct with a multitude of components, including the adoption of core values consisting of honesty, fairness, and integrity and communication by the Chief Executive Officer ("CEO") regarding the Company's commitment to compliance.    The Code of Business Conduct will specifically provide that Abbott will promote its products for the purposes which they are intended and approved.

Importantly, the Code will further provide that Abbott will maintain policies and procedures designed to minimize the likelihood of enforcement actions by regulators with respect to the Food, Drug and Cosmetic Act ("FDCA") and government healthcare programs.

It will likewise provide that Abbott will maintain healthcare compliance systems designed to detect and prevent activities which violate applicable laws, regulations and/or Company policies.

Additionally, the proposed Settlement provides that through the Business Conduct Committee, Abbott will periodically review the Code of Business Conduct and other compliance-related publications and, if appropriate, recommend modifications to the Company's policies and procedures. The first such review will take place in 2014, with any revisions to the Code of Business Conduct to be implemented by December 31, 2014. The OEC will be charged with the responsibility of communicating to Abbott employees regarding the revised Code of Business Conduct, and will distribute it to all employees throughout the Company.

### B. Senior Management Communications On Compliance Issues

To set a "tone from the top," the proposed Settlement requires Abbott's CEO to distribute to all employees a letter with the revised Code of Business Conduct emphasizing the importance of compliance, and also to meet on at least an annual basis with senior management to emphasize the importance of compliance and their role and accountability for compliance. Senior leadership will also communicate periodically with employees – including at meetings and through newsletters, email updates, intranet postings and/or articles authored by or attributed to senior managers – regarding the importance of compliance. There are to be at least six such communications per year by senior managers. In addition, at the annual meeting for each of Abbott's Divisions, the Senior Vice President (or the person in charge of the Division) must devote a portion of his or her presentation to ethics and compliance.

### C. Strengthening the Public Policy Committee's Oversight of Compliance

Abbott's Public Policy Committee Charter will be revised and the Committee will commit to the following: (i) meet at least four times a year; (ii) assist the Board in fulfilling its

oversight responsibility with respect to regulatory and healthcare compliance issues that affect the Company; (iii) annually review the Company's compliance program regarding legal and regulatory requirements (including regulation by FDA); (iv) review and evaluate the Company's policies and practices with respect to maintaining legal, regulatory and healthcare compliance, and review such matters with the Board where appropriate; (v) receive regular reports – not less than three times a year – from the CECO concerning such matters as regulatory and healthcare compliance; (vi) receive from Abbott's Legal Department reporting on any legal, regulatory and healthcare compliance issues that it determines is necessary; (vii) review on an annual basis the adequacy of the Committee's charter, and propose to the Board any appropriate changes; and (viii) receive reports from the Head of Quality at least twice a year, such reports to include information on any FDA Warning Letters issued to the Company and the Company's response thereto, as well as any upcoming compliance initiatives.

### D. Enhancing the Role of the Lead Director

The Lead Director's responsibilities and requirements in Abbott's Corporate Governance Guidelines will include the following: (i) be nominated by, and then approved by a majority of, the independent directors of the Board; (ii) preside at all Board meetings at which the chairman is not present, including executive sessions of the independent directors; (iii) serve as liaison between the chairman and the independent directors; (iv) review – and, where needed, confer with the Chairperson on matters such as – meeting agenda and schedules to assure that there is sufficient time for discussion of all agenda items and, where appropriate, ensure information is sent to the Board; (v) have independent authority to call a meeting of the independent directors; (vi) be available for consultation and direct communication with major shareholders if requested; and (vii) confer with the CEO and the Nominations and Governance Committee regarding

succession planning for senior executive officers, including the CEO, and recommend to the Board on an ongoing basis one or more successors in the event of an unexpected inability of senior executive officers to continue to serve.

### E. Adoption of a Compensation Recoupment Policy

Abbott's Compensation Committee will adopt a new compensation recoupment policy, to the extent permitted by governing law, which will allow the Compensation Committee to seek recoupment of incentive compensation paid to a senior executive. Recoupment includes the recovery of compensation already paid and forfeiture, recapture, reduction or cancellation of amounts awarded or granted over which Abbott retains control. The recoupment policy may be exercised if, in the judgment of the Compensation Committee: (i) the senior executive engaged in misconduct or, in appropriate circumstances, failed in his or her supervisory responsibility to manage or monitor conduct or risks appropriately; and (ii) such misconduct or failure to supervise results in a material violation of law or Abbott policy that causes significant financial harm to Abbott. The policy will also provide that public disclosure concerning decisions to recoup compensation will be made in compliance with the rules and regulations of the Securities and Exchange Commission and other applicable laws.

### F. Maintaining the Independence and Responsibilities of the Nominations and Governance Committee

The Nominations and Governance Committee will maintain certain responsibilities and independence requirements, as follows: The Committee will be comprised of only independent directors. It will oversee an annual evaluation of the performance of the Board and senior members of Abbott's management team. This Committee will review the qualifications, requirements, membership, structure, and performance of all Board Committees, as well as make recommendations to the Board regarding committee membership and chairmanship. In

addition, the Committee will recommend to the Board which Directors should be nominated, and be apprised of the appointment of the CECO.

**G.    Formalizing the Reporting of Committees to the Board**

The chairperson of each Board committee will report to the Board on an annual basis to state whether the Committee in question has performed all of its responsibilities.

**H.    Authorizing Board and Committee Retention of Independent Advisors**

The Board and each of its Committees are authorized to retain and consult with, at their discretion, any financial, legal or other independent advisors at Abbott's expense.

**I.    Strengthening the Business Conduct Committee's Role in Compliance**

The Business Conduct Committee will:   (i) be chaired by the CECO; (ii) receive periodic updates from the CECO about the legal and regulatory environment, potential risk areas for the Company, and best practices within the industry; (iii) evaluate the Company's compliance program on the basis of the updates it receives from the CECO and, if appropriate, recommend to the CECO any modifications to the compliance program; (iv) periodically review and, if appropriate, recommend modifications to the standards of conduct, policies and procedures of the Company, its Divisions and subsidiaries, including the Code of Business Conduct; (v) periodically review and, if appropriate, recommend modifications to Abbott's internal systems and controls to carry out the standards, policies and procedures as part of routine operations; (vi) monitor the development and implementation of compliance-related training and education programs; (vii) monitor the development and implementation of lines of communication regarding ethics and compliance issues; (viii) monitor the development and implementation of monitoring, auditing and investigatory procedures; (ix) monitor the enforcement of the standards, policies and procedures through publicized disciplinary guidelines; (x) monitor the development

12

and implementation of responses to detected violations of the standards, policies and procedures, and monitor corrective and preventive actions; and (xi) report periodically to the Chairman of the Board and CEO of the Company concerning the compliance program.

The CECO will include the activities of the Business Conduct Committee, as appropriate, in its reports to the Public Policy Committee.

**J.      Disciplinary Action Against Employees for Violations of HealthCare Programs and FDA Requirements**

Abbott will be expressly permitted, to the extent permitted by law and in its discretion and taking into account such considerations as it deems appropriate, to take disciplinary action against an employee in the event it determines the employee has personally and intentionally engaged in misconduct constituting substantial and intentional participation in a significant violation of law or Company policy relating to any Federal healthcare program or FDA requirement.

**K.      A Reporting System to Promote Compliance Oversight**

Abbott will maintain a reporting system designed toward facilitating communications relating to adherence to the Company's compliance program.   With respect to the reporting system, the Settlement provides that:    (i) there is to be online capability and email transmission, and an anonymous helpline managed by the OEC; (ii) there is to be accessibility to those within the Company and externally (such as healthcare professionals), who will be able to report to the CECO or designee any conduct, practices, or procedures that may constitute a potential violation of criminal, civil or administrative law, including with respect to a Federal healthcare program or FDA requirement; and (iii) Abbott will publicize in an appropriate manner the existence of the reporting mechanism.

13

With respect to reporting to the CECO, as described in (ii) above, upon receipt of a report, the CECO or designee will gather all relevant information and make a preliminary, good faith inquiry into the allegations. Where corrective action is appropriate, Abbott will conduct an internal review of the allegations and ensure that proper follow-up is conducted. The CECO will maintain a log that records and summarizes each report received, the status of the internal reviews, and any corrective action taken. Significant investigations will be reported to the Public Policy Committee by the CECO.

### L. Continuing Education for Directors on Compliance Issues

Abbott's directors will participate on a periodic basis in continuing education programs that each individual director determines is necessary. Abbott will pay the expenses for any director's attendance at external continuing education programs. Further, at least annually, the CECO will present to the Board on legal and regulatory compliance issues that are applicable to Abbott and its businesses.

## IV. PRELIMINARY RELIEF SOUGHT AT THIS TIME

Lead Plaintiff respectfully requests that the Court enter the [Proposed] Order Preliminarily Approving Proposed Settlement, Directing the Issuance of Notice, and Setting a Final Settlement Hearing (the "Preliminary Approval Order"), in the manner and form submitted herein as Exhibit C to the Stipulation. The Preliminary Approval Order, if approved by the Court, will:

(a)     preliminarily approve the proposed Settlement as set forth in the Stipulation;

(b)     establish a procedure for Abbott shareholders to follow should they wish to object to the proposed Settlement, including setting a date by which any such objections must be made;

14

(c)     direct a notice program to Abbott shareholders such that: (a) the Notice of Proposed Settlement of Consolidated Derivative Actions, Final Settlement Hearing, and Right to Appear (the "Notice") shall be maintained on Abbott's corporate website beginning within five days from the date of the Preliminary Approval Order and until Final Approval of the Settlement; (b) the Notice shall be filed by Abbott with the SEC on Form 8-K within ten days from the date of the Preliminary Approval Order; and (c) a Summary Notice of Pendency of Shareholder Derivative Action Involving Abbott Laboratories, Proposed Settlement, and Settlement Hearing (the "Summary Notice") shall be published at least one time each in the national editions of *The Wall Street Journal* and *USA Today* no later than ten days following the date of the Preliminary Approval Order;

(d)     schedule a hearing for the Court to consider final approval of the settlement (the "Settlement Hearing"); and

(e)     establish that at or prior to the Settlement Hearing, Abbott shall file with the Court an affidavit indicating compliance with the notice requirements of this paragraph.

Lead Plaintiff's Counsel, having conferred with counsel for Abbott and the Individual Defendants, respectfully propose for the Court's consideration the following schedule of dates for the various events leading up to and including the Settlement Hearing:

| Posting of the Notice on Abbott's company website | within 5 business days of entry of the Preliminary Approval Order |
|---|---|
| Filing of the Form 8-K | within 10 days of entry of the Preliminary Approval Order |
| Publication of the Summary Notice | within 10 days of entry of the Preliminary |

15

| | Approval Order |
|---|---|
| Filing of brief in support of final approval of settlement | 28 days prior to the Settlement Hearing |
| Last day for Abbott shareholders to file any objection to the settlement | 14 days prior to the Settlement Hearing |
| Filing of supplemental briefs in support of final approval of settlement, as necessary | Up to 7 days prior to the Settlement Hearing |
| Settlement Hearing | Approximately 45 days following the entry of the Preliminary Approval Order |

## V.     THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

The proposed Settlement, which creates significant, material benefits for Abbott and its shareholders, is the result of vigorous and protracted arm's-length negotiations between experienced counsel, and merits preliminary approval.   If finally approved by the Court, Lead Plaintiff will voluntarily dismiss with prejudice its claims on behalf of Abbott against the Individual Defendants in return for the maintenance or adoption of the corporate governance policies and practices set forth in Exhibit A to the Stipulation.

### A.     Settlements Are Generally Favored

There is an overriding public interest in resolving litigation, and this is particularly true in derivative and class actions and other complex litigation.   *See Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *E.E.O.C v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 888-89 (7th Cir. 1985), *cert. denied,* 478 U.S. 1004 (1986) (noting that there is a general policy favoring voluntary settlements of class action disputes); *Armstrong,* 616 F.2d at 312 ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."); *Redman v. RadioShack Corp.*, No. 11 C 06741, 2014 WL 497438, at *3 (N.D. Ill. Feb. 7, 2014) (quoting *Isby*, 75 F.3d at 1196); *Henry v. Sears Roebuck & Co.*, No. 98-cv-4110, 1999 WL 33496080, at *8 (N.D. Ill. July 23, 1999) (same).

16

Class action and derivative settlements minimize the expenses incurred by the parties and reduce the strain that litigation imposes upon already scarce judicial resources. *Armstrong,* 616 F.2d at 313 *(citing Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977)); *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010) (quoting *Armstrong*, 616 F.2d at 313); *In re AOL Time Warner Shareholder Deriv. Litig.,* No. 02 Civ. 6302, 2006 U.S. Dist. LEXIS 63260, *8 (S.D.N.Y. Sept. 6, 2006) (recognizing the public policy favoring settlement of shareholder derivative litigation); *Cohn v. Nelson,* 375 F. Supp. 2d 844 (E.D. Mo. 2005) (settlement of shareholder derivative suits are particularly favored); *Shimmel v. Goldman,* 57 F.R.D. 481, 487 (S.D.N.Y. 1973) ("settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable'"); *see also* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:41 at 87 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

### B.    The Proposed Settlement Meets the Standard for Preliminary Approval

Rule 23.1 of the Federal Rules of Civil Procedure requires court approval for the settlement of a derivative claim. At the preliminary approval stage, the Court is not required to make a final determination that a proposed settlement is fair and reasonable. Rather, the Court must determine "whether the proposed settlement is 'within the range of possible approval.' This hearing is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. . . . If the district court finds a settlement proposal 'within the range of possible approval,' . . . [c]lass members are notified of the proposed settlement and of the fairness hearing . . . ." *Armstrong*, 616 F.2d at 314.

17

A proposed settlement falls within the "range of possible approval" under Rule 23(e) when it is conceivable that the proposed settlement will meet the standards applied for final approval. *See, e.g., Butler v. Am. Cable & Tel., LLC*, No. 09 CV 5336, 2011 WL 2708399, at *8 (N.D. Ill. July 12, 2011) ("a more summary version" of the fairness hearing inquiry takes place at the preliminary approval phase) (quoting *AT&T Mobility*, 270 F.R.D. at 346); *Kessler v. Am. Resorts Int'l Holiday Network, Ltd.,* Nos. 05 C 5944, 07 C 2439, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) ("a more summary version" of the fairness hearing inquiry takes place at the preliminary approval phase); *Tucker v. Walgreen Co.,* Nos. 05-440, 07-172, 2007 WL 2915578, at *3 (S.D. Ill. Oct. 5, 2007) (same).

When the Court considers granting final approval of a class action or derivative settlement, the standard is whether the proposed settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e) and 23.1; *see also Uhl v. Thoroughbred Tech. & Telecomms. Inc.,* 309 F.3d 978, 986 (7th Cir. 2002); *Isby,* 75 F.3d at 1198-99; *Am. Int'l Group v. ACE INA Holdings, Inc.*, Nos. 07-cv-2898, 09-cv-2026, 2012 WL 651727, at *1 (N.D. Ill. Feb. 28, 2012) ("But the court may not approve a settlement that binds class members unless it finds, after a hearing, that the settlement is 'fair, reasonable, and adequate.'" (quoting Fed. R. Civ. P. 23(e)(3))).

The Seventh Circuit Court of Appeals has described the process for approval of class action litigation settlements:

> District court review of a class action settlement proposal is a two-step process. The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval." This hearing is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. Manual for Complex Litigation s 1.46, at 53-55 (West 1977). If the district court finds a settlement proposal "within the range of possible approval," it then proceeds to the second step in the review process, the fairness hearing. Class members are notified of the proposed settlement and of the fairness hearing at which they and all interested parties have an opportunity to be

heard.

*Armstrong,* 616 F.2d at 314.

Here, there is no doubt that the proposed Settlement is well "within the range of possible approval." As discussed above, Lead Plaintiff believes that the relief accorded represents significant corporate governance machinery designed to prevent and detect future wrongful conduct. Courts have long recognized that in derivative actions, non-monetary benefits constitute real and substantial benefits, and thus warrant approval. *See, e.g., In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 479 (D.N.J. 2012) ("the 'principal factor' to be considered 'is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest'") (quoting *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978))); *In re Schering-Plough Corp. S'holders Derivative Litig.,* No. 01-1412, 2008 U.S. Dist. LEXIS 2569, *15 (D.N.J. Jan. 14, 2008) ("This litigation provides an example of how derivative actions that result in the adoption of rigorous compliance standards confer tangible benefits to the corporation and its shareholders."); *Unite Nat'l Ret. Fund v. Watts,* No. 04-CV-3603, 2005 U.S. Dist. LEXIS 26246, *9-*10 (D.N.J. Oct. 28, 2005) *("Shell Deriv.")* (approving governance-oriented settlement and stating "the most important factor in evaluating the fairness of the settlement agreement is the benefit to the corporation").

The proposed Settlement here is supported not only by experienced counsel for the parties, but also by an expert in the field of corporate governance and compliance retained by Lead Plaintiff and its Counsel. As discussed above, a distinguished expert on corporate governance was retained to evaluate Abbott's corporate governance mechanisms and design reforms to strengthen Board oversight of healthcare legal and regulatory compliance. The comprehensive corporate governance and compliance reforms reflected in the proposed

19

Settlement are far-reaching and highly specific, and will assist the Board and Abbott to detect potential violations of law, healthcare regulations, and Company policies.

As discussed above, the proposed Settlement was achieved after extensive factual and legal investigation, and arm's-length negotiations, both face-to-face and by telephone, over a five-month period. Indeed, the settlement process, which took place between August 2013 and January 2014, included five in-person meetings at the offices of counsel for Abbott in Washington, DC, and sixteen telephonic meetings. These negotiations took place against a backdrop of significant litigation risk on both sides.

While only summarily reviewed at the preliminary approval stage, the Seventh Circuit has set forth factors for consideration in deciding whether to grant final approval to a proposed settlement:

> In making that determination, a district court should examine: (1) the strength of the plaintiffs' case compared to the amount of the settlement offer; (2) an assessment of the likely complexity of a trial; (3) the length and expense of the litigation; (4) the amount of opposition to settlement among affected parties; (5) the opinion of competent counsel; and (6) the stage of the proceedings and amount of discovery completed at the time of settlement.

*Freeman v. Berge,* 68 Fed. Appx. 738, 742-43 (7th Cir. 2003) (*citing Isby,* 75 F.3d at 1199). As described below, assessment of those factors relevant to this stage of the proceeding further fully supports preliminary approval of the proposed Settlement at this time.

### 1. The Strength of Lead Plaintiff's Case

While Lead Plaintiff's claims have survived motions to dismiss, there remains considerable uncertainty as to whether these claims could be proven at trial. Indeed, based on the documents provided by Abbott, as well as the deposition and interview conducted in connection with confirmatory discovery, it is clear that Lead Plaintiff will face significant challenges in establishing liability. While the civil and criminal settlement agreements between

20

Abbott and the U.S. Government provide factual support for the underlying conduct, it is far from conclusive that the Individual Defendants were aware of – or even could have been aware of – the alleged misconduct. As such, Lead Plaintiff would face significant hurdles in attempting to prove breaches of fiduciary duty on the part of the Board or members of senior management. The significant reforms at the heart of the proposed Settlement constitute an excellent recovery under any circumstances, and that fact is amplified by the uncertainty clouding the proof of these claims.

As demonstrable from the substance of the Corporate Governance Terms themselves (Exhibit A to the Stipulation), this Settlement provides extensive corporate governance and compliance provisions that Lead Plaintiff believes go to the heart of the alleged underlying wrongdoing at issue in this litigation, and thus substantially benefits Abbott and its shareholders. *See e.g., Johnson & Johnson*, 900 F. Supp. 2d at 489-94 (rejecting objector's criticisms of pharmaceutical company's corporate governance reforms, and concluding that such reforms "confer[] a substantial benefit on the corporation"); *Shell Deriv.,* 2005 U.S. Dist. LEXIS 26246, *18 ("the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement . . . will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings").

### 2.     The Complexity of Trial

As courts have recognized, derivative litigation is "notoriously difficult and unpredictable." *See, e.g., Granada Investments, Inc. v. DWG Corporations,* 962 F.2d 1203, 1205 (6th Cir. 1992); *see also, Shell Deriv.,* 2005 U.S. Dist. LEXIS 262465, *13 ("Here, Plaintiffs face the 'difficulties inherent in derivative litigation as well as significant procedural and substantive obstacles. '"). Thus, "[i]n order to evaluate the fairness of a settlement, a

district court must consider [among other things] '. . . an assessment of the likely complexity, length and expense of the litigation . . . ." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby*, 75 F.3d at 1199); *see also Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 at 585-86 (N.D. Ill. 2011) ("The Seventh Circuit has held that the likely complexity, length, and expense of continued litigation are relevant factors in determining whether a class-action settlement is fair, reasonable, and adequate.").

### 3. The Expense, Risk and Likely Duration of Continued Litigation

As discussed above, the factual and legal issues triggered by the claims asserted in the Consolidated Derivative Actions are complex. As each defendant vigorously denies liability and disputes the factual and legal predicates underlying the claims, litigating these claims to trial and through appeals would entail substantial costs and impose material burden on both parties. Although Lead Plaintiff's demand futility allegations survived motions to dismiss, Lead Plaintiff faces considerable risks at summary judgment and trial. Indeed, as the confirmatory discovery suggests, should the claims have proceeded to trial, Lead Plaintiff would face an uphill battle in proving the breaches of fiduciary duties alleged. It is not clear, for example, that the Individual Defendants were aware of the alleged unlawful marketing practices involving Depakote, or that the Individual Defendants were privy to the panoply of red flags alleged in the Second Amended Complaint.

Ultimately, Lead Plaintiff faces the risks inherent in any complex litigation including, *inter alia,* establishing liability in the face of conflicting testimony and evidence, the unpredictability of a lengthy and complex jury trial, the potential unavailability of witnesses, and the possibility that jurors could react to the evidence in unforeseen ways.

Moreover, should Lead Plaintiff prevail on liability, it would continue to face substantial

22

hurdles in demonstrating and quantifying damage to the Company. That issue would undoubtedly devolve into a battle of competing experts, a situation fraught with risks for both sides in a hotly contested litigation.

### 4. The Opinion of Competent Counsel

"The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23." *Schulte*, 805 F. Supp. 2d at 586; *see also Freeman*, 68 Fed. Appx. at 742-43. Lead Counsel are highly experienced in the specialized area of complex derivative and other shareholder litigation. *See e.g.*, *In re Abbott Laboratories, Inc. Deriv. S'holder Litig*. No. 99 C 7246 (N.D. Ill.); *Felzen v. Andreas (Archer Daniels Midland Co. Deriv. Litig.),* No. 95 C 3979 *(C.D. Ill.)*; *see also*, *In re Lehman Brothers Holdings, Inc. Equity/Debt Sec. Litig.*, No. 08-cv-5523 (S.D.N.Y.); *Utah Retirement Systems v. Strauss (American Home Mortgage Sec. Litig.)*, No. 09-cv-3221 (E.D.N.Y.); *In re Converium Holding (Switzerland) AG Litig.*, No. 04 Civ. 07897 (DLC) (S.D.N.Y.); *In re Parmalat Sec. Litig.*, No. 04 Civ. 0030 (LAK) (S.D.N.Y.).

In a case such as this, where both Lead Counsel and counsel for Abbott and the Individual Defendants have extensive experience in derivative and class action litigation, and all counsel have engaged the facts and law on a highly detailed level, courts recognize the judgment of those experienced counsel in assessing the reasonableness of a proposed settlement. *See, e.g., Freeman,* 68 Fed. Appx. at 743 (district court properly relied on the opinion of class counsel, a team of experienced and well-respected attorneys, who reached the agreement only after exhaustive negotiations and extensive discovery); *Schulte*, 805 F. Supp. 2d at 586 (favorable opinion of class counsel supported approval of settlement); *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001)

23

(same); *see also Maher v. Zapata Corp.,* 714 F.2d 436, 454 (5th Cir.1983). In this action, experienced counsel, fully knowledgeable about the relevant facts and law and negotiating at arm's-length, have weighed the factors discussed above and fully endorse the proposed Settlement.

**5.**      **The Stage of Proceedings and Discovery Taken**

As set forth above, prior to arriving at the proposed Settlement, Lead Counsel conducted an extensive investigation into the alleged wrongdoing. This included, among other things, a review of news reports, analyst reports, Abbott's SEC filings, as well as court filings and exhibits from the U.S. Government's action, including the *Qui Tam* actions, and documents produced by the FDA and business records obtained from Abbott. Lead Counsel also conducted extensive legal research to ascertain the merits of Lead Plaintiff's breach of fiduciary duty claims. Counsel also examined Abbott's organizational structure and existing corporate governance policies.

As discussed above, the parties initiated settlement dialogue after the motion to dismiss the Second Amended Complaint was denied. Negotiations gathered speed after the Court denied Abbott's and the Individual Defendants' motion for reconsideration on September 12, 2013. At that procedural juncture, and in light of the Court's ruling on the motion to dismiss, there was substantial risk to both Lead Plaintiff in proving its claims, and to Abbott and the Individual Defendants in terms of defending against the claims.

During the course of the negotiations, each party has demonstrated an extensive grasp of both the facts and the law relevant to its claims and positions. The derivative claims had thus clearly reached the stage where the parties were "'fully . . . able to evaluate the merits of plaintiffs' claims.'" *Schulte*, 805 F. Supp. 2d at 587 (quoting *Armstrong*, 616 F.2d at 325); s*ee*

24

*also Cohn,* 375 F. Supp. 2d at 855 ("In assessing the merits of the settlement, plaintiffs' counsel considered the factual and legal questions that were disputed in the derivative actions. The court considered that the proposed settlement was made after counsel had conducted an extensive investigation . . . .").

Lead Plaintiff respectfully contends that consideration of each of the above factors within the context of the proposed Settlement fully supports the Court's grant of preliminary approval at this time.

## VI.    THE PROPOSED NOTICE TO ABBOTT SHAREHOLDERS IS ADEQUATE

If the Court grants preliminary approval, Abbott will notify the current Abbott shareholders of the Settlement, pursuant to the Preliminary Approval Order, as follows: (a) the Notice shall be filed by Abbott with the SEC on Form 8-K within ten days from the date of the Preliminary Approval Order; (b) the Notice shall be maintained on Abbott's corporate website beginning within five days from the date of the Preliminary Approval Order and until Final Approval of the Settlement; and (c) the Summary Notice shall be published at least one time each in the national editions of *The Wall Street Journal* and *USA Today* no later than ten days following the date of the Preliminary Approval Order.  At or prior to the Settlement Hearing, Abbott shall file with the Court an affidavit indicating compliance with these requirements.

The proposed forms of notice will fairly and reasonably apprise Abbott shareholders of the essential terms of the proposed Settlement and of information regarding Lead Counsel's fee application.  It will also set forth the procedure for objecting to the settlement or to the request for an award of attorneys' fees and

reimbursement of expenses. Thus, the proposed forms of notice fully satisfy due process requirements.[7]

Likewise, the means by which Abbott shareholders are to be apprised of the settlement have been deemed sufficient under Rule 23.1 and principles of due process. *See e.g., In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 344 (S.D.N.Y. 2011) (final approval of pharmaceutical industry derivative settlement where notice entailed filing of Form 8-K, posting of notice on company website, and publication). *See also Feuer v. Thompson*, Nos. 10-cv-00279 YGR, 12-cv-0203 YGR, 2012 WL 6652597, at *2 (N.D. Cal. Dec. 13, 2012) (notice program satisfied due process and deemed "best notice practicable" under Rule 23.1 where notice constituted posting on company website, publication in news services, and Form 8-K); *Klein ex rel. SICOR, Inc. v. Salvi*, No. 02 Civ. 1862, 2004 WL 596109, at *3 (S.D.N.Y. Mar. 30, 2004) (noting that court had approved notice procedure, which comprised publication in national financial newspapers and on company's web page).

## VII. CONCLUSION

Lead Plaintiff respectfully requests that the form of Preliminary Approval Order (Exhibit C to the Stipulation) be entered, that preliminary approval of the proposed Settlement be granted, that a date for the Settlement Hearing be set, and that notice to

---

[7] *See Arace v. Thompson*, No. 08 Civ. 7905, 2011 WL 3627716, at *4 (S.D.N.Y. Aug. 17, 2011) (notice of settlement in derivative action was adequate where it "sufficiently apprised Wachovia shareholders of the nature of the proposed settlement, the upcoming public hearing on the matter, and the opportunity to object"); *Abrams v. Swift Boat Film LLC*, No. 05-cv-2082, 2006 WL 337661, at *1 (S.D.N.Y. Feb. 10, 2006) (notice of settlement in derivative action was adequate where "the notice summarized the background of the litigation in neutral terms, explained the terms of the settlement and its potential impact on Swift Boat and informed shareholders of their right to object")*; see also Bell Atlantic Corp.* v. *Bolger*, 2 F.3d 1304, 1317 (3d Cir. 1993) (notice held adequate because it "summarized the Bell of Pennsylvania matter, the procedural history, the parties' contentions, the issues involved, the reasons each party recommended settlement, and the terms of the settlement agreement" and it "advised shareholders of their right to object, the consequences of not doing so, and how to go about obtaining further information available on file with the court") (citing *Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 395 (3d Cir.1981)).

Abbott shareholders as described above be ordered in the manner provided in the Stipulation and Preliminary Approval Order.

Dated: March 6, 2014

**SUSMAN HEFFNER & HURST LLP**

By: /s/ Matthew T. Heffner
Matthew T. Heffner
30 N. LaSalle Street, 12th Floor
Chicago, IL 60602
Tel.: 312.346.3466
Fax: 312.346.2829

*Local Counsel*

**SPECTOR ROSEMAN KODROFF**
    **& WILLIS, P.C.**
Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirarchi
*rroseman@srkw-law.com*
*aabramowitz@srkw-law.com*
*dmirarchi@srkw-law.com*
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Tel.: 215.496.0300
Fax: 215.496.6611

Mark S. Willis
*mwillis@srkw-law.com*
1101 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004
Tel.: 202.756.3600
Fax: 202.756.3602

*Lead Counsel for Lead Plaintiff,*
*Jacksonville Police & Fire Pension Fund*