**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

------------------------------------------------------------------------x

**IN RE ABBOTT-DEPAKOTE SHAREHOLDER**     **:**

**DERIVATIVE LITIGATION**     **:**   **CASE NO: 1:11-cv-08114**

    **:**   **Hon. Virginia M. Kendall**

------------------------------------------------------------------------x

**LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT
AND AWARD OF ATTORNEYS' FEES AND EXPENSES**

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    PROCEDURAL BACKGROUND...........................................................................3

       A.     The Consolidated Derivative Actions ............................................................ 4

       B.     The Settlement Process ..................................................................................5

III.   SUMMARY OF THE PROPOSED SETTLEMENT........................................................7

       A.     Enhance the "Tone at the Top" ......................................................................7

       B.     Strengthening the Public Policy Committee's Oversight of Legal and
              Regulatory Compliance .................................................................................9

       C.     Adoption of a Compensation Recoupment Policy.................................................9

       D.     Strengthening the Role of the Lead Director ..........................................................10

       E.     Strengthening the Company's Internal Compliance Governance..........................10

       F.     Expanding A Reporting System to Promote Compliance Oversight.....................11

       G.     The Settlement's Additional Reforms ...................................................................11

IV.    THE PROPOSED SETTLEMENT SHOULD BE APPROVED............................. 13

       A.     Settlements are Generally Favored ................................................................. 13

       B.     All Criteria For Approving the Proposed Settlement Are Satisfied .....................14

              1.     The Settlement Provides A Substantial Benefit to Abbott........................14

              2.     Each of the *Isby* Factors Weighs in Favor of Final Approval....................17

                     a.     The Merits of the Corporate Governance and Compliance
                            Provisions of the Settlement in Light of the Merits of Lead
                            Plaintiff's Claims ..........................................................................18

                     b.     Assessment of the Complexity, Length, and Expense of
                            Litigation........................................................................................20

i

      c.      Opposition to the Settlement..........................................................21

      d.      Opinion of Competent Counsel .....................................................22

      e.      The Stage of the Proceedings and Amount of Discovery Completed ......................................................................................24

C.      Notice to Abbott Shareholders Was Adequate ......................................26

    1.      Notice Was Effected in Accordance with the Preliminary Approval Order ......................................................................................26

    2.      The Notice Procedures Fully Satisfied Due Process.................................27

V.     THE COURT SHOULD APPROVE THE FEE AND EXPENSE AWARD TO PLAINTIFFS' COUNSEL BECAUSE IT IS THE PRODUCT OF ARM'S-LENGTH NEGOTIATIONS AND IS FAIR AND REASONABLE IN LIGHT OF ALL RELEVANT FACTORS ................................................................27

A.      Applicable Legal Standards for Consideration of a Fee Request .........................27

    1.      The Substantial Benefit Doctrine.............................................................29

    2.      Each of the Factors Considered by the Seventh Circuit Supports Payment of the Agreed-Upon Fee Award..................................................30

      a.      The Benefits Achieved for Abbott and the Quality of Services Rendered Support The Fee Award ..................................31

      b.      The Fee Award is Justified by the Risk of Nonpayment ..............31

      c.      The Fee is Justified by Awards in Similar Actions.......................34

    3.      The Agreed-Upon Fee Award is also Fair and Reasonable Under the Lodestar Methodology .......................................................................36

    4.      Expenses of Plaintiffs' Counsel Would Otherwise Be Reimbursable as Reasonable....................................................................38

B.      Public Policy Supports an Award of Attorneys' Fees ...........................................39

VI.    CONCLUSION ....................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Armstrong v. Bd. of Sch. Dirs.,*
  616 F.2d 305 (7th Cir. 1980) .......................................................................... 13

*Bell Atl. Corp. v. Bolger,*
  2 F.3d 1304 (3d Cir. 1993)...............................................................................27

*Buccellato v. AT&T Operations, Inc.,*
  No. C10-00463, 2011 WL 3348055 (N.D. Cal. June 30, 2011) ...........................38

*Carson v. Am. Brands,*
  450 U.S. 79 (1981).............................................................................................14

*Cohn v. Nelson,*
  375 F. Supp. 2d 844 (E.D. Mo. 2005).......................................................13, 28, 38

*E.E.O.C. v. Hiram Walker & Sons, Inc.,*
  768 F.2d 884 (7th Cir. 1985) ..............................................................................14

*Florin v. Nationsbank of Georgia, N.A.,*
  34 F.3d 560 (7th Cir. 1994) ................................................................................37

*Florin v. Nationsbank of Georgia, N.A.,*
  60 F.3d 1245 (7th Cir. 1995) ..............................................................................39

*Goldsmith v. Tech. Solutions Co.,*
  92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995).....................................22

*Granada Invs., Inc. v. DWG Corp.,*
  962 F.2d 1203 (6th Cir. 1992) ............................................................................32

*Great Neck Capital Appreciation Inv. P'ship v. PriceWaterHouseCoopers, LLP,*
  212 F.R.D. 400 (E.D. Wis. 2002) .......................................................................28

*Harman v. Lyphomed, Inc.,*
  945 F.2d 969 (7th Cir. 1991) ..............................................................................37

*Henry v. Sears Roebuck & Co.,*
  No 98-cv-4110, 1999 WL 33496080 (N.D. Ill. July 23, 1999) .............................13

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983)............................................................................................28

*In re Abbott Depakote S'holder Deriv. Litig.,*
  No. 11 C 8114, 2013 WL 2451152 (N.D. Ill. June 5, 2013)...................... 18, 19

*In re Abbott Laboratories S'holder Deriv. Litig.*,
    No. 99-cv-7246, (N.D. Ill. March 1, 2005) ...................................................................34

*In re AOL Time Warner S'holder Derivative Litig.*,
    No. 02-cv-6302, 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) ............................13, 14, 18, 21

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
    270 F.R.D. 330 (N.D. Ill. 2010).................................................................................13

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ........................................................................21

*In re Auto. Refinishing Paint Antitrust Litig.*,
    No. MDL 1426, 2003 WL 23316645 (E.D. Pa. 2003)...........................................22

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996)...................................................................................32

*In re Citigroup S'holder Deriv. Litig.*,
    No. 12-cv-3114, 2013 WL 4441511 (S.D.N.Y. Aug. 19, 2013).............................38

*In re Cont'l Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ....................................................................................27

*In re Forest Labs., Inc. Derivative Litig.*,
    No. 05-cv-3489 (S.D.N.Y. Feb. 7, 2012) ................................................................15

*In re Johnson & Johnson Derivative Litig.*,
    900 F. Supp. 2d 467 (D.N.J. 2010) .................................................................. passim

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003)...................................................................... 22

*In re Mexico Money Transfer Litig.*,
    164 F. Supp. 2d 1002 (N.D. Ill. 2000) ...............................................................21, 22

*In re MRV Commc'ns, Inc. Deriv. Litig.*,
    No. 08-cv-03800, 2013 WL 2897874 (C.D. Cal. June 6, 2013)........................18, 32

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) .....................................................................................32

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) .............................................................................22

*In re Pfizer, Inc. Derivative Sec. Litig.*,
    307 F. App'x 590 (2d Cir. 2009) ..............................................................................32

*In re Pfizer Inc. S'holder Derivative Litig.*,
  780 F. Supp. 2d 336 (S.D.N.Y. 2011)............................................................ passim

*In re Pub. Serv. Co. of Ind. Derivative Litig.*,
  125 F.R.D. 484 (S.D. Ind. 1988)............................................................30

*In re Schering-Plough Corp. S'holder Derivative Litig.*,
  No. 01-1412, 2008 WL 185809 (D.N.J. Jan. 14, 2008)............................................29, 35, 39

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ................................................................30, 31, 32

*In re Trans Union Corp. Privacy Litig.*,
  629 F.3d 741 (7th Cir. 2011) ................................................................30

*Isby* v. *Bayh,*
  75 F.3d 1191 (7th Cir. 1996) ................................................................ passim

*Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*,
  553 F.3d 487 (7th Cir. 2009) ................................................................37

*Joe Hand Promotions, Inc. v. Zani*,
  No. 11 C 4319, 2014 WL 958716 (N.D. Ill. Mar. 11, 2014) ................................................36

*Lambrecht v. Taurel*,
  No. 08-cv-00068, 2010 WL 2985946 (S.D. Ind. June 8, 2010)............................14, 16, 17, 35

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) ................................................................15, 18

*Manville Pers. Injury Settlement Trust v. Gemunder*,
  No. 10-CI-01212, (Ky., Kenton Cir. Ct. 4th Div. Oct. 29, 2013)............................................36

*Matter of Superior Beverage/Glass Container Consol. Pretrial*,
  133 F.R.D. 119 (N.D. Ill. 1990)............................................................37

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970)............................................................15, 29

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)............................................................27

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
  No. 05 Civ. 11148, 2009 WL 2408560, (D. Mass. Aug, 3, 2009)............................................38

*Newman* v. *Stein,*
  464 F.2d 689 (2d. Cir. 1972)............................................................20

*Polonski v. Trump Taj Mahal Assocs.*,
   137 F.3d 139 (3d Cir. 1999)..................................................................................30

*Ramey v. Cincinnati Enquirer, Inc.*,
   508 F.2d 1188 (6th Cir. 1974) .............................................................................39

*Redman v. RadioShack Corp.*,
   No. 11-cv-06741, 2014 WL 497438 (N.D. Ill. Feb. 7, 2014)...........................13, 14

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011) ...............................................................21, 31

*Shimmel v. Goldman*,
   57 F.R.D. 481 (S.D.N.Y. 1973) ............................................................................13

*Strube v. Am. Equity Inv. Life Ins. Co.*,
   No. 6:01-cv-1236, 2006 WL 1232816 (M.D. Fla. May 5, 2006) ...........................28

*Taubenfeld v. AON Corp.*,
   415 F.3d 597 (7th Cir. 2005) ................................................................................28

*Unite Nat'l Ret. Fund v. Watts*,
   No. 04-cv-3603, 2005 WL 2877899 (D.N.J. Oct. 28, 2005) ...........................18, 32

*Walsh* v. *Great Atl. & Pac. Tea Co.,*
   96 F.R.D. 632 (D.N.J. 1983)..................................................................................20

*Yuzary v. HSBC Bank USA, N.A.*,
   No. 12-cv-3693, 2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013)................................38

STATUTES

Freedom of Information Act, 5 U.S.C. §§ 55, *et seq.* ....................................................24

Section 954 of the Dodd-Frank Act of 2010, 15 U.S.C. §78 j-4 ("Dodd-Frank")..................1, 3, 9

ADDITIONAL AUTHORITIES

4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:41, at 87 (4th ed.
   2002) ......................................................................................................................13

## I.      INTRODUCTION

Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, Lead Plaintiff Jacksonville Police & Fire Pension Fund, by and through undersigned counsel, respectfully submits this memorandum of points and authorities in support of its motion for final approval of the Settlement[1] as being fair, reasonable, adequate, and in the best interests of Abbott Laboratories ("Abbott" or the "Company") and its shareholders, and for approval of the requested award of attorneys' fees, inclusive of expenses.

As set forth in the Stipulation and Agreement of Settlement (the "Stipulation"), and as delineated more specifically in the Corporate Governance Terms attached as Exhibit A thereto, the Settlement contains various governance reforms – including new legal and regulatory compliance responsibilities, a clawback policy, and "flow of information" protocols – which Lead Plaintiff believes are designed to address oversight deficiencies that resulted in Abbott having to pay $1.6 billion in criminal and civil penalties due to the illegal marketing and sale of its Depakote drug (the second largest penalties ever paid for off-label marketing at that time).

Specifically, through the procedures outlined in the Corporate Governance Terms, Abbott must, for a period of at least *four years*, effect, enhance, and/or maintain a number of benefits to the Company, including, but not limited to:

- strengthen the "tone from the top" to foster a culture of legal and regulatory compliance with federal law and healthcare programs, and adopt stronger corporate governance measures as "core values";

- enact a compensation recoupment policy with real teeth to deter future wrongdoing, one that goes well beyond what is required under the clawback provision in Section 954 of the Dodd-Frank Act of 2010, 15 U.S.C. §78 j-4

---

[1] Unless otherwise indicated, all capitalized terms in this Memorandum are defined in the same way as in Lead Plaintiff's Motion for Preliminary Approval of Settlement, including the Stipulation attached as Exhibit 1 thereto.

("Dodd-Frank");

- revise the Public Policy Committee's charter and expand its duties so that it functions essentially as a Legal and Regulatory Compliance Committee, ensuring that the Board fulfills its oversight responsibility with respect to legal, regulatory, and healthcare compliance issues;

- strengthen the role of the Lead Director with additional responsibilities so as to create a visible check on non-independent directors;

- foster additional communication by Abbott's senior management on compliance issues;

- maintain and strengthen internal compliance governance by requiring the Business Conduct Committee, which is chaired by the Chief Ethics and Compliance Officer ("CECO"), to report directly to the Chairman of the Board and the Chief Executive Officer ("CEO") on all compliance programs at Abbott; and

- cultivate a reporting system (flow of information) designed to facilitate adherence to Abbott's compliance program.

The substantial benefits to Abbott and its shareholders resulting from this Settlement are illustrated further by Lead Plaintiff's two experts. Jeffrey N. Gordon is the Richard Paul Richman Professor of Law at Columbia Law School and a distinguished expert on corporate governance who has written extensively on the role of boards in corporate governance. He was retained to: (a) evaluate the corporate governance mechanisms in place at Abbott at the time this action was filed so as to identify, among other things, any deficiencies in its internal controls and the Board's supervision of the Company; and (b) assist Lead Counsel in designing reforms to strengthen Board oversight, particularly with regard to healthcare legal and regulatory compliance.[2] In the opinion of Professor Gordon, "the Reforms embodied in the Proposed Settlement will significantly strengthen Board oversight of Abbott's compliance with the federal, state and foreign government regulatory regimes for the sale of drugs, nutritional

---

[2] The Affidavit of Jeffrey N. Gordon In Support of Lead Plaintiff's Motion for Final Approval of Derivative Action Settlement (the "Gordon Aff.") is attached hereto as Exhibit A.

products, medical devices and medical products and will produce other improvements to internal compliance and accountability." Exh. A, ¶2. It "will thus provide significant value for the Company and its shareholders." *Id.* at ¶52.

R. Alan Miller, President of Philadelphia Investment Banking Corporation, provided Lead Counsel with an economic evaluation and analysis of the terms of the Settlement.[3] In the opinion of Mr. Miller, "the value of the benefits to Abbott and its shareholders from the Proposed Settlement of the Litigation is a minimum of $800 million because . . . the Reforms will reduce the likelihood of such violations and they will provide significant value to Abbott and its shareholders…." Exh. B, ¶2.

Ultimately, the proposed Settlement – which is the outcome of an extensive factual and legal investigation on the part of Lead Counsel, hard-fought litigation over nearly two years, arm's-length negotiations conducted by highly experienced counsel over a five-month period, and significant discovery – eliminates the risk of delay or non-recovery, as well as the uncertainty and expense of continued litigation.

Thus, for the reasons set forth herein, Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement as fair, reasonable and adequate to Abbott and its shareholders, and approve the requested award of attorneys' fees, inclusive of expenses.

## II.   PROCEDURAL BACKGROUND

The procedural background of the Consolidated Derivative Actions (defined immediately below) is recounted in detail in the Declaration of Robert M. Roseman in Support of Final Approval of Proposed Settlement and Award of Attorneys' Fees and

---

[3] The Affidavit of R. Alan Miller In Support of Lead Plaintiff's Motion for Final Approval of Derivative Action Settlement (the "Miller Aff.") is attached hereto as Exhibit B.

Expenses (the "Roseman Litigation Declaration"), attached hereto as Exhibit C, as well as in the Memorandum of Points and Authorities in Support of Lead Plaintiff's Motion for Preliminary Approval of Settlement (the "Preliminary Approval Memorandum"). Accordingly, Lead Plaintiff provides here a short summary for the Court's convenience.

### A. The Consolidated Derivative Actions

Seven shareholder actions, brought derivatively on behalf of and for the benefit of Abbott against members of Abbott's Board, former directors, and certain current and former officers, were filed in this Court and consolidated as *In re Abbott-Depakote Shareholder Derivative Litigation* (the "Consolidated Derivative Actions").[4]  Jacksonville Police & Fire Pension Fund was appointed Lead Plaintiff, Spector Roseman Kodroff & Willis, P.C. ("Spector Roseman") was appointed Lead Counsel, and Susman Heffner & Hurst LLP was appointed Local Counsel by Order dated April 13, 2012.

These actions charge the Individual Defendants with breaching their fiduciary duties by causing or allowing Abbott to engage in alleged illegal marketing and sales activities for its Depakote drug.  The Consolidated Derivative Actions allege that Abbott began to actively promote Depakote to physicians and patients for off-label purposes in 1998.  This practice prompted an investigation by the U.S. Department of Justice ("DOJ") – which investigation was itself precipitated by the filing of several *Qui Tam* Actions – and the issuance of subpoenas by the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG-HHS").  The DOJ's investigation resulted in settlements with the U.S.

---

[4] These actions comprise the lawsuits defined in the Preliminary Approval Memorandum as the Consolidated Derivative Actions, as well as an eighth derivative action, *Montini Family Trust v. White, et al.*, 1:13-cv-08187, which this Court consolidated into the above-captioned case by Order dated March 12, 2014.  Additionally, two shareholder derivative actions were filed in the Circuit Court of Lake County, Illinois:  *Patricia Goodman v. White, et al.*, No. 11CH5243, and *William Bojan v. White, et al.*, 11CH5498.

Government and a number of States. The Company ultimately settled all Depakote-related claims for a total of approximately $1.6 billion in criminal and civil penalties, as well as entry into a Corporate Integrity Agreement.[5]

Following appointment of Lead Plaintiff and Lead Counsel, Lead Plaintiff filed a Consolidated Verified Amended Shareholder Derivative Complaint on June 1, 2012. After briefing on Abbott's and the Individual Defendants' motions to dismiss, the Court dismissed that complaint with leave to amend by Order dated November 15, 2012. On December 6, 2012, Lead Plaintiff filed a Second Consolidated Verified Amended Shareholder Derivative Complaint ("Second Amended Complaint"). By Order dated June 5, 2013, the Court denied Abbott's and the Individual Defendants' motion to dismiss the Second Amended Complaint and held that Lead Plaintiff had alleged with sufficient specificity that demand upon Abbott's Board should be excused as futile. Abbott and the Individual Defendants subsequently filed a motion for reconsideration of that ruling, which the Court denied by Order dated September 12, 2013.

**B.      The Settlement Process**

In late August 2013, the parties began to engage in settlement discussions, which continued through January 2014. These extensive, arm's-length negotiations included five in-person meetings as well as sixteen telephonic meetings. During this period, the parties undertook highly detailed negotiations regarding corporate governance and compliance issues. Lead Plaintiff was assisted throughout the settlement negotiations by Professor Gordon, a distinguished expert on corporate governance who has written at length on the role of company boards in ensuring good governance. Working extensively with Professor Gordon, Lead Counsel

---

[5] Following the separation of Abbott's research-based human pharmaceutical business (now called AbbVie) in January 2013, the Corporate Integrity Agreement and other compliance measures transferred to AbbVie.

designed detailed settlement proposals directed at both the Board and management levels.

This robust process eventually yielded the proposed Settlement consisting of the Corporate Governance Terms attached as Exhibit A to the Stipulation. The parties then executed a Memorandum of Understanding (the "MOU") on January 21, 2014, which, in addition to delineating the Corporate Governance Terms, set forth, *inter alia*, the process by which the parties would seek preliminary approval of the proposed Settlement by the Court, notify shareholders of the proposed Settlement, conduct confirmatory discovery, and seek final judicial approval of the Settlement by the Court.

With the parties having reached an agreement on the terms of the Settlement, Lead Plaintiff conducted confirmatory discovery to confirm the fairness and reasonableness of the Settlement and to ensure that it is in the best interests of Abbott and its shareholders. Along with documents previously provided by Abbott, Lead Plaintiff reviewed in this litigation nearly 4,000 pages of documents including, but not limited to, minutes from Abbott's Board of Directors' meetings, which covered Depakote and the Company's legal and regulatory compliance; correspondence with the FDA regarding Depakote marketing; presentations to the Board by Abbott's CECO and others concerning Abbott's regulatory risks; presentations and other materials concerning Depakote that were furnished to the Board by Abbott's Pharmaceutical Products Division; and guidelines governing the review and approval process for promotional materials. And, also as part of confirmatory discovery, Lead Plaintiff conducted: (1) a Rule 30(b)(6) deposition of Abbott, for which Abbott designated a Divisional Vice President and Associate General Counsel for Legal, Regulatory and Compliance (an eight-year veteran of the Company) to testify on its behalf on topics related to Abbott's ethics and compliance program and Board reporting, specifically with respect to Depakote; and (2) an extensive interview of the

former Corporate Secretary and General Counsel of Abbott who was in attendance at all or nearly all Board meetings and meetings of Board committees from early February 2004 forward.

Based on the confirmatory discovery, as well as their ongoing investigation and analysis, and consultation with their experts, Lead Plaintiff and Lead Counsel concluded that settlement of the Consolidated Derivative Actions under the terms outlined in the proposed Settlement confers substantial benefits upon, and is in the best interests of, Abbott and its shareholders.

## III.   SUMMARY OF THE PROPOSED SETTLEMENT

Following the five months of extensive negotiations, the parties reached agreement on the Corporate Governance Terms set forth in the Stipulation and Exhibit A thereto.  As a result of the proposed Settlement, Abbott has agreed to make enhancements to its current governance and adopt new, or enhance or maintain existing corporate governance policies and practices for at least four years after approval of the Settlement.  Lead Plaintiff and its experts believe that the key features of the corporate governance policies and practices, discussed below, address the heart of its allegations in the Consolidated Derivative Actions and will provide significant value for the Company and its shareholders.

### A.    Enhance the "Tone at the Top"

Abbott has agreed to implement several mechanisms to enhance a culture of legal and regulatory compliance with specific import on the "tone at the top."  First, the Company's Code of Business Conduct will emphasize the core values consisting of honesty, fairness, and integrity [¶1.B][6] and include the following new policies and guidelines:  (1) the Company will promote and sell its products with honesty and integrity and for the purposes which they are intended and approved [¶¶1.D, F]; (2) implement and maintain policies and procedures designed to minimize adverse regulatory enforcement actions with respect to the FDCA and government healthcare

---

[6] "[¶]" refers to the paragraphs in the Corporate Governance Terms, Exhibit A to the Stipulation.

programs [¶1.G]; and (3) implement, maintain and support healthcare compliance systems designed to detect, correct and prevent activities violative of applicable laws, regulations and/or Company polices and standards. [¶1.H]  The Business Conduct Committee will be charged with undertaking periodic reviews of the Company's compliance programs, standards of conduct, policies and procedures, internal systems and controls, the Code of Business Conduct and other compliance-related publications, and recommending modifications. [¶¶10.B, C, D]

Second, the key to cultivating an appropriate tone at the top begins with communication from senior management.  The reforms require the CEO, in a letter included with the revised Code of Business Conduct, to expressly state that the Board of Directors fully supports the Code of Business Conduct and the policies, procedures and principles embodied therein. [¶1]  Any revisions to the Code of Business Conduct will be accompanied by a letter from the CEO emphasizing the importance of compliance to the Company. [¶2.A]  The first periodic review of the Code of Business Conduct will take place this year and any revisions will be completed by December 31, 2014. [¶1]  The Office of Ethics and Compliance will also provide training and communications on the new Code of Business Conduct. [¶1]

Additionally, senior leadership will also communicate periodically with employees – including at meetings and through newsletters, email updates, intranet postings and/or articles authored by or attributed to senior managers – regarding the importance of legal and regulatory compliance. [¶¶2.B,C]  There are to be at least six such communications per year by senior managers. [¶2.C]  Further, at the annual meeting for each of Abbott's Divisions, the Senior Vice President (or the person in charge of the Division) must devote a portion of his or her presentation to ethics and compliance. [¶2.D]

### B. Strengthening the Public Policy Committee's Oversight of Legal and Regulatory Compliance

Abbott's Public Policy Committee Charter will be substantially revised to task the committee's members with the specific responsibility for oversight of the Company's legal and regulatory compliance.  In particular, the Committee will: (1) now be required to meet at least four times a year [¶9.A]; (2) assist the Board in fulfilling its oversight responsibility with respect to regulatory and healthcare compliance issues that affect the Company [¶9.B]; (3) annually review the Company's compliance program regarding legal and regulatory requirements (including regulations by the FDA) [¶9.C]; (4) review and evaluate the Company's policies and practices with respect to maintaining legal, regulatory and healthcare compliance, and review such matters with the Board where appropriate [¶9.D]; (5) receive regular reports – not less than three times a year – from the CECO concerning such matters as regulatory and healthcare compliance [¶9.E]; (6) receive from Abbott's Legal Department reporting on an as needed basis on any legal, regulatory and healthcare compliance issues that it determines is necessary [¶9.F]; (7) review on an annual basis the adequacy of the Committee's charter, and propose to the Board any appropriate changes [¶9.G]; and (8) receive reports from the Head of Quality at least twice a year, such reports to include information on any FDA Warning Letters issued to the Company and the Company's response thereto, as well as any upcoming compliance initiatives [¶9.H].  In effect, the Public Policy Committee acts as a Legal and Regulatory Compliance Committee of the Board of Directors.

### C. Adoption of a Compensation Recoupment Policy

Abbott's Compensation Committee will enact a compensation recoupment policy that goes well beyond what is required under the clawback provision in Section 954 of Dodd-Frank relating to financial restatements arising from material non-compliance with financial reporting

requirements. Abbott's newly created clawback policy goes beyond Dodd-Frank in three material ways: (1) it is triggered by *any* "misconduct" that results in a "material violation of law or Abbott policy that causes significant financial harm" to the Company [¶6]; (2) it is triggered when a senior executive directly engages in wrongful conduct and/or, in appropriate circumstances, fails in his/her supervisory responsibility to manage or monitor conduct or risks appropriately [¶6]; and (3) the clawback can include recovery of amounts already paid, as well as the cancellation of amounts awarded or granted over which Abbott retains control. [¶6]

The policy also provides that public disclosure concerning decisions to recoup compensation will be made in compliance with the rules and regulations of the Securities and Exchange Commission and other applicable laws. [¶6]

### D. Strengthening the Role of the Lead Director

The Lead Director's responsibilities and authority will be expanded, resulting in a perceptible check on the non-independent directors. The new reforms provide that the Lead Director has the authority to: (1) collaborate with the Chairperson on matters such as meeting agenda and schedule [¶3.D] and, importantly, (2) confer with the CEO and the Nominations and Governance Committee regarding succession planning for senior executive officers, including the CEO, and recommend to the Board on an ongoing basis one or more successors in the event of an unexpected inability of senior executive officers to continue to serve. [¶3.G] The reforms also now require the Lead Director to convene four executive sessions with the independent directors during the year. [¶3.B]

### E. Strengthening the Company's Internal Compliance Governance

The Business Conduct Committee ("BCC"), a management-level committee, is responsible for observing the legal and regulatory compliance of the Company and assuring that

Abbott's existing compliance programs are adequate. [¶10] The BCC fulfills its responsibilities by reviewing internal controls and systems, compliance training, internal compliance reporting systems, investigative procedures, and corrective and preventive responses to observed violations. [¶10] In particular, the Committee, which is chaired by the CECO, is required to report periodically directly to the Chairman of the Board and CEO of the Company concerning the compliance programs [¶10.J] and, as appropriate, to the Public Policy Committee. [¶¶9.E, 10.K] The BCC's responsibilities will strengthen the Company's internal compliance governance.

### F. Expanding A Reporting System to Promote Compliance Oversight

In addition to maintaining a reporting system designed to facilitate communications regarding adherence to the Company's compliance program, the reforms also require the Company to maintain, develop, and publicize a reporting system specifically for legal and regulatory compliance issues relating to federal healthcare programs and FDA requirements. [¶12] The CECO (or his or her designee) is tasked with investigative responsibilities. [¶¶12.D,E,F] Importantly, the CECO is now required to report significant investigations directly to the Public Policy Committee. [¶12.G] This requirement enhances the flow of information directly to the Board and is crucial to the Board's oversight and monitoring responsibilities over legal and regulatory compliance.

### G. The Settlement's Additional Reforms

Additional Board-level reforms include: (1) expanding director continuing education programs, which will now include a presentation by the CECO regarding legal and regulatory compliance issues that are applicable to Abbott's businesses [¶4]; (2) apprising the Nominations and Governance Committee of the appointment of any individual to the position of CECO

11

[¶5.F]; (3) ensuring annual reporting to the Board by each chairperson of each Board Committee whether his or her Committee has performed all responsibilities of the Committee [¶7]; and (4) ensuring that each Committee of the Board will have complete authority and discretion to retain financial and legal outside advisors [¶8].

In addition to changes made at the Board level, the proposed Settlement provides for maintenance and enhancement of other governance provisions at the management level in addition to those discussed above. Each of these enhancements ensures that there is a regular "flow of information" from management to the Board with respect to legal and regulatory healthcare compliance issues. For instance, as part of his/her responsibilities as chair of the Business Conduct Committee, the CECO: reports to the Business Conduct Committee on the legal and regulatory environment, as well as potential risk areas for Abbott and best practices within the industry [¶10.B]; reports on the activities of the Business Conduct Committee, as necessary, to the Public Policy Committee [¶10.K]; reports to the Chairman of the Board and CEO periodically regarding Abbott's legal and regulatory compliance program [¶10.J]; and undertakes monitoring of, development of, and implementation of various compliance programs and procedures [¶¶10.E-I].

Finally, as an adjunct to the clawback provisions with respect to senior executives, the proposed Settlement provides that the Company, in its discretion and taking into account such considerations as it deems appropriate, can institute disciplinary action against employees that personally and intentionally engage in misconduct constituting substantial and intentional participation in a significant violation of law or Company policy in connection with a federal healthcare program or FDA requirement. [¶11]

## IV. THE PROPOSED SETTLEMENT SHOULD BE APPROVED

### A. Settlements are Generally Favored

There is an overriding public interest in settling and quieting litigation, and this is particularly true in complex litigation, such as the Consolidated Derivative Actions. *See, e.g., See Isby* v. *Bayh,* 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation"); *Armstrong v. Bd. of Sch. Dirs.,* 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement"), *overruled on other grounds, Felzen* v. *Andreas,* 134 F.3d 873 (7th Cir. 1998); *see also Redman v. RadioShack Corp.*, No. 11-cv-06741, 2014 WL 497438, at *3 (N.D. Ill. Feb. 7, 2014) (same) (quoting *Isby*, 75 F.3d at 1196); *Henry v. Sears Roebuck & Co.*, No 98-cv-4110, 1999 WL 33496080, at *8 (N.D. Ill. July 23, 1999) (same).

Indeed, courts routinely favor settlements of representative litigation (derivative and class actions) because they minimize the burden both on the parties and on strained judicial resources. *See Armstrong*, 616 F.2d at 313 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010) (quoting *Armstrong*, 616 F.2d at 313); *accord In re AOL Time Warner S'holder Derivative Litig.*, No. 02-cv-6302, 2006 WL 2572114, at *3 (S.D.N.Y. Sept. 6, 2006) (recognizing that public policy favors shareholder derivative settlements); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) (same); *Shimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973) ("settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable'"); 4 Alba Conte & Herbert B. Newberg, *Newberg on*

13

*Class Actions* § 11:41, at 87 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

Accordingly, and because the goal of settlement is to avoid the waste and expense of further litigation, the Court does not "decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands*, 450 U.S. 79, 88 n.14 (1981); *see also E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (in considering a settlement, a district court must "refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights"). As the Seventh Circuit held in *Isby*, a court's inquiry "is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate." 75 F.3d at 1196; *accord AOL Time Warner*, 2006 WL 2572114, at *2 ("Before approving the settlement of a derivative action, the Court must be satisfied that the compromise fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted." (quotation marks and citations omitted). "Evaluations of fairness, reasonableness, and adequacy require that the facts be viewed in a light most favorable to the settlement." *Redman*, 2014 WL 497438, at *3.

### B. All Criteria for Approving the Proposed Settlement Are Satisfied

#### 1. The Settlement Provides A Substantial Benefits to Abbott

Because this is a derivative action, the Court must first consider the extent of the benefit conferred on Abbott by the settlement. *See Lambrecht v. Taurel*, No. 08-cv-00068, 2010 WL 2985946, at *3 (S.D. Ind. June 8, 2010) (*Eli Lilly*) (holding that the terms of the shareholder derivative settlement were fair, reasonable, and adequate after having "considered the substantial benefits the Settlement provides Lilly…."); *see also In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 479 (D.N.J. 2010) (*J&J*) ("While the shareholders' interest is relevant, . . .

14

the 'principal factor' to be considered 'is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest.'") (quoting *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978)).

Importantly, the benefits afforded by a settlement in a derivative action need not be monetary: "a settlement may fairly, reasonably, and adequately serve the best interest of a corporation, on whose behalf the derivative action is brought, even though no direct monetary benefits are paid by the defendants to the corporation." *Maher v. Zapata Corp.*, 714 F.2d 436, 466 (5th Cir. 1983). As the court in *J&J* noted, "***shareholder derivative suits are far less likely to involve a monetary component than typical class action suits. . . . Indeed, an empirical study of shareholder derivative actions concluded that the overwhelming majority of settlements result solely in corporate governance changes like those presented here.***" 900 F. Supp. 2d at 480 (citing Jessica Erickson, *Corporate Governance in the Courtroom: An Empirical Analysis*, 51 Wm. & Mary L. Rev. 1749 (2010)) (emphasis added).

In cases involving alleged misconduct – including a failure of board oversight – by companies in the pharmaceutical industry, courts have routinely held that enhanced corporate governance measures confer a "substantial benefit" on a corporation.[7] *See, e.g.*, *J&J*, 900 F. Supp. 2d at 488-94 (rejecting objector's arguments that corporate governance reforms effected by proposed settlement did not confer a "substantial benefit" on corporation); *In re Forest Labs., Inc. Derivative Litig.*, No. 05-cv-3489 (S.D.N.Y.), Order dated Feb. 7, 2012 (approving settlement involving corporate governance changes only, holding that they "provide[d]

---

[7] Courts typically evaluate whether a derivative settlement creates a "substantial benefit" in the context of plaintiffs' counsel's entitlement to a fee award. *See, e.g.*, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970) ("a corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature").

substantial benefits to Forest and its shareholders");[8] *Eli Lilly*, 2010 WL 2985946, at *3 (approving settlement with corporate governance component only, and stating that "the Court has considered the substantial benefits the Settlement provides Lilly, taking into account among other factors the risks of establishing liability and proving damages, the complexity, expense, and likely duration of the litigation, and the stage of the proceedings."); *cf. In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 343 (S.D.N.Y. 2011) (approving counsel fees where corporate therapeutics component of settlement, "separate and apart from any monetary award . . . will provide significant corporate benefits for Pfizer and its shareholders").

Here, Lead Plaintiff believes the substantial corporate governance and compliance provisions of the proposed Settlement clearly confer a significant benefit to Abbott and its shareholders. As enumerated in Section III, *supra*, the Corporate Governance Terms task the Board with overseeing Abbott's legal and regulatory compliance, and even permit the Board to hold certain individuals accountable for wrongdoing that harms the Company. The specific areas implicated in the far-reaching Corporate Governance Terms include appropriate "tone from the top" communications, enhanced Board- and management-level responsibilities with respect to legal and regulatory monitoring of and compliance with federal healthcare programs, an extensive compensation clawback policy for misconduct or failure to supervise by senior executives, expansion of the Lead Director's sphere of influence, and enhancement of management's responsibility with respect to communication as to issues of legal and regulatory compliance (the flow of information to the Board and its Committees). The Corporate Governance Terms at the heart of the proposed Settlement are precisely the types of corporate therapeutics deemed beneficial to companies and approved by courts as part of derivative settlements. For instance, in *J&J*, the therapeutics-only settlement entailed, *inter alia*,

---

[8] *See* Compendium of Unreported Cases submitted herewith.

various mechanisms designed "to create quality control and assurance systems that will prevent, timely detect, and correct noncompliance with drug marketing laws…." 900 F. Supp. 2d at 473. The court found these corporate reforms to have conferred a substantial benefit on J&J. *Id.* at 488-91. Likewise, *Eli Lilly* consisted of a therapeutics-only settlement that involved the adoption of compliance core objectives, as well as changes in compensation, compliance training, and monitoring. This settlement was approved as having conferred a substantial benefit. 2010 WL 2985946, at *2-3.

Thus, reference to shareholder derivative settlements, including those involving the pharmaceutical industry, establishes that the Corporate Governance Terms that form the basis of the proposed Settlement provide a substantial benefit to Abbott. *See*, Exh. A, ¶52 ("Because of the financial and franchise risks to the Company from further violations of the applicable regulatory regimes, these Reforms will provide significant value for the Company and its shareholders".); Exh. B, ¶20 ("The value of the benefits to Abbott and its shareholders from the Proposed Settlement of the Litigation is a **minimum** of $800 million because the Reforms will significantly reduce the likelihood of such costly violations in the future." (emphasis in original)).

2.     <u>Each of the *Isby* Factors Weighs in Favor of Final Approval</u>

In evaluating whether a settlement is fair, reasonable, and adequate, courts within the Seventh Circuit apply the factors articulated in *Isby*:

> These include the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement.

17

75 F.3d at 1199.[9]    For the reasons discussed below, the *Isby* factors all weigh in favor of settlement, and the Court should grant final approval.

> a. *The Merits of the Corporate Governance and Compliance Provisions*
> *of the Settlement in Light of the Merits of Lead Plaintiff's Claims*

In evaluating the settlement of a derivative action, courts have long recognized that such cases "[are] notoriously difficult and unpredictable." *Maher,* 714 F.2d at 455; *see also Unite Nat'l Ret. Fund v. Watts*, No. 04-cv-3603, 2005 WL 2877899, at *3 (D.N.J. Oct. 28, 2005) (*Shell Derivative*) ("Derivative suits are by their nature undeniably complex.").  If this case were to proceed, Lead Plaintiff would face substantial risks, including those unique to derivative litigation and often absent in other types of class actions and shareholder litigation.  *See Shell Derivative*, 2005 WL 2877899, at *4 ("Here, Plaintiffs face the 'difficulties inherent in derivative litigation as well as significant procedural and substantive obstacles.'").

Here, even though Lead Plaintiff survived a motion to dismiss pursuant to Fed. R. Civ. P. 23.1, it still faces significant challenges in proving its claims, including establishing Board knowledge of the off-label marketing of Depakote.  For instance, in denying the motion to dismiss the Second Amended Complaint, this Court made it abundantly clear that "the Court is not deciding whether illegal conduct occurred through 2008; rather, it only decides whether Plaintiffs sufficiently allege that it did."  *In re Abbott Depakote S'holder Deriv. Litig.*, No. 11 C 8114, 2013 WL 2451152, at *9 (N.D. Ill. June 5, 2013).  Indeed, because Lead Plaintiff incorporated into its Second Amended Complaint

---

[9] Neither the Seventh Circuit nor this Court has expressly applied the *Isby* factors, which developed in the context of class action settlements, to shareholder derivative settlements.  However, other courts evaluating derivative settlements frequently employ the framework for assessing class action settlements, such as the framework enunciated in *Isby*. *See, e.g., In re MRV Commc'ns, Inc. Deriv. Litig.*, No. 08-cv-03800, 2013 WL 2897874, at *2 (C.D. Cal. June 6, 2013); *J&J*, 900 F. Supp. 2d at 479; *AOL Time Warner*, 2006 WL 2572114, at *3.

allegations contained in the Civil Settlement Agreement between Abbott, the U.S. Government, and certain states, the Court held that "it is now reasonable for this Court to infer that the off-label marketing scheme did not stop in 2006, as it previously found…." *Id.* at *7. Importantly, the Court cautioned that Lead Plaintiff "overreach[es]" when arguing that the Civil Settlement Agreement constitutes an admission by Abbott that it engaged in wrongful conduct through 2008, but that "this distinction is irrelevant for purposes of deciding the motion to dismiss. At this stage the Court is required to make all reasonable inferences in favor of the non-moving party." *Id.* at *8. Thus, Lead Plaintiff still faces the substantial hurdle of ***proving*** that the off-label marketing of Depakote continued through at least 2008 and ***proving*** that the Board was aware of the scheme at that time.

In the course of negotiating the proposed Settlement, Lead Counsel, while believing they had arguments and evidence to overcome these hurdles, were nonetheless fully aware of the material risks of continuing to litigate this action, particularly when weighed against the immediate and tangible benefits conferred upon the Company by the proposed Settlement. Litigating these claims to trial and through likely appeals would entail substantial costs and impose material burdens on Lead Plaintiff and the Company. Instead of the risk of failing to obtain any benefit for Abbott through costly and time-consuming litigation, the proposed Settlement allows Abbott to put these matters to rest and to go forward armed with corporate governance and compliance practices that Lead Counsel and its corporate governance expert believe "will significantly strengthen Board oversight of Abbott's compliance with the federal, state, and foreign government regulatory regimes… [and] would hold senior executives responsible for failure in supervisory responsibilities…."

19

Exh. A, ¶2.[10]

b. *Assessment of the Complexity, Length, and Expense of Litigation*

The complexity, length, and expense of the litigation in the absence of a settlement are important considerations weighing in favor of a settlement. *See Isby*, 75 F.3d at 1199.

Continued litigation of these claims would no doubt entail intensive, lengthy, and costly proceedings. While Lead Counsel has already performed significant work on the case – undertaking an investigation and surviving a motion to dismiss the Second Amended Complaint and a motion to reconsider that ruling, following dismissal of an earlier pleading – it is highly likely that the future of the case before trial would be marked by complex, expensive, and contested discovery, detailed expert studies and related discovery, one or more motions for summary judgment or partial summary judgment, and *Daubert* motions.

Apart from the unique risks of derivative litigation discussed above, Lead Plaintiff faces all of the risks inherent in any complex litigation, including highly technical factual and legal issues that require extensive expert analysis, as well as the challenge of establishing liability in the face of conflicting testimony and evidence. Should Lead Plaintiff's claims have survived dispositive motions and proceeded to trial, a jury would have been presented with the Individual Defendants' denial of all wrongdoing and their denial of any knowledge of the efforts within Abbott to market Depakote for off-label uses. Given the change in Board composition in recent years, it is not at all inconceivable that such evidence would be well-received by a jury.

---

[10] The litigation risks discussed above reinforce the conclusion that the comprehensive proposed Settlement falls well within the "range of reasonableness." *See, e.g., Newman* v. *Stein*, 464 F.2d 689, 693 (2d. Cir. 1972) (the range of reasonableness of a settlement "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion"); *see also Walsh* v. *Great Atl. & Pac. Tea Co.*, 96 F.R.D. 632, 642 (D.N.J. 1983), *aff'd*, 726 F.2d 956 (3rd Cir. 1983).

Lead Plaintiff's claims would also be subject to the unpredictability of a lengthy and complex jury trial, the possible unavailability of witnesses, and the possibility that jurors could react to the evidence in unforeseen ways. Should Lead Plaintiff have prevailed on liability, it would have continued to face substantial hurdles in demonstrating and quantifying damage to the Company, with any such showing likely to result in a battle of competing experts – another situation fraught with unpredictability.

Lastly, even if Lead Plaintiff prevailed at trial, the Individual Defendants have fought strenuously throughout the life of this litigation, and there is no reason to believe they would not pursue an appeal to the Seventh Circuit. This would obviously involve further delay and expense, possibly postponing final resolution of the claims for years.

In effect, the proposed Settlement avoids all of these delays, uncertainties, complexities, and expenses, and offers immediate and substantial benefits to Abbott and its shareholders.

### c. *Opposition to the Settlement*

Courts view the absence of opposition to a settlement by affected parties as a factor strongly supporting judicial approval of the settlement. *See AOL Time Warner*, 2006 WL 2572114, at *6 (in shareholder derivative action, "the lack of objections may well evidence the fairness of the Settlement") (quotation marks and citation omitted); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 964-65 (N.D. Ill. 2011) (approving settlement where only 235 out of over 32 million class members opted out and only 10 objections were filed).[11]

---

[11] *See also Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) (in class action settlement with more than 100,000 claims, 342 opt-outs and 15 filed objections amounted to "very small percentage" of opposition, supporting approval of settlement); *In re Mexico Money Transfer Litig.*, 164 F.

Here, shareholders were first notified of the proposed Settlement no later than March 24, 2014.[12] While Abbott shareholders are permitted to file objections to the proposed Settlement through May 8, 2014, as of the date of this filing, not a single shareholder has objected to the proposed Settlement in the month since notice was first disseminated. Three shareholders have contacted Lead Counsel to request information on the proposed Settlement. *See* Exh. C (Roseman Litigation Decl.), ¶68. Thus, at this juncture, there is no reason to believe that the proposed Settlement is not widely endorsed by Abbott's shareholders.

d. *Opinion of Competent Counsel*

*Isby* next invites a court to consider the opinion of competent counsel in assessing a settlement. 75 F.3d at 1199. The Court should attribute significant weight to the opinion of experienced counsel that the settlement is in the best interest of Abbott and its shareholders. *See Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020 ("The court places significant weight on the unanimously strong endorsement of these settlements by Plaintiffs' well-respected attorneys.").[13]

Settlements achieved by experienced counsel through arm's-length negotiations are entitled to deference from the Court. *See, e.g., Goldsmith v. Tech. Solutions Co.,* 92 C 4374, 1995 WL 17009594, at *3 n.2 (N.D. Ill. Oct. 10, 1995); *In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("A presumption of correctness is said to attach to a

Supp. 2d 1002, 1021 (N.D. Ill. 2000) (holding that the fact that more than "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlement[s]").

[12] By virtue of the Preliminary Approval Order, which the parties first received *via* ECF on March 21, 2014, the Notice of Settlement was to be published, *inter alia,* on Abbott's company website within five days. Preliminary Approval Order (Dkt. #317), ¶ 5.

[13] *See also In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2003 WL 23316645, at *2 (E.D. Pa. 2003) ("[I]t is appropriate to give substantial weight to the recommendations of experienced attorneys, who have engaged in arms-length settlement negotiations . . . ."); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("'[G]reat weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.").

22

class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") *(quoting Hanrahan* v. *Britt,* 174 F.R.D. 356, 366 (E.D. Pa. 1997)).

As the firm biographies of Lead Counsel and the other Plaintiffs' counsel overwhelmingly establish,[14] the proposed Settlement was negotiated by lawyers who are highly experienced in the field of derivative litigation and other complex litigation. Lead Counsel has served as lead or co-lead counsel in numerous derivative cases and other types of shareholder litigation around the country.

One measure of the abilities and experience of Lead Counsel is the high caliber of defense counsel with whom they negotiated. Abbott, as a nominal defendant, retained Kirkland & Ellis, LLP, and the Individual Defendants retained Jones Day. Both firms are highly regarded for the quality of their lawyers.

In negotiating the Settlement, Lead Counsel took into account, *inter alia,* the numerous and significant legal issues presented by this case, as described above. In this process, they evaluated both the strengths and the risks presented by each of these issues. The proposed Settlement was thus ultimately reached based on the highly informed judgment of Lead Counsel as to the risks both Lead Plaintiff and Defendants faced moving forward in the litigation, and the scope and nature of the governance and compliance reforms Lead Plaintiff was able to extract through arduous negotiations.

---

[14] The firm resumes of Lead Counsel Spector Roseman and of Susman Heffner & Hurst, Labaton Sucharow LLP, Kahn Swick & Foti, LLC, and the Law Offices of Bernard M. Gross, P.C. are furnished herewith. *See* Declaration of Robert M. Roseman Collecting All Plaintiffs' Counsel's Fee and Expense Reports (the "Roseman Fee Declaration"), attached hereto as Exhibit D.

e. *The Stage of the Proceedings and Amount of Discovery Completed*

Finally, the Court should consider the stage of the proceedings and the amount of discovery completed. *See Isby*, 75 F.3d at 1199. As discussed above, the parties have entered into the proposed Settlement at a procedural posture where significant risk remained for both sides, and where the cost of litigating was about to skyrocket. Having agreed to resolve the action after the motion to dismiss was denied, the parties have avoided protracted and expensive discovery. Discovery was likely to involve the production and review of hundreds of thousands of documents, numerous depositions in multiple locations, and the retention and discovery of experts. The parties also avoid summary judgment and trial.

During the course of this litigation, Lead Plaintiff has had abundant opportunities to thoroughly investigate the factual and legal bases for the derivative claims. Off-label marketing of Depakote within Abbott has been well documented in the media, as it led to Abbott's payment of $1.6 billion in fines and penalties. Lead Plaintiff also had access to the Criminal Plea Agreement and the Civil Settlement Agreement, which contained a multitude of facts and averments.

Additionally, Lead Plaintiff was in a position to review: Abbott's public filings with the Securities and Exchange Commission ("SEC"), news reports, analyst reports, and industry reports; court filings and exhibits from other related actions, including the Government's action and the *Qui Tam* actions; documents produced by the FDA pursuant to the Freedom of Information Act, 5 U.S.C. §§ 55, *et seq.,* and additional documents produced by Abbott directly to Lead Plaintiff.

Lead Plaintiff also conducted substantial confirmatory discovery after the parties had agreed to the terms of the proposed Settlement and executed the MOU. Lead Plaintiff thus

24

reviewed, through confirmatory discovery or otherwise, nearly 4,000 pages of documents including, but not limited to, minutes from Abbott's Board of Directors' meetings referencing Depakote and legal and regulatory compliance; correspondence with the FDA regarding Depakote marketing; guidelines governing the review and approval process for promotional materials; presentations to the Board by Abbott's CECO and others concerning Abbott's regulatory risks; and presentations and other materials concerning Depakote that were furnished to the Board by Abbott's Pharmaceutical Products Division during the Relevant Period.[15] Lead Plaintiff, during confirmatory discovery also conducted: (1) a Rule 30(b)(6) deposition of Abbott, which designated a Divisional Vice President and Associate General Counsel for Legal, Regulatory and Compliance, an eight-year veteran of the Company, to testify on its behalf on topics related to Abbott's ethics and compliance program and Board reporting and specifically with respect to Depakote; and (2) an extensive interview of the former Corporate Secretary and General Counsel of Abbott who was in attendance at all or nearly all Board meetings and meetings of Board committees during the Relevant Period.

All of the information obtained by Lead Plaintiff served to bolster its confidence in the prudence of settling this matter on the agreed-to terms, as it revealed the daunting challenges that lay in proving, *inter alia*, how long the illegal marketing scheme persisted within Abbott, the Board's knowledge of the misconduct, and its failure of oversight. Accordingly, both the current stage of the litigation and the discovery obtained thus far weigh strongly in favor of approving the proposed Settlement.

---

[15] The Relevant Period is defined in the Second Amended Complaint as 1998 through the filing of the first-filed complaint in this action on November 14, 2011.

**C.     Notice to Abbott Shareholders Was Adequate**

1.     <u>Notice Was Effected in Accordance with the Preliminary Approval Order</u>

The Preliminary Approval Order requires notice of the proposed Settlement, shareholders' right to object, and the setting of a fairness hearing to be published and disseminated as follows:  (1) the Notice of Proposed Settlement of Consolidated Derivative Actions, Final Settlement Hearing, and Right to Appear (the "Notice") was to be maintained on Abbott's corporate website beginning within five days from the date of the Preliminary Approval Order and until Final Approval of the Settlement; (2) the Notice was to be filed by Abbott with the SEC on Form 8-K within ten days from the date of the Preliminary Approval Order; and (3) a Summary Notice of Pendency of Shareholder Derivative Action Involving Abbott Laboratories, Proposed Settlement, and Settlement Hearing (the "Summary Notice") was to be published at least one time each in the national editions of *The Wall Street Journal* and *USA Today* no later than ten days following the date of the Preliminary Approval Order.  Preliminary Approval Order (Dkt. #317), ¶5.  In addition to the fact of and the nature of the proposed Settlement (including the Corporate Governance Terms), the Notice was to advise Abbott shareholders of their right to object to the Settlement and to appear at a fairness hearing regarding the Settlement, as well as the process by which they could do either or both of those things.  *Id.* at ¶¶8-10.

To the best of Lead Plaintiff's knowledge and as Lead Plaintiff anticipates will be set forth in the affidavit to be filed by Abbott prior to the Settlement Hearing, per the terms of the Preliminary Approval Order, notice was effected in the manner ordered by this Court.

26

2. <u>The Notice Procedures Fully Satisfied Due Process</u>

Rule 23.1 of the Federal Rules of Civil Procedure requires that notice be given to shareholders in derivative actions "in such manner as the court directs." The notice process employed in this case satisfies Rule 23.1 and this Court's Order, and otherwise comports with due process, as the notice informed Abbott's shareholders of (1) the terms of the settlement, (2) the availability of further information from the Court, and (3) the right to object and be heard. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1317 (3d Cir. 1993) (To satisfy due process, the notice "must be sufficiently informative and give sufficient opportunity for response.") (quotation marks and citation omitted)); *J&J*, 900 F. Supp. 2d at 486 (quoting *Bolger*).

**V.  THE COURT SHOULD APPROVE THE FEE AND EXPENSE AWARD TO PLAINTIFFS' COUNSEL BECAUSE IT IS THE PRODUCT OF ARM'S-LENGTH NEGOTIATIONS AND IS FAIR AND REASONABLE IN LIGHT OF ALL RELEVANT FACTORS**

**A.  Applicable Legal Standards for Consideration of a Fee Request**

Lead Counsel respectfully requests approval of an award of attorneys' fees in the amount of $9,900,000, inclusive of expenses. These fees and expenses, if approved, will be shared with all Plaintiffs' Counsel pursuant to paragraph 5.1 of the Stipulation.

In deciding whether a fee request is fair and reasonable, substantial deference should be given where, as here, requested fees are the product of arm's-length negotiations among the parties to a shareholder derivative action. *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568-70 (7th Cir. 1992). Courts in the Seventh Circuit consider several factors in determining

27

reasonableness, including: (1) the benefits conferred by the settlement; (2) the awards in similar cases; (3) the risks of nonpayment; (4) the quality of legal services rendered; and (5) the public service aspects of the case. *Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005); *see also Great Neck Capital Appreciation Inv. P'ship v. PriceWaterHouseCoopers, LLP*, 212 F.R.D. 400, 411 (E.D. Wis. 2002) (same).

Abbott has agreed not to contest any award of attorneys' fees and expenses up to $9.9 million. Stipulation ¶ 5.1. This agreement was made at arm's length and only after the substantive terms of the Settlement had been negotiated. In such circumstances, courts have held that a negotiated fee is entitled to deference. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (holding that an agreed-to fee is an ideal situation because "[a] request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee"); *Strube v. Am. Equity Inv. Life Ins. Co.*, No. 6:01-cv-1236, 2006 WL 1232816, at *3 (M.D. Fla. May 5, 2006) (absent collusiveness "great weight should be given to the negotiated fee in considering whether the fee is appropriate"); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 861 (E.D. Mo. 2005) (awarding $2.25 million in derivative action and stating that "where, as here, the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference"). As set forth in the Roseman Litigation Declaration (Exh. C hereto), the agreed-to attorneys' fees and reimbursement of out-of-pocket expenses were the result of multiple in-person meetings and telephone conferences between counsel for the parties, with the participation of the directors' and officers' insurance carriers and their counsel. As with the terms of the Settlement, the fee negotiations were hard fought, as counsel for Defendants and counsel for the insurance carriers had every incentive to negotiate the lowest possible fee amount.

Moreover, as set forth above and as supported by the expert affidavits of Jeffrey N. Gordon and R. Alan Miller furnished herewith, the settlement provides substantial benefits to Abbott and its shareholders. Lead Counsel therefore respectfully submits that the requested fee is reasonable under any applicable framework, and should be approved in its entirety.

        1.    <u>The Substantial Benefit Doctrine</u>

It is well-settled that where a derivative action provides substantial non-monetary benefits to the nominal defendant corporation, plaintiffs' counsel are entitled to an award of reasonable attorneys' fees. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970) ("a corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature"). A benefit is "substantial," and thus deserving of a fee award, where, as here, it corrects or prevents an abuse that would harm the corporation. *See id.* at 396. Robust corporate governance reforms, such as those that form the basis for the proposed Settlement here, amply satisfy this standard. *See, e.g.*, *In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 343 (S.D.N.Y. 2011) (corporate therapeutics component of settlement, "separate and apart from any monetary award . . . will provide significant corporate benefits for Pfizer and its shareholders"); *J&J*, 900 F. Supp. 2d at 488-94 (rejecting objector's arguments that corporate governance reforms effected by proposed settlement did not confer a "substantial benefit" on corporation); *In re Schering-Plough Corp. S'holder Derivative Litig.*, No. 01-1412, 2008 WL 185809, at *4 (D.N.J. Jan. 14, 2008) (changes to company's corporate governance structure, which conferred a substantial benefit on the company).

As set forth in Section IV.B.1, *supra*, and as attested to by Lead Plaintiff's two experts (Jeffrey N. Gordon and R. Alan Miller), the Corporate Governance Terms at the core of the

proposed Settlement will confer a significant benefit on Abbott and its shareholders. This includes, *inter alia*, strengthening Abbott's commitment to legal and regulatory compliance with federal healthcare programs; enacting a compensation recoupment policy; enhancing the role of the Lead Director; fostering stronger communication by Abbott's senior management on compliance issues; strengthening the role of the CECO; and developing a reporting system that facilitates the compliance program. Thus, an award of attorneys' fees is appropriate here.

2.  Each of the Factors Considered by the Seventh Circuit Supports Payment of the Agreed-Upon Fee Award

In determining the reasonableness a requested fee in a common benefit case such as this, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).[16] This determination falls within the trial court's discretion. *See In re Pub. Serv. Co. of Ind. Derivative Litig.*, 125 F.R.D. 484, 487 (S.D. Ind. 1988) (citing *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 776 F.2d. 646, 650 (7th Cir. 1985)). At the same time, the Seventh Circuit has recognized that "[s]uch estimation is inherently conjectural," *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011), and has therefore articulated a number of factors relevant to the "market rate" inquiry. The "market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and

---

[16]  Although this Settlement has produced a non-monetary "common benefit," as opposed to a "common fund" from which attorneys' fees may be awarded (as is often the case in class action settlements), this case is governed by "common fund principles," which require that those who receive the benefit of a representative action share the cost of producing that benefit. *See, e.g.*, *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 145 (3d Cir. 1999) (Noting that the common benefit doctrine derives from the common fund doctrine, and explaining that, "[u]nder the common benefit doctrine, an award of attorney's fees is appropriate where 'the plaintiff's successful litigation confers a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.'" (quoting *Hall v. Cole*, 412 U.S. 1, 5 (1973); additional quotation marks and citation omitted)).

in part on the stakes of the case." *Synthroid*, 264 F.3d at 721. Courts should also consider the probability of success that counsel faced at the outset of the litigation, as well as attorneys' fee awards in comparable actions. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 597-98 (N.D. Ill. 2011).

a.     <em>The Benefits Achieved for Abbott and the Quality of Services<br/>Rendered Support The Fee Award</em>

Pursuing these complex derivative claims in a manner that resulted in the Corporate Governance Terms – which will confer a substantial benefit to Abbott – required the participation of highly skilled attorneys with vast knowledge of the specialized areas of derivative litigation and substantive corporate governance. *See supra*, n.14. As detailed in the Roseman Litigation Declaration (Exh. C hereto), Lead Plaintiff and Lead Counsel faced numerous daunting hurdles in the prosecution of these claims. That fact is no better exemplified than by the Court's dismissal of Lead Plaintiff's first amended complaint, after which Lead Plaintiff significantly amended its pleading and subsequently survived the motion to dismiss the Second Amended Complaint and motion for reconsideration by Defendants. This was followed by more than five months of intensive settlement negotiations.

Lead Counsel, as well as the other plaintiffs' counsel, brought a high degree of expertise and sophistication to bear in the litigation of these claims. As such, Lead Counsel respectfully submits that the agreed-upon fee amount of $9.9 million, inclusive of expenses, fairly and reasonably reflects the services rendered to Abbott and its shareholders and the benefit they each received.

b.     <em>The Fee Award is Justified by the Risk of Nonpayment</em>

The Court must next take into account the extent to which Lead Counsel undertook the representation of Abbott's interests on a purely contingent basis, and the risk that it would not be

31

compensated for its work. *See Synthroid*, 264 F.3d at 721. Indeed, courts have regularly recognized that derivative litigation is inherently risky. *See, e.g.*, *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("the odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful"); *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) (derivative litigation is "notoriously difficult and unpredictable"); *In re MRV Commc'ns, Inc. Derivative Litig.*, No. 08-03800, 2013 WL 2897874, at *3 (C.D. Cal. June 6, 2013) (quoting *Pacific Enterprises*); *Shell Derivative*, 2005 WL 2877899, at *4 ("Here, Plaintiffs face the 'difficulties inherent in derivative litigation as well as significant procedural and substantive obstacles.'").

The difficulty in successfully litigating a shareholder derivative action is compounded where, as here, at least part of the claim is premised on the failure by the corporate board to properly monitor the operations of the company. *See, e.g., In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) (Delaware Chancery Court found failure to monitor claim "is possibly the most difficult theory in corporate law upon which a plaintiff might hope to win a judgment."); *In re Pfizer, Inc. Derivative Sec. Litig.*, 307 F. App'x 590, 594 (2d Cir. 2009) (summarily affirming dismissal of derivative action, holding that standard for failure of oversight claim is more demanding than scienter under Rule 10b-5, requiring "both a showing of knowledge and that the knowledge created an affirmative duty to act, which the directors consciously ignored").

Here, Lead Counsel undertook a considerable amount of work against the high prospect of non-recovery, especially after the Court dismissed the first amended complaint. As the Roseman Litigation Declaration (Exh. C hereto) sets forth in abundant detail, Lead Counsel undertook, *inter alia:* (1) extensive legal and factual research and investigation, including

the review and analysis of internal Company documents and materials obtained by virtue of a Freedom of Information Act request; (2) drafting the pleadings filed in this action, including two rounds of amendments and motions to dismiss; (3) extensive research and analysis undertaken in the drafting of detailed governance and compliance proposals directed to what Lead Plaintiff contends was the misconduct within Abbott; (4) months of intensive discussions and negotiations with counsel for Abbott regarding settlement; (5) meetings, telephonic conference calls and consultations with their experts throughout the entire negotiation process; (6) extensive confirmatory discovery, (7) drafting and negotiating the Settlement documents; and (8) drafting the pleadings seeking preliminary and final approval of the proposed Settlement. This work was performed over more than a two-year period on a fully contingent basis.

In addition to the substantial work undertaken, Lead Counsel has incurred significant expenses in the litigation of these claims. These outlays of money were assumed on a wholly contingent basis, as well. In addition to the travel expenses that were incurred (in regularly appearing before the Court, for settlement meetings with counsel for Defendants, meetings with Professor Gordon, and for confirmatory discovery), Lead Counsel retained two preeminent experts, incurring substantial expense, in order to ensure a rigorous evaluation of the merits of the claims and the crafting of reforms that would prevent and detect, going forward, the alleged wrongdoing at the heart of the litigation. As set forth in the Roseman Fee Declaration and the exhibits thereto, these expenses total $194,957.90 (Exh. D, ¶2), and, as discussed below, reflect expenses reasonably incurred in connection with the conduct of the litigation.

33

c. *The Fee is Justified by Awards in Similar Actions*

As discussed in detail above, Lead Counsel negotiated significant and highly valuable corporate therapeutics. These specifically address the alleged deficiencies in Abbott's corporate governance structure that exposed the Company to substantial monetary and reputational harm as a result of its off-label marketing of Depakote. Courts have uniformly recognized the value of such reforms and, accordingly, have awarded attorneys' fees in pharmaceutical-industry derivative cases commensurate with those being sought – and agreed to by all parties – here. The corporate governance reforms resulting from the proposed Settlement are more extensive and far-reaching than those enacted in the cases below, with the exception of *Pfizer*. The instant Settlement even stands strongly next to *Pfizer*, as both settlements comprise many of the same reforms, such as a clawback provision and enhanced legal and regulatory compliance mechanisms.

A review of other derivative settlements in the pharmaceutical industry amply demonstrates the reasonableness of the attorney fees' agreed to here:

(a) *In re Abbott Laboratories Derivative Shareholder Litigation* (*Abbott I*), No. 99-cv-7246 (N.D. Ill.) (Moran, J.), a case that arose out of Abbott's having entered into a Consent Decree with the Government and paying $100 million in fines after non-compliance with FDA regulations governing medical devices – misconduct very different from that alleged in the instant action. In that case, which settled following two dismissals, a reversal of the second dismissal by the Seventh Circuit Court of Appeals, and significant discovery, Judge Moran awarded $9 million in fees and expenses where the settlement entailed governance mechanisms (which included the adoption of a Public Policy Committee charter) that were geared toward that

34

alleged misconduct. *See Abbott I*, 1:99-cv-07246, Final Judgment and Order of Dismissal, March 1, 2005. (dkt. # 181);[17] *see also* Second Amended Complaint, ¶¶ 62-64. (dkt. #183).

(b) *Eli Lilly*, a case involving a pharmaceutical company's improper marketing and promotion practices. The Southern District of Indiana approved a fee award of $8.75 million, including expenses, where the plaintiffs' counsel obtained "numerous and significant governance changes." 2010 WL 2985946, at *2. These reforms included several enhancements to reporting systems pertaining to compliance issues, the creation of management-level positions for compliance and risk management, and a provision for board education.

(c) *Schering-Plough*, a case involving a pharmaceutical company's deficient manufacturing processes and inadequate responses to FDA concerns, resulting in delayed approval of the company's drug, increased FDA scrutiny, and damage to the company's reputation. The court awarded $9.5 million in fees, plus up to $300,000 in expenses, in connection with a settlement that entailed significant corporate governance changes that significantly improved Board oversight. They included: the requirement that a Board committee conduct periodic reviews of the non-financial and operational aspects of the company's audit plan; enhancements in director training, particularly with regard to FDA regulatory trends; and centralization of the global compliance and audit functions, facilitating the direct reporting of compliance information to the Board. 2008 WL 185809, at *3-4, 6.

(d) *Pfizer*, a case involving off-label marketing and illegal kick-backs for numerous drugs resulting in a $2.3 billion fine. The settlement (which was reached following extensive discovery and during the briefing of summary judgment) resulted in a payment of $75 million, $22 million of which paid plaintiffs' counsels' fees and $1.6 million for their out-of-pocket costs. The corporate reforms, a number of which were also obtained in this Action, included a

---

[17] *See* Compendium of Unreported Cases submitted herewith.

compensation clawback provision, the creation of a regulatory and compliance committee of the board, and an ombudsman program. In addition, the company had implemented a number of governance changes during the pendency of the litigation, which the company made taking into account the litigation. *See Pfizer*, 780 F. Supp. 2d at 343.

(e) *Omnicare*, a derivative action involving violations of the federal anti-kickback laws, which also resulted in a $98 million settlement with the DOJ. In a mediated settlement that resulted in reforms addressing salary adjustments based on performance appraisals of officers' and employees' failure to comply with company rules, requiring the chief compliance officer to provide information to the board's compliance committee, and employee training, the mediator recommended an attorneys' fee award of $8.6 million and expenses of $222,000. Additionally, a settlement fund was created in the amount of $16.7 million from which the attorney fees and expenses were paid. *See Manville Pers. Injury Settlement Trust v. Gemunder*, No. 10-CI-01212, slip op. at 4 (Ky., Kenton Cir. Ct. 4th Div. Oct. 29, 2013) (*Omnicare Derivative*);[18] *see also* Omnicare, Inc., Current Report (Form 8-K), Ex. 99.1 at 2-3 (Aug. 15, 2013) (describing terms of proposed settlement).

These cases demonstrate the reasonableness of Lead Counsel's negotiated fee of $9.9 million in light of the reforms obtained in this Action and the benefits conferred upon Abbott, compared to those obtained in the above-cited settlements.

      3.      The Agreed-Upon Fee Award is also Fair and Reasonable Under the Lodestar Methodology

An evaluation of the requested fee award under the lodestar methodology confirms that the proposed fee award in this case is reasonable. *See Joe Hand Promotions, Inc. v. Zani*, No. 11 C 4319, 2014 WL 958716, at *2 (N.D. Ill. Mar. 11, 2014). Under the lodestar method, a court

---

[18] *See* Compendium of Unreported Cases submitted herewith.

multiplies the number of hours worked by counsel's reasonable hourly rate, and then applies a multiplier. *See Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 562 & n.3 (7th Cir. 1994). In cases involving a high degree of expertise and specialization, such as this one, a court should assess the reasonableness of counsel's hourly rates based on the national market for such services. *See Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487, 490 (7th Cir. 2009).

Notably, the Seventh Circuit has held that under common fund principles, "a risk multiplier is not merely available . . . but mandated, if the court finds that counsel 'had no sure source of compensation for their services.'" *Florin,* 34 F. 3d at 565 (quoting *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 569 (7th Cir. 1992)). The risk determination must be assessed *ex ante*, requiring the Court "to assess the multiplier with regard to the probability of success in this type of litigation at the outset of the case . . . without regard to most developments during discovery and litigation because it is designed to reflect the riskiness of the case at the outset." *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991).

As the Northern District of Illinois has explained:

> [i]t is obvious that one hour well spent may produce more and better results than one hundred plodding hours of mediocrity. And that one hour should be compensated equally, even more generously, than the one hundred hours. Obviously, one hour makes for a smaller lodestar than one hundred. But that is where multipliers step in. ***There is no reason that multipliers, in such cases, should be low***. . . . Frequently when they are, it is because a higher multiplier would result in an unreasonable fee.

*Matter of Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 126 (N.D. Ill. 1990) (emphasis in original).

In the Seventh Circuit, courts have historically approved a multiplier between 1 and 4. *See Harman*, 945 F.2d at 976 (noting that multipliers between 1 and 4 have been approved).

Courts elsewhere have ruled in step. "In shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005); *see Yuzary v. HSBC Bank USA, N.A.*, No. 12-cv-3693, 2013 WL 5492998, at *10 (S.D.N.Y. Oct. 2, 2013) (collecting lodestar multipliers in class action cases ranging from 2 to 8.74); *Buccellato v. AT&T Operations, Inc.*, No. C10-00463, 2011 WL 3348055, at *2 (N.D. Cal. June 30, 2011) (approving multiplier of 4.3 in wage and hour class action settlement); *New England Carpenters Health Benefits Fund v. First Databank, Inc.,* No. 05 Civ. 11148, 2009 WL 2408560, at *2 (D. Mass. Aug, 3, 2009) (awarding multiplier of 8.3 in class action settlement involving fraudulent pricing schemes for prescription drugs).

Here, Lead Counsel and the other plaintiffs' counsel expended a total of 4,655.80 hours litigating these claims, generating a total lodestar of $2,738,003.75. *See* Exh. D (Roseman Fee Declaration), ¶2. Consequently, the $9.9 million fee negotiated by the parties translates into a multiplier of 3.5 after expenses are deducted. This is well within the range of accepted and approved multipliers in derivative litigation, and thus should be approved here.

> 4.     Expenses of Plaintiffs' Counsel Would Otherwise Be Reimbursable as
>        <u>Reasonable</u>

Finally, Lead Counsel and counsel for the other plaintiffs have incurred total unreimbursed litigation costs and expenses in the amount of $194,957.90. *See* Exh. D (Roseman Fee Declaration), ¶2. These costs and expenses consist primarily of travel, experts, discovery, and research, and were reasonable and necessary for the prosecution of this action. Accordingly, such expenses may be reimbursed. *See In re Citigroup S'holder Deriv. Litig.*, No. 12-cv-3114, 2013 WL 4441511, at *3 (S.D.N.Y. Aug. 19, 2013) ("[C]ourts have long recognized the 'common corporate benefit' doctrine as a basis for the reimbursement of . . . expenses in

corporate litigation.") (quoting *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997)); *Schering-Plough*, 2008 WL 185809, at *6 ("The Court also determines that the proposed reimbursement of up to $300,000 in expenses, which consists mainly of experts' fees, is reasonable under the facts and circumstances of this matter."). The Court should therefore approve the agreed-upon fee, as it includes reasonably incurred litigation costs and expenses that would otherwise go unreimbursed to Lead Counsel and the other plaintiffs' counsel.

### B.    Public Policy Supports an Award of Attorneys' Fees

Lastly, it deserves note that courts routinely grant fee awards if a derivative settlement results in corporate governance changes because important public policy goals are served in the process. *See, e.g.*, *Schering-Plough*, 2008 WL 185809, at *5 ("The results of counsels' efforts achieve the socially laudable goal of promoting regulatory compliance, which is particularly important in light of Schering's role as one of the world's leading pharmaceutical companies."); *accord Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1197 (6th Cir. 1974) (in derivative litigation, Sixth Circuit endorsed district court's determination "that the public had a stake in this and similar litigation"). Courts thus recognize the important incentive that the award of attorneys' fees provides in furthering the public good of corporate governance. Indeed, the Seventh Circuit has held that, in evaluating a fee award, a court must balance the interests of the represented parties with the need "to sustain the incentive for attorneys to continue to represent such clients on an 'inescapably contingent' basis." *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245, 1247 (7th Cir. 1995) (quoting *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 569 (7th Cir. 1992)).

Given the sizeable corporate governance reforms effected by the proposed Settlement and

the substantial benefits to Abbott and its shareholders, an award of attorneys' fees here furthers the public policy interest in incentivizing litigation that promotes strong corporate governance.

## VI.    CONCLUSION

For the reasons set forth herein, the detailed provisions of the proposed Settlement provide substantial benefits to Abbott and its shareholders.  Accordingly, Lead Plaintiff and Lead Counsel respectfully request that the Court find the proposed Settlement to be fair, reasonable and adequate to Abbott and its shareholders, and approve the Settlement in its entirety.  Lead Counsel further respectfully requests that the Court approve the requested award of attorneys' fees in the amount of $9.9 million, inclusive of expenses.[19]

---

[19] A [Proposed] Final Order and Judgment is attached hereto as Exhibit E.

Dated:  April 24, 2014

**SUSMAN HEFFNER & HURST LLP**

By: /s/ Matthew T. Heffner
Matthew T. Heffner
30 N. LaSalle Street, 12th Floor
Chicago, IL 60602
Tel.:  312.346.3466
Fax:  312.346.2829

*Local Counsel*

**SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.**
Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirarchi
*rroseman@srkw-law.com*
*aabramowitz@srkw-law.com*
*dmirarchi@srkw-law.com*
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Tel.:  215.496.0300
Fax:  215.496.6611

Mark S. Willis
*mwillis@srkw-law.com*
1101 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004
Tel.:    202.756.3600
Fax:    202.756.3602

*Lead Counsel for Lead Plaintiff,*
*Jacksonville Police & Fire Pension Fund*