# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---------------------------------------------------------------------------x
IN RE ABBOTT-DEPAKOTE SHAREHOLDER     :
DERIVATIVE LITIGATION     :  **CASE NO: 1:11-cv-08114**
     :  **Hon. Virginia M. Kendall**
     :
---------------------------------------------------------------------------x

**AFFIDAVIT OF JEFFREY N. GORDON IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF DERIVATIVE ACTION SETTLEMENT**

## INTRODUCTION

1.    This affidavit provides my opinion and reasoning regarding the Corporate Governance Reforms ("the Reforms") agreed to by the board of directors ("the Board") of Abbott Laboratories ("Abbott" or "the Company") in connection with the proposed settlement of the above-captioned litigation ("the Litigation"), as reflected in the Stipulation of Settlement ("the Proposed Settlement").

2.    In my opinion, the Reforms embodied in the Proposed Settlement will significantly strengthen Board oversight of Abbott's compliance with the federal, state, and foreign government regulatory regimes for the sale of drugs, nutritional products, medical devices and medical products and will produce other improvements to internal compliance and accountability. Moreover, the Reforms include a "Recoupment Policy" to be adopted by the Compensation Committee that would hold senior executives responsible for failure in supervisory responsibilities in circumstances where such failure to supervise resulted in "a material violation of law or Abbott policy that causes significant financial harm to Abbott." This is a more aggressive recoupment policy than found in recent settlements of similar litigation

involving other pharmaceutical companies that were accused by the federal government in off-label marketing of FDA-approved prescription drugs. The result of the governance changes in the Reforms will be to reduce the possibility of recurrent wrongful corporate conduct by Abbott as evidenced by the May 2012 criminal guilty plea and civil settlement with the U.S. government and 49 state authorities to address issues arising from Abbott's unlawful promotion of Depakote for uses not approved as safe and effective by the FDA. These agreements required Abbott to pay a total of $1.6 billion in criminal and civil penalties and fines and forfeitures and enter into a Corporate Integrity Agreement ("CIA") which, following the spin-off of Abbott's Pharmaceutical Products Group in January 2013, was transferred to, and became binding on, the new entity, AbbVie, a publicly traded company.

3.     The Company's continuing involvement in the heavily-regulated medical and healthcare products industry means that further violations of applicable law presents financial and franchise risks. Because the Reforms will reduce the likelihood of such violations, they will provide significant value for Abbott and its shareholders.

4.     This affidavit describes the Reforms and provides the basis for my opinion that each Reform will produce benefits for the shareholders of Abbott. I also participated in the formulation of the Reforms and was consulted by Lead Plaintiff's Counsel throughout the negotiations that led to the Proposed Settlement. I will briefly describe that process.

## QUALIFICATIONS

5.     I have been retained by Lead Plaintiff's Counsel in this matter as an expert on corporate law and governance and directors' fiduciary duties.

6.     I am the Richard Paul Richman Professor of Law at Columbia University Law School, Co-Director of the Millstein Center for Global Markets and Corporate Ownership, Co-Director of the Richman Center for Business, Law, and Public Policy, and Co-Director of the

Columbia Center for Law and Economic Studies. I am also a Fellow of the European Corporate Governance Institute. I have been a law professor for thirty years, starting at NYU Law School in 1982 and moving to Columbia in 1988. In the fall of 2002, I was the Bruce W. Nichols Visiting Professor of Law at Harvard Law School. Most of my teaching and scholarship have been in the corporate and securities area, broadly defined. I have become a specialist in corporate law (including the fiduciary duties of boards and directors), corporate governance, corporate finance, and mergers and acquisitions. I have taught Corporations or Advanced Corporate Law: Mergers and Acquisitions on a yearly basis throughout my career. Recently, I have regularly taught courses that focus on various aspects of corporate governance. I also regularly participate in continuing legal education panels on corporate law and governance and mergers and acquisitions topics. Further professional background is provided by my c.v., attached as Exhibit A hereto.

7. Of particular relevance to the opinions I express in this affidavit, I have written extensively on the board's role in corporate governance. My recent article on the role of boards and independent directors in corporate governance, *The Rise of Independent Directors in the United States: 1950-2005*, 59 Stan. L. Rev. 1465 (2007), was selected by a vote of business law academics as one of the 10 best articles on business law published in the United States during 2007 and was awarded the European Corporate Governance Institute's Egon Zehnder International Prize for the best working paper in 2007 on company boards and their role in corporate governance. Another much-discussed article directly addressed the responsibility of the Enron board in that company's collapse, *Governance Failures of the Enron Board and the New Information Order of Sarbanes-Oxley*, 35 U. Conn. L. Rev. 1125 (2003) (symposium issue).

8.      My article calling for board responsibility in reviewing and approving disclosures relating to executive compensation was cited by the Securities and Exchange Commission ("SEC") in connection with its own similar rule, *Executive Compensation:  If There is a Problem, What's the Remedy?  The Case for "Compensation Discussion and Analysis*," 30 J. Corp. Law 675 (2005).   An article on the governance role of controlling shareholders, *Controlling Controlling Shareholders*, 152 U. Penn. L. Rev. 785 (2003) (with Ronald J. Gilson), also selected as a "top ten" article, has been cited and relied upon several times by the Delaware Chancery Court.  Other articles addressing other corporate law issues have also been cited by the Delaware Chancery Court.  I am also a co-author of THE LAW AND FINANCE OF CORPORATE ACQUISITIONS, 3d edition (in preparation) (with Ronald J. Gilson, Bernard S. Black, and Charles Whitehead), a leading casebook in the mergers and acquisitions field, which extensively treats the standards of board behavior in business decision-making.

9.      More recently I have begun to address the governance problems of financial firms, including a recently-released working paper that focuses on the particular responsibilities of the board in risk oversight of systemically important financial firms, *Systemic Harms and Shareholder Value* (with John Armour), available at http://ssrn.com/abstract=2307959.

10.     In the course of teaching and scholarship in the corporate law and corporate governance areas, I have become very familiar with the laws of Delaware, whose courts are the most important U.S. expositor of corporate law norms, including the fiduciary duties of directors. I regularly use the Delaware corporate statutes and case law in my teaching and scholarship.

11.     I also participate in the international dialogue about corporate governance and sophisticated business transactions.  As indicated in my c.v., I have written a number of articles on international corporate governance standards and have co-edited CONVERGENCE AND

PERSISTENCE IN CORPORATE GOVERNANCE (with Mark J. Roe) (2004). My work has been translated into German, French, and Chinese. I am currently working as part of a multinational, interdisciplinary team to study the effect of national takeover laws on the level of cross-border mergers and acquisitions activity. As previously noted, I am a Fellow of the European Corporate Governance Institute, a leading interdisciplinary group of economists and lawyers.

12. On a number of occasions I have been retained by agencies of the United States government (namely, the Office of the U.S. Attorney for the Southern District of New York, the Office of the U.S. Attorney for the Eastern District of New York, the SEC, the Board of Governors of the Federal Reserve System, and the Internal Revenue Service) to serve as an expert witness in pending criminal or civil litigation, involving various matters of corporate and securities law including, but not limited to, various questions of corporate governance, board behavior, controlling shareholder responsibilities, corporate structure, and finance. In all cases where I was called upon to testify or submit an affidavit, and where the court permitted expert testimony, I have been accepted as an expert.

13. I have also submitted affidavits as a corporate governance expert in recent settlements of shareholder derivative suits in connection with stock option backdating, disclosure issues, and alleged fiduciary duty breach issues. These matters included the recent settlements of litigations involving Pfizer, Inc. and Omnicare, Inc. that arose, as here, from allegations of non-compliance with federal and state regulatory regimes for the marketing or sale of drugs to Medicare and Medicaid recipients

14. In preparing this affidavit, I have reviewed the litigation material identified in Exhibit B attached hereto.

## THE UNDERLYING LITIGATION AND RELATED MATTERS

15.     The derivative action brought by Lead Plaintiff arises in the aftermath of a settlement by Abbott of various federal and state criminal and civil enforcement actions that alleged the wrongful marketing of the proprietary drug Depakote over an extended period.  The applicable federal statutes included the Federal False Claims Act, the Food, Drug, and Cosmetic Act, and the Anti-Kickback Statute as applied to Medicare and/or Medicare reimbursement to third parties.  The applicable state statutes included various state consumer anti-fraud statutes. In May 2012, Abbott pled guilty to a federal misdemeanor criminal charge relating to conduct over the 1998-2006 period, filing an Agreed Statement of Facts, and simultaneously settled federal and state actions relating to conduct over the 1998-2008 period.   Fines and forfeiture penalties in respect of these dispositions totaled $1.6 billion ("the Government Settlement").  At the time, it was the second largest settlement for alleged illegal pharmaceutical marketing ever, exceeded only by Pfizer's payment of $2.3 billion.

16.     In connection with the Government Settlement, Abbott entered into a CIA and a compliance monitoring agreement that imposed special duties on the senior management team to avoid marketing violations.

17.     In 2010 Abbott settled another civil case relating to the Company's pharmaceutical marketing practices.  This matter had alleged exploitative pricing of medications sold through government financed health care program; the settlement was for $126.5 million.

18.     Following the settlement of the federal and state enforcement actions related to this Litigation, Abbott completed its previously-announced split of its business into two companies.  As of January 1, 2013, the research-based human pharmaceuticals business was spun off into a separate company, now called AbbVie.  Although AbbVie has a temporary

arrangement to purchase some administrative services from Abbott, it is an independent company. As part of the spinoff transaction, AbbVie agreed to subject itself to the CIA and other compliance measures. Although Abbott is no longer a party to the CIA, it has agreed to maintain a compliance program that includes a Chief Ethics and Compliance Officer and an Office of Ethics and Compliance.

19. Subsequent to the AbbVie spinoff, Abbott continues to engage in several lines of business that are subject to U.S. and foreign regulation. These businesses include the sale of branded generic drugs outside the U.S., diagnostic products (especially in the immunochemistry space), nutritional products (such as infant formula and other pediatric nutrition products), and vascular products (such as stents and products used in endovascular surgery). Abbott's continuing focus in the healthcare industry is reflected by its acquisitions in 2013 of IDEV Technologies (for $100 million) to expand its endovascular portfolio and OptiMedica (for up to $410 million depending on achievement of performance targets), an entry point into the laser-assisted cataract surgery market.

20. In this Litigation, Lead Plaintiff has alleged various breaches of the duty of loyalty and care by various Abbott directors and officers related to the illegal marketing of Depakote. In particular Lead Plaintiff has alleged that Abbott's Board and certain officers either participated in or facilitated the wrongful acts or were reckless in their failure to monitor and become aware of the wrongful acts so as to be able to prevent their occurrence.

## PROCESS

21. I was retained on or about August 25, 2013 by Spector Roseman Kodroff & Willis, PC, Lead Plaintiff's Counsel, as a corporate governance expert in connection with a possible settlement of the Litigation. I participated in formulating the Reforms that are reflected

in the Proposed Settlement. Based on my review of the record in this Litigation, Abbott's corporate governance in place at that time, and discussions with counsel regarding the evidence revealed in the course of the litigation, I strongly urged Reforms that: (i) reflect and underscore a new "tone at the top;" (ii) increase the responsibility and power of an identified Board committee tasked with overseeing the Company's compliance with the various laws and regulations in the medical and healthcare products area; and (iii) create accountability through an appropriate compensation mechanism.

22.     Lead Plaintiff's Counsel negotiated the Proposed Settlement, including the Reforms, with Defendants' counsel over the course of several months. At various stages in the negotiations, Lead Plaintiff's Counsel consulted with me regarding Defendants' various positions in response to their corporate governance reform proposals. In this regard, I advised Lead Plaintiff's Counsel about elements of the proposals that I thought were critical to a meaningful settlement and resisted changes suggested by Defendants that I regarded as unjustified by the concerns raised by Defendants' counsel. For example, I strongly advised the desirability of a compensation clawback arrangement that would apply not just in a case of intentional wrong-doing by a senior executive but also in a failure-to-supervise case. Additionally, in light of the Company's recent history of a criminal plea in connection with the Depakote matter and significant monetary payouts to settle civil suits alleging non-compliance with laws and regulations governing its business, I also strongly advised that that a committee of the Board be charged with meaningful legal and regulatory oversight responsibilities and that the Lead Director play an important role in Board governance. In my opinion, the final agreement embodies the essential elements of the initial settlement proposal, including the elements that I thought were especially important.

23.     Without meaning to overstate my role in the negotiations, this was not a case in which counsel negotiated a settlement that included corporate governance reforms and then brought in an expert to opine on their value.

### SUMMARY OF CORPORATE GOVERNANCE REFORMS

24.     The agreed-upon Reforms address what I regard as the critical corporate governance issues at Abbott.  First, the Reforms engage the "tone at the top" issue through an emphasis on visible senior management commitment to a strong Code of Business Conduct. Second, the Reforms strengthen the role of the independent Lead Director of the Board, which should have additional implications for the "tone at the top."  Third, the Reforms substantially modify the duties of the Public Policy Committee so as to give that Committee specific legal and regulatory oversight responsibility with respect to Abbott's various compliance obligations. Fourth, the Reforms strengthen the Company's internal compliance governance by expanding the mandate of the Business Conduct Committee, chaired by the Chief Ethics and Compliance Officer, who reports to the Public Policy Committee.  Fifth, the Reforms strengthen the Company's compliance reporting and monitoring systems.  And, sixth, the Reforms enact a "Recoupment Policy" to be followed by the Compensation Committee in an effort to use the threat of clawback to neutralize various incentives for aggressive business practices and for willful blindness by senior executives to questionable conduct.

### 1.  Foster a Better "Tone at the Top"

25.     As part of the Government Settlement, Abbott entered into an Agreed Statement of Facts as part of a criminal plea agreement admitting wrongdoing from January 1998 through December 2006 and a civil settlement agreement involving four *Qui Tam* actions alleging the same conduct for which Abbott admitted criminal liability, but for the period January 1998 through December 31, 2008; Abbott did not admit wrongdoing over the 2006-2008 period.  The

admitted wrong-doing reflected sustained activity to promote the off-label use of the potent psychoactive medication Depakote, on such a sufficiently large scale to produce a $1.6 billion settlement payment. Moreover, much of this wrong-doing occurred during a period when Abbott was subject to a prior Corporate Integrity Agreement, entered into in 2003 as part of a settlement of criminal kickback allegations against an Abbott subsidiary. This history of wrongdoing suggests a corporate culture that could greatly benefit from the Reforms.

26. One of the key "lessons learned" from a series of corporate scandals throughout the 2000s, beginning with Enron and covering many other cases, is the importance of a "culture of compliance" and the importance of "tone at the top" in establishing that culture. Thus, several of the Reforms focus on mechanisms to establish and support a culture of compliance at Abbott. This in turn requires a complementary "tone at the top," a phrase that refers to the messages conveyed by senior management and the board throughout the organization. Establishing a new "tone at the top" at Abbott is particularly important in light of the extended period, beginning in 1998, over which the Company, as admitted in the Government Settlement, engaged in wrongful acts. The tenure of the current CEO overlaps this period.

27. The Reforms specify several mechanisms to foster a culture of compliance with particular importance on "tone at the top." First, the Reforms require and emphasize the importance of the Code of Business Conduct ("the Code") that embraces "honesty, fairness and integrity as core values" as well as "adhere[nce] to all laws, regulations, and Company requirements that apply to its work" [¶¶ 1.B, E][1]. The first undertaking in the Code is "[a] communication regarding a commitment to compliance by the Chief Executive Officer" [¶ 1.A].

---

[1] References refer to Exhibit A to the Stipulation of Settlement, Corporate Governance Terms.

28.     Second, the CEO is required to transmit the Code to employees with a letter that conveys not only his personal compliance commitment but also that "the Board fully supports the Code of Business Conduct and the policies, procedures, and principles embodied therein" [¶ 1].  Employees are required to receive training on the Code and to sign-on individually to its precepts [¶ 1, last paragraph].

29.     Third, the CEO is required to meet at least annually with senior executives "to emphasize the importance of compliance and their role and accountability for compliance" [¶ 2. B].

30.     Fourth, Abbott's senior leadership is required to follow up in communications with employees about the importance of compliance in diverse ways throughout the year, through at least six separate communications [¶ 2.C].

31.     Fifth, at each Division's annual meeting, the Division's leader is required to speak specifically to ethics and compliance as part of his/her presentation [¶ 2.D].

## 2.  Strengthen the Role of the Lead Director

32.     The Reforms also require Abbott's Corporate Governance Guidelines to include an elaboration of the Lead Director's responsibilities and authority.  In particular, the Reforms give the Lead Director additional authority to collaborate with the Chair/CEO in setting the Board's agenda [¶ 3.D] and provide for the Lead Director's involvement in CEO succession planning [¶ 3.G].  Not only does the Lead Director have authority to convene executive sessions of the independent directors, the Reforms also require a minimum of four such executive sessions during the year [¶ 3.B].  The cumulative effect of these Reforms is to create a space within which the independent directors can independently evaluate the performance of the CEO

under the guidance of a board leader, the Lead Director, who has the capacity to set the agenda for such evaluation.

33.     The additional responsibilities of the Lead Director, which create an important visible check on the CEO, make for an important "tone at the top" intervention .  Thus, the Reforms put in place a mechanism to insist on a high level of accountability for future compliance failures emanating from an inadequate "tone at the top."

### 3.  Expand the Duties of the Public Policy Committee

34.     The Reforms include a substantial revision of the charter of the Public Policy Committee so as to task that Committee with specific responsibility for oversight of the Company's compliance with applicable laws and regulations [¶ 9.A].  Of course the Board as a whole has non-delegable responsibilities in that regard, but a specific committee can have focused responsibility and, by "tee-ing" up issues as they arise, helps the Board perform its oversight functions.

35.     In particular the Public Policy Committee is charged with the annual review of the Company's compliance program with applicable FDA regulations [¶ 9.A.ii] and also with a special receipt and review function for reports from the Chief Ethics and Compliance Officer ("the CECO"), the Legal Department, and the Head of Quality with respect to regulatory and healthcare compliance issues [¶¶ 9.A.v, vi, viii].

36.     It is valuable to place the Public Policy Committee directly in the information flow from these separate organs within the Company, each with particular responsibilities for regulatory compliance, each with distinctive sources of information.  The CECO, for example, may receive information from internal sources, perhaps *via* the internal hotlines contemplated in

the Reforms, and external sources [see ¶¶ 12.A, B]. The Head of Quality may receive FDA Warning Letters.

37.     The Reforms also require reports to the Public Policy Committee from the CECO at least three times yearly and reports from the Head of Quality at least twice yearly. Under the existing set up, the Public Policy Committee consists exclusively of independent directors, so the reporting relationships set forth in the Reforms will help assure that the Committee and thus the Board receives notice of emerging compliance problems unfiltered by senior management's screening efforts. Management's knowledge of this protected reporting channel can itself help deter practices that could create compliance problems.

### 4. Strengthen Internal Compliance Governance

38.     The Business Conduct Committee ("the BCC") is the internal organ within the Company that is responsible for observing the "legal and regulatory environment in which the Company functions" [¶ 10.A] and for assuring that Abbott's existing compliance program is suitable for that environment. The BCC has a broad mandate to review internal systems and controls, compliance training, internal compliance reporting systems, investigative procedures, disciplinary practices, and corrective and preventive responses to observed violations [¶ 10]. The BCC is also tasked with recommending changes in all of these areas as deemed appropriate.

39.     A committee with such a broad agenda and mandate can be an effective mechanism for fashioning effective compliance governance at the Company. What's particularly valuable in helping Abbott's BCC realize its potential is the dual reporting responsibility of its Chair, the CECO. On behalf of the BCC, the CECO reports directly to the CEO [¶ 10.J] and to the Public Policy Committee [¶¶ 10.K; 9.A.v]. This gives the CECO access to the corporate officer who would have the greatest capacity to address compliance issues identified by the

CECO and the BCC but also access to the Board Committee with responsibility for compliance oversight. The CEO of course knows of the CECO's reporting responsibilities (at least three times yearly) to a Board Committee that consists solely of independent directors.

40.     Thus the BCC as headed by the CECO can be an effective way to strengthen the Company's internal compliance governance.

### 5. Broaden Compliance Reporting and Monitoring

41.     The Reforms also require the Company to develop, maintain, and publicize a reporting system for compliance issues relating to Federal healthcare programs and FDA requirements [¶ 12]. The reporting system needs to provide various modalities by which Abbott employees and non-employees (including healthcare professionals) can report issues "on-line" (including by email) or otherwise, and anonymously or not [¶¶ 12 A, B].

42.     The Reforms task the CECO with specific investigative and other follow-up responsibilities [¶¶ 12.D, E, F]. "Significant investigations" are to be reported to the Public Policy Committee [¶ 12.G]. This reporting requirement will make it more likely that significant compliance concerns are expeditiously raised to the Board level, which can bring high level focus to the matters in question. Such a reporting requirement, as well as the direct Board channel, protects the CECO and his/her staff from possible pressure to suppress the flow of information and thereby strengthens the internal monitoring mechanism.

### 6. Compensation "Recoupment" for Misconduct or Failure to Supervise

43.     One especially notable Reform is Abbott's adoption of a compensation recoupment policy ("the Recoupment Policy") that provides for Compensation Committee review of compensation "paid, granted or awarded" to a "senior executive" in instances where (i) the executive "engaged in misconduct or, in appropriate circumstances, failed in his or her

supervisory responsibility to manage or monitor conduct or risks appropriately" *and* (ii) the misconduct or failure to supervise "results in material violation of law or Abbott policy that causes significant financial harm to Abbott" [¶ 6]. "Recoupment" includes "recovery of compensation already paid" and "forfeiture, recapture, reduction or cancellation" of "amounts awarded or granted over which Abbott retains control" [¶ 6].

44.     Such a Recoupment Policy is a more aggressive approach to senior executive wrong-doing or failure to supervise than for most large public corporations. Recoupment gained momentum as a governance tool from the passage of section 304 of the Sarbanes-Oxley Act of 2002, which calls for reimbursement by the chief executive officer and chief financial officer of certain incentive-based compensation in the event of "misconduct" that requires an accounting restatement. Section 954 of the Dodd-Frank Act of 2010 expanded the recoupment mechanism by requiring public companies to adopt, maintain, and disclose "clawback" policies relating to financial restatements arising from material non-compliance with financial reporting requirements.

45.     Many large companies have adopted broader "clawback" policies than required by law, covering a wider group of employees but still triggered chiefly by accounting restatements, not necessarily by other compliance issues. A 2012 Equilar study of Fortune 100 companies, *Equilar 2012 Clawback Policy Report*, for example, reported that while adoption of clawback measures was widespread (85%), only 25% of such adoptions included triggers for other than accounting restatements. Similar findings are reported in the Shearman & Sterling 2013 survey of the 100 largest U.S. public companies, *Compensation Governance 2013*.

46.     The Reforms would expand the common range of "clawback" policies in three respects. First, the trigger is *any* "misconduct" that results in "material violation of law or

Abbott policy that causes significant financial harm to Abbott," not just misconduct related to financial disclosure. This would cover the misconduct that was described in the Agreed Statement of Facts as part of Abbott's criminal plea agreement, the Civil Settlement Agreement with the Government, and that was otherwise alleged in this Litigation. Second, the "clawback" may also be triggered by a senior executive's failure to supervise or monitor not just primary misconduct. Within a large organization, significant wrong-doing is more likely to reflect a supervisory or monitoring failure rather than direct senior executive wrongdoing. The Recoupment Policy embodied in the Reforms establishes that a senior executive has an affirmative duty to be watchful against misconduct through his or her supervisory remit. Third, the "clawback" may include recovery of amounts already paid as well as the cancellation of stock options or other stock-based pay and perhaps other forms of deferred compensation.

47. It is important to note that a "clawback" is not automatically triggered by the circumstances. Rather, the Reforms give the Compensation Committee power to initiate a review and take appropriate action. Moreover, the Recoupment Policy is constrained by "contract, compensation plan, law, or regulation." Both of these factors may create uncertainty about the implementation-in-fact of the Recoupment Policy. This uncertainty, which may be inherent in the endeavor, should not seriously undermine the effectiveness of the Policy. The point is to create strong disincentives for misconduct and strong incentives for forthright supervision and monitoring of potential areas of legal exposure. The Recoupment Policy achieves those goals and thus should reduce the risk of recurrence of the misconduct alleged in this Litigation.

48. Finally, in adopting the Recoupment Policy as specified in the Reforms, Abbott would join several other pharmaceutical companies who have adopted such policies in

conjunction with an industry/institutional investor working group. "The principles, *Principal Elements of a Leading Recoupment Policy. . .* is a best practice corporate governance strategy that seeks to strengthen board risk oversight and preserve long-term shareholder value."[2] Among the signatories were Pfizer, Johnson & Johnson, and Eli Lilly, pharmaceutical firms that had entered into very large settlements because of compliance related issues similar to Abbott's.

49.     Thus, Abbott's Recoupment Policy will reflect a robust form of the best practice principles, particularly in the coverage of supervisory failure.

### 7. The Four Year Commitment

50.     The Reforms are in place for at least four years. I believe a four year commitment is reasonable in light of the uncertainty in application of governance measures that sound useful in conception and the possibility that regulatory initiatives may overtake the Reforms as currently drafted.

51.     The Reforms are well-designed for their purpose. The four-year commitment period is a sufficiently long time to establish customary practices within the Board – for example, the functioning of the Public Policy Committee and its deepening relationship with the CECO. The four-year period also is long enough for the emphasis on the Code of Business Conduct to help create and sustain a compliance culture within the Company. The new practices and procedures are likely to become sufficiently embedded in Abbott's corporate culture and way of doing business that the most important features will survive long after the end of the four-year commitment.

---

[2] Pharmaceutical Companies, Investor Coalition, Develop Industry Standard-Setting Principles for Recoupment Policies Covering Major Compliance Failures, April 4, 2013, available at http://www.prnewswire.com/news-releases/pharmaceutical-companies-investor-coalition-develop-industry-standard-setting-principles-for-recoupment-policies-covering-major-compliance-failures-201421791.html.

**CONCLUSION**

52.     In my opinion, the Reforms embodied in the Proposed Settlement will significantly strengthen Board oversight of Abbott's compliance with the federal, state, and foreign government regulatory regimes for the sale of drugs, nutritional products, medical devices and medical products and will produce other improvements to internal compliance and accountability.  The Reforms will strengthen the Public Policy Committee, the Business Conduct Committee, and the CECO and thus will enhance the effectiveness of internal compliance and accountability mechanisms.  The focus on "tone at the top" improvements will help create and sustain a culture of compliance within Abbott that is itself an important check on management-directed behavior.  The Recoupment Policy helps reduce incentives that can produce wrong-doing and also rejects avoidance of knowledge as a supervisory defense.  The result of the governance changes in the Reforms will be to reduce the possibility of recurrent wrongful corporate conduct by Abbott as evidenced by the guilty plea and $1.6 billion in fines and forfeitures paid out in the 2012 Government Settlement and by settlement in 2010 of a civil case making similar allegations with a payout of approximately $126.5 million.    Because of the financial and franchise risks to the Company from further violations of the applicable regulatory regimes, these Reforms will thus provide significant value for the Company and its shareholders.

New York, New York
April 23, 2014

_____

Jeffrey N. Gordon

**Exhibit A**

## JEFFREY N. GORDON

Columbia University Law School
435 West 116th St.
New York, N.Y. 10027
*jgordon@law.columbia.edu*
voice: 212-854-2316
fax: 212-854-7946

Columbia University Law School
435 West 116th St.
New York, N.Y. 10027
*jgordon@law.columbia.edu*
voice: 212-854-2316
fax: 212-854-7946

ACADEMIC APPOINTMENTS

Richard Paul Richman Professor of Law, Columbia University Law School, 2011-current

Co-Director, Columbia Center for Law and Economic Studies, 1988- current

Co-Director, Millstein Center for Global Markets and Corporate Ownership, 2012-current

Co-Director, Richman Center for Business, Law and Public Policy, 2012-current

Fellow, European Corporate Governance Institute, 2004-current

Alfred W. Bressler Professor of Law, Columbia University Law School, 1998-2011

Albert E. Cinelli Enterprise Professor of Law, 2006-07

Bruce W. Nichols Visiting Professor of Law, Harvard Law School, fall 2002

Exchange Faculty Member, Columbia-Oxford Alliance, spring 2010

Professor of Law, New York University Law School, 1982-1988
(starting as assistant professor of law)


COURSES

Mergers and Acquisitions; Financial Crises and Financial Regulation; Regulation of Financial Institutions; Foundations of the Regulatory State; Corporations; Corporate Governance; Comparative Corporate Governance; Regulation of Institutional Investors; Corporate Law and Political Economy

<u>PUBLICATIONS</u>

Efficient Markets, Costly Information, and Securities Research, 60 N.Y.U. L. Rev. 761 (1985) (with Lewis A. Kornhauser).

The Puzzling Survival of the Constrained Prudent Man Rule, in B. Longstreth, MODERN INVESTMENT THEORY AND THE PRUDENT MAN RULE (Oxford Univ. Press 1986).

Takeover Defense Tactics: A Comment on Two Models, 96 Yale L.J. 295 (1986) (with Lewis A. Kornhauser).

The Puzzling Persistence of the Constrained Prudent Man Rule, 62 N.Y.U. L. Rev. 52 (1987) (revision and substantial elaboration of book chapter).

Ties That Bond: Dual Class Common Stock and the Problem of Shareholder Choice, 76 Calif. L. Rev. 1 (1988), condensed version reprinted in L. Bebchuk (ed.), CORPORATE LAW AND ECONOMIC ANALYSIS (Oxford Univ. Press 1990).

The Mandatory Structure of Corporate Law, 89 Colum. L. Rev. 1549 (1989).

Corporations, Markets, and Courts, 91 Colum. L. Rev. 1931 (1991) (analyzing *Paramount Communications, Inc. v. Time Inc.*).

Shareholder Initiative: A Social Choice and Game Theoretic Approach to Corporate Law, U. Cincinnati Law Review Corporate Law Symposium issue, 60 U. Cin. L. Rev. 347 (1991), reprinted in 1992 Corp. Practice Commentator 455.

Institutions as Relational Investors: A New Look at Cumulative Voting, 94 Colum. L. Rev. 124 (1994), reprinted in 1994-1995 Corp. Practice Commentator 455.

Employee Stock Ownership As a Transitional Device: The Case of the Airline Industry, in Darryl Jenkins, ed., HANDBOOK OF AIRLINE ECONOMICS (McGraw-Hill 1995).

Employees, Pensions, and the New Economic Order, 97 Colum. L. Rev. 1519 (1997).

"Just Say Never?" Poison Pills, Deadhand Pills, and Shareholder-Approved Bylaw Amendments," 19 Cardozo L. Rev. 511 (1997), *reprinted in* 1998 Corp. Practice Commentator 1 *and* 20 Bank & Corp. Gov. Reporter 702 (July 1998).

The Shaping Force of Corporate Law in the New Economic Order, 31 U. Rich. L.Rev.1473 (1997) (George Allen Chair lecture).

2

Employee Stock Ownership in Economic Transitions: The Case of United Air Lines, 10 J. Applied Corp. Fin. 59 (1998).

Employee Stock Ownership in Economic Transitions: The Case of United Air Lines, different versions published in 3 different conference volumes:

> EMPLOYEE REPRESENTATION IN THE EMERGING WORKPLACE: ALTERNATIVES/SUPPLEMENTS TO COLLECTIVE BARGAINING (Samuel Estreicher, ed.) (Kluwer Law Press, 1998).

> CORPORATE GOVERNANCE: THE STATE OF THE ART AND EMERGING RESEARCH (Klaus Hopt, Mark Roe & Eddy Wymeersch, eds.) (Oxford Univ. Press, 1998).

EMPLOYEES' ROLE IN CORPORATE GOVERNANCE (Margaret Blair & Mark Roe, eds.) (Brookings Inst. 1999),    Translated into Chinese and published in the Aordo Investment Review, Vol. 4, 2006

Deutsche Telekom, German Corporate Governance, and the Transition Costs of Capitalism, 1998 Colum. Bus. L. Rev. 185.

Individual Responsibility for the Investment of Retirement Savings: A Cautionary View, 64 Brklyn L. Rev. 1037 (1998).

Pathways to Corporate Convergence?  Two Steps on the Road to Shareholder Capitalism in Germany, 5 Colum. J. of European L. 219 (1999) (symposium issue), *reprinted in* 2000 Corporate Practice Commentator 107.

L'actionnariat salarie: l'analyze americaine appliquee a Air France [American Reflections on Employee Stock Ownership in Air France] in RAPPORT MORAL SUR L'ARGENT DANS LE MONDE (1999)  [The Report on Money and Morals Worldwide].

Poison Pills and the European Case, 54 U. Miami L. Rev. 839 (2000) (symposium issue).

New Merger Accounting Regime on the Way: Let's Hope It Works [Published as *Reviewing The New Merger Accounting Regime*], New York Law Journal, 7/19/2001, p.1.

What Enron Means for the Management and Control of the Modern Business Corporation: Some Initial Reflections, 69 U. Chi. L. Rev. 1233 (2002), *reprinted in* Thomas Clarke, ed. Theories of Corporate Governance (2004).

Das neue deutsche „Anti"-Übernahmegesetz aus amerikanischer Perspektive [An American Perspective on the New German Anti-takeover Law], 12 *Die Aktiengesellschaft* (December 2002).

Governance Failures of the Enron Board and the New Information Order of Sarbanes-Oxley, 35 U.Conn. L.Rev. 1125 (2003) (symposium issue).

The United Airline Bankruptcy and the Future of Employee Ownership, 7 Employee Rts & Employment  Pol. J. 227 (2003) (part of proceedings issue on "Employee Stock Ownership after Enron").

Convergence on Shareholder Capitalism: An Internationalist Perspective, in Curtis Milhaupt, ed., Global Markets, Domestic Institutions: Corporate Law and Governance in a New Era of Cross-border Deals (2003).

Controlling Controlling Shareholders, 152 U. Penn. L. Rev. 785 (2003) (with Ronald J. Gilson) *reprinted in* 2004 Corporate Practice Commentator.

The International Relations Wedge in the Corporate Convergence Debate, in Jeffrey N. Gordon & Mark J. Roe, eds, CONVERGENCE AND PERSISTENCE IN CORPORATE GOVERNANCE (2004).

CONVERGENCE AND PERSISTENCE IN CORPORATE GOVERNANCE, co-editor with Mark J. Roe (Cambridge Univ. Press 2004) (translated into Chinese).

An American Perspective on Anti-Takeover Laws in the EU: A German Example, in Ferrarini, Hopt, Winter & Wymeersch Hopt, eds., Reforming Company Law in Europe (2004).

Executive Compensation:  If There is a Problem, What's the Remedy? The Case for "Compensation Discussion and Analysis," 30 J. Corp. Law 675 (2005).

A Remedy for the Executive Pay Problem: The Case for "Compensation Discussion and Analysis," 17 App. Corp. Fin. 24 (Fall 2005).

The Rise of Independent Directors in the United States, 1950-2005: Of Shareholder Value and Stock Market Prices, 59 Stan. L. Rev. 1465 (2007) (Recipient of Egon Zehnder prize, European Corporate Governance Institute),  *reprinted in* 2008 CORPORATE PRACTICE COMMENTATOR and THE HISTORY OF MODERN U.S. CORPORATE GOVERNANCE (Brian R. Cheffins, ed, 2011).

The "Prudent Retiree" Rule: What To Do When Retirement Security Is Impossible?, 11 Lewis & Clark L. Rev. 481 (2007) (symposium).

Proxy Contests in an Era of Increasing Shareholder Power: Forget Issuer Proxy Access and Focus on E-Proxy, 61 Vand. L. Rev. 475 (2008) (symposium).

The Rise of Independent Directors in Italy: A Comparative Perspective, Rivista Delle Società, 2008 (conference volume celebrating 50th anniversary).

The Story of *Unocal v. Mesa Petroleum*: The Core of Takeover Law, CORPORATE LAW STORIES (J. Mark Ramseyer, ed.) (2009).

"Say on Pay": Cautionary Notes on the UK Experience and the Case for Shareholder Opt-in, 46 Harv. J. on Legislation 323 (2009).

Confronting Financial Crisis: The Case for a Systemic Emergency Insurance Fund, 28 Yale J. Reg. 151 (2011) (with Christopher Muller).

Corporate Governance and Executive Compensation in Financial Firms: the Case for Convertible Equity-Based Pay, 2012 Colum. Bus. L. Rev. 834.

The Agency Costs of Agency Capitalism: Activist Investors and the Re-valuation of Governance Rights, Columbia Law Review 113 Colum. L. Rev. 863 (2013) (with Ronald Gilson).

Money Market Funds Run Risk: Will Floating Net Asset Value Fix the Problem? (with Christopher M. Gandia), forthcoming, 2014 Colum. Bus. L. Rev., current draft available at http://ssrn.com/abstract=2134995.

Agency Capitalism: Further Implications of Equity Intermediation (with Ronald Gilson), forthcoming in Research Handbook on Shareholder Power (Jennifer Hill & Randall Thomas, eds. Forthcoming 2014), current draft available at http://ssrn.com/abstract=2359690.


UNPUBLISHED WORKING PAPERS

Toward a Theory of Corporate Recapitalizations (with Lewis Kornhauser) (working paper, Jan. 1990).

Corporate Governance and the Transition Costs of Capitalism (working paper, March 1994).

An International Relations Perspective on Corporate Governance: German Shareholder Capitalism and the European Union: 1990-2000 (Columbia Center for Law and Economic Studies and European Corporate Governance Institute Working Paper) (2003), available at http://ssrn.com/abstract=374620) .

Economic Nationalism and Corporate Governance: German Shareholder Capitalism in the European Union (working paper, October 2005).

Avoiding Eight-Alarm Fires in the Political Economy of Systemic Risk Management (with Christopher Muller) (Columbia Center for Law and Economic Studies and European Corporate Governance Institute Working Paper, Feb. 2010), available at http://ssrn.com/abstract=1553880.

The Micro, Macro and International Design of Financial Regulation, with Colin Mayer (Draft of April 2012), available at http://ssrn.com/abstract=2047436.

Systemic Harms and Shareholder Value (with John Armour), (draft of August 2013), available at http://ssrn.com/abstract=2307959.

Banking Union Resolution Without Deposit Insurance: An American Perspective on What It Would Take (with Georg Ringe) (draft, December 2013), available at http://ssrn.com/abstract=2361347.

The Empty Promise of Benefit-Cost Analysis in Financial Regulation (publication expected 2014 in Journal of Legal Studies) (draft, December 2013), available at http://ssrn.com/abstract=2378562.

WORKS IN PROGRESS

The Contestable Claims of Shareholder Wealth Maximization: Evidence from the Airline Industry (working paper, 2009) (under revision) (Yair Listokin, co-author)

THE LAW AND FINANCE OF CORPORATE ACQUISITIONS (joining Gilson, Black, and Whitehead as co-author on 3d edition, expected completion 2014)

PRINCIPLES OF FINANCIAL REGULATION (with John Armour, Dan Awrey, Paul Davies, and Colin Mayer, Oxford Univ. Press, expected completion 2014)

OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (with Georg Ringe, Oxford Univ. Press, expected completion 2014)

FOUNDATION GRANTS

Sloan Foundation, 2000-2006 (individual investigator grant in support of empirical project on shareholder wealth maximization)

ACADEMIC PRIZES

6

Egon Zehnder prize, European Corporate Governance Institute, 2007 (for the best paper "on company boards and their role in corporate governance," awarded for *The Rise of Independent Directors in the United States, 1950-2005: Of Shareholder Value and Stock Market Prices*, 59 Stan. L. Rev. 1465 (2007)).

S̲ELECTED A̲CADEMIC C̲ONFERENCES AND S̲EMINARS

1980-1989

Conference on Commercial Banks and the Securities Industry -- Is the Glass-Steagall Act an Anachronism in the 1980's? (Salomon Brothers Center for the Study of Financial Institutions Nov. 1984) ("Conflicts of Interest: The Need for a Broader View").

Univ. of Pennsylvania Law and Economics Institute (February1985) (draft of "Efficient Markets" paper).

Conference on Modern Investment Theory and the Prudent Man Rule (Salomon Brothers Center for the Study of Financial Institutions November 1986) ("Points of Restraint and Conflict in the Application of the Prudent Man Rule to Contemporary Investment Problems").

Conference on the Economics of Corporate and Capital Markets Law (Harvard Law School Nov. 1986) (draft of "Dual Class Common Stock" paper).

Harvard Law School Law and Economics Workshop (April 1988) (early draft of "Mandatory Structure of Corporate Law" paper).

Conference on Contractual Freedom in Corporate Law (Columbia Univ. Law School Dec. 1988) (organizer of conference; also presented revised draft of "Mandatory Structure" paper; symposium based on conference was published as November 1989 issue of Columbia Law Review).

Univ. of Michigan Law and Economics Workshop (February 1989) (further revised draft of "Mandatory Structure" paper).

Univ. of Chicago Law and Economics Workshop (April 1989) (same).

Tel Aviv Univ. Conference on Legal Theory (May 1989) (draft of "Duties and Markets" paper).

American Association of Law Schools Annual Meeting, Section on Business Associations (January 1990) (draft of "Toward a Theory of Corporate Recapitalizations") (with Lewis A. Kornhauser).

<u>1990-1999</u>

Georgetown Univ. Law and Economics Workshop (October 1990) (draft of "Corporations, Markets, and Courts").

Univ. of Cincinnati Corporate Law Symposium (March 1991) (draft of "Shareholder Initiative" paper).

Conference on "The Future of Corporate Governance," (Columbia Univ. Law School, May 1991) (organizer of conference, also presented comments on "Are There Limits for the Institution as Shareholder?").

Conference on "Relational Investing," (Columbia Institutional Investor Project, May 1993) (draft of "Cumulative Voting Paper").

"Delaware Goes to the Movies -- Recent Legal Developments in Mergers and Acquisitions" (Columbia Law and Economics Center, March 1994) (conference organizer and presenter).

Univ. of Toronto Law and Economics Workshop (March 1994) ("Corporate Governance and the Transition Costs of Capitalism" working paper).

Univ. of Pennsylvania Law and Economics Institute (April 1995) (draft of "Employee Stock Ownership as a Transitional Device").

Boston Univ. Law School Faculty Workshop (November 1995) (draft of "Employee Stock Ownership as a Transitional Device").

Conference on "Employees in Corporate Governance" (Columbia Law School Sloan Project, November 1996) (draft of "Employee Stock Ownership in Economic Transitions: The Case of United Air Lines").

Conference on "Cross Border Views of Corporate Governance" (Columbia Law School Sloan Project/L'Ecole Polytechnique Federale, March 1997) (draft of "Deutsche Telekom, German Corporate Governance, and the Transition Costs of Capitalism").

Conference on Comparative Corporate Governance (Max Planck Institute/Columbia Law School Sloan Project) (May 1997) (draft of Employee Ownership/United Air Lines paper).

Conference on New Trends in Labor Law (NYU Law School) (May 1997) (draft of Employee Ownership/United Air Lines paper).

Conference on Warren Buffet (Cardozo Law School, October 1997) ("'Just Say Never?' Poison Pills, Deadhand Pills, and Shareholder-Approved Bylaw Amendments").

Conference on "Is Corporate Law Converging? (Columbia Law School Sloan Project, December 1997) (co-organizer).

Allen Chair Lecture, T.C. Williams Law School, Univ. Of Richmond (April 1997) ("The Shaping Force of Corporate Law in the New Economic Order").

Conference on Comparative Corporate Law (University of Frankfurt/Columbia Law School, May 1998) (draft of "Two Steps on the Road to Shareholder Capitalism in Germany").

Univ. of Michigan Law and Economics Workshop (December 1998) (draft of "Two Steps on the Road to Shareholder Capitalism in Germany").

Bressler Chair Inaugural Lecture, Columbia Univ. Law School (December 1998) ( "Corporate Law in the New Political Economy").

Univ. of San Diego Law School Political Economy Workship (November 1999) (draft of "The Contestable Claims of Shareholder Wealth Maximization: Evidence from the Airline Industry").


2000-2006

Univ. of Southern California Law and Economics Workshop (February 2000) (draft of "The Contestable Claims of Shareholder Wealth Maximization: Evidence from the Airline Industry").

Columbia-NYU Law and Economics Workshop (November 2000) (same).

University of Virginia Law and Economics Workshop (February 2001) (same).

Vanderbilt Univ. Law and Economics Workshop (February 2001) (same).

University of Pennsylvania Law and Economics Workshop (March 2001) (same).

University of California at Berkeley Law and Economics Workshop (April 2001) (same).

Conference on "Corporations as Producers and Distributors of Rents" (Georgetown-Sloan Project on Business Institutions, October 2001) (Shareholder wealth maximization paper).

Conference on "Global Markets, Domestic Institutions" (Columbia & Center for International Political Economy, October 2001, April 2002) ("Corporate Governance and Transnational Integration: The Evolution of German Shareholder Capitalism in the 1990s").

Univ. of Chicago Conference on "Management and Control of the Modern Business Corporation" (February 2002) ("What Enron Means for the Management and Control of the Modern Business Corporation: Some Initial Reflections").

Boston Univ. Law and Economics Workshop (April 2002) (German shareholder capitalism paper).

German Investor Relations Conference (April 2002) (Frankfurt) ("The Intended And Unintended Consequences of Germany's New Antitakeover Law") (keynote speech).

Annual meeting of American Law and Economics Association (May 2002) (refereed selection process) (Shareholder wealth maximization paper, German shareholder capitalism paper).

Harvard Law School Faculy Workshop (November 2002) ("An International Relations Perspective on Corporate Governance: German Shareholder Capitalism and the European Union:1990-2000").

Univ. of Connecticut Conference on "Crisis in Confidence: Corporate Governance and Professional Ethics Post-Enron" (November 2002) ("Governance Failures of the Enron Board and the New Information Order of Sarbanes-Oxley").

American Ass'n of Law Schools Annual Meeting, section on Pensions and Employment Benefits (January 2003) ("Has Employee Ownership failed at United Airlines?").

Columbia Law School Faculty Workshop (January 2003) ("Economic Nationalism and Corporate Governance: German Shareholder Capitalism and the European Union, 1990-2000".

Univ. of Pennsylvania Symposium on Corporate Control Transactions (February 2003) ("Controlling Controlling Shareholders: New Limits On the Operate, Sale of Control and Freeze-Out Alternatives").

Cornell Law School Conference on "Enron and the Future of U.S. Corporate Law and Policy" (February 2003) (Blame Delaware?: The Delaware Law Roots of the Corporate Governance Crisis).

Univ. of Toronto Law and Economics Workshop (March 2003) ("Economic Nationalism and Corporate Governance: German Shareholder Capitalism and the European Union, 1990-2000").

Univ. of Pennsylvania Law School Roundtable on "Mergers of Equals" (April 2003).

Yale Law School Roundtable on "Recent Legally Induced Changes in Corporate Governance: Necessity and Effectiveness" (May 2003).

Conference on "A Modern Regulatory Framework for Company and Takeover Law in Europe – The Corporate Governance and Takeover Recommendations of the High Level Group of Company Law Experts to the European Commission". (Syracuse, Sicily, May 2003) ("An American Perspective on Anti-Takeover Laws in the EU: A German Example").

Annual meeting of American Law and Economics Association (September 2003) (refereed selection process) (Comparative US/European Anti-Takeover Laws paper)

Fordham Law School Corporate Law Conference (November 2003) ("Boards").

Korea Development Institute Conference on Corporate Governance and Capital Markets in Korea (December 2003) (Seoul, Korea) ("Boards: How a Korean Comparison Clarifies Understanding")

Univ. California Berkeley Law and Economics Workshop (April 2004) ("The Mechanisms of Board Independence").

Columbia Law School Conference on Law, Finance, and Political Economy (April 2004) (co-organizer, with Katharina Pistor).

Columbia Law School Conference on Executive Compensation (October 2004) (co-organizer) ("Executive Compensation: Puzzles, Questions and the Search for the Appropriate Remedy").

Harvard Law School Conference on EU Corporate Law-Making (October 2004) ("Economic Nationalism and Corporate Governance: German Shareholder Capitalism in the European Union").

Stanford Law and Economics Workshop (April 2005) ("Boards").

Yale Law School Conference on Reassessing Director Elections (October 2005) ("Rethinking Cumulative Voting").

Washington Univ. Law School Conference on Corporate Governance (September 2005) ("Executive Compensation: The Case for 'Compensation Discussion and Analysis').

Georgetown Law School Conference on Corporate Governance (October 2005) ("The Rise of Independent Directors").

Columbia Law School Faculty Workshop (February 2006) ("The Rise of Independent Directors").

11

University of Lisbon Faculty of Law Securities Law Institute (March 2006) ("The Case of Strengthening the Role of Independent Directors in Portuguese Corporate Governance").

Columbia Law School Conference on the Law and Economics of Contracts (April 2006) (co-organizer).

York Univ. Business School, Toronto (April 2006) ("Executive Compensation"; "Rise of Independent Directors").

Lewis and Clark Law School Conference on "Baby-Boomer" Retirement  (September 2006) ("Is Retirement Security Possible?"

Columbia Law School Conference on "The Structure of the Corporation" (Nov. 2006) (organizer and paper presenter).

Rivisti Delle Societa 50th Anniversary Celebration (Nov. 2006) ("What Accounts for the Rise of Independent Directors in the United States?").

2007-2010

AALS Section on Business Law (January 2007) ("Stock Market Prices and Independent Directors," paper selected in refereed process).

Columbia Law School conference on Hedge Funds (February 2007) ("The Effect of Informative Stock Prices on the Role of the Board").

Univ. of Virginia Law and Finance conference ("Stock Market Prices and Independent Directors").

American Law and Economic Association Annual Meeting (area organizer) (May 2007).

Stanford-Yale Junior Faculty Forum (area organizer and commentator) (May 2007).

Yale School of Organization and Management conference on "Short-Termism" (June 2007).

Columbia Law School conference marking the 75th Anniversary of the Publication of Adolph A. Berle's and Gardiner Means' *The Modern Corporation and Private Property* (co-organizer, co-author of "The Berle-Means Corporation of the 21st Century").

Vanderbilt Law School workshop (February 2008) ("Issuer Proxy Access and E-Proxy Alternatives").

Fordham Law School workshop (February 2008) ("Berle-Means Corporation of the 21[st] Century").

12

American Law and Economic Association Annual Meeting (program co-chair) (May 2008).

Univ. of Pennsylvania Corporate Law and Economics Workshop (November 2008) ("Berle-Means Corporation of the 21st Century").

Georgetown Univ. Law School Faculty Workshop (Nov. 2008) ("Berle-Means Corporation of the 21st Century").

Cambridge Univ. Center for Corporate and Commercial Law, Conference on Ownership and Control (January 2008) ("Berle-Means Corporation of the 21st Century").

Vanderbilt Law School, Conference on the Future of Federal Regulation of Financial Markets, Shareholder Litigation and Corporate Governance (March 2009) ("Cautionary Lessons from the Financial Crisis about Executive Compensation and Corporate Governance").

IMBEC & St. Gallen Univ. (Sz) Foundation for Law and Economics, Conference on Capital Market Regulation and International Standards in Brazil, the US, the EU and Switzerland (Sao Paulo, April 2009) (Current Developments on the US Mergers Landscape).

Transatlantic Corporate Governance Dialogue (under the auspices of the SEC and the EU) (Washington, DC September 2009) (The Government as Owner/Investor in the United States).

NYU Law School Conference on Executive Compensation (October 2009) ("'Say on Pay' in Executive Compensation").

George Washington Univ. Law School, Conference on Regulatory Response to the Financial Crisis (October 2009) ("An International Perspective on Regulatory Initiatives for Executive Compensation").

Univ. of Virginia Law School workshop (November 2009) ("Avoiding Eight-Alarm Fires in the Political Economy of Systemic Risk Management").

Harvard Law School workshop (November 2009) ("Avoiding Eight-Alarm Fires in the Political Economy of Systemic Risk Management").

AALS Annual Meeting, Section on Business Associations (January 2010) ("Corporate Governance Reform in Financial Firms").

AALS Annual Meeting, Section on Financial Institutions (January 2010) ("Avoiding Eight-Alarm Fires in the Political Economy of Systemic Risk Management") (refereed selection).

Columbia Law School Faculty Workshop (February 2010) ("Avoiding Eight-Alarm Fires in the Political Economy of Systemic Risk Management").

Vanderbilt Conference on Executive Compensation (February 2010) (Comment on "The European Response to Bankers' Pay").

Co-organizer, Columbia Law School Conference on The Financial Crisis: Can We Prevent a Recurrence? (March 2010).

Univ. of Connecticut Conference on Regulating Risk (April 2010) ("Confronting Financial Crisis: the Case for a Systemic Emergency Insurance Fund").

Univ. of Delaware Roundtable on the Government as Shareholder (April 2010) ("Government and Governance").

Univ. of Oxford Law Faculty Workshop (May 2010) ("Confronting Financial Crisis").

Columbia-Univ. of Tokyo Symposium on Mergers and Acquisitions and the Law (June 2010) ("Legal and Structural Barriers to M&A around the World: An Empirical Assessment").

Vanderbilt Conference on Shareholder Litigation (October 2010) (Comment on "Is Delaware Losing Its Cases?").

Univ. of Pennsylvania Law School Faculty Workshop (October 2010) ("Confronting Financial Crisis").

Transatlantic Corporate Governance Dialogue (under the auspices of the SEC and the EU) (Brussels, October 2010) ("Resolution of Failing Financial Firms: Alternative Approaches").

Conference on Empirical Legal Studies (November, 2010) (Comment on "Corporate Financial and Investment Policies in the Presence of a Blockholder on the Board").

Columbia Law School Faculty Workshop (November 2010) ("Executive Compensation and Corporate Governance in Financial Firms").

2011

Brooklyn Law School Symposium on Comparative Approaches to Systemic Risk and Resolution (February 2011) ("Resolution of Financial Firms – Why Dodd-Frank Falls Short")

Columbia-Oxford Pre-Conference on "Corporate Governance After the Financial Crisis" (to prepare for large conference at Oxford in January 2012) (March 2011) (pre-conference co-organizer and discussion co-leader for session on "Are Banks Different?")

Yale Roundtable on Financial Regulation (April 2011) (presenter in session on "'Too Big to Fail and the New Resolution Authority")

European Univ. Inst./Hague Inst. for Int'ntl'zn of Law Conference on "Banking and Finance (April 2011) ("Corporate Governance and Executive Compensation in Financial Firms")

American Law and Economics Annual Meeting (May 2011) ("Corporate Governance and Executive Compensation in Financial Firms: The Case for Convertible Equity-Based Pay")

Columbia Conference on the Delaware Chancery Court (November 2011) ("The Delaware Roots of Executive Compensation Excesses")

Transatlantic Corporate Governance Dialogue (December 2011) (co-organizer; "What is 'Appropriate' Shareholder Engagement – Framing the Issues?")

Federalist Society (December 2011) (The Affirmative Case for the Consumer Financial Protection Bureau)

2012

CLS-Oxford Conference on Corporate Governance After the Financial Crisis (January 2012) (co-organizer; co-author of three presented papers, with John Armour, Ronald Gilson, Colin Mayer)

Pace Law School Faculty Workshop ("Capital Markets, Efficient Risk Bearing and Corporate Governance: The Agency Costs of Agency Capitalism," with Ronald Gilson) (February 2012)

Univ of Texas Law School Conference on Financial Regulation (February 2012) (commentator; presented work-in-progress on Money Market Mutual Funds)

Univ. of Colorado Law School Faculty Workshop (February 2012) ("Capital Markets, Efficient Risk Bearing and Corporate Governance: The Agency Costs of Agency Capitalism," with Ronald Gilson)

Notre Dame Law School Faculty Workshop (April 2012) ("Capital Markets, Efficient Risk Bearing and Corporate Governance: The Agency Costs of Agency Capitalism," with Ronald Gilson)

ETH-NYU Conference on Banking Regulation (April 2012) ("The Micro, Macro and International Design of Financial Regulation," with Colin Mayer)

CLS Project on Investment, Ownership and Control in the Modern Firm (May 2012) (co-organizer) ("The Agency Costs of Agency Capitalism: Activist Investors and the Re-valuation of Governance Rights," with Ronald Gilson)

CLS-Ono Conference (June 2012)  ("The Agency Costs of Agency Capitalism: Activist Investors and the Re-valuation of Governance Rights," with Ronald Gilson)

American Enterprise Institute (June 2012),  Money Market Reform (panelist)

Conference on Empirical Legal Studies (November 2012) ("Money Market Funds Run Risk: Will Floating Net Asset Value Fix the Problem?" (with Christopher M. Gandia).

Transatlantic Corporate Governance Dialogue (December 2012) ("The Corporate Governance of Banks and Other Systemically Important Financial Institutions") (also co-organizer of conference, on theme of "Corporate Governance and Banking Union in Transatlantic Perspective").

2013

Harvard Law and Economics Workshop (January 2013)  ("Systemic Harms and the Limits of Shareholder Value" (with John Armour).

Columbia Law School Faculty Workshop (January 2013) ("Systemic Harms and the Limits of Shareholder Value" (with John Armour).

Oxford Conference on Eurozone Banking Union (April 2013) ("Banking Union Resolution Without Deposit Insurance: An American Perspective on What It Would Take" (with Georg Ringe))

Columbia Law School/Millstein Center for Global Markets and Corporate Ownership Conference on "Changes in Ownership: Beyond the Berle-Means Paradigm" (April 2013) (co-organizer) ("Dual Class Common Stock: From 'Banker-Control' to Protection of Entrepreneurial Vision")

American Law and Economics Ass'n 2013 Annual Meeting ( May 2013) ("Systemic Harms and the Limits of Shareholder Value" (with John Armour)); ("Money Market Funds Run Risk: Will Floating Net Asset Value Fix the Problem?" (with Christopher M. Gandia))

ETH-NYU Conference on Banking Regulation (June 2013) ("Banking Union Resolution Without Deposit Insurance: An American Perspective on What It Would Take" (with Georg Ringe))

Toulouse Institute for Advanced Study Conference on Law and Economics ( June 2013) ("Agent-Focused Strategies in the Control of Systemic Risk: Resolving the Bank Corporate Governance Paradox") (with Patrick Bolton)

Fordham Law School Faculty Workshop (Oct 2013) ("Systemic Harms and the Limits of Shareholder Value" (with John Armour)

Univ. Pennsylvania-Wharton joint Faculty Workshop (Oct. 2013) ("Money Market Funds Run Risk: Will Floating Net Asset Value Fix the Problem?" (with Christopher M. Gandia))

Global Justice Forum, Columbia Law School (Oct. 2013) ("FIRREA as a Tool in Redressing Sub-Prime Fraud").

Univ. Chicago Conference on Benefit-Cost Analysis for Financial Regulation (Oct. 2013) ("The Empty Promise of Benefit-Cost Analysis in Financial Regulation").

Transatlantic Corporate Governance Dialogue (Dec. 2013).

Univ. of Europe at Rome Conference on Corporate Governance (Dec. 2013) ("Activist Investors in an Era of Ownership Reconcentration: Solving the Agency Costs of Equity Intermediation")

SELECTED PRACTITIONER PRESENTATIONS

Univ. of Miami Mergers & Acquisition Institute (February 2000).

Fried, Frank, Harris, Shriver & Jacobsen (April 2001).

On-Line Moderator, Law.com seminars on mergers and acquisitions (spring 2001).

Columbia Law School London CLE program (June 2001).

Cleary Gottlieb Steen & Hamilton CLE program (November 2004).

 ALI-ABA CLE program (December 2004).

NY Society of Securities Analysts (February 2007).

Brazilian Institute on Business Law (February 2007).

Conference Board annual conference on Executive Compensation (June 2007).

Baruch College seminar series on Corporate Governance (June 2007).

17

Institutional Investor Education Foundation conference on Institutional Activism (December 2008).

NYU Center for Labor & Employment Law, conference on New Initiatives in Regulating Executive Compensation (October 2009).

TIAA-CREF and National Association of Corporate Directors (NY Chapter) conference on "Say on Pay" (October 2009).

NY State Bar Ass'n-Canadian Bar Ass'n Joint Meeting, Panel on US-Canada Approaches to M&A (March 2012)

NYSE Board-Shareholder Forum (June 2013)

SELECTED SHORT PRACTITIONER-ORIENTED ARTICLES

Reviewing The New Merger Accounting Regime, New York Law Journal, 7/19/2001, p.1.

Published Commentary

"Why Investors Should Worry About Money Funds," Wall. St. J., June 4, 2011, p. C7.

GOVERNMENT TESTIMONY

Securities Exchange Commission, Hearings on Dual Class Common Stock, December 1986.

Senate Committee on Banking, Housing, and Urban Affairs, Hearings on Money Market Funds, June, 2012 (invited written submission).

SEC COMMENT LETTERS

Comment Letter filed on SEC Money Market Fund Proposal, September 2009.

Comment filed on SEC Money Market Fund Proposal, August 2011.

Comment filed on Federal Stability Oversight Council Money Market Fund Reform Proposals, February 2013.

OTHER PROFESSIONAL ACTIVITIES

Member, American Law Institute.

Advisor to Restatement (Third) of Trusts: Prudent Investor Rule (ALI Project).

Director, American Law and Economics Association, 2008-2011.

Member, Securities Law Committee, Association of the Bar of the City of New York, 2001-04.

Member, Columbia Univ. Advisory Committee on Socially Responsible Investing, 2002- 2004 (Chair, Spring 2004).

Member, Corporate Law Committee, Association of the Bar of the City of New York, 1986-89.

Secretary, Ad Hoc Committee on Corporate Takeover Legislation, Association of the Bar of the City of New York, 1988-90.

Chair, Section on Business Associations, American Association of Law Schools, 1989.

Chair, Section on Law and Economics, American Association of Law Schools, 2000.

Program Co-Chair, American Law and Economics Association 2008 Annual Meeting, 2008.

PRIOR EMPLOYMENT

1982-1988, Assistant Professor through Professor of Law, New York University.

l979-1981, attorney in U.S. Treasury Department, Washington, D.C. Attorney-advisor in office of Assistant General Counsel (Domestic Finance); Special Assistant to the General Counsel. Exceptional Service Award, Dep't of Energy.  Major project areas: Chrysler, synfuels, and NYC loan guarantee programs; drafting of financial institutions deregulation legislation; oversight of CFTC regulation of financial futures trading.

1976-l979, associate at Cleary, Gottlieb, Steen & Hamilton, New York, New York.  Corporate and securities litigation and negotiation; general appellate practice.

l975-l976, law clerk to the Hon. William E. Doyle, U.S. Court of Appeals, 10th Cir., Denver, Co.

Summer, l974, summer associate at Wilmer, Cutler & Pickering, Washington, D.C.

Summer l973 and 1971-1972, newspaper reporter, Rocky Mountain News, Denver, Co.

EDUCATION

Harvard Law School, Cambridge, Mass., J.D. magna cum laude l975.

19

Senior articles editor, Harvard Civil Rights-Civil Liberties  Law Review (Vol. 10).
Tutor in Law, Adams House in Harvard College.

Yale University, New Haven, Conn., B.A. magna cum laude l97l.
Phi Beta Kappa; Managing Board, Yale Daily NEWS; John Spangler Nicholas Prize

PERSONAL

Born June 18, 1949 in Richmond, Va.

Bar Admissions: New York, November, l977; District of Columbia, January 1981

Member, NYC Bar Ass'n; Am. Bar Ass'n; Am. Econ. Ass'n, Am. Law & Econ. Ass'n

Listed in Who's Who in America

01/14

20

**Exhibit B**

**Affidavit of Jeffrey N. Gordon -- Materials Relied Upon**

Second Consolidated Verified Amended Complaint, In Re Abbott-Depakote Shareholder Derivative Litigation ("the SAC")

Memorandum Opinion and Order by Judge Virginia Kendall sustaining the SAC

*United States v. Abbott Laboratories,* Civil Settlement Agreement, May 2012.

Corporate Integrity Agreement between OIG of HHS and Abbott Laboratories, May 2012.

*United States v. Abbott Laboratories,* Agreed Statement of Facts, May 2012

Separation and Distribution Agreement between AbbVie, Inc. and Abbott, Nov. 2012

Abbott Public Filings, including Form 10K's (and 10K/A's) for 2012, 2011, 2010; Form 14A's for 2012, 2011, 2010; Form 10Q's in 2012, 2011, and 2010; Form 8K's in 2012, 2011, and 2010.

Abbott Corporate Governance documents available on Company website, include Code of Business Conduct, Audit Committee Charter, Public Policy Committee Charter