# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE ABBOTT- DEPAKOTE         )      **CASE NO. 1:11-cv-08114**
SHAREHOLDER DERIVATIVE LITIGATION )
                                    )      **Hon. Virginia M. Kendall**
                                    )

### AFFIDAVIT OF R. ALAN MILLER IN SUPPORT OF
### LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL
### OF DERIVATIVE ACTION SETTLEMENT

### INTRODUCTION AND SUMMARY OF OPINION

1.      I have been retained by Lead Plaintiff's Counsel for the purpose of consulting

on corporate governance and economic issues, and providing my expert economic evaluation

and analysis of the Corporate Governance Reforms (the "Reforms") agreed to by the Board of

Directors (the "Board") of Abbott Laboratories ("Abbott") in connection with the proposed

settlement of this litigation (the "Litigation") as reflected in the Stipulation of Settlement (the

"Proposed Settlement").   Specifically, I have been asked to derive an economic value of the

Reforms which are designed to strengthen the Board's governance and to avoid a recurrence of

legal and regulatory compliance actions similar to those brought by the U.S. Government and

several states that led to this Litigation.

2.      In my opinion, the value of the benefits to Abbott and its shareholders from the

Proposed Settlement of the Litigation is a **minimum** of $800 million because, as discussed

below, the Reforms will reduce the likelihood of such violations and they will provide

significant value to Abbott and its shareholders,  My opinion is based on my education,

knowledge, and professional experience including that of assisting in negotiating, structuring

1

and evaluating numerous settlements of securities litigation matters and the valuation of businesses.

## BACKGROUND AND QUALIFICATIONS

3.     I am President of Philadelphia Investment Banking Company ("PIBC") and am submitting this Affidavit summarizing my opinions in this matter.

4.     A copy of my résumé is attached as Exhibit A hereto to outline my education, professional experience and expertise.  I have testified at trial or hearings thirty-four (34) times;  I have been qualified or accepted as an expert on the operations of the securities market, damages, materiality issues, investment banking practices, valuations and related corporate finance matters in numerous federal and state courts nationwide beginning in 1977.  I have provided many depositions and submitted numerous Declarations, Affidavits, and Reports on matters in these areas, including many dealing with investment banking practices, evaluations of securities, business interests, and companies, materiality and damage questions and/or the factors relevant to such studies.

5.     PIBC and I have provided a wide range of corporate finance services to clients. These services include raising capital through private placements of debt and equity financings; advisory services concerning public offerings of securities, merger, acquisition and divestiture advisory services, evaluation and economic analysis services, consulting and litigation support, and other advisory services.

6.     PIBC and its staff perform a considerable amount of work in the area of evaluation of businesses and securities and the factors involved in such evaluation.  These are done on a formal basis for a wide variety of purposes, as well as continuously on an informal

basis in the process of performing our corporate finance functions such as raising capital, assisting in mergers and acquisitions, and providing advisory, litigation support and expert services. The factors used in such evaluations and their importance and materiality to the investment community are areas in which I have developed expertise and have had substantial experience over the last 41 years. Additionally, we have prepared a substantial number of analyses of market impact and damages in connection with numerous shareholder litigations.

7.      I have also provided testimony during both trials and depositions involving the determinations of values of companies and/or securities based on actual situations and/or hypothetical assumptions, as well as the determination of materiality.

8.      Finally, I have also provided quantifiable economic analyses of corporate governance improvement measures in the settlement of shareholder derivative litigation. In a matter similar in some ways to this Litigation, I submitted a Declaration on behalf of the plaintiffs' counsel in which I analyzed and evaluated the corporate governance improvement measures, in terms of the value to the Archer-Daniels-Midland Company and its public shareholders, which the company's Board of Directors agreed to adopt as part of the settlement of a shareholder derivative action. (*Felzen, et al. v. Andreas, et al.*, Case No. 95.2279 (C.D. Ill.). Judge Baker, in finding "that the settlement is fair, reasonable, and adequate," stated that "I rely on what Professor Coffee has said and what Alan Miller, the statements made by Miller in support. I respect them as experts."

9.      Also, I submitted a Declaration in February of 2005 regarding the quantification of the value of the corporate therapeutics settlement of *In re Abbott Laboratories, Inc.*

*Derivative Shareholder Litigation*, Civil Action No. 99 C 72466735 (N.D. Ill.) which was relied upon by Judge Moran in approving the settlement of that litigation.

10.     I received a B.S. in Economics from Cornell University in 1970, and a Masters in Business Administration (major in Financial Accounting) from the Wharton School of Finance and Commerce of the University of Pennsylvania in 1973. I have attended various Practising Law Institute and similar programs and seminars on topics such as corporate finance and due diligence.

11.     I have actively worked in the investment banking field for 41 years. My work experience includes:

> • Howard & Co., a corporate finance research and consulting firm, Philadelphia, 1972 to 1976. Performed research, writing and consulting on a wide range of corporate finance topics including bank debt, long term debt—private and public, mergers and acquisitions, equity capital—private and public, going public, being public, *etc*. Topics included cost of each type of capital or project, terms, advantages and disadvantages to issuer and financing party, sources of capital, roles of participants (agents, underwriters, counsel, accountants, rating agencies, regulators, issuers, sources of financing), time to accomplish tasks, *etc*. Such research included a detailed and comprehensive study of 550 IPO's that had occurred in the five years prior to 1973; issues studied included determination of required disclosures, materiality, due diligence practices and procedures, terms and pricing, roles of participants, costs, timing, other issues that arose. Authored and/or edited numerous articles in a series of newsletters on above topics and prepared research for presentation at seminars and to clients. Consultation to clients on corporate finance projects and issues.

> • Butcher and Singer, a major regional investment banking firm headquartered in Philadelphia, corporate finance department 1976 to 1980. Performed corporate finance functions for investment banking/brokerage firm. Work included private placements and public offerings of debt and equity securities, merger and

acquisition work, evaluations, fairness opinions, tender offer management, creating and structuring leasing transactions, corporate finance advisory and consulting work. Early work on "securitization" financing structures of leasing transactions for railroad and municipal equipment. Obtained professional license as registered representative.

- Philadelphia Capital Advisors, a corporate finance services group of Philadelphia National Bank, 1980 to 1983. Continued corporate finance functions, except for public offering activities, for a wide range of clients. Supervised and instructed other group members.

- Philadelphia Investment Banking Company, a corporate finance services firm, 1983 to present. Continued corporate finance activities and expert litigation support.

12.    In preparation of this Affidavit, in addition to reviewing and analyzing the Reforms, I reviewed the following:

- Second Consolidated Verified Amended Shareholder Derivative Complaint

- Abbott's Corporate Governance Guidelines, Board Committee Charters, and Code of Business Conduct

- Abbott's Forms 10-K and Proxy Statements

- Numerous business press and investment community articles and research and analyses of board structure and composition, corporate governance, and effects on company performance and shareholder value

- Brokerage firm securities analyst reports on Abbott

- Affidavit of Jeffrey N. Gordon In Support of Lead Plaintiff's Motion for Final Approval of Derivative Action Settlement

- Smith, Michael P., Shareholder Activism by Institutional Investors: Evidence from CalPERS. Journal of Finance, Vol. 51, No. 1, March 1996.

- Gompers, Paul A. and Ishii, Joy L. and Metrick, Andrew, Corporate Governance and Equity Prices. Quarterly Journal of Economics, Vol. 118, No. 1, February 2003.

- Bebchuk, Lucian A. and Cohen, Alma and Ferrell, Allen, What Matters in Corporate Governance? <u>Review of Financial Studies</u>, Vol. 22, No. 2, February 2009.

- Cremers, Martijn and Ferrell, Allen, Thirty Years of Corporate Governance: Firm Valuations and Stock Returns. Working Paper, November 2009.

- Klapper, Leora F. and Love, Inessa, Corporate Governance, Investor Protection, and Performance in Emerging Markets. World Bank Policy Research Working Paper 2818, April 2002.

## EVALUATION OF TERMS OF SETTLEMENT

13.    To my understanding, the benefits to Abbott from the Proposed Settlement include the following:

(a).    Adoption and implementation of the Reforms, the purpose of which (from an economic viewpoint) is to significantly reduce or eliminate the likelihood of recurrence of the types of conduct by the Company which led to the Government's civil and criminal actions and associated financial consequences; and

(b).    Ending the very considerable expense, loss exposure, reputational harm, and management distraction which would be caused if the Litigation continued.

14.    In addition to the implementation of the Reforms, the Settlement Agreement provides that Abbott will fund the corporate governance improvement activities as necessary. The commitment to fund these activities is straightforward, and the <u>benefits</u> of this funding are likely to well exceed the cost to fund the relevant activities of the Board and management and their consultants, experts, and others.    To the extent these activities reduce the likelihood of

recurrence of the type of action which led to the Litigation, they increase the value of the Reforms substantially in excess of their cost.

### A.     Calculation of Damages

15.     In determining the value of the Reforms, I first determined the financial damage to Abbott as a result of the wrongdoing by the Defendants as alleged by the Government in its action and Lead Plaintiff in the Litigation. In determining damages to Abbott, I utilized a direct out-of-pocket costs damage analysis which is discussed below.

Direct Out-of-Pocket Costs:     The Company's settlement with the U.S. Government and certain States in May of 2012 required it to make total payments of $1.6 billion. Settlements of similar charges in 2010 cost another $165 million. In addition, to provide a complete picture of the entire exposure to Abbott as a result of the illegal and wrongful conduct concerning the off-labeling marketing of Depakote, the legal expenses incurred in both defending against the Government and this shareholder action, the substantial distraction of management attention caused by defending and dealing with these matters, and any reputational harm caused to Abbott should be added to the direct costs. Thus, Abbott's minimum direct out-of-pocket cost is $1.6 billion.

### B.     The Economic Value of the Reforms to Abbott

16.     The benefits of avoiding the costs referred to above can be measured by quantifying the benefits of avoidance of such costs in the future. To derive an economic value from avoiding a recurrence of these regulatory/compliance and legal actions and their costs, a percentage probability must be assigned to the likelihood of their recurrence, with and without

the Reforms. This is a commonly accepted economic analysis technique known as expected value analysis, or as rational expectations analysis.

This technique is a basic economic tool often used to measure the value of events with multiple possible outcomes. To apply it, one must determine the cost of an event if it does occur, then assign a (percentage) factor to indicate its likelihood of occurrence. If (as in this case) there are two different likelihoods of occurrence given two different sets of assumptions (before and after implementation of the Reforms), one can measure the difference between them as the cost of the event it if does occur, multiplied times the difference between the likelihood factors. This expected value analysis technique is taught in basic economic courses. It is used constantly by participants in the financial markets, both explicitly and implicitly, as a regular part of quantifying the likely effect on companies or entities of various possible future events, and as a means of reducing risks of various events occurring to dollar values. I have used this technique as the basis for determining alternative values as a basis for damages in numerous litigation matters, including in testimony which became the basis for awards by fact finders.

Considering the extensive nature of the violations of law at issue, the level of the personnel purportedly involved, the length of time over which they repeatedly occurred, it is difficult to believe the alleged violations of law and FDA regulations would have come to light absent the whistleblowers' allegations and subsequent actions by the Government, with its attendant costs. With the implementation of the Reforms to ensure, among other things, the effectiveness of legal and regulatory oversight as a result of the Settlement, recurrence seems much less likely and more difficult to achieve.

17.     To express the value of the Reforms, we estimate the probability of recurrence of the wrongdoing without the Reforms and subtract from that the probability of recurrence with the Reforms in place. In my opinion, a fair, conservative estimate of the difference between likelihood of recurrence and not is approximately 50%; that is 75 to 85% chance of recurrence [80% midpoint] without reforms minus perhaps 25 to 35% [midpoint 30%] with effective reforms. Thus, in quantifying the economic value of the Reforms to Abbott under the expected value methodology using the direct out of pocket costs analysis ($1.6 billion), we multiply the cost to the Company of recurrence ($1.6 billion) by 50% (the differential in likelihood of recurrence due to reforms) for a result of $800 million minimum in value to Abbott.

18.     In determining our estimate of the proper percentage likelihood of recurrence of the wrongdoing, I note the following from Professor Gordon's Declaration:

> In my opinion, the Reforms embodied in the Proposed Settlement will significantly strengthen Board oversight of Abbott's compliance with the federal, state, and foreign government regulatory regimes for the sale of drugs, nutritional products, medical devices and medical products and will produce other improvements to internal compliance and accountability. . . . . The result of the governance changes in the Reforms will be to reduce the possibility of recurrent wrongful corporate conduct by Abbott as evidenced by the guilty plea and $1.6 billion in fines and forfeitures paid out in the May 2012 settlement of U.S. government and state charges, and by settlements of cases making similar allegations in 2010 costing approximately $165 million. Because of the financial and franchise risks to the Company from further violations of the applicable regulatory regimes, these Reforms will thus provide significant value for the Company and its shareholders.

19.     We performed a search of academic literature, and trade and business press and investment community publications, to attempt to determine if there was published information

bearing on the value of improving corporate governance and/or providing a framework within which to compare the Abbott settlement provisions. Below are summaries of the authoritative articles and treaties which I rely on in support of my conclusion:

(a) An article which appeared in The Journal of Finance, Vol. LI, No. 1, March 1996, entitled "Shareholder Activism by Institutional Investors: Evidence from CalPERS" by Michael P. Smith (Exhibit B). I believe the article is instructive in that it measures shareholder wealth effects of improved corporate governance structures and procedures, and concludes that "Shareholder wealth increases for firms that adopt [improved corporate governance] or settle and decreases for firms that resist" (from the Abstract). The article concludes "Overall, the evidence indicates that shareholder activism is largely successful in changing governance structure and, when successful, results in a statistically significant increase in shareholder wealth."

(b) An oft-cited article, "Corporate Governance and Equity Prices", that appeared in the Quarterly Journal of Economics (2003) by Gompers, Ishii, and Metrick (Exhibit C). Their study shows a linkage between shareholders' rights and stock returns. The authors note that:

> Shareholder rights vary across firms. Using the incidence of 24 governance rules, we construct a "Governance Index" to proxy for the level of shareholder rights at about 1500 large firms during the 1990s. An investment strategy that bought firms in the lowest decile of the index (strongest rights) and sold firms in the highest decile of the index (weakest rights) would have earned abnormal returns of 8.5 percent per year during the sample period. We find that firms with stronger shareholder rights had higher firm value, higher profits, higher sales growth, lower capital expenditures, and made fewer corporate acquisitions.

(c) An article titled "What Matters in Corporate Governance" (Exhibit D) which was authored by Bebchuk, Cohen, and Ferrell, refines the analysis in the Gompers study. In their

focus on six corporate governance provisions (of the 24 listed in Gompers) and similarly conclude that "increases in the index level are monotonically associated with economically significant reductions in firm valuation as well as large negative abnormal returns during the 1990-2003 period". This article appeared in The Review of Financial Studies in 2009.

(d)    Cremers and Ferrell 2009 working paper entitled "Thirty Years of Corporate Governance: Firms Valuations and Stock Returns" (Exhibit E). While the Gompers article focused on corporate governance and stock returns during the ten-year period of the 1990s, Cremers and Ferrell further expand the Gompers analysis to a 30-year period from 1978 to 2007, and reach the same conclusions.

(e)  The World Bank in 2002 published a working paper by Klapper and Love entitled "Corporate Governance, Investor Protection, and Performance in Emerging Markets" (Exhibit F) in which the authors observed that "better corporate governance is associated with higher operating performance (ROA) and higher Tobin's-Q".[1]   The authors noted that good governance is classified into seven categories: discipline, transparency, independence, accountability, responsibility, fairness, and social awareness. The conclusion of the authors, as in the preceding articles, is that higher corporate integrity leads to higher valuation.

## CONCLUSION

20.    In my opinion, the Reforms embodied in the Proposed Settlement will significantly strengthen, among other things, Board oversight of Abbott's legal and regulatory compliance with the various federal and state marketing and reimbursement regimes and other

---

[1] According to Footnote 11 in the World Bank paper, "Tobin's-Q is defined as the market value of assets (calculated as book value of assets minus book value of equity plus market value of equity) over book value of assets, and return on assets (ROA) is defined as net income over total assets."

regulatory mandates. The value of the benefits to Abbott and its shareholders from the Proposed Settlement of the Litigation is a **minimum** of $800 million because the Reforms will significantly reduce the likelihood of such costly violations in the future.

_R. Alan Miller_

R. Alan Miller, President
Philadelphia Investment Banking Company

Villanova, Pennsylvania
April 17, 2014

12

# EXHIBIT A

# PHILADELPHIA INVESTMENT BANKING COMPANY

### R. ALAN MILLER

<u>President</u>

Mr. Miller was a founder of PIBC in September of 1983. A summary of PIBC's services is attached.

From November of 1980 until the formation of PIBC, Mr. Miller served as Senior Vice President of Philadelphia Capital Advisors, the corporate finance services division of the Philadelphia National Bank. At Philadelphia Capital Advisors, Mr. Miller was responsible for corporate finance activities, including private placements of debt and equity capital; mergers, acquisitions and divestitures; financial consulting, evaluation and expert witness services; leasing and other alternate sources of capital; and for providing assistance and advice to PCA's staff on their projects.

Prior to joining Philadelphia Capital Advisors, Mr. Miller was Vice President, Corporate Finance at Butcher & Singer, Inc., an investment banking firm based in Philadelphia, from 1976 to 1980. At Butcher & Singer his duties included private placements of debt and equity capital; mergers and acquisitions; public offerings of securities; leasing, evaluations, financial consulting and expert witness assignments.

From 1972 to 1976 Mr. Miller was a Senior Associate and General Manager with Howard & Co., a Philadelphia based financial consulting company. Assignments there included research and consulting on a wide range of corporate finance topics. Mr. Miller also edited and wrote many of the articles for a series of newsletters on corporate finance published by Howard & Co.

Mr. Miller received a B.S. in Economics from Cornell University in 1970 and an M.B.A. in Financial Accounting from the Wharton School of the University of Pennsylvania in 1973. He served in the United States Marine Corps Reserve from 1970 through 1976. Mr. Miller has authored several articles on various corporate finance topics and has been a guest lecturer at the Wharton School and La Salle University. He currently lives in Wayne, Pa.

## PHILADELPHIA INVESTMENT BANKING COMPANY

### Summary of Services

The following are specific categories of PIBC services.  All situations are unique; we invite your inquiries as to our capabilities.

FINANCINGS

      Private debt and equity financings
      Joint ventures
      "Operational" or trade financing
      Marketing/distribution arrangements as capital sources
      Public offerings--advisory
      Leasing and "managed" equipment financing
      Other specialized financings

EVALUATIONS AND ECONOMIC ANALYSES

      Litigation consulting and support
      General business valuations
      Merger, acquisition and divestiture analyses
      Shareholder representation
      Fairness opinions
      Estate or gift tax; estate planning
      Marital or property settlement; other dispute resolution
      ESOP transactions/annual evaluations; corporate repurchases
      Recapitalizations
      Assistance to fiduciaries
      Offeree representative, prospective investor analysis

MERGERS AND ACQUISITIONS, LEVERAGED AND MANAGEMENT BUYOUTS

REFINANCING, TURNAROUND "PROJECT MANAGEMENT" AND WORKOUT FINANCING; BANKRUPTCY PLANS

TRUSTEE/FIDUCIARY, ASSET MANAGER ASSIGNMENTS

CORPORATE FINANCIAL ADVISORY; CONSULTING; "WORKING DIRECTOR" ASSIGNMENTS

# R. ALAN MILLER

## Expert Witness Testimony in Court

1. <u>Vadakin v. Vadakin.</u> State Court of Ohio Court System, Marietta, Ohio, 1977.

2. <u>Baer v. Fidelco Growth Investors.</u> Court of Common Pleas, Montgomery County, PA, 1978.

3. <u>Shanno v. Magee Industrial Enterprises, Inc.</u> United States District Court for the Eastern District of Pennsylvania. Civil Action 79-2038, J. Fullam, October 12, 1983.

4. <u>Raymond K. Peil v. Speiser, et al.</u> (Health-Chem Securities Litigation). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 82-1289, J. O'Neill, April 1985.

5. <u>Gordon McShane, et al. v. Pennwalt Corporation, et al.</u> United States District Court for the Eastern District of Pennsylvania. Civil Action No. 85-6020, J. Ludwig, March 10, 1986.

6. <u>Harry Lewis v. John D. DePaul, et al.</u> (Lehigh Press Litigation). Court of Common Pleas, Philadelphia County, PA. Civil Action No. 4760, November Term, 1986. March 5, 1987.

7. <u>California Natural v. Nestle.</u> United States District Court for the District of New Jersey, J. Brotman, June 1987.

8. <u>GCA Corporation Securities Litigation.</u> United States District Court for the District of Massachusetts, Master File No. 85-4693-c, J. Caffrey. October 1987.

9. <u>Van de Walle v. Unimation, et al.</u> Court of Chancery of the State of Delaware, New Castle County. Civil Action No. 7046, Vice Chancellor Jack B. Jacobs, February and April 1989.

10. <u>U.S. Healthcare Securities Litigation.</u> United States District Court for the Eastern District of Pennsylvania. Civil Action No. 88-0559, J. McGlynn, April 1989.

11. <u>California Natural v. Nestle.</u> United States District Court for the District of New Jersey (Camden). J. Brotman. April 1989.

12. <u>IA Holdings Corporation Dissenter's Appraisal Action.</u> Court of Common Pleas, Delaware County, Pennsylvania. Civil Action 86-14981, J. Lawhorne, October 1989.

R. Alan Miller / Expert Witness Testimony in Court / Page 2

13. Kulicke & Soffa Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Master File No. 86-1656, J. Ditter, March 1990.

14. McKinley Allsopp, Inc. v. Jetborne International, Inc. United States District Court for the Southern District of New York. 89 CIV. 1489 (DNC), J. Leval, May 1990.

15. Kay Jewelers Securities Litigation. United States District Court for the Eastern District of Virginia, Alexandria Division. Civil Action No. 90-1663-A through 90-1688-A, J. Bryan, June 1991.

16. Pennsylvania Enterprises Securities Litigation (Lindner Fund, et al. v. Pollock, et al.). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 91-6901, J. VanArtsdalen, December 1991.

17. O & M Investment Partners v. Windon, et al. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 91-CV1970, J. Robert F. Kelly, September 1992.

18. National Media (Derivative) Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 90-8113, J. Bechtle, November 1992.

19. First Pennsylvania Securities Litigation (Grossman v. First Pennsylvania Corporation, et al.). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 89-9234, J. Brody, July 1993.

20. In the Matter of R. Glen Fenstermacher, et al., Debtors. United States Bankruptcy Court for the District of New Jersey. Case No. 93-13041, J. Wizmur, July 1993.

21. Sunkyong America, Inc. v. Omega Sports, Inc. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 93-CV-5355, J. Van Antwerpen, September 1994.

22. Geriatric & Medical Centers Securities Litigation (Hoffman v. Geriatric & Medical Centers, Inc., et al.). United States District Court for the Eastern District of Pennsylvania. Civil Action No. 93-CV-2129, J. Fullam, May and June, 1995.

23. U.S. Banknote Securities Litigation (Vladimir v. U.S. Banknote and Morris Weissman). United States District Court for the Southern District of New York. 94 Civ. 0255(MGC), J. Cedarbaum, January 1997.

R. Alan Miller / Expert Witness Testimony in Court / Page 3

24. Lewin, et al. v. Saidel, et al. (MetroBank Proxy/Securities Litigation). Court of Common Pleas, County of Philadelphia, PA. No. 96-04-SD-0015. J. Levin, November 1997.

25. Kenney (as Ch. 11 Trustee for Daisy Systems Corp., et al.) v. Bear Stearns & Co., Inc. United States District Court for the Northern District of California, Oakland Division. No. C92-1845-DLJ, J. Jensen, April 1998.

26. Alpha Group Consultants, Ltd., et al., and Pension Reserves Investment Trust Fund of the Commonwealth of Massachusetts v. Bear Stearns & Co., Inc. United States District Court for the Southern District of California. Case No. CV-91-00143-IEG, J. Gonzalez, July and August, 1998.

27. Fightertown Entertainment, Inc. v. Robertson, Stephens & Company, et al. Superior Court of the State of California In and For the County of Orange. No. 750511, J. Kline, October 1998.

28. First Pension Cases I—Murray v. Belka. Superior Court of the State of California In and For the County of Orange. No. 740706, J. Firmat, April 2000.

29. Krogman, et al. v. Sterritt, et al. (Continental Investment Corp. Securities Litigation). United States District Court for the Northern District of Texas. Civil Action No. 3-98-CV 2895-T, J. Lynn, November 2000.

30. Heiser, et al., v. Southeastern Pennsylvania Transportation Authority. City of Philadelphia Court of Common Pleas. Case No. 9907-3167, J. Shepard, December 2002.

31. PolyMedica Corp. Securities Litigation. United States District Court for the District of Massachusetts, Civil Action No. 00-12426 REK, J. Young, March 23, 2006.

32. Blecker vs. Aspen Technology, Inc. et al. Commonwealth of Massachusetts Superior Court—Suffolk, Civil Action No. 06-2357, J. Fabricant, November 18, 2009.

33. Sawant, et al. v. Ramsey, et al. (Host America Securities Litigation). United States District Court, District of Connecticut. Civil Action No. 3:07-cv-00980 (VLB), J. Bryant, June 14 and 15, 2012.

34. Edgewater [Capital] v. H.I.G. Capital, Inc. In the Court of Chancery of the State of Delaware, C.A. #3601-VCS, Chancellor Strine, October 9, 2012.

R. ALAN MILLER

Deposition and Arbitration Testimony

The following list is of matters in which I have given testimony at deposition or in arbitration since January 1, 1990.

Depositions

1. Shearson/Indian Wells Securities Litigation. United States District Court for the Western District of Washington at Seattle. No. C88-695WD, May 14, 15 and 16, 1990.

2. Kay Jewelers Securities Litigation. United States District Court for the Eastern District of Virginia, Alexandria Division. Civil Action No. 90-1663-A through 90-1688-A, May 15, 1991.

3. Rospatch Securities Litigation. United States District Court for the Western District of Michigan, Southern Division. No. 1:90-CV-805, February 4, 1992, March 6, 1992.

4. National Media (Derivative) Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 90-8113, October 21, 1992.

5. Federal Express Securities Litigation. United States District Court for the Western District of Tennessee. Master File No. 90-2359-4B, November 24, 1992.

6. Gillette Securities Litigation. United States District Court for the District of Massachusetts. Civil Action No. 88-1858-K, March 12 and 26, 1993.

7. HBO & Co. Securities Litigation. United States District Court for the Northern District of Georgia, Atlantic Division. Civil Action No. 1:87-CV-657A-JTC, May 6, 1993.

8. American Dental Laser Securities Litigation. United States District Court for the Eastern District of Michigan, Southern Division. Master File No. 92-CV-71917-DT, August 3, 11, 18, and 31, 1993.

9. Mesa Petroleum Securities Litigation. United States District Court for the Northern District of Texas, Dallas Division. Case No. 3:91-CV-2376-x, March 28, 1994.

10. Geriatric and Medical Centers Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Civil Action Nos. 92-CV-5113 and 93-CV-2129, October 10 and 20, 1994.

R. Alan Miller / Deposition and Arbitration Testimony / Page 2

11. Moore Medical Corporation Securities Litigation. United States District Court for the Southern District of New York. Civil Action No. 91 Civ. 3701 (ML), November 3 and 4, 1994.

12. Cellcor Securities Litigation. Court of Chancery of the State of Delaware in and for New Castle County. Civil Action No. 12725, April 12 and 13, 1995.

13. New America Securities Litigation. United States District Court for the District of Massachusetts. Civil Action No. 90-10782-MA, May 11 and 12, 1995.

14. U.S. Banknote Securities Litigation. United States District Court for the Southern District of New York. Civil Action No. 94 Civ. 0255(MGC), February 23, 1996.

15. U.S. Wireless Data Securities Litigation. United States District Court for the District of Colorado. Civil Action No. 94-2-2258, April 9, 1996.

16. Bay Financial Corporation Securities Litigation. United States District Court for the District of Massachusetts. Civil Action Master File No. 89 2377-WD, April 18 and 19, 1996.

17. American Mobile Systems, Inc. Securities Litigation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 92-1782, May 21, 1996.

18. Clinicorp Securities Litigation. United States District Court for the Southern District of Florida--West Palm Beach Division. 94-8163-CIV-RYSKAMP, July 9, 1996.

19. Circle K Bankruptcy Litigation. United States Bankruptcy Court for the District of Arizona. Bankruptcy Court Nos. 90-5052-PHX-GBN to 90-5075-PHX-GBN Jointly Administered, Advisory Proceeding No. 93-1123, August 8, 1996.

20. People's Bank Securities Litigation. United States District Court, District of Connecticut. Civil Action No. B-90-600 (JAC), February 5 and 6, 1997.

21. Castle Pines Securities Litigation. District Court, County of Douglas, Colorado. Civil Action No. 91-CV-429, Division 2, August 21, 1997.

22. Thomas P. Jasin v. Brown & Company Securities Corporation. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 96-CV-6872, October 31, 1997.

23. Goldfine v. Steinberg, et al. (Shearson) Litigation. Circuit Court of Cook County, Illinois. No. 93L5223, February 11 and 12, 1998.

R. Alan Miller / Deposition and Arbitration Testimony / Page 3

24. Kenney (as Ch. 11 trustee for Daisy Systems Corp., et al.) vs. Bear Stearns & Co., Inc. United States District Court for the Northern District of California, Oakland Division. Case No. C-92-1845-DLJ, March 20, 1998.

25. Rolite, Inc. v. Wheelabrator Environmental Systems, Inc. and WMX Technologies, Inc. United States District Court for the Eastern District of Pennsylvania, No. 94-CV-5894, April 29, 1998.

26. Alpha Group Consultants, Ltd., et al., and Pension Reserves Investment Trust Fund of the Commonwealth of Massachusetts v. Bear Stearns & Co., Inc. United States District Court for the Southern District of California, Case No. CV-91-00143-IEG (JAH), July 8, 1998.

27. Fightertown Entertainment, Inc. v. Robertson, Stephens & Co. Superior Court of the State of California for the County of Orange, Case No. 750511, August 6 and 7, 1998.

28. Kidder Peabody Securities Litigation. United States District Court for the Southern District of New York, Master File Civil Action No. 94-CV-3954 (BSJ) (MHD), January 28, 1999 and February 18, 1999.

29. Micrion Corporation Securities Litigation. United States District Court for the District of Massachusetts, No. 96-11596-REK, May 7, 1999.

30. Mizel IRA et al. v. Butler et al.—Avatex Derivative Litigation. Supreme Court of the State of New York—County of New York, Index No. 602773/98, September 8, 1999.

31. First Pension Cases—Coordination Proceeding No. 3131 (Murray v. Belka et al.). Superior Court of the State of California for the County of Orange, No. 740706, December 15, 16 and 17, 1999.

32. Miller Industries Securities Litigation. United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action, Master File No. 1:97-CV-2811 (TWT), March 15 and 16, 2000.

33. Continental Investment Corp. Securities Litigation. United States District Court for the Northern District of Texas, Civil Action No. 3-98-CV2895-T, May 8, 2000.

34. IKON Office Solutions, Inc. Securities Litigation. United States District Court for the Eastern District of Pennsylvania, MDL Docket No. 1318 (MK) No. 98-CV-4286, September 27 and 28, 2000.

35. PaineWebber Incorporated v. NetRatings, Inc. Supreme Court of the State of New York, County of New York, Index No. 99/605036, October 20, 2000.

R. Alan Miller / Deposition and Arbitration Testimony / Page 4

36. Jacobs, et al. v. Coopers & Lybrand, L.L.P., et al. (Happiness Express Securities Litigation). United States District Court for the Southern District of New York, Case No. 97 CIV. 3374 (RPP), January 18, 2001.

37. Robert Mowbray, et al. v. Waste Management Holdings, Inc. United States District Court for the District of Massachusetts, Civil Action No. 98-11534-WG4, March 22 and 23, 2001.

38. Lee Adams v. Western Micro Technology, Inc., et al. Superior Court of the State of California, In and For the County of Orange, Case No. 810801, June 8, 2001.

39. BankAmerica Corp. Securities Litigation. United States District Court for the Eastern District of Missouri—Eastern Division, MDL No. 1264 (Judge Nangle), July 26 and 27, and December 6, 2001.

40. Sternbach and Ancowitz v. Network Associates and Lichtman. United States District Court for the District of New Jersey, Civil Action No. CIV. 00-1576 (JCL), August 1, 2001.

41. Sunbeam Corporation Securities Litigation (Debentures). United States District Court for the Southern District of Florida, Miami Division, MDL No. 1297, November 1 and 2, 2001.

42. Infocure Corporation Litigation. United States District Court for the Northern District of Georgia, Atlanta Division, C.A. No. 01-CV-0001-TWT, November 14, 2001.

43. Equimed, Inc. Securities Litigation. United States District Court for the Eastern District of Pennsylvania, Master File No. 98-CV-5374 (NS), December 20, 2001.

44. Merz Pharmaceuticals v. Accupac, Inc. United States District Court for the Eastern District of Pennsylvania, Civil Action No. 01-CV-1668, January 23, 2002.

45. Smallworldwide PLC Securities Litigation. United States District Court for the District of Colorado, Civil Action No. 99-K-1254, March 28 and April 24, 2002.

46. PSINet Securities Litigation. United States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action No. 00-1850-A, January 8, 2003.

47. DaimlerChrysler Securities Litigation. United States District Court for the District of Delaware, Master Docket No. 00-0993 (JJF), January 13, 2003.

R. Alan Miller / Deposition and Arbitration Testimony / Page 5

48. Hayden v. FleetBoston Financial Corporation and Robertson Stephens, Inc. JAMS Arbitration, August 27, 2003.

49. Rollins-Safety Kleen (Proxy) Litigation. United States District Court for the District of South Carolina, Civil Action No. 3:00-1343-17, October 1, 2003.

50. AMF Bowling Securities Litigation. United States District Court for the Southern District of New York, Civil Action No. 99 CIV 3023 (DL), December 17, 2003.

51. Telxon Corporation Securities Litigation and Hayman v. PricewaterhouseCoopers, LLP. United States District Court for the Northern District of Ohio—Eastern Division, Case No. 5:98-CV-2876, January 13 and 14, 2004.

52. Apropos Securities Litigation. United States District Court for the Northern District of Illinois, Civil Action No. 01C8406, January 30, 2004.

53. Safeguard Scientifics Securities Litigation. United States District Court for the Eastern District of Pennsylvania, Civil Action 01-3208, June 29, 2004.

54. Official Committee of Unsecured Creditors of Tri Valley Growers vs. Deloitte & Touche LLP. Superior Court of the State of California, County of San Francisco, No. 406914, August 25 and 26, 2004.

55. Levitan v. McCoy, et al. (Bank One Securities Litigation). United States District Court for the Northern District of Illinois—Eastern Division, Civil Action No. 00-C-5096, May 4, 2005.

56. Commercial Financial Services, Inc. v. Chase Securities, Inc. United States District Court for the Northern District of Oklahoma, May 25, 2005.

57. Ahearn v. Credit Suisse First Boston (Winstar). United States District Court for the District of Massachusetts, No. 03-CV-10956 (JLT), January 3, 2006.

58. Touch America Holdings, Inc. (Montana Power Company) ERISA Litigation. United States District Court for the District of Montana—Butte Division, No. CV-02-106-BU-SHE, June 27 and July 20, 2006.

59. Fiala, et al. v. Metropolitan Life Insurance Company, et al. Court of the State of New York, County of New York: Part 49, No. 601181/00, No. 108887/00, July 14, 2006.

60. Adams Golf Securities Litigation. United States District Court for the District of Delaware, Consolidated C.A. No. 99-371 (KAJ), August 11, 2006.

R. Alan Miller / Deposition and Arbitration Testimony / Page 6

61. Enron Securities Litigation (Public Employees' Retirement System of Ohio v. Andrew S. Fastow, et al.). United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-02-4788, December 11 and 12, 2006.

62. Jack E. Salmon, Jr. v. KPMG LLP et al. Arbitration. May 1, 2007.

63. Parmalat Securities Litigation. United States District Court, Southern District of New York, Case No. 04MD-1653 (LAK), August 6 and 7, 2007.

64. Peregrine Securities Litigation (Bains, et al. v. Moores, et al.). Superior Court of the State of California for the County of San Diego, No. GIC 806212, August 15, 2007.

65. Motorola ERISA Litigation (Lingis et al. v. Motorola, Inc. et al.). United States District Court, Northern District of Illinois, Eastern Division, No. 03C5044, November 2, 2007.

66. SBA, as Receiver for Acorn Technology Fund, L.P. v. Smith Stratton, et al. United States District Court for the Eastern District of Pennsylvania, Civil Action No. 05-190, September 29, 2008.

67. NetBank, Inc. Securities Litigation. United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:07-CV-2298-BBM, May 13, 2009.

68. Carol R. Kaufman et al. v. SunGard Investment Systems, Inc. United States District Court, District of New Jersey, Civil Action No. 2:05-CV-1236 (JLL), May 19, 2009.

69. Computer Sciences Corporation ERISA Litigation. United States District Court, Central District of California, Western Division, Master File No. CV08-02398 SJO (JWJx), June 19, 2009.

70. First American Corporation Securities Litigation (Berks County Employees' Retirement Fund, et al. v. First American Corporation, et al.). United States District Court, Southern District of New York, Civil Case No. 08-CV-5654 (LAK), December 4, 2009.

71. Baxter International, Inc. ERISA Litigation (Rogers, et al. v. Baxter International, Inc., et al.). United States District Court For The Northern District of Illinois—Eastern Division, 04C 6476, January 8, 2010.

72. Host America Securities Litigation (Sawant, et al. v. Ramsey, et al.). United States District Court, District of Connecticut, Case No. 3:07CV980 (VLB), April 6, 2010.

73. Jermyn, et al. v. Best Buy Stores, L.P. United States District Court, Southern District of New York, Docket No. 08CV00214, September 23, 2010; December 30, 2010.

R. Alan Miller / Deposition and Arbitration Testimony / Page 7

74. Leeseburg v. Converted Organics, Inc. United States District Court for the District of Delaware, C.A. No. 08-926-GMS, February 8, 2011.

75. Corporate Property Associates 14, Inc. and Corporate Property Associates 15, Inc. v. CHR Holding Corporation, et al. In the Court of Chancery of the State of Delaware, Civil Action No. 3231-VCS, March 8, 2011.

76. Ovalia Resorts, Inc. v. HSBC Securities (USA) Inc. Supreme Court of the State of New York, County of New York, Index No. 09/600878, June 1, 2011.

77. Edgewater [Capital] v. H.I.G. Capital, Inc. In the Court of Chancery of the State of Delaware, C.A. #3601-VCS, August 23, 2012.

Arbitrations

1. Liberty University v. Kemper. American Arbitration Association. AAA Arbitration No. 11-136-00194-91, November 21, 1991.

2. Raymond James Customer Arbitration. NYSE. November 17 and 18, 1992. NYSE Arbitration Docket No. 1991-001538.

3. Saponaro Customer Arbitration. NASD. March 8, 1996. NASD No. 94-01491.

4. Kennilworth Partners v. Bear Stearns. NASD. February 26 and 27, 2003. NASD No. 00-01232.

5. Hayden v. FleetBoston Financial Corporation and Robertson Stephens, Inc. JAMS Arbitration, September 9, 2003.

6. Jack E. Salmon, Jr. v. KPMG LLP, et al. May 25, 2007.

# EXHIBIT  B

THE JOURNAL OF FINANCE • VOL. LI, NO. 1 • MARCH 1996

# Shareholder Activism by Institutional Investors: Evidence from CalPERS

MICHAEL P. SMITH*

### ABSTRACT

This study examines firm characteristics that lead to shareholder activism and analyzes the effects of activism on target firm governance structure, shareholder wealth, and operating performance for the 51 firms targeted by CalPERS over the 1987–93 period. Firm size and level of institutional holdings are found to be positively related to the probability of being targeted, and 72 percent of firms targeted after 1988 adopt proposed changes or make changes resulting in a settlement with CalPERS. Shareholder wealth increases for firms that adopt or settle and decreases for firms that resist. No statistically significant change in operating performance is found.

INSTITUTIONAL OWNERSHIP OF DOMESTIC equities has grown rapidly in recent years and in 1992 surpassed the 50 percent level of aggregate ownership.[1] At the same time, the market for corporate control that was active in the 1970s and 1980s, and that served effectively to discipline managers, has weakened substantially.[2] The rise in institutional holdings and corresponding decline of the market for corporate control have focused attention on the role and importance of institutional investors as monitors of corporate management. The recent increase in monitoring by traditionally passive institutional investors has been described as "shareholder activism." For this study, shareholder activism is defined to include monitoring and attempting to bring about changes in the organizational control structure of firms (targets) not perceived to be pursuing shareholder-wealth-maximizing goals.

The emergence of shareholder activism raises questions about the practices of activist institutional investors and particularly whether activism is beneficial for shareholders of targeted firms and possibly firms that are not targeted

* Economic Analysis Corporation, Los Angeles. This article is based on my dissertation at Arizona State University. I thank DeWitt Bowman (Chief Investments Officer), Kayla Gillan (Assistant General Counsel), Jose Arau (Director of Corporate Relations) and Hilda Applbaum (Director of Research) of CalPERS for providing valuable data and information. I also thank Hank Bessembinder, Jim Booth, Jay Coughenour, Dan Deli, Stu Gillan, Mike Joehnk, Herb Kaufman, Frank Kerins, Ken Lehn, Paul Seguin, Janet Smith, Susan Woodward, René Stulz, the editor, and two referees for helpful comments. I especially thank my dissertation chair, Rick Smith, for invaluable guidance and suggestions. Financial support was provided by the Arizona State Unversity Regents Dissertation Scholarship.

[1] *Flow of Funds Accounts, Financial Assets and Liabilities 1966–1989*, Federal Reserve Board, and the *Wall Street Journal*, November 13, 1992, C1.

[2] See Martin and McConnell (1991) on the disciplinary role of takeovers and Jensen (1989) on the decline of takeover activity.

*The Journal of Finance*

but could have been. Questions regarding the effects of shareholder activism on targeted firms include the following: What types of firms are subject to shareholder activism? Is shareholder activism effective in changing target firm governance structures? Does shareholder activism increase shareholder wealth for targeted firms? Are the positive expectations of the market "confirmed" by subsequent improvements in performance of targeted firms? And, is there a spillover effect of activism for other firms that also are likely targets for shareholder activism? Answers to these questions indicate whether shareholder activism is an effective monitoring mechanism and whether effectiveness is limited by constraints on institutional behavior. An empirical analysis of firms subject to shareholder activism can provide these answers.

This study analyzes whether shareholder activism is effective as a source of monitoring. The focus of the analysis is on what firm characteristics lead to activism and whether shareholder activism results in changes in target firm governance structures and performance and whether these changes appear to give rise to changes in shareholder wealth. This is done by focusing on targets of the institutional investor regarded as a leader in shareholder activism—the California Public Employees' Retirement System ("CalPERS" or the "System"). The focus is on the targets of CalPERS to cleanly investigate a comprehensive set of activism targets (targeted publicly and privately) and to control for activist attributes. Since CalPERS is regarded as a leader in activism, if effects are not found from its activism, effects are not likely to be found for other activists. The primary sample consists of 51 target firms involved in the 78 targeting events of CalPERS over the 1987 to 1993 period. In addition, firm characteristics and changes in operating performance for control samples are used to analyze target selection and possible spillover effects of activism.

Firms targeted for activism are firms with poor stock price performance (for firms targeted after 1988) that are larger and have higher levels of institutional ownership relative to control samples. Results show that over the period 1987 to 1988, only one of 15 firms targeted (7 percent) adopted proposed governance structure changes outright or made changes sufficient to warrant a settlement the first year targeted, but over the period 1989 to 1993 the success rate was higher, 26 of 36 firms (72 percent). The effect of shareholder activism on shareholder wealth differs depending on the outcome of targeting. For the sample of firms that settled with CalPERS and that have public announcements of targeting, the mean change in shareholder wealth at initial announcement is 1.06 percent ($z = 2.56$). For the sample of firms that did not settle, the mean change in wealth is $-1.16$ percent ($z = -2.43$). Results for effects on accounting measures of performance do not allow me to reject the null hypothesis that activism does not improve operating performance.

The remainder of the article is organized as follows. Section I develops testable hypotheses regarding factors affecting target selection and the effects of shareholder activism on target firm shareholder wealth and operating performance. Section II provides background on CalPERS and shareholder

activism. Section III describes the data. Section IV conducts the analysis of target selection and the effects of shareholder activism on target firm governance structure, shareholder wealth and operating performance. Section V provides conclusions.

## I. Hypotheses

Rational shareholders will become "active" if the expected benefits of activism exceed the expected costs of activism, where the expected benefits are equal to the probability of successful targeting times the shareholder's private gain if successful.[3] This is modeled formally in Admati, Pfleiderer, and Zechner (1992) where large shareholders with diversified portfolios are shown to have an incentive to expend resources in monitoring management even though there is free-riding by other shareholders. In their model, activism arises as an equilibrium condition when the expected gains from monitoring exceed the expected costs. Ayres and Cramton (1993) argue that through multiperiod relationships, institutional investors that commit to holding a firm's equity have increased credibility and influence in monitoring management. Therefore, by increasing the probability of success, they increase the expected benefits of activism. The expected benefits and expected costs framework and findings from the takeover literature can be used to develop hypotheses about which firms are more likely to be targeted for activism.

For example, ownership structure has been shown to affect the likelihood that a firm receives a tender offer. Stulz (1988) argues and Shivdasani (1993) finds that the level of inside holdings is negatively related to the probability that a firm is subject to a takeover as higher levels of holdings reduce the probability of success. Mikkelson and Partch (1989) find that the level of inside ownership has a negative relation to the probability of being targeted but a positive relation to the probability of being acquired. Inside ownership may have the same effects for shareholder activism, and hence the level of inside ownership should have a negative relation to the probability of being targeted by an activist, but perhaps a positive relation to the probability of successful targeting if activism serves as a substitute for takeovers. On the other hand, the presence of large outside blockholders can increase the likelihood that a firm is targeted (Shleifer and Vishny (1986)). Shivdasani (1993) finds a positive (negative) relation between ownership by block-holders unaffiliated (affiliated) with management and the likelihood of a hostile takeover attempt. If activism is an alternative form of corporate control and institutional investors act as large unaffiliated blockholders, then the level of institutional ownership will be positively related to the probability that a firm becomes subject to shareholder activism. If institutional investors behave more like affiliated blockholders, as some evidence indicates (Pound (1988) and Roe (1990)), there may be a negative relation between activism targeting and the level of institutional ownership.

---

[3] "Active" in this study refers to the involvement in monitoring the management of portfolio firms as opposed to active security selection (i.e., stock picking) without taking an active role in monitoring.

Firm size may affect the likelihood of being targeted. If larger firms comprise a larger percentage of an institution's investment portfolio (perhaps due to indexing strategies), the expected benefits may be larger from targeting these firms since the private gain to the activist, if targeting is successful, is larger. Therefore, firm size and likelihood of targeting should be positively related. Martin and McConnell (1991) find an inverse relation between stock price performance prior to takeover and management turnover following takeover. If stock price performance reflects managerial performance and firms with poor stock price performance are more likely to be disciplined, then there should be a negative relation between stock price performance and probability of being targeted through activism. Finally, Tobin's q or a market-to-book ratio of firm value may be related to the probability of being targeted with shareholder activism. This follows from the findings of Lang, Stulz, and Walkling (1989) and Servaes (1991), which show a relation between Tobin's q and gains to takeovers. Firms with lower Tobin's q or market-to-book ratios should have a higher probability of targeting. Analysis of characteristics of firms targeted and firms not targeted by an activist shareholder will allow for investigation of these hypotheses.

Apart from determining which factors may influence target selection, the question of whether shareholder activism benefits shareholders of targeted firms by aligning managerial incentives has not yet been answered. If shareholder activism is beneficial for shareholders of targeted firms, there should be observable effects for firms when they are targeted by an activist institutional investor. The argument parallels that of Kaplan (1989) and Jensen (1986, 1988) who study bonding activity. If activism, like bonding, aligns incentives, then improvements in operating performance should follow targeting by an activist institution. If investors perceive that targeting is likely to improve operating performance, then firm market value is expected to increase with unanticipated activism. Firm market value could also increase if activism targeting is associated with an increase in the probability that the firm will be subject to a takeover attempt. On the other hand, if the practices of activist institutions or regulatory constraints of institutional investors make shareholder activism ineffective, then there would be no expected improvement in operating performance and no associated increase in shareholder wealth. The initial stock price reaction could still be positive if investors incorrectly perceive benefits from activism, but the initial reaction would be corrected over time.

This study also examines whether activism has spillover effects on firms not targeted. If firms perceive themselves to be candidates for activism, the threat of activism may align incentives of managers with shareholders and there may be observable changes in potential activism targets similar to actual targets.

## II. CalPERS and the Practice of Shareholder Activism

The institutional investor widely regarded as the leader in shareholder activism in the U.S. equities market is the California Public Employees' Retirement System ("CalPERS" or the "System"). CalPERS is the largest public pension fund in the United States (second largest pension fund) with

$72 billion in assets in 1993 including $24 billion in domestic equities, $19 billion of which is managed internally by CalPERS staff (the rest is managed by external money managers).[4] CalPERS has had an organized shareholder activism campaign since 1986.

To encourage shareholder activism by interested institutional investors, CalPERS was a primary participant in the creation of the Council of Institutional Investors in 1984.[5] The Council serves as a clearinghouse for activist institutional investors and provides information to members on firms with poor stock price performance, and as of June 1993 represented 80 institutional investors with a total of approximately $600 billion in assets. CalPERS also has been involved in public policy formation on the federal and state levels. For example, in 1989 CalPERS proposed Securities and Exchange Commission (SEC) proxy reform that was enacted in 1992.[6] CalPERS was chosen for this study due to the prominent role it plays in shareholder activism, because it has a longer history of activism than other organizations, is large enough as a shareholder to potentially have an impact by itself, and is open about its practices.[7]

Firms the System considers for activism are in the System's internally managed portfolio and according to CalPERS officials, the target selection process can be divided into two regimes. The first covers the 1987 and 1988 proxy seasons during which the primary criterion was corporate governance structure (e.g., presence of a poison pill). The second covers the 1989 to 1993 proxy seasons during which stock price performance was the primary criterion.

During the 1987 and 1988 proxy seasons CalPERS targeted firms based primarily on their corporate governance structures. In Fall 1986, CalPERS identified 47 firms held in its portfolio (portfolio firms) that had implemented poison pills without shareholder approval. Of those 47, CalPERS identified the subset in which it was one of the largest shareholders and in which the level of institutional ownership was high (typically above 60 percent). Ten firms met these criteria and were selected to be targets of shareholder resolutions requesting rescission of the poison pills. In Fall 1987, the System expanded its governance structure criteria to include firms making greenmail payments and firms not using confidential shareholder voting systems. The governance structure and ownership structure (CalPERS and institutional holdings) cri-

---

[4] CalPERS Asset Allocation Report, 1/21/93.

[5] Information on the Council of Institutional Investors is based on documents from the Council, discussions with CalPERS officials, and Chernoff, Joel, "CII Greets Newcomers Cautiously," *Pensions & Investments*, April 5, 1993, pp. 16,22.

[6] Prior to the October 1992 changes to the proxy rules, if more than ten shareholders as a group discussed a company's business, they were required to send information to the other shareholders. This communication restriction was eased with the 1992 proxy reform such that an unlimited number of shareholders can communicate as long as written materials are provided to the SEC.

[7] Most information has been obtained from personal meetings with CalPERS officials including the Chief Investments Officer, Director of Research, Assistant General Counsel, and Senior Officer in Charge of Corporate Relations.

teria resulted in identification of seven target firms for the 1988 proxy season (two of which were also targets in 1987).

The target selection process changed in Fall 1988, when the primary selection criterion shifted from governance structure to firm performance and the selection process became more sophisticated. The process begins in June of each year by ranking portfolio firms based on five-year stock returns ending the previous calendar year. From this ranking, the bottom quartile of firms (approximately 250 firms referred to internally as the "Bottom 250") is chosen for further analysis. Firms in the Bottom 250 are eliminated as potential targets if they have high levels of inside ownership, large employee stock ownership plans (ESOPs), low levels of institutional ownership, or if CalPERS is not one of the largest shareholders.

The result of the above filtering each year is a list of approximately 50 firms which is referred to internally as the "Failing Fifty." Firms in the Failing Fifty are then analyzed further and the Investment Committee identifies approximately 12 targets and one corporate governance structure issue (for each target) that it will pursue in the form of a shareholder resolution.[8] Shareholder resolutions have included creating shareholder advisory committees, changing the composition of the board of directors and its committees, and restructuring executive compensation.

Because many firms have fall filing deadlines for shareholder resolutions, the first step in notifying targets is to file shareholder resolutions with the target firms. In 1992 CalPERS tested what it considered to be a less adversarial approach, in which resolutions were not filed with target firms. At the same time a resolution is filed, a letter is sent to the Chairman of the Board, CEO, or both, requesting a meeting with CalPERS officials to discuss ways in which the governance structure goals of CalPERS can be met without the need for shareholder resolutions to reach a vote. If management is persuaded to adopt the proposal or if a suitable compromise is reached, CalPERS withdraws the resolution and it does not appear in the proxy statement and hence is not voted on. For this reason, studies examining only firms with proposals in their proxy statements exclude many firms that are subject to activism. Proposal adoption or settlement is the desired outcome for CalPERS because even if shareholder resolutions receive a majority of votes, they often are nonbinding.[9]

### III. Data

The primary sample used in this study is the comprehensive set of activism targets of CalPERS from 1987 to 1993. Since CalPERS is a leader in activism,

---

[8] In many instances, the Investment Committee will coordinate its targeting activity with other activists. This coordination typically takes the form of obtaining cosponsorship of shareholder resolutions. For example, resolutions filed at ten of the twelve firms targeted in 1989 were cosponsored by the Treasurer of the State of Connecticut and/or the Pennsylvania Public School Employees' Retirement System.

[9] See Gordon and Pound (1993), Loss (1988), and Clark (1986) on the limitations of shareholder proposals (SEC Rule 14A-8).

if significant results are not found, results are not likely to be found for other activists. The total number of target firms used in the study is 51. For each target year 1987 to 1993, names of firms targeted, descriptions of shareholder resolutions filed with targets, percents of target firm's outstanding common stock held, and outcomes of targeting are obtained from CalPERS. Analysis is conducted relative to the first year a firm is targeted by CalPERS.[10]

To test for factors that may affect target selection and to examine changes in operating performance, three control samples are constructed. First, following Kaplan (1989), an industry-matched sample was created. Each target firm's 4-digit SIC code is identified from COMPUSTAT and a matched firm with the same 4-digit SIC code and nearest sales level in the year prior to being targeted is selected from firms listed on COMPUSTAT. In all cases a match is found at the four-digit level, and there is no difference statistically between the samples in terms of sales level (not reported). This sample will serve as a control group of firms not targeted and should reflect any industry-wide changes in operating performance for target firms.

The second control sample is made up of firms that, according to CalPERS officials, are considered potential targets. These firms are in the "Failing Fifty" group over the period 1991 to 1993 but were not targeted. This control sample (Remaining Failing Fifty) is useful because it is made up of firms that should be similar to target firms in terms of the performance and ownership structure characteristics that CalPERS says are important in the target selection process, but differ from targets along some dimensions. This sample is used to examine target selection factors and possible spillover effects of activism. The Remaining Failing Fifty sample is comprised of 95 firms.

The third control sample is comprised of firms that appear to be candidates for activism in terms of performance but are or consider themselves to be insulated from activism. One definition for this sample is firms in the bottom quartile of CalPERS's portfolio when ranked by previous five-year stock returns (exclusive of targets and firms in the Remaining Failing Fifty). These firms (Remaining Bottom 250) should be similar to targets and firms in the Remaining Failing Fifty in terms of stock price performance, but differ along some dimensions (e.g., level of inside ownership or institutional ownership) which precludes them from appearing in the Failing Fifty and consequently reduces the probability that the firms would become activism targets. This sample is created by replicating CalPERS's internally managed portfolio for each year 1985 to 1991 based on market value of equity and identifying the 250 firms with the lowest returns over the previous five years. Firms are included only for the first year they appeared in the Bottom 250. Firms that were targeted or appeared in the Remaining Failing Fifty sample are eliminated from this sample. The result is a sample of 578 firms. This sample is used also for target selection and spillover effects analysis.

---

[10] A search is conducted using the Dow Jones News Retrieval for evidence that firms were targeted before the first year they were targeted by CalPERS, and no such evidence is found.

234 *The Journal of Finance*

## Table I
### Shareholder Activism Events by Governance Structure Resolution

Number of shareholder activism targeting events by target year and governance structure change sought by CalPERS over the period 1987 to 1993. Also included in brackets are number of firms targeted for the first time and number of those firms that either adopted the proposed resolution or made changes sufficient to warrant a settlement with CalPERS. In the Fall of 1993 specific resolutions were not identified for targeted firms but were all performance-related.

| Year | Takeover-related Resolutions | | | | | Performance-related Resolutions | | | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Redeem Poison Pill[1] | "Opt Out" of State Law[2] | Rein-corporate[3] | Prohibit Greenmail[4] | Implement Confidential Voting[5] | Create Shareholder Advisory Committee[6] | Alter Board Composition[7] | Reduce Executive Compensation[8] | Count Voting Abstentions[9] | Not Identified[10] | |
| 1987 | 10 [10,0] | | | | | | | | | | 10 [10,0] |
| 1988 | 5 [3,1] | | | 1 [1,0] | 1 [1,0] | | | | | | 7 [5,1] |
| 1989 | 5 [1,0] | 1 [1,0] | 1 [1,1] | | 4 [3,2] | | 1 [1,1] | | | | 12 [7,4] |
| 1990 | 3 [0,0] | 1 [0,0] | | | 4 [2,1] | 4 [3,3] | | | 1 [1,1] | | 13 [6,5] |
| 1991 | | 1 [1,0] | 2 [2,2] | | 3 [1,0] | 2 [1,1] | 1 [1,1] | 2 [2,2] | 1 [1,1] | | 12 [9,7] |
| 1992 | | | | | | 5 [3,1] | 4 [2,1] | 3 [3,2] | | | 12 [8,4] |
| 1993 | | | | | | | | | | 12 [6,6] | 12 [6,6] |
| Total | 23 [14,1] | 3 [2,0] | 3 [3,3] | 1 [1,0] | 12 [7,3] | 11 [7,5] | 6 [4,3] | 5 [5,4] | 2 [2,2] | 12 [6,6] | 78 [51,27] |

[1] Resolution calling for the board of directors to redeem a poison pill that had been implemented.
[2] Resolution to have the targeted firm "opt out" of coverage by Delaware's state antitakeover laws.
[3] Resolution for the targeted firm to change state of incorporation from Delaware to California (1989) or Pennsylvania to Delaware (1991).
[4] Resolution to amend company bylaws to prohibit repurchase of shares at price above market from 3 percent or greater equityholder.
[5] Resolution to change proxy voting process so that management cannot identify how individual shareholders vote.
[6] Resolution for the creation of a shareholder advisory committee with representatives from shareholder groups to provide input in major decisions (e.g., nominating candidates for the board of directors, compensating managers, financial restructuring, etc.).
[7] Resolution to change the composition of the board of directors by increasing the proportion of independent or outside directors.
[8] Resolution to decrease the level of compensation to executive officers of the targeted company.
[9] Resolution to count abstentions from voting at annual meetings as "no" or "against" votes on all voting matters.
[10] Specific resolutions not identified for each target but were related to shareholder advisory committees, board composition, and compensation.

Data used for empirical analysis are obtained from CalPERS documents (targeting information and CalPERS holdings data), COMPUSTAT (company financial data), Center for Research in Security Prices (CRSP) (stock returns), *Standard & Poor's Stock Reports* (institutional ownership figures), company proxy statements (inside ownership figures, and proxy mailing and annual meeting dates), the Dow Jones News Retrieval System (public announcements of targeting and outcomes) and *Standard & Poor's Register of Corporations, Directors, and Executives* (management turnover, board of directors composition, and number of SIC codes).

Table I shows the distribution of the 78 targeting events and 51 target sample firms by year and type of shareholder resolution. The resolutions are categorized by takeover-related and performance-related issues. The decline in takeover-related resolutions after 1988 coincides with the decline of the market for corporate control. One interpretation is that the market for corporate control over this period is perceived to be ineffective regardless of firm governance structure.

## IV. Empirical Results

### A. Target Selection Factors

A primary selection criterion over the most recent portion of the sample period appears to be stock price performance. Table II presents summary statistics on pretargeting stock price performance for the entire sample and various subsamples.[11] The table reflects the shift to stock price performance in 1989. Overall, the median abnormal return is negative and significant, with significant differences between the two sample periods and the two general types of proposals and a marginally significant difference between successful and unsuccessful outcomes. These results are consistent with the hypothesis that stock price performance and probability of being targeted for activism are inversely related. Figure 1 presents the returns over the entire five-year period and reflects that most of the poor performance actually occurs in the two or three years preceding targeting.

To examine other factors leading to targeting, I run two sets of probit regressions—one looking at the probability of being targeted, and the other the probability of success. Table III presents results from probit regressions of target selection where the dependent variable is equal to one if the firm was targeted by CalPERS and zero otherwise. The independent variables are those factors hypothesized in Section II to affect the likelihood of targeting. Firm size is measured as the log of the market value of equity. Ownership structure is measured by both level of inside (officer and director) and institutional ownership. Prior period stock price performance is measured as five-year market-adjusted holding period return using the CRSP equal-weighted index. Market-

---

[11] Returns are calculated as holding period abnormal (market-adjusted) returns using the CRSP value-weighted index. Returns are also calculated using the equal-weighted index (reported in an earlier draft of this paper) with similar, although more negative, results.

*The Journal of Finance*

## Table II
## Target Sample Pretargeting Performance

Mean and median five-year holding period abnormal stock returns ending the calendar year prior to being selected as a target. Abnormal returns are market-adjusted returns compounded daily from CRSP using the value-weighted index. Numbers in parentheses are p-values for t-tests (means) and Wilcoxon signed rank tests (medians) for difference from zero. Firms targeted by CalPERS are divided into samples by period they were targeted (1987–88 or 1989–93), type of shareholder resolution (takeover-related or performance-related), and outcome of targeting (successful or unsuccessful) where a successful outcome is defined as one where the targeted firm either adopts the resolution or makes changes sufficient to warrant withdrawal of the resolution by CalPERS. Difference-in-means tests are conducted for time period, resolution type, and outcome sub-samples.

| Sample | | Takeover Resolution | Performance Resolution | Successful Outcome | Unsuccessful Outcome | Totals |
|---|---|---|---|---|---|---|
| 1987–88 | Mean | 49.75% (0.12) | 81.97% (na) | 66.75% (na) | 50.84% (0.11) | 51.90% (0.08) |
| | Median | 20.68% (0.14) n = 14 | 81.97% (na) n = 1 | 66.75% (na) n = 1 | 20.68% (0.12) n = 14 | 33.30% (0.07) n = 15 |
| 1989–93 | Mean | 0.44% (0.99) | −34.25% (0.00) | −25.12% (0.00) | −37.16% (0.00) | −28.47% (0.00) |
| | Median | −4.68% (1.00) n = 6 | −34.19% (0.00) n = 30 | −33.32% (0.00) n = 26 | −31.28% (0.00) n = 10 | −32.82% (0.00) n = 36 |
| Takeover resolution | Mean | | | 50.45% (0.06) | 31.09% (0.28) | |
| | Median | | | 48.09% (0.13) n = 4 | −1.29% (0.60) n = 16 | |
| Performance resolution | Mean | | | −34.27% (0.00) | −19.66% (0.24) | |
| | Median | | | −34.69% (0.00) n = 23 | −29.42% (0.20) n = 8 | |
| Totals | Mean | 34.96% (0.13) | −30.50% (0.00) | −21.72% (0.00) | 14.17% (0.47) | −4.83% (0.64) |
| | Median | 11.07% (0.18) n = 20 | −33.68% (0.00) n = 31 | −32.95% (0.00) n = 27 | −15.07% (0.76) n = 24 | −22.69% (0.02) n = 51 |

Difference-in-Means Tests:

| Samples | Difference | t-statistic |
|---|---|---|
| 1987–88 v. 1989–93 | 80.37% | 2.85 |
| Takeover v. Performance | 65.46% | 2.87 |
| Successful v. Unsuccessful | 35.89% | 1.73 |



**Figure 1. Pretargeting stock price performance of firms targeted by CalPERS 1987–93.**
Cumulative abnormal returns for 51 firms targeted by CalPERS over the 1987–93 period and for subsamples of firms targeted during the 1987–88 (15 firms) and 1989–93 (36 firms) periods. Cumulative abnormal returns are compounded daily market-adjusted returns using the Center for Research in Security Prices (CRSP) value-weighted index. Returns are calculated over the five year period ending the calendar year prior to being selected as a target.

to-book is measured following Smith and Watts (1992) as the ratio of firm market value (market value of equity plus book value of assets minus book value of equity) and book value of assets.

The first regression model in Table III includes the target, Remaining Failing Fifty, and Remaining Bottom 250 samples for all years 1987 to 1993. Results suggest that firm size and level of institutional ownership are positively related to target selection. In other words, the larger the firm and the higher the level of institutional ownership, the greater the probability of being targeted given the firm appears in the Bottom 250. The relation between firm size and probability of being targeted may be due to CalPERS's investment policy of indexing its internally managed portfolio and the institutional constraints on its ability to alter positions in portfolio firms. That is, since CalPERS is required to hold the largest firms in the market in its portfolio (the result of indexing), these firms are more likely to be targeted given poor performance since these firms represent larger portions of CalPERS's portfolio and hence can provide the largest gains to CalPERS. Interestingly, the level of inside ownership does not appear to be a significant factor in target selection. Market-to-book is negatively related to probability of being targeted, as expected, but not significant. As CalPERS did not select targets based on prior performance until 1989, however, including targets (and firms in the Bot-

**Table III**
## Target Selection Model

Probit model estimates of target selection where the dependent variable is equal to one if the firm was selected as a target and zero otherwise. The sample is comprised of firms targeted by CalPERS, firms in the Remaining Failing Fifty sample, and firms in the Remaining Bottom 250 sample. The independent variables are log of the market value of equity for the firm (LMVE), percent of outstanding shares held by officers and directors (INSIDE), percent of shares held by institutional investors (INST), the five-year cumulative abnormal return (market-adjusted) ending the year prior to appearing in the samples (CUMABN) and market-to-book (MKT/BK). All variables are measured as of the fiscal year end prior to the firms appearing in their respective samples.

| Variable | Mean | Full Sample Coefficient (*p*-value) | 1989–93 Sample Coefficient (*p*-value) |
|---|---|---|---|
| Intercept | 1.0000 | −6.5711 | −9.1334 |
|  |  | (0.0000) | (0.0000) |
| LMVE | 6.9570 | 0.6200 | 0.8346 |
|  |  | (0.0000) | (0.0000) |
| INSIDE | 0.0602 | −0.5282 | 0.2626 |
|  |  | (0.8028) | (0.9036) |
| INST | 0.5383 | 2.9580 | 3.9082 |
|  |  | (0.0005) | (0.0006) |
| CUMABN | −0.4226 | 1.4107 | 0.0535 |
|  |  | (0.0000) | (0.9067) |
| MKT/BK | 0.9690 | −0.2128 | −0.1404 |
|  |  | (0.3426) | (0.5814) |
| N |  | 327 | 199 |
| Log-Likelihood |  | −95.679 | −62.987 |
| Restricted Log-Likelihood |  | −141.560 | −94.080 |
| Chi-Squared |  | 91.768 | 62.186 |
| (*p*-value) |  | (0.0000) | (0.0000) |

tom 250) from 1987 and 1988 for this model may not be appropriate. This would explain the positive coefficient for pretargeting abnormal stock returns (CUMABN). The second regression includes only firms appearing in the samples after 1988, and the results from this regression are very similar to those for the full sample, with the exception of the coefficient for CUMABN which is not significantly different from zero. LMVE and INST have significant positive coefficients. The statistically insignificant coefficient for CUMABN suggests that prior performance of firms among the Bottom 250 is not a significant factor in target selection. Market-to-book is not significantly related to targeting.

Table IV reports results from probit regressions of targeting outcome where the dependent variable is equal to one if the outcome of targeting was successful and zero otherwise and the sample is firms targeted by CalPERS. This analysis may reflect which variables affect the probability of success and therefore expected benefits from targeting. The table includes results for four different model specifications. In the first model, the statistically insignificant coefficient estimate for each independent variable suggests that although at

Table IV

## Model Estimation for Targeting Outcome

Probit model estimates of targeting event outcome where the dependent variable is equal to one if the targeted firm adopted the shareholder resolution or made changes sufficient to warrant a settlement and zero otherwise. The independent variables are log of the market value of equity for the firm (LMVE), percent of outstanding shares held by officers and directors (INSIDE), percent of shares held by institutional investors (INST), the five-year cumulative abnormal return (market-adjusted) ending the year prior to being selected for targeting (CUMABN), market-to-book (MKT/BK), a dummy variable (TYPE) equal to one if the shareholder resolution was takeover-related and zero if the resolution was performance-related, and the two-day abnormal return (CPE) at initial public announcement of targeting. LMVE, INSIDE, and INST are measured as of the year end prior to target selection. The sample is comprised of 51 firms targeted by CalPERS between 1987 and 1993 (Full Sample) and the 39 targeted firms with public announcements of targeting (Announcement Sample).

| | | Full Sample | | Announcement Sample | |
|---|---|---|---|---|---|
| Variable | Mean | Coefficient (*p*-value) | Coefficient (*p*-value) | Coefficient (*p*-value) | Coefficient (*p*-value) |
| Intercept | 1.0000 | 1.2698 (0.6741) | 5.8969 (0.1119) | 0.1102 (0.9786) | 0.6278 (0.8894) |
| LMVE | 7.8331 | −0.0168 (0.9440) | −0.3532 (0.2094) | 0.3296 (0.3154) | 0.2731 (0.4727) |
| INSIDE | 0.0261 | 9.5340 (0.1981) | 2.4759 (0.7331) | 9.1748 (0.2519) | 8.4332 (0.3166) |
| INST | 0.6422 | −1.1082 (0.5974) | −2.8996 (0.2435) | −1.8232 (0.5264) | −1.9676 (0.5026) |
| CUMABN | −0.1519 | −0.5124 (0.1617) | 0.1467 (0.7222) | −0.4262 (0.3721) | −0.3522 (0.5150) |
| MKT/BK | 0.8351 | −0.7952 (0.1321) | −0.7009 (0.2355) | −2.5150 (0.0370) | −2.3497 (0.0741) |
| TYPE | 0.3922 | | −1.6512 (0.0010) | | −0.2190 (0.7731) |
| CPE | −0.0003 | | | 31.2642 (0.0119) | 29.2641 (0.0374) |
| N | | 51 | 51 | 39 | 39 |
| Log-Likelihood | | −32.056 | −25.785 | −15.314 | −15.273 |
| Restricted Log-Likelihood | | −35.262 | −35.262 | −25.525 | −25.525 |
| Chi-Squared (*p*-value) | | 6.412 (0.2682) | 18.955 (0.0042) | 20.421 (0.0023) | 20.503 (0.0046) |

least some of these factors (firm size and institutional ownership) are important in the target selection process, they do not affect the likelihood of success in targeting. In the second model an indicator variable (TYPE) equal to one for takeover-related and zero for performance-related resolutions is added. The negative and statistically significant coefficient estimated for TYPE suggests that performance-related resolutions have a higher probability of success than takeover-related resolutions after controlling for firm size, ownership structure, pretargeting abnormal return, and market-to-book.

The other two model specifications reported in Table IV include only the 39 firms for which initial public announcements of targeting and corresponding

*The Journal of Finance*

two-day abnormal returns (CPE) are available (described below). The results suggest that CPE is positively related to targeting success and given that when TYPE and CPE are included, TYPE loses its statistical significance, CPE appears to be more important than TYPE. For the announcement sample, market-to-book has a significant negative relation to success. It does not appear that firm size, ownership structure, or pretargeting abnormal return explain targeting outcome. This finding, along with the results from target selection analysis, suggests ownership structure and firm size affect expected benefits from targeting through the shareholder's private gain rather than through the probability of success, while market-to-book ratio may affect expected benefits through probability of success. Overall, the results on target selection are consistent with the hypotheses that firm size and level of institutional ownership affect the expected benefits from activism.

These results are largely consistent with recent studies of activism through shareholder proposal filings. Karpoff, Malatesta, and Walkling (1994), in a study of shareholder proposal filings during the 1986 to 1990 proxy seasons, most of which were made by individuals (as opposed to institutions), find level of institutional ownership to be positively related and prior firm performance to be negatively related to the likelihood of receiving a shareholder proposal. John and Klein (1994) find similar results in their study of proposal filings between July 1991 and June 1992 made by individual and institutional investors. Namely, prior accounting performance is negatively and firm size is positively related to probability of receiving a shareholder proposal.

Also of interest is whether firms targeted for activism are different than control firms in terms of board of director composition and level of firm diversification. Data is collected from *Standard & Poor's Register of Corporations, Directors and Executives* on board size and percent that are insiders (employees of the firm) for the year before targeting for the target sample and the industry-matched sample, and the year before the firms appeared in the sample for the Remaining Failing Fifty. Targets have the same number of directors as their industry matches (median of 13 for both) and more than firms in the Remaining Failing Fifty (median of 11). The difference between the medians for targets and Remaining Failing Fifty is statistically significant ($z = 4.34$). Targets have a lower percent of insiders on the board (median of 18.5 percent) than either their industry matches (median of 22.2 percent) or the Remaining Failing Fifty (median of 22.2 percent), although the differences are not statistically significant at conventional levels ($z = -1.84$ and $z = -1.39$, respectively). Targets are also in more SIC codes than their industry matches or firms in the Remaining Failing Fifty. Targets are in an average (median) of 7.76 (6) codes versus 6.84 (4) for industry matches and 5.21 (3) for firms in the Remaining Failing Fifty. The average and median for targets are not statistically different from the average and median for the industry matches ($t = 0.72$ for difference in means, $z = 1.16$ for difference in medians). The average and median for targets are significantly larger than the average and median for the Remaining Failing Fifty, however ($t = 2.53$ for means and

$z = 2.76$ for medians). These results suggest that activism targets have slightly different board composition and are more diversified than control firms.

## B. *Effect of Shareholder Activism on Corporate Governance Structure*

One measure of the effectiveness of shareholder activism is the success rate of achieving desired changes in corporate governance structures. Table I shows the distribution across target year and resolution type of the number of firms that either adopted the CalPERS shareholder resolution or made changes sufficient to warrant a settlement with CalPERS the first year they were targeted. During the first two years, when CalPERS was selecting targets based on governance structure, only one of the 15 firms targeted for the first time (7 percent) adopted the resolution or made changes sufficient to warrant a settlement. These numbers may provide another interpretation of the decline of takeover-related resolution filings. That is, in response to little success getting takeover-related resolutions adopted, CalPERS shifted to performance-related resolutions. Over the 1989 to 1993 period, 26 of the 36 targeted firms (72 percent) either adopted the resolution or settled the first year targeted. While results from the probit analysis indicate that performance-related resolutions have higher success rates than takeover-related resolutions, this table reflects that the success rate also has increased over time. Over the entire time period, 72 percent of performance-related targeting was successful, with 100 percent successful in 1993.

Another measure of the effect of activism on governance structure is whether activism results in changes in management, as found in hostile takeovers. Following Martin and McConnell (1991), annual CEO turnover for each of the target, industry-matched, and Remaining Failing Fifty samples from two years before targeting to three years following targeting is calculated. Target firms generally have higher CEO turnover throughout the event period than industry-matched or Remaining Failing Fifty firms. While the industry-matched sample has turnover ranging from 10 to 12 percent, the target sample ranges from 11 to 16 percent, fluctuating around 16 percent from years $-2$ to $+2$. Firms in the Remaining Failing Fifty experience a spike in turnover the year before first appearing in the sample to 26 percent, but have between 9 and 14 percent in the other years. This increase in turnover for the Remaining Failing Fifty may reflect that for these firms, other forces were disciplining poor managers. While CEO turnover is generally higher for the target sample, it is not statistically different than that for either the industry-matched or Remaining Failing Fifty samples. Overall, the results on the effect of activism on governance structure indicate that activism is reasonably successful in getting governance structure changes adopted, particularly performance-related changes, but there is no marked effect on management turnover from activism.

## C. Effect of Shareholder Activism on Stock Price

To test whether targeting results in stock price increases, stock returns are examined two ways, both of which follow Partch (1987). First, abnormal returns are measured around the initial public announcement of targeting by CalPERS. *Wall Street Journal, Barrons,* and Dow Jones News Wire articles and company press releases by target firms and CalPERS are searched over a one-year period centered on the mailing date of the targeting letter to each targeted firm. In addition to news articles and press releases, company proxy statements are searched for CalPERS-sponsored shareholder proposals. Of the 51 firms targeted, public announcements of targeting are found for 39 firms through 1993.[12]

Second, abnormal returns are measured over the period from initial public announcement to public announcement of the outcome of targeting (settlement or the annual meeting date). This event window includes more information about the targeting event but also adds noise, and thus reduces the power of statistical tests. In 16 cases the outcome date is the annual meeting, in 14 cases it is a *Wall Street Journal* or Dow Jones News Wire date when a settlement is announced, and in nine cases no outcome announcement is identified. This longer event window has an average length of 21.1 trading days and a median length of 22 trading days.

Table V presents evidence of the effects of shareholder activism on firm market value. The finding of no effect on stock price for the entire sample is consistent with (i) activism having no effect on firm value, (ii) activism having an effect but it is anticipated, and (iii) activism having mixed effects—positive and negative. In an effort to detect anticipation, abnormal returns over a 60-day period preceding the initial public announcement of targeting is examined (not reported). No significant abnormal returns during this pre-announcement period are found, so it does not appear that targeting is anticipated in a systematic fashion. To examine the possibility that targeting has mixed effects on targeted firms, stock price reactions for sub-samples of targeted firms are evaluated to identify any systematic patterns.

Given the change in targeting policy in 1988, there may have been a corresponding change in the effects of targeting. For this reason, an examination of subperiods of 1987–1988 and 1989–1993 is done. These results suggest that targeting during 1987 and 1988 had the effect of reducing firm market value. One possible explanation is that CalPERS produces information that has not been incorporated in the stock price prior to targeting (e.g., these firms are more resistant to takeovers than previously believed). Another possible explanation is that the market anticipates resistance by management to changes sought by the activist and capitalizes costs, which reduces market value. Over the 1989–1993 period, targeting caused no significant change in firm market

---

[12] In 24 cases the first public announcement of targeting appears in the *Wall Street Journal* (six of these are announcements that the firm has been targeted and has reached a settlement). In 14 cases the first announcement appears as a shareholder proposal included in the company's proxy statement, and in one case the annual meeting is the first identifiable date.

Table V
## Effect of Shareholder Activism on Stock Price

Mean and median two-day cumulative abnormal returns around initial public announcement of targeting for 39 firms that were targeted by CalPERS between 1987 and 1993. The two-day period begins the day before an announcement in the *Wall Street Journal* or the day of a proxy mailing or annual meeting. Abnormal returns are estimated using the market model, the Center for Research in Security Prices (CRSP) value-weighted index, and a 200-day estimation period beginning 260 days prior to initial announcement. The "successful" sample is comprised of firms that either adopt CalPERS's shareholder resolution or make governance changes sufficient to warrant a settlement by CalPERS. Firms in the "takeover" and "performance" samples were targeted with takeover- and performance-related resolutions, respectively. Test statistics for difference from zero for the mean (z-statistic) and median (Wilcoxon signed rank) are also reported (*p*-values for signed rank statistics in parentheses).

| Sample | Mean | z | Median | Signed Rank | % Positive | N |
|--------|------|---|--------|-------------|------------|---|
| Panel A: Entire Sample | | | | | | |
| 1987–93 | −0.08% | 0.05 | −0.30% | −14.00 (0.85) | 41.0% | 39 |
| Panel B: Divided by Time Period | | | | | | |
| 1987–88 | −1.39% | −1.86 | −1.31% | −19.50 (0.05) | 20.0% | 10 |
| 1989–93 | 0.37% | 1.15 | −0.19% | 43.50 (0.36) | 48.3% | 29 |
| Panel C: Divided by Outcome | | | | | | |
| Successful | 1.06% | 2.56 | 1.43% | 42.00 (0.09) | 57.9% | 19 |
| Unsuccessful | −1.16% | −2.43 | −1.59% | −57.00 (0.03) | 25.0% | 20 |
| Panel D: Divided by Type of Resolution | | | | | | |
| Takeover | −1.44% | −2.61 | −1.31% | −32.50 (0.04) | 21.4% | 14 |
| Performance | 0.68% | 2.01 | 0.96% | 52.50 (0.16) | 52.0% | 25 |
| Panel E: 1989–93 Targets | | | | | | |
| Successful | 1.06% | 2.56 | 1.43% | 42.00 (0.09) | 57.9% | 19 |
| Unsuccessful | −0.93% | −1.58 | −1.62% | −7.50 (0.49) | 30.0% | 10 |
| Takeover | −1.65% | −2.09 | −1.75% | −3.50 (0.44) | 20.0% | 5 |
| Performance | 0.79% | 2.22 | 1.19% | 56.00 (0.11) | 54.2% | 24 |

value. Again, these results are consistent with activism having no effect on firm value or mixed effects for different sets of firms.

The results from splitting the sample into successful and unsuccessful outcomes indicate that the effects of activism on firm value may depend on the result of targeting. This would explain the negative abnormal return for firms targeted in the 1987–1988 period since none of those targeting events resulted in adoption or settlement. The results suggest that activism is beneficial to shareholders if the activist is able to change the organizational control structure of targeted firms and may be detrimental to shareholders if unsuccessful (again, possibly due to the capitalization of costs incurred by management in rebuffing the activist).

*The Journal of Finance*

**Table VI**

**Effect of Shareholder Activism on Stock Price**

Mean and median cumulative abnormal returns from initial public announcement of targeting to public announcement of the outcome for 39 firms that were targeted by CalPERS between 1987 and 1993. The event window begins the day before an announcement in the *Wall Street Journal* or the day of a proxy mailing or annual meeting and ends the day of the *Wall Street Journal* announcement of the outcome or the annual meeting. Abnormal returns are estimated using the market model, the Center for Research in Security Prices (CRSP) value-weighted index, and a 200 day estimation period beginning 260 days prior to initial announcement. The "successful" sample is comprised of firms that either adopt CalPERS's shareholder resolution or make governance changes sufficient to warrant a settlement by CalPERS. Firms in the "takeover" and "performance" samples were targeted with takeover- and performance-related resolutions, respectively. Test statistics for difference from zero for the mean ($z$-statistic) and median (Wilcoxon signed rank) are also reported ($p$-values for signed rank statistics in parentheses).

| Sample | Mean | $z$ | Median | Signed Rank | % Positive | N |
|---|---|---|---|---|---|---|
| Panel A: Entire Sample | | | | | | |
| 1987–93 | 2.84% | 2.19 | 1.34% | 88.00 (0.22) | 53.8% | 39 |
| Panel B: Divided by Time Period | | | | | | |
| 1987–88 | −2.02% | −0.26 | −2.56% | −5.50 (0.63) | 50.0% | 10 |
| 1989–93 | 4.52% | 2.70 | 2.12% | 94.50 (0.04) | 55.2% | 29 |
| Panel C: Divided by Outcome | | | | | | |
| Successful | 1.91% | 2.27 | 2.12% | 51.00 (0.04) | 57.9% | 19 |
| Unsuccessful | 3.73% | 0.84 | −0.07% | 3.00 (0.93) | 50.0% | 20 |
| Panel D: Divided by Type of Resolution | | | | | | |
| Takeover | 2.21% | 0.90 | −0.90% | −2.50 (0.90) | 50.0% | 14 |
| Performance | 3.20% | 2.07 | 2.12% | 77.50 (0.03) | 56.0% | 25 |
| Panel E: 1989–93 Targets | | | | | | |
| Successful | 1.91% | 2.27 | 2.12% | 51.00 (0.04) | 57.9% | 19 |
| Unsuccessful | 9.48% | 1.46 | 0.48% | 7.50 (0.49) | 50.0% | 10 |
| Takeover | 8.94% | 1.56 | −3.14% | 0.50 (1.00) | 40.0% | 5 |
| Performance | 3.60% | 2.25 | 2.28% | 88.00 (0.01) | 58.3% | 24 |

Panel D of Table V divides the sample into takeover- and performance-related resolutions as defined in Table I. These returns are consistent with the argument that the market capitalizes expected costs of resisting the activist since takeover-related resolutions probably are filed with firms believed to have "entrenched" management (i.e., firms with poison pills).

To control for any time-period effects, the abnormal returns for firms targeted in the 1989–1993 period are evaluated. The results suggest that the effects of activism are not dependent on the target selection criterion or time period of targeting, but rather the outcome or type of resolution.



**Figure 2. Posttargeting stock price performance of firms targeted by CalPERS 1987–93.**
Cumulative abnormal returns for 51 firms targeted by CalPERS over the 1987–93 period and for
subsamples of firms that either adopt CalPERS's shareholder proposals or make changes suffi-
cient to warrant a settlement ("successful targets," 27 firms) and firms that do not adopt or settle
("unsuccessful targets," 24 firms). Cumulative abnormal returns are compounded daily market-
adjusted returns using the Center for Research in Security Prices (CRSP) value-weighted index.
Returns are calculated over the three-year period beginning the calendar year of targeting. When
three years of returns are not available, returns are calculated through December 31, 1993.

The results for the longer event window are reported in Table VI and are
similar to those for the initial announcement period. However, the average
return for the entire sample becomes significantly positive (2.84 percent, $z =
2.19$) and the significant negative returns for the subsamples become insignif-
icantly different from zero.

An alternative way of examining wealth effects of activism is to estimate
dollar value changes in activist holdings. Using abnormal returns for the
longer event window (initial announcement to outcome announcement) for the
entire sample for which public announcements and CalPERS holdings data is
available (34 firms), the total wealth increase for CalPERS from activism is
$18,880,817. Given that CalPERS officials have estimated total annual costs of
activism at approximately $500,000, activism appears to provide a net benefit
to the activist.

Long-term (three-year) stock price performance is examined for evidence of
continued underperformance by target firms. Figure 2 shows cumulative ab-
normal returns (market-adjusted) for all targets and samples of successful and
unsuccessful targets. Targets overall do not underperform the market, with
successful targets slightly outperforming unsuccessful targets. This indicates
that activism may be effective in stemming poor stock price performance.

*The Journal of Finance*

The results on the effect of activism on stock price are consistent with the hypothesis that activism improves operating performance by aligning incentives and with findings of recent studies. Gillan and Starks (1995) find significant positive stock price reaction around proxy mailing dates for first-time targets receiving governance-related proposals from pension funds over the 1990–91 period. Results for an earlier period suggest no wealth changes. They also find negative but insignificant abnormal returns over the three years following targeting. Wahal (1995) finds significant positive abnormal returns around targeting announcements (letter mailing and press announcement dates) for post-1989 targets and performance-related targets of nine pension funds. He also finds significant abnormal returns for his sample of some of the firms targeted by CalPERS. Nesbitt (1994) finds significant positive abnormal long-term stock price performance following targeting for a sample of firms targeted by CalPERS.

### D. Effect of Shareholder Activism on Operating Performance

One measure of managerial performance, in addition to stock price, is accounting earnings. Since stock price measures the present discounted value of the expected future cash flows of the company, it incorporates expectations that ineffective management will be replaced. Accounting earnings, on the other hand, measure short-term profitability and therefore may be a better measure of managerial performance than stock price, as stock price performance may understate the effects of external monitoring. This argument is suggested by Weisbach (1988) in a study of monitoring by outside directors.

To test whether target firms experience changes in operating performance following targeting, the methodology of Kaplan (1989) is followed. Specifically, median percent changes in operating income (before depreciation), operating income as a percent of sales, and operating income as a percent of assets are measured.[13] Since the empirical literature on the time series properties of earnings indicates that earnings follow a random walk, changes in earnings are an unbiased estimate of unexpected earnings and should measure unexpected changes in operating performance. Changes are measured relative to the fiscal year prior to being targeted (e.g., fiscal year-end 1986 is used as the base for firms selected in Fall 1986 and targeted in the 1987 proxy season). In addition to earnings changes, median percent changes in capital expenditures, undistributed cash flow, and asset sales are examined for alternative sources of shareholder wealth gains.

To control for possible market- and industry-wide changes in the accounting measures, changes are adjusted by changes for the industry-matched sample.[14] To test for possible spillover effects of activism, changes are compared to

---

[13] Operating income is defined as net sales less cost of goods sold and selling, general, and administrative expenses before depreciation, depletion; and amortization are deducted. Using a measure of earnings before interest and tax expenses reduces the effects of changes in capital structure or tax treatment on earnings.

[14] Kaplan (1989) uses median industry changes to adjust, whereas matched-sample changes are used here.

Table VII

## Effect of Shareholder Activism on Operating Performance

Median percent change in operating income, operating income/sales, and operating income/assets for targets, industry-adjusted targets, Remaining Failing Fifty, and Remaining 250 samples over the period 1987–1993. Year $-1$ is the fiscal year-end prior to being targeted or appearing in either control sample and year $+1$ is the target year or year appearing in either control sample. Two-tailed Wilcoxon signed rank test $p$-values for difference from zero are reported for the target and industry-adjusted target samples in parentheses, and Wilcoxon rank sum test $p$-values for difference from target sample median are reported for the Remaining Failing Fifty and Remaining Bottom 250 samples in parentheses. The number of observations is reported in brackets.

| Sample | $-6$ to $-1$ | $-1$ to $+1$ | $-1$ to $+2$ | $-1$ to $+3$ |
|---|---|---|---|---|
| Panel A: Operating Income[1] | | | | |
| Targets | 42.56% | 6.95% | 2.39% | 9.38% |
| | (0.00) [47] | (0.09) [46] | (0.35) [41] | (0.19) [35] |
| Industry-adjusted Targets | $-8.83$% | $-8.92$% | $-19.92$% | $-21.31$% |
| | (0.28) [47] | (0.14) [45] | (0.11) [39] | (0.25) [35] |
| Remaining Failing Fifty | $-12.74$% | 2.42% | 13.29% | 25.29% |
| | (0.00) [83] | (0.66) [80] | (0.56) [55] | (0.48) [28] |
| Remaining Bottom 250 | 21.16% | 10.11% | 20.95% | 24.73% |
| | (0.21) [428] | (0.54) [450] | (0.05) [383] | (0.13) [303] |
| Panel B: Operating Income/Sales[2] | | | | |
| Targets | 4.07% | 1.88% | $-2.46$% | $-2.30$% |
| | (0.29) [47] | (0.99) [46] | (0.69) [41] | (0.59) [35] |
| Industry-adjusted Targets | 4.07% | 1.88% | $-2.46$% | $-2.30$% |
| | (0.74) [47] | (0.22) [45] | (0.39) [39] | (0.38) [35] |
| Remaining Failing Fifty | $-28.79$% | 2.71% | 5.11% | 6.72% |
| | (0.00) [83] | (0.39) [80] | (0.32) [55] | (0.23) [28] |
| Remaining Bottom 250 | $-8.14$% | 1.84% | 2.91% | 0.38% |
| | (0.02) [428] | (0.39) [449] | (0.16) [382] | (0.52) [303] |
| Panel C: Operating Income/Assets[3] | | | | |
| Targets | $-16.13$% | 2.46% | $-5.49$% | $-4.07$% |
| | (0.01) [47] | (0.36) [46] | (0.93) [41] | (0.64) [35] |
| Industry-adjusted Targets | 0.11% | $-0.39$% | $-7.71$% | $-0.20$% |
| | (0.40) [47] | (0.73) [45] | (0.58) [39] | (0.86) [35] |
| Remaining Failing Fifty | $-28.41$% | 1.51% | $-2.71$% | 8.12% |
| | (0.08) [83] | (0.99) [80] | (0.84) [55] | (0.32) [28] |
| Remaining Bottom 250 | $-20.89$% | 2.44% | 2.91% | 0.84% |
| | (0.39) [428] | (0.84) [449] | (0.40) [383] | (0.45) [303] |

[1] Operating income before depreciation (COMPUSTAT variable A13).

[2] Operating income before depreciation divided by net sales (COMPUSTAT variables A13 and A12).

[3] Operating income before depreciation divided by book value of assets (COMPUSTAT variables A13 and A6).

changes for firms in the Remaining Failing Fifty and Remaining Bottom 250 samples.

Results for the effect of shareholder activism on operating performance are presented in Table VII. Results are reported for the five-year pretargeting

*The Journal of Finance*

period and one, two, and three year posttargeting periods. Over the pretargeting period, targets outperform firms in the Remaining Failing Fifty in terms of all three measures (operating income, operating income/sales, and operating income/assets). However, the targets do not perform significantly differently than their respective industries. There is some evidence that targets have significant positive increases in operating income, especially over the year they are targeted, but the changes do not differ from changes for the industry matched sample or either the Remaining Failing Fifty or Remaining Bottom 250. These results suggest that any positive expectations of the market at the time of targeting announcement are not "confirmed" by significant increases in operating performance relative to control samples. This is consistent with Wahal (1995), who finds that operating performance (measured as operating income/assets and net income/assets) does not improve after targeting.

Table VIII presents results of analysis involving alternative accounting measures that may reflect sources of shareholder wealth gains from targeting. Target firms have a significant positive increase in capital expenditures over the pretargeting period that is greater than firms in the Remaining Failing Fifty. This suggests that given the low market-to-book ratios for target firms, targets may be investing in negative net present value projects. However, the changes in target firm capital expenditures are significantly lower than changes in their industry matches. Posttargeting changes for targets are not different than for their industry matches but are lower than for firms in the Remaining Bottom 250. These results suggest that possibly over-investing targets do not significantly reduce their level of investment following targeting.

Panel B of Table VIII shows changes in Lehn and Poulsen's (1989) measure of undistributed cash flow. If undistributed cash flow is higher for high agency cost firms and targeting helps align incentives, then significant reductions in undistributed cash flow may signal incentive alignment and be the source of shareholder wealth gains at initial targeting announcement. From the table it appears that target firms do not have different pretargeting changes in undistributed cash flow than their industries and less negative changes than firms in either the Remaining Failing Fifty or Remaining Bottom 250 samples. Although target firms have reductions in cash flow following targeting, they are not statistically significant, nor are they different from any of the control samples. Therefore, it does not appear that wealth gains arise from reductions in undistributed cash flow.

Finally, Panel C of Table VIII examines asset sales for targets and control samples. Over the pretargeting period, targets do not have changes in the level of asset sales different than any of the control samples. In the first year of targeting, however, targets do have a significant increase in asset sales which is significantly higher than either the Remaining Failing Fifty or Remaining Bottom 250 samples and insignificantly higher than the industry matches. Over the three years following targeting, the increase in asset sales is greater than the industry matches or Remaining Bottom 250 sample. This suggests that targets may be divesting poorly performing assets in the posttargeting period.

### Table VIII
## Effect of Shareholder Activism on Expenditures, Undistributed Cash Flow, and Divestitures

Median percent change in capital expenditures, undistributed cash flow and asset sales for firms in the target, industry-adjusted target, Remaining Failing Fifty, and Remaining 250 samples over the period 1987–1993. Year $-1$ is the fiscal year-end prior to being targeted or appearing in either control sample and year $+1$ is the target year or year appearing in either control sample. Two-tailed Wilcoxon signed rank test $p$-values for difference from zero are reported for the target and industry-adjusted target samples in parentheses, and Wilcoxon rank sum test $p$-values for difference from target sample median are reported for the Remaining Failing Fifty and Remaining Bottom 250 samples in parentheses. The number of observations is reported in brackets.

| Sample | $-6$ to $-1$ | $-1$ to $+1$ | $-1$ to $+2$ | $-1$ to $+3$ |
|---|---|---|---|---|
| Panel A: Capital Expenditures[1] | | | | |
| Targets | 15.45% | 2.03% | $-2.13\%$ | 10.56% |
| | (0.01) [47] | (0.43) [46] | (0.52) [41] | (0.25) [33] |
| Industry-adjusted Targets | $-31.30\%$ | $-6.14\%$ | $-8.17\%$ | $-19.69\%$ |
| | (0.02) [44] | (0.94) [42] | (0.31) [36] | (0.50) [30] |
| Remaining Failing Fifty | $-8.03\%$ | $-4.12\%$ | 1.65% | 21.53% |
| | (0.02) [80] | (0.24) [77] | (0.94) [52] | (0.47) [26] |
| Remaining Bottom 250 | 3.40% | 6.00% | 17.56% | 27.16% |
| | (0.19) [363] | (0.57) [389] | (0.05) [328] | (0.07) [269] |
| Panel B: Undistributed Cash Flow[2] | | | | |
| Targets | $-10.47\%$ | $-4.09\%$ | $-6.61\%$ | $-2.81\%$ |
| | (0.53) [44] | (0.87) [43] | (0.83) [39] | (0.66) [33] |
| Industry-adjusted Targets | $-3.09\%$ | 14.72% | 17.23% | 5.24% |
| | (0.99) [42] | (0.62) [40] | (0.15) [35] | (0.20) [31] |
| Remaining Failing Fifty | $-35.11\%$ | $-15.33\%$ | $-12.76\%$ | 11.17% |
| | (0.01) [79] | (0.17) [77] | (0.97) [53] | (0.16) [26] |
| Remaining Bottom 250 | $-26.10\%$ | $-2.67\%$ | $-3.69\%$ | $-14.43\%$ |
| | (0.02) [361] | (0.74) [388] | (0.96) [325] | (0.51) [271] |
| Panel C: Asset Sales[3] | | | | |
| Targets | 48.53% | 52.92% | 40.42% | 31.93% |
| | (0.19) [16] | (0.01) [22] | (0.18) [18] | (0.19) [14] |
| Industry-adjusted Targets | 0.00% | 87.55% | 154.59% | 374.97% |
| | (0.84) [7] | (0.38) [7] | (0.31) [5] | (0.06) [5] |
| Remaining Failing Fifty | $-46.78\%$ | $-22.39\%$ | $-3.24\%$ | 140.96% |
| | (0.34) [30] | (0.04) [37] | (0.58) [26] | (0.18) [14] |
| Remaining Bottom 250 | 1.22% | $-16.33\%$ | $-27.15\%$ | $-43.81\%$ |
| | (0.92) [147] | (0.02) [184] | (0.37) [141] | (0.07) [100] |

[1] Capital expenditures (COMPUSTAT variable A128).

[2] Undistributed cash flow (operating income before depreciation minus interest expense, taxes, preferred and common dividends) divided by assets.

[3] Sale of property, plant and equipment (COMPUSTAT variable A107).

In summary, although some evidence is found that activism is followed by increases in operating income, reductions in undistributed cash flow, and increases in asset sales, it does not appear that shareholder activism has a

*The Journal of Finance*

statistically significant impact on these measures. This is somewhat puzzling in light of stock price reactions to announcements of targeting. There are several possible reasons for these apparent conflicting results. First, the market may correctly anticipate improvements in operating performance of targeted firms but improvements do not appear within three years following targeting. That is, improvements may occur over a longer period of, say, five years and thus are not measurable in this analysis. Second, the market may correctly anticipate improvements, but the improvements are not reflected in the accounting measures used, or the improvements are so small and spread over such a long period that they are not detected. This would seem a reasonable explanation given the relatively small gains in shareholder wealth (roughly one percent) which, if spread over several years would be virtually undetectable. What would be an economically meaningful change in operating performance, given the large size of these firms and CalPERS's stake in them, may not be statistically significant. Third, the market may incorrectly anticipate improvements, in which case a correction in stock price would be expected. Since no systematic correction in long-term stock price performance is found, even though the size of the correction would be small and perhaps undetectable, this seems an unlikely explanation. Or finally, the market may be reacting to some factor other than anticipated operating improvements.

To more directly examine the relation between stock price reactions at targeting and subsequent changes in operating performance, two tests are conducted. The first conducts the analysis of Tables VII and VIII, but only for targets with successful outcomes. The results (not reported) are not significantly different from those reported for the full sample. Thus, it does not appear that successful targets respond differently than unsuccessful targets. As a second test, the two-day targeting announcement abnormal returns are regressed on posttargeting changes in all the measures reported in Tables VII and VIII, run separately for each measure and for each posttargeting period (one, two, and three years). No significant relation between stock price reaction and any of the accounting measures is found. These results suggest either no relation between change in operating performance and stock price reaction or that sufficient noise exists in the performance measures to make a relation undetectable.

An alternative explanation for the positive stock price reaction to targeting is that activism targeting increases the probability that a firm is subject to a takeover. To examine this possibility, a search is done of the Dow Jones News Retrieval for takeover activity involving the 51 activism targets. Two of the 1987 targets were takeover targets within three years after activism targeting, and one of the 1988 targets was a proxy contest target over the three years following targeting. Other than these instances, no other activism target in the sample was a takeover target for the three years following activism targeting. This result, combined with the fact that shareholder wealth gains are associated with performance-related as opposed to takeover-related targeting, indicates that the source of wealth gains is not increased probability of a takeover.

## V. Conclusion

This study examines the emerging role of institutional investors as active monitors of corporate management. The characteristics that lead to targeting and the effects of activism on governance structure, shareholder wealth, and operating performance are examined. The study shows that level of institutional ownership and firm size affect the probability of being targeted, after controlling for prior stock price performance. It is shown that over the last five years of the sample period (1989–93), 72 percent of targets either adopted proposed governance structure resolutions or made changes sufficient to warrant a settlement. There is a significant positive stock price reaction for successful targeting events and a significant negative reaction for unsuccessful events. Changes in operating performance do not reflect statistically significant improvement. Overall, the evidence indicates that shareholder activism is largely successful in changing governance structure and, when successful, results in a statistically significant increase in shareholder wealth. However, if the source of the wealth increase is improved operating performance, it is not statistically significant. On net, activism appears to be beneficial to CalPERS, as the value increase of its holdings from activism is almost $19 million over the 1987–93 period (for the 34 firms with sufficient data), while its estimated costs of activism over the same period were approximately $3.5 million ($500,000 per year).

### REFERENCES

Admati, Anat R., Paul Pfleiderer, and Josef Zechner, 1992, Large shareholder activism, risk sharing, and financial market equilibrium, Unpublished manuscript, University of British Columbia.

Ayres, Ian, and Peter Cramton, 1993, An agency perspective on relational investing, Unpublished manuscript, Stanford Law School.

Clark, R., 1986, *Corporate law*, Boston: Little, Brown, and Co.

Gillan, Stuart, and Laura Starks, 1995, Relationship investing and shareholder activism by institutional investors, Unpublished manuscript, University of Texas at Austin.

Gordon, Lilli, and John Pound, 1993, Information, ownership structure, and shareholder voting: Evidence from shareholder-sponsored corporate governance proposals, *Journal of Finance* 48, 697–718.

Jensen, Michael C., 1986, Agency costs of free cash flow, corporate finance and takeovers, *American Economic Review* 76, 323–329.

Jensen, Michael C., 1988, Takeovers: Their causes and consequences, *Journal of Economic Perspectives* 2, 21–48.

Jensen, Michael C., 1989, The eclipse of the public corporation, *Harvard Business Review* 5, 61–75.

John, Kose, and April Klein, 1994, Shareholder proposals and corporate governance, Unpublished manuscript, New York University.

Kaplan, Steven, 1989, The effects of management buyouts on operating performance and value, *Journal of Financial Economics* 24, 217–254.

Karpoff, Jonathan, Paul Malatesta, and Ralph Walkling, 1994, Corporate governance and shareholder initiatives: Empirical evidence, Unpublished manuscript, University of Washington.

Lang, Larry, René M. Stulz, and Ralph A. Walkling, 1989, Managerial performance, Tobin's q, and the gains from successful tender offers, *Journal of Financial Economics* 24, 137–154.

Lehn, Kenneth, and Annette Poulsen, 1989, Free cash flow and stockholder gains in going private transactions, *Journal of Finance* 44, 771–789.

Loss, L., 1988, Fundamentals of security regulation, Boston: Little, Brown, and Co.

Martin, K., and John J. McConnell, 1991, Corporate performance, corporate takeovers, and management turnover, *Journal of Finance* 46, 671–687.

Mikkelson, Wayne H., and M. Megan Partch, 1989, Managers' voting rights and corporate control, *Journal of Financial Economics* 25, 263–290.

Nesbitt, Stephen L., 1994, Long-term rewards from shareholder activism: A study of the "CalPERS effect", *Journal of Applied Corporate Finance* 6, 75–80.

Partch, M. Megan, 1987, The creation of a class of limited voting common stock and shareholder wealth, *Journal of Financial Economics* 18, 313–339.

Pound, John, 1988, Proxy contests and the efficiency of shareholder oversight, *Journal of Financial Economics* 20, 237–265.

Roe, Mark, 1990, Political and legal restraints on ownership and control of public companies, *Journal of Financial Economics* 27, 7–42.

Servaes, Henri, 1991, Tobin's q and the gains from takeovers, *Journal of Finance* 46, 409–419.

Shivdasani, Anil, 1993, Board composition, ownership structure, and hostile takeovers, *Journal of Accounting and Economics* 16, 167–198.

Shleifer, Andrei, and Robert Vishny, 1986, Large shareholders and corporate control, *Journal of Political Economy* 94, 461–488.

Smith, C. W., and R. L. Watts, 1992, The investment opportunity set and corporate financing, dividend, and compensation policies, *Journal of Financial Economics* 32, 263–292.

Stulz, René M., 1988, Managerial control of voting rights; Financing policies and the market for corporate control, *Journal of Financial Economics* 20, 25–54.

Wahal, Sunil, 1995, Public fund activism and firm performance, Unpublished manuscript, University of North Carolina at Chapel Hill.

Weisbach, Michael S., 1988, Outside directors and CEO turnover, *Journal of Financial Economics* 20, 431–460.

# EXHIBIT C

# CORPORATE GOVERNANCE AND EQUITY PRICES

[QUARTERLY JOURNAL OF ECONOMICS, FORTHCOMING, FEBRUARY 2003]

Paul A. Gompers
Harvard Business School
Harvard University and NBER


Joy L. Ishii
Department of Economics
Harvard University


Andrew Metrick
Department of Finance, The Wharton School
University of Pennsylvania and NBER

We thank Franklin Allen, Judy Chevalier, John Core, Robert Daines, Darrell Duffie, Ken French, Gary
Gorton, Edward Glaeser, Joe Gyourko, Robert Holthausen, Steve Kaplan, Sendhil Mullainathan,
Krishna Ramaswamy, Roberta Romano, Virginia Rosenbaum, Andrei Shleifer, Peter Siegelman, Rob
Stambaugh, Jeremy Stein, René Stulz, Joel Waldfogel, Mike Weisbach, Julie Wulf, three anonymous
referees, and seminar participants at Chicago, Columbia, Cornell, Duke, The Federal Reserve Board of
Governors, Georgetown, Harvard, INSEAD, Stanford, Wharton, Yale, the 2001 NBER Summer
Institute, and the NYU Five-Star Conference for helpful comments. Yi Qian and Gabriella Skirnick
provided excellent research assistance. Gompers acknowledges the support of the Division of Research
at Harvard Business School. Ishii acknowledges support from an NSF Graduate Research Fellowship.

# CORPORATE GOVERNANCE AND EQUITY PRICES

ABSTRACT

Shareholder rights vary across firms. Using the incidence of 24 governance rules, we construct a "Governance Index" to proxy for the level of shareholder rights at about 1500 large firms during the 1990s. An investment strategy that bought firms in the lowest decile of the index (strongest rights) and sold firms in the highest decile of the index (weakest rights) would have earned abnormal returns of 8.5 percent per year during the sample period. We find that firms with stronger shareholder rights had higher firm value, higher profits, higher sales growth, lower capital expenditures, and made fewer corporate acquisitions.

Keywords: *Corporate governance, shareholder rights, investor protection, agency problems, entrenched management, hostile takeovers, poison pills, golden parachutes, greenmail.*

## I.     Introduction

Corporations are republics. The ultimate authority rests with voters (shareholders). These voters elect representatives (directors) who delegate most decisions to bureaucrats (managers). As in any republic, the actual power-sharing relationship depends upon the specific rules of governance. One extreme, which tilts toward a democracy, reserves little power for management and allows shareholders to quickly and easily replace directors. The other extreme, which tilts toward a dictatorship, reserves extensive power for management and places strong restrictions on shareholders' ability to replace directors. Presumably, shareholders accept restrictions of their rights in hopes of maximizing their wealth, but little is known about the ideal balance of power. From a theoretical perspective, there is no obvious answer. In this paper, we ask an empirical question -- is there a relationship between shareholder rights and corporate performance?

Twenty years ago, large corporations had little reason to restrict shareholder rights. Proxy fights and hostile takeovers were rare, and investor activism was in its infancy. By rule, most firms were shareholder democracies, but in practice management had much more of a free hand than they do today. The rise of the junk bond market in the 1980s disturbed this equilibrium by enabling hostile-takeover offers for even the largest public firms. In response, many firms added takeover defenses and other restrictions of shareholder rights. Among the most popular were those that stagger the terms of directors, provide severance packages for managers, and limit shareholders' ability to meet or act. During the same time period, many states passed antitakeover laws giving firms further defenses against hostile bids. By 1990, there was considerable variation across firms in the strength of shareholder rights. The takeover market subsided in the early 1990s, but this variation remained in place throughout the decade.

Most research on the wealth impact of takeover defenses uses event-study methodology, where firms' stock returns are analyzed following the announcement of a new defense.[1] Such studies face the difficulty that new defenses may be driven by contemporaneous conditions at the firm, i.e., adoption of a defense may both change the governance structure and provide a signal of managers' private information about impending takeover bids. Event studies of changes in state takeover laws are mostly immune from this problem, but it is difficult to identify a single date for an event that is preceded by legislative negotiation and followed by judicial uncertainty. For these and other reasons, some authors argue that event-study methodology cannot identify the impact of governance provisions.[2]

We avoid these difficulties by taking a long-horizon approach. We combine a large set of governance provisions into an index which proxies for the strength of shareholder rights, and then study the empirical relationship between this index and corporate performance. Our analysis should be thought of as a "long-run event study": we have democracies and dictatorships, the rules stayed mostly the same for a decade -- how did each type do? Our main results are to demonstrate that, in the 1990s, democracies earned significantly higher returns, were valued higher, and had better operating performance. Our analysis is not a test of market efficiency. Because theory provides no clear prediction, there is no reason that investors in 1990 should have foreseen the outcome of this novel experiment. Also, because this "experiment" did not use random assignment, we cannot make strong claims about causality, but we do explore the implications and assess the supportive evidence for several causal hypotheses.[3]

---

[1] Surveys of this literature can be found in Bhagat and Romano [2001], Bittlingmayer [2000], Comment and Schwert [1995], and Karpoff and Malatesta [1989].

[2] See Coates [2000] for a detailed review of these arguments.

[3] Other papers that analyze relationships between governance and either firm value or performance have generally focused on board composition, executive compensation, or insider ownership [Baysinger and Butler 1985, Bhagat and Black 1998, Core, Holthausen, and Larcker 1999, Hermalin and Weisbach 1991, Morck, Shleifer, and Vishny 1988, Yermack 1996]. See Shleifer and Vishny [1997] for a survey.

Our data are derived from publications of the Investor Responsibility Research Center. These publications provide 24 distinct corporate-governance provisions for approximately 1,500 firms since 1990.[4] In Section II, we describe these provisions and data sources in more detail. We divide the rules into five thematic groups and then construct a "Governance Index" as a proxy for the balance of power between shareholders and managers. Our index construction is straightforward: for every firm, we add one point for every provision that reduces shareholder rights. This reduction of rights is obvious in most cases; the few ambiguous cases are discussed. Firms in the highest decile of the index are placed in the "Dictatorship Portfolio" and are referred to as having the "highest management power" or the "weakest shareholder rights"; firms in the lowest decile of the index are placed in the "Democracy Portfolio" and are described as having the "lowest management power" or the "strongest shareholder rights".

In Section III, we document the main empirical relationships between governance and corporate performance. Using performance-attribution time-series regressions from September 1990 to December 1999, we find that the Democracy Portfolio outperformed the Dictatorship Portfolio by a statistically significant 8.5 percent per year. These return differences induced large changes in firm value over the sample period. By 1999, a one-point difference in the index was negatively associated with an 11.4 percentage-point difference in Tobin's $Q$. After partially controlling for differences in market expectations by using the book-to-market ratio, we also find evidence that firms with weak shareholder rights were less profitable and had lower sales growth than other firms in their industry.

---

[4] These 24 provisions include 22 firm-level provisions and six state laws (four of the laws are analogous to four of the firm-level provisions). For the remainder of the paper, we refer interchangeably to corporate governance "laws", "rules", and "provisions". We also refer interchangeably to "shareholders" and "investors" and refer to "management" as comprising both managers and directors.

The correlation of the Governance Index with returns, firm value, and operating performance could be explained in several ways. Section IV sets out three hypotheses to explain the results. Hypothesis I is that weak shareholder rights caused additional agency costs. If the market underestimated these additional costs, then a firm's stock returns and operating performance would have been worse than expected, and the firm's value at the beginning of the period would have been too high. Hypothesis II is that managers in the 1980s predicted poor performance in the 1990s, but investors did not. In this case, the managers could have put governance provisions in place to protect their jobs. While the provisions might have real protective power, they would not have caused the poor performance. Hypothesis III is that governance provisions did not cause poor performance (and need not have any protective power) but rather were correlated with other characteristics that were associated with abnormal returns in the 1990s. While we cannot identify any instrument or natural experiment to cleanly distinguish among these hypotheses, we do assess some supportive evidence for each one in Section V. For Hypothesis I, we find some evidence of higher agency costs in a positive relationship between the index and both capital expenditures and acquisition activity. In support of Hypothesis III, we find several observable characteristics that can explain up to one-third of the performance differences. We find no evidence in support of Hypothesis II. Section VI concludes the paper.

## II. Data

### A. Corporate-Governance Provisions

Our main data source is the Investor Responsibility Research Center (IRRC), which publishes detailed listings of corporate-governance provisions for individual firms in *Corporate Takeover Defenses* [Rosenbaum 1990, 1993, 1995, and 1998]. These data are derived from a variety of public sources including corporate bylaws and charters, proxy statements, annual reports, as well as 10-K and 10-Q documents filed with the SEC. The IRRC's universe is drawn from the Standard & Poor's (S&P) 500 as well as the annual lists of the largest corporations in the publications of *Fortune, Forbes,* and *Businessweek*. The IRRC's sample expanded by several hundred firms in 1998 through additions of some smaller firms and firms with high institutional-ownership levels. Our analysis uses all firms in the IRRC universe except those with dual-class common stock (less than 10 percent of the total).[5] The IRRC universe covers most of the value-weighted market: even in 1990, the IRRC tracked more than 93 percent of the total capitalization of the combined New York Stock Exchange (NYSE), American Stock Exchange (AMEX), and Nasdaq markets.

The IRRC tracks 22 charter provisions, bylaw provisions, and other firm-level rules plus coverage under six state takeover laws; duplication between firm-level provisions and state laws yields 24 unique provisions. Table I lists all of these provisions and Appendix A discusses each one in detail. We divide them into five groups: tactics for delaying hostile bidders (*Delay*); voting rights (*Voting*); director/officer protection (*Protection*); other takeover defenses (*Other*); and state laws (*State*).

---

[5] We omit firms with dual-class common stock because the wide variety of voting and ownership differences across these firms makes it difficult to compare their governance structures with those of single-class firms.

The *Delay* group includes four provisions designed to slow down a hostile bidder. For takeover battles that require a proxy fight to either replace a board or dismantle a takeover defense, these provisions are the most crucial. Indeed, some legal scholars argue that the dynamics of modern takeover battles have rendered all other defenses superfluous [Daines and Klausner 2001, Coates 2000]. The *Voting* group contains six provisions, all related to shareholders' rights in elections or charter/bylaw amendments. The *Protection* group contains six provisions designed to insure officers and directors against job-related liability or to compensate them following a termination. The *Other* group includes the six remaining firm-level provisions.

These provisions tend to cluster within firms. Out of $(22 * 21)/2 = 231$ total pairwise correlations for the 22 firm-level provisions, 169 are positive, and 111 of these positive correlations are significant.[6] In contrast, only nine of the 62 negative correlations are significant. This clustering suggests that firms may differ significantly in the balance of power between investors and management.

The IRRC firm-level data do not include provisions that apply automatically under state law. Thus, we supplement this data with state-level data on takeover laws as given by Pinnell [2000], another IRRC publication. From this publication, we code the presence of six types of so-called "second-generation" state takeover laws and place them in the *State* group.[7] Few states

---

[6] Unless otherwise noted, all statements about statistical significance refer to significance at the five-percent level.
[7] These laws are classified as "second-generation" in the literature to distinguish them from the "first-generation" laws passed by many states in the 60s and 70s and held to be unconstitutional in 1982. See Comment and Schwert [1995] and Bittlingmayer [2000] for a discussion of the evolution and legal status of state takeover laws and firm-specific takeover defenses. The constitutionality of almost all of the second-generation laws and the firm-specific takeover defenses was clearly established by 1990. All of the state takeover laws cover firms incorporated in their home state. A few states have laws that also cover firms incorporated outside of the state that have significant business within the state. The rules for "significant" vary from case to case, but usually cover only a few very large firms. We do not attempt to code for this out-of-state coverage.

have more than three of these laws, and only Pennsylvania has all six.[8]  Some of these laws are analogues of firm-level provisions given in other groups.  We discuss these analogues in Section II.B.

The IRRC dataset is not an exhaustive listing of all provisions.  Although firms can review their listing and point out mistakes before publication, the IRRC does not update every company in each new edition of the book, so some changes may be missed.  Also the charter and bylaws are not available for all companies and thus the IRRC must infer some provisions from proxy statements and other filings. Overall, the IRRC intends its listings as a starting point for institutional investors to review governance provisions.  Thus, these listings are a noisy measure of a firm's governance provisions, but there is no reason to suspect any systematic bias.  Also, all of our analysis uses data available at time $t$ to forecast performance at time $t+1$ and beyond, so there is no possibility of look-ahead bias induced by our statistical procedures.

To build the dataset, we coded the data from the individual firm profiles in the IRRC books.  For each firm, we recorded the identifying information (ticker symbol, state of incorporation) and the presence of each provision.  Although many of the provisions can be made stronger or weaker (e.g., supermajority thresholds can vary between 51 and 100 percent), we made no strength distinctions and coded all provisions as simply "present" or "not present". This methodology sacrifices precision for the simplicity necessary to build an index.

For most of the analysis of this paper, we match the IRRC data to the Center for Research in Security Prices (CRSP) and, where necessary, to Standard and Poor's Compustat database. CSRP matching was done by ticker symbol and was supplemented by handchecking names, exchanges, and states of incorporation. These procedures enable us to match 100 percent of the

---

[8] The statistics of Table I reflect exactly the frequency of coverage under the default law in each state.  A small minority of firms elect to "opt-out" of some laws and "opt-in" to others.  We code these options separately and use them in the creation of our index.

IRRC sample to CRSP, with about 90 percent of these matches having complete annual data in Compustat.

## B. The Governance Index

The index construction is straightforward: for every firm, we add one point for every provision that restricts shareholder rights (increases managerial power). This power distinction is straightforward in most cases, as is discussed below. While this simple index does not accurately reflect the relative impacts of different provisions, it has the advantage of being transparent and easily reproducible. The index does not require any judgments about the efficacy or wealth effects of any of these provisions; we only consider the impact on the balance of power.

For example, consider Classified Boards, a provision that staggers the terms and elections of directors and hence can be used to slow down a hostile takeover. If management uses this power judiciously, it could possibly lead to an increase in overall shareholder wealth; if management uses this power to maintain private benefits of control, then this provision would decrease shareholder wealth. In either case, it is clear that Classified Boards increase the power of managers and weaken the control rights of large shareholders, which is all that matters for constructing the index.

Most of the provisions can be viewed in a similar way. Almost every provision gives management a tool to resist different types of shareholder activism, such as calling special meetings, changing the firm's charter or bylaws, suing the directors, or just replacing them all at once. There are two exceptions: Secret Ballots and Cumulative Voting. A Secret Ballot, also called "confidential voting" by some firms, designates a third-party to count proxy votes and

prevents management from observing how specific shareholders vote. Cumulative Voting allows shareholders to concentrate their directors' votes so that a large minority holder can ensure some board representation. (See Appendix A for fuller descriptions.) These two provisions are usually proposed by shareholders and opposed by management.[9] In contrast, none of the other provisions enjoy consistent shareholder support or management opposition; in fact, many of these provisions receive significant numbers of shareholder proposals for their repeal [Ishii 2000]. Also, both Cumulative Voting and Secret Ballots tend to be negatively correlated with the presence of other firm-level provisions (19 negative out of 21 for Cumulative Voting; 11 out of 21 for Secret Ballot). Thus, we consider the presence of Secret Ballots and Cumulative Voting to be *increases* in shareholder rights. For each one, we add one point to the Governance Index when firms do *not* have it. For all other provisions, we add one point when firms do have it.[10]

Thus, the Governance Index ("*G*") is just the sum of one point for the existence (or absence) of each provision. We also construct subindices for each of the five categories: *Delay, Protection, Voting, Other,* and *State*. Recall that there are 28 total provisions listed in the five categories, of which 24 are unique. For the state laws with a firm-level analogue, we add one point to the index if the firm is covered under the firm-level provision, the state law, or both.[11] For example, a firm that has an Antigreenmail provision and is also covered by the

---

[9] In the case of Secret Ballots, shareholder fiduciaries argue that it enables voting without threat of retribution, such as the loss of investment-banking business by brokerage-house fiduciaries. See Gillan and Bethel [2001] and McGurn [1989].

[10] Only two other provisions – Antigreenmail and Golden Parachutes – seem at all ambiguous. Since both are positively correlated with the vast majority of other firm-level provisions and can logically be viewed as takeover defenses, we code them like other defenses and add one point to the index for each. See their respective entries in Appendix A for a discussion.

[11] Firms usually have the option to opt out of state law coverage. Also, a few state laws require firms to opt in to be covered. The firms that exercise these options are listed in the IRRC data. When we constructed the *State* subindex, we ignored these options and used the default state coverage. When we constructed the *G* index, we included the options and used actual coverage.

Antigreenmail state law would get one point added to both its *State* subindex and its *Other* subindex, but only one point (not two) would be added to its overall $G$ index. Thus, $G$ has a possible range from 1 to 24 and is not just the sum of the five subindices.

Table II gives summary statistics for $G$ and the subindices in 1990, 1993, 1995, and 1998. Table II also shows the frequency of $G$ by year, broken up into groups beginning with $G \leq 5$, then each value of $G$ from $G = 6$ through $G = 13$, and finishing with $G \geq 14$. These ten "deciles" are similar but not identical in size, with relative sizes that are fairly stable from 1990 to 1995. In the remainder of the paper, we pay special attention to the two extreme portfolios: the "Dictatorship Portfolio" of the firms with the weakest shareholder rights ($G \geq 14$), and the "Democracy Portfolio" of the firms with the strongest shareholder rights ($G \leq 5$). These portfolios are updated at the same frequency as $G$.

Most of the changes in the distribution of $G$ come from changes in the sample due to mergers, bankruptcies, and additions of new firms by the IRRC. In 1998, the sample size increased by about 25 percent, and these new firms tilted toward lower values of $G$. At the firm level, $G$ is relatively stable. For individual firms, the mean (absolute) change in $G$ between publication dates (1990, 1993, 1995, 1998) is 0.60, and the median (absolute) change between publication dates is zero.[12]

Table III shows the correlations between pairs of subindices. The *Delay*, *Protection*, *Voting*, and *Other* subindices all have positive and significant pairwise correlations with each other. *State*, however, has negative correlations with *Delay*, *Protection*, and *Voting*. It could be that firms view some of the state laws as substitutes for the firm-level provisions, but then it

---

[12] The IRRC gives dates for some of the provision changes – where available, this data suggests that the majority of the provisions were adopted in the 1980s. Danielson and Karpoff [1998] perform a detailed study on a similar set of provisions and demonstrate a rapid pace of change between 1984 and 1989.

would be surprising that *Other*, which contains three provisions that are direct substitutes for state laws, is the only subindex that is positively correlated with *State*. Overall, it appears that coverage under state laws is not highly correlated with the adoption of firm-level provisions. This fact has implications for the analysis of causality, as is discussed in Section IV.

Table IV lists the ten largest firms (by market capitalization) in the Democracy and Dictatorship Portfolios in 1990 and gives the value of $G$ for these firms in 1990 and 1998. Of the ten largest firms in the Democracy Portfolio in 1990, six of them are still in the Democracy Portfolio in 1998, three have dropped out of the portfolio and have $G = 6$, and one (Berkshire Hathaway) disappeared from the sample.[13] The Dictatorship Portfolio has a bit more activity, with only two of the top ten firms remaining in the portfolio, four firms dropping out with $G = 13$, and three firms leaving the sample though mergers or the addition of another class of stock.[14] Thus, 40 percent (eight out of 20) of the largest firms in the extreme portfolios in 1990 were also in these portfolios in 1998. This is roughly comparable to the full set of firms: among all firms in the Democracy and Dictatorship Portfolios in 1990, 31 percent were still in the same portfolios in 1998.

There is no obvious industry concentration among these top firms; the whole portfolios are similarly dispersed. Classifying firms into 48 industries as in Fama and French [1997], the portfolios appear to be broadly similar to each other in all years, with a mix of old-economy and new-economy industries.[15] Each portfolio has an important technology component. "Computers" is the largest industry by market value in the Democracy Portfolio in 1990, with

---

[13] Berkshire Hathaway disappeared because it added a second class of stock before 1998. Firms with multiple classes of common stock are not included in our analysis.

[14] NCR disappeared after a merger. It reappeared in the sample in 1998 as a spin-out, but since it received a new permanent number from CRSP, we treat the new NCR as a different company.

[15] The industry names are from Fama and French [1997], but use a slightly updated version of the SIC classification of these industries that is given on Ken French's website (June 2001). In Sections III and V, we use both this updated classification and the corresponding industry returns (also from the French website).

22.4 percent of the portfolio, falling to third place with 12.3 percent of the value in 1998. "Communications" does not make the top five in market value for the Dictatorship Portfolio in 1990, but rises to first place with 25.3 percent of the portfolio in 1998.

### III.    Governance: Empirical Relationships

A. Summary Statistics

Table V gives summary statistics and correlations for $G$ (and subindices) with a set of firm characteristics as of September 1990: book-to-market ratio, firm size, share price, monthly trading volume, Tobin's $Q$, dividend yield, S&P 500 inclusion, past five-year stock return, past five-year sales growth, and percentage of institutional ownership. The first four of these characteristics are in logs. The construction of each characteristic is described in Appendix B. The first column of Table V gives the correlation of each of these characteristics with $G$, the next two columns give the mean value in the Democracy and Dictatorship Portfolios, and the final column gives the difference between these means. These results are descriptive and are intended to provide some background for the analyses in the following sections.

The strongest relation is between $G$ and S&P 500 inclusion. The correlation between these variables is positive and significant -- about half of the Dictatorship Portfolio is drawn from S&P 500 firms compared to 15 percent of the Democracy Portfolio. Given this finding, it is not surprising that $G$ is also positively correlated with size, share price, trading volume, and institutional ownership. S&P firms tend to have relatively high levels of all of these characteristics. In addition, the correlation of $G$ with five-year sales growth is negative and significant, suggesting that high-$G$ firms had relatively lower sales growth over the second half of the 1980s, the period when many of the provisions were first adopted.

Correlations at other times in the sample period (not shown in the table) are similar. Overall, it appears that firms with weaker shareholder rights tend to be large S&P firms with relatively high share prices, institutional ownership and trading volume, relatively poor sales growth, and poor stock-market performance. The 1990s were a time of rising activism by institutional investors and more attention to governance provisions; thus, we might expect to see some reduction in the institutional ownership of high-$G$ firms. In untabulated tests, we find no evidence of such a reduction, with both pairwise correlations and multivariate analysis suggesting no robust relationship between $G$ and changes in institutional ownership.

### B. Governance and Returns

If corporate governance matters for firm performance *and* this relationship is fully incorporated by the market, then a stock price should quickly adjust to any relevant change in the firm's governance. This is the logic behind the use of event studies to analyze the impact of takeover defenses. If such a reaction occurs, then expected returns on the stock would be unaffected beyond the event window. If, however, governance matters but is not incorporated immediately into stock prices, then realized returns on the stock would differ systematically from equivalent securities.

In this section, we examine the relationship between $G$ and subsequent returns. An investment of $1 in the (value-weighted) Dictatorship Portfolio on September 1, 1990, when our data begin, would have grown to $3.39 by December 31, 1999. In contrast, a $1 investment in the Democracy Portfolio would have grown to $7.07 over the same period. This is equivalent to annualized returns of 14.0 percent for the Dictatorship Portfolio and 23.3 percent for the Democracy Portfolio, a difference of more than nine percent per year.

What can explain this disparity? One possible explanation is that the performance differences are driven by differences in the riskiness or "style" of the two portfolios. Researchers have identified several equity characteristics that explain differences in realized returns. In addition to differences in exposure to the market factor ("beta"), a firm's market capitalization (or "size"), book-to-market ratio (or other "value" characteristics), and immediate past returns ("momentum") have all been shown to significantly forecast future returns.[16] If the Dictatorship Portfolio differs significantly from the Democracy Portfolio in these characteristics, then style differences may explain at least part of the difference in annualized raw returns.

Several methods have been developed to account for these style differences in a system of performance attribution. We employ one method here and use another in Section V. The four-factor model of Carhart [1997] is estimated by:

$$(1) \qquad R_t = \alpha \ + \beta_1 * RMRF_t + \beta_2 * SMB_t + \beta_3 * HML_t + \beta_4 * Momentum_t + \varepsilon_t$$

where $R_t$ is the excess return to some asset in month $t$, $RMRF_t$ is the month $t$ value-weighted market return minus the risk-free rate, and the terms $SMB_t$ (small minus big), $HML_t$ (high minus low), and $Momentum_t$ are the month $t$ returns on zero-investment factor-mimicking portfolios designed to capture size, book-to-market, and momentum effects, respectively.[17] Although there is ongoing debate about whether these factors are proxies for risk, we take no position on this issue and simply view the four-factor model as a method of performance attribution. Thus, we

---

[16] See Basu [1977] (price-to-earnings ratio), Banz [1981] (size), Fama and French [1993] (size and book-to-market), Lakonishok, Shleifer and Vishny [1994] (several value measures), and Jegadeesh and Titman [1993] (momentum).

[17] This model extends the Fama-French [1993] three-factor model with the addition of a momentum factor. For details on the construction of the factors, see Fama and French [1993] and Carhart [1997]. We are grateful to Ken French for providing the factor returns for $SMB$ and $HML$. Momentum returns were calculated by the authors using the procedures of Carhart [1997].

interpret the estimated intercept coefficient, "alpha", as the abnormal return in excess of what could have been achieved by passive investments in the factors.

The first row of Table VI shows the results of estimating (1) where the dependent variable, $R_t$, is the monthly return difference between the Democracy and Dictatorship Portfolios. Thus, the alpha in this estimation is the abnormal return on a zero-investment strategy that buys the Democracy Portfolio and sells short the Dictatorship Portfolio. For this specification, the alpha is 71 basis points (bp) per month, or about 8.5 percent per year. This point estimate is statistically significant at the one-percent level. Thus, very little of the difference in raw returns can be attributed to style differences in the two portfolios.

The remaining rows of Table VI summarize the results of estimating (1) for all ten "deciles" of $G$, including the extreme deciles comprising the Democracy ($G \leq 5$) and Dictatorship ($G \geq 14$) Portfolios. As the table shows, the significant performance difference between the Democracy and Dictatorship Portfolios is driven both by overperformance (for the Democracy Portfolio) and underperformance (by the Dictatorship Portfolio). The Democracy Portfolio earns a positive and significant alpha of 29 bp per month, while the Dictatorship Portfolio earns a negative and significant alpha of –42 bp per month.

The results also show that alpha decreases as $G$ increases. The Democracy Portfolio earns the highest alpha of all the deciles, and the next two highest alphas, 24 and 22 bp, are earned by the third ($G = 7$) and second ($G = 6$) deciles, respectively. The Dictatorship Portfolio earns the lowest alpha, and the second lowest alpha is earned by the eighth ($G = 12$) decile. Furthermore, the four lowest $G$ deciles earn positive alphas, while the three highest $G$ deciles earn negative alphas. More formally, a Spearman rank-correlation test of the null hypothesis of

no correlation between $G$-decile rankings and alpha rankings yields a test statistic of 0.842, and is rejected at the one-percent level.

Table VII reports several variations of the abnormal-return results. In each variation, we estimate the performance-attribution regression in equation (1) on the return difference between the Democracy and Dictatorship Portfolios, while changing some aspect of the portfolio construction or return calculation. We perform all of these tests using both value-weighted (VW) and equal-weighted (EW) portfolios. These tests allow us to estimate the fraction of the benchmark abnormal returns that can be attributed to industry composition, choice of cutoffs for the extreme portfolios, new provisions during the decade, legal variation across states, and different time periods.

The first row of Table VII replicates the baseline portfolio construction used above. The remaining rows of the table summarize tests using industry-adjusted returns (Row 2), two alternative constructions of the extreme portfolios (Rows 3 and 4), fixed portfolios built with 1990 levels of $G$ (Row 5), a subsample that includes only Delaware firms (Row 6), and subsamples split between the first half and the second half of the sample period (Rows 7 and 8). Details of each of these constructions are given in the table note. The main themes of these results are, first, that the VW returns (Democracy minus Dictatorship) are economically large in all cases and, second, the EW abnormal returns are usually about two-thirds of the VW abnormal returns. Most of the return differential can be attributed to within-state variation already in place in 1990, and this return differential is apparent in both halves of the sample period.

Overall, we find significant evidence that the Democracy Portfolio outperformed the Dictatorship Portfolio in the 1990s. We also find some evidence of a monotonic relationship between $G$ and returns. It would be useful to know which subindices and provisions drive these

results. We address this issue in depth within the broader analysis of causality and omitted-variable bias in Section V, so we defer a detailed analysis until then.

## C. Governance and the Value of the Firm

It is well established that state and national laws of corporate governance affect firm value. La Porta et al. [2001] show that firm value is positively associated with the rights of minority shareholders. Daines [2001] finds that firms incorporated in Delaware have higher valuations than other U.S. firms. In this section, we study whether variation in firm-specific governance is associated with differences in firm value. More importantly, we analyze whether there was a change in the governance/value relationship during the 1990s. Since there is evidence of differential stock returns as a function of $G$, we would expect to find relative "mispricing" between 1990 and 1999 as a function of $G$.

Our valuation measure is Tobin's $Q$, which has been used for this purpose in corporate-governance studies since the work of Demsetz and Lehn [1985] and Morck, Shleifer, and Vishny [1988]. We follow Kaplan and Zingales' [1997] method for the computation of $Q$ (details are listed in Appendix B) and also compute the median $Q$ in each year in each of the 48 industries classified by Fama and French [1997]. We then regress

$$(2) \qquad Q'_{it} = a_t + b_t X_{it} + c_t W_{it} + e_{it},$$

where $Q'_{it}$ is industry-adjusted $Q$ (firm $Q$ minus industry-median $Q$), $X_{it}$ is a vector of governance variables ($G$, its components, or inclusion in one of the extreme portfolios) and $W_{it}$ is a vector of firm characteristics. As elements of $W$, we follow Shin and Stulz [2000] and include

the log of the book value of assets and the log of firm age as of December of year $t$.[18]  Daines [2001] found that $Q$ is different for Delaware and non-Delaware firms, so we also include a Delaware dummy in $W$.  Morck and Yang [2001] show that S&P 500 inclusion has a positive impact on $Q$, and that this impact increased during the 1990s; thus, we also include a dummy variable for S&P 500 inclusion in $W$.

Using a variant of the methods of Fama and MacBeth [1973], we estimate annual cross-sections of (2) with statistical significance assessed within each year (by cross-sectional standard errors) and across all years (with the time-series standard error of the mean coefficient). This method of assessing statistical significance deserves some explanation.  In particular, one logical alternative would be a pooled setup with firm fixed effects and time-varying coefficients.  We rejected this alternative mainly because there are few changes over time in the Governance Index, and the inclusion of fixed effects would force identification of the $G$ coefficient from only these changes. In effect, our chosen method imposes a structure on the fixed effects: they must be a linear function of $G$ or its components.

Table VIII summarizes the results.  The first column gives the results with $G$ as the key regressor. Each row gives the coefficients and standard errors for a different year of the sample; the last row gives the average coefficient and time-series standard error of these coefficients. The coefficients on $G$ are negative in every year and significantly negative in nine of the ten years.    The largest absolute value point estimate occurs in 1999, and the second largest is in 1998.  The point estimate in 1999 is economically large; a one-point increase in $G$, equivalent to adding a single governance provision, is associated with an 11.4 percentage point lower value for

---

[18] Unlike Shin and Stulz [2000], we do not trim the sample of observations that have extreme independent variables. Results with a trimmed sample are nearly identical and are available from the authors.

$Q$. If we assume that the point estimates in 1990 and 1999 are independent, then the difference between these two estimates ($11.4 - 2.2 = 9.2$) is statistically significant.

In the second column of Table VIII, we restrict the sample to include only firms in the Democracy and Dictatorship Portfolios. We then estimate (2) using a dummy variable for the Democracy Portfolio. The results are consistent with the previous regressions on $G$. The point estimate for 1999 is the largest in the decade, implying that firms in the Democracy Portfolio have a $Q$ that is 56 percentage points higher, other things being equal, than do firms in the Dictatorship Portfolio. This compares to an estimated difference of 19 percentage points in 1990. While the difference in coefficients between 1990 and 1999 is not statistically significant, it is similar to the total EW difference in abnormal returns estimated in Table VII.[19] There is no real pattern for the rest of the decade, however, and large standard errors toward the end of the sample period prevent any strong inference across years.

The final columns of Table VIII give results using the five governance subindices: *Delay, Voting, Protection, Other,* and *State.* The table shows that all subindices except *Voting* have average coefficients that are negative and significant (assuming independence across years). Over the full sample period, *Delay* and *Protection* have the most consistent impact, while the largest absolute coefficients are for *Voting* at the end of the sample period. The subindices are highly collinear, however, and the resulting large standard errors and covariances make it difficult to draw strong conclusions. For example, even in 1999 we cannot reject the null hypothesis that the coefficient on *Voting* is equal to the coefficient on *Delay*.

---

[19] Table VII, first row, second column, shows an alpha of 45 bp per month for the EW difference between the Democracy and Dictatorship portfolios. Over 112 months this produces a difference of approximately 50 percent, as compared to the $56 - 19 = 37$ percent difference estimated for the $Q$ regressions. We use the EW alpha as a comparison because the $Q$ regressions are also equal-weighted.

Overall, the results for returns and prices tell a consistent story. Firms with the weakest shareholder rights (high values of $G$) significantly underperformed firms with the strongest shareholder rights (low values of $G$) during the 1990s. Over the course of the 1990s, these differences have been at least partially reflected in prices. While high-$G$ firms already sold at a significant discount in 1990, this discount became much larger by 1999.

## D. Governance and Operating Performance

Table IX shows the results of annual regressions for three operational measures on $G$ (or a Democracy dummy). The three operational measures are the net profit margin (income divided by sales), the return on equity (income divided by book equity), and one-year sales growth. All of these measures are industry-adjusted by subtracting the median for this measure in the corresponding Fama-French [1997] industry. This adjustment uses all available Compustat firms. To reduce the influence of large outliers − a common occurrence for all of these measures -- we estimate median (least-absolute-deviation) regressions in each case. While our sample does not include a natural experiment to identify $G$ as the cause of operational differences, we attempt to control for "expected" cross-sectional differences by using the log book-to-market ratio ($BM$) as an additional explanatory variable.

The odd-numbered columns give the results when $G$ is the key regressor. We find that the average coefficient on $G$ is negative and significant for both the net-profit-margin and sales-growth regressions, and is negative but not significant for the return-on-equity regressions. The even-numbered columns give the results for the subsample of firms from the extreme deciles, with a dummy variable for the Democracy Portfolio as the key regressor. For all three operating measures, the average coefficient on this dummy variable was positive but insignificant. Thus,

these results are consistent with the evidence for the full sample but not significant on their own. In untabulated results, we also regressed these same measures on the five subindices. The results show no clear pattern of differential influence for any particular subindex, with most coefficients having the same sign as $G$. Overall, we find some significant evidence that more democratic firms have better operating performance and no evidence that they do not.

## IV. Governance: Three Hypotheses

Section III established an empirical relationship of $G$ with returns, firm value, and operating performance. Since firms did not adopt governance provisions randomly, this evidence does not itself imply a causal role by governance provisions. Indeed, there are several plausible explanations for our results:

Hypothesis I) Governance provisions cause higher agency costs. These higher costs were underestimated by investors in 1990.

Hypothesis II) Governance provisions do not cause higher agency costs, but rather were put in place by 1980s managers who forecasted poor performance for their firms in the 1990s.

Hypothesis III) Governance provisions do not cause higher agency costs, but their presence is correlated with other characteristics that earned abnormal returns in the 1990s.

Most explanations of the Section III results can be fit within these three hypotheses. Under Hypothesis I, a reduction in shareholder rights causes an unexpectedly large increase in agency costs through some combination of inefficient investment, reduced operational efficiency, or self-dealing. If shareholders find it difficult or costly to replace managers, then managers may be more willing and able to extract private benefits. This is the standard justification for takeover threats as the strongest form of managerial discipline [Jensen 1986]. For Hypothesis 1 to be correct, these additional agency costs must have been underestimated in 1990.

Under Hypothesis II, governance does not affect performance, but there must be a perception that governance provisions are protective for management. In this case, the stock in these companies would have been relatively overvalued in 1990, even though objective measures (e.g., $Q$ regressions) would suggest that it was undervalued relative to observable characteristics. When the poor operating performance occurs, the market is surprised but the managers are not. The protective provisions then supply a shield, real or imagined, for managerial jobs and compensation.

Under Hypothesis III, all of the results in the previous section would be driven by omitted-variable bias. Since governance provisions were certainly not adopted randomly, it is plausible that differences in industry, S&P 500 inclusion, institutional ownership, or other firm characteristics could be correlated both with $G$ and with abnormal returns. Under this hypothesis, governance provisions could be completely innocuous, with no influence either on managerial power or on agency costs.

Ideally, we would distinguish among these three hypotheses by using random variation in some characteristic that was causal for $G$. Unfortunately, we have not been able to identify such

an instrument. One candidate would be the subset of state laws, with the *State* subindex as a proxy. Though in some states these laws were passed at the urging of large corporations, it seems reasonable to assume that their passage was exogenous to most firms. But the *State* subindex has three flaws as an instrument. First, firms can choose to reincorporate into different states; enough firms have done so that exposure to state laws is not truly exogenous [Subramanian 2001]. Second, many firms have opted out of the protections of some of the most stringent of these laws, so that a firm's state of incorporation is only a noisy measure for its actual legal exposure. Third, as shown in Table III, the *State* subindex is not positively or consistently correlated with the other components of $G$. Other potential instruments have different problems. For example, if takeover protections were adopted during industry-specific takeover waves, then we might be able to use industry as an instrument for $G$. Unfortunately, this would render it impossible to distinguish between $G$ or industry as the cause of poor returns in the 1990s.

In Section V, our tests consist of a search for evidence supportive of each hypothesis, while acknowledging the impossibility of a perfect test to distinguish among them. First, if Hypothesis I is correct, then we should observe some "unexpected" differences in agency costs across firms. We discuss several previous studies on this topic and look for such differences in our sample by analyzing capital expenditure and acquisition behavior. Second, for Hypothesis II, we analyze insider-trading activity as a function of $G$. If governance provisions were put in place by prescient managers, these same managers might be net sellers of the stock in their firms. Finally, for Hypothesis III, we test whether a large set of observable firm characteristics can explain the empirical relationship between returns and $G$.

V.    Governance: Tests

In this section we examine the evidence for each of the hypotheses described in Section IV.  Section V.A covers Hypothesis I, Section V.B covers Hypothesis II, and Section V.C covers Hypothesis III.  Section V.D summarizes and discusses the evidence.


A. Evidence on Hypothesis I

Increased agency costs at high-$G$ firms can directly affect firm performance in several ways.   In the specific case of state takeover laws, where causality is easier to establish, researchers have found evidence of increased agency costs through a variety of mechanisms. Borokhovich, Brunarski and Parrino [1997] show that compensation rises for CEOs of firms adopting takeover defenses.  Bertrand and Mullainathan [1999a, 1999b, and 2000] find a similar result for CEOs and other employees in firms newly covered by state takeover laws.  They also find that these laws cause a decrease in plant-level efficiency, measured either by total factor productivity or return on capital. Garvey and Hanka [1999] show that state takeover laws led to changes in leverage consistent with increased corporate slack.  These studies provide the cleanest evidence in support of Hypothesis I, but, of course, do not make use of the full variation embodied in the  $G$  index.  We supplement these findings by examining the empirical relationship of  $G$  with two other possible sources of agency costs: capital expenditure and acquisition behavior.

A substantial literature, dating back at least to Baumol [1959], Marris [1964], and Williamson [1964], holds that managers may undertake inefficient projects in order to extract private benefits.   This problem is particularly severe when managers are entrenched and can resist hostile takeovers [Jensen and Ruback 1983, Shleifer and Vishny 1989].  Under this view, if

capital expenditure increases following the adoption of new takeover defenses, this increase would be a net negative for firm value.[20]

To examine the empirical relationship between capital expenditure and governance, we estimate annual median regressions for capital expenditure (CAPEX), scaled by either sales or assets, and net of the industry median. To control for the different investment opportunities available at value and growth firms, we include the log book-to-market ratio (BM) as a control variable in all specifications. Table X summarizes the results, with BM coefficients omitted. Columns (1) and (3) give results for the full sample, with $G$ as the key regressor; columns (2) and (4) give results for the sample restricted to firms in the Democracy and Dictatorship Portfolios, with a Democracy dummy as the key regressor. The average coefficient on $G$ is positive and significant in both sets of regressions. Consistent with these results, we find that the average coefficient on the Democracy dummy is negative and significant in both sets of regressions. We conclude that, other things equal, high-$G$ firms have higher CAPEX than do low-$G$ firms.

Another outlet for capital expenditure is for firms to acquire other firms. Some of the strongest evidence for the importance of agency costs comes from the negative returns to acquirer stocks after a bid is announced. Considerable evidence shows that these negative returns are correlated with other agency problems, including low managerial ownership [Lewellen, Loderer, and Rosenfeld 1985], high free-cash flow [Lang, Stulz, and Walkling 1991], and diversifying transactions [Morck, Shleifer, and Vishny 1990]. In addition to negative announcement returns, there is also long-run evidence of negative abnormal performance by

---

[20] For an alternative view, see Stein [1988 and 1989]. Empirical evidence on this issue is given by Daines and Klausner [2001], Johnson and Rao [1997], Meulbroek et al. [1990], Pugh, Page, and Jahera [1992], and Titman, Wei, and Xie [2001].

acquirer firms [Loughran and Vijh 1997, Rao and Vermaelen 1998].[21]  Taken together, these studies suggest acquisitions as another pathway through which governance affects performance.

To analyze the relation between acquisition activity and  $G$ , we use the SDC database to identify all transactions in which a sample firm acted as either the acquirer or the seller during the sample period.  From January 1991 through December 1999, there are 12,694 acquisitions made by sample firms; SDC gives the acquisition price for just under half of these.  For each firm, we count the number of acquisitions ("Acquisition Count").  We also calculate the sum of the price of all acquisitions in each calendar year and divide this sum by the firm's average market capitalization for the first day and last day of the year ("Acquisition Ratio").

Table XI summarizes the results of annual regressions for both Acquisition Count and the Acquisition Ratio in year  $t$  on  $G$  (or a Democracy dummy), the log of size, the log of the book-to-market ratio, and 48 industry dummies, all measured at year-end  $t-1$ .  Coefficients on all control variables are omitted from the table.  Since many firms make no acquisitions in a year, the dependent variables are effectively left-censored at zero.  To account for this censoring, we estimate Poisson regressions for Acquisition Count and Tobit regressions for the Acquisition Ratio.  Columns (1) and (3) give results for the full sample, with  $G$  as the key regressor; columns (2) and (4) give results for the sample restricted to firms in the Democracy and Dictatorship portfolios, with a Democracy dummy as the key regressor.  For both sets of regressions, the coefficients on  $G$  are positive in every year, and the average coefficient on  $G$  is positive and significant.  Consistent with this result, the average coefficient on the Democracy dummy is negative for both sets of regressions and is significant for Acquisition Count.

---

[21] Mitchell and Stafford [2000] have challenged the magnitude of this long-run evidence, but still allow for some underperformance for acquisitions financed by stock.  A related debate on whether diversifying acquisitions destroy value has grown too large to survey here.  The seminal works are Lang and Stulz [1994] and Berger and Ofek [1995].  Recent work is summarized in Holmstrom and Kaplan [2001] and Stein [2001].

One interpretation of these results is that high-$G$ firms engaged in an unexpectedly large amount of inefficient investment during the 1990s. This interpretation is consistent with contemporaneous unexpected differences in profitability, stock returns, and firm value. This inefficient investment does not necessarily mean that firms are attempting to maximize their size in a form of empire building. Indeed, empire building would be inconsistent with the negative relationship between sales growth and $G$ found in Table IX. Instead, managers may be attempting to stave off "empire collapse" with high expenditure and acquisition activity. In that case, the results of this section are consistent with the evidence of Table IX.

### B. Evidence on Hypothesis II

It is well established that insider trading can forecast returns. Firms whose shares have been intensively sold (bought) by insiders tend to underperform (overperform) benchmarks in subsequent periods.[22] If some 1980s insiders forecasted poor performance for their firms, we might expect them to have looked for ways to keep the shareholders from firing them, either through voting or takeovers. In this case, weak shareholder rights would be a symptom of insiders' superior information, but would not necessarily be the cause of the poor performance in the subsequent decade.

To study this possibility, we use data collected by Thomson Financial from the required SEC insider-trading filings. For each firm in our sample, we sum all (split-adjusted) open-market transactions for all insiders in each year, with purchases entering positively and sales entering negatively. We then normalize this sum by shares outstanding at the beginning of the year to arrive at a "Net Purchases" measure for each firm in each year. If insiders put new

---

[22] See Seyhun [1998] for a comprehensive review of this literature and a discussion of SEC rules, filing requirements, and available data.

provisions in place when they forecast poor performance, then we would expect Net Purchases to be negatively correlated with $G$.

We employ two regression specifications. First, we estimate OLS regressions of Net Purchases on $G$ (or a Democracy dummy), BM, and log of size. For some firm-years, the Net Purchase measure is dominated by one large transaction. While large transactions might have information content, they might also reflect liquidity or rebalancing needs. In an OLS regression, firms with large outliers will dominate. Thus, we also estimate ordered logit regressions on the same OLS regressors, in which the dependent variable is equal to one if Net Purchases is positive, zero if Net Purchases is zero, and negative one if Net Purchases is negative.

Table XII summarizes the results of these regressions. Columns (1) and (3) give results for the full sample, with $G$ as the key regressor; columns (2) and (4) give results for the sample restricted to firms in the Democracy and Dictatorship Portfolios with a Democracy dummy as the key regressor. Coefficients on all control variables are omitted from the table. We find no significant relationships between governance and insider trading. Two of four sets of regressions have positive average coefficients, two have negative average coefficients, and none of these average coefficients are significant. In untabulated results, we also estimated median regressions, replicated all of the above results using all transactions (the main difference is the inclusion of option-exercise transactions), and estimated long-horizon regressions using all years of data for each firm. In none of these cases did we find a robust relationship between governance and insider trading. Overall, we find no support for Hypothesis II in the insider-trading data.

## C. Evidence on Hypothesis III

What other factors might be driving the return difference between the Democracy and Dictatorship portfolios? We saw in Table II that $G$ is correlated with several firm characteristics, including S&P 500 membership, institutional ownership, trading volume, and past sales growth. If returns to stocks with these characteristics differed in the 1990s in a way not captured by the model in equation (1), then a type of omitted variable bias may drive the abnormal-return results. In this section, we explore this possibility using a cross-sectional regression approach. In addition to providing evidence on Hypothesis III, this method also supplements the analysis of Section III.B by allowing a separate regressor for each component of $G$.

For each month in the sample period, September 1990 to December 1999, we estimate

$$(3) \qquad\qquad r_{it} = a_t + b_t X_{it} + c_t Z_{it} + e_{it},$$

where, for firm $i$ in month $t$, $r_{it}$ are the returns (either raw or industry-adjusted), $X_{it}$ is a vector of governance variables (either $G$, its components, or inclusion in one of the extreme portfolios), and $Z_{it}$ is a vector of firm characteristics. As elements of $Z$, we include the full set of regressors used by Brennan, Chordia, and Subrahmanyam [1998], plus five-year sales growth, S&P 500 inclusion, and institutional ownership.[23] Variable definitions are given in Appendix B.

We estimate (3) separately for each month and then calculate the mean and time-series standard deviation of the 112 monthly estimates of the coefficients. Table XIII summarizes the results. The first two columns give the results, raw and industry-adjusted, for the full sample of firms in each month with $G$ as the key independent variable. In both regressions, the average

---

[23] All of these additional variables are correlated with $G$ (see Table III) and, in prior studies, with either firm value or abnormal returns. See Lakonishok, Shleifer, and Vishny [1994] (sales growth), Gompers and Metrick [2001] (institutional ownership), and Morck and Yang [2001] ($Q$).

coefficient on $G$ is negative but not significant. The point estimates are not small. For example, the point estimate for the coefficient on $G$ in column 3 implies a lower return of approximately four bp per month (= 48 bp per year) for each additional point of $G$, but it would require estimates nearly twice as large before statistical significance would be reached.

The next two columns give the results when the sample is restricted to stocks in either the Democracy ($G \leq 5$) or Dictatorship ($G \geq 14$) portfolios. In the first column, the dependent variable is the raw monthly return for each stock. In the second column, the dependent variable is the industry-adjusted return for each stock, where industry adjustments are relative to the Fama and French [1997] 48 industries. The key independent variable in these regressions is the Democracy dummy, set equal to one if the stock is in the Democracy Portfolio and zero if the stock is in the Dictatorship Portfolio. For both the raw and industry-adjusted returns, the coefficient on this dummy variable is positive and significant at the one-percent level. The average point estimate can be interpreted as a monthly abnormal return. These point estimates, 76 bp per month raw and 63 bp per month industry-adjusted, are similar to those found in the factor models, and provide a further robustness check to the benchmark result. Here, industry adjustments explain about one-sixth of the raw result. In the factor-model results of Table VII, the industry adjustment explained about one-third of the raw result.

Columns (5) and (6) of Table XIII give the results for the full sample of firms when the five subindices are used as the components of $X$. In principle, these regressions could help us distinguish between Hypotheses I and III. If governance provisions cause poor performance, then we might expect certain provisions to play a stronger role. In the absence of such a finding, we should wonder if the results are driven by some other characteristic. For example, some legal scholars argue that the *Delay* provisions are the only defenses with deterrent value [Coates 2000,

Daines and Klausner 2001]. If managers also believe this, then the *Delay* subindex should also be the most important driver of the results.

Unfortunately, large standard errors, due in part to the substantial multicollinearity between the regressors, makes it difficult to construct a powerful test. None of the subindex coefficients are statistically significant in either specification, but many of the point estimates are economically large. In the end, we cannot precisely measure the relative importance of *Delay* or any other subindex. This is similar to the problem that occurred in the $Q$ regressions of Table VIII. For example, in both Tables VIII and XIII, the coefficients on *Voting* suggest potentially enormous economic significance, but large standard errors prevent any meaningful statistical inference.

In untabulated tests, we also included all 28 provisions from Table I as separate regressors in (3). Regressing raw returns on these 28 provisions plus the same controls as in Table XIII, we find that 16 of the coefficients are negative, and only one (Unequal Voting) is significant. (With this many regressors, we would expect one to appear "significant" just by chance.) Results for industry-adjusted returns are similar. These results highlight and magnify the lack of power in the subindex regressions. Indeed, many of the point estimates imply return effects above 20 basis points per month (2.4 percent per year), but are still far from being statistically significant. This result also suggests that the Democracy-minus-Dictatorship return differences are not driven by the presence or absence of any one provision.


D. Discussion

The evidence in sections V.A, V.B, and V.C must be interpreted with caution. Since this is an experiment without random assignment, no analysis of causality can be conclusive. The

main problem is the possibility that some unobserved characteristic is correlated with $G$ and is also the main cause of abnormal returns. This type of omitted-variable bias could be something prosaic, such as imperfect industry adjustments or model misspecification, or something more difficult to quantify, such as a partially unobservable or immeasurable "corporate culture". Under the latter explanation, management behavior would be constrained by cultural norms within the firm, and democracy and dictatorship would be a persistent feature of a corporate culture; $G$ would be a symptom, but not a cause, of this culture. In this case, all the results of the paper could be explained if investors mispriced culture in 1990, just as they appear to have mispriced its proxy, $G$. The policy impact of reducing $G$ would be nonexistent unless it affected the culture of managerial power that was the true driver of poor performance.

In addition to the three hypotheses considered above, other explanations fall into the general class of "Type I" error. For example, one could argue that investors in 1990 had rational expectations about the expected costs and benefits of takeover defenses, where the expected costs are more severe agency problems and the expected benefits are higher takeover premia. Then, when the hostile takeover market largely evaporated in the early 1990s -- perhaps because of macroeconomic conditions unrelated to takeover defenses -- Dictatorship firms were left with the costs but none of the benefits of their defenses. Over the subsequent decade, the expected takeover premia eroded as investors gradually learned about the weak takeover market. Simple calculations suggest that this explanation cannot be that important. Suppose that in 1990 the expected takeover probability for Dictatorship firms was 30 percent, and the expected takeover premium conditional on takeover was also 30 percent. Further suppose that both of these numbers were zero for Democracy firms. Then, the unconditional expected takeover premium

for Dictatorship firms would have been only nine percent, which is approximately the relative underperformance of these firms for only a single year.

In sum, we find some evidence in support of Hypothesis I and no evidence in support of Hypothesis II. For Hypothesis III, we find that industry classification can explain somewhere between one-sixth and one-third of the benchmark abnormal returns, but we do not find any other observable characteristic that explains the remaining abnormal return. The subindex regressions, which might be helpful in distinguishing between Hypotheses I and III, are not powerful enough for strong inference. We conclude that the remaining performance differences, which are economically large, were either directly caused by governance provisions (Hypothesis I), or were related to unobservable or difficult-to-measure characteristics correlated with governance provisions (Hypothesis III).

What do these hypotheses imply about abnormal returns in the future? None suggests any obvious pattern for the relationship between $G$ and returns. Under Hypothesis I, if we interpret our test as a long-run event study, then there is no reason to expect any relationship once the market has fully priced the underlying "event" of corporate governance. The fact that this price adjustment is taking such a long time does not seem so surprising in light of the lengthy intervals necessary for much more tangible information to be incorporated into prices.[24] Thus, to the extent that end-of-sample price adjustment is incomplete, complete, or has overreacted, the future relationship between $G$ and returns could be negative, zero, or positive. Under Hypothesis II, there is a similar dependence on whether past insider information has been fully incorporated into prices. Under Hypothesis III, future return differences would be driven the relevant omitted characteristic; clearly, this hypothesis yields no clear prediction.

---

[24] For example, there is evidence that earnings surprises [Bernard and Thomas 1989], dividend omissions [Michaely, Thaler, and Womack 1995], and stock repurchases [Ikenberry, Lakonishok, and Vermaelen 1995] have long-term drift following the event, and all seem to be relatively simple events compared to changes in governance structure.

## VI.    Conclusion

The power-sharing relationship between investors and managers is defined by the rules of corporate governance. Beginning in the late 1980s, there is significant and stable variation in these rules across different firms.    Using 24 distinct corporate-governance provisions for a sample of about 1,500 firms per year during the 1990s, we build a Governance Index, denoted as $G$, as a proxy for the balance of power between managers and shareholders in each firm.    We then analyze the empirical relationship of this index with corporate performance.

We find that corporate governance is strongly correlated with stock returns during the 1990s.   An investment strategy that purchased shares in the lowest-$G$ firms ("Democracy" firms with strong shareholder rights), and sold shares in the the highest-$G$ firms ("Dictatorship" firms with weak shareholder rights), earned abnormal returns of 8.5 percent per year. At the beginning of the sample, there is already a significant relationship between valuation and governance: each one-point increase in $G$ is associated with a decrease in Tobin's $Q$ of 2.2 percentage points.  By the end of the decade, this difference has increased significantly, with a one-point increase in $G$ associated with a decrease in Tobin's $Q$ of 11.4 percentage points. The results for both stock returns and firm value are economically large and are robust to many controls and other firm characteristics.

We consider several explanations for the results, but the data do not allow strong conclusions about causality.   There is some evidence, both in our sample and from other authors, that weak shareholder rights caused poor performance in the 1990s. It is also possible that the results are driven by some unobservable firm characteristic.   These multiple causal explanations have starkly different policy implications and stand as a challenge for future research.    The

empirical evidence of this paper establishes the high stakes of this challenge. If an 11.4 percentage point difference in firm value were even partially "caused" by each additional governance provision, then the long-run benefits of eliminating multiple provisions would be enormous.

**Appendix A – Corporate-Governance Provisions**

This appendix describes the provisions listed in Table I and used as components of the Governance Index. The shorthand title of each provision, as used in the text of the paper, is given in bold. These descriptions are given in alphabetical order and are similar to Rosenbaum [1998]. For a few provisions, we discuss their impact on shareholder rights or the logic behind their categorization in Table I.

**Antigreenmail** – Greenmail refers to a transaction between a large shareholder and a company in which the shareholder agrees to sell his stock back to the company, usually at a premium, in exchange for the promise not to seek control of the company for a specified period of time. Antigreenmail provisions prevent such arrangements unless the same repurchase offer is made to all shareholders or approved by a shareholder vote. Such provisions are thought to discourage accumulation of large blocks of stock because one source of exit for the stake is closed, but the net effect on shareholder wealth is unclear [Shleifer and Vishny 1986, Eckbo 1990]. Five states have specific **Antigreenmail laws**, and two other states have "recapture of profits" laws, which enable firms to recapture raiders' profits earned in the secondary market. We consider recapture of profits laws to be a version of Antigreenmail laws (albeit a stronger one). The presence of firm-level Antigreenmail provisions is positively correlated with 18 out of the other 21 firm-level provisions, is significantly positive in eight of these cases, and is not significantly negative for any of them. Furthermore, states with Antigreenmail laws tend to pass them in conjunction with laws more clearly designed to prevent takeovers [Pinnell 2000]. Since it seems likely that most firms and states perceive Antigreenmail as a takeover "defense", we treat Antigreenmail like the other defenses and code it as a decrease in shareholder rights.

**Blank Check** preferred stock is stock over which the board of directors has broad authority to determine voting, dividend, conversion, and other rights. While it can be used to enable a company to meet changing financial needs, its most important use is to implement poison pills or to prevent takeover by placing this stock with friendly investors. Because of this role, blank check preferred stock is a crucial part of a "delay" strategy. Companies that have this type of preferred stock but require shareholder approval before it can be used as a takeover defense are *not* coded as having this provision in our data.

**Business Combination laws** impose a moratorium on certain kinds of transactions (e.g., asset sales, mergers) between a large shareholder and the firm, unless the transaction is approved by the Board of Directors. Depending on the State, this moratorium ranges between two and five years after the shareholder's stake passes a prespecified (minority) threshold. These laws were in place in 25 states in 1990 and two more by 1998. It is the only state takeover law in Delaware, the state of incorporation for about half of our sample.

**Bylaw** and **Charter** amendment limitations limit shareholders' ability to amend the governing documents of the corporation. This might take the form of a supermajority vote requirement for charter or bylaw amendments, total elimination of the ability of shareholders to amend the bylaws, or the ability of directors (beyond the provisions of state law) to amend the bylaws without shareholder approval.

Control-share **Cash-out laws** enable shareholders to sell their stakes to a "controlling" shareholder at a price based on the highest price of recently acquired shares. This works something like fair-price provisions (see below) extended to nontakeover situations. These laws were in place in three states by 1990 with no additions during the decade.

A **Classified Board** (or "staggered" board) is one in which the directors are placed into different classes and serve overlapping terms. Since only part of the board can be replaced each year, an outsider who gains control of a corporation may have to wait a few years before being able to gain control of the board. This slow replacement makes a classified board a crucial component of the *Delay* group of provisions, and one of the few provisions that clearly retains some deterrent value in modern takeover battles [Daines and Klausner 2001].

**Compensation Plans** with changes-in-control provisions allow participants in incentive bonus plans to cash out options or accelerate the payout of bonuses should there be a change in control. The details may be a written part of the compensation agreement, or discretion may be given to the compensation committee.

Director indemnification **Contracts** are contracts between the company and particular officers and directors indemnifying them from certain legal expenses and judgments resulting from lawsuits pertaining to their conduct. Some firms have both "Indemnification" in their bylaws or charter and these additional indemnification "Contracts".

**Control-share Acquisition laws** (see Supermajority, below).

**Cumulative Voting** allows a shareholder to allocate his total votes in any manner desired, where the total number of votes is the product of the number of shares owned and the number of directors to be elected. By allowing them to concentrate their votes, this practice helps minority shareholders to elect directors. Cumulative Voting and Secret Ballot (see below) are the only two provisions whose presence is coded as an *increase* in shareholder rights, with an additional point to the Governance Index if the provision is absent.

**Directors' Duties** provisions allow directors to consider constituencies other than shareholders when considering a merger. These constituencies may include, for example,

employees, host communities, or suppliers. This provision provides boards of directors with a legal basis for rejecting a takeover that would have been beneficial to shareholders. 31 states have **Directors' Duties laws** allowing similar expansions of constituencies, but in only two of these states (Indiana and Pennsylvania) are the laws explicit that the claims of shareholders should not be held above those of other stakeholders [Pinnell 2000]. We treat firms in these two states as though they had an expanded directors' duty provision unless the firm has explicitly opted out of coverage under the law.

**Fair-Price** provisions limit the range of prices a bidder can pay in two-tier offers. They typically require a bidder to pay to all shareholders the highest price paid to any during a specified period of time before the commencement of a tender offer, and do not apply if the deal is approved by the board of directors or a supermajority of the target's shareholders. The goal of this provision is to prevent pressure on the target's shareholders to tender their shares in the front end of a two-tiered tender offer, and they have the result of making such an acquisition more expensive. Also, 25 states had **Fair-Price laws** in place in 1990, and two more states passed such laws in 1991. The laws work similarly to the firm-level provisions.

**Golden Parachutes** are severance agreements that provide cash and non-cash compensation to senior executives upon an event such as termination, demotion, or resignation following a change in control. They do not require shareholder approval. While such payments would appear to deter takeovers by increasing their costs, one could argue that these parachutes also ease the passage of mergers through contractual compensation to the managers of the target company [Lambert and Larcker 1985]. While the net impact on managerial entrenchment and shareholder wealth is ambiguous, the more important effect is the clear decrease in shareholder rights. In this case, the "right" is the ability of a controlling shareholder to fire management

without incurring an additional cost. Golden Parachutes are highly correlated with all the other takeover defenses. Out of 21 pairwise correlations with the other firm-level provisions, 15 are positive, 10 of these positive correlations are significant, and only one of the negative correlations is significant. Thus, we treat Golden Parachutes as a restriction of shareholder rights.

Director **Indemnification** uses the bylaws, charter, or both to indemnify officers and directors from certain legal expenses and judgments resulting from lawsuits pertaining to their conduct. Some firms have both this "Indemnification" in their bylaws or charter and additional indemnification "Contracts". The cost of such protection can be used as a market measure of the quality of corporate governance [Core 1997 and 2000].

Limitations on director **Liability** are charter amendments that limit directors' personal liability to the extent allowed by state law. They often eliminate personal liability for breaches of the duty of care, but not for breaches of the duty of loyalty or for acts of intentional misconduct or knowing violation of the law.

**Pension Parachutes** prevent an acquirer from using surplus cash in the pension fund of the target to finance an acquisition. Surplus funds are required to remain the property of the pension fund and to be used for plan participants' benefits.

**Poison Pills** provide their holders with special rights in the case of a triggering event such as a hostile takeover bid. If a deal is approved by the board of directors, the poison pill can be revoked, but if the deal is not approved and the bidder proceeds, the pill is triggered. Typical poison pills give the holders of the target's stock other than the bidder the right to purchase stock in the target or the bidder's company at a steep discount, making the target unattractive or diluting the acquirer's voting power. Poison pills are a crucial component of the "delay" strategy

at the core of modern defensive tactics. Nevertheless, we do not include poison pills in the *Delay* group of provisions, but include it in the *Other* group because the pill itself can be passed on less than one-day's notice, so it need not be in place for the other *Delay* provisions to be effective. The other provisions in this group require a shareholder vote, so they cannot be passed on short notice. See Coates [2000] and Daines and Klausner [2001] for a discussion of this point.

Under a **Secret Ballot** (also called confidential voting), either an independent third party or employees sworn to secrecy are used to count proxy votes, and the management usually agrees not to look at individual proxy cards. This can help eliminate potential conflicts of interest for fiduciaries voting shares on behalf of others, and can reduce pressure by management on shareholder-employees or shareholder-partners. Cumulative Voting (see above) and Secret Ballots are the only two provisions whose presence is coded as an *increase* in shareholder rights, with an additional point to the Governance Index if the provision is absent.

Executive **Severance** agreements assure high-level executives of their positions or some compensation and are not contingent upon a change in control (unlike Golden or Silver parachutes).

**Silver Parachutes** are similar to Golden Parachutes in that they provide severance payments upon a change in corporate control, but differ in that a large number of a firm's employees are eligible for these benefits. Since Silver Parachutes do not protect the key decision makers in a merger, we classified them in the *Other* group rather than in the *Protection* group.

**Special Meeting** limitations either increase the level of shareholder support required to call a special meeting beyond that specified by state law or eliminate the ability to call one entirely. Such provisions add extra time to proxy fights, since bidders must wait until the regularly scheduled annual meeting to replace board members or dismantle takeover defenses.

This delay is especially potent when combined with limitations on actions by written consent (see below).

**Supermajority** requirements for approval of mergers are charter provisions that establish voting requirements for mergers or other business combinations that are higher than the threshold requirements of state law. They are typically 66.7, 75, or 85 percent, and often exceed attendance at the annual meeting. In practice, these provisions are similar to **Control-Share Acquisition laws**. These laws require a majority of disinterested shareholders to vote on whether a newly qualifying large shareholder has voting rights. They were in place in 25 states by September 1990 and one additional state in 1991.

**Unequal Voting** rights limit the voting rights of some shareholders and expand those of others. Under time-phased voting, shareholders who have held the stock for a given period of time are given more votes per share than recent purchasers. Another variety is the substantial-shareholder provision, which limits the voting power of shareholders who have exceeded a certain threshold of ownership.

Limitations on action by **Written Consent** can take the form of the establishment of majority thresholds beyond the level of state law, the requirement of unanimous consent, or the elimination of the right to take action by written consent. Such requirements add extra time to many proxy fights, since bidders must wait until the regularly scheduled annual meeting to replace board members or dismantle takeover defenses. This delay is especially potent when combined with limitations for calling special meetings (see above).

**Appendix B – Definitions for the Regression Variables**

This list includes all variables used as regressors or for summary statistics in Tables V and XIII. All components are drawn from the CRSP monthly files and all variables are in natural logs unless explicitly noted otherwise. Variables are listed in alphabetical order.

**BM** - The ratio of book value of common equity (previous fiscal year) to market value of common equity (end of previous calendar year). Book value of common equity is the sum of book common equity (Compustat item 60) and deferred taxes (Compustat item 74). This variable, and all other variables that use Compustat data, are recalculated each July and held constant through the following June.

**5-Year Return** – The compounded return from month t-61 to month t-2.

**IO** – Shares held by institutions divided by total shares outstanding (not in logs). Institutional holdings are from SEC Form 13F quarterly filings, as provided by Thomson Financial. We use the most recent quarter as of the end of month t-1, with shares outstanding (from CRSP) measured on the same date.

**NADVOL** - The dollar volume of trading in month t-2 for stocks that trade on the Nasdaq. Approximated as stock price at the end of month t-2 multiplied by share volume in month t-2. For New York Stock Exchange (NYSE) and American Stock Exchange (AMEX) stocks, NADVOL equals zero.

**NASDUM** - A dummy variable equal to one if the firm traded on the Nasdaq Stock Market at the beginning of month t and zero otherwise.

**NYDVOL** - The dollar volume of trading in month t-2 for stocks that trade on the NYSE or AMEX. Approximated as stock price at the end of month t-2 multiplied by share volume in month t-2. For Nasdaq stocks, NYDVOL equals zero.

**PRICE** - Price at the end of month t-2.

**Q** - The market value of assets divided by the book value of assets (Compustat item 6), where the market value of assets is computed as book value of assets plus the market value of common stock less the sum of the book value of common stock (Compustat item 60) and balance sheet deferred taxes (Compustat item 74). All book values for fiscal year t (from Compustat) are combined with the market value of common equity at the calendar end of year t.

**RET2-3** - Compounded gross returns for months t-3 and t-2.

**RET4-6** - Compounded gross returns for months t-6 through t-4.

**RET7-12** - Compounded gross returns for months t-12 through t-7.

**SGROWTH** - The growth in sales (Compustat item 12) over the previous five fiscal years (not in logs).

**SIZE** - Market capitalization in millions of dollars at the end of month t-2.

**SP500** - membership in the S&P 500 as of the end of month t-1. Value is equal to one if the firm is in the index, and zero otherwise. Data is from CRSP S&P 500 constituent file.

**VOLUME** - The dollar volume of trading in month t-2 = NADVOL + NYDVOL.

**YLD** - The ratio of dividends in the previous fiscal year (Compustat item 21) to market capitalization measured at calendar year end (not in logs).

## REFERENCES

Banz, Rolf, "The Relation Between Return and Market Value of Stocks," Journal of Financial Economics, XXXVIII (1981), 269-296.

Basu, Sanjoy, "The Investment Performance of Common Stocks in Relation to Their Price-to-Earnings: A Test of the Efficient Markets Hypothesis," Journal of Finance, XXXII (1977), 663-682.

Baumol, William, Business Behavior, Value, and Growth, (New York, NY: MacMillan, 1959).

Baysinger, Barry D., and Henry N. Butler, "Corporate Governance and the Board of Directors: Performance Effects of Changes in Board Composition," Journal of Law, Economics, and Organization, I (1985), 101-124.

Berger, Philip G., and Eli Ofek, "Diversification's Effect on Firm Value," Journal of Financial Economics, XXXVII (1995), 39-65.

Bernard, Victor, and J.K. Thomas, "Post-Earnings Announcement Drift: Delayed Price Response or Risk Premium?," Journal of Accounting Research, Supplement XXVII (1989), 1-36.

Bertrand, Marianne, and Sendhil Mullainathan, "Is There Discretion in Wage Setting?," Rand Journal of Economics, XXX (1999a), 535-554.

-------, "Corporate Governance and Executive Pay: Evidence from Takeover Legislation," Working Paper, MIT Department of Economics, 1999b.

-------, "Enjoying the Quiet Life? Managerial Behavior Following Anti-Takeover Legislation," Working Paper, MIT Department of Economics, 2000.

Bhagat, Sanjai, and B.S. Black, "The Relationship Between Board Composition and Firm Performance," in Comparative Corporate Governance: The State of the Art and Emerging Research, K. Hopt, M. Roe, and E. Wymeersch, eds. (Oxford, UK: Clarendon Press, New York, NY: Oxford University Press, 1998).

Bhagat, Sanjai, and Roberta Romano, "Event Studies and the Law: Part II -- Empirical Studies of Corporate Law," Working Paper, Yale University, 2001.

Bittlingmayer, George, "The Market for Corporate Control (Including Takeovers)," in Encyclopedia of Law and Economics, Vol. III – The Regulation of Contracts, Boudewijn Bouckaert and Gerrit de Geest, eds. (Cheltenham, UK and Northhampton, MA: Edward Elgar, 2000).

Borokhovich, Kenneth A., Kelly R. Brunarski, and Robert Parrino, "CEO Contracting and Antitakeover Amendments," Journal of Finance, LII (1997), 1495-1518.

Brennan, Michael J., Tarun Chordia, and Avanidhar Subrahmanyam, "Alternative Factor Specifications, Security Characteristics, and the Cross-Section of Expected Stock Returns," Journal of Financial Economics, XLIX (1998), 345-375.

Carhart, Mark, "On Persistence in Mutual Fund Performance," Journal of Finance, LII (1997), 57-82.

Coates, John, "Takeover Defenses in the Shadow of the Pill: A Critique of the Scientific Evidence," Texas Law Review, LXXIX (2000), 271-382.

Comment, Robert, and G. William Schwert, "Poison or Placebo? Evidence on the Deterrence and Wealth Effects of Modern Antitakeover Measures," Journal of Financial Economics, XXXIX (1995), 3-43.

Core, John, "On the Corporate Demand for Directors' and Officers' Insurance," Journal of Risk and Insurance, LXIV (1997), 63-87.

------, "The Directors' and Officers' Insurance Premium: An Outside Assessment of the Quality of Corporate Governance," Journal of Law, Economics, and Organization, XVI (2000), 449-477.

Core, John E., Robert W. Holthausen, and David F. Larcker, "Corporate Governance, Chief Executive Officer Compensation, and Firm Performance," Journal of Financial Economics, LI (1999), 371-406.

Daines, Robert, "Does Delaware Law Improve Firm Value?," Journal of Financial Economics, LXII (2001), 525-558.

Daines, Robert, and Michael Klausner, "Do IPO Charters Maximize Firm Value? Antitakeover Protection in IPOs," Journal of Law, Economics, and Organization, XVII (2001), 83-120.

Danielson, Morris G., and Jonathan M. Karpoff, "On the Uses of Corporate Governance Provisions", Journal of Corporate Finance, IV (1998), 347-371.

Demsetz, Harold, and Kenneth Lehn, "The Structure of Corporate Ownership: Causes and Consequences," Journal of Political Economy, XCIII (1985), 1155-1177.

Eckbo, B. Espen, "Valuation Effects of Greenmail Prohibitions," The Journal of Financial and Quantitative Analysis, XXV (1990), 491-505.

Fama, Eugene F., and Kenneth R. French, "Common Risk Factors in the Returns on Bonds and Stocks," Journal of Financial Economics, XXXIII (1993), 3-53.

-------, "Industry Costs of Equity," Journal of Financial Economics, XLIII (1997), 153-194.

Fama, Eugene F., and James D. MacBeth, "Risk, Return, and Equilibrium: Empirical Tests," Journal of Political Economy, LXXXI (1973), 607-636.

Garvey, Gerald T., and Gordon Hanka, "Capital Structure and Corporate Control: The Effect of Antitakeover Statutes on Firm Leverage," Journal of Finance, LIV (1999), 519-546.

Gillan, Stuart, and Jennifer Bethel, "Managerial Control of the Proxy Process: The Impact on Shareholder Voting," Working Paper, Babson College, 2001.

Gompers, Paul A., and Andrew Metrick, "Institutional Investors and Equity Prices," Quarterly Journal of Economics, CXIV (2001), 229-260.

Hermalin, Benjamin, and Michael Weisbach, "The Effects of Board Composition and Direct Incentives on Firm Performance," Financial Management, XX (1991), 101-112.

Holmstrom, Bengt, and Steven N. Kaplan, "Corporate Governance and Merger Activity in the United States: Making Sense of the 1980s and 1990s," Journal of Economic Perspectives, XV (2001), 121-144.

Ikenberry, David, Josef Lakonishok, and Theo Vermaelen, "Market Underreaction to Open Market Share Repurchases," Journal of Financial Economics, XXXIX (1995), 181-208.

Ishii, Joy L., "Corporate Governance in the 1990s: New Evidence on the Role of Shareholder Proposals," Senior Honors Thesis, Harvard University, 2000.

Jegadeesh, Narasimhan, and Sheridan Titman, "Returns to Buying Winners and Selling Losers: Implications for Stock Market Efficiency," Journal of Finance, XLVIII (1993), 65-91.

Jensen, Michael, "Agency Costs of Free Cash Flow, Corporate Finance, and Takeovers," American Economic Review, LXXVI (1986), 323-329.

Jensen, Michael, and Richard Ruback, "The Market for Corporate Control: The Scientific Evidence," Journal of Financial Economics, XI (1983), 5-50.

Johnson, Mark S., and Ramesh P. Rao, "The Impact of Antitakeover Amendments on Corporate Financial Performance," Financial Review, XXXII (1997), 659-690.

Kaplan, Steven N., and Luigi Zingales, "Do Investment-Cash Flow Sensitivities Provide Useful Measures of Financing Constraints?" Quarterly Journal of Economics, CXII (1997), 169-216.

Karpoff, Jonathan M., and Paul H. Malatesta, "The Wealth Effects of Second-Generation State Takeover Legislation," Journal of Financial Economics, XXV (1989), 291-322.

Lakonishok, Josef, Andrei Shleifer, and Robert Vishny, "Contrarian Investment, Extrapolation, and Risk," Journal of Finance, XLIX (1994), 1541-1578.

Lambert, Richard A., and David F. Larcker, "Golden Parachutes, Executive Decision-Making and Shareholder Wealth," Journal of Accounting and Economics, VII (1985), 179-203.

Lang, Larry H. P., and René M. Stulz, "Tobin's Q, Corporate Diversification, and Firm Performance," Journal of Political Economy, CII (1994), 1248-1280.

Lang, Larry H. P., René M. Stulz, and Ralph A. Walkling, "A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," Journal of Financial Economics, XXIX (1991), 315-335.

La Porta, Rafael, Florencio Lopez-de-Silanes, Andrei Shleifer, and Roberty Vishny, "Investor Protection and Corporate Valuation," Working Paper, Harvard University, 2001.

Lewellen, Wilbur, Claudio Loderer, and Ahron Rosenfeld, "Merger Decisions and Executive Stock Ownership in Acquiring Firms," Journal of Accounting and Economics, VII (1985), 209-231.

Loughran, Tim, and Anand M. Vijh, "Do Long-Term Shareholders Benefit from Corporate Acquisitions?," Journal of Finance, LII (1997), 1765-1790.

Marris, Robin, The Economic Theory of Managerial Capitalism, (New York, NY: Free Press of Glencoe, 1964).

McGurn, Patrick S., Confidential Proxy Voting, (Washington, D.C.: Investor Responsibility Research Center Inc., 1989).

Meulbroek, Lisa K., Mark L. Mitchell, J. Harold Mulherin, Jeffrey M. Netter, and Annette B. Poulsen, "Shark Repellants and Managerial Myopia: An Empirical Test," Journal of Political Economy, XCVIII (1990), 1108-1117.

Michaely, Roni, Richard Thaler, and Kent Womack, "Price Reactions to Dividend Initiations and Omissions," Journal of Finance, XXXVIII (1995), 1597-1606.

Mitchell, Mark L., and Erik Stafford, "Managerial Decisions and Long-Term Stock Price Performance," The Journal of Business, LXXIII (2000), 287-330.

Morck Randall, Andrei Shleifer, and Robert Vishny, "Management Ownership and Market Valuation: An Empirical Analysis," Journal of Financial Economics, XX (1988), 293-315.

-------, "Do Managerial Objectives Drive Bad Acquisitions?," Journal of Finance, XLV (1990), 31-48.

Morck, Randall, and Fan Yang, "The Mysterious Growing Value of the S&P 500 Membership," Working Paper, University of Alberta, 2001.

Pinnell, Maria Carmen S., State Takeover Laws, (Washington, D.C.: Investor Responsibility Research Center Inc., 2000).

Pugh, William M., Daniel E. Page, and John S. Jahera Jr., "Antitakeover Charter Amendments: Effects on Corporate Decisions," Journal of Financial Research, XV (1992), 57-67.

Rau, P. Raghavendra, and Theo Vermaelen, "Glamour, Value and the Post-Acquisition Performance of Acquiring Firms," Journal of Financial Economics, XLIX (1998), 223-253.

Rosenbaum, Virginia, Corporate Takeover Defenses, (Washington, D.C.: Investor Responsibility Research Center Inc., 1990, 1993, 1995, 1998).

Seyhun, H. Nejat, Investment Intelligence from Insider Trading, (Cambridge, MA: MIT Press, 1998).

Shin, Hyun-Han, and René M. Stulz, "Firm Value, Risk, and Growth Opportunities," NBER Working Paper No. 7808, 2000.

Shleifer, Andrei, and Robert Vishny, "Greenmail, White Knights, and Shareholders' Interest," Rand Journal of Economics, XVII (1986), 293-309.

-------, "Management Entrenchment: The Case of Manager-Specific Investments," Journal of Financial Economics, XXV (1989), 123-140.

-------, "A Survey of Corporate Governance," Journal of Finance, LII (1997), 737-783.

Stein, Jeremy C., "Takeover Threats and Managerial Myopia," Journal of Political Economy, XCVI (1988), 61-80.

-------, "Efficient Markets, Inefficient Firms: A Model of Myopic Firm Behavior," Quarterly Journal of Economics, CIV (1989), 655-669.

-------, "Agency, Information, and Corporate Investment," <u>Handbook of the Economics of Finance</u>, George Constantinides, Milton Harris, and René Stulz, eds. (Amsterdam: Elsevier Science, 2001).

Subramanian, Guhan, "The Influence of Antitakeover Statutes on Reincorporation Choice: Evidence on the "Race" Debate and Antitakeover Overreaching," Working Paper, Harvard Business School, 2001.

Titman, Sheridan, K.C. John Wei, and Feixue Xie, "Capital Investments and Stock Returns," Working Paper, University of Texas at Austin, 2001.

Williamson, Oliver, <u>The Economics of Discretionary Behavior: Managerial Objectives in a Theory of the Firm</u>, (Englewood Cliffs, NJ: Prentice Hall, 1964).

Yermack, David, "Higher Market Valuation for Firms with a Small Board of Directors," <u>Journal of Financial Economics</u>, XL (1996), 185-211.

**TABLE I**
**Governance Provisions**

This table presents the percentage of firms with each provision between 1990 and 1998. The data are drawn from the IRRC Corporate Takeover Defenses publications [Rosenbaum 1990, 1993, 1995, and 1998] and are supplemented by data on state takeover legislation coded from Pinnell [2000]. See Appendix A for detailed information on each of these provisions. The sample consists of all firms in the IRRC research universe except those with dual class stock.

| | Percentage of firms with governance provisions in | | | |
| | 1990 | 1993 | 1995 | 1998 |
|---|---|---|---|---|
| *Delay* | | | | |
|   *Blank Check* | 76.4 | 80.0 | 85.7 | 87.9 |
|   *Classified Board* | 59.0 | 60.4 | 61.7 | 59.4 |
|   *Special Meeting* | 24.5 | 29.9 | 31.9 | 34.5 |
|   *Written Consent* | 24.4 | 29.2 | 32.0 | 33.1 |
| *Protection* | | | | |
|   *Compensation Plans* | 44.7 | 65.8 | 72.5 | 62.4 |
|   *Contracts* | 16.4 | 15.2 | 12.7 | 11.7 |
|   *Golden Parachutes* | 53.1 | 55.5 | 55.1 | 56.6 |
|   *Indemnification* | 40.9 | 39.6 | 38.7 | 24.4 |
|   *Liability* | 72.3 | 69.1 | 65.6 | 46.8 |
|   *Severance* | 13.4 | 5.5 | 10.3 | 11.7 |
| *Voting* | | | | |
|   *Bylaws* | 14.4 | 16.1 | 16.0 | 18.1 |
|   *Charter* | 3.2 | 3.4 | 3.1 | 3.0 |
|   *Cumulative Voting* | 18.5 | 16.5 | 14.9 | 12.2 |
|   *Secret Ballot* | 2.9 | 9.5 | 12.2 | 9.4 |
|   *Supermajority* | 38.8 | 39.6 | 38.5 | 34.1 |
|   *Unequal Voting* | 2.4 | 2.0 | 1.9 | 1.9 |
| *Other* | | | | |
|   *Antigreenmail* | 6.1 | 6.9 | 6.4 | 5.6 |
|   *Directors' Duties* | 6.5 | 7.4 | 7.2 | 6.7 |
|   *Fair Price* | 33.5 | 35.2 | 33.6 | 27.8 |
|   *Pension Parachutes* | 3.9 | 5.2 | 3.9 | 2.2 |
|   *Poison Pill* | 53.9 | 57.4 | 56.6 | 55.3 |
|   *Silver Parachutes* | 4.1 | 4.8 | 3.5 | 2.3 |
| *State* | | | | |
|   *Antigreenmail Law* | 17.2 | 17.6 | 17.0 | 14.1 |
|   *Business Combination Law* | 84.3 | 88.5 | 88.9 | 89.9 |
|   *Cash-Out Law* | 4.2 | 3.9 | 3.9 | 3.5 |
|   *Directors' Duties Law* | 5.2 | 5.0 | 5.0 | 4.4 |
|   *Fair Price Law* | 35.7 | 36.9 | 35.9 | 31.6 |
|   *Control Share Acquisition Law* | 29.6 | 29.9 | 29.4 | 26.4 |
| Number of Firms | 1357 | 1343 | 1373 | 1708 |

**TABLE II**
**The Governance Index**

This table provides summary statistics on the distribution of $G$, the Governance Index, and the subindices (*Delay, Protection, Voting, Other,* and *State*) over time. $G$ and the subindices are calculated from the provisions listed in Table I as described in Section II. Appendix A gives detailed information on each provision. We divide the sample into ten portfolios based on the level of $G$ and list the number of firms in each portfolio. The Democracy Portfolio is composed of all firms where $G \le 5$, and the Dictatorship Portfolio contains all firms where $G \ge 14$.

|  | 1990 | 1993 | 1995 | 1998 |
|---|---|---|---|---|
| Governance Index |  |  |  |  |
| Minimum | 2 | 2 | 2 | 2 |
| Mean | 9.0 | 9.3 | 9.4 | 8.9 |
| Median | 9 | 9 | 9 | 9 |
| Mode | 10 | 9 | 9 | 10 |
| Maximum | 17 | 17 | 17 | 18 |
| Standard Deviation | 2.9 | 2.8 | 2.8 | 2.8 |
| Number of Firms |  |  |  |  |
| $G \le 5$ (Democracy Portfolio) | 158 | 139 | 120 | 215 |
| $G = 6$ | 119 | 88 | 108 | 169 |
| $G = 7$ | 158 | 140 | 127 | 186 |
| $G = 8$ | 165 | 139 | 152 | 201 |
| $G = 9$ | 160 | 183 | 183 | 197 |
| $G = 10$ | 175 | 170 | 178 | 221 |
| $G = 11$ | 149 | 168 | 166 | 194 |
| $G = 12$ | 104 | 123 | 142 | 136 |
| $G = 13$ | 84 | 100 | 110 | 106 |
| $G \ge 14$ (Dictatorship Portfolio) | 85 | 93 | 87 | 83 |
| Total | 1357 | 1343 | 1373 | 1708 |
| Subindex Means |  |  |  |  |
| *Delay* | 1.8 | 2.0 | 2.1 | 2.1 |
| *Protection* | 2.4 | 2.5 | 2.5 | 2.1 |
| *Voting* | 2.2 | 2.1 | 2.1 | 2.2 |
| *Other* | 1.1 | 1.2 | 1.1 | 1.0 |
| *State* | 1.8 | 1.8 | 1.8 | 1.7 |

53

**TABLE III**
**Correlations between the Subindices**

This table presents pairwise correlations between the subindices, *Delay, Protection, Voting, Other,* and *State* in 1990. The calculation of the subindices is described in Section II. The elements of each subindex are given in Table 1 and described in detail in Appendix A. Significance at the five-percent and one-percent levels is indicated by * and ** respectively.

|  | *Delay* | *Protection* | *Voting* | *Other* |
|---|---|---|---|---|
| *Protection* | 0.22** |  |  |  |
| *Voting* | 0.33** | 0.10** |  |  |
| *Other* | 0.43** | 0.27** | 0.19** |  |
| *State* | -0.08** | -0.04 | -0.07* | 0.05 |

**TABLE IV**
**The Largest Firms in the Extreme Portfolios**

This table presents the firms with the largest market capitalizations at the end of 1990 of all companies within the Democracy Portfolio ($G \leq 5$) and the Dictatorship Portfolio ($G \geq 14$). The calculation of $G$ is described in Section II. The companies are listed in descending order of market capitalization.

| 1990 Democracy Portfolio | | | |
| --- | --- | --- | --- |
| | State of Incorporation | 1990 Governance Index | 1998 Governance Index |
| IBM | New York | 5 | 6 |
| Wal-Mart | Delaware | 5 | 5 |
| Du Pont de Nemours | Delaware | 5 | 5 |
| Pepsico | North Carolina | 4 | 3 |
| American International Group | Delaware | 5 | 5 |
| Southern Company | Delaware | 5 | 5 |
| Hewlett Packard | California | 5 | 6 |
| Berkshire Hathaway | Delaware | 3 | – |
| Commonwealth Edison | Illinois | 4 | 6 |
| Texas Utilities | Texas | 2 | 4 |

| 1990 Dictatorship Portfolio | | | |
| --- | --- | --- | --- |
| | State of Incorporation | 1990 Governance Index | 1998 Governance Index |
| GTE | New York | 14 | 13 |
| Waste Management | Delaware | 15 | 13 |
| General Re | Delaware | 14 | 16 |
| Limited Inc | Delaware | 14 | 14 |
| NCR | Maryland | 14 | – |
| K Mart | Michigan | 14 | 10 |
| United Telecommunications | Kansas | 14 | – |
| Time Warner | Delaware | 14 | 13 |
| Rorer | Pennsylvania | 16 | – |
| Woolworth | New York | 14 | 13 |

**TABLE V**
**Summary Statistics**

This table gives descriptive statistics for the relationship of $G$ with several financial and accounting measures in September 1990. The first column gives the correlations for each of these variables with the Governance Index, $G$. The second and third columns give means for these same variables within the Democracy Portfolio ($G \leq 5$) and the Dictatorship Portfolio ($G \geq 14$) in 1990. The final column gives the difference of the two means with its standard error in parentheses. The calculation of $G$ is described in Section II, and definitions of each variable are given in Appendix B. Significance at the five-percent and one-percent levels is indicated by * and ** respectively.

| | Correlation with $G$ | Mean, Democracy Portfolio | Mean, Dictatorship Portfolio | Difference |
|---|---|---|---|---|
| *BM* | 0.02 | -0.66 | -0.54 | -0.12 |
| | | | | (0.10) |
| *SIZE* | 0.15** | 12.86 | 13.46 | -0.60** |
| | | | | (0.21) |
| *PRICE* | 0.16** | 2.74 | 3.14 | -0.40** |
| | | | | (0.12) |
| *VOLUME* | 0.19** | 16.34 | 17.29 | -0.95** |
| | | | | (0.24) |
| *Q* | -0.04 | 1.77 | 1.47 | 0.30* |
| | | | | (0.14) |
| *YLD* | 0.03 | 4.20% | 7.20% | -3.00% |
| | | | | (4.34) |
| *SP500* | 0.23** | 0.15 | 0.49 | -0.34** |
| | | | | (0.06) |
| *5-Year Return* | -0.01 | 90.53% | 85.41% | 5.12% |
| | | | | (20.74) |
| *SGROWTH* | -0.08** | 62.74% | 44.78% | 17.96% |
| | | | | (9.83) |
| *IO* | 0.14** | 25.89% | 34.44% | -8.55%* |
| | | | | (3.36) |

## TABLE VI
### Performance-Attribution Regressions for Decile Portfolios

We estimate four-factor regressions (equation (1) from the text) of value-weighted monthly returns for portfolios of firms sorted by $G$. The calculation of $G$ is described in Section II. The first row contains the results when we use the portfolio that buys the Democracy Portfolio ($G \leq 5$) and sells short the Dictatorship Portfolio ($G \geq 14$). The portfolios are reset in September 1990, July 1993, July 1995, and February 1998, which are the months after new data on $G$ became available. The explanatory variables are *RMRF*, *SMB*, *HML*, and *Momentum*. These variables are the returns to zero-investment portfolios designed to capture market, size, book-to-market, and momentum effects, respectively. (Consult Fama and French [1993] and Carhart [1997] on the construction of these factors.) The sample period is from September 1990 through December 1999. Standard errors are reported in parentheses and significance at the five-percent and one-percent levels is indicated by * and ** respectively.

| | $\alpha$ | *RMRF* | *SMB* | *HML* | *Momentum* |
|---|---|---|---|---|---|
| **Democracy-Dictatorship** | **0.71**\*\* | **-0.04** | **-0.22**\* | **-0.55**\*\* | **-0.01** |
| | **(0.26)** | **(0.07)** | **(0.09)** | **(0.10)** | **(0.07)** |
| $G \leq 5$ (Democracy) | 0.29* | 0.98** | -0.24** | -0.21** | -0.05 |
| | (0.13) | (0.04) | (0.05) | (0.05) | (0.03) |
| $G = 6$ | 0.22 | 0.99** | -0.18** | 0.05 | -0.08 |
| | (0.18) | (0.05) | (0.06) | (0.07) | (0.04) |
| $G = 7$ | 0.24 | 1.05** | -0.10 | -0.14 | 0.15** |
| | (0.19) | (0.05) | (0.07) | (0.08) | (0.05) |
| $G = 8$ | 0.08 | 1.02** | -0.04 | -0.08 | 0.01 |
| | (0.14) | (0.04) | (0.05) | (0.06) | (0.04) |
| $G = 9$ | -0.02 | 0.97** | -0.20** | 0.14** | -0.01 |
| | (0.12) | (0.03) | (0.04) | (0.05) | (0.03) |
| $G = 10$ | 0.03 | 0.95** | -0.17** | -0.00 | -0.08** |
| | (0.11) | (0.03) | (0.04) | (0.04) | (0.03) |
| $G = 11$ | 0.18 | 0.99** | -0.14** | -0.06 | -0.01 |
| | (0.16) | (0.05) | (0.05) | (0.06) | (0.04) |
| $G = 12$ | -0.25 | 1.00** | -0.11* | 0.16** | 0.02 |
| | (0.14) | (0.04) | (0.05) | (0.06) | (0.04) |
| $G = 13$ | -0.01 | 1.03** | -0.21** | 0.14* | -0.08* |
| | (0.14) | (0.04) | (0.05) | (0.06) | (0.04) |
| $G \geq 14$ (Dictatorship) | -0.42* | 1.03** | -0.02 | 0.34** | -0.05 |
| | (0.19) | (0.05) | (0.06) | (0.07) | (0.05) |

## TABLE VII

### Performance-Attribution Regressions under Alternative Portfolio Constructions

This table presents the alphas from four-factor regressions for variations on the Democracy ($G{\leq}5$) minus Dictatorship ($G{\geq}14$) Portfolio. The calculation of $G$ is described in Section II. The portfolios are reset in September 1990, July 1993, July 1995, and February 1998, which are the months after new data on $G$ became available. The sample period is September 1990 to December 1999. The first row uses the unadjusted difference between the monthly returns to the Democracy and Dictatorship Portfolios. The second row contains the results using industry-adjusted returns, with industry adjustments done relative to the 48 industries of Fama and French [1997]. The third and fourth rows use alternative definitions of the Democracy and Dictatorship Portfolios. In the third row, firms are sorted on $G$ and the two portfolios contain the smallest set of firms with extreme values of $G$ such that each has at least 10 percent of the sample. This implies cutoff values of $G$ for the Democracy Portfolio of 5, 5, 6, and 5 for September 1990, July 1993, July 1995, and February 1998, respectively. The cutoffs for the Dictatorship Portfolio are always 13. In the fourth row, the two portfolios contain the largest set of firms such that each has no more than 10 percent of the sample. The cutoff values of $G$ for the Democracy Portfolio are 4, 4, 5, and 4 for September 1990, July 1993, July 1995, and February 1998, respectively, and they are always 14 for the Dictatorship Portfolio. In the fifth row, portfolio returns are calculated maintaining the 1990 portfolios for the entire sample period. As long as they are listed in CRSP, we neither delete nor add firms to these portfolios regardless of subsequent changes in $G$ or changes in the IRRC sample in later editions. The sixth row shows the results of restricting the sample to firms incorporated in Delaware. In the seventh and eighth rows, the sample period is divided in half at April 30, 1995, and separate regressions are estimated for the first half and second half of the period (56 months each). The explanatory variables are *RMRF*, *SMB*, *HML*, *Momentum*, and a constant. These variables are the returns to zero-investment portfolios designed to capture market, size, book-to-market, and momentum effects, respectively. (Consult Fama and French [1993] and Carhart [1997] on the construction of these factors.) All coefficients except for the alpha are omitted in this table. Standard errors are reported in parentheses and significance at the five-percent and one-percent levels is indicated by * and ** respectively.

|     |                      | $\alpha$, Value-Weighted | $\alpha$, Equal-Weighted |
| --- | -------------------- | ------------------------ | ------------------------ |
| (1) | Democracy-Dictatorship | 0.71**<br>(0.26)       | 0.45*<br>(0.22)          |
| (2) | Industry-Adjusted    | 0.47*<br>(0.22)          | 0.30<br>(0.19)           |
| (3) | Big Portfolios       | 0.47*<br>(0.21)          | 0.39*<br>(0.19)          |
| (4) | Small Portfolios     | 0.78*<br>(0.33)          | 0.45<br>(0.25)           |
| (5) | 1990 Portfolio       | 0.53*<br>(0.24)          | 0.33<br>(0.22)           |
| (6) | Delaware Portfolio   | 0.63<br>(0.34)           | 0.42<br>(0.26)           |
| (7) | Early Half           | 0.45<br>(0.23)           | 0.58*<br>(0.28)          |
| (8) | Late Half            | 0.75<br>(0.40)           | 0.04<br>(0.27)           |

58

## TABLE VIII
## Q Regressions

The first column of this table presents the coefficients on G, the Governance Index, from regressions of industry-adjusted Tobin's Q on G and control variables. The second column restricts the sample to firms in the Democracy ($G\leq5$) and Dictatorship ($G\geq14$) portfolios and includes as regressors a dummy variable for the Democracy Portfolio and the controls. The third through seventh columns show the coefficients on each subindex from regressions where the explanatory variables are the subindices Delay, Protection, Voting, Other, and State, and the controls. We include as controls a dummy variable for incorporation in Delaware, the log of assets in the current fiscal year, the log of firm age measured in months as of December of each year, and a dummy variable for inclusion in the S&P 500 as of the end of the previous year. The coefficients on the controls and the constant are omitted from the table. The calculation of G and the subindices is described in Section II. Q is the ratio of the market value of assets to the book value of assets: the market value is calculated as the sum of the book value of assets and the market value of common stock less the book value of common stock and deferred taxes. The market value of equity is measured at the end of the current calendar year, and the accounting variables are measured in the current fiscal year. Industry adjustments are made by subtracting the industry median, where medians are calculated by matching the four-digit SIC codes from December of each year to the 48 industries designated by Fama and French [1997]. The coefficients and standard errors from each annual cross-sectional regression are reported in each row, and the time-series averages and time-series standard errors are given in the last row. * and ** indicate significance at the five-percent and one-percent levels respectively.

| | (1) G | (2) Democracy Portfolio | (3) Delay | (4) Protection | (5) Voting | (6) Other | (7) State |
|---|---|---|---|---|---|---|---|
| 1990 | -0.022** | 0.186 | -0.015 | -0.035 | 0.015 | -0.031 | -0.004 |
| | (0.008) | (0.127) | (0.022) | (0.018) | (0.030) | (0.026) | (0.020) |
| 1991 | -0.040** | 0.302* | -0.033 | -0.048 | -0.012 | -0.059 | 0.003 |
| | (0.012) | (0.143) | (0.034) | (0.028) | (0.047) | (0.040) | (0.031) |
| 1992 | -0.036** | 0.340* | -0.041 | -0.039 | 0.021 | -0.054 | -0.011 |
| | (0.010) | (0.151) | (0.027) | (0.023) | (0.038) | (0.032) | (0.025) |
| 1993 | -0.042** | 0.485* | -0.023 | -0.055* | 0.009 | -0.060 | -0.062* |
| | (0.011) | (0.204) | (0.029) | (0.026) | (0.038) | (0.035) | (0.027) |
| 1994 | -0.031** | 0.335* | -0.032 | -0.012 | -0.032 | -0.029 | -0.047* |
| | (0.009) | (0.161) | (0.023) | (0.020) | (0.031) | (0.028) | (0.022) |
| 1995 | -0.039** | 0.435* | -0.046 | -0.062* | -0.086* | 0.023 | -0.022 |
| | (0.011) | (0.217) | (0.030) | (0.027) | (0.041) | (0.036) | (0.028) |
| 1996 | -0.025* | 0.299 | -0.029 | -0.030 | -0.078 | 0.018 | -0.024 |
| | (0.011) | (0.195) | (0.031) | (0.028) | (0.041) | (0.037) | (0.028) |
| 1997 | -0.016 | 0.210 | -0.017 | -0.007 | -0.055 | -0.001 | -0.017 |
| | (0.013) | (0.196) | (0.035) | (0.032) | (0.047) | (0.042) | (0.032) |
| 1998 | -0.065** | 0.203 | -0.023 | -0.096* | -0.132 | -0.058 | 0.012 |
| | (0.020) | (0.404) | (0.052) | (0.049) | (0.070) | (0.066) | (0.052) |
| 1999 | -0.114** | 0.564 | -0.067 | -0.171* | -0.294** | -0.006 | -0.033 |
| | (0.027) | (0.602) | (0.071) | (0.067) | (0.098) | (0.090) | (0.073) |
| Mean | -0.043** | 0.336** | -0.033** | -0.056** | -0.065 | -0.025* | -0.020* |
| | (0.009) | (0.040) | (0.005) | (0.015) | (0.030) | (0.010) | (0.007) |

## TABLE IX
### Operating Performance

The first, third, and fifth columns of this table give the results of annual median (least absolute deviation) regressions for net profit margin, return on equity, and sales growth on the Governance Index, $G$, measured in the previous year, and the book-to-market ratio, $BM$. The second, fourth, and sixth columns restrict the sample to firms in the Democracy ($G \leq 5$) and Dictatorship ($G \geq 14$) portfolios and include as regressors a dummy variable for the Democracy Portfolio and $BM$. The coefficients on $BM$ and the constant are omitted from the table. The calculation of $G$ is described in Section II. Net profit margin is the ratio of income before extraordinary items available for common equity to sales; return on equity is the ratio of income before extraordinary items available for common equity to the sum of the book value of common equity and deferred taxes; $BM$ is the log of the ratio of book value (the sum of book common equity and deferred taxes) in the previous fiscal year to size at the close of the previous calendar year. Each dependent variable is net of the industry median, which is calculated by matching the four-digit SIC codes of all firms in the CRSP-Compustat merged database in December of each year to the 48 industries designated by Fama and French [1997]. The coefficients and standard errors from each annual cross-sectional regression are reported in each row, and the time-series averages and time-series standard errors are given in the last row. Significance at the five-percent and one-percent levels is indicated by * and ** respectively. All coefficients and standard errors are multiplied by 1000.

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
|  | Net Profit Margin | | Return on Equity | | Sales Growth | |
|  | $G$ | Democracy Portfolio | $G$ | Democracy Portfolio | $G$ | Democracy Portfolio |
| 1991 | -0.70 | 10.61 | -1.19* | 13.54 | -2.30 | -3.52 |
|  | (0.39) | (7.12) | (0.60) | (11.30) | (1.38) | (17.83) |
| 1992 | -0.52 | 9.45 | 0.42 | 2.54 | -1.43 | 0.10 |
|  | (0.58) | (10.43) | (0.61) | (9.21) | (1.06) | (11.52) |
| 1993 | -0.76 | 7.77 | -0.34 | 2.51 | -3.35** | 18.55 |
|  | (0.48) | (9.98) | (0.79) | (10.98) | (1.17) | (17.71) |
| 1994 | -0.83 | 10.94 | -1.07 | 2.69 | -2.71* | 12.58 |
|  | (0.48) | (6.59) | (0.61) | (10.36) | (1.10) | (22.81) |
| 1995 | -0.72 | 7.56 | -1.39 | 14.77 | -0.89 | 7.91 |
|  | (0.67) | (8.30) | (0.75) | (9.88) | (1.70) | (19.67) |
| 1996 | -0.43 | -2.17 | 0.90 | -2.30 | -2.44 | 14.84 |
|  | (0.40) | (7.22) | (0.65) | (12.09) | (1.39) | (19.36) |
| 1997 | 0.21 | -9.61 | 0.66 | -17.54 | 0.01 | -4.28 |
|  | (0.55) | (9.99) | (0.81) | (9.83) | (1.64) | (26.61) |
| 1998 | -0.73 | -3.99 | -1.28 | 13.62 | -1.45 | -15.65 |
|  | (0.63) | (7.15) | (1.01) | (15.10) | (1.50) | (23.36) |
| 1999 | -1.27* | 4.59 | 0.93 | -15.53 | -0.52 | 15.38 |
|  | (0.58) | (11.58) | (0.85) | (10.38) | (1.92) | (26.10) |
| Mean | -0.64** | 3.91 | -0.26 | 1.59 | -1.68** | 5.10 |
|  | (0.13) | (2.46) | (0.33) | (3.98) | (0.37) | (3.84) |

**TABLE X**
**Capital Expenditure**

The first and third columns of this table present the results of annual median (least absolute deviation) regressions of CAPEX/Assets and CAPEX/Sales on the Governance Index, $G$, measured in the previous year, and $BM$. The second and fourth columns restrict the sample to firms in the Democracy ($G \leq 5$) and Dictatorship ($G \geq 14$) portfolios and include as regressors a dummy variable for the Democracy Portfolio and $BM$. The coefficients on $BM$ and the constant are omitted from the table. The calculation of $G$ is described in Section II. CAPEX is capital expenditures, and $BM$ is the log of the ratio of book value (the sum of book common equity and deferred taxes) in the previous fiscal year to size at the close of the previous calendar year. Both dependent variables are net of the industry median, which is calculated by matching the four-digit SIC codes of all firms in the CRSP-Compustat merged database in December of each year to the 48 industries designated by Fama and French [1997]. The coefficients and standard errors from each annual cross-sectional regression are reported in each row, and the time-series averages and time-series standard errors are given in the last row. Significance at the five-percent and one-percent levels is indicated by * and ** respectively. All coefficients and standard errors are multiplied by 1000.

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
|  | CAPEX/Assets | | CAPEX/Sales | |
|  | $G$ | *Democracy Portfolio* | $G$ | *Democracy Portfolio* |
| 1991 | 1.32** | -13.02** | 0.70* | -9.28 |
|  | (0.27) | (4.28) | (0.32) | (4.96) |
| 1992 | 0.42 | -7.03 | 0.54 | -7.23 |
|  | (0.35) | (4.86) | (0.35) | (6.01) |
| 1993 | 0.81* | -6.06 | 0.09 | -1.68 |
|  | (0.37) | (4.48) | (0.34) | (4.98) |
| 1994 | 0.51 | -7.84 | -0.07 | -4.82 |
|  | (0.32) | (5.21) | (0.37) | (4.76) |
| 1995 | 0.35 | -3.40 | 0.32 | -9.80 |
|  | (0.39) | (6.83) | (0.39) | (5.90) |
| 1996 | 0.75 | -6.90 | 0.31 | -3.26 |
|  | (0.39) | (5.55) | (0.33) | (6.36) |
| 1997 | 0.74* | -4.23 | 0.70 | -8.05 |
|  | (0.34) | (3.50) | (0.40) | (5.71) |
| 1998 | 0.80* | -10.57 | 0.37 | -6.43 |
|  | (0.37) | (6.75) | (0.35) | (5.63) |
| 1999 | -0.15 | 3.12 | -0.32 | 3.49 |
|  | (0.39) | (4.20) | (0.38) | (5.52) |
| Mean | 0.62** | -6.21** | 0.30* | -5.23** |
|  | (0.13) | (1.53) | (0.11) | (1.41) |

## TABLE XI
### Acquisitions

The first column of this table presents annual Tobit regressions of the *Acquisition Ratio* on the Governance Index, *G,* measured in the previous year, *SIZE*, *BM*, and industry dummy variables. The third column presents annual Poisson regressions of *Acquisition Count* on the same explanatory variables. In the second and fourth columns, we restrict the sample to firms in the Democracy ($G \leq 5$) and Dictatorship ($G \geq 14$) portfolios, and we include as a regressor a dummy variable that equals 1 when the firm is in the Democracy Portfolio and 0 otherwise. The coefficients on *SIZE*, *BM*, and the industry dummy variables are omitted from the table. The calculation of *G* is described in Section II. *Acquisition Ratio* is defined as the sum of the value of all corporate acquisitions during a calendar year scaled by the average of market value at the beginning and end of the year. *Acquisition Count* is defined as the number of acquisitions during a calendar year. The data on acquisitions are from the SDC database. *SIZE* is the log of market capitalization at the end of the previous calendar year in millions of dollars, and *BM* is the log of the ratio of book value (the sum of book common equity and deferred taxes) in the previous fiscal year to size at the close of the previous calendar year. Industry dummy variables are created by matching the four-digit SIC codes of all firms in the CRSP-Compustat merged database in December of each year to the 48 industries designated by Fama and French [1997]. The coefficients and standard errors from each annual cross-sectional regression are reported in each row, and the time-series averages and time-series standard errors are given in the last row. Significance at the five-percent and one-percent levels is indicated by * and ** respectively. All coefficients and standard errors are multiplied by 100.

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | *Acquisition Count* (Poisson Regressions) | | *Acquisition Ratio* (Tobit Regressions) | |
| | | *Democracy* | | *Democracy* |
| | *G* | *Portfolio* | *G* | *Portfolio* |
| 1991 | 1.58 (1.46) | -50.81 (26.12) | 0.51 (0.47) | 0.14 (5.03) |
| 1992 | 1.64 (1.44) | -31.39 (24.61) | 0.10 (0.50) | 7.91 (6.42) |
| 1993 | 1.75 (1.42) | -47.67 24.51 | 0.70 (0.56) | -6.31 (6.85) |
| 1994 | 4.09** (1.27) | -13.10 (21.02) | 0.75 (0.48) | 1.82 (4.14) |
| 1995 | 2.57* (1.15) | -60.92** (17.85) | 0.41 (0.44) | -2.95 (4.42) |
| 1996 | 2.69* (1.14) | -66.06** (20.48) | 1.33* (0.60) | -24.22** (9.41) |
| 1997 | 2.34* (1.12) | -63.81** (19.03) | 0.99* (0.51) | -9.24 (6.78) |
| 1998 | 2.42* (1.09) | -52.03** (17.67) | 1.47 (0.76) | -11.11 (8.51) |
| 1999 | 0.52 (1.01) | -47.64** (17.27) | 0.84 (0.74) | -20.87* (9.68) |
| Mean | 2.18** (0.33) | -48.16** (5.60) | 0.79** (0.14) | -7.21 (3.49) |

## TABLE XII
### Insider Trading

The first and third columns of this table present annual OLS and ordered logit regressions of *Net Insider Purchases* on *G* measured in the previous year, *SIZE*, *BM*, and a constant. In the second and fourth columns, we restrict the sample to firms in the Democracy ($G \leq 5$) and Dictatorship ($G \geq 14$) portfolios and we include as a regressor a dummy variable that equals 1 when the firm is in the Democracy Portfolio and 0 otherwise. The coefficients on *SIZE*, *BM*, and the constant are omitted from the table. The calculation of *G* is described in Section II. *Net Insider Purchases* is the sum of split-adjusted open market purchases less split-adjusted open market sales during a year scaled by shares outstanding at the end of the previous calendar year. The ordered logit regressions use a dependent variable that equals 1 if *Net Insider Purchases* is positive, 0 if it is zero, and -1 if it is negative. The data on insider sales is from the Thomson database. *SIZE* is the log of market capitalization in millions of dollars measured at the end of the previous calendar year, and *BM* is the log of the ratio of book value (the sum of book common equity and deferred taxes) in the previous fiscal year to size at the close of the previous calendar year. The coefficients and standard errors from each annual cross-sectional regression are reported in each row, and the time-series averages and time-series standard errors are given in the last row. Significance at the five-percent and one-percent levels is indicated by * and ** respectively. All coefficients and standard errors are multiplied by 1000.

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | OLS | | Ordered Logit | |
| | | Democracy | | Democracy |
| | *G* | Portfolio | *G* | Portfolio |
| 1991 | 0.07* | -0.14 | -8.85 | -345.18 |
| | (0.04) | (0.53) | (21.34) | (295.15) |
| 1992 | 0.10 | -1.47 | -66.92** | 499.93 |
| | (0.07) | (1.50) | (21.70) | (310.53) |
| 1993 | 0.10 | -0.23 | -32.40 | 797.17* |
| | (0.07) | 0.51 | (21.41) | (326.87) |
| 1994 | 0.07 | -0.61 | -28.09 | 323.07 |
| | (0.04) | (1.23) | (20.58) | (290.11) |
| 1995 | 0.04 | -0.17 | -4.66 | -153.33 |
| | (0.02) | (0.20) | (22.00) | (308.90) |
| 1996 | 0.15 | -0.62 | 12.01 | -93.95 |
| | (0.14) | (1.05) | (21.67) | (321.18) |
| 1997 | -0.01 | 0.89 | -46.08 | 781.42* |
| | (0.10) | (0.66) | (24.33) | (369.78) |
| 1998 | -0.12 | 2.41 | -1.88 | 146.49 |
| | (0.20) | (3.17) | (24.31) | (342.22) |
| 1999 | 0.36 | -1.36 | 4.41 | -117.36 |
| | (0.48) | (2.91) | (21.09) | (323.85) |
| Mean | 0.09 | -0.15 | -19.16 | 204.25 |
| | (0.04) | (0.40) | (8.66) | (140.02) |

## TABLE XIII
### Fama-MacBeth Return Regressions

This table presents the average coefficients and time-series standard errors for 112 cross-sectional regressions for each month from September 1990 to December 1999. The dependent variable is the stock return for month $t$. The results are presented using both raw and industry-adjusted returns, with industry adjustments done using the 48 industries of Fama and French [1997]. The first and second columns include all firms with data for all right-hand side variables and use $G$, the Governance Index, as an independent variable. In the third and fourth columns, the sample is restricted to firms in either the Democracy ($G \leq 5$) or Dictatorship ($G \geq 14$) portfolios, and we use the independent variable, *Democracy Portfolio*, a dummy variable that equals 1 when the firm is in the Democracy Portfolio and 0 otherwise. In the fifth and sixth columns, we again include all firms with data for each explanatory variable and use the subindices, *Delay*, *Protection*, *Voting*, *Other*, and *State* as regressors. The calculation of $G$ and the subindices is described in Section II. Definitions for all other explanatory variables are provided in Appendix B. All regressions are estimated with weighted least squares where all variables are weighted by market value at the end of month $t-1$. Significance at the five-percent and one-percent levels is indicated by * and ** respectively.

| | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| | Raw | Industry-Adjusted | Raw | Industry-Adjusted | Raw | Industry-Adjusted |
| *G* | -0.04 (0.04) | -0.02 (0.03) | | | | |
| *Democracy Portfolio* | | | 0.76* (0.32) | 0.63* (0.26) | | |
| *Delay* | | | | | -0.03 (0.10) | 0.02 (0.07) |
| *Protection* | | | | | -0.07 (0.08) | -0.01 (0.06) |
| *Voting* | | | | | -0.08 (0.13) | -0.08 (0.10) |
| *Other* | | | | | 0.01 (0.08) | -0.04 (0.07) |
| *State* | | | | | 0.02 (0.08) | -0.04 (0.06) |
| *NASDUM* | -0.83 (6.94) | -0.42 (5.26) | -8.23 (6.45) | -10.36 (5.94) | -2.60 (6.39) | -0.29 (4.98) |
| *SP500* | -0.19 (0.49) | -0.20 (0.42) | -0.42 (0.49) | -0.21 (0.41) | -0.19 (0.45) | -0.24 (0.40) |
| *BM* | 0.04 (0.19) | 0.14 (0.12) | 0.06 (0.38) | 0.11 (0.29) | 0.06 (0.20) | 0.15 (0.11) |
| *SIZE* | 0.17 (0.27) | 0.22 (0.16) | 0.47 (0.38) | 0.02 (0.32) | 0.19 (0.27) | 0.24 (0.17) |
| *PRICE* | 0.26 (0.26) | 0.20 (0.20) | 0.28 (0.31) | 0.44 (0.31) | 0.20 (0.28) | 0.16 (0.22) |
| *IO* | 0.61 (0.47) | 0.10 (0.33) | 0.78 (0.67) | -0.16 (0.60) | 0.59 (0.44) | 0.14 (0.33) |
| *NYDVOL* | -0.11 (0.29) | -0.21 (0.18) | -0.49 (0.36) | -0.03 (0.31) | -0.13 (0.28) | -0.21 (0.18) |
| *NADVOL* | 0.01 (0.43) | -0.13 (0.29) | -0.09 (0.41) | 0.48 (0.39) | 0.06 (0.43) | -0.15 (0.29) |
| *YLD* | 10.85 (10.54) | 10.94 (7.25) | 15.74 (14.62) | 9.23 (11.56) | 6.21 (11.63) | 8.76 (7.70) |
| *RET2-3* | -0.48 (1.40) | -0.93 (1.04) | -2.04 (2.33) | -1.82 (1.73) | -0.57 (1.43) | -1.03 (1.07) |
| *RET4-6* | -0.68 (1.33) | -0.48 (0.92) | -2.21 (1.89) | -1.12 (1.36) | -0.58 (1.33) | -0.55 (0.93) |
| *RET7-12* | 2.42* (1.00) | 0.89 (0.65) | 0.12 (1.35) | -1.67 (1.03) | 2.69** (0.99) | 1.06 (0.65) |
| *SGROWTH* | -0.00 (0.26) | 0.03 (0.18) | 0.75 (0.47) | 0.27 (0.40) | -0.01 (0.25) | 0.02 (0.18) |
| Constant | -0.53 (2.55) | -0.18 (1.71) | 1.17 (3.43) | -1.86 (2.99) | 0.03 (2.39) | -0.16 (1.69) |

# EXHIBIT  D

**RFS Advance Access published November 27, 2008**

# What Matters in Corporate Governance?

**Lucian Bebchuk**
Harvard Law School and NBER

**Alma Cohen**
Tel-Aviv University Department of Economics, NBER, and Harvard Law
School Olin Center for Law, Economics, and Business

**Allen Ferrell**
Harvard Law School and ECGI

We investigate the relative importance of the twenty-four provisions followed by the In-
vestor Responsibility Research Center (IRRC) and included in the Gompers, Ishii, and
Metrick governance index (Gompers, Ishii, and Metrick 2003). We put forward an en-
trenchment index based on six provisions: staggered boards, limits to shareholder bylaw
amendments, poison pills, golden parachutes, and supermajority requirements for mergers
and charter amendments. We find that increases in the index level are monotonically asso-
ciated with economically significant reductions in firm valuation as well as large negative
abnormal returns during the 1990–2003 period. The other eighteen IRRC provisions not in
our entrenchment index were uncorrelated with either reduced firm valuation or negative
abnormal returns. (*JEL* G30, G34, K22)

There is now widespread recognition, as well as growing empirical evidence,
that corporate governance arrangements can substantially affect shareholders.
But which provisions, among the many provisions firms have and outside
observers follow, are the ones that play a key role in the link between corporate
governance and firm value? This is the question we investigate in this article.

An analysis that seeks to identify which provisions matter should not look
at provisions in isolation without controlling for other corporate governance
provisions that might also influence firm value. Thus, it is desirable to look at
a universe of provisions together. We focus in this article on the universe of

For those wishing to use the entrenchment index put forward in this paper in their research, data on firms' entrench-
ment index levels is available at http://www.law.harvard.edu/faculty/bebchuk/data.shtml. A list of over seventy-
five studies already using the index is available at http://www.law.harvard.edu/faculty/bebchuk/studies.shtml. For
helpful suggestions and discussions, we are grateful to Bernie Black, Victor Chernozhukov, Martijn Cremers,
Ray Fisman, Yaniv Grinstein, Robert Marquez, Andrew Metrick, Guhan Subramanian, Greg Taxin, Manuel
Trajtenberg, Yishay Yafeh, Rose Zhao, Michael Weisbach (the editor), an anonymous referee, and conference
participants at the NBER, Washington University, the Oxford Saïd Business School, Tel-Aviv University, the
Bank of Israel, and the ALEA annual meeting. Our work benefited from the financial support of the Nathan
Cummins Foundation; the Guggenheim Foundation; the Harvard Law School John M. Olin Center for Law,
Economics, and Business; the Harvard Milton fund; and the Harvard Program on Corporate Governance. Send
correspondence to Lucian Bebchuk, Harvard Law School, Cambridge, MA 02138; telephone: (617) 495-3138;
fax: (617) 812-0554; E-mail: bebchuk@law.harvard.edu.

© The Author 2008. Published by Oxford University Press on behalf of The Society for Financial Studies. All
rights reserved. For Permissions, please e-mail: journals.permissions@oxfordjournals.org.
doi:10.1093/rfs/hhn099

provisions that the Investor Responsibility Research Center (IRRC) monitors for institutional investors and researchers interested in corporate governance. The IRRC follows twenty-four governance provisions (the IRRC provisions) that appear beneficial to management, and which may or may not be harmful to shareholders. Prior research has identified a relationship between the IRRC provisions in the aggregate and firm value. In an influential article, Gompers, Ishii, and Metrick (2003) found that a broad index based on these twenty-four provisions, giving each IRRC provision equal weight, was negatively correlated with firm value, as measured by Tobin's $Q$, as well as stockholder returns during the decade of the 1990s. Not surprisingly, a substantial amount of subsequent research has utilized this index (the "GIM index") as a measure of the quality of firms' governance provisions.[1]

There is no a priori reason, of course, to expect that all the twenty-four IRRC provisions contribute to the documented correlation between the IRRC provisions in the aggregate and Tobin's $Q$, as well as stock returns in the 1990s.[2] Some provisions might have little relevance, and some provisions might even be positively correlated with firm value. Among those provisions that are negatively correlated with firm value or stock returns, some might be more so than others. Furthermore, some provisions might be at least partly the endogenous product of the allocation of power between shareholders and managers set by other provisions. In this article, we look inside the box of the IRRC provisions to identify which of them are responsible for the correlation between these provisions in the aggregate and firm value.

We begin our investigation by identifying a hypothesis for testing. In particular, we hypothesize that six provisions among the twenty-four provisions tracked by IRRC play a significant role in driving the documented correlation between IRRC provisions and firm valuation. We include in this list of six provisions all the provisions among the IRRC provisions that have systematically drawn substantial opposition from institutional investors voting on precatory resolutions. To confirm that focusing on these provisions is plausible, we also performed our own analysis of their consequences, as well as conducting interviews with six leading M&A practitioners.

Of the six provisions, four set constitutional limits on shareholder voting power, which is the primary power shareholders have. These four arrangements—staggered boards, limits to shareholder amendments of the by-laws, supermajority requirements for mergers, and supermajority requirements for charter amendments—limit the extent to which a majority of shareholders

---

[1] See, for example, Harford, Mansi, and Maxwell (2008); Klock, Mansi, and Maxwell (2005); Amit and Villalonga (2006); John and Litov (2006); Perez-Gonzalez (2006); Cremers, Nair, and Wei (2007); and Dittmar and Mahrt-Smith (2007).

[2] This point was recognized by Gompers, Ishii, and Metrick (2003). To focus on examining the general question whether there is a connection between corporate governance provisions in the aggregate and firm value, they chose to abstract from assessing the relative significance of provisions by assigning an equal weight to all the IRRC provisions.

can impose their will on management. Two other provisions are the most well-known and salient measures taken in preparation for a hostile offer: poison pills and golden parachute arrangements.

We construct an index, which we label the entrenchment index (E index), based on these six provisions. Each company in our database is given a score, from 0 to 6, based on the number of these provisions that the company has in the given year or month. We first explore whether these entrenching provisions are correlated with lower firm value as measured by Tobin's $Q$. We find that, controlling for the rest of the IRRC provisions, the entrenching provisions—both individually and in the aggregate—are negatively correlated with Tobin's $Q$. Increases in our E index are correlated, in a monotonic and economically significant way, with lower Tobin's $Q$ values. Moreover, the provisions in the E index appear to be largely driving the correlation that the IRRC provisions in the aggregate have with Tobin's $Q$. We find no evidence that the eighteen provisions not in the E index are negatively correlated, either in the aggregate or individually, with Tobin's $Q$.

Of course, documenting that entrenching provisions are negatively correlated with lower firm valuation, like the earlier finding that the IRRC provisions in the aggregate are correlated with lower firm valuation, does not establish that the entrenching provisions, or that the IRRC provisions in general, cause lower firm valuation. The identified correlation could be at least partly the product of the tendency of managers of low-value firms to adopt entrenching provisions. It is worth noting that even if the identified correlation between low Tobin's $Q$ and high entrenchment were traceable to the tendency of low-$Q$ firms to adopt high entrenchment levels (for some firms this occurred in the mid-1980s), it would have still been possible for entrenchment to play a key role in enabling the low-$Q$ firms to retain their low-$Q$ status. A high entrenchment level might protect low-$Q$ firms from being taken over or forced to make changes that would raise their Tobin's $Q$. Indeed, such an effect is presumably why low-$Q$ firms might wish to adopt and retain a high level of entrenchment. Thus, a mere serial correlation in firms' Tobin's $Q$s does not indicate that causality runs primarily from low $Q$ to high entrenchment, rather than in the opposite direction.

In any event, to explore this issue, we examine how firm valuation during the last five years of our sample period is correlated with firms' entrenchment scores as of 1990. We find that, even after controlling for firm valuation in 1990, high entrenchment scores in 1990 are negatively correlated with firm valuation at the end of our sample period. In addition, in firm fixed effects regressions controlling for the unobserved time-invariant characteristics of firms, we find that increases in the E index during our sample period are associated with decreases in Tobin's $Q$. Although more work remains to be done on the question of causation, both of these findings are consistent with the possibility that the identified correlation between entrenchment and low $Q$ is not fully the product of the low $Q$ that firms adopting high entrenchment levels had in the first place.

3

After analyzing the relation between the E index and Tobin's $Q$, we explore the extent to which the six provisions in the index are responsible for the documented correlation between the IRRC provisions and reduced stockholder returns during the 1990s. We find that the entrenching provisions were correlated with a reduction in firms' stock returns both during the 1990–1999 period that Gompers, Ishii, and Metrick (2003) studied and during the longer 1990–2003 period that we were able to study using the data we had. A strategy of buying firms with low E index scores and, simultaneously, selling short firms with high E index scores would have yielded substantial abnormal returns. To illustrate, during the 1990–2003 period, buying an equally weighted portfolio of firms with a zero E index score and selling short an equally weighted portfolio of firms with E index scores of 5 and 6 would have yielded an average annual abnormal return of approximately 7%. In contrast, we do not find evidence that the eighteen IRRC provisions not in our E index are correlated with reduced stock returns during the time periods (1990–1999; 1990–2003) we study.

A finding of a correlation between governance and returns during a given period is subject to different possible interpretations (see, for example, Gompers, Ishii, and Metrick 2003; Cremers, Nair, and John 2008). Our results on returns do not enable choosing among these interpretations, and they should not be taken to imply that the identified correlation between the E index and returns reflect market inefficiency or that it should be expected to continue in the future. But our return results do serve to highlight the significance that the E index provisions have among the larger universe of IRRC provisions.

We conclude that the six entrenching provisions in our E index largely drive the documented negative correlation that the IRRC provisions in the aggregate have with firm valuation and stockholder returns since 1990. This identification can contribute to the literature and to future work in corporate governance in several ways. First, our index can be used, and has already been widely used, by work seeking to examine the association between shareholder rights and various corporate decisions and outcomes. To the extent that the eighteen provisions in the GIM index that are not in the E index represent "noise," the E index can be useful by providing a measure of corporate governance quality that is not affected by the "noise" created by the inclusion of these provisions. Indeed, since the appearance of the discussion paper version of this article (Bebchuk, Cohen, and Ferrell 2004), more than seventy-five papers have already used our E index in their analysis.[3]

In addition, our work contributes by identifying a small set of provisions on which future research work, as well as private and public decision makers, may want to focus. Knowing which provisions are responsible for the identified negative correlation between the IRRC provisions and firm performance can be useful for investigating the extent to which governance provisions affect (rather

---

[3] See, for example, Masulis, Wang, and Xie (2007). For a list of the papers using the index, see http://www.law.harvard.edu/faculty/bebchuk/studies.shtml.

than reflect) value. In addition, to the extent that the identified correlation between the provisions in our E index and firm value at least partly reflects a causal relation going from entrenchment to firm value, these provisions are ones that deserve the attention of private and public decision makers seeking to improve corporate governance. Indeed, even if the correlation were fully driven by the desire of firm insiders at lower valued firms to protect themselves, it would be beneficial for researchers and decision makers to know the provisions on which such protection efforts are concentrated.

Finally, although our investigation is limited to the universe of IRRC provisions, our findings have significant implications for those investigating other sets of governance provisions. In particular, our findings cast some doubt on the wisdom of an approach recently followed by shareholder advisory firms. Responding to the demand for measures of the quality of corporate governance, some shareholder advisory firms have developed and marketed indexes based on a massive number of governance attributes. Institutional Shareholder Services (ISS), the most influential shareholder advisory firm, has developed a governance metric based on 61 elements (see Brown and Caylor 2006). Governance Metric International has been even more ambitious, including more than six hundred provisions in its index. The development and use of these indexes has put pressure on firms to change their governance arrangements in ways that will improve their rankings.

Our results indicate that this "kitchen sink" approach of shareholder advisory firms might be misguided. Among a large set of governance provisions, the provisions of real significance are likely to constitute only a limited and possibly small subset. As a result, an index that gives weight to many provisions that do not matter, and as a result under-weighs the provisions that do matter, is likely to provide a less accurate measure of governance quality than an index that focuses only on the latter. Furthermore, when the governance indexes of shareholder advisory firms include many provisions, firms seeking to improve their index rankings might be induced to make irrelevant or even undesirable changes and might use their improved rankings to avoid making the few small changes that do matter. Thus, institutional investors deciding which firms to include in their portfolios and which governance changes to press for would likely be better served if shareholder advisory firms were to use governance measures based on a small number of key provisions rather than attempt to count all the trees in the governance forest.

In a prior work, Cremers and Nair (2005) use an index based on four of the provisions in the GIM index and show that it is negatively correlated with Tobin's $Q$, but they do not attempt to show either that other provisions do not matter or that each of the provisions used in their index matters (and, indeed, our results indicate that neither is the case). In another relevant prior work, Bebchuk and Cohen (2005) show that, controlling for all other IRRC provisions, staggered boards are negatively correlated with Tobin's $Q$. That paper did not identify which IRRC provisions other than staggered boards are

negatively correlated with firm value, however, and thus completed only the first step in the inquiry we pursue fully in this article. Although the literature using the GIM index is large, ours is the only effort to provide a full identification of the IRRC provisions that do and do not matter, with other work largely accepting and using our results concerning this identification.

The rest of our analysis is organized as follows. Section 1 provides the needed background in terms of theory and institutional detail. Section 2 describes the data. Section 3 studies the correlation between the E index and firm value. Section 4 studies the correlation between this index and stock returns during the 1990–1999 and 1990–2003 periods. Section 5 offers some concluding remarks.

## 1. The E Index and Its Elements

The definitions of the twenty-four corporate governance provisions tracked by the IRRC, including the six that we hypothesize matter in terms of increasing entrenchment, are summarized in the Appendix. The great majority of the IRRC provisions, and all the IRRC provisions that we hypothesize matter, are those that appear to provide incumbents at least nominally with protection from removal or the consequences of removal. We refer to such protection as "entrenchment."

Entrenchment can have adverse effects on management behavior and incentives. As first stressed by Manne (1965), such insulation might harm shareholders by weakening the disciplinary threat of removal and thereby increasing shirking, empire-building, and extraction of private benefits by incumbents. In addition, such insulation might have adverse effects on the incidence and consequences of control transactions. To be sure, entrenchment can also produce beneficial effects by reducing the extent to which the threat of a takeover distorts investments in long-term projects (Stein 1988; Bebchuk and Stole 1993) or by enabling managers to extract higher acquisition premiums in negotiated transactions (Stulz 1988). For this reason, the theoretical literature on the various effects of entrenchment (see Bebchuk 2002 for a survey) does not establish that entrenchment would overall necessarily have an adverse effect on firm value, but only that hypothesizing such a relationship is theoretically defensible.

An association between entrenchment and low firm value might also result from the greater incentive that managers of low-value firms have to obtain protection from the risk of removal or its consequences. An incentive on the part of managers of low-value firms to adopt entrenching provisions and entrenchment in turn reducing firm value are not mutually exclusive. Even if low-value firms have a greater tendency to adopt high entrenchment levels, the adopted entrenchment levels can reinforce or strengthen the correlation between low value and entrenchment. The high level of entrenchment might lead to further deterioration in value or at least prevent the improvement in value that might otherwise be caused by the threat or realization of a change in control.

6

Given the potential significance of entrenchment, we will attempt to identify a hypothesis for testing the identity of the provisions in the IRRC universe that are most responsible for, or reflective of, managerial entrenchment.

## 1.1  The provisions garnering significant shareholder opposition

In forming a hypothesis about which governance provisions are of significance, examining the preferences registered by institutional investors (and other share-holders) in votes on precatory resolutions seems to be an objective and natural approach. To be sure, shareholders might be mistaken in their judgment of which provisions deserve attention and opposition. But to the extent that share-holders have focused their attention and opposition on some provisions and not others, their views can help inform the inquiry as to which IRRC provisions should be deemed to be potentially significant.

To this end, we reviewed the data reported by Georgeson Shareholder, the leading proxy solicitation firm, in its ANNUAL CORPORATE GOVERNANCE REVIEW concerning the incidence and outcomes of shareholder precatory resolutions at the end of our sample period (the end of 2003).[4] At this point in time, shareholders' voting decisions could have been informed by whatever share-holders might have learned during the sample period or earlier. Given that the end of the sample period falls between the 2003 and 2004 proxy seasons, we examined the data gathered by Georgeson Shareholder with respect to shareholder votes on precatory resolutions during both the 2003 proxy season (Georgeson Shareholder 2003) and the 2004 proxy season (Georgeson Shareholder 2004).

The question we investigated in examining the incidence and outcomes of shareholder precatory resolutions was which of the twenty-four IRRC provisions were opposed by a nontrivial number of precatory resolutions that often passed. An examination of the data indicates that four types of precatory resolutions, targeting six IRRC provisions, stood out. Each of these types of precatory resolutions was submitted a significant number of times (fifteen or more times during the 2003–2004 proxy seasons) and passed (obtaining a majority of the votes cast by shareholders) in a majority of the cases in which it was submitted. The four types of precatory resolutions, and the six IRRC provisions they targeted, were as follows:

- resolutions against classified boards, which passed in 91% of the votes on them during 2003–2004;
- resolutions against poison pills, which passed in 72% of the votes on them during 2003–2004;
- resolutions against golden parachutes, which passed in 62% of the votes on them during 2003–2004; and
- resolutions against supermajority provisions, which simultaneously targeted supermajority merger requirements, limits on charter amendments,

---

[4] Georgeson Shareholder did not track shareholder votes on precatory resolutions at the beginning of our sample period.

and limits on bylaw amendments, which passed in 100% of the votes on them during 2003–2004. (The Georgeson data report one figure for all resolutions against supermajority provisions, reflecting the fact that precatory resolutions targeting supermajority provisions generally express support for a general simple-majority standard and opposition to all types of supermajority voting requirements.)

All the other eighteen IRRC provisions do not come even close to the above six IRRC provisions in terms of being the target of a significant number of opposing resolutions obtaining majority support among shareholders. To begin, out of these eighteen provisions, seventeen were the subject of either no or only a de minimis number of precatory resolutions (let alone passing resolutions): thirteen provisions were not the target of even a single precatory resolution during the 2003 and 2004 proxy seasons;[5] and four provisions had only a nominal presence in the precatory resolution landscape, with none of them targeted by more than three precatory resolutions over the entire 2003–2004 period.[6] Finally, out of the eighteen provisions, only one of them—absence of cumulative voting—was the target of a significant number of precatory resolutions, but these resolutions commonly failed to pass. The resolutions, most of which were initiated by the same individual who submitted the same resolutions at many companies, passed in a mere 7% of the cases in which votes on them were held.

## 1.2 Discussion of the provisions in the E index

Having identified the subset of IRRC provisions that attracted substantial shareholder opposition, we also undertook our own legal and economic analysis of the possible significance of each of these six provisions. In conducting this analysis, we were informed and assisted by interviews we conducted with six highly prominent M&A practitioners in six major corporate law firms.[7] The purpose of our analysis was to provide a cross-check to ensure that we were not proceeding to the testing stage with a provision whose inclusion in our index would be implausible based on such an analysis.

The six provisions in the E index can be divided into two categories. Four of them involve constitutional limitations on shareholders' voting power. The other two provisions can be regarded as "takeover readiness" provisions that

---

[5] These IRRC provisions are: director indemnification, director indemnification contract, limited director liability, compensation plan, severance agreement, unequal voting rights, blank check preferred stock, fair price requirements, cash-out law, director duties, antigreenmail, pension parachute, and silver parachute.

[6] These four IRRC provisions were special meeting, written consent, opt-out of state takeover law, and confidential voting.

[7] These lawyers were Richard Climan, head of the mergers & acquisitions group at Cooley, Godward; David Katz, a senior corporate lawyer at Wachtell, Lipton, Rosen & Katz; Eileen Nugent, a co-author of a leading treatise on acquisitions and a senior corporate lawyer at Skadden, Arps, Sale, Meagher & Flom; Victor Lewkow, a leading mergers & acquisitions lawyer at Cleary Gottlieb; James Morphy, managing partner of the mergers and acquisitions group at Sullivan & Cromwell; and Charles Nathan, global co-chair of the mergers and acquisitions department at Latham & Watkins. We are grateful to them for their time and insights.

boards sometimes put in place. Below we discuss the reasons for viewing their inclusion in our E index as plausible. Before proceeding, it is worth stressing that the point of the discussion below is not that the analysis proves that each of the provisions must be correlated with lower firm value. Indeed, if that were the case, there would be little need for empirical testing. Rather, the issue is whether there are reasons to view shareholders' focus on and opposition to these six provisions, as evidenced by shareholders' votes on precatory resolutions, as sufficiently plausible to justify inclusion of these six provisions in an E index of provisions whose significance will then be the subject of empirical testing.

**1.2.1 Constitutional limitations on shareholders' voting power.** At bottom, shareholders' most important source of power is their voting power (Clark 1986). But shareholders' voting power can be constrained by constitutional arrangements that constrain the ability of a majority of the shareholders to have their way.

When the firm has a staggered board, directors are divided into classes, almost always three, with only one class of directors coming up for reelection each year. As a result, shareholders cannot replace a majority of the directors in any given year, no matter how widespread the support among shareholders for such a change in control. This makes staggered boards a powerful defense against removal in either a proxy fight or proxy contests. There is evidence that staggered boards are a key determinant for whether a target receiving a hostile bid will remain independent (Bebchuk, Coates, and Subramanian 2002, 2003). The lawyers we interviewed were all of the view that staggered boards are a key defense against control challenges.

There is also evidence that, controlling for all the other IRRC provisions, staggered boards are negatively correlated with Tobin's $Q$ (Bebchuk and Cohen 2005). Furthermore, there is evidence that firms' announcement of a classified board adoption are accompanied with negative abnormal stock returns (Faleye 2007) and that firms' announcements that they are going to dismantle their staggered board are accompanied by positive abnormal stock returns (Guo, Kruse, and Nohel 2008). To be sure, some researchers and market participants maintain that investors' concerns about staggered boards are exaggerated or even unwarranted (Wilcox 2002; Bates, Becher, and Lemmon 2008). But there is little reason to doubt that the hypothesis that staggered boards play a significant role in driving the correlation between the IRRC provisions and firm value is one that would be reasonable to subject to empirical testing.

In addition to the power to vote to remove directors, shareholders have the power to vote on bylaw amendments, charter amendments, and mergers. Three types of IRRC provisions make it more difficult for the majority of shareholders to have their way on such important issues: limits on bylaw amendments, which usually take the form of supermajority requirements; supermajority requirements for mergers; and supermajority provisions for charter amendments. As noted earlier, shareholders have registered strong opposition to such provisions.

9

One hundred percent of the resolutions opposing such supermajority provisions during the 2003 and 2004 proxy season passed, attracting on average 67% of the shares cast (Georgeson Shareholder 2003, 2004).

The M&A lawyers we interviewed were all in consensus that limits on bylaw amendments could significantly enhance the effectiveness of a target's defenses. A well-known Delaware case, Chesapeake Corp. v. Marc P. Shore, also expressed this view; the court in this case ruled that a supermajority requirement of two-thirds of all outstanding shares for a bylaw amendment had draconian antitakeover consequences, making it practically impossible for nonmanagement shareholders to remove defensive provisions that management earlier placed in the bylaws.

As to supermajority requirements for mergers and charter amendments, these provisions can provide (and are so viewed by the M&A lawyers we interviewed) "a second line of defense" against a takeover. When such provisions are present, insiders holding a block of shares might be in a position to defeat or impede charter amendments or mergers even if they lose control of the board. Thus, to the extent that such provisions could enable management and shareholders affiliated with them to frustrate the plans of a buyer of a control block, this might discourage hostile buyers from seeking to acquire such a block in the first place.

**1.2.2 Takeover readiness provisions.** Poison pills (less colorfully known as shareholder rights plans) are rights that, once issued by the company, preclude a hostile bidder as a practical matter from buying shares as long as the incumbents remain in office and refuse to redeem the pill. The legal developments that allowed boards to put in place pills are thus widely regarded to have considerably strengthened the protections against replacement that incumbents have.

During the period of examination, shareholder resolutions seeking to limit poison pills constituted a significant fraction of all shareholder resolutions, and these resolutions attracted substantial shareholder support. At the end of the period, resolutions calling for limitations on the use of the poison pill obtained an average of 60% of votes cast with a passage rate of 72% (Georgeson Shareholder 2003, 2004).

It should be noted that boards may adopt poison pills, with no need for a shareholder vote of approval, not only before but also after the emergence of a hostile bid. For this reason, companies without a poison pill in place can still be viewed as having a "shadow pill" that could be rolled out in the event of a hostile bid (Coates 2000). Nonetheless, during the period under examination, a substantial fraction of companies (ranging from 54% to 59% during the period) do have pills in place.

Having a poison pill in place is not costless for the board because institutional investors look unfavorably on poison pills and a board could "get points" with such investors by not having a pill. Thus, boards and their advisers maintaining a pill were presumably led to do so by a belief that it would provide them with

*What Matters in Corporate Governance?*

some advantages. The leading M&A lawyers we interviewed noted several reasons why they and other lawyers often advised clients concerned about a hostile bid to put a pill in place. To begin, having a pill in place provides an absolute barrier to any attempts by outsiders to obtain through market purchases a block larger than the one specified by the terms of the pill (usually 10–15%).[8] In addition, having the pill in place saves the need to install it in "the heat of battle." This removes one issue from those that the board and its independent directors will have to deal with should a hostile bid be made. Furthermore, according to the lawyers we interviewed, there was a widespread perception that maintaining a pill signals to hostile bidders that the board will "not go easy" if an unsolicited offer is made and that, conversely, not adopting a pill or (even worse) dropping an existing pill could be interpreted as a message that incumbents are "soft" and "lack resolve." For all these reasons, incumbents worried about a hostile bid could have slept somewhat better by putting a pill in place prior to a hostile bid being made.[9]

Golden parachutes are terms in executive compensation agreements that provide executives who are fired or demoted with substantial monetary benefits in the event of a change in control. Golden parachutes protect incumbents from the prospect of replacement by providing management with a soft and sweet landing in the event of ouster. Thus, a golden parachute provides incumbents with substantial insulation from the economic costs that they would otherwise bear as a result of losing their control.

To be sure, golden parachutes may also produce benefits for shareholders by making incumbents more willing to accept an acquisition and increasing the likelihood of an acquisition (Lambert and Larker 1985; Bebchuk, Cohen, and Wang 2008). However, while this effect might be beneficial, golden parachutes might also have an adverse effect by increasing slack on the part of managers as a result of being less subject to discipline by the market for corporate control. Whether the latter effect outweighs the former is an empirical question. It is also possible that golden parachutes may be negatively correlated with firm value to the extent that managers of low-value firms who face a higher likelihood of being acquired are especially likely to seek them (Bebchuk, Cohen, and Wang 2008). According to the M&A lawyers we interviewed, they recommend golden parachutes to any incumbents who attach a significant likelihood of their company being acquired.[10]

---

[8] Incumbents have some protection from attempts to obtain quickly a significant block by the notice requirements of the Hart-Scott-Rodino Act and the Williams Act. But as John Malone's surprise move to increase his stake at News Corp. illustrates, a poison pill (which News Corporation's management hastily adopted) is sometimes necessary to block such moves.

[9] Some early studies examined how the adoption of a poison pill affected the firm's stock price (see, for example, Ryngaert 1988). When a firm adopts a poison pill, however, its stock price might be influenced not only by the expected effect of the poison pill but also by inferences that investors make as to management's private information about the likelihood of a bid (Coates 2000).

[10] To be sure, even when executives do not have a golden parachute in their ex ante compensation contracts, boards can and often do grant executives "golden good-bye" payments when an acquisition offer is already on the table (Bebchuk and Fried 2004, Ch. 7). But such ex post grants require much more explaining to outsiders.

11

We decided to include golden parachutes in the E index based on their potential insulating effects for management and the substantial shareholder support for limiting their use during the period of our study. At the end of this period, resolutions targeting golden parachutes received on average 51% of votes cast with a passage rate of 62% (Georgeson Shareholder 2003, 2004).

It is worth stressing that golden parachutes, as that variable is defined by the IRRC, are quite different from three other IRRC provisions: severance agreements, compensation plans, and silver parachutes. Severance contract payments, as defined by the IRRC, are not conditional on the occurrence of a change in control. Silver parachutes provide benefits to a large number of the firm's employees and do not target the firm's top executives, whose insulation from a control contest could matter most in terms of increasing managerial slack. Compensation plans are plans that accelerate benefits, such as option vesting, but do not by themselves provide additional benefits in the event of a change in control, in contrast to golden parachutes. These differences might explain why shareholder precatory resolutions have targeted golden parachutes rather than any of these three other IRRC provisions.

### 1.3 Discussion of the other provisions

We now discuss the eighteen provisions not in the E index. We do not include them in the index because, as explained in subsection 1.1, none of these provisions is the target of frequent and commonly successful shareholder resolutions. As we did in connection with the provisions included in the E index, we also conducted our own analysis, based in part on the existing literature and on our interviews with prominent practitioners. This analysis was intended to serve as a cross-check, namely, to examine whether there are any provisions which, notwithstanding the described record of shareholder voting, are so clearly important that proceeding to test the hypothesis that the provisions in the E index are those most likely to matter is a priori implausible.

Our analysis of these eighteen provisions did not reveal a basis for viewing any of them as those that are bound to be significant. Indeed, with respect to most of these provisions, our analysis suggested reasons to expect them to be inconsequential. For example, some antitakeover statutes, fair price provisions, and business combination statutes constituted takeover protections that were important in the late 1980s but subsequently became largely irrelevant due to legal developments that provide incumbents with the power to use more powerful takeover defenses.[11]

---

[11] As long as incumbents are in office, they can now use a poison pill to prevent a bid and thus have little need for the impediments provided by most antitakeover statutes. And if the bidder were to succeed in replacing incumbents with a team that would redeem the pill, these impediments would be irrelevant because they apply only to acquisitions not approved by the board. Our legal analysis of these provisions was echoed in our interviews with the leading M&A lawyers mentioned earlier. It is worth noting that studies identifying some effects of antitakeover statutes on firms largely focused on data from an earlier period during most of which such statutes did plausibly matter because incumbents did not yet have the power to maintain poison pills indefinitely (see, for example, Borokhovich, Kelly and Parrino 1997; Johnson and Rao 1997; Bertrand and Mullainathan 1999; Garvey and Hanka 1999; Bertrand and Mullainathan 2003).

*What Matters in Corporate Governance?*

Another takeover-related provision that we believe to be largely inconsequential is blank check preferred stock. This provision was included by the IRRC and prior research in the set of studied provisions because blank check preferred stock is the currency most often used for the creation of poison pills. However, lawyers are able to, and do, create poison pills without blank check preferred stock. Indeed, in the IRRC data, of the companies that did not have a blank check preferred stock in 2002, about 45% nevertheless had a poison pill in place.

Similarly, there is evidence that limits on special meeting and written consent do not have a statistically significant effect on the outcome of hostile bids (Bebchuk, Coates, and Subramanian 2003). Such limits prevent shareholders from voting between annual meetings and require them to wait until the annual meeting to conduct any vote, but the practical significance of the required delay is limited. Even when shareholders can act by written consent or call a special meeting, the rules governing proxy solicitations are likely to impose some delay before a vote can be conducted. And waiting until the next annual meeting commonly does not involve substantial delay. Perhaps not surprisingly, limitations on special meeting and written consent are virtually never the subject of a precatory resolution (Georgeson Shareholder 2003, 2004).

Some of the IRRC provisions are related not to issues of control changes but rather to issues of liability and indemnification in the event of shareholder suits. As Black, Cheffins, and Klausner (2006) powerfully argue and document, directors are protected from personal liability by myriad factors. The risk of liability is negligible even in companies that do not have any of the IRRC provisions. Personal liability might arise in some rare cases of egregious bad faith behavior, but in such cases the three liability and indemnification provisions in the IRRC set would provide no protection.

Finally, with respect to a few of the provisions not in the E index, an analysis cannot establish unambiguously that they are bound to be insignificant. However, given the absence of a solid basis for expecting these other provisions to be significant, our approach was to proceed with the hypothesis developed on the basis of the evidence concerning shareholder voting to test whether the six provisions in the E index are those that matter. As will be explained below, in conducting our testing, we remained open to and explored the possibility that one or more of the provisions not in our E index also play a significant role in producing the correlation between the IRRC provisions in the aggregate and firm value.

## 1.4 The E index and the other provisions index

Based on the above discussion, we construct two indexes. As is standard in the literature constructing governance indices on the basis of a set of provisions (La Porta et al. 1998; Gompers, Ishii, and Metrick 2003), each of our indexes gives an equal weight to each of the provisions in the set. Of course, as is generally recognized in this literature, some relevant provisions could deserve more

13

weight than others, and the appropriate weight of a provision might depend on the presence or absence of other provisions (that is, interactions could matter), and the standard equal-weight construction is an approach that we, like others in the literature, use for its simplicity. Our effort focuses on extending the literature by narrowing the set of relevant provisions while continuing to use the standard approach for constructing an index on the basis of this relevant set.

Thus, the level of the "entrenchment index" for any given firm is calculated by giving one point for each of the six components of the index that the firm has. The "other provisions index" (O index) is based on all the other eighteen provisions not included in the E index and tracked by the IRRC. This index, like the E index, counts all the provisions included in it equally, giving one point for each one of these provisions a firm has. The conjecture to be tested is that our E index drives to a substantial degree the correlation identified in earlier research between the IRRC provisions, in the aggregate, and firm valuation.

## 2. Data and Summary Statistics

### 2.1 Data sources

Our dataset includes all the companies for which there was information in one of the volumes published by the Investor Responsibility Research Center (IRRC). The IRRC volumes include detailed information on the corporate governance arrangements of firms. The IRRC has published six such volumes: September 1990; July 1993; July 1995; February 1998; November 1999; and February 2002.

Each volume includes information on between 1400 and 1800 firms, with some variation in the list of included firms from volume to volume. All the firms in the S&P 500 are covered in each of the IRRC volumes. In addition, a number of firms not included in the S&P 500 but considered important by the IRRC are also covered. In any given year of publication, the firms in the IRRC volume accounted for more than 90% of the total U.S. stock market capitalization.

Because the IRRC did not publish volumes in each year, we assumed, following Gompers, Ishii, and Metrick (2003), that firms' governance provisions as reported in a given IRRC volume were in place during the period immediately following the publication of the volume until the publication of the subsequent IRRC volume. Using a different "filling" method, however, does not change our results.

In addition to the IRRC volumes, we also relied on Compustat, CRSP, and ExecuComp. Firm financials were taken from Compustat. Stock return data were taken from the CRSP monthly datafiles. Insider ownership data were taken from ExecuComp. The age of firms, following Gompers, Ishii, and Metrick (2003), was estimated based on the date on which pricing information about a firm first appeared in CRSP.

*What Matters in Corporate Governance?*

Table 1
Incidence of corporate governance provisions

| | Year | | | | | |
|---|---|---|---|---|---|---|
| | 1990 | 1993 | 1995 | 1998 | 2000 | 2002 |
| **Entrenchment index provisions** | | | | | | |
| Staggered board | 59.2% | 60.5% | 61.8% | 59.5% | 60.5% | 61.9% |
| Limits to amend bylaws | 14.5% | 16.2% | 16.1% | 18.2% | 20.0% | 23.2% |
| Limits to amend charter | 3.3% | 3.4% | 3.1% | 3.0% | 3.3% | 2.5% |
| Supermajority | 39.0% | 39.5% | 38.4% | 34.1% | 34.1% | 32.3% |
| Golden parachutes | 53.3% | 55.7% | 55.2% | 56.9% | 67.4% | 70.2% |
| Poison pill | 54.4% | 57.6% | 56.6% | 55.4% | 59.9% | 59.0% |
| **All other provisions** | | | | | | |
| Limits to special meeting | 24.8% | 30.0% | 32.0% | 34.8% | 38.3% | 50.2% |
| Limits to written consent | 24.8% | 29.3% | 32.1% | 33.3% | 36.2% | 46.4% |
| No cumulative vote | 81.6% | 83.6% | 85.0% | 87.8% | 89.0% | 90.4% |
| No secret ballot | 97.1% | 90.5% | 87.8% | 90.4% | 89.1% | 88.8% |
| Director indemnification | 40.8% | 39.5% | 38.5% | 24.5% | 23.6% | 19.1% |
| Director indemnification contracts | 16.6% | 15.2% | 12.6% | 11.2% | 9.1% | 8.1% |
| Director liability | 72.7% | 69.2% | 65.5% | 47.2% | 43.1% | 33.9% |
| Compensation plans | 45.3% | 66.1% | 72.8% | 63.2% | 72.6% | 74.0% |
| Severance agreements | 13.1% | 5.5% | 10.2% | 11.2% | 9.2% | 6.1% |
| Unequal vote | 2.4% | 2.0% | 1.9% | 1.7% | 1.5% | 1.6% |
| Blank check | 76.7% | 80.1% | 85.9% | 88.0% | 89.4% | 90.8% |
| Fair price | 58.0% | 59.1% | 57.6% | 49.4% | 48.5% | 44.0% |
| Cash-out law | 4.1% | 3.7% | 3.6% | 3.1% | 2.7% | 2.5% |
| Director duties | 10.4% | 11.1% | 10.9% | 9.9% | 10.2% | 10.8% |
| Business combination law | 84.1% | 87.5% | 87.4% | 88.4% | 89.0% | 89.1% |
| Antigreen mail | 19.7% | 20.8% | 20.1% | 17.1% | 15.8% | 15.0% |
| Pension parachutes | 4.0% | 5.3% | 4.0% | 2.2% | 1.5% | 1.0% |
| Silver parachutes | 4.1% | 4.9% | 3.5% | 2.4% | 2.0% | 1.7% |

In calculating abnormal returns, we used the three Fama-French benchmark factors, which were obtained from Kenneth French's website. The Carhart momentum factor was calculated by us using the procedures described in Carhart (1997) using information obtained from CRSP.

We excluded firms with a dual class structure. In these companies the holding of superior voting rights might be sufficient to provide incumbents with a powerful entrenching mechanism that renders other entrenching provisions relatively unimportant. We also excluded real estate investment trusts (REITs), i.e., firms with a SIC Code of 6798, as REITs have their own special governance structure and entrenching devices. While we kept both financial and nonfinancial firms in our data, running our regressions on a subset consisting only of nonfinancial firms (as done by Daines 2001) yields similar results throughout.

## 2.2 Summary statistics

Table 1 provides summary statistics about the incidence of the twenty-four IRRC governance provisions, including the six provisions we have chosen to include in our E index, during the period covered by our study.[12]

---

[12] We use, throughout, the definitions of the IRRC provisions used by Gompers, Ishii, and Metrick (2003). For example, because the IRRC used in some years the term "secret ballot" and in some years the term "confidential voting" to describe essentially the same arrangement, GIM defined a company as having no secret ballot in a

*The Review of Financial Studies*

**Table 2**
**Incidence of the entrenchment index**

| Entrenchment index | 1990 | 1993 | 1995 | 1998 | 2000 | 2002 |
|---|---|---|---|---|---|---|
| 0 | 13.0% | 11.0% | 11.0% | 10.7% | 7.9% | 7.3% |
| 1 | 18.2% | 17.3% | 17.6% | 19.0% | 18.0% | 15.4% |
| 2 | 24.3% | 25.0% | 25.4% | 25.9% | 24.0% | 26.8% |
| 3 | 25.4% | 25.7% | 25.3% | 25.1% | 27.6% | 27.2% |
| 4 | 14.7% | 16.3% | 16.7% | 15.9% | 18.2% | 18.3% |
| 5 | 3.7% | 4.3% | 3.8% | 2.8% | 3.8% | 4.6% |
| 6 | 0.7% | 0.4% | 0.2% | 0.6% | 0.5% | 0.4% |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Of the six provisions in the E index, staggered boards, golden parachutes, and poison pills are the most common, with each present in a majority of companies. The incidence of golden parachutes has been increasing steadily, starting at 53% as of 1990 and reaching approximately 70% in 2002. The incidence of staggered boards has been stable at around 60%, and the incidence of poison pills has been relatively stable as well, in the 55–60% range.

The incidence of supermajority provisions has been declining slightly over time, starting at 39% in 1990 and ending at approximately 32% in 2002. The incidence of limits to bylaws has been increasing, starting at 14.5% in 1990 and reaching approximately 23% by 2002. Of the six provisions, the only one that does not have a substantial presence is provisions that limit charter amendments, which has throughout the 1990–2002 period a very low incidence hovering around 3%.

The E index assigns each company one point for each of the six provisions in the index that the firm has. Accordingly, each firm in each year will have an E index score between 0 and 6. Table 2 provides summary statistics about the incidence of the index levels during the study period. On the whole, there was a moderate upward trend in the levels of the E index during this period. While 55% of the firms had an index level below 3 in 1990, only 49% of the firms were in this range in 2002. Especially significant was the decline in the incidence of firms with a zero entrenchment level, from 13% in 1990 to approximately 7% in 2002.

As for the cross-sectional distribution of firms across entrenchment levels, roughly half of the companies have an entrenchment level of 3 or more, while roughly half have an entrenchment level below 3. Of the half of the firms with entrenchment levels below 3, a substantial fraction are at two, with firms at the zero and one levels constituting 23–31% of all firms. For the roughly half of

given year when it did not have in that year in the IRRC dataset either the secret ballot variable or the confidential voting variable. To give another example, GIM defined a company as having a fair price arrangement in a given year when in that year it (1) had the variable for a fair price charter provision, or (2) had the variable indicating incorporation in a state with a fair price provision, and (3) did not have the variable indicating a charter provision opting out of the state's statute. We are grateful to Andrew Metrick for providing us with the GIM set of definitions of the 24 IRRC provisions.

16

the firms with entrenchment levels of 3 or more, a substantial fraction are at three, with firms in the four to six range constituting 19–23% of all firms.

A relatively small fraction of firms are at the extremes. Given that one of the provisions is present in only about 3% of firms, it is not surprising that only a few firms reach the maximum level of six, with its incidence never exceeding 0.7% of the sample. Given the small number of observations with E index scores of 6, firms in index level 6 are grouped together with firms in index group 5 in the course of conducting the statistical analysis. This group of companies with index scores of 5 and 6, the very worst companies in terms of their entrenchment scores, constitutes approximately 3.5–5% of all firms throughout the period. At the other end of the spectrum, the group of companies that are the "best" in terms of entrenchment is firms with a 0 entrenchment level. These firms constitute roughly 7–13% of all firms during the 1990–2002 period.

The correlation between the E index and the GIM index is 0.74, while the correlation between the O index and the GIM index is 0.89. The E index and the O index, however, have a correlation of only 0.36 with each other. Because the E index and the O index are both significant elements of the GIM index, and because the O index contributes three times more provisions to the GIM index than the E index, it is not surprising that both subindexes are substantially correlated with the GIM index, and that the O index has a higher correlation. Note that, because the O index contributes many provisions to the GIM index and has a correlation of only 0.36 with the E index, the E index and the GIM index fall significantly short of being perfectly correlated. If the provisions in the E index are indeed those that matter for correlation with firm value, then the addition of the other provision index to the E index to form the GIM index is adding a significant amount of "noise."

Turning to the correlation of the six entrenching provisions, the correlation tends to be relatively low. Nine out of the fifteen correlations are less than 0.1. The highest correlation of 0.31 is that between poison pills and golden parachutes, our two "takeover readiness" provisions. The second highest correlation, at 0.24, is that between limits on ability of shareholders to amend the corporate bylaws and limits on shareholders' ability to amend the corporate charter. The relatively low correlation among the entrenching provisions suggests that each entrenching provision is potentially a candidate for inclusion in the E index as a stand-alone element, rather than merely on the basis of being highly correlated with some other entrenching provision.

There are no significant differences between firms in and out of the S&P 500 in terms of their entrenchment scores (respectively 2.58 and 2.46), and there are likewise no noteworthy entrenchment score differences between young and old firms (2.30, 2.35, and 2.82 for, respectively, the 1990s, 1980s, and pre-1980). It is worth noting, however, that entrenchment levels are different in firms that are very large in size. In 2002, out of the fifteen companies with a market cap exceeding $100 billion, only one had an E level index exceeding three. This is not surprising. With no hostile bid or proxy fight ever directed

*The Review of Financial Studies*

Table 3
Incidence of other provisions index

| Index of other provisions | 1990 | 1993 | 1995 | 1998 | 2000 | 2002 | Average E index: year 1990 | Average E index: year 2002 |
|---|---|---|---|---|---|---|---|---|
| 1 | 0.15% | 0.00% | 0.00% | 0.00% | 0.06% | 0.00% | 1.50 | 1.11 |
| 2 | 1.41% | 0.68% | 0.66% | 0.71% | 0.52% | 0.55% | 0.89 | 1.41 |
| 3 | 3.72% | 3.68% | 2.41% | 3.12% | 2.14% | 1.64% | 1.42 | 1.61 |
| 4 | 7.58% | 6.38% | 5.41% | 10.88% | 8.31% | 7.71% | 1.67 | 2.10 |
| 5 | 14.94% | 12.91% | 13.38% | 17.82% | 17.85% | 15.79% | 1.75 | 2.24 |
| 6 | 19.03% | 17.87% | 17.98% | 17.24% | 18.23% | 21.86% | 2.09 | 2.72 |
| 7 | 16.36% | 16.97% | 16.81% | 16.53% | 19.92% | 22.16% | 2.36 | 2.90 |
| 8 | 15.24% | 17.49% | 19.52% | 14.88% | 14.99% | 13.60% | 2.52 | 2.86 |
| 9 | 10.26% | 12.01% | 11.77% | 9.59% | 9.28% | 8.50% | 2.78 | 3.33 |
| 10 | 7.21% | 6.76% | 6.94% | 5.71% | 5.78% | 5.04% | 3.01 | 3.44 |
| 11 | 3.35% | 4.28% | 4.24% | 2.71% | 2.14% | 2.37% | 3.04 | 3.38 |
| 12 | 0.45% | 0.75% | 0.66% | 0.65% | 0.65% | 0.49% | 2.17 | 3.40 |
| 13 | 0.30% | 0.23% | 0.22% | 0.18% | 0.13% | 0.30% | 2.25 | 1.11 |
| Average | | | | | | | 2.24 | 2.49 |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | | |

at a company of this size, the managements of these very large firms have no need for entrenching provisions in order to be secure.

Table 3 provides the distribution of the O index for the IRRC publication years. As Table 3 indicates, the highest level of the O index actually reached by firms is 13, and the lowest level of the O index that firms actually have is 1. Approximately 40–45% of firms have an O index score of 6 or less, with the remaining firms having an O index score of 7 or more. There are very few firms at the extremes, with only roughly 1% of firms having an O index score of 1 or 2 and another 1% of firms having an O index score of 12 or 13. The correlation between the O index and the E index ranges from 0.3 to 0.35 throughout the 1990–2002 period. Thus, to the extent that the provisions in the E index matter but those in the O index do not, including the latter in the governance measure could contribute a significant amount of noise.

## 3. Entrenchment and Firm Value

In studying the association between the E index and firm value, we use Tobin's $Q$ as the measure of firm value. In doing so, we follow Gompers, Ishii, and Metrick (2003), as well as earlier work on the association between corporate arrangements and firm value (see, for example, Demsetz and Lehn 1985; Morck, Shleifer, and Vishny 1988; McConnell and Servaes 1990; Lang and Stulz 1994; Daines 2001; La Porta et al. 2002).

We use the definition of Tobin's $Q$ that was used by Kaplan and Zingales (1997) and subsequently also by Gompers, Ishii, and Metrick (2003). According to this specification, $Q$ is equal to the market value of assets divided by the book value of assets, where the market value of assets is computed as the book value of assets plus the market value of common stock less the sum of book value of common stock and balance sheet deferred taxes. This measure (and

*What Matters in Corporate Governance?*

simpler ones that drop deferred taxes) has been increasingly used in light of the complexities involved in the more sophisticated measures of $Q$ and the evidence of very high correlation between this proxy and more sophisticated measures (see, for example, Chung and Pruitt 1994).

Our dependent variable in most regressions is the log of industry-adjusted Tobin's $Q$, where industry-adjusted Tobin's $Q$ is a firm's $Q$ minus the median $Q$ in the firm's industry in the observation year. We defined a firm's industry by the firm's two-digit primary SIC Code. Using the Fama-French (1997) classification of forty-eight industry groups, rather than two-digit SIC Codes, yields similar results. Using industry-adjusted Tobin's $Q$ as the dependent variable also produces similar results.

As independent variables, we use throughout standard financial controls. These controls include the assets of the firm (in logs), the age of the firm (in logs) (Shin and Stulz 2000), and whether the firm is incorporated in Delaware—all variables used by Gompers, Ishii, and Metrick (2003). We also use additional controls that the literature has used in $Q$ regressions—the level of insider ownership, return on assets, capital expenditures on assets, research and development expenditures, and leverage. (Using only the controls used by Gompers, Ishii, and Metrick 2003 produces similar results throughout.) Moreover, we use dummies for firms' two-digit SIC Codes. In all of the regressions, in addition to the standard financial and ownership controls, we controlled for firms' O index scores in order to control for the IRRC provisions not included in the E index. In our $Q$ regressions, we focus on the period 1992–2002, because our inside ownership data (from ExecuComp) did not cover 1990, 1991, and 2003.

### 3.1 The E index and the O index

#### 3.1.1 A first look.
Table 4 presents the results of pooled OLS regressions for the 1992–2002 period. The pooled OLS regressions in Table 4 used White (1980) robust standard errors to account for potential heteroskedasticity. In the first column of Table 4, we used as an independent variable, in addition to the financial variables and O index discussed above, firms' E index scores. As column 1 indicates, the coefficient on the E index is negative (with a value of $-0.044$) and statistically significant at the 1% level. The coefficient of the O index is also significant at the 1% level, but it is positive (with a value of 0.01).

In the second column, in order to avoid the imposition of linearity on the E index, we used dummy variables to stand for the different levels that the index can take. As the results indicate, the coefficient for any level of the index above 0 is negative, with all being significant at the 1% level (except for the Entrenchment Index 4 dummy which is significant at the 5% level). Moreover, the magnitude of the coefficient is monotonically increasing in the level of the E index.

To avoid imposition of linearity on the O index, we also ran unreported regressions using the log of the O index as a control, and obtained similar

19

*The Review of Financial Studies*

**Table 4**
**The entrenchment index and firm value**

| Variable | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Entrenchment Index E | −0.044*** | | −0.020*** | |
| | 0.004 | | 0.007 | |
| Entrenchment Index 1 | | −0.092*** | | −0.056** |
| | | 0.023 | | 0.022 |
| Entrenchment Index 2 | | −0.146*** | | −0.065*** |
| | | 0.022 | | 0.025 |
| Entrenchment Index 3 | | −0.155*** | | −0.077*** |
| | | 0.022 | | 0.029 |
| Entrenchment Index 4 | | −0.206** | | −0.104*** |
| | | 0.023 | | 0.031 |
| Entrenchment Index 5–6 | | −0.282*** | | −0.107*** |
| | | 0.027 | | 0.040 |
| Other Provisions Index | 0.010*** | 0.010*** | 0.002 | 0.002 |
| | 0.003 | 0.003 | 0.006 | 0.006 |
| Log(Assets) | 0.015*** | 0.015*** | −0.119*** | −0.118*** |
| | 0.004 | 0.004 | 0.014 | 0.014 |
| Log(Company Age) | −0.048*** | −0.047*** | −0.026 | −0.026 |
| | 0.008 | 0.008 | 0.031 | 0.031 |
| Delaware Incorporation | −0.03*** | −0.028*** | 0.004 | 0.008 |
| | 0.01 | 0.01 | 0.04 | 0.04 |
| Insider Ownership | 0.001 | 0.001 | 0.005*** | 0.005** |
| | 0.001 | 0.001 | 0.002 | 0.002 |
| Insider Ownership Square | −0.00003 | −0.0003 | −0.0001* | −0.0001* |
| | 0 | 0 | 0 | 0 |
| ROA | 0.008 | 0.008 | 0.019 | 0.019 |
| | 0.009 | 0.009 | 0.015 | 0.015 |
| CAPEX/Assets | 0.994*** | 1.00*** | 0.868*** | 0.869*** |
| | 0.089 | 0.09 | 0.120 | 0.120 |
| Leverage | −0.544*** | −0.553*** | −0.426*** | −0.427*** |
| | 0.046 | 0.046 | 0.047 | 0.047 |
| R&D per Sales | 0.002** | 0.001* | −0.001** | −0.001** |
| | 0.001 | 0.001 | 0.001 | 0.001 |
| | | | | |
| Year fixed effects | Yes | Yes | Yes | Yes |
| Firm fixed effects | No | No | Yes | Yes |
| Number of observations | 8015 | 8015 | 8015 | 8015 |
| R_squared | 0.096 | 0.098 | 0.704 | 0.804 |

This table reports pooled OLS regressions of log(industry-adjusted Tobin's $Q$) on various controls and two specifications of the entrenchment index. Tobin's $Q$ is the ratio of the market value of assets to the book value of assets, where the market value of assets is computed as book value of assets plus the market value of common stock less the sum of book value of common stock and balance sheet deferred taxes. Industry-adjusted Tobin's $Q$ is equal to Tobin's $Q$ minus the median Tobin's $Q$ in the industry, where industry is defined by two-digit SIC Code. Entrenchment index $i$ ($i = 1, 2, 3, 4,$ and 5–6) is equal to 1 if the firm has an entrenchment level $i$ and 0 otherwise. The other provisions index is equal to the GIM index (Gompers, Ishii, and Metrick 2003) minus the entrenchment index. Insider Ownership is equal to the fraction of shares held by officers and directors. ROA is the ratio of net income to assets. CAPEX/assets is the ratio of capital expenditures to assets. R&D per Sales is the ratio of research and development expenditures to total sales. Leverage is the ratio of long-term debt plus debt due in one year to assets. Year dummies and a dummy for missing R&D data are included in all regressions, but their coefficients (as well as the constant) are omitted. Columns 1 and 2 provide OLS estimates, which are White (1980) robust, and columns 3 and 4 provide the results of regressions with fixed firm effects. Robust standards errors appear below the coefficient estimate. Significance levels are indicated by *, **, and *** for 10%, 5%, and 1%, respectively.

results to those reported in Table 4. In unreported regressions, we also ran regressions using industry-adjusted $Q$ as the dependent variable instead of its log, and obtained similar results. Finally, we ran median regressions and, again, obtained similar results.

20

*What Matters in Corporate Governance?*

**3.1.2 Controlling for unobserved firm characteristics.** We next ran regressions using firm fixed effects in order to control for unobserved firm heterogeneity that remains constant over the time period we study. The fixed effects regressions, reported in columns 3 and 4 of Table 4, examine the effect on firm value of changes that firms made, during the 1990–2003 period, in the number of entrenching provisions (whether to increase or decrease the number of entrenching provisions). As Table 1 indicates, there was meaningful variation in the incidence of some entrenching provisions over the 1990–2003 period, such as golden parachutes and limits on shareholders' ability to amend bylaws, that would result in changes in firms' entrenchment scores. Other entrenching provisions, and in particular staggered boards, were rarely changed by firms during the period of study, and are therefore unlikely to constitute a significant source for changes in firms' entrenchment scores.

As columns 3 and 4 indicate, in the firm fixed effects regressions, the coefficient values for the E index (column 3) and the coefficient values for the dummy variables for the different levels of the E index above 0 (column 4) remain negative, economically meaningfully, and statistically significant at the 1% level (except for the coefficient value on having an entrenchment level of 1 where the statistical significance is 5%). The magnitudes of the coefficient values also continue to increase monotonically in the level of the E index. The coefficient value on the O index remains positive, but is no longer statistically significant.

**3.1.3 Annual regressions.** For a final robustness check, we also ran annual regressions. In all regressions, we used the E index and the O index as the independent governance variables. We first ran a set of annual regressions similar to the baseline regressions in column 1 of Table 4, with OLS regressions employing the log of industry-adjusted $Q$ as the dependent variable. We then also ran a set of median regressions with log of industry-adjusted $Q$ as the dependent variable, as well as a set of OLS regressions with industry-adjusted $Q$ as the dependent variable. We calculated the Fama-McBeth coefficients for each set of annual regressions.

Table 5 displays the results of these three sets of annual regressions, displaying only the coefficients of the E index and of the O index. The coefficient of the E index is negative in all of the individual annual regressions. Of the thirty-three estimated negative annual coefficient values on the E index (three sets of annual regressions per year times eleven years), twenty-seven were statistically significant. Of the six negative coefficient values without significance, three occurred in one year (1992). The Fama-McBeth coefficient value on the E index is negative at the 1% level for each one of the three sets of annual regressions.

As for the O index, the coefficient on the O index in the annual regressions is positive in a substantial majority of the annual regressions, and occasionally positive with statistical significance. It is never negative and statistically

*The Review of Financial Studies*

**Table 5**
**The entrenchment index and firm value: annual regressions**

| | (1) Log (industry-adjusted Q) Mean regressions | | (2) Log (industry-adjusted Q) Median regressions | | (3) Industry-adjusted Q Mean regressions | |
|---|---|---|---|---|---|---|
| Year | Entrenchment index | Other provisions index | Entrenchment index | Other provisions index | Entrenchment index | Other provisions index |
| 1992 | −0.011 | 0.003 | −0.009 | −0.001 | −0.028 | −0.002 |
| | 0.009 | 0.006 | 0.016 | 0.011 | 0.021 | 0.014 |
| 1993 | −0.018* | −0.003 | −0.022** | −0.007 | −0.058** | −0.011 |
| | 0.011 | 0.007 | 0.010 | 0.006 | 0.027 | 0.016 |
| 1994 | −0.018** | 0.004 | −0.037*** | 0.001 | −0.052*** | 0.010 |
| | 0.009 | 0.006 | 0.010 | 0.007 | 0.020 | 0.014 |
| 1995 | −0.016 | 0.0013 | −0.023 | −0.005 | −0.067** | 0.008 |
| | 0.011 | 0.008 | 0.015 | 0.011 | 0.032 | 0.026 |
| 1996 | −0.024** | 0.011 | −0.025* | −0.002 | −0.074** | 0.029 |
| | 0.01 | 0.007 | 0.015 | 0.011 | 0.029 | 0.025 |
| 1997 | −0.014* | 0.005 | −0.029* | 0.011 | −0.058** | 0.017 |
| | 0.008 | 0.007 | 0.016 | 0.017 | 0.027 | 0.022 |
| 1998 | −0.064*** | 0.022** | −0.058*** | 0.000 | −0.209*** | 0.066** |
| | 0.014 | 0.009 | 0.021 | 0.014 | 0.053 | 0.033 |
| 1999 | −0.068*** | 0.005 | −0.065*** | 0.003 | −0.327*** | 0.015 |
| | 0.015 | 0.01 | 0.016 | 0.011 | 0.077 | 0.054 |
| 2000 | −0.03** | 0.003 | −0.066*** | −0.003 | −0.089** | −0.010 |
| | 0.013 | 0.009 | 0.020 | 0.014 | 0.041 | 0.028 |
| 2001 | −0.017* | 0.006 | −0.024* | 0.006 | −0.044 | 0.016 |
| | 0.01 | 0.007 | 0.014 | 0.010 | 0.027 | 0.019 |
| 2002 | −0.05*** | 0.013* | −0.057*** | 0.000 | −0.119*** | 0.020 |
| | 0.013 | 0.007 | 0.014 | 0.009 | 0.028 | 0.015 |
| Fama-McBeth | −0.03*** | 0.006*** | −0.038*** | 0.001*** | −0.102*** | 0.014*** |
| | 0.006 | 0.002 | 0.006 | 0.002 | 0.027 | 0.006 |

This table reports mean and median annual OLS regressions of log of industry-adjusted $Q$ and industry-adjusted $Q$ on the entrenchment index and various controls. The data, as in the previous table, consist of 8015 observations. Industry-adjusted Tobin's $Q$ is defined in the same way as in Table 4. The independent variables are the same as in the regressions reported in Table 4, but the table reports only the coefficients of the E index and the O index. Fama-McBeth coefficients are calculated and reported in the last row. Columns 1 and 3 provide OLS estimates that are White (1980) robust, and column 2 provides the results of median regressions. Robust standards errors appear immediately below the coefficient estimate. Levels of significance are indicated by *, **, and *** for 10%, 5%, and 1%, respectively.

22

**Table 6**
**The entrenchment index provisions and firm value**

| | Staggered board | Golden parachutes | Limits to amend bylaws | Limits to amend charter | Supermajority | Poison pill |
|---|---|---|---|---|---|---|
| Coefficient in a regression with (i) the provision and (ii) the GIM index minus the provision | −0.035*** 0.011 | −0.024** 0.012 | −0.079*** 0.022 | −0.048*** 0.01 | −0.079*** 0.0101 | −0.061*** 0.011 |
| Coefficient in a regression with (i) the provision, (ii) the entrenchment index minus the provision, and (iii) the index of all other provision | −0.051*** 0.005 | −0.037*** 0.005 | −0.047*** 0.004 | −0.044*** 0.004 | −0.045*** 0.005 | −0.042*** 0.005 |
| Coefficient in a regression with (i) the provision, (ii) dummies for each of the other five provisions in the entrenchment index, and (iii) the index of all other provision | −0.026** 0.011 | −0.025** 0.012 | −0.067*** 0.021 | −0.044*** 0.01 | −0.07*** 0.011 | −0.046*** 0.011 |
| Coefficient in a regression with (i) the provision and (ii) dummies for each of the other twenty-three IRRC provision | −0.030*** 0.011 | −0.026** 0.012 | −0.068*** 0.022 | −0.043*** 0.01 | −0.071*** 0.011 | −0.048*** 0.011 |

This table reports the results of twenty-four pooled OLS regressions of log(industry-adjusted Tobin's *Q*) on provisions in the entrenchment index and various controls. Each table consists of 8015 observations. Each column displays the results of four different regressions investigating a given provision, and it displays only the coefficient of the provision of interest in these four regressions. The independent variables other than governance provisions are the same as in the regressions of Table 4. OLS estimates are White (1980) robust. Robust standards errors appear immediately below the coefficient estimate. Levels of significance are indicated by *, **, and *** for 10%, 5%, and 1%, respectively.

significant in any of the annual regressions. The Fama-McBeth coefficient value on the O index is positive at the 1% level in each one of the three sets of annual regressions, albeit with a coefficient with a small magnitude.

### 3.2 Individual provisions: looking inside the two indexes

The analysis in Section 3.1 indicates that the six entrenching provisions we have identified are, in the aggregate, highly correlated with lower firm valuation. There is still the possibility, however, that one or more of the individual entrenching provisions are not contributing to this negative effect on firm valuation. To explore this possibility, we ran several sets of regressions whose results are displayed in Table 6.

In the first set of six regressions, we ran a regression for each of the six provisions in the E index in which the independent corporate governance variables were (i) one of the six entrenching provisions and (ii) the GIM index minus the entrenching provision in (i). That is, each of the regressions has one of the entrenching provisions as an independent variable while controlling for

23

all the other IRRC provisions. The financial controls used earlier (see Table 4 regressions) are also used as independent variables.[13]

The results of these six regressions, one for each of the entrenching provisions, are displayed in row one of Table 6. In each of the regressions, the coefficient of the entrenching provision under investigation is negative and statistically significant. Five entrenching provisions have statistically significant negative coefficient values at the 1% level, while the other one has statistical significance at the 5% level.

It is worth cautioning that not too much should be read into the differences in the levels of statistical significance and coefficient estimates of the various entrenching provisions due to the problem of co-linearity. Each entrenching provision is positively correlated with the GIM index minus that entrenching provision. Accordingly, it might well be that any particular entrenching provision's coefficient is underestimated. The one conclusion that can be comfortably drawn from the results displayed in row one of Table 6 is that each of the entrenching provisions contributes to the negative correlation between Tobin's $Q$ and the IRRC provisions in the aggregate.

For a robustness check, we then proceeded to run three additional sets of regressions. In particular, we ran for each entrenching provision $i$ the following types of regressions:

(1) a regression in which the independent corporate governance variables in addition to entrenching provision $i$ are (a) a variable equal to the E index minus provision $i$ and (b) the O index;

(2) a regression in which the independent corporate governance variables in addition to entrenching provision $i$ are (a) dummy variables for each of the five other entrenching provisions and (b) the O index;

(3) a regression in which the independent corporate governance variables in addition to entrenching provision $i$ are dummy variables for each of the other twenty-three IRRC provisions.

Rows 2, 3, and 4 of Table 6 display the results of the regressions of types (1), (2), and (3), respectively. For each one of the six entrenching provisions, the coefficient in each of the three types of regressions was negative and statistically significant at 1% or 5%. Thus, none of our robustness tests provide any evidence that is inconsistent with the view that each of the six entrenching provisions contributes to the negative correlation that the IRRC provisions in the aggregate have with Tobin's $Q$.

We now turn to the eighteen provisions in the O index. The results reported earlier indicate that, in the aggregate, these eighteen provisions are not negatively correlated with firm valuation. This finding does not imply, however,

---

[13] We display only the coefficients of the entrenching provision being investigated in each regression. In all the regressions, the coefficient of the GIM index minus the provision under investigation is negative and significant, and the coefficients of the financial controls are similar to those obtained in earlier regressions.

that none of the eighteen provisions contained in this index is harmful for firm valuation. It might be that one or more provisions have adverse effects, but this effect does not show up in our regressions because it is diluted or counteracted by the effects of the provisions contained in the O index. Indeed, the results of our article highlight the importance of looking inside the "box" of a broad index to try to identify the effects of particular corporate governance provisions.

Accordingly, we carried out a preliminary investigation to look inside the O index. We ran four sets of eighteen regressions (for seventy-two regressions overall) whose results are displayed in Table 7. In particular, for each provision $i$ in the O index, we ran the following four types of regressions:

(1)  a regression in which the independent corporate governance variables were provision $i$ and a variable equal to the GIM index minus provision $i$;

(2)  a regression in which the independent corporate governance variables were provision $i$, a variable equal to the O index minus provision $i$, and the E index;

(3)  a regression in which the independent corporate governance variables were provision $i$, dummies for each of the other seventeen provisions in the O index, and the E index; and

(4)  a regression in which the independent corporate governance variables were provision $i$ and dummies for each of the other twenty-three IRRC provisions.

Rows 1, 2, 3, and 4 of Table 7 display the results of the regressions of type (1), (2), (3), and (4), respectively (only the coefficient of the provision under investigation in any given regression is displayed). The standard financial controls used in earlier regressions were also used in these regressions (see regressions in Table 4). Of the eighteen IRRC provisions in the O index, seventeen of them do not have a coefficient that is negative and statistically significant in any of the types of regressions used. Indeed, a fair number of them are positive with statistical significance.

With respect to one provision in the O index, pension parachutes, its coefficient is not statistically significant in regression type (4), negative and significant at the 10% level in regression types (2) and (3), and negative and significant at the 5% level in regression type (1). The results with respect to the negative effect of pension parachutes on firm valuation are thus mixed, and weaker than the results for each of the entrenching provisions. It is worth noting that pension parachutes are present in only 1% of firms as of 2002 (and reached a maximum of 5.3% of firms in 1993). Despite the mixed results and low incidence, the exact correlation between pension parachutes on firm valuation is an issue worth further exploration in future research.

It is important to note that, because of the problem of colinearity, we do not rule out the possibility that some of the eighteen provisions in the O index are negatively correlated with firm value. We merely note that, using the same method that produced strong and unambiguous results regarding the negative

*The Review of Financial Studies*

**Table 7**
In side the other provisions index

| | Blank check | Limits to meetings | Limits to consent | Compensation plans | Director indemnification K | Director indemnification |
|---|---|---|---|---|---|---|
| Regression type (1) | 0.02 | 0.025*** | 0.001 | -0.005 | 0.031** | 0.003 |
| | 0.014 | 0.011 | 0.012 | 0.011 | 0.013 | 0.01 |
| Regression type (2) | 0.025* | 0.031*** | 0.002 | 0.006 | 0.031** | -0.011 |
| | 0.014 | 0.011 | 0.012 | 0.011 | 0.013 | 0.01 |
| Regression type (3) | 0.021 | 0.037*** | -0.001 | 0.008 | 0.036*** | -0.011 |
| | 0.014 | 0.012 | 0.014 | 0.011 | 0.013 | 0.01 |
| Regression type (4) | 0.021 | 0.034*** | -0.014 | 0.013 | 0.035*** | -0.013 |
| | 0.014 | 0.012 | 0.013 | 0.012 | 0.013 | 0.01 |

| | No secret ballot | Unequal vote | Antigreenmail | Director duties | Fair price | Pension parachutes |
|---|---|---|---|---|---|---|
| Regression type (1) | 0.028* | -0.048 | -0.008 | -0.004 | 0.038*** | -0.049** |
| | 0.014 | 0.032 | 0.013 | 0.015 | 0.012 | 0.021 |
| Regression type (2) | 0.034** | -0.04 | -0.001 | 0.005 | 0.032*** | -0.037* |
| | 0.014 | 0.032 | 0.012 | 0.015 | 0.012 | 0.021 |
| Regression type (3) | 0.032** | -0.03 | -0.012 | 0.01 | 0.03** | -0.035* |
| | 0.015 | 0.033 | 0.013 | 0.015 | 0.012 | 0.021 |
| Regression type (4) | 0.035** | -0.035 | -0.009 | 0.004 | 0.027*** | -0.031 |
| | 0.015 | 0.033 | 0.013 | 0.015 | 0.013 | 0.021 |

| | No cumulative vote | Director liability | Business combination | Silver parachutes | Cash-out | Severance agreements |
|---|---|---|---|---|---|---|
| Regression type (1) | -0.017 | 0.003 | 0.021** | 0.017 | 0.026 | 0.038** |
| | 0.013 | 0.011 | 0.016 | 0.021 | 0.029 | 0.020 |
| Regression type (2) | -0.005 | -0.013 | 0.024 | 0.015 | -0.000 | 0.022 |
| | 0.012 | 0.011 | 0.016 | 0.022 | 0.028 | 0.020 |
| Regression type (3) | -0.007 | -0.006 | 0.025 | 0.021 | -0.003 | 0.021 |
| | 0.013 | 0.011 | 0.017 | 0.022 | 0.03 | 0.020 |
| Regression type (4) | -0.005 | -0.004 | 0.026 | 0.019 | 0.001 | 0.01 |
| | 0.012 | 0.011 | 0.017 | 0.022 | 0.013 | 0.021 |

This table reports the results of seventy-two pooled OLS regressions of log of industry-adjusted Tobin's $Q$ on a given provision in the other provisions index and various controls. Industry-adjusted Tobin's $Q$ is defined in the same way as in Table 4. Each table consists of 8015 observations. For each provision $i$, four types of regressions are run: (1) A regression in which the independent corporate governance variable are the provision $i$, and a variable equal to the GIM governance provisions index minus the provision $i$; (2) A regression in which the independent corporate governance variables are the provision $i$, a variable equal to the other provision index minus the provision $i$, and the entrenchment index; (3) A regression in which the independent corporate governance variables are the provision $i$, dummies for each of the other seventeen provisions in the other provisions index, and the entrenchment index; and (4) A regression in which the independent corporate governance variables are the provision $i$ and dummies for each of the other twenty-three IRRC provisions. The independent nongovernance variables are the same as in the regressions reported in Table 4. We display only the coefficient on the provision $i$. OLS estimates are White (1980) robust. Robust standard errors appear immediately below the coefficient estimate. Levels of significance are indicated by *, **, and *** for 10%, 5%, and 1%, respectively.

correlation between each of the entrenching provisions and Tobin's $Q$, we do not obtain similar results with respect to any of the elements of the O index.

## 3.3 Exploring the issue of simultaneity

The findings reported so far have established that the E index and the individual provisions that collectively constitute the E index are inversely correlated, with economic and statistical significance, with firm valuation. Of course, these findings, by themselves, do not establish that having a higher E index score is the cause of lower firm valuation. It is possible that the correlation is the result of lower valued firms adopting entrenching provisions either because low-value firms might be more concerned with hostile takeovers or, alternatively, bad management will tend both to reduce firm valuation and to adopt entrenching provisions.[14] This issue of simultaneity is often raised with respect to studies that find a correlation between various aspects of firm ownership and structure and firm valuation, and it is notoriously difficult to resolve.[15]

This section explores this issue of simultaneity. In doing so, we are assisted by the fact that there was a meaningful amount of stability in firms' E index scores over the 1990–2002 period. In our data, a firm with a high entrenchment score as of 1990 is likely to have a high entrenchment score in 2002. With respect to some of the entrenching provisions, it is necessary to first obtain shareholder approval before they can be adopted, which made it difficult for firms that did not already have these entrenching provisions as of 1990 to adopt them afterward. The most notable example of this phenomenon is staggered boards (Bebchuk and Cohen 2005). With respect to other entrenching provisions that did not require a shareholder vote—poison pills and golden parachutes—management could unilaterally adopt these provisions. This makes the presence of these two provisions at a particular point in time more likely to be the result of an endogenous firm decision at that point than the other entrenching provisions. Even so, there are some costs to management for suddenly adopting one of these provisions given possibly negative public, institutional investor, and market reaction. It is easier to retain a pre-existing poison pill or golden parachute than to suddenly adopt one.

We examine whether a firm's entrenchment score in 1990, the beginning of our sample period, had a negative correlation with firm valuation in the 1998–2002 period, the years at the end of our sample period. While a firm's 1990 entrenchment score is correlated with the firm's entrenchment score during the 1998–2002 period for the reasons described above, the firm's 1990

---

[14] It is worth noting that the bad management causation story for the documented correlation is hardly a ringing endorsement of entrenching provisions and the managers adopting them.

[15] Part of the problem is that good instruments are difficult to identify in this area. Bhagat and Bolton (2008) use the percentage of stock owned by a firm's directors as an instrument for governance, reasoning that stock ownership can be viewed as a substitute form of governance and that director percentage stock ownership was found not to be related to performance in one study. Although this approach is interesting, it is not clear that directors' ownership percentage should be viewed as a substitute form of governance if it has no effect on performance.

*The Review of Financial Studies*

**Table 8**
**The entrenchment index and firm value 1998–2002**

| Variable | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Entrenchment Index E 90 | −0.024*** | | −0.017*** | |
| | 0.005 | | 0.005 | |
| Entrenchment Index 1 90 | | −0.045 | | −0.036 |
| | | 0.031 | | 0.03 |
| Entrenchment Index 2 90 | | −0.073** | | −0.075*** |
| | | 0.029 | | 0.027 |
| Entrenchment Index 3 90 | | −0.071** | | −0.054** |
| | | 0.029 | | 0.028 |
| Entrenchment Index 4 90 | | −0.122*** | | −0.092*** |
| | | 0.03 | | 0.028 |
| Entrenchment Index 5–6 90 | | −0.105*** | | −0.078** |
| | | 0.039 | | 0.036 |
| Other Provisions Index | 0.002 | 0.002 | 0.002 | 0.002 |
| | 0.004 | 0.004 | 0.004 | 0.004 |
| Log(Industry-Adjusted $Q$) 90 | | | 0.289*** | 0.291*** |
| | | | 0.025 | 0.025 |
| Log(Assets) | 0.049*** | 0.049 | 0.045*** | 0.044*** |
| | 0.005 | 0.005 | 0.005 | 0.005 |
| Log(Company Age) | −0.036** | −0.032* | −0.016 | −0.01 |
| | 0.017 | 0.017 | 0.018 | 0.017 |
| Delaware Incorporation | −0.021 | −0.02 | −0.017 | −0.015 |
| | 0.015 | 0.015 | 0.014 | 0.014 |
| Insider Ownership | −0.004* | 0.005* | −0.003 | −0.003 |
| | 0.003 | 0.003 | 0.002 | 0.002 |
| Insider Ownership Square | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 |
| ROA | 2.859*** | 2.859*** | 2.457*** | 2.456*** |
| | 0.134 | 0.134 | 0.147 | 0.147 |
| CAPEX/Assets | 0.173*** | 0.729*** | 0.847*** | 0.87*** |
| | 0.167 | 0.031 | 0.16 | 0.162 |
| Leverage | −0.403*** | −0.405*** | −0.31*** | 0.312*** |
| | 0.058 | 0.058 | 0.059 | 0.059 |
| R&D per Sales | 1.218*** | 1.28*** | 0.909*** | 0.934*** |
| | 0.242 | 0.242 | 0.242 | 0.242 |
| | | | | |
| Year fixed effects | Yes | Yes | Yes | Yes |
| Number of observations | 2173 | 2173 | 2157 | 2157 |
| R_squared | 0.4833 | 0.4840 | 0.5219 | 0.5230 |

This table reports pooled OLS regressions of log(industry-adjusted Tobin's $Q$) for 1998–2002 on various controls and two specifications of the entrenchment index. The calculation of industry-adjusted Tobin's $Q$ is described in Table 4. In addition to the controls used earlier in the Table 4 regressions, columns 1 and 3 control for firms' 1990 entrenchment index scores, while columns 2 and 4 control for the different levels of firms' 1990 entrenchment index scores. Moreover, columns 3 and 4 control for the log of firms' industry-adjusted Tobin's $Q$ as of 1990. Year dummies and a dummy for missing R&D data are included in all regressions, but their coefficients (as well as the constant) are omitted. White (1980) robust standards errors appear below the coefficient estimate. Significance levels are indicated by *, **, and *** for 10%, 5%, and 1%, respectively.

entrenchment score cannot itself be the result of low-firm valuation during the 1998–2002 period. Column 1 of Table 8 presents the results of running a regression where the dependent variable is the log of industry-adjusted Tobin's $Q$ and the independent variables are firms' E index scores as of 1990 and firms' other provisions scores in the 1998–2002 period. Column 2 presents the results when dummy variables are used for the different levels of firms' E index scores as of 1990. Both regressions control for the full set of firm characteristics used in earlier regressions.

28

As the results in column 1 indicate, a firm's E index score as of 1990 is negatively correlated, with economic and statistical significance (at the 1% level), with lower firm valuation during the 1998–2002 period. The results when dummies are used for the different levels of the E index tell the same story. Four out of the five dummy variables are negatively correlated, either at the 1% or 5% level, with lower firm valuation. Only the dummy variable representing the lowest entrenchment score, while having a negative coefficient, is not statistically significant.

It might be suggested, however, that poor management at or prior to 1990 was responsible both for the existence of entrenching provisions in 1990 and for the firm's low valuation in the 1998–2002 period. Of course, the likelihood of this explaining the documented correlation is weakened by the fact that managerial turnover is common over a twelve-year period. Nevertheless, given this possibility, we controlled for the log of firms' industry-adjusted Tobin's $Q$ as of 1990 in the regressions we report in columns 3 and 4 of Table 8. Low firm valuation as of 1990 helps control for poor management as of 1990. As before, entrenching provisions are negatively correlated, with economic and statistical significance (at the 1% level), with lower firm valuation. And, as before, four out of the five dummy variables representing the different levels of the E index are negatively correlated, either at the 1% or 5% level, with lower firm valuation. Only the dummy variable representing the lowest entrenchment score, while negative, is not statistically significant.[16]

We conclude that, although low-$Q$ firms tended to have high E levels at the end of our sample period, the negative correlation between Tobin's $Q$ and E at the end of our sample period was not all due to the correlation in the beginning of the period; while high E firms began the period already with lower $Q$, their $Q$ further declined over time. This is consistent with the possibility that having a higher entrenchment score at least partly brings about (and not merely reflects) lower firm valuation. We should also remind the reader that, as stressed earlier, even if it turned out that the low $Q$ of high E firms at the end of the period was all due to their low $Q$ already in the beginning of the period, that would not imply that entrenchment does not have an effect on firm value; it still could be the case that a high entrenchment level is necessary (and indeed chosen) in order to sustain a low $Q$ level over time without being taken over. In any event, although our evidence is consistent with an effect of entrenchment on value, it does not establish the direction of causation. The issue of simultaneity is one that clearly calls for further examination.[17]

---

[16] We did not extend our analysis to Tobin's $Q$ and E levels prior to 1990 due to lack of data about entrenchment levels prior to 1990. Lehn, Patro, and Zhao (2006) suggest that low $Q$ levels in the early 1980s could not have reflected relatively high entrenchment levels because, based on a subset of firms for which they collected data, the average level of E was low during 1981–1985 data. But even though the average level of E in their 1981–1985 sample was low, there was a significant variation among firms in E levels.

[17] Another question with respect to the association between the E index and Tobin's $Q$ that is worthwhile answering concerns identifying how the identified association between E and Tobin's $Q$ varies among different subsets of the

## 4. Entrenchment and Stock Returns

We next examine the relationship between a firm's E index score and the firm's abnormal stock returns. Much attention has therefore been paid to the findings of Gompers, Ishii, and Metrick (2003) that firms with low GIM index scores were associated with higher abnormal returns during the 1990s compared to those of firms with high GIM index scores. We investigate below whether the identified correlation between returns and the GIM index during the 1990s was attributable to the provisions in the E index.

At the outset, we should stress that for a provision to be associated with a negative abnormal return during a given time period is neither a necessary condition nor a sufficient condition, for the provision to be negatively correlated with firm value.[18] The findings on Tobin's $Q$ might well be more informative than stock return results in identifying provisions that might have adverse effects on shareholders. We also wish to emphasize that the literature has still not resolved how to best interpret the Gompers, Ishii, and Metrick (2003) results concerning abnormal returns. Are these results due to the market learning to appreciate the significance of entrenchment (Gompers, Ishii, and Metrick 2003), to a correlation between the GIM index and some common risk factor missing from the standard asset pricing model (Cremers, Nair, and John 2008), or to yet some other factor? This and similar questions are ones on which a consensus is yet to emerge.

For our purposes, which are to identify which IRRC provisions matter, what is most important is not to explain the abnormal return results of Gompers, Ishii, and Metrick (2003) but to examine whether they are driven by the provisions in the E index. Our finding that they do reinforces our earlier conclusion that, within the IRRC provisions universe, the provisions in the E index are those that matter.

Gompers, Ishii, and Metrick (2003) employed the following methodology in calculating the abnormal return associated with differences in GIM index scores. A "Democracy" portfolio was constructed consisting of firms with strong shareholder rights protections, defined as those firms with GIM index scores of 5 or less. Likewise, a "Dictatorship" portfolio was constructed consisting of firms with weak shareholder rights protections, defined as those firms with GIM index scores of 14 or more. The firms in the Democracy and Dictatorship portfolios roughly correspond to the best and worst 10% of firms in terms of GIM index scores. Democracy and Dictatorship portfolios were constructed both by weighting stock positions by a firm's market capitalization

---

economy's public firms. This question is explored by Cremers, Nair, and Peyer (forthcoming) and Kadyrzhanova (2006).

[18] A corporate governance provision that is harmful to shareholders might have no abnormal returns associated with it during a given period if the market accurately assessed the provision's adverse consequences in the beginning of the period. Conversely, a provision that is in fact beneficial to shareholders might be associated with a negative return during a given period if the market viewed it at the end of the period somewhat less positively—although still positively—than in the beginning of the period.

(value-weighted portfolios), as well as by equally weighting each firm (equal-weighted portfolios).

Gompers, Ishii, and Metrick (2003) found that the monthly abnormal return for going long the Democracy portfolio and short the Dictatorship portfolio, value-weighted, was 71 basis points with 1% significance level, and that doing so using equally weighted portfolios yielded a monthly abnormal return of 45 basis points with 5% significance.[19] Their findings of statistically significant abnormal returns applied only to a trading strategy using Democracy and Dictatorship portfolios (firms at the extremes of the GIM index) in its long and short positions. Expanding their testing to a broader spectrum of firms, including firms in the middle of the GIM index distribution, they found no statistically significant abnormal returns resulting from going long firms with low GIM index scores while shorting firms with high GIM index scores.

Our main findings are as follows. Firms with a low E index score are associated with statistically significant abnormal returns both during the 1990–1999 period investigated by Gompers, Ishii, and Metrick (2003) and the longer 1990–2003 time period which our data enable us to study. Moreover, including firms in our trading strategies that are in the middle of the E index distribution still generates positive monthly abnormal returns with 1% statistical significance, albeit abnormal returns that are smaller than those generated using firms only with extreme E index scores. We find that this association between E index scores and stock returns is not due to the E index being correlated with IRRC provisions not included in the E index. Finally, we find that the corporate governance provisions not included in the E index have no explanatory power, above that already provided by the E index, for returns during the two time periods (1990–1999; 1990–2003) we study.

## 4.1 The E index and returns for the 1990s

**4.1.1 Summary statistics.** We begin by presenting some basic summary statistics on the E index and stock returns during the 1990s. Table 9 presents the average monthly returns of portfolios of firms, both equally weighted and value-weighted, with the same E scores (0, 1, 2, 3, 4, 5–6) for the period of September 1990–December 1999. Interestingly, the average monthly return drops monotonically as one moves from having an entrenchment score of 0 to an index score of 5 and 6. The difference between firms with an entrenchment score of 0 and firms with an entrenchment score of five or six is quite substantial: 1.74% versus 1.26% for equally weighted portfolios and 2.45% versus 1.51% for value-weighted portfolios. Because the returns of value-weighted portfolios can be substantially affected by the returns of a small number of the largest companies, it could be plausibly argued that more attention should be paid

---

[19] We were able to replicate these basic findings with the Fama-French benchmark factors. We found that the value-weighted trading strategy generated a monthly abnormal return of 73 basis points at the 1% level, while the equally weighted trading strategy generated a monthly abnormal return of 49 basis points at the 5% level.

*The Review of Financial Studies*

Table 9
Summary statistics on entrenchment index stock returns

| Entrenchment index level | Equal-weight | Value-weight |
|---|---|---|
| Index 5–6 | 1.26% | 1.51% |
| Index 4 | 1.40% | 1.85% |
| Index 3 | 1.46% | 1.93% |
| Index 2 | 1.59% | 2.26% |
| Index 1 | 1.72% | 2.33% |
| Index 0 | 1.74% | 2.45% |

This table documents the average monthly return of stocks of portfolios of stocks consisting of the same entrenchment index scores (0, 1, 2, 3, 4, or 5–6) for the period of September 1990–December 1999. Portfolios are constructed using equal weights of stocks and weighting positions in stocks by firms' common stock market capitalization. Firms' entrenchment scores were adjusted when updated information on firms' corporate governance provisions became available: July 1993; July 1995; and February 1998.

to results based on equally weighted portfolios. But we follow the literature by reporting throughout results based on both equally weighted and value-weighted portfolios.

This decline in monthly returns as a firm's entrenchment score increases occurs not only when one moves from firms with very low entrenchment scores to firms with very high entrenchment scores but also as E index scores increase in the middle of the E index distribution. Moreover, the decline in monthly returns as a firm's entrenchment score increases holds equally true for both equally weighted and value-weighted portfolios. In both cases, average returns decrease monotonically as one moves to portfolios with higher entrenchment scores.

Obviously, these summary statistics are only suggestive of a possible relationship between the E index and stock returns in the 1990s. To explore this possibility systematically, it is necessary to control for other factors, such as systematic risk, that might be affecting stock returns for firms with different E index scores.

### 4.1.2 The baseline model: controlling for the Fama-French and Carhart four factors.

To identify the correlation between different levels of the E index and stock returns, we investigated the following question: What was the abnormal return associated with taking a long position in the firms with a given E index score and, at the same time, shorting the firms with a higher E index score? To answer this question, we follow the methodology of Gompers, Ishii, and Metrick (2003) of regressing the return of this long-short trading strategy for month $t$ (call this variable $Diff_t$), on the four-factor model of Carhart (1997). In other words, we ran the following regression:

$$Diff_t = a + b_1 * MKTRF_t + b_2 * HML_t + b_3 * SMB_t$$
$$+ b_4 * Momentum_t + e_t, \quad (1)$$

where $MKTRF_t$ is the month $t$ value-weighted market return minus the risk-free rate, $SMB_t$ and $HML_t$ are the Fama-French zero-investment benchmark factor

32

mimicking portfolios reflecting, respectively, size and book-to-market stock return effects for time $t$ (see Fama and French 1993), and *Momentum$_t$* reflects stock return momentum effects for time $t$ (see Carhart 1997). The Fama-French factors were obtained from Kenneth French's data library and the Carhart momentum factor was constructed by us using the procedures described in Carhart (1997). Accordingly, $a$ is construed as the monthly abnormal return associated with going long firms with low E index scores and, simultaneously, shorting firms with high E index scores.

Monthly abnormal returns were calculated using both value-weighted portfolios and equally weighted portfolios. These hedging portfolios were updated as new information became publicly available concerning the corporate governance provisions firms had. September 1990 is the starting date of the sample period as this was the month that the first IRRC volume was published and became publicly available. Firm membership in portfolios was adjusted in July 1993, July 1995, February 1998, November 1999, and February 2002 as these are the dates when updated IRRC volumes became publicly available.

Table 10 displays the abnormal return results for the 1990s controlling for the Carhart (1997) four factors (the baseline model). These results, regardless of whether one looks at equally weighted or value-weighted E index portfolios, are striking. During the 1990s, going long those firms with the lowest possible entrenchment score (index score of 0) and shorting the high E index portfolio (index scores of 5 and 6) would have generated a monthly abnormal return of 61 basis points with 1% significance when equally weighted portfolios are used; and it would have yielded monthly abnormal returns of 116 basis points with 1% significance when value-weighted portfolios are used. On an annual compounded basis, these strategies would have produced an abnormal return of 7.4% when equally weighted portfolios are used and 14.8% when value-weighted portfolios are used.[20]

There is another interesting pattern that emerges from the baseline model results in Table 10. The abnormal returns are all positive with statistical significance at the 1% level but progressively decline, whether equally weighted or value-weighted portfolios are used in the trading strategy, as one includes more and more firms in the middle of the E index distribution. This monotonic decline in abnormal returns as the trading strategies include more firms in the middle of the distribution (with the first trading strategy on the far left being long index level 0-short index levels 5–6, then long 0-short 4–6, long 0–1-short 4–6, long 0–1-short 3–6, and finally long 0–2, short 3–6) is illustrated in Figure 1.

The same pattern of declining abnormal returns emerges when firms in the middle of the E index are added to the long and short positions (with the first

---

[20]  These figures are based on compounding the monthly return over the year. Without compounding, the annual abnormal returns would be approximately 7.2% for a strategy based on equally weighted portfolios and 13.9% for a strategy based on value-weighted portfolios.

33

*The Review of Financial Studies*

**Table 10**
Monthly abnormal returns associated with different trading strategies: the 1990s

| Long-short portfolios | Baseline model | | Industry-adjusted | | O-bucket-adjusted | |
|---|---|---|---|---|---|---|
| | Equal-weight | Value-weight | Equal-weight | Value-weight | Equal-weight | Value-weight |
| Index 0–Index 5–6 | 0.61*** | 1.16*** | 0.60*** | 1.01*** | 0.73*** | 1.16*** |
| | (0.200) | (0.284) | (0.182) | (0.301) | (0.269) | (0.298) |
| Index 0–Index 4–5–6 | 0.42*** | 0.74*** | 0.47*** | 0.82*** | 0.61*** | 0.89*** |
| | (0.134) | (0.191) | (0.116) | (0.198) | (0.195) | (0.210) |
| Index 0–1–Index 4–5–6 | 0.41*** | 0.62*** | 0.44*** | 0.62*** | 0.34** | 0.77*** |
| | (0.138) | (0.153) | (0.109) | (0.154) | (0.141) | (0.180) |
| Index 0–1–Index 3–4–5–6 | 0.32*** | 0.52*** | 0.34*** | 0.57*** | 0.28*** | 0.58*** |
| | (0.106) | (0.141) | (0.088) | (0.130) | (0.107) | (0.161) |
| Index 0–1–2–Index 3–4–5–6 | 0.25*** | 0.47*** | 0.26*** | 0.51*** | 0.23*** | 0.50*** |
| | (0.079) | (0.116) | (0.067) | (0.108) | (0.071) | (0.123) |

This table documents the monthly abnormal returns, and their associated robust standard errors in parentheses, associated with different trading strategies for the period of September 1990–December 1999. The monthly abnormal returns were calculated using three different methods. In the baseline model, abnormal returns were calculated by regressing the return associated with a particular trading strategy on the three Fama-French factors (Fama and French 1993)—book-to-market stock effects, firm size stock effects, and market stock effects—and a momentum factor that was calculated using the procedures described in Carhart (1997). The trading strategies analyzed consist of going long a portfolio of stocks with a certain entrenchment index score and, simultaneously, shorting another portfolio of stocks with a higher entrenchment score. These long and short portfolios were adjusted when updated information on firms' corporate governance provisions became available: July 1993; July 1995; and February 1998. The long and short portfolios of stocks were constructed using equal weightings of each stock (equal-weight) and by weighting the holding of a stock in the portfolio by its common stock-market capitalization (value-weight). With industry-adjusted returns, the monthly abnormal returns were calculated by first subtracting from each firm's monthly stock return the median industry return for the industry in which the firm operates. The Fama-French forty-eight industry classifications (Fama and French 1997) were used in classifying firms across industries. Monthly abnormal returns were then calculated by regressing the industry-adjusted returns associated with a trading strategy on the four Carhart (1997) factors used in the baseline model. Finally, with the O-bucket-adjusted returns, the long and short portfolios were constructed by first dividing all stocks into four buckets consisting of firms with O scores of 0–5, 6, 7–8, and 9–13. Then, the return on going long firms with a certain E score and short firms with a certain E score (either equally weighted or value-weighted) within each bucket was calculated with an overall long-short portfolio consisting of an equally weighted position in each of the four long and short positions created for the four O buckets. The O bucket-adjusted returns associated with a particular trading strategy were regressed, as always, on the four Carhart factors. Levels of significance are indicated by *, **, and *** for 10%, 5%, and 1%, respectively.

34

*What Matters in Corporate Governance?*



**Figure 1**
Monthly abnormal returns: baseline model, equally weighted portfolios.



**Figure 2**
Monthly abnormal returns: baseline model, value-weighted portfolios.

trading strategy on the far left again being long 0-short 5–6, then long 0-short 4–6, long 0–1-short 4–6, long 0–1-short 3–6, and finally long 0–2-short 3–6) when value-weighted portfolios are used (Figure 2).

This monotonic decline in abnormal returns is to be expected if stock returns are negatively correlated with the degree to which managers are entrenched as captured by the E index.

**4.1.3 Industry-adjusted returns.** There is, of course, always the possibility that a firm's corporate governance provisions merely reflect the industry in which the firm happens to operate. That is, it might be that low entrenchment levels were more common in industries that happened to perform well in terms of returns during the 1990s, and that the above findings of abnormal returns were driven by industry association. We therefore control for industry effects on stock returns in the same manner as Gompers, Ishii, and Metrick (2003).

In particular, we classified all the firms in our dataset into one of the forty-eight Fama-French (1997) industry classifications, and then calculated industry-adjusted monthly returns by first subtracting from each firm's monthly stock return the median monthly industry return for the Fama-French industry in which the firm operates. Monthly abnormal industry-adjusted returns on a trading strategy were then calculated by regressing the industry-adjusted returns

35

associated with this strategy (going long firms with a particular E index score and, simultaneously, shorting other firms with a higher E index score) on the three Fama-French factors (Fama and French 1993) and a momentum factor (Carhart 1997). The industry-adjusted monthly abnormal returns were calculated for the same trading strategies analyzed in the baseline model. The results are also reported in Table 10.

As Table 10 indicates, all the long-short portfolios continue to generate positive abnormal returns that are all statistically significant at the 1% level. Also, once again, as one adds firms with index scores in the middle of the distribution to the long and short portfolios, the industry-adjusted monthly abnormal returns monotonically decrease. Finally, the industry-adjusted return estimates are approximately the same as those estimated without adjusting for industry. In short, the abnormal return results generated using the baseline model do not appear to be driven by industry effects.

**4.1.4 Controlling for other governance provisions.** One potential issue with the preceding analysis is the fact that the E index is correlated with other corporate governance provisions covered by the IRRC. Recall that the correlation between the E index and the O index is about 0.3–0.35 during the period of our study. This makes it desirable to examine whether the results associating higher abnormal returns with lower E index scores are due to a correlation between returns and the O index.

To address this issue, we calculate the results of a new set of trading strategies that seek to control for the provisions in the O index. We wish to test whether, within pools of firms that have similar levels of the O index, going long on low entrenchment companies and short on high entrenchment companies continues to produce positive abnormal returns.

Specifically, we start by dividing all firms into four buckets based on their O index score. The four buckets were created so as to contain, to the extent possible, equal numbers of observations. The four buckets of firms consist of firms with low O index scores (index score of 5 or less); firms with medium-low O index scores (index score of 6); firms with medium-high O index scores (index scores of 7 and 8); and firms with high O index scores (index scores of 9 or more). In addition, we used several different divisions of the O index into buckets and found that using them does not affect the results.

With these O buckets in place, we were able to take into account the O distribution, as captured by the four buckets, when calculating abnormal returns associated with going long firms with low E index scores and short high E index firms.[21] When considering a trading strategy of going long firms with a given low E index score level and short firms with a given high E index score level, we would for each O index bucket create positions (either equally weighted

---

[21] It is impossible to do an exact O index distribution given a lack of sufficient firm observations across the entrenchment index to replicate the O index distribution.

*What Matters in Corporate Governance?*

or value-weighted) consisting of going long all the firms with the given low entrenchment level and short all the firms with the given high entrenchment level in that O index bucket. We then created an overall long-short portfolio consisting of an equally weighted position in each of the four long and short positions created for the four O index buckets. As before, we then regressed the return associated with this long-short portfolio on the Carhart (1997) four-factor model, with the intercept term being interpreted as the monthly abnormal return associated with this particular trading strategy.

The basic idea behind constructing portfolios in this way is to ensure that, in constructing our long-short portfolios, the firms purchased and shorted are different in their E index scores while still being roughly similar in their O index scores. The method is analytically similar to the way in which the Fama-French book-to-market and firm size factors are calculated (see Fama and French 1993) as well as the Carhart momentum factor construction (see Carhart 1997).

The same trading strategies analyzed earlier were used once again. The results, which are reported in Table 10, indicate relatively little changes after we control for correlation with the O index. The abnormal returns remain positive and statistically significant at the 1% level, with one exception that is positive and significant at the 5% level. Moreover, the abnormal return estimates are of roughly similar magnitudes. For instance, the monthly abnormal return of going long firms in the bottom half of the distribution and short the top half is 23 basis points for equally weighted portfolios and 50 basis points for value-weighted portfolios, both with 1% significance. Also, the same pattern of decreasing abnormal returns again emerges when looking at the effect of adding firms in the middle of the E index distribution to the long and short portfolios.

## 4.2 The E index and returns for 1990–2003

Following the initial finding by Gompers, Ishii, and Metrick (2003) of correlation between the GIM index and lower stock returns during the period 1990–1999, subsequent work did not find such correlation in a period extended forward to include the beginning of this decade (Cremers and Nair 2005). The question therefore naturally arises whether the trading strategies analyzed above, going long firms with low E index scores and shorting firms with higher E index scores, would have yielded abnormal returns in the 1990–2003 period.

Turning to this question, we calculated for the period 1990–2003 the abnormal returns for different trading strategies using the Carhart (1997) four factors (the baseline model), the industry-adjusted model, and the O-bucket adjusted model. The results are summarized in Table 11.

As Table 11 indicates, all the trading strategies, going long on low entrenchment firms and short on high entrenchment firms, continue to produce positive abnormal returns that are large and statistically significant at the 1% level. Furthermore, for both the equally weighted and value-weighted portfolios, abnormal returns on trading strategies largely continue to decline monotonically

37

**Table 11**
Monthly abnormal returns associated with different trading strategies: 1990–2003

| Long-short portfolios | Baseline model | | Industry-adjusted | | O-bucket-adjusted | |
|---|---|---|---|---|---|---|
| | Equal-weight | Value-weight | Equal-weight | Value-weight | Equal-weight | Value-weight |
| Index 0–Index 5–6 | 0.60*** | 0.84*** | 0.66*** | 0.94*** | 0.68*** | 0.81*** |
| | (0.185) | (0.224) | (0.156) | (0.230) | (0.220) | (0.246) |
| Index 0–Index 4–5–6 | 0.39*** | 0.57*** | 0.48*** | 0.67*** | 0.50*** | 0.60*** |
| | (0.145) | (0.186) | (0.125) | (0.185) | (0.169) | (0.206) |
| Index 0–1–Index 4–5–6 | 0.42*** | 0.52*** | 0.52*** | 0.53*** | 0.35*** | 0.58*** |
| | (0.133) | (0.157) | (0.114) | (0.151) | (0.130) | (0.179) |
| Index 0–1–Index 3–4–5–6 | 0.37*** | 0.41*** | 0.43*** | 0.46*** | 0.34*** | 0.43*** |
| | (0.107) | (0.132) | (0.090) | (0.125) | (0.100) | (0.144) |
| Index 0–1–2–Index 3–4–5–6 | 0.27*** | 0.37*** | 0.34*** | 0.39*** | 0.24*** | 0.38*** |
| | (0.085) | (0.117) | (0.070) | (0.110) | (0.074) | (0.121) |

This table documents the monthly abnormal returns, and their associated robust standard errors in parentheses, associated with different trading strategies for the period of September 1990–December 2003. The abnormal returns were calculated in the same manner as in Table 10: the baseline model, industry-adjusted returns, and O bucket-adjusted returns. The long and short portfolios were adjusted when updated information on firms' corporate governance provisions became available: July 1993; July 1995; February 1998; November 1999; and February 2002. The long and short portfolios of stocks were constructed using equal weightings of each stock (equal-weight) and by weighting the holding of a stock in the portfolio by its common stock market capitalization (value-weight). Levels of significance are indicated by *, **, and *** for 10%, 5%, and 1%, respectively.

as firms in the middle of the E index are added to the long and short portfolios. This overall pattern emerges in the baseline model, the industry-adjusted model, and the O-bucket-adjusted model.

In terms of the magnitude of the abnormal returns, the results for the period 1990–2003 are roughly similar to the results for the period 1990–1999 when the trading strategies use equally weighted portfolios. For example, going long E index 0 and short index 5 or 6 would have yielded 61 basis points during 1990–1999 and 60 basis points during 1990–2003 using the baseline four-factor model; would have yielded 60 basis points during 1990–1999 and 66 basis points during 1990–2003 using the industry-adjusted model; and would have yielded 73 basis points during 1990–1999 and 68 basis points during 1990–2003 using the O-bucket-adjusted model. Similarly, when going long firms with E index scores of 2 or less and shorting the firms with index 3 or more, moving from 1990–1999 to 1990–2003 would have increased the monthly abnormal return by 2 basis points (to 27 basis points) under the baseline model; by 8 basis points (to 34 basis points) under the industry-adjusted model; and 1 basis point (to 24 basis points) under the O-bucket-adjusted model.

For trading strategies using value-weighted portfolios, the abnormal returns for the 1990–2003 period are significantly smaller than the corresponding trading profits for the 1990–1999 period. The trading profits using value-weighted portfolios in the 1990–2003, however, continue to be quite large in magnitude and, in particular, higher than the abnormal return on the corresponding strategies using equally weighted portfolios during either the 1990–1999 or the 1990–2003 period. For example, during 1990–2003, using value-weightings, going long E index zero firms and shorting index five or six firms would have yielded a monthly positive abnormal return of 84 basis points under the baseline model; 94 basis points under the industry-adjusted model; and 81 basis points under the O-bucket-adjusted model. In contrast, using equal-weightings, going long index zero firms and shorting index five or six firms during 1990–1999 would have yielded only a monthly positive abnormal return of 61 basis points under the baseline model (or 60 basis points if the period were extended to 2003); 60 basis points under the industry-adjusted model (or 66 if the period were extended to 2003); and 73 basis points under the O-bucket-adjusted model (or 68 if the period were extended to 2003).

### 4.3 Stock returns and the O index

We have found that, even after controlling for the O index, the E index was correlated with stock returns during the period we study. There is still the possibility, however, that the O index was also correlated, controlling for the E index level, with stock returns. In other words, it is possible to flip the inquiry and ask whether the O index, the IRRC corporate governance provisions not reflected in the E index, has explanatory power for stock returns.

**Table 12**
**Monthly abnormal returns associated with different trading strategies controlling for entrenchment index distribution**

| Long-short portfolios | 1990–1999 | | 1990–2003 | |
|---|---|---|---|---|
| | Equal-weight | Value-weight | Equal-weight | Value-weight |
| Index 0–5-Index 9–13 | 0.10 (0.162) | 0.13 (0.180) | 0.07 (0.133) | 0.05 (0.146) |
| Index 0–5-Index 7–8 | −0.024 (0.143) | 0.08 (0.124) | 0.03 (0.124) | 0.17 (0.106) |
| Index 0–5-Index 6 | −0.10 (0.148) | −0.01 (0.155) | −0.04 (0.136) | −0.05 (0.141) |
| Index 0–6-Index 7–13 | 0.10 (0.107) | 0.02 (0.056) | 0.07 (0.096) | 0.05 (0.051) |

This table documents the monthly abnormal returns, and their associated *t*-statistics in parentheses, associated with trading strategies controlling, as in Tables 10 and 11, for the three Fama-French factors (Fama and French 1993) and the Carhart (1997) momentum factor. Portfolios are constructed by first dividing all stocks in the same other provisions (O) category, 0–5, 6, 7–8, or 9–13, into six entrenchment index categories. The six entrenchment index buckets are entrenchment index scores of 0, 1, 2, 3, 4 and 5–6. A portfolio in a certain O index category is then constructed by calculating the equally weighted return of stocks with the desired O index category across the six entrenchment buckets. Within each bucket, the equally weighted and value-weighted returns of stocks in the same O category were calculated. The monthly abnormal returns associated with going long and short various portfolios was calculated for both the period of September 1990–December 1999 period and the longer period of September 1990–December 2003. The long and short portfolios were adjusted when updated information on firms' corporate governance provisions became available: July 1993; July 1995; February 1998; November 1999; and February 2002. Levels of significance are indicated by *, **, and *** for 10%, 5%, and 1%, respectively.

Accordingly, we calculated the abnormal returns associated with firms' O index scores, controlling for the E index distribution as captured by different E index buckets. To this end, we created six E index buckets, each consisting of all the firms in a given level of the index from 0 to 5, with the small number of firms with E index 6 scores added to the bucket with E index five firms. Following the methodology described earlier, we would for each E index bucket create positions (either equally weighted or value-weighted) consisting of going long all the firms with a given low O index score and short all the firms with a given high O index score in that E level bucket. After doing this, we then created an overall long-short portfolio consisting of an equally weighted position in each of the six long and short positions created for the six E index buckets. As always, we regressed the return associated with this long-short portfolio on the Carhart (1997) four-factor model, with the intercept term being interpreted as the monthly abnormal return associated with this particular trading strategy.

We did the calculations both for the 1990–1999 period and for the 1990–2003 period. The long-short portfolios in O index positions were based on the division of firms into four O index buckets: firms with O index scores between 0 and 5; firms with O index scores of 6; firms with O index scores of 7 or 8; and firms with O index scores of 9 and more. Table 12 contains the results of this analysis.

Out of the sixteen trading strategies analyzed, consisting of going long firms with low O index levels and short firms with high O index levels, none generated statistically significant abnormal returns, even at the 10% level. Indeed, many of the *t*-statistics indicate *p*-values in the range of 80%. In addition to the lack of statistical significance, the coefficients are sometimes negative rather than positive and always small in magnitude, never exceeding 0.17. These results

*What Matters in Corporate Governance?*

are consistent with the view that the O index has little residual explanatory power for returns once the E index is taken into account.

## 5. Concluding Remarks

This article has identified which provisions, among the set of twenty-four IRRC provisions used in the GIM governance index, are negatively correlated with firm performance. We have identified six entrenching provisions that are negatively correlated with firm valuation, as measured by Tobin's $Q$, as well as with stock returns during the 1990–2003 period. We have also found that these provisions fully drive the findings documented by prior research that the IRRC provisions in the aggregate are correlated with Tobin's $Q$, as well as returns during the 1990s.

Our results contribute to our understanding of the relationship between governance and firm value, and provide a basis for future work in several ways. The E index provides a measure that can be used, and is already being used in a large number of studies, by researchers seeking to use in their tests a governance measure not influenced by the noise produced by the other IRRC provisions. The six provisions in the E index are those which researchers, as well as private and public decision makers, should pay most attention. And knowing which provisions matter also provides a useful tool in the inquiry into the cause of the correlation between the IRRC provisions in the aggregate and firm value.

Pursuing fully this inquiry is an important task for future work. We present some evidence that is consistent with the possibility that, in the aggregate, the entrenching provisions bring about or help maintain lower firm valuation. But this evidence does not establish causality and much more work needs to be done. With the key provisions responsible for the correlation with firm value now known, it will be possible to examine whether the answers to these questions vary among the provisions in the E index. We conjecture that the constitutional limitations on shareholder power do bring about, and not merely reflect, lower firm value. In contrast, we conjecture that the correlation that poison pills and golden parachutes have with lower firm value at least partly reflects the greater tendency of managers of firms with lower firm value to adopt takeover readiness provisions.

In constructing the E index, we have followed the standard approach of giving each of the provisions an equal weight and not making this weight conditional on the presence (or absence) of other provisions that might interact with it. An important avenue for future work to explore is the possibility of improving the index by exploring the possibility that some of the provisions in the E index matter more than others and that interactions among them (e.g., having a combination of a staggered board and a poison pill) are important.

Looking beyond the set of IRRC provisions, our analysis cautions against the "kitchen sink" approach of building ever-larger indexes of governance

41

measures. Shareholder advisory firms, including industry leader ISS, have put forward indexes of good corporate governance based on a massive number of provisions, and the development and use of these indexes has put pressure on firms to adjust their arrangements in ways that would improve their index scores. As this article highlights, in any large set of governance provisions, many are likely not to matter or to be an endogenous product of others. Compared with a governance rating scheme based on the key provisions that matter, a governance rating system based on a much larger set can push firms in directions that are counter-productive or at least wasteful, and provides a noisier measure of governance quality. In short, adding more provisions to an index is hardly bound to be beneficial; in this area, less can be more. Shareholders and their advisers might do well to focus on those corporate governance provisions that really matter for firm value.

## Appendix: IRRC Definitions of the Twenty-Four Provisions

### E index provisions

*Staggered board*: a board in which directors are divided into separate classes (typically three) with each class being elected to overlapping terms.

*Limitation on amending bylaws*: a provision limiting shareholders' ability through majority vote to amend the corporate bylaws.

*Limitation on amending the charter*: a provision limiting shareholders' ability through majority vote to amend the corporate charter.

*Supermajority to approve a merger*: a requirement that requires more than a majority of shareholders to approve a merger.

*Golden parachute*: a severance agreement that provides benefits to management/board members in the event of firing, demotion, or resignation following a change in control.

*Poison pill*: a shareholder right that is triggered in the event of an unauthorized change in control that typically renders the target company financially unattractive or dilutes the voting power of the acquirer.

### O index provisions

*Limitation on special meeting*: a provision limiting shareholders' ability to act by calling a special meeting (as opposed to waiting for the regularly scheduled shareholders' meeting).

*Limitation on written consent*: a provision limiting shareholders' ability to act via written consent (as opposed to acting through a vote at the shareholders' meeting).

*Elimination of cumulative voting*: a provision eliminating shareholders' ability to apportion their votes in an election.

*Secret ballot*: a system of voting that ensures management does not look at individual proxy cards.

*Director indemnification*: a charter or bylaw provision indemnifying the firm's officers and directors against certain legal expenses and judgments as a result of their conduct.

*Director indemnification contract*: a contract with individual officers and directors promising indemnification against certain legal expenses and judgments as a result of their conduct.

*Limited director liability*: a provision that limits the personal liability of its directors.

*Compensation plan*: a plan that accelerates benefits in the event of a change in control.

*Severance agreement*: a contract which ensures executives some income protection in the event of losing their positions.

*Unequal voting rights*: a provision by which voting power changes based on certain conditions.

*Blank check preferred stock*: this is stock that, when authorized, gives the board broad discretion in establishing the stock's voting, dividend, and other rights when issued.

*Fair price requirements*: a requirement that a bidder pays all shareholders a "fair price," typically the highest price paid by a bidder prior to a tender offer being made.

*Cash-out law*: a provision that enables shareholders to sell to a controlling shareholder, usually at the highest price recently paid by the controlling shareholder.

*Director duties*: a provision that permits the board to consider nonshareholder interests in evaluating a possible change in control.

*Business combination law*: a law that limits the ability of an acquirer to conduct certain transactions with the acquired company postacquisition.

*Antigreenmail provision*: a provision that prevents an entity from acquiring a block of stock in a company and selling it back to the company at an above-market price.

*Pension parachute*: provisions that limit the ability of an acquirer from using surplus money in a pension plan to fund the acquisition.

*Silver parachute*: a severance agreement that provides benefits to a large number of firm employees in the event of firing, demotion, or resignation following a change in control.

### References

Amit, R., and B. Villalonga. 2006. How Do Family Ownership, Control, and Management Affect Firm Value? *Journal of Financial Economics* 80:385–417.

Bates, T., D. Becher, and M. Lemmon. 2008. Board Classification and Managerial Entrenchment: Evidence from the Market for Corporate Control. *Journal of Financial Economics* 87:656–77.

Bebchuk, L. 2002. The Case against Board Veto in Corporate Takeovers. *University of Chicago Law Review* 69:973–1035.

Bebchuk, L., and A. Cohen. 2005. The Costs of Entrenched Boards. *Journal of Financial Economics* 78:409–33.

Bebchuk, L., A. Cohen, and A. Ferrell. 2004. What Matters in Corporate Governance? Discussion Paper No. 491, John M. Olin Center for Law, Economics, and Business, Harvard Law School.

Bebchuk, L., J. Coates, and G. Subramanian. 2002. The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence & Policy. *Stanford Law Review* 54:887–951.

Bebchuk, L., J. Coates, and G. Subramanian. 2003. The Power of Takeover Defenses. Working Paper, Harvard Law School and NBER.

Bebchuk, L., A. Cohen, and C. Wang. 2008. Golden Parachutes and Corporate Acquisitions. Working Paper, Harvard Law School and NBER.

Bebchuk, L., and J. Fried. 2004. *Pay Without Performance: The Unfulfilled Promise of Executive Compensation.* Cambridge, MA: Harvard University Press.

Bebchuk, L., and L. Stole. 1993. Do Short-Term Managerial Objectives Lead to Under- or Over-Investment in Long-Term Projects? *Journal of Finance* 48:719–29.

Bertrand, M., and S. Mullainathan. 1999. Is There Discretion in Wage Setting? *Rand Journal of Economics* 30:535–54.

Bertrand, M., and S. Mullainathan. 2003. Enjoying the Quiet Life? Managerial Behavior Following Anti-takeover Legislation. *Journal of Political Economy* 11:1043–75.

Bhagat, S., and B. Bolton. 2008. Corporate Governance and Firm Performance. *Journal of Corporate Finance* 14:257–73.

Black, B., B. Cheffins, and M. Klausner. 2006. Outside Director Liability. *Stanford Law Review* 58:1055–159.

43

Borokhovich, K., B. Kelly, and R. Parrino. 1997. CEO Contracting and Antitakeover Amendments. *Journal of Finance* 52:1495–517.

Brown, L., and M. Caylor. 2006. Corporate Governance and Firm Valuation. *Journal of Accounting and Public Policy* 25:409–34.

Clark, R. 1986. *Corporate Law*. Little, Brown & Company Limited, Printed in the United States of America.

Carhart, M. 1997. On Persistence in Mutual Fund Performance. *Journal of Finance* 52:57–82.

Chung, K., and S. Pruitt. 1994. A Simple Approximation of Tobin's *Q*. *Financial Management* 23:70–74.

Coates, J. 2000. Takeover Defenses in the Shadow of the Pill: A Critique of the Scientific Evidence. *Texas Law Review* 79:271–382.

Cremers, M., and V. Nair. 2005. Governance Mechanisms and Equity Prices. *Journal of Finance* 60:2859–94.

Cremers, M., V. Nair, and K. John. 2008. Takeovers and the Cross-Section of Returns. *Review of Financial Studies*. Advance Access published on April 2, 2008. 10.1093/rfs/hhn032.

Cremers, M., V. Nair, and U. Peyer. Forthcoming. Takeover Defenses and Competition. *Journal of Empirical Legal Studies*.

Cremers, M., V. Nair, and C. Wei. 2007. Governance Mechanisms and Bond Prices. *Review of Financial Studies* 20:1359–88.

Daines, R. 2001. Does Delaware Law Improve Firm Value? *Journal of Financial Economics* 62:559–71.

Demsetz, H., and K. Lehn. 1985. The Structure of Corporate Ownership: Causes and Consequences. *Journal of Political Economy* 93:1155–77.

Dittmar, A., and J. Mahrt-Smith. 2007. Corporate Governance and the Value of Cash Holdings. *Journal of Financial Economics* 83:599–634.

Faleye, O. 2007. Classified Boards, Firm Value, and Managerial Entrenchment. *Journal of Financial Economics* 83:501–29.

Fama, E., and K. French. 1993. Common Risk Factors in the Returns on Bonds and Stocks. *Journal of Financial Economics* 33:3–53.

Fama, E., and K. French. 1997. Industry Costs of Equity. *Journal of Financial Economics* 93:153–94.

Garvey, G., and G. Hanka. 1999. Capital Structure and Corporate Control: The Effect of Antitakeover Statutes on Firm Leverage. *Journal of Finance* 54:519–46.

Georgeson Shareholder. 2003. *Annual Corporate Governance Review*. http://www.georgeson.com/usa/resources_research.php (accessed November 14, 2008).

Georgeson Shareholder. 2004. *Annual Corporate Governance Review*. http://www.georgeson.com/usa/resources_research.php (accessed November 14, 2008).

Gompers, P., J. Ishii, and A. Metrick. 2003. Corporate Governance and Equity Prices. *Quarterly Journal of Economics* 118:107–55.

Guo, R., T. Kruse, and T. Nohel. 2008. Undoing the Powerful Anti-Takeover Force of Staggered Boards. *Journal of Corporate Finance* 14:274–88.

Harford, J., S. Mansi, and W. Maxwell. 2008. Corporate Governance and Firm Cash Holdings. *Journal of Financial Economics* 87:535–55.

Investor Responsibility Research Center (IRRC) (1990, 1993, 1995, 1998, 2000, 2002). Corporate Takeover Defenses. Washington: D.C.

John, K., and L. Litov. 2006. Corporate Governance and Financing Policy: New Evidence. Working Paper, Olin School of Business and Stern School.

*What Matters in Corporate Governance?*

Johnson, M., and R. Rao. 1997. The Impact of Antitakeover Amendments on Corporate Financial Performance. *Financial Review* 32:659–90.

Kadyrzhanova, D. 2006. Does Governance Pay, or Is Entrenchment the Way? Merger Gains and Antitakeover Provisions. Working Paper, Columbia University.

Kaplan, S., and L. Zingales. 1997. Do Investment-Cash Flow Sensitivities Provide Useful Measures of Financing Constraints? *Quarterly Journal of Economics* 112:169–216.

Klock, M., S. Mansi, and W. Maxwell. 2005. Does Corporate Governance Matter to Bondholders? *Journal of Financial and Quantitative Analysis* 40:693–719.

La Porta, R., F. Lopez-de-Silanes, A. Shleifer, and R. Vishny. 1998. Law and Finance. *Journal of Political Economy* 106:1113–55.

La Porta, R., F. Lopez-de-Silanes, A. Shleifer, and R. Vishny. 2002. Investor Protection and Corporate Valuation. *Journal of Finance* 57:1147–70.

Lambert, R., and D. Larker. 1985. Golden Parachutes, Executive Decision-Making and Shareholder Wealth. *Journal of Accounting and Economics* 7:179–203.

Lang, L., and R. Stulz. 1994. Tobin's *Q*, Corporate Diversification, and Firm Performance. *Journal of Political Economy* 102:1248–80.

Lehn, K., S. Patro, and M. Zhao. 2006. Governance Indices and Valuation Multiples: Which Causes Which? Working Paper, University of Pittsburgh and Bentley College.

Manne, H. 1965. Mergers and the Market for Corporate Control. *Journal of Political Economy* 73:110–20.

Masulis, R.W., C. Wang, and F. Xie. 2007. Corporate Governance and Acquirer Returns. *Journal of Finance* 62:1851–89.

McConnell, J., and H. Servaes. 1990. Additional Evidence on Equity Ownership and Corporate Value. *Journal of Financial Economics* 27:595–612.

Morck, R., A. Shleifer, and R. Vishny. 1988. Management Ownership and Market Valuation: An Empirical Analysis. *Journal of Financial Economics* 20:293–315.

Perez-Gonzalez, F. 2006. Inherited Control and Firm Performance. *American Economic Review* 30:1559–88.

Ryngaert, M. 1988. The Effect of Poison Pill Securities on Shareholder Wealth. *Journal of Financial Economics* 20:377–417.

Shin, H., and R. Stulz. 2000. Firm Value, Risk, and Growth Opportunities. Working Paper No. 7808, NBER.

Stein, J. 1988. Takeover Threats and Managerial Myopia. *Journal of Political Economy* 96:61–80.

Stulz, R. 1988. Managerial Control of Voting Rights. *Journal of Financial Economics* 20:25–54.

White, H. 1980. A Heteroskedasticity-Consistent Covariance Matrix Estimator and a Direct Test for Heteroskedasticity. *Econometrica* 48:817–38.

Wilcox, J. 2002. Tow Cheers for Staggered Boards. *Corporate Governance Advisor* 10:1–5.

45

# EXHIBIT  E

# THIRTY YEARS OF CORPORATE GOVERNANCE: FIRM VALUATION & STOCK RETURNS

Martijn Cremers

Yale School of Management

martijn.cremers@yale.edu

Allen Ferrell

Harvard Law School

fferrell@law.harvard.edu

*November 2009*

## Abstract

This paper introduces a dataset tracking approximately 1,000 firms' G- and E-index scores, as well the individual corporate governance provisions constituting these indexes, over the 1978-1989 period. Combining this data with the 1990-2006 IRRC data, we are able to track firms' corporate governance over a thirty year period. Most governance changes occurred during the 1980s (with relative stability thereafter). We find a robustly negative association between the G- and E-Index and Tobin's Q for the 1978-2006 period, even when using firm fixed effects, and little direct evidence for reverse causation. The negative firm valuation effects of classified boards, poison pills and G-Index was significantly greater after the judicial approval of the poison pill in 1985 in a landmark Delaware Supreme Court decision. This decision can be considered as a largely unanticipated, exogenous shock to corporate governance. Moreover, G-Index changes have a stronger negative association with firm valuation when a firm is in an industry experiencing "high" levels of M&A activity. Finally, we find a robust positive association between "good" corporate governance and abnormal returns for the 1978-2006 period. The abnormal returns association with governance was strongest in the beginning of our 1978-2006 time period and generally declining thereafter, consistent with an explanation of these returns based on the market learning the importance of good governance.

For helpful comments, we are grateful to Reena Aggarwal, Lucian Bebchuk, John Coates, Alma Cohen, Shane Johnson, András Marosi, Andrew Metrick, Ted Moorman, Randall Morck, Warren Stern, Leo Strine and seminar participants at the Harvard Law, Economics and Organization Research Workshop, Corporate Governance Research Conference organized by Harvard Law School/Sloan Foundation, The Financial Crisis and Corporate Governance Conference at Ono Academic College, NBER Law & Economics (Summer 2009), Frontiers of Finance 2009 conference in Banff, the Einaudi Institute for Economics and Finance in Rome, Italy, the University of Illinois, the University of Virginia and Yale University. We would like to thank Harvard Law School, the John M. Olin Foundation in Law, Economics and Business at Harvard Law School, Yale's Millstein Center for Corporate Governance and Performance, and the Robert C. Clark Corporate Governance Fund for their generous financial support. We would also like to thank the Delaware Division of Corporations for its kind provision of charters, the Corporate Library for providing us their coding of state defaults and our research assistants, Haroon Baryalay, Johnson Elugbadebo, Hui Liu and Bing Shuai.

# I. INTRODUCTION

In this paper, we introduce a comprehensive corporate governance database starting in 1978 and ending in 1989, which tracks for a sample of approximately 1,000 unique firms whether these firms had any of the 24 corporate governance variables that constitute the G-Index of Gompers, Ishii and Metrick (2003). The computation of this index for the 1990-2006 period is based on data compiled by the IRRC (Investor Responsibility Research Center) albeit with us correcting in some of our specifications some coding issues with the 1990-2006 IRRC data. The IRRC database became very prominent in empirical corporate governance research after the introduction of the G-Index and the documentation of its strong empirical link between governance and equity prices in Gompers, Ishii and Metrick (2003). The G-Index is a composite of the twenty-four variables, adding one point if any of the provisions is present, where a higher score indicates more restrictions on shareholder rights or a greater number of anti-takeover measures. The E-Index of Bebchuk, Cohen, and Ferrell (2009) is based on six of the twenty-four G-Index provisions.

Based on our corporate governance database, we calculate each firm's G-Index and E-Index scores starting in 1978. By combining our dataset with the IRRC database which covers the 1990-2006 time period, we obtain comprehensive corporate governance data for the 1978-2006 time period. In turn, we combine this corporate governance data with data on M&A activity, firm financials, institutional ownership, and stock returns.

Besides the introduction of our database, our focus in this paper is two-fold: the relationship between governance and firm valuation and the relationship between governance and abnormal stock returns over the 1978-2006 time period. The importance of having data for the 1978 – 1989 period is underscored by the fact that this period is characterized by widespread corporate governance changes (i.g., changes in firms' G-Index and E-Index scores), while after 1990 such changes largely cease. For example, the median G-Index score equals 5 from 1978 – 1983, then increases by one a year until 1989, while the distribution of the G-Index remains basically constant after 1990. Further, four out of the six E-Index provisions (supermajority voting requirement for merger approval, classified board, poison pill and golden parachute) experienced dramatic increases in their incidence during the 1978-1989 period, with their incidences remaining relatively stable thereafter.

A second reason for the value of including data from this period in analyzing these relationships, besides the time variation in corporate governance arrangements, is the fact that both M&A activity and the law surrounding the use of antitakeover defenses (and specifically when a

target board's can deploy them to fend off unwanted acquisition offers in a manner consistent with the board's fiduciary obligations to its shareholders) was in considerable flux during the 1978-1989 period. As a result, this period is characterized by significant cross-sectional and time variation in how much governance can ex ante be expected to matter, both of which we will exploit in our analysis.

Turning to the central issue of the relationship between governance and firm valuation, we find a robust statistically significant negative association between poor governance and firm valuation over the 1978-2006 period. In particular, the inclusion of firm fixed effects in pooled panel regressions mitigates the endogeneity of firms adopting governance provisions depending on their heterogeneous circumstances. Using both firm and year fixed effects, we document a robust negative and economically meaningful association between the G-Index and Tobin's Q. This finding survives various robustness checks. The economic magnitude of the association seems meaningful. For example, over the full time period and using both firm and year fixed effects, the coefficient of the G-Index equals -0.011 implies that a one standard deviation increase of the G-Index (3.0) is associated with a decrease in firm value of about 3.3%.

We find, however, no evidence in support of the "reverse causation" explanation for this negative association in the 1978-1989 period, i.e. that firms with lower firm value tended to adopt more G- and E-Index provisions. In fact, we find that the higher valued firms tended to adopt more provisions, although this relationship disappears once firm and year fixed effects are included. The "reverse causation" may play a (economically very minor) role in explaining changes in firms' corporate governance in the 1990-2006 time period.

In order to more fully understand the relationship between governance and firm valuation, we explore whether governance affects firm valuation through a takeover channel, i.e. by affecting the probability of a firm receiving and accepting a takeover bid and, hence, target shareholders receiving an attractive takeover premium. We undertake three sets of analyses along these lines. First, we examine the impact on governance's firm valuation effects of the Delaware Supreme Court's seminal decision in 1985 in the *Moran v. Household International* decision, which for the first time judicially validated the adoption of a poison pill as within the authority vested with a target firm's board and subject to the most relaxed form of judicial review, the business judgment rule. This decision is widely seen, both at the time as well as today, by corporate law practitioners and corporate law scholars as a central legal event opening the way for target companies to deploy takeover defenses. The decision in *Household*, however, was not expected, as evidenced by the discussions and debates among prominent corporate lawyers and scholars prior to 1985 and the fact that the Securities and Exchange Commission filed a brief in *Household* arguing that the use

3

of the poison pill was illegal. Consistent with a causal relationship between governance and firm value and the potential importance of a takeover channel, we find that the negative effect on firm valuation of certain antitakeover provisions (classified boards, poison pills and the G-Index generally) only exists after the *Household* decision (with generally no effect before 1985).[1]

Second, if poor governance reduces firm value by reducing the likelihood of an attractive offer being received and accepted by the board, then the negative effects of poor governance should be particularly powerful when a firm in a given year happens to be in an industry experiencing "high" levels of M&A activity relative to firms in industries experiencing "low" levels. It is worth noting that M&A activity occurs in industry waves (see e.g. Mitchell and Mulherin (1996)) in response to unexpected exogenous shocks to industry structure, regulation or technological innovation. And, indeed, we document that increases in a firm's G-Index score have a larger negative effect on firm valuation when a firm happens to be in an industry that is experiencing "high" levels of M&A activity relative to a firm that increase its G-Index score but is in an industry experiencing "low" levels of M&A activity in that particular year. This interaction effect is economically meaningful with a one point increase in the G-Index during the 1978-2006 period being associated with an approximately 50% larger negative impact on firm valuation when that firm happens to be an industry with a "high" level of M&A activity relative to being in an industry with a "low" level of M&A activity.

Third, we examine the relationship between governance and operating performance, another plausible channel by which governance can affect firm valuation other than a takeover channel (recognizing of course that these two channels are not mutually exclusive and are complementary in that the disciplinary effect of a possible takeover could potentially improve existing management's incentives). While we fail to identify any strong and robust statistical association between accounting profits or sales growth and governance over the 1978-2006 period in the time series, we do document a strongly negative relationship between corporate governance and operating performance in the cross-section.

Turning to the relationship between firm valuation and abnormal stock returns, Gompers, Ishii and Metrick (2003) document that firms with higher (lower) G-Index scores have lower (higher) subsequent stock returns. This finding has generated a substantial literature with a number of explanations, see e.g. Cremers and Nair (2005), Core, Guay, and Rusticus (2006), Johnson, Moorman, and Sorescu (2008), Bebchuk, Cohen and Ferrell (2009) and Cremers, Nair and John

---

[1] Classified boards are far more potent as an antitakeover defense when used in conjunction with a poison pill, see e.g. Gilson (1981) and Bebchuk and Cohen (2005); Bebchuk, Coates, and Subramanian (2002).

4

(2009). Our longer time period and the time variation in corporate governance arrangements, enable us to make a number of findings bearing on this literature.

For the full 1978-2007 time period, whether using value-weighted or equally-weighted portfolios, there are positive, strongly statistically significant positive abnormal returns (using the Fama-French-Cahart four-factor model) associated with going long good corporate governance firms and shorting those with poor governance (whether proxying the quality of corporate governance by the G- or E-Index). For example, the value-weighted long-short portfolio that buys (sells) firms with G-Index scores in the lowest (highest) decile group earns annualized abnormal stock returns of 2.83% over 1978-2007.

Second, the abnormal returns for equally-weighted portfolios over the 1978-2007 period are robust to industry-adjusting as in Johnson, Moorman, and Sorescu (2008). For example, the equally-weighted long-short portfolio that buys (sells) firms with G-Index scores in the lowest (highest) decile group earns annualized abnormal stock returns adjusted for industry exposure of 3.32% over 1978-2007. However, the abnormal returns of the value-weighted portfolios are not robust to industry-adjusting.

Third, our analysis of returns suggest that governance seems to matter most for smaller capitalization stocks and that the association between governance and abnormal returns generally appears to decline over our time period. Specifically, the time trend for equally-weighted abnormal returns is strongly statistically negative over the 1978-2007 period. Further, the governance-related abnormal returns over 1990-2007 are all insignificant, for both value and equally-weighted portfolios, and with or without industry-adjusting the stock returns.

While speculative, we interpret these governance-related abnormal return findings as consistent with 'learning,' i.e., investors learned gradually over time the importance of good governance, which is reflected in the fact that abnormal returns were largest in the beginning of our time period and then generally declined thereafter. On the other hand, we fail to find evidence for a risk-based explanation for the abnormal return results (Cremers, Nair and John (2009)). Nor do we find evidence for an explanation based on managers adopting G-Index provisions in anticipation of poor operating performance or evidence for the explanation that there are "other characteristics" associated both with being a low or high G-Index firms and abnormal stock returns.

The remainder of this paper is organized as follows. Part II describes the data. As one of the major contributions of this paper is the introduction of the new dataset of corporate governance provisions over 1978-1989 (inclusive) period, we go into significant detail on the data collection process and how the data compares to the IRRC sample. Part III explores the relationship between

governance and firm valuation over the 1978-2006 time period as well as the issue of whether low-valued firms tend to adopt more G-Index provisions. In Part IV, we examine whether the negative firm valuation effects of poor governance are attributable to a takeover channel. This includes our analysis of the effect of the *Household* decision, the interaction of industry-level M&A activity and firms' G-Index scores, and the relationship between governance and operating performance. Part V investigates abnormal stock returns accruing to governance-sorted portfolios and Part VI concludes.

## II. Data

In this paper, we focus on the G-Index, a shareholder rights index introduced by Gompers, Ishii and Metrick (2003) that is based on 24 provisions, and its relationship with firm value and stock returns. A higher G-Index score indicates more restrictions on shareholder rights or a greater number of anti-takeover measures. We also consider the E-Index of Bebchuk, Cohen, and Ferrell (2009), which is based on six of the twenty-four G-Index provisions. In the remainder of this section, we provide significant detail of the various provisions of the G-Index and our coding of these variables for the 1978-1989 period.

Table I provides descriptive statistics of both indices, plus all of the other variables used in this paper. The main other variable of interest is our proxy for firm value, Tobin's Q.[2] This follows a substantial literature on the association between firm value and various corporate arrangements, which extensively used Tobin's Q as a measure of firm value (e.g., Demsetz and Lehn (1985); Morck, Shleifer, and Vishny (1988); Lang and Stulz (1994); Yermack (1996); and Gompers, Ishii, and Metrick (2003)). We industry-adjust Tobin's Q by deducting the median Q for that year of the firm's 48 Fama-French industry group, using all firm's in Compustat.

*1. The 1978-2006 Corporate Governance Dataset*

RiskMetrics (which acquired the Investor Responsibility Research Center (IRRC)) has maintained a corporate governance database which has served as an extremely important source of data on firms' corporate governance provisions beginning as of 1990 since the publication of Gompers, Ishii & Metrick (2003). The IRRC data has now been used in a large number of published academic articles on corporate governance plus many more that are currently still in

---

[2] Tobin's Q is the ratio of market-to-book of the firm. We calculate Tobin's Q as (data199*data25+data6-data60-data74)/data6, where data199 is the stock price at the end of the fiscal year, data25 is the number of shares outstanding, data6 is the book value of total assets, data60 is the book value of equity, and data74 is the amount of deferred taxes. If data199 is missing, we use data24 instead. If data74 is missing, it is set to zero.

working paper form. The IRRC database covers a number of firm-level corporate governance provisions, firms' states of incorporation, a firm's governing corporate law statutes and firm opt-ins and opt-outs thereto. A number of the firm-level provisions concern the presence of takeover provisions (such as classified boards and poison pills), the presence of certain types of compensation arrangements (such as golden parachutes and compensation plans), and a variety of additional provisions that affect the balance of power between managers and shareholders (such as supermajority voting requirements for amending the firm's charter or bylaw). The G-Index, which consists of twenty-four corporate governance provisions, is based on the IRRC's firm-level corporate governance provisions and a firm's governing state corporate law statutes (and opt-ins and opt-outs thereto).

In total, the IRRC corporate governance database covers twenty-three firm-level corporate governance provisions for selected firms in 1990, 1993, 1995, 1998, 2000, 2002, 2004 and 2006. Each volume contains data for between 1,400 and 1,800 firms for the selected year. In any given year of publication, the firms in the IRRC volume accounted for more than 90% of the total U.S. stock market capitalization (Bebchuk, Cohen and Ferrell (2009)). The IRRC also contains data on firm's governing state corporate law statutes and opt-ins and opt-outs thereto. The IRRC corporate governance database does not include any of this data prior to 1990. As a result, information on firms' G-Index scores has simply not been available on a similar comprehensive basis for earlier time periods. As a result, studies using the IRRC database have been forced to begin their analysis in 1990.

We have comprehensively collected data for the 1978-1989 time period (inclusive) with annual updates on (i) firms' firm-level corporate governance provisions (including those variables tracked by the IRRC for the 1990-2006 time period); (ii) state corporate law statutes (including those tracked by the IRRC for the 1990-2006 time period); and (iii) states' corporate law default rules (this last category not being tracked by the IRRC at all). We also track firm-level corporate governance provisions for the 1978-1989 time period beyond those tracked by the IRRC (and utilized by the G- and E-Indexes), but will not include a description here of the data collection process for these additional variables given that we confine our attention in this paper to the G- and E-Indexes and their constituent corporate governance variables.[3]

---

[3] These additional corporate governance variables include: (1) whether the board or shareholders are granted the power to fill vacancies on the board; (2) maximum board size; (3) actual board size; and (4) whether shareholders have the power, by majority vote, to remove a director with or without cause (or whether, instead, a supermajority vote is required for removal or director removal by shareholders is limited to "for cause"). These additional corporate governance variables can arguably be quite consequential. Whether the current directors or the shareholders have the power to fill vacancies on a board, such as a vacancy caused by death, resignation or an increase in the board's size (variable 1) can be quite important in different contexts. For example, a board that can increase the size of the board and unilaterally appoint the directors that will fill the vacancies thereby created can

7

We then combined our dataset with the corporate governance data maintained by IRRC for the 1990-2006 period resulting in a corporate governance dataset covering a total of about 2,200 of firms over the 1978-2006 (inclusive) time period. Next, we combined the resulting 1978-2006 corporate governance database with (i) Compustat data containing financial data on each firm for the 1978-2006 period; (ii) CRSP return data for the 1978-2006 period; (iii) SDC Platinum's data on merger and acquisition activity for the 1979-2006 period, including data on friendly, leverage buyout and hostile takeovers;[4] and (iv) Thompson Financial data of institutional holdings (13F).

We will describe our construction of our 1978-1989 corporate governance dataset in five steps. First, we will provide an overview of the content of our corporate governance database. Second, we address the compatibility of our dataset with that of the IRRC, which covers the subsequent 1990-2006 time period. Third, we provide a description how the firms were selected for inclusion in our dataset. Fourth, we describe the wide variety of the data used to gather information on firms' firm-level corporate governance provisions, state corporate law statutes, state corporate law default rules and opt-in and opt-outs thereto. Fifth and finally, we describe various controls we conducted to ensure the accuracy and completeness of our data.

*2. Content of the 1978-1989 Corporate Governance Database*

### a. Firm-Level Corporate Governance Provisions

The twenty-three IRRC firm-level corporate governance variables we track, which are also used in part in the construction of the G- and E-Indexes, for the 1978-1989 (inclusive) time period are: (1) cumulative voting; (2) poison pill; (3) confidential (secret) voting; (4) unequal voting; (5) dual-class shares; (6) classified board; (7) fair price provisions; (8) director indemnification provisions; (9) limits on the ability of shareholders to amend the corporate charters; (10) limits on the ability of shareholders to amend the corporate bylaws; (11) supermajority voting requirements for mergers; (12) anti-greenmail provisions; (13) limits on director liability; (14) limits on the ability of shareholders to call special meetings; (15) limits on the ability of shareholders to act by written consent; (16) pension parachutes; (17) golden parachutes; (18) silver parachutes; (19) compensation plans; (20) severance agreements; (21) director indemnification contracts; (22)

---

effectively "pack" the board (Coates 2001). Whether the board's size can, in fact, be increased will turn on the difference between actual and maximum board size (variables 2 and 3). Actual board size can also modify the effects of a firm having cumulative voting (variable 3). In general, the impact of cumulative voting tends to become less important as the board size decreases (Bhagat & Brickley 1984). Whether shareholders have the power to remove a director without cause can obviously affect the balance of power between shareholders and management (variable 4). We also coded state defaults, which are relevant when the firm's charter or bylaw is silent on an issue, with respect to whether a majority of shareholders can fill board vacancies (relevant to variable 1) and whether a majority of shareholders under the state's default rule can fire directors without cause (variable 4).

[4] The SDC Platinum merger and acquisition data begins in 1979 and not 1978.

blank check preferred; and a (23) firm's state of incorporation. The definitions of these variables are contained in the introduction to the 1990 IRRC volume as well as the appendix to Gompers, Ishii, and Metrick (2003). For every year for every firm in our database for the 1978-1989 time period, we attempted to code the presence or absence of these twenty-three firm-level corporate governance variables.

### b. State Defaults

Unlike the IRRC database, we also coded for several state defaults (i.e., the governing state rule when the company's charter or bylaw is silent on an issue) which can be quite important. Specifically, we coded for whether the state's default is to limit the ability of shareholders to call a special meeting (relevant to variable 14) and whether the state default is to limit the shareholders' ability to act be written consent (relevant to variable 15). State defaults were based on our researching the history of states' corporate law codes during the 1978-1989 period which was then double-checked against Coates (2001) and the Corporate Library's coding of these state defaults.

### c. State Corporate Law Statutes

Whether a firm was subject to any of the following state corporate law statutes (information that is also necessary for constructing the G- and E-Indexes) was also coded: (1) business combination laws; (2) control share cash-out statutes; (3) control share acquisition statutes; (4) fair price statutes; (5) directors' duties statutes; (6) anti-greenmail statutes; (7) mandatory cumulative voting statutes; and (8) director liability statutes. The year of a statute's adoption was also coded to ensure that prior to adoption firms incorporated in that state were not treated as subject to the statute. The IRRC coded the first six types of antitakeover statutes, but not the last two – mandatory cumulative voting and director liability statutes – although the IRRC did track cumulative voting and director liability provisions if they were adopted by a firm by virtue of a provision in their charter or bylaw.

We collected information on state corporate law statutes from a number of sources. We gathered information on state antitakeover statutes from Jarrell & Bradley (1980), Bhagat & Brickley (1984), Gilson (1988), Karpoff & Malatesta (1989), Mahla (1991), IRRC STATE TAKEOVER LAWS (1999), and Betrand and Mullainathan (2003). For some state statutes, firms in their charters or bylaws could, if they wanted to, opt-out (or more rarely opt-in) of a state statute. Accordingly, whether firms opted-out or opted-in to any of the above state statutes in their charter or bylaw was also coded for when we coded firms' charters and bylaws.

Based on this data we coded for each firm in our database their E-Index score and their G-Index score.[5]

### 3. Compatibility of the C-F Database with the IRRC Database

Substantial effort was taken to ensure that our coding of the IRRC variables during the 1978-1989 time period was consistent with the coding by the IRRC over the 1990-2006 time period. This was important given our goal of combining our database with the IRRC database to construct a comprehensive corporate governance database covering the entire 1978-2006 period.

Given the importance we attached to compatibility, we began our data collection by developing a detailed coding protocol for the twenty-three firm-level provisions that the G-Index is, in part, based on.[6] The coding protocol was based on replicating IRRC's coding for these twenty-three firm-level variables in the year 1990 for two hundred randomly selected firms covered by the 1990 IRRC volume. This was done by collecting and analyzing the two hundred firms' 1990 10-K, 10-Q, and documents and contracts attached thereto (which included firms' charters and bylaws and contracts relating to compensation arrangements). We then researched the applicable state corporate law, including state default rules, to calculate the presence or absence of each of the twenty-four G-Index provisions as of 1990.

Based on our (re-)construction of the IRRC coding protocol, we adopted the same coding protocol for nineteen of the twenty-four G-Index corporate governance variables. The remaining five G-Index variables – limits on the ability of shareholders to call special meeting, limits on the ability of shareholders to act by written consent, limits on anti-greenmail, limits on director liability and director duties – were not coded using the IRRC coding protocol we developed. The reason for this divergence with respect to the limits on the ability to call a special meeting variable is that the IRRC treats a firm as having no limit on the ability to call a special meeting if the firm's charter or bylaw is silent on the issue. However, for a number of states, including most prominently Delaware, the default is that shareholders cannot call a special meeting. A similar issue arises for limits on written consent. The state default in a number of states, such as New York and Ohio, is that a majority of shareholders cannot act by written consent. In other words, for both

---

[5] The G-Index of a firm is the sum of the number of the following 24 provisions a firm has either by virtue of state law or a firm-level provision: (1) classified board; (2) limitation on amending bylaws; (3) limitation on amending the charter; (4) supermajority to approve a merger; (5) golden parachute; (6) poison pill; (7) limitation on special meeting; (8) limitation on written consent; (9) elimination of cumulative voting; (10) no secret ballot; (11) director indemnification; (12) director indemnification contract; (13) limited director liability; (14) compensation plan; (15) severance agreement; (16) unequal voting rights; (17) blank check preferred; (18) fair price requirements; (19) control share cash-out; (20) director duties; (21) business combination statute; (22) anti-greenmail provision: (23) pension parachute; and (24) silver parachute. A firm's E-Index is the sum of the first six of these provisions.
[6] The only G-Index provision that is calculated purely by examining a firm's governing state corporate law (and opt-ins and opt-outs thereto) is the control share cash-out variable.

limits on special meeting and written consent silence in the charter or bylaws does not necessarily mean there are in fact no limits.

A second difference from IRRC is the number of state corporate law statutes we identify. This affects our coding of the anti-greenmail, limits on director liability and director duties variables (as will be documented in Table II, this only makes a material difference for the last two variables). As for anti-greenmail statutes, we agree with all five states identified as having anti-greenmail statutes in the IRRC database (AZ, MN, NY, TN and WI) but with one addition. Michigan as of 1988 had an anti-greenmail statute, still in effect as of 1990, which is not coded as such in the IRRC. In addition to coding for charter and bylaw provisions that limit director liability, as IRRC also does, we identified five state statutes adopted during the 1980s that limited director liability without the need for a charter or bylaw provision (IN, OH, FL, WI and ME), so-called self-executing director liability statutes. Finally, as for director duties statutes, only two states (IN and PA) were identified as having these statutes in 1990 in the IRRC. We have identified a total of nineteen states (GA, HI, IA, ID, IL, IN, KY, LA, MA, ME, MI, MN, MY, NJ, NM, NY, OH, OR, and WI) that had a director duties statute at some point in the 1980s, all of which were in effect in 1990 (with a number of additional states passing director duties statutes in the 1990s such as Pennsylvania in 1990).

In order to test the compatibility as well as the accuracy of our coding, we compared the incidence of the twenty-four G-Index provisions as of 1989 in our database to the incidence of these provisions as reflected in the IRRC database as of 1990. This comparison is presented in Table II. For the nineteen G-Index provisions for which we used the same coding protocol as the IRRC, there were only two noticeable discrepancies. The incidence of director indemnification in our dataset is 96% while the IRRC reports an incidence of 41%. After checking a number of instances in which the IRRC reports no director indemnification provision against the firm's charter, we conclude that the IRRC has very substantially underreported the incidence of this provision. The second discrepancy is the incidence of blank check which is far higher in the IRRC database (76% versus 24% in our database). As for this variable, we have concluded that the IRRC's figure is likely the more accurate number given the spotty reporting of blank checks in firm's 10-Ks, our primary source of information for this variable. It is worth noting that the error in our blank check variable is a Type II error, i.e. our identification of firms with blank check is accurate but does not identify all firms with blank check. We have rerun the results reported in this paper without using the blank check variable and they remain qualitatively unaltered.

There are three other noticeable discrepancies between our data and that of the IRRC, as is obvious from Table II, and that is the incidence of limits on special meeting (88% in 1989 versus

24% in 1990), limits on written consent (71% in 1989 versus 24% in 1990) and director duties (38% in 1989 versus 10% in 1990). However, these discrepancies are not surprising given that we used a different coding protocol for these three variables than that used by the IRRC. Using our best efforts to incorporate state defaults for the first two of these variables and the additional director duties statutes and incorporating this information into the IRRC's 1990 data, these discrepancies largely disappear (limits on special meeting in 1989 having an incidence of 88% versus 75% in 1990; limits on written consent having an incidence of 71% in 1989 and 64% in 1990; and director duties having an incidence of 38% in both 1989 and 1990).

Given these differences in coding of the G-Index provisions by IRRC and us, we constructed a "corrected" version of the G-Index for the 1990-2006 period, which we used in our analysis unless otherwise noted. In calculating the "corrected" version of the G-Index, we coded for the additional state statutes that we identified that affect the presence or absence of a G-Index variable. As a result, we collected data not only on state corporate law statutes in the 1978-1989 period but for the 1990-2006 period as well. This additional information affected the coding in the 1990-2006 period of the director duties, anti-greenmail, limitation on director liability, limitation on written consent and limitation on special meeting variables.[7]

We also create a G-Subgroup Index consisting of eighteen of the twenty-four G-Index provisions for which these coding differences were not an issue and calculated the value of this Subgroup for both the 1978-1989 time period as well as the 1990-2006 period using IRRC data. We used this G-Subgroup Index in various robustness checks to ensure that our results were not being driven by these differences in coding between our coding of the G-Index provisions for 1978-1989 versus the IRRC's coding for 1990-2006. The six provisions that were not included in our G-Subgroup Index were: limitation on special meeting, limitation on written consent, director indemnification, limits on director liability, blank check preferred and director duties. Finally, we also use as a robustness check the actual G-Index score as reported in IRRC for the 1990-2006 time period, which we label G-Index Uncorrected.

*4. Firms Covered*

The 1978 panel set in our database was based on an initial list of all firms that appear either (1) on the 1978 Fortune 1,000 list of firms; (2) in the S&P 500 as of January 1, 1978; or (3) had more than one billion dollars in sales for 1977 as reported in Compustat. The year 1977 was used for sales because inclusion in the Fortune 1,000 is based on 1977 data. Any firms that meet any of

---

[7] We assumed that a state's corporate law default rule constitutes the actual firm-level provision for purposes of calculating limitations on written consent and limitations on special meeting in the 1990-2006 period.

these three criteria were included in our 1978 panel if they met the following two additional conditions: (1) the firm was also tracked in the CRSP/Compustat merged database for 1978 (and could, therefore, be assigned a firm-specific CRSP permo number); and (2) had filed either a 10-K or proxy statement at any point in the 1978-1989 as reflected in the comprehensive SEC reports contained in the microfilm database at Harvard Business School's Baker Library – the primary source for SEC reports used in constructing our database – or, alternatively, in Thomson Financial. Thomson Financial was used, as it would on occasion (albeit rarely) have SEC filings not available on microfilm at the Baker Library. The vast majority of firms on our initial list had, in fact, permco numbers and had filed a 10-K or proxy statement during the 1978-1989 period. There were, in total, 1,079 firms in our 1978 panel set.

Given the rate of drop-outs, due to factors such as acquisition, bankruptcy and going-private activity, we updated our database at two five-year intervals: 1983 and 1988. The year 1983 is interesting as it is around the start of a huge boom in acquisition activity in the 1983-1987 period, while the year 1988 is interesting as it immediately presages the collapse of the takeover market, in particular the hostile takeover market, in the late 1980s. The 1983 panel set consisted of all firms that appear on the 1983 Fortune 500 list (the Fortune 1,000 list was not published in 1983); all firms in the S&P 500 as of January 1, 1983; and all firms with more than one billion dollars in sales in 1982 as reported in Compustat if, as with the 1978 panel set, (1) the firm was also tracked in the CRSP/Compustat merged database for 1983; and (2) had filed a 10-K or proxy statement in the 1983-1989 period. Again, the vast majority of firms meet these two conditions. There were 152 firms in our 1983 panel set that were not already being tracked in the 1978 panel set. Finally, we created a 1988 panel set consisting of all firms on the 1988 Fortune 500 list (as with 1983, the Fortune 1,000 was not published in 1988); all firms in the S&P 500 as of January 1, 1988; and all firms with more than one billion dollars in sales in 1987 as reported in Compustat if the same two conditions – inclusion in CRSP/Compustat and SEC filing – were satisfied. There were 252 firms in our 1988 database not already being tracking in either the 1978 or 1983 panel set.

For each one of the firms in our three panel sets, we tracked for every year during the relevant time period (period 1978-1989 inclusive for the 1978 panel set; 1983-1989 inclusive for the 1983 panel set; and 1988-1989 inclusive for the 1988 panel set), the corporate governance variables, state corporate laws and opt-ins/opt-outs referred to earlier. Coverage of a firm ceased if the firm was acquired by another firm or ceased filing 10-K and proxy statements. However, if a firm was the acquirer, the firm remained in our database post-acquisition. This treatment is consistent with the Compustat protocol on when firms are still tracked under their original firm

identifier post-acquisition. The year 1989 was chosen as the last year for all three of our panels given that the IRRC database begins in 1990.

### 5. Data Collection for the Firm-Level Corporate Governance Variables

In order to code for firms' firm-level corporate governance variables, we first pulled every 10-K, 10-Q, and proxy statement for every firm in one of our three panels for every year starting with the year that the firm was added to the database (either 1978, 1983 or 1988). More specifically, information on cumulative voting, poison pills, confidential (secret) voting, unequal voting, dual-class shares, classified boards, blank check preferred, state of incorporation and compensation plans was gathered from a firm's 10-K and 10-Q reports for every year the firm was in the database (in contrast to the IRRC which did not update firm-level corporate governance provisions each year, but every two or three years). A number of the IRRC's compensation variables – pension parachutes; golden parachutes; silver parachutes; compensation plans; severance agreements; and indemnification contracts – were coded based on the various contracts and documents attached as exhibits to the firm's 10-K and 10-Q, such as employment contracts, stock option plans and pension agreements.

A number of firm-level corporate governance variables were coded based on an analysis of firms' charters and bylaws. To this end, we gathered approximately a quarter of a million pages of charters, bylaws and amendments thereto. Firms' charters and bylaws were obtained from three sources: (a) attachments to the firm's 10-K which often included the firm's charter, bylaws and amendments thereto; (b) attachments to the firm's 10-Q which occasionally included the firm's charter, bylaws and amendments thereto; and (c) the Delaware Division of Corporations, which very generously provided all the charters and charter amendments for all the Delaware firms – 415 firms in total – in our 1978 panel for the entire 1978-1989 period.

Based on an analysis of these charters and bylaws, information on a number of variables was obtained. These bylaw- or charter-based variables included classified boards (for which information was also gathered directly from the 10-K); fair price provisions; director indemnification provisions; limits on the ability of shareholders to amend the corporate charters; limits on the ability of shareholders to amend the corporate bylaws; supermajority voting requirements for mergers; anti-greenmail provisions; director liability provisions; limits on the ability of shareholders to call special meetings; and limits on the ability of shareholders to act by written consent.

For two of these variables (special meeting and written consent), we coded whether the firm's bylaws or charter were silent on the ability of shareholders to engage in the activity or

whether it affirmatively stated there was no limitation on shareholders ability to engage in these activities. If the bylaw and charter were silent on the issue, whether shareholders could engage in the activity turns on the state of incorporation's default rules. Where a particular provision, such as for example a classified board or supermajority voting requirement for mergers, appears in the corporate charter or a bylaw was also coded. The reason why this distinction can be important is due to the fact that it is often the case that it is relatively easy for shareholders to change the corporate bylaws, assuming there is no limitation on the ability of shareholders to amend the corporate bylaws, while it can be difficult if not impossible for shareholders to unilaterally change the corporate charter (Coates 2001). In the IRRC, the distinction between appearing in the corporate charter or bylaw is not taken into account.

*6. Quality Controls*

In addition to the primary sources of information on firms' corporate governance arrangements we performed a number of quality controls to ensure the accuracy and completeness of our dataset. First, the 1990 IRRC volume occasionally contained information on when a firm-level provision was adopted prior to 1990. Each one of these entries was double-checked against the coding in our database.

Second, IRRC published corporate governance volumes in 1984, 1985 and 1986, which covered whether some firms had certain corporate governance provisions. These volumes mostly covered firms that were in the S&P 500 and therefore covered far fewer firms than the 1990 IRRC volume. These pre-1990 volumes also tracked only a modest subset of the twenty-three IRRC firm-level variables with the variables tracked and the firms covered varying from volume to volume. Again, every entry in these IRRC volumes was compared with our coding of the primary data.

Third, all the corporate governances reported in the annual 10-K reports – cumulative voting; poison pill; confidential (secret) voting; unequal voting; dual-class shares; classified board; and compensation plans – were checked against the firm's 10-K a second time for every firm.

Fourth, several studies contained information on dual-class companies against which we checked our coding for dual-shares. The G-Index database of dual-class shares companies for the 1994-2005 period was used to ensure that any firms in that database coded as having dual-class shares that also appear in our database are also coded as having dual-class shares unless they adopted dual-class shares after 1989. In addition, the Lease, McConnell & Mikkelson (1983); Deanglo & Deanglo (1985) and Jarrell & Paulson (1988) studies contain lists of dual-class companies for their firm samples against which we checked our database.

Fifth, several studies compiled data on corporate governance provisions in addition to dual-class provisions, for samples of firms overlapping with our database. These studies are Lambert & Larcker (1985), which contains a list of 90 firms with golden parachutes for 1975-1982, and Jarrell & Paulson (1987), which lists firms with various antitakeover protections. Our database was double-checked against these studies.

Sixth, *Corporate Control Alert*, a monthly publication that started in 1983, compiled comprehensive listings periodically during our time period of all firms that had adopted poison pills and the date of adoption. We used this publication to double-check all the poison pill codings in our database.

### 7. Missing Data

Despite our efforts, there remained some firms for some years, especially for the years 1978-1980, for which we were unable to collect information for the fully complement of G-Index provisions. For purposes of our empirical analysis, unless otherwise specifically noted, only firms were used if in a given year they had no more than seven missing G-Index provisions. This leaves us with approximately 1,000 unique firms in our database in the 1978-1989 period.

Table III documents the number of firms for each year during the 1978-1989 period for which we collected corporate governance data; the number of firms for which the number of missing G-Index variables was no more than eleven; no more than seven; and no more than three. Also, given our use of the no more seven missing G-Index provisions cut-off, Table III also reports the median number of missing provisions for this group. The median number of missing provisions for this group was 6 in 1978 and zero thereafter. Moreover, starting in 1981 over 80% of firms have no missing G-Index provisions at all in the sample we primarily used for our analysis. At the same time, before 1981, the sample as used still includes many firms with several missing provisions. Finally, for robustness purposes, we try to impute the value of missing provisions by using next year's value. This can be motivated by the fact that only about 1-5% (depending on the year) of provisions change year-on-year in our sample. We thus also report the number of firms for which the number of missing G-Index variables is no more than seven using this method of imputing missing variables. We will check our main results using this G-Index with imputed missing values as a robustness check.

In order to better understand what observations are excluded because of our cut-off, we ran logit regressions to estimate the likelihood of the firm-year being excluded from our sample because of too many missing G-Index provisions. As independent variables, we include the G-Index, Q (firm value), all controls used in the Q regressions (see section III), year fixed effects, and

with and without industry fixed effects. Clustering standard errors by firm, we robustly find that the most important characteristics associated with having more than seven missing provisions are a lower G-Index score, smaller book value of assets, higher leverage, no or missing R&D expenses and fewer capital expenditures. However, neither Q nor ROA are associated with dropping out of the sample, with their t-statistics (far) below 1.[8] This gives us some confidence that the results are not being driven by the exclusion of these firm-years. Further, as a robustness test we reran the regressions we present in this paper so as to include a variable indicating how many provisions were missing. This variable was always statistically insignificant. We also ran regressions, which we will present in the next section, using a different cut-off than no more than 7 missing provisions. Finally, we also make sure all results are robust to excluding the pre-1981 data altogether, which is in fact the case.

## III. GOVERNANCE AND FIRM VALUATION

We begin our analysis with the central issue of whether firm valuation is affected by a firm's corporate governance arrangements (as proxied by the G-Index and E-Index). This is an issue that we will also explore not only here, but in Part IV as well. Gompers, Ishii and Metrick (2003) document a strong cross-sectional association between corporate governance, proxied by their G-Index, and firm value. They find that higher G-Index scores (i.e., more anti-takeover provisions) are associated with lower Tobin's Qs. They propose different explanations for this, including investors learning about the importance of good governance over their 1990-1999 time period and thereby increasing firm values for well-governed firms. Bebchuk, Cohen and Ferrell (2009) also document a strong cross-sectional association between corporate governance, proxied by their E-Index, and lower firm value.

The significant variation of governance provisions within firms across time in our sample allows for an out-of-sample re-examination of this association between governance and firm value. In particular, the inclusion of firm fixed effects in pooled panel regressions mitigates the endogeneity of firms adopting governance provisions depending on their circumstances. Using both firm and year fixed effects, we document a robust negative association between the G-Index and Tobin's Q for 1978-2006. This is our first primary finding. However, the negative association of the G-Index with firm valuation does not survive the introduction of firm fixed effects for 1990-2006 or other sub-periods.

---

[8] These results are not reported to save space, but are available upon request. In addition, some results are even stronger when being less restrictive or allowing more missing provisions when leaving firms in the sample, e.g. the coefficient and its significance of the G-Index in the Q-regressions in section IV.

We begin our exploration of the firm valuation effects of governance by first documenting in Section 1 the significant changes in firms' G- and E-Index scores during the 1978-1989 period and the relative stability thereafter, variation which we will exploit in our regressions. Section 2 will then present our Q regressions. Finally, Section 3 will document that the association we find between poor corporate governance and lower firm valuation is not explained by "reverse causation," i.e. whether low valued firms tended to adopt poor corporate governance.

*1. The Changing Corporate Governance Landscape in the 1980s*

The 1980s saw dramatic changes in firms' corporate governance arrangements with far more stability in those arrangements prevailing during the 1990s. As a result, it is imperative to have corporate governance data for a large sample of firms over the 1980s in order to investigate why firms have the corporate governance arrangements they currently do and the effects of variation in corporate governance arrangements over time rather than just in the cross-section. Both inquiries are useful in helping to identify whether any association between firm valuation and governance is causal in nature.

Figure 1 tracks the evolution of the G-Index of all the firms in our sample (with fewer than 8 missing provisions) over the 1978-2006 time period. We plot the 10%, 20%, 50%, 80% and 90% percentiles in each year. As Figure 1 illustrates, the distribution of the G-Index significantly shifted upward across all the percentiles over this time period. The median G-Index score equals 5 from 1978-1983, then increases by exactly one point a year from 1983-1989 to reach 11 in 1989, shifts to 9 in 1990 and remains almost constant thereafter.

Firms likewise also experienced substantial increases in the E-Index scores during the 1980s. Changes in firms' E-Index scores, again broken down by their percentile rankings, is graphed in Figure 2. As is also evident from Figure 2, the variation between firms in their E-Index scores, particularly in the first half of the 1980s, was lower than that for firms' G-Index score.

Not surprisingly, this significant time variation also appears when one examines the incidence of individual provisions during the 1978-1989 period. Moreover, there is significant variation across individual corporate provisions in terms of their incidence in any given year in the 1978-1989 period.

Figure 3 graphs the incidence in our sample of the six provisions which constitute the E-Index: supermajority voting requirements for charters, by-laws and mergers, classified boards, poison pills and golden parachutes.[9]

---

[9] Some series start in 1980 due to too many missing observations for 1978 and 1979.

Of the six E-Index provisions, four of them enjoyed very substantial increases in their incidence in the 1980s (supermajority merger, classified board, poison pill and golden parachute), one enjoying a fairly modest increase (supermajority by-law), and one with effectively no growth (supermajority charter). Moreover, the timing of these increases differed, with classified boards enjoying a steady increase for most of the 1980s while poison pills experienced dramatic growth in the mid-1980s. In contrast, there is very little in the way of time variation, at least at the aggregate level, over the 1990s in the incidence of these variables.

*2. Governance and Firm Valuation*

Panel A of Table IV presents annual cross-sectional regressions of firms' year-end industry-adjusted Tobin's Q on the G-Index over the 1978-2006 time period for a total of twenty-nine regressions. For each of these annual regressions the coefficient value on the G-Index was consistently negative, except for one year (1981, though the point estimate is not statistically significant) with an average coefficient of -1.71%. As for the E-Index, all twenty-nine annual cross-sectional regressions of firms' industry-adjusted Tobin's Q on the E-index covering the 1978-2006 time period are negative as well, with an average coefficient value of -4.50% (results not reported to save space).

Panel B of Table IV contains pooled regressions of industry adjusted Tobin's Q on the G-Index, along with a number of other controls, including year fixed effects throughout, robust standard errors clustered by firm, and either industry or firm-fixed effects in some regressions. A higher G-Index is again associated with lower firm valuation with the coefficient estimate (-0.020) being negative and statistically significant at the 1% level for 1978-2006. This basic finding of a negative and statistically significant relationship between a firm's G-Index and a firm's industry-adjusted Tobin's Q survives the introduction of industry fixed effects (coefficient value -0.018 and 1% statistical significance) and firm fixed effects (coefficient value of -0.011 with p value of 6%). Perhaps not unsurprisingly given the data demands of these regressions, when one looks at sub-periods (1978-1989 and 1990-2006) the coefficient value on the G-Index with firm fixed effects is not statistically significant, although the negative coefficient estimate for the G-Index of -0.016 for 1990-2006 is suggestive with a t-statistic of 1.61 with a corresponding p-value of 11%.

Panel C of Table IV presents the results of various robustness checks for our primary finding of a negative association between firm value and poor governance over the 1978-2006 time period. As before, we use pooled panel regressions of industry-adjusted Tobin's Q, year fixed effects throughout, the Panel B controls and, in some regressions, either industry or firm fixed

effects. Columns (1) – (3) document that using different cut-offs in terms of the acceptable number of missing G-Index variables (cut-off of no more that 5 missing; no more than 11 missing; no more than 15 missing) changes neither the point estimates of the firm valuation effects of governance nor their statistical significance. This is not surprising given the annual cross-section regression results in Panel A which document a negative association between firm value and governance for every year between 1982-1989, years for which there were very few missing variables (see Table III).

In columns 4 – 6, we again use a maximum of 7 missing provisions. In column 4, we add industry fixed effects that change each year (Industry x Year fixed effects), and find that the G-Index coefficient remains negative and statistically significant. In column 5, we use the G-Index where missing G-Index provisions are replaced with the following year's value, if non-missing, together with firm fixed effects. Naturally increasing the sample, this method of imputing missing provisions can be motivated by the fact that only 1-5% of provisions change year-on-year in our sample. The coefficient of this alternative G-Index remains similar and significant with a 8% p-value. Column 6 again uses firm fixed effects, with an additional control of the 'G-Index in 1989' (which is set to zero every other year). This is to ensure that our results are not driven by any discontinuities caused by the partly different coding protocols in 1989 versus 1990. We find that the coefficient of the G-Index is unchanged from Panel B and significant, while the 'G-Index in 1989' variable is insignificant.

Panel C also examines of the effect of the E-Index on firm valuation during this period documenting a strong negative association (-0.05 with 1% statistical significance, see column 7) for the 1978-2006 period, a finding that does not however survive the introduction of firm fixed effects (column 8). This latter finding is not surprising either given Figure 2, which documents the lack of a spread in the E-Index for much of the 1978-1989 period. In contrast, Bebchuk, Cohen, and Ferrell (2009) document a robust association between the E-Index and firm valuation during the 1990-2006 period for which there was a meaningful spread among firms in terms of their E-Index scores.

Panel C also presents the results when we use our G-Subgroup Index, which is based on eighteen of the twenty-four G-Index provisions, rather than the full G-Index. The negative association between governance and firm valuation remains statistically significant (with the same point estimate as that of the full G-Index) even with firm fixed effects (see columns 9 – 10). Finally Panel C presents the results, again with firm fixed effects, when the G-Index Uncorrected is used (column 11). And, again, there is a negative association with a -0.01 coefficient, albeit with a p-value of only 12%. This suggests the importance of correctly incorporating the state defaults.

### 3. The Effect of Firm Valuation on Firms' Corporate Governance Choices

A common "reverse causation" story in the corporate governance literature is the possibility that a firm with lower firm valuation will tend to adopt more G-Index provisions in order to insulate the firm from hostile takeovers (see e.g. Lehn, Patro & Zhao 2006). As a result, the documented correlation between low firm valuation and the G-Index index, according to this story, might be at least in part due to reverse causation.[10]

With this "reverse causation" story in mind, we examine whether a firm's valuation, as measured by that firm's Tobin's Q, helps explain a firm's G-Index score. In our regressions we control for a number of other variables including, importantly, firm fixed effects. All the independent variables, including the firm's Tobin's Q, are lagged by one year to the firm's G-Index score (the dependent variable). All our regressions cluster standard errors at the firm-level. The results of this analysis are contained in Table V.

Interestingly, the coefficient on Tobin's Q is actually positively and significantly associated with having an increased G-Index index for both the entire 1978-2006 period (coefficient of 0.29) as well as the 1978-1989 period separately (1.23) when year fixed effects were not controlled for. However, when year fixed effects are added, this statistically significant positive association disappears for both the entire 1978-2006 period (coefficient of -0.07, 1% statistical significance) and the 1978-1989 period considered separately (0.05, no statistical significance even at the 10% level). This substantial change in the regression results of adding year fixed effects indicates that firms tended to increase their G-Index scores in years in which firm valuations were generally rising, with the result that the positive association between firms' valuation and changes in firms' G-Index scores either disappears (1978-1990 time period) or actually reverses (1978-2006 time period). As for the 1990-2006 time period, there is a negative association that is very minor economically between Tobin's Q and a firm's G-Index score controlling for both year and fixed effects (-.05, 1% statistical significance). Finally, when one looks at the relationship between a firm's return on assets (ROA), while controlling for a firm's Tobin's Q, there is no statistical significant association with changes in a firm's G-Index for any of the time periods (1978-2006; 1978-1989; and 1990-2006) when year fixed effects are included.

In short, for the period in which firms' corporate governance arrangements were changing most rapidly (the 1978-1989 period), there was no identifiable effect of firm valuation on firms' corporate governance choices, though the effect of a low firm valuation on a firm's corporate

---

[10] However, the cause for why firms can maintain their low firm valuation after insulating themselves from hostile takeovers might be the corporate governance provisions that provide such insulation. In other words, the ability to maintain a low firm valuation might be caused by the corporate governance provisions.

governance choices predicted by the "reverse causation" story does hold true to some extent during the 1990-2006 time period. However, the association seems quite minor economically, which a one standard deviation decrease in Tobin's Q being associated with an increase in the G-Index score of only 0.05 x 0.8 = 0.04.

## IV. GOVERNANCE AND THE TAKEOVER CHANNEL

An important issue in exploring the relationship between governance and firm valuation is the potential channels by which governance can affect firm valuation. Identification of such channels is of interest in its own right as well potentially providing evidence that governance does in fact affect firm valuation.

We begin our exploration of this issue by first documenting in Section 1 the incidence and composition of takeover activity in the 1980s and thereafter. We then examine in Section 2 the change in the effect of governance on firm valuation that resulted from a dramatic increase in the potency of poison pills and classified boards as a takeover defense due to a seminal 1985 decision by the Delaware Supreme Court. In Section 3 we then explore the effect of governance on firm valuation for firms who happened to be in industries experiencing "high" levels of M&A activity relative to firms in industries experiencing "low" M&A activity levels. Finally, in Section 3 we examine the effect of governance on operating performance (net profit margins and return on assets).

The results of these analyses suggest that association between governance and firm valuation arises primarily through a "takeover channel", through the probability of takeover and, hence, the probability of target shareholders receiving a takeover premium. In considering the plausibility of the "takeover channel" as an important channel for governance effects on firm valuation, it is worth bearing in mind the finding of Andrade, Mitchell and Stafford (2001) that the median bid premium is approximately 38%, suggesting that takeovers generally are very beneficial to the target shareholders.

### 1. M&A Activity in the 1980s and Thereafter

Not only was the 1980s a period of substantial change in firms' corporate governance arrangements, as documented by Figures 1-3, but it was also a period of substantial changes in M&A activity. Figure 4 displays the incidence of M&A activity broken down into three categories – friendly takeovers, hostile takeovers, and leveraged buyouts (LBOs) – over the 1979-2006 time period for all the companies in our sample.

22

For each of our three categories of M&A activity we graph in Figure 4 their incidence as measured by (i) the aggregate dollar value of M&A activity in any given category and year, divided by the total market capitalization of all firms in our sample as of the beginning of the year (represented by the solid "DV" lines, henceforth the aggregate percentage of firm capitalization undergoing M&A); and (ii) the aggregate number of firms subject to M&A activity in a given year, divided by the total number of firms in our sample (represented by the dotted "#" lines, henceforth the aggregate proportion of firms undergoing M&A).

As is apparent from Figure 4, M&A activity, while starting at a very low base at the beginning of this period, occurred on an extensive scale both during the 1980s and the 1990s. The dramatic uptick in M&A activity of all kinds began around 1982. As is also obvious from Figure 4, the composition of M&A activity was substantially different in the 1980s relative to the 1990s, particularly in the incidence of hostile and LBO M&A activity. This is a fact that is well-recognized in the literature (see e.g. Andrade, Mitchell and Stafford 2001).

### 2. Governance and the Changing Law of Takeover Defenses

The law surrounding the use of takeover defenses was also in considerable flux in the 1980s. As was seen in Figure 3, poison pills were first deployed in 1982 and were adopted by a few firms in 1983 and 1984. From 1985 to 1986 the rate of adoption increased dramatically, from 4% of all firms in the sample as of 1985 to 26% of all firms as of 1986. And every year thereafter that percentage steadily increased so that, by 1989, 52% of firms in our sample had a poison pill.

The year of the dramatic increase in the incidence of poison pills, 1985, was the same year as the seminal case of *Moran v. Household International*,[11] which judicially validated the poison pill for the first time. The Delaware Supreme Court in this decision cleared away three hurdles to a target board's use of poison pill to block unwanted takeover bids. First, the Court held that the decision of the Household Corporation to adopt a poison pill was within the legal authority vested in the firm's board of directors pursuant to a provision in the Delaware General Corporation Law (section 157) granting boards the authority to issue share rights. Second, the Court held that in determining whether a target board's decision to exercise this legal authority and adopt a poison pill was consistent with the board's fiduciary duties to its shareholders it would use the most relaxed form of judicial review possible, the business judgment rule.[12] Third, the Court rejected the argument that Household Corporations' poison pill was invalid given its impact on the right of shareholders to conduct a proxy contest. Most non-Delaware state courts that addressed the issue,

---

[11] 500 A.2d 1346 (Del. 1985).
[12] "[I]n reviewing a pre-planned defensive mechanisms it seems even more appropriate to apply the business judgment rule." *Id.*

as is quite common on corporate law issues, followed *Moran's* lead in their treatment of poison pills[13] with a couple of states passing legislation to statutorily codify the poison pill's legality.[14]

The *Household* decision was far from a pre-ordained result. The decision resolved significant legal uncertainty that existed till that point concerning the legality of poison pills. The prominent corporate lawyer and creator of the poison pill, Martin Lipton, explained that of all the Delaware decisions on the use of defensive tactics at the time "the one that proved to have the greatest practical impact was undoubtedly *Household* – the pill changed everything" (Lipton and Rowe 2002). He went on to explain that, "*Household* recognized that the pill gave boards the power to 'just say no' until such time as the shareholders replaced the incumbent directors, if they so wished." Or as a contemporary commentator put it, "This is probably the single most important corporate law case to come before the courts in years" (Stevenson (1985, p.58) quoting a prominent corporate lawyer))." A *Business Week* article at the time explained that the "*Household* case in Delaware is the crucial one.

Numerous commentators pre-*Household* commented on the significant legal uncertainty surrounding the use of the poison pill. As one article at the time explained, some corporate lawyers were "skeptical about poison pill plans, and questioned whether the plans will withstand legal scrutiny" (Masters (1983), p.9). Much of the legal uncertainty in the *Household* case concerned whether the issuance of a poison pill was within the power vested in the board of directors under Delaware's General Corporation Law statute and whether the use of a poison pill to block an unwanted acquisition would violate a target board's common law fiduciary obligations to its shareholders. Numerous commentators made arguments pre-*Household* questioning the validity of the poison pill (see, e.g., Lynch & Steinberg (1979); Easterbrook & Fischel (1981); Gilson (1981)). The Securities and Exchange Commission filed an amicus brief in the *Household* case arguing that the Household Corporation's adoption of a poison pill violated the basic rights of shareholders under Delaware corporate law to decide for themselves the merits of a hostile tender offer. The Securities and Exchange Commission also argued that the poison pill would fatally undermine the ability of shareholders to conduct a proxy contest and should be deemed illegal for this reason as well. These arguments, while prominent prior to *Household*, were rejected by the court in its *Household* decision.

The judicial validation of the poison pill in *Household* also had the effect of substantially increasing the antitakeover effect of a classified board, given that control of the target board was now necessary in a situation where a firm had decided to adopt a poison pill. This marked a

---

[13] See, e.g. Velasco (2002), p.400 ("As is often the case in corporate law matters, courts often turned to Delaware in assessing the validity of the poison pill. . . . The impact of *Moran* in such cases is undeniable.")
[14] See, e.g., Wis. Stat. section 180-0624 (1999).

substantial shift in the effect of classified boards prior to *Household*, as the presence of a classified board without the ability of the firm to use a poison pill posed little if anything in the way of a barrier to a bidder who wished to acquire a control block (Gilson (1981); Bebchuk, Coates and Subramanian (2002)). In the absence of a pill, bidders could still acquire a control block against the wishes of target board, and once that had occurred it was quite unlikely (as a practical matter) for a target board to oppose the wishes of a controlling shareholder (Gilson (1981)). Pre-*Household* classified boards, however, would still potentially have the beneficial effects of increasing board stability and board independence, common justifications for having a classified board other than their antitakeover effect.

In short, the year 1985 marked a critical turning point in the ability of firms to use poison pills (as well as poison pills combined with classified boards) to block unwanted third party acquisitions. As this judicial decision resolved a major source of legal uncertainty surrounding the use of antitakeover defense, this event is another useful way to address endogeneity concerns surrounding the negative association between firm value and antitakeover provisions. The resolution in 1985 of the legal uncertainty surrounding the use of antitakeover defenses largely in favor of the ability of a target board's ability to deploy them would not only affect a board's ability to use poison pills and classified boards, but other antitakeover defenses as well that are also included in the G-Index (and are listed in footnote 5).

Given our preceding discussion, the hypothesis we wish to test is that the G-Index, poison pills and classified boards have a more significant negative effect on firm valuation post-1985 relative to pre-1985. Our dependent variable is industry-adjusted Tobin's Q for the full 1978-2006 sample. We create a dummy variable for whether the year is prior to 1985 and another dummy variable for whether the year is equal to 1985 (with post-1985 being our baseline time period) and then interact these dummy variables with the G-Index, classified board and poison pill variables. We employ the same controls as in Table IV and also control throughout for year fixed effects, plus either industry or firm fixed effects. Robust standard errors are clustered by firm. The results of our analysis are reported in Table VI.

As the interaction results for the G-Index x Pre-1985 dummy variable documented in columns (1)-(3) show, the G-Index did indeed have a more negative impact in the post-1985 period versus pre-1985, with the interaction effect having a p-value of 7% in columns (1) and (2). The G-Index standing alone is also statistically significant negative at a level of 5% even in the fixed effects regression (column (3)). This means that before 1985, the coefficient of the G-Index is not significantly associated with firm value, either economically or statistically. After 1985, an

increase in the G-Index of one point is associated with a lower firm value of 2.0% with industry fixed effects, or of 1.2% with firm fixed effects.

Turning to the individual corporate governance provisions, we find that classified boards only had negative association with firm valuation post-1985, but not in the pre-1985 period (with the difference being statistically significance at 1%). Economically, firms with a classified board have an 8.1% lower firm value after 1985, but about 4% higher firm value before 1985. Poison pills are also only strongly negatively associated with firm valuation after 1985, with a large economic effect, as firms with a poison pill have an 11.7% lower firm value after 1985. While the interaction effect is not quite statistically significant at the 10% level, the association of a poison pill and firm value is positive before 1985. However, both the classified board and poison pill results are only significant with industry fixed effects, but disappear (with no more significance) once firm fixed effects are added (these results are not reported to save space).

*3. Governance and Levels of M&A Activity*

If the G-Index is negatively associated with firm value by reducing the likelihood of an attractive takeover, then the negative effects of a higher G-Index should be particularly powerful when a firm happens to be in an industry experiencing "high" levels of takeover activity, relative to firms in the same industry with lower G-Index scores and relative to firms with the same G-index score but in an industry that year that was experiencing "low" levels of takeover activity. Being a firm in an industry with "high" levels of takeover activity renders the possibility of a takeover offer particularly relevant to firm valuation given the increased likelihood, all else being equal, of receiving a takeover bid. This is the hypothesis we will test in this section.

As takeover bids tend to cluster in industries, we conjecture that past industry-specific takeover activity is a good instrument for the channel through which governance affects firm value. Our hypothesis exploits the fact that the level of M&A activity in an industry in a given year can help identify whether the G-Index causes lower firm valuation. In particular, Mitchell and Mulherin (1996) report that mergers occur in waves; and within a wave, mergers strongly cluster by industry. In unreported regressions, we in fact find a strong link between past and future friendly takeover activity, both at the aggregate and industry levels. The literature (see e.g. Andrade, Mitchell and Mulherin 2001) has interpreted these findings as suggesting that mergers might be reactions to unexpected shocks to industry structure, regulation or technological innovation, such that industry-specific waves could be considered as exogenous to the firm (and not proxying for some other endogenous choice by the firm, if these merger waves are indeed driven by unexpected industry shocks). In other words, to the extent that industry M&A merger

waves are exogenous, this can help both identify whether the G-Index could cause lower firm valuation and whether that lower firm valuation comes about through the takeover channel.

Our hypothesis implies that the interaction between the G-Index and being in an industry in a given year with a "high" level of friendly activity should have a negative coefficient, given that antitakeover provisions are expected to be more harmful if M&A activity is more likely. In order to test our hypothesis, we create two dummy variables. One dummy variable indicates whether a firm in a given year is in an industry (using the 48 Fama-French industry groups) experiencing a "high" level of friendly takeover activity, and analogously we construct a dummy for "low" levels of friendly activity. "High" and "low" levels of activity are determined by whether the industry was in the top quartile or the bottom quartile in terms of friendly M&A activity in that year, as measured by the proportion of Compustat firms in the industry taken over. We interact these dummy variables with the G-Index in pooled panel regressions with industry-adjusted Tobin's Q as the dependent variable. In our regressions, we use the same set of controls as used in Table IV and include year fixed effects plus industry or firm fixed effects.[15] We begin our analysis with the year 1982 as prior to that there is virtually no spread in takeover activity between "high" and "low" takeover industries.

The results of our analysis can be found in Table VII for the 1982 – 2006 time period, plus the 1982-1990 and 1991-2006 sub-periods. Turning first to the entire 1982-2006 period, the coefficient value on G-Index interaction with being a firm in an industry with a "high" level of friendly takeover activity is statistically significant (coefficient of -0.004 with a p-value of 3%), and remains significant (coefficient of -0.002 with a p-value of 7%) with the introduction of firm fixed effects. The G-Index standing by itself still has a statistically significant at the 1% level negative effect on firm valuation with industry fixed effects (coefficient of -0.019) and remains statistically significant negative even with the introduction of firm fixed effects (coefficient of - 0.011 with a p-value of 7%). The G-Index interaction with firms in industries with "low" levels of takeover activity has a positive and significant coefficient, even with firm fixed effects (coefficient of 0.003 with a p-value of 0.5%).

For the 1982-1990 period, the coefficient value on the interaction term of being a firm in an industry experiencing "high" levels of M&A activity and the G-Index is statistically significant and negative even controlling for firm fixed effects (coefficient of -0.004 and p-value of 4%). With the introduction of this interaction term and controlling for firm fixed effects (column 4), the G-Index by itself does not have any statistically significant association with firm valuation. Finally,

---

[15] We have also tried adding interactions with dummies indicating whether the friendly M&A activity in the year was relatively high (itself partly forward-looking or ex-post), but found no significant differences in the importance of the G-Index (results not reported).

focusing on the 1991-2006 period, the interaction term for "high" levels of takeover activity and the G-Index is statistically significant at the 1% level (-0.005) without firm fixed effects, but is no longer statistically significantly negative with firm fixed effects.

In short, we find that a firm in an industry with "high" levels of M&A activity has a more pronounced negative association of the G-Index with firm valuation. These results survive the introduction of firm fixed effects and seem economically meaningful. For example, using the full time period and firm fixed effects specification in column 2, a one point increase in the G-Index is associated with a decrease in firm value of 0.8% for firms in an industry with a low level of M&A activity, and a decrease in firm value of 1.3% for firms in an industry with a high level of M&A activity.

### 4. Governance and Operating Performance

Another plausible (not mutually exclusive and possibly complementary) channel through which governance could affect firm valuation is through governance's effects on a firm's operating performance.[16] Our examination of the effect of governance on operating performance is explored in Table VIII. While we find a negative association of the G-Index with operating performance cross-sectionally, we are unable to identify this in the time series (i.e., using firm fixed effects).

We use in our analysis as dependent variables firms' industry-adjusted return on assets (ROA, see Panel A), industry-adjusted net profit margins (NPM, see Panel B) and industry-adjusted sales growth (Sales Growth, see Panel C) as dependent variables rather than Tobin's Q. The G-Index is the main independent variable of interest (along with the usual controls from Table IV, using year dummies throughout and, in all regressions except column 1, either firm or industry fixed effects).

The results are not clear-cut. Using industry fixed effects and 1978-2006 (see column 2), we find a statistically significant negative association with the G-Index for both NPM and sales growth, though not for ROA. The economic magnitude of this association seems modest. For NPM, the coefficient of -0.1 implies that a one standard deviation shock increase to the G-Index (3.0) is associated with a decrease in NPM of about -0.3%.

However, using firm fixed effects, none of these associations for NPM and sales growth remains significant even at the 10% level (see column 3). Further, ROA does not show any significant negative associations with the G-Index with industry or firm fixed effects (columns 1 – 3). Therefore, like Gompers, Ishii and Metrick (2003), our finding of negative associations

---

[16] Of course, one mechanism by which governance can affect a firm's operating performance is by affecting whatever disciplinary effect the possibility of a hostile takeover has on the incentives of existing management.

between the G-Index and accounting profitability and sales growth is a cross-sectional result, with our analysis unable to identify statistically that time variation in the G-Index is followed by changes in profitability or sales growth.

## V. GOVERNANCE AND STOCK RETURNS

### 1. Abnormal Returns of Hedge Portfolios Based on Low-High G-Index Stocks

One of the most intriguing findings in Gompers, Ishii, and Metrick (2003) is that stocks with low G-Index scores vastly outperform stocks with high G-Index scores in their time period of 1990-1999. Subsequent papers exploring these return findings are, for example, Cremers & Nair (2005), Bebchuk, Cohen & Ferrell (2009), Cremers, Nair & John (2009), Johnson, Moorman and Sorescu (2008), and Giroud & Mueller (2008). In this subsection, we investigate whether having "better" corporate governance (as proxied by a lower G-Index or E-Index) results in positive abnormal stock returns over the full time period or any sub-periods.

We weight our portfolios of "good" and "poor" corporate governance firms by firms' respective market capitalizations as well as use equally weighted portfolios. Next, we form 'hedge' portfolios by going long the portfolio with low G-Index (or E-Index) stocks and shorting the portfolio with high G-Index stocks, where low and high are defined using either the quintile or decile extreme portfolios. In all cases, we use only information that would have been publicly available at the annual portfolio formation dates. We report both annualized "excess returns" (over the risk-free rate) and annualized abnormal returns, i.e. alphas generated by the Fama-French-Carhart four-factor model that includes market, size, value and momentum factors.

Table IX reports the results for portfolios sorted on their G-Index score (using value-weighted portfolios in Panel A and equally-weighted portfolios in Panel B), for different time periods and for sorting stocks and forming hedge portfolio from quintile and decile groups. While Gompers, Ishii and Metrick (2003) employ fixed G-Index cut-off points in sorting stocks in different governance-related portfolios over their time period (1990-1999), we cannot do so due to the large time variation of G-Index over 1978-1989. However, after 1990 the top and bottom G-Index decile portfolios are very close to Gompers, Ishii and Metrick (2003)'s 'dictatorship' and 'democracy' portfolios, respectively.

For the full 1978-2007 time period we document, whether using value-weighted or equally-weighted portfolios, that there are positive, strongly statistically significant abnormal returns associated with going long the bottom G-Index decile of firms with "good" corporate governance and going short the top G-Index decile of firms (annualized alpha of 3.93% with a t-statistic of

29

2.43 using value-weighted portfolios; and an annualized alpha of 4.58% with a t-statistic of 3.88 using equally-weighted portfolios). For quintile portfolios and 1978-2006, the results are naturally weaker, and no longer statistically significant for value-weighted portfolios, though still economically and statistically significant for equally-weighted portfolios (annualized alpha of 3.26% per year with a t-statistic of 3.25).

Across periods, the equally-weighted long-short positions of higher-low G-Index stocks generate higher abnormal returns for the 1978-1990 period than for the 1990-2006. For example, the equally-weighted decile portfolios have an annualized alpha spread of 7.91% (t-statistic of 3.96) for 1978-1990 but only 1.54% (t-statistic of 1.10) for 1990-2006. For value-weighted portfolios, the annualized alpha is insignificant in both of the longer sub-periods, with the long-short decile spread equal to 2.87% (t-statistic of 1.23) for 1978-1990 and 3.43% (t-statistic of 1.66) for 1990-2007. However, as is well-known, we replicate the value-weighted annualized long-short alpha based on decile sorts of 8.46% (t-statistic of 2.81) for the Gompers, Ishii and Metrick (2003) time period of 1990-1999.

Table X provides the robustness check motivated by Johnson, Moorman, and Sorescu (2008), who argue that the Gompres, Ishii and Metrick (2003) return results for 1990-1999 are not robust to clustering of stocks with high and low G-Index scores across industries. Their main methodology involves forming matching portfolios based upon firms' three-digit SIC-codes. Specifically, for each stock in, say, the lowest G-Index decile portfolio, we create a value-weighted industry-matched portfolio containing only stocks for which we know the G-Index score but that are not included in the 'democracy' portfolio, and have the same three-digit SIC-codes as that particular firm. However, Lewellen and Metrick (2009) argue that industry-adjusting at the three-digit SIC level does not yield well-specified tests. Instead, they advocate the use of GICS industry classifications or the 48 Fama-French industry groups. As GICS industry classifications start in 1985 only and are thus not available for our full sample period, we also form matching portfolios based upon firms' 48 Fama-French industry group.[17] Specifically, for each stock in, say, the highest G-Index decile portfolio, we create a value-weighted industry-matched portfolio containing only stocks for which we know the G-Index score but that are not included in the 'dictatorship' portfolio, and are in the same 48 Fama-French industry group as that particular firm.

Next, we compute the stock's 'industry-adjusted' return by deducting the returns of these industry-matched portfolios from the firm's return. Finally, we calculate the industry-adjusted 'democracy' portfolio return by equally- or value-weighting the individual industry-adjusted

---

[17] We thank Kenneth French for making these industry groups available on his website. Lewellen and Metrick (2009) find that using industry-matched portfolios matched for 48 Fama-French industry groups yields tests with greater power and size than those matched at the three-digit SIC level.

returns of the stocks in the democracy portfolio. The industry-adjusted returns for the highest G-Index decile and lowest and highest quintile portfolios are constructed analogously. The table reports the industry-adjusted quintile and decile G-Index portfolio abnormal return results for the full time period of 1978-2007 as well as the various sub-periods. We only present four-factor alphas (no excess returns), for both value and equally-weighted portfolios. The results using industry-matched portfolios at the three-digit SIC level are given in Panel A, and using industry-matched portfolios at the 48 Fama-French industry group level in Panel B.

The main finding is that the equally-weighted alphas over the full time period are robust to industry-adjusting, i.e., the spread in abnormal returns of low and high G-Index portfolios remains both economically and statistically significant over 1978-2007, but the results for value-weighted portfolios are not robust. For example using equally-weighted portfolios and three-digit SIC level industry-matched portfolios, the long-short portfolio of buying (selling) stocks with lowest (highest) decile G-Index scores generates an industry-adjusted, annualized abnormal return equal to 3.32% (t-statistic of 2.57). However, the analogous value-weighted hedge portfolio's alpha is no longer significant (annualized alpha of 1.08% with a t-statistic of 0.57).

Furthermore, industry-adjusting only seems to affect the abnormal returns post-1990. For the equally-weighted hedge portfolios and the 1978-1990 sub-period and three-digit SIC level industry-matched portfolios, the industry-adjusted annualized alpha remains economically and statistically strong (4.38% with a t-statistic of 3.65 for quintile sorts and 7.19% with a t-statistic of 3.51 for decile sorts). However, all equally-weighted hedge portfolios for both the 1990-2007 and 1990-1999 sub-periods are insignificant. For the value-weighted portfolios, industry-adjusting is particularly dramatic for the 1990-1999 period, where we replicate the results in Johnson, Moorman, and Sorescu (2008). For the 1978-1990 period, value-weighted hedge portfolio alphas are insignificant with or without industry-adjusting. Finally, using industry-matched portfolios at the 48 Fama-French industry group level gives quite similar results to using industry-matched portfolios at the three-digit SIC level.[18]

Two interesting empirical regularities are suggested by the results of Tables IX and X: governance seems to matter most for smaller capitalization stocks and the overall association between abnormal returns and governance seems to decline over our time period, with an

---

[18] Note that in Table X, as elsewhere, we use the 'UMD' momentum factor available on Kenneth French's website. Using the Fama-French 3-factor model or the 'PR1YR' momentum factor as constructed in Carhart (1997), the value-weighted long-short portfolios based on G-Index decile sorts yield statistically significant industry-adjusted alphas - using 48 FF industry group matched portfolios - for the 1990-1999 period, as also shown in Lewellen and Metrick (2009). However, we find that for all other sub-periods and for the full time period, our results using 48 FF industry group matched portfolios are robust to not including the momentum factor. Our results for non-industry adjusted returns or using three-digit SIC level matched portfolios are also robust to not including the momentum factor. Finally, results are also robust to using equally-weighted industry portfolios.

important exception. First, across the full time period 1978-2007 and the 1978-1990 sub-periods, the equally-weighted long-short positions of higher-low G-Index stocks generate higher abnormal returns than the value-weighted portfolios. Over the 1990 – 2007 sub-period, there are no statistically significant abnormal returns accruing to the governance hedge portfolios (neither using value nor equally-weighted portfolios, and neither for quintile nor decile sorts).

Second, the significance of the alphas of the governance hedge portfolios for 1978-1990 combined with the insignificant alphas for 1990-2007 suggests the decline of the importance of governance for abnormal returns over time. This is further illustrated in Figure 5, which plots the 24-month moving averages of the abnormal returns of hedge portfolios that buy stocks in the decile with the lowest G-Index and short stocks in the decile with the highest G-Index. We show results for both value and equally-weighted hedge portfolios. The abnormal returns are calculated over the full 1978-2007 time period (i.e., with constant betas estimated in-sample). We also plot the fit from a regression of the respective monthly abnormal returns series on a constant and a simple time trend. For both value and equally-weighted hedge portfolios, this time trend has a negative coefficient, though it is only (strongly) statistically significant for the equally-weighted hedge portfolio.[19]

Finally, Table XI presents analogous results on quintile and decile portfolios based on the E-Index of Bebchuk, Cohen & Ferrell (2009). The main conclusion is that over the full period of 1978-2007, portfolios with low E-Index stocks significantly outperform high E-Index stocks, with statistically significant alphas for both quintile and decile spread portfolios using either value- or equally weighting. For example, the long-short portfolio buying stocks with E-Index in the lowest decile and selling stocks in the highest decile generates an annualized alpha of 3.37% (t-statistic of 2.56) using value-weighting and of 2.26% (t-statistic of 2.82) using equally-weighting. However, almost all of the abnormal return seems due to the post-1990 period. This may well be largely due to a limited cross-sectional spread in firms' E-Index scores before 1990. For example, the difference between the 10% and 90% percentiles of the E-Index equals 2 until 1982 and 3 until 1986. At the same time, the results for the E-Index are not robust to industry-adjusting returns. None of the hedge portfolio alphas are significant for industry-adjusted returns, neither for value

---

[19] Other intriguing features of the abnormal return series in Figure 5 are the large difference between value- and equally-weighted portfolios from 1994 – 2000 and a remarkable peak in the alphas of the value-weighted portfolio around 1999. As this general period coincides with the significant rise of stock prices of technology firms, as a robustness check, we remove all technology firms from our sample (or about 7.5% of the total firm-year observations, namely firms operates in an industry with four-digit SIC code of 3570, 3571, 3572, 3576, 3577, 3661, 3674, 4812, 4813, 5045, 5961, 7370, 7371, 7372, or 7373). Doing so removes the large difference between value- and equally-weighted portfolios for 1994 – 2000, while not affecting the main conclusions about alphas accruing to governance portfolios (industry-adjusted or not) over the full time period. Results are available upon request.

nor equally-weighted portfolios, and neither for the full time period nor any of the sub-periods (results not reported to save space).

*2. Interpretation of the Governance-Related Abnormal Returns*

Gompers, Ishii and Metrick (2003) advance three different interpretations of the abnormal return results they document. First, their Hypothesis I is that the market initially underestimated the agency costs generated by the weakening of the shareholder rights (or increase of the G-Index). As a result, firm values of high G-Index firms were initially too high at the beginning of their time period, and subsequent declined, and the opposite for low G-Index firms. We call this the 'learning' hypothesis. The second, 'anticipation' hypothesis distinguishes between the executives and the market, where executives of firms correctly anticipated their firms' poor subsequent performance and increased their firms' G-Index scores to protect against takeovers to keep their jobs. The third 'other characteristics' hypothesis is that the G-Index does not cause higher agency costs, but G-Index scores are correlated with other characteristics that was associated with abnormal returns.

Our fourth 'risk' hypothesis follows from Cremers, Nair and John (2009), who propose a risk-based explanation by arguing that likely takeover targets (e.g., with low G-Index scores) are more sensitive to aggregate cash flow shocks and thus have a higher expected return.[20] They find that the post-1990 governance-related alphas disappear once they add a takeover-factor to the four-factor Carhart model.

Our extended time period allows a reconsideration of these five hypotheses. Overall, our evidence seems most consistent with the 'learning' hypothesis. However, given the estimation risk involved with calculating abnormal returns, this section is more speculative.

As suggested by Figure 5 and Table IX, the alpha of the governance hedge portfolio has trended down since 1978. This seems generally consistent with the concept of learning, where abnormal returns are highest in the beginning and then, as investors learn about the importance of governance, such abnormal returns decline over time. The 1990-1999 period is the main exception, with a temporary increase in the alphas followed by a steep decline. Such volatility is of course inherent in calculating abnormal returns over relatively short periods. The finding that governance-association with abnormal returns is strongest for smaller capitalization stocks is also consistent

---

[20] The greater sensitivity of likely target firms to aggregate cash flow shocks follows from the empirical finding that takeovers tend to cluster together in times with more free cash availability. The higher expected return assumes that inter-temporal hedging effects are second-order. Target shareholders expect to receive a large payout upon the takeover, which typically happens in good times when they least need it. Intuitively, in that sense likely targets can be interpreted as 'anti-insurance' stocks that are riskier and thus commanding a higher expected return.

with learning, assuming that investors generally have less information about smaller capitalization stocks.

According to the second 'anticipation' hypothesis, as Gompers, Ishii and Metrick (2003) argue, the market would have been surprised by the relatively poor operating performance of the high G-Index firms, even if managers anticipated these. However, over the full time period, we do not find any (negative) association between the G-Index and operating performance as measured by accounting profits and sales growth. This is the main finding from Gompers, Ishii and Metrick (2003) that is not robust to extending the time period. In addition, Core, Guay and Rusticus (2006) find no evidence that the market was actually surprised by the low operating performance of high G-Index firms 1990-1999. Finally, Gompers, Ishii and Metrick (2003) investigate and also reject this hypothesis by considering insider trading, finding no evidence that e.g. insiders in high G-Index firms sold shares in advance of subsequent poor stock market performance.

For the third 'other characteristics' hypothesis, Gompers, Ishii and Metrick (2003) ran monthly cross-sectional regressions of excess returns on the G-Index and other characteristics. However, their analysis was inconclusive, mostly due to a lack of statistical power. Our longer time period improves such power and further permits the investigation of time variation in the G-Index (and in the other characteristics) through the use of firm fixed effects. For this purpose, we first estimate firm-level alphas using the four-factor Carhart model, for each period over which the G-Index is updated.[21] Second, we run pooled panel regressions of the annualized abnormal returns on the level of the G-Index with year and firm fixed effects. As controls, we also add the abnormal return from the previous period and the following firm characteristics: the market capitalization, percentage of institutional ownership, return on equity, sales growth, the industry Herfindahl index, the dividend yield and Q, where all characteristics are taken at the end of the fiscal year preceding the start of the period over which abnormal returns are calculated. Table XII presents the results for the full time period as well as various sub-periods.[22]

Over the full time period the coefficient of the G-Index is negative and significant, both economically and statistically. For example, the coefficient in the full specification of column 2 equals -0.0058, such a one standard deviation shock increase to the G-Index (2.9) is associated

---

[21] In order to improve beta estimates, we employ daily returns, and add lagged factors to account for trading non-synchronicity (price staleness), bid-ask bounces or other microstructure issues, effectively using an 8-factor model. As we update the G-Index every year for 1978-1990, for those years, each period over which abnormal returns are calculated runs from the beginning of July until the end of June the following year, so each 'period' lasts 12 months. After 1990, we change the portfolio formation at the end of the month that new data became available from IRRC, and each period over which abnormal returns are calculated starts at the beginning of the next month and runs until the month that new data again becomes available (typically about 2 years).

[22] Variable definitions follow Gompers, Ishii and Metrick (2003), if relevant. Robust standard errors are clustered by firm, but results are robust to clustering by year or not clustering.

with a -1.7% annualized abnormal return over the following period. In column 3, we add both firm fixed effects and industry fixed effects that change each year (i.e., industry dummies interacted with all year dummies). In effect, this should control for any industry clustering and thus serves as a robustness check to the industry-adjusting of the portfolio returns in the previous subsection. We find that the addition of such (industry x year) fixed effects leaves the G-Index coefficient almost unchanged and statistically strongly significant, while (naturally) greatly increasing the $R^2$.[23] Across sub-periods, the G-Index coefficient remains strongly statistically significant only for 1978-1989. For 1990-2007 and 1990-1999, the G-Index coefficient is similar to the coefficient for the whole 1978-2007 period, but without statistical significance. This is consistent with the findings in Gompers, Ishii and Metrick (2003), and with a lack of statistical power in those sub-periods due to limited time variation in the G-index.[24] In conclusion, we find that neither the abnormal return results over the whole period (nor for 1978-1989 over which they seem to be the most robust) can be explained by these other characteristics or by year and firm fixed effects.

For the fourth 'risk' hypothesis, we tried appending the takeover factor as constructed in Cremers, Nair and John (2009) to the four-factor model, and estimate abnormal returns with this five-factor model of governance-sorted portfolios as done for Tables IX-XI. While their takeover factor can explain much of the governance alphas post 1990, as documented in Cremers, Nair and John (2009), we find that if used over the whole period the alpha estimates are robust to adding the takeover factor. One possible explanation is that the 1980s takeover wave may have been more unanticipated. Alternatively, governance changes over the 1980s may have been, at least partly, a response to anticipated takeover threats, such that in equilibrium there was no relationship between the level of the G-Index and takeover likelihood. Therefore, we conclude that the 'learning' interpretation seems most consistent with our results.

## VI. CONCLUSION

While corporate governance has become a central research topic in corporate finance, comprehensive data on corporate governance has generally not been available prior to the 1990s. In this paper we introduce a database consisting of a large sample of firms starting in 1978 tracking these firms' G- and E-Index scores, as well as the presence or absence of each of the twenty-four

---

[23] Several of the controls are significant as well, e.g. greater firm size, more institutional ownership and higher Q are associated with lower abnormal returns. In unreported results, (log) firm age is insignificant when added.

[24] For both the 1990-2007 and 1990-1999 sub-periods, the coefficient of the G-Index is negative and statistically significant at 1% in the regression without year and firm fixed effects. The insignificance of the G-Index using only data starting in 1990 is also consistent with Chidambaran, Palia and Zheng (2008) who focus on the relationship between large governance changes and subsequent returns and performance changes.

G-Index corporate governance provisions. This enables us to study thirty years of corporate governance. For nineteen of the twenty-four G-Index provisions we follow our reconstruction of the IRRC's coding protocol, while for five of these provisions – director duties, director liability, anti-greenmail, limits on special meeting and limits on written consent – we have adopted a somewhat different coding protocol. With respect to the first three of these five provisions, we have coded for additional state statutes than those tracked by the IRRC while with respect to the last two (limits on special meeting and written consent) our coding protocol, unlike that of the IRRC, takes into account state statutory defaults which are important when a firm's charter or bylaw is silent on the issue.

Our analysis therefore has the considerable benefit of using "out of sample" data with considerable time variation to test existing hypotheses in the literature. We investigate the central issue of the effect of governance on firm valuation by exploiting the fact, which we document, that many changes in corporate governance occurred in the 1980s, with relative stability thereafter. We find a robust negative association, both economically and statistically meaningful, between poor governance (as proxied by the G- and E-Indexes) and firm valuation for the 1978-2006 time period. We find little evidence, however, to support the "reverse causation" explanation for this negative association (i.e., we do not find that low-valued firms tended to adopt more G-Index provisions).

To further explore the relationship between governance and firm value, we investigate whether governance affects firm valuation primarily through a "takeover channel", i.e. by affecting the probability of takeover rather than primarily through affecting a firm's current operating performance (as proxied by accounting profits and sales growth). We first document the substantial incidence of all types of M&A activity during much of the 1980s. Next, the law governing the use of takeover defenses during this time was also in considerable flux. Specifically, the legality of the poison pill was quite uncertain (as evidenced by the pre-1985 discussions and debates by leading corporate lawyers and corporate law scholars and the SEC's own position in *Household*) till the issuance of the seminal *Household* opinion by the Delaware Supreme Court in 1985 judicially validating the adoption of a poison pill as within the authority vested in a target board and subject to the most relaxed form of judicial review, the business judgment rule. Consistent with the takeover channel, poison pills, classified boards (which are a far more potent antitakeover defense when combined with a poison pill) and the G-Index more generally are indeed associated with more pronounced negative firm valuation effects after 1985.

Further support for the takeover channel is given by the finding that the G-Index has a more negative effect on firm value when a firm happens to be in an industry with a "high" level of

M&A activity rather than a "low" level. This hypothesis exploits the fact that mergers cluster by industry and appear to be, according to the literature, driven by unexpected exogenous shocks to industry structure, regulation or technological innovation.

Finally, in exploring other (not mutually exclusive but rather complementary) explanations for the negative association between poor governance and firm valuation as relating more generally to agency costs, we are unable to identify a statistically robust association between governance and a firm's operating performance in the time series (i.e., using firm fixed effects), although such an association exists cross-sectionally.

Our paper then examines the association between governance and abnormal stock returns, a subject that has generated a substantial literature in the aftermath of the Gompers, Ishii, and Metrick (2003) finding that good governance is associated with positive abnormal returns for the 1990-1999 period. We make a number of findings that bear on this literature.

First, for the full 1978-2007 time period we document, whether using value-weighted or equally-weighted portfolios, that there are positive, strongly statistically significant abnormal returns (using the Fama-French-Cahart four-factor model) associated with going long good corporate governance firms and shorting those with poor governance. Second, the abnormal returns for equally-weighted portfolios over the 1978-2007 period are robust to industry-adjusting as described in Johnson, Moorman, and Sorescu (2008). Third, governance seems to matter most for smaller capitalization stocks and the association between governance and abnormal returns generally appears to decline over our time period with a clearly negative time trend for equally-weighted abnormal returns over the 1978-2007 period.

Our extended time period allows for a reconsideration of the different explanations in the literature for the positive association between good governance and positive abnormal returns: (1) the market learned over time the importance of good governance; (2) firms adopted poor governance in anticipation (but unknown by the market) of future poor operating performance; (3) "other characteristics" were associated with high and low G-Index firms that were in turn associated with abnormal returns; and (4) low G-Index scores proxy for some source of un-diversifiable risk. We find our return findings most consistent with learning, (1), as abnormal returns are highest in the beginning of our time period and then, as investors presumably learn the importance of governance, decline over time. We investigate but fail to find evidence to support the other hypotheses.

## Bibliography

Andrade, Gregor, Mark Mitchell, and Erik Stafford, 2001, "New Evidence and Perspectives on Mergers," *Journal of Economic Perspectives* 15, 103-120.

Bebchuk, Lucian, John C. Coates, and Guhan Subramanian, 2002, "The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence & Policy," *Stanford Law Review* 54, 885-917.

Bebchuk, Lucian, Alma Cohen and Allen Ferrell, 2009, "What Matters in Corporate Governance?," *Review of Financial Studies* 22, 783.

Bebchuk, Lucian and Alma Cohen, 2005, "The Costs of Entrenched Boards," 78 *Journal of Financial Economics* 409-433.

Bertrand, M. and Sendhil Mullainathan, 2003, "Enjoying the Quiet Life? Corporate and Managerial Preferences," 111 *Journal of Political Economy* 215.

Bhagat, S. and J.A. Brickley, 1984, "Cumulative Voting: The Value of Minority Shareholder Voting Rights," 27 *Journal of Law and Economics* 339.

Coates, J., 2001, "Explaining Variation in Takeover Defenses: Blame the Lawyers," 89 *California Law Review* 1376.

Core, J. E., W. R. Guay, and T. O. Rusticus, 2006, "Does Weak Governance Cause Weak Stock Returns: An Examination of Firm Operating Performance and Investors' Expectations," *Journal of Finance* 61, 655-687.

Chidambaran, N. K., D. Palia and Y. Zheng, 2008, "Corporate Governance and Firm Performance: Evidence from Large Governance Changes," Working Paper.

Cremers, K.J.M., and V.B. Nair, 2005 "Governance Mechanisms and Equity Prices," *Journal of Finance* 60, 2859-2894.

Cremers, K.J.M., V. Nair and K. Jose, 2009, "Takeovers and the Cross-section of Returns," *Review of Financial Studies* 22, 1409-1445.

DeAngelo, H. and I. DeAngelo, 1985, "Managerial Ownership of Voting Rights: A Study of Public Corporations with Dual Classes of Stock," 14 *Journal of Finance* 33-70.

Demsetz, D. and K. Lehn (1985), "The Structure of Corporate Ownership: Causes and Consequences," *Journal of Political Economy* 93-6, 1155-1177.

Easterbrook, Frank and D. Fischel, 1981, "The Proper Role of a Target's Management in Responding to a Tender Offer," *Harvard Law Review* 94, 1161.

Fama, E.F. and K.R. French, 1997, "Industry Costs of Equity," *Journal of Financial Economics*, 93, 153-194.

Gilson, Ronald, 1981, "A Structural Approach to Corporations: The Case against Defensive Tactics in Tender Offers," 33 *Stanford Law Review* 819.

Gilson, Ronald, 1988, "Drafting an Effective Antigreenmail Prohibition," 88 *Columbia Law Review* 330

Giroud, Xavier, and Holger Mueller, 2008, "Corporate Governance, Product Market Competition, and Equity Prices," working paper.

Gompers, Paul, Joy Ishii, and Andrew Metrick, 2003, "Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118.

Investor Responsibility Research Center, 1999. State Takeover Laws. Washington, D.C.

Jarrell, Gregg and Michael Bradley, 1980, "The economic effects of federal and state regulations of cash tender offers," 23 *Journal of Law and Economics* 371-407.

Jarrell, Gregg and A. Poulsen, 1987, "Shark Repellents and stock prices: The Effects of Antitakeover Amendments since 1980, 19 *Journal of Financial Economics* 127-169

Jarrell, Gregg and A. Poulsen, 1988, "Dual Class Recapitalizations as Antitakeover Mechanisms: The Recent Evidence," 20 *Journal of Financial Economics* 129-152

Johnson, S.A., T. Moorman, and S. Sorescu, 2008, "A Reexamination of Corporate Governance and Equity Prices," *Review of Financial Studies*, forthcoming.

Karpoff, Jonathan M. and Paul H. Malatesta, 1989, "The wealth effects of second-generation state takeover legislation," 25 *Journal of Financial Economics* 291-322.

Lambert, Richard, and David Larker, 1985, "Golden Parachutes, Executive Decision Making and Shareholder Wealth," *Journal of Accounting and Economics 7,* 179-203.

Lang, L. H. P. and R. M. Stultz (1994), "Tobin's q, Corporate Diversification, and Firm Performance," *Journal of Political Economy* 102, 1248-1280.

Lease, R., J. McConnell and W. Mikkelson, 1983, "The Market Value of Control in Publicly-traded companies," 11 *Journal of Financial Economics* 321.

Lehn, Kenneth and Annette Poulsen, 1989, "Free Cash Flow and Stockholder Gains in Going Private Transactions," *Journal of Finance*, 771.

Lehn, Kenneth, Sukesh Patro, and Mengxin Zhao, 2006, "Governance Indices and Valuation Multiples: Which Causes Which?" Working Paper.

Lewellen, S., and A. Metrick, 2009, "Industry, Governance, and Equity Prices," Working Paper.

Lipton, Martin and Paul Rowe, 2002, "Pills, Polls and Professors: A Reply to Professor Gilson," 27 *Journal of Corporation Law* 1.

Lynch and Steinberg, 1979, "The Legitimacy of Defensive Tactics in Tender Offers," 64 *Cornell Law Review* 901.

Mahla, C.R., 1991, "State Takeover Statutes and Shareholder Wealth," Unpublished paper.

Masters, Kim, "Poison pill takeover defense stirs Controversy, uncertainty," Business Week (August 29, 1983).

Morck, R., A. Shleifer, and R. Vishny (1988), "Management Ownership and Market Valuation: An Empirical Analysis," *Journal of Financial Economics* 20, 293–315.

Mitchell, Mark and J. Harold Mulherin, 1996, "The Impact of Industry Shocks on Takeover and Restructuring Activity," *Journal of Financial Economics* 41, 193-229.

Rosenbaum, Virgina K., 1990. Corporate Takeover Defenses. Washington, D.C.:  Investor Responsibility Research Center.

Stevenson, Gelvin, "A poison pill that's causing a rash of lawsuits," Business Week (April 1, 1985).

Velasco, J., 2002, "The Enduring Illegitimacy of the Poison Pill," 27 *Journal of Corporation Law* 381.

Yermack, D. (1996), "Higher Market Valuation for Firms with a Small Board of Directors," *Journal of Financial Economics* 40, 185–211.





Figures 1 and 2 present the 10th, 20th, 50th, 80th and 90th percentiles of the distribution of the G-Index and E-Index, respectively. We require no more than 7 missing provisions for the G-Index and no more than 2 missing for the E-Index.



Figure 3 presents the annual incidence of the 6 provisions in the E-Index: (i) supermajority voting requirements for changing the charter (ii) for changing the by-laws and (iii) for approving merger, (iv) classified board, (v) poison pill, (vi) golden parachute.



Figure 4 presents the annual mergers and acquisition activity, either measured by deal value ('DV,' as a percentage of market cap of all firms in Compustat) or by the number of firms ('#,' as a percentage of all firms in Compustat). We separate deals into friendly, hostile and LBOs deals, as classified by the SDC database.



Figure 5 plots the 24-month moving averages of the abnormal returns of hedge portfolios that buy stocks in the decile with the lowest G-Index and short stocks in the decile with the highest G-Index (D1-D10). We show results for both value and equally-weighted hedge portfolios. The abnormal returns are annualized and calculated over the full 1978-2007 time period (i.e., with constant betas estimated in-sample). We also plot the fit from a regression of the respective monthly abnormal returns series on a constant and a simple time trend.

TABLE I
DESCRIPTIVE STATISTICS

The Table presents the mean and standard deviation (St. Dev.) of the variables used in subsequent tables. G-Index is the shareholder rights index based on 24 provisions (see Gompers, Ishii and Metrick (2003)), where a higher score means fewer shareholder rights. E-Index is a sub-index of the G-Index based on 6 provisions (see Bebchuk, Cohen and Ferrell (2009)). Q is a proxy for firm value, measured as the market-to-book ratio of the firm. ROA is the return on assets, measured as the ratio of net income over book value of total assets. NPM is the net profit margin, measured as the ratio of net income over total sales. Sales Growth is measured over a 5-year period. Log Book is the log of the book value of total assets. Capex/Assets is the ratio of capital expenditures over book value of total assets. Capex Missing is a dummy variable equal to one if Capex are missing in Compustat. Leverage is the ratio of book value of total debt over book value of total assets. R&D is the ratio of research and development expenditures over the book value of total assets. R&D Missing is a dummy variable equal to one if R&D expenditures are missing in Compustat. S&P 500 dummy equals one if the firm is included in the S&P 500 index. PPE/Assets is the ratio of property, plant and equipment expenditures over the book value of total assets. PPE Missing is a dummy variable equal to one if PPE expenditures are missing in Compustat. IO is the percentage of institutional ownership as recorded by the Thompson database of quarterly 13F filings. Herfindahl is the herfindahl index of the 48 Fama-French industry groups, using all firms in Compustat, and based on total sales. Ind.Adj. means that the variable is industry-adjusted, which is done by subtracting the industry-median based on the 48 Fama-French industry groups, using all firms in Compustat.

| | 1978-2006 | | 1978-1989 | | 1990-2006 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Mean | St. Dev. | Mean | St. Dev. | Mean | St. Dev. |
| G-Index | 8.69 | 3.00 | 7.08 | 2.87 | 9.29 | 2.83 |
| E-Index | 2.05 | 1.42 | 1.39 | 1.32 | 2.30 | 1.38 |
| Ind.Adj. Q | 0.17 | 0.80 | 0.04 | 0.47 | 0.22 | 0.88 |
| Ind.Adj. ROA | 0.04 | 0.09 | 0.03 | 0.08 | 0.05 | 0.10 |
| Ind.Adj. NPM | 0.03 | 0.15 | 0.01 | 0.07 | 0.04 | 0.17 |
| Ind.Adj. Sales Growth | 0.01 | 0.19 | 0.00 | 0.17 | 0.01 | 0.20 |
| Q | 1.56 | 0.90 | 1.24 | 0.51 | 1.68 | 0.98 |
| ROA | 0.14 | 0.08 | 0.15 | 0.08 | 0.13 | 0.08 |
| NPM | 0.05 | 0.09 | 0.04 | 0.06 | 0.05 | 0.10 |
| Sales Growth | 0.08 | 0.20 | 0.08 | 0.18 | 0.09 | 0.21 |
| Log Book | 7.27 | 1.62 | 6.91 | 1.50 | 7.40 | 1.65 |
| Capex/Assets | 0.06 | 0.05 | 0.07 | 0.05 | 0.06 | 0.05 |
| Capex Missing | 0.02 | 0.14 | 0.01 | 0.08 | 0.03 | 0.16 |
| Leverage | 0.21 | 0.17 | 0.20 | 0.15 | 0.21 | 0.17 |
| R&D | 0.02 | 0.07 | 0.02 | 0.03 | 0.02 | 0.08 |
| R&D Missing | 0.50 | 0.50 | 0.45 | 0.50 | 0.52 | 0.50 |
| S&P 500 | 0.41 | 0.49 | 0.53 | 0.50 | 0.36 | 0.48 |
| PPE/Assets | 0.13 | 0.22 | 0.07 | 0.17 | 0.15 | 0.23 |
| PPE Missing | 0.62 | 0.49 | 0.82 | 0.38 | 0.54 | 0.50 |
| IO | 0.51 | 0.22 | 0.39 | 0.19 | 0.55 | 0.21 |
| Herfindahl | 0.22 | 0.18 | 0.26 | 0.19 | 0.21 | 0.18 |

TABLE II

COMPARISON OF CF DATABASE AS OF 1989 WITH IRRC DATABASE AS OF 1990

This table compares the incidence of the twenty-four corporate governance provisions in the G-Index as of 1989 as reflected in the Cremers-Ferrell database with the incidence of these provisions as reflected in the IRRC database as of 1990. Any difference in incidence between the two years greater than the absolute value of .10 is in bold. For five of these provisions – limits on written consent, limits on special meeting, director liability, director duties and anti-greenmail – the Cremers-Ferrell coding of these variables varied from that of the IRRC. For these five, IRRC data was used to estimate the incidence of these five provisions using the Cremers-Ferrell coding protocol (the "IRRC corrected" incidence).

| Provisions | 1989 Incidence | 1990 Incidence | Difference |
|---|---|---|---|
| Classified board | .57 | .57 | 0.00 |
| Supermajority | .44 | .39 | -.05 |
| Limit to amend bylaws | .20 | .14 | -.06 |
| Limit to amend charter | .04 | .03 | -.01 |
| Poison pill | .52 | .52 | 0.00 |
| Golden parachute | .53 | .50 | -.03 |
| Limits to special meeting | .88 | .24 | **-.64** |
| *Limits to special meeting (IRRC corrected)* | .88 | .75 | **-.13** |
| Limits to written consent | .71 | .24 | **-.47** |
| *Limits to written consent (IRRC corrected)* | .71 | .64 | -.07 |
| No cumulative voting | .82 | .83 | .01 |
| No secret ballot | .96 | .98 | .02 |
| Director indemnification K | .20 | .17 | -.03 |
| Director indemnification | .96 | .41 | **-.55** |
| Director liability | .87 | .73 | **-.15** |
| *Director liability (IRRC corrected)* | .87 | .80 | -.07 |
| Compensation plans | .46 | .44 | -.02 |
| Severance agreements | .19 | .14 | -.05 |
| Unequal vote | .01 | .02 | .01 |
| Fair price | .62 | .57 | -.05 |
| Cash out law | .41 | .40 | -.01 |
| Director duties | .38 | .10 | **-.28** |
| *Director duties (IRRC corrected)* | .38 | .38 | 0.00 |
| Business combination | .79 | .84 | .05 |
| Anti-greenmail | .22 | .19 | -.03 |
| *Anti-greenmail (IRRC corrected)* | .22 | .21 | -.01 |
| Pension Parachutes | .06 | .04 | -.02 |
| Silver parachutes | .04 | .04 | 0.00 |
| Blank check | .24 | .76 | **.52** |

### TABLE III
### NUMBER OF FIRMS CONTAINED IN CREMERS-FERRELL DATABASE

This table documents the number of firms for which corporate governance data was collected for each year from 1978 to 1989. It also documents the number of firms for which there was missing data for no more than 11 out of 24 provisions; no more than 7 provisions; and no more than 3 missing. The table also reports the median number of provisions for which data was missing for the no more than 7 missing group, which is used throughout the paper unless specifically noted.

| Year | Firms for which data was collected | No more than 11 missing | No more than 7 missing | No more than 3 missing | Median # of missing for the no more than 7 group | Max. 7 missing, replacing missing provisions with next year's value |
|------|------|------|------|------|------|------|
| 1978 | 1,208 | 996 | 215 | 82 | 6 | 296 |
| 1979 | 1,184 | 978 | 285 | 146 | 0 | 485 |
| 1980 | 1,159 | 957 | 471 | 364 | 0 | 588 |
| 1981 | 1,127 | 933 | 554 | 478 | 0 | 607 |
| 1982 | 1,095 | 907 | 565 | 494 | 0 | 682 |
| 1983 | 1,078 | 958 | 638 | 542 | 0 | 751 |
| 1984 | 1,039 | 914 | 689 | 611 | 0 | 755 |
| 1985 | 991 | 869 | 674 | 594 | 0 | 753 |
| 1986 | 944 | 828 | 675 | 594 | 0 | 753 |
| 1987 | 897 | 795 | 670 | 579 | 0 | 863 |
| 1988 | 847 | 844 | 766 | 638 | 0 | 853 |
| 1989 | 788 | 786 | 730 | 614 | 0 | 814 |

## TABLE IV
### FIRM VALUATION

This Table presents regressions where the dependent variable is industry-adjusted Tobin's Q (using the Fama-French 48 (1997) industry classification) with industry-adjustments done by subtracting the median value using all Compustat firms. Panel A are annual cross-sectional regressions and their associated t-statistics. All regressions in each of the 3 Panels include the same controls, but these are only in Panels B, and not reported in Panels A and C to save space. Panels B and C are pooled panel regressions on either the G-Index, the G-Index with imputed missing provisions, the E-Index, the G-Subgroup Index or the G-Index Uncorrected and various controls. Both Panels B and C control for year fixed effects, in some regressions firm or 48 industry group fixed effects. For panel C: 'Industry x Year F.E.' means industry fixed effects that change each year, see column 4. The 'G-Index with imputed missing provisions' uses next year's information on a provision if it's missing, see column 5. Controlling for the 'G-Index in 1989' is a robustness check for the compatibility of the G-Index over 1978-1989 to the G-Index over 1990-2006, see column 6. See Table I for a description of the controls in all 3 panels. In Panels A and B, the maximum number of missing provisions allowed is 7. T-statistics are based on robust standard errors clustered at the firm-level.

### PANEL A. ANNUAL CROSS-SECTIONAL REGRESSIONS OF INDUSTRY-ADJUSTED Q ON G-INDEX

|      | G-Index | t-statistic | R2 |
|------|---------|-------------|--------|
| 1978 | -1.18%  | -0.70       | 14.47% |
| 1979 | -0.65%  | -0.40       | 8.34%  |
| 1980 | -0.58%  | -0.33       | 8.71%  |
| 1981 | 0.17%   | 0.16        | 11.33% |
| 1982 | -2.45%  | -1.75       | 14.54% |
| 1983 | -2.64%  | -2.44       | 14.44% |
| 1984 | -2.04%  | -2.85       | 12.19% |
| 1985 | -1.96%  | -2.45       | 9.98%  |
| 1986 | -1.01%  | -1.50       | 7.61%  |
| 1987 | -1.60%  | -2.31       | 9.26%  |
| 1988 | -1.25%  | -2.03       | 8.63%  |
| 1989 | -1.22%  | -1.66       | 8.35%  |
| 1990 | -2.21%  | -3.28       | 8.81%  |
| 1991 | -3.27%  | -4.01       | 10.81% |
| 1992 | -3.18%  | -4.10       | 11.46% |
| 1993 | -2.80%  | -3.22       | 7.18%  |
| 1994 | -2.11%  | -2.75       | 7.67%  |
| 1995 | -2.12%  | -2.51       | 6.96%  |
| 1996 | -1.50%  | -1.65       | 9.62%  |
| 1997 | -1.32%  | -1.35       | 10.60% |
| 1998 | -2.48%  | -2.45       | 16.15% |
| 1999 | -2.71%  | -2.11       | 12.10% |
| 2000 | -2.62%  | -2.11       | 17.97% |
| 2001 | -2.26%  | -1.93       | 19.86% |
| 2002 | -0.68%  | -0.73       | 18.18% |
| 2003 | -1.25%  | -1.16       | 14.11% |
| 2004 | -1.10%  | -1.06       | 10.93% |
| 2005 | -1.06%  | -0.97       | 9.84%  |
| 2006 | -0.46%  | -0.45       | 11.75% |

PANEL B. POOLED PANEL REGRESSIONS OF INDUSTRY-ADJUSTED Q

| | 1978-2006 | | | 1978-1989 | | 1990-2006 | | 1990-1999 | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| G-Index | -0.020 | -0.018 | -0.011 | -0.007 | 0.001 | -0.021 | -0.016 | -0.022 | -0.022 |
| | (3.76) | (3.74) | (1.92) | (1.56) | (0.23) | (3.59) | (1.61) | (3.61) | (1.46) |
| Log Book | -0.079 | -0.087 | -0.167 | -0.068 | -0.168 | -0.097 | -0.224 | -0.085 | -0.185 |
| | (7.03) | (6.51) | (7.12) | (5.59) | (6.06) | (5.79) | (7.86) | (5.01) | (4.82) |
| Capex/Assets | 1.994 | 2.533 | 1.758 | 1.159 | 0.688 | 3.160 | 2.045 | 2.665 | 1.485 |
| | (8.04) | (9.12) | (8.84) | (5.13) | (3.21) | (8.37) | (8.03) | (6.55) | (5.34) |
| Capex Missing | -0.005 | -0.196 | -0.068 | -0.120 | -0.078 | -0.193 | -0.070 | -0.209 | -0.068 |
| | (0.11) | (3.41) | (1.53) | (2.03) | (2.29) | (2.92) | (1.09) | (3.28) | (0.85) |
| Leverage | -0.686 | -0.728 | -0.400 | -0.439 | 0.257 | -0.803 | -0.541 | -0.785 | -0.425 |
| | (7.30) | (7.29) | (5.12) | (3.29) | (2.39) | (6.76) | (5.75) | (6.01) | (3.70) |
| R&D | 0.343 | 0.911 | 0.400 | 2.861 | 0.602 | 0.833 | 0.338 | 2.161 | 1.408 |
| | (1.73) | (1.70) | (2.81) | (3.09) | (0.67) | (1.69) | (2.91) | (4.46) | (2.26) |
| R&D Missing | 0.014 | -0.083 | 0.057 | 0.027 | -0.019 | -0.130 | 0.084 | -0.047 | -0.006 |
| | (0.47) | (2.31) | (1.52) | (0.86) | (0.51) | (2.77) | (1.48) | (0.97) | (0.08) |
| S&P500 | 0.347 | 0.356 | 0.127 | 0.167 | 0.111 | 0.434 | 0.132 | 0.333 | 0.146 |
| | (9.83) | (10.43) | (3.58) | (5.73) | (2.74) | (9.76) | (3.06) | (7.11) | (2.46) |
| PPE/Assets | -0.328 | -0.340 | -0.005 | -0.055 | -0.074 | -0.347 | 0.000 | -0.183 | 0.052 |
| | (4.89) | (5.12) | (0.10) | (0.56) | (0.62) | (4.72) | (0.01) | (1.90) | (0.55) |
| PPE Missing | -0.138 | -0.166 | -0.037 | 0.053 | 0.009 | -0.195 | -0.057 | -0.048 | -0.051 |
| | (3.80) | (4.66) | (1.23) | (1.18) | (0.16) | (4.77) | (1.80) | (0.91) | (1.08) |
| | | | | | | | | | |
| Firm F.E. | No | No | Yes | No | Yes | No | Yes | No | Yes |
| Industry F.E. | No | Yes | No | Yes | No | Yes | No | Yes | No |
| Year F.E. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| N | 23,296 | 23,296 | 23,296 | 6,381 | 6,381 | 16,915 | 16,915 | 11,054 | 11,054 |
| R2 | 10.10% | 15.46% | 65.94% | 21.14% | 74.23% | 15.94% | 70.14% | 14.54% | 73.97% |

PANEL C: POOLED PANEL REGRESSIONS OF INDUSTRY-ADJUSTED Q: ROBUSTNESS CHECKS

All specifications use the 1978-2006 period.

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| G-Index | -0.011 | -0.010 | -0.010 | -0.017 | | -0.011 | | | | | |
| | (1.79) | (2.00) | (1.98) | (3.39) | | (1.92) | | | | | |
| G-Index with imputed missing provisions | | | | | -0.010 | | | | | | |
| | | | | | (1.78) | | | | | | |
| G-Index in 1989 | | | | | | 0.003 | | | | | |
| | | | | | | (0.51) | | | | | |
| E-Index | | | | | | | -0.049 | -0.012 | | | |
| | | | | | | | (5.08) | (1.05) | | | |
| G-Subgroup | | | | | | | | | -0.027 | -0.012 | |
| | | | | | | | | | (4.09) | (1.67) | |
| G-Uncorrected | | | | | | | | | | | -0.009 |
| | | | | | | | | | | | (1.55) |
| Missing Provisions Maximum | 5 | 11 | 15 | 7 | 7 | 7 | 2 | 2 | 9 | 9 | 7 |
| Panel B Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm F.E. | Yes | Yes | Yes | No | Yes | Yes | No | Yes | No | Yes | Yes |
| Industry F.E. | No | No | No | Yes | No | No | Yes | No | Yes | No | No |
| Industry x Year F.E. | No | No | No | Yes | No | No | No | No | No | No | No |
| Year F.E. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| N | 22,404 | 26,782 | 26,893 | 23,296 | 24,080 | 23,296 | 22,986 | 22,986 | 24,756 | 24,756 | 23,296 |
| R2 | 66% | 65% | 65% | 21% | 65% | 66% | 16% | 66% | 15% | 65% | 66% |

TABLE V
GOVERNANCE AND REVERSE CAUSATION

The dependent variable is firms' G-Index score focusing on one of three time periods: 1978-2006; 1978-1989; and 1990-2006. Moreover, all the independent variables are the previous year's values (one year lagged). The regressions are pooled panel regressions with firm fixed effects and, in some regressions, year fixed effects. T-statistics are based on robust standard errors clustered at the firm-level. See Table I for a description of the independent variables.

| Dependent: G-Index | 1978-2006 | | 1979-1989 | | 1990-2006 | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Q | 0.29 | -0.07 | 1.23 | 0.05 | 0.00 | -0.05 |
| | (2.71) | (6.05) | (5.87) | (0.67) | (0.20) | (4.51) |
| Log Book | 0.86 | 0.13 | 2.67 | 0.14 | 0.37 | 0.08 |
| | (6.25) | (4.18) | (9.76) | (2.98) | (6.12) | (2.24) |
| Capex/Assets | -3.19 | 0.67 | -7.15 | 0.57 | -0.18 | 0.61 |
| | (2.68) | (2.91) | (3.65) | (1.52) | (0.51) | (2.06) |
| Capex Missing | 0.58 | 0.21 | 1.19 | 0.14 | 0.09 | 0.07 |
| | (2.82) | (1.74) | (1.59) | (0.27) | (1.25) | (0.88) |
| Leverage | 1.09 | 0.40 | 1.76 | 0.64 | 0.21 | 0.21 |
| | (4.38) | (4.25) | (5.11) | (3.18) | (1.79) | (2.11) |
| R&D | 3.06 | -0.14 | 18.39 | 5.15 | 0.42 | -0.55 |
| | (2.96) | (0.41) | (3.69) | (3.24) | (1.28) | (2.19) |
| R&D Missing | 0.15 | -0.03 | 0.03 | -0.29 | 0.06 | 0.01 |
| | (2.38) | (0.51) | (0.25) | (2.30) | (1.49) | (0.38) |
| S&P 500 | 0.18 | 0.20 | 0.53 | 0.11 | 0.14 | 0.24 |
| | (2.13) | (5.18) | (2.53) | (1.27) | (2.29) | (5.81) |
| PPE/Assets | 0.32 | -0.06 | 1.36 | 0.35 | 0.04 | 0.00 |
| | (2.43) | (0.92) | (2.50) | (1.19) | (0.61) | (0.05) |
| PPE Missing | -0.13 | -0.07 | -0.64 | 0.27 | -0.32 | -0.02 |
| | (1.13) | (1.54) | (3.33) | (1.20) | (5.82) | (0.48) |
| Total IO | 2.90 | 0.43 | 5.89 | -0.07 | 0.98 | 0.53 |
| | (5.23) | (4.18) | (7.64) | (0.31) | (10.57) | (5.30) |
| ROA | -1.84 | 0.21 | -2.80 | -0.30 | -0.49 | -0.07 |
| | (2.10) | (1.04) | (1.78) | (0.69) | (1.75) | (0.46) |
| Firm F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| Year F.E. | No | Yes | No | Yes | No | Yes |
| N | 20,906 | 20,906 | 6,015 | 6,015 | 14,891 | 14,891 |
| R2 | 76.02% | 86.36% | 68.21% | 85.01% | 90.84% | 91.40% |

TABLE VI

FIRM VALUATION AND PRE- AND POST-1985

The dependent variable is industry-adjusted, year-end Tobin's Q over the period 1978-2006. In columns (1)(3) independent variables include the G-Index and the G-Index interacted with a dummy variable for whether the year is prior to 1985 and a dummy for whether the year is equal to 1985. In columns (4)(5) independent variables include classified board interacted with a pre-1985 and 1985 dummy variables and columns (6)(7) have pre-1985 and 1985 dummy variables interact with poison pills. All controls in Table IV are included as well in all regressions; see Table I for a description. All specifications include year fixed effects, and either 48 industry group or firm fixed effects. T-statistics are based on robust standard errors clustered at the firm-level and are given between parentheses.

|  | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|
| Gindex x Pre-1985 | 0.022 | 0.020 | 0.011 |  |  |  |  |
|  | (1.82) | (1.81) | (1.14) |  |  |  |  |
| Gindex x 1985 | 0.002 | 0.002 | 0.006 |  |  |  |  |
|  | (0.20) | (0.18) | (0.72) |  |  |  |  |
| Gindex | -0.021 | -0.020 | -0.012 |  |  |  |  |
|  | (3.70) | (3.68) | (1.98) |  |  |  |  |
| CBoard x Pre-1985 |  |  |  |  | 0.117 |  |  |
|  |  |  |  |  | (2.87) |  |  |
| CBoard x 1985 |  |  |  |  | 0.047 |  |  |
|  |  |  |  |  | (1.09) |  |  |
| CBoard |  |  |  | -0.065 | -0.081 |  |  |
|  |  |  |  | (2.31) | (2.53) |  |  |
| PPill x Pre-1985 |  |  |  |  |  |  | 0.161 |
|  |  |  |  |  |  |  | (1.35) |
| PPill x 1985 |  |  |  |  |  |  | 0.053 |
|  |  |  |  |  |  |  | (0.58) |
| PPill |  |  |  |  |  | -0.116 | -0.117 |
|  |  |  |  |  |  | (4.02) | (4.02) |
| Controls Table III | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm F.E. | No | No | Yes | No | No | No | No |
| Industry F.E. | No | Yes | No | Yes | Yes | Yes | Yes |
| Year F.E. | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| N | 23,296 | 23,296 | 23,296 | 23,247 | 23,247 | 23,296 | 23,296 |
| R2 | 10.12% | 15.48% | 65.94% | 15.29% | 15.35% | 15.54% | 15.54% |

TABLE VII
GOVERNANCE AND THE TAKEOVER CHANNEL

The dependent variable is industry-adjusted, year-end Tobin's Q over the period 1982-2006 as well as sub-periods 1982-1990 and 1991-2006. Low (High) Friendly Ind48 is a dummy variable equal to one if the firm is in an industry experiencing a relatively low (high) level of friendly takeover activity in that year. Low and high are defined as the industry's percentage of all Compustat firms engaged in a friendly takeover falling in the first and fourth quartile, respectively. These two dummy variables are interacted with the G-Index. We separately control for the industry's percentage of all Compustat firms engaged in a friendly takeover (48 Ind. % friendly, #). All controls in Table IV are included as well in all regressions; see Table I for a description. All specifications include year fixed effects, and either 48 industry group or firm fixed effects. T-statistics are based on robust standard errors clustered at the firm-level and are given between parentheses.

| Dependent: industry-adjusted Q | 1982-2006 | | 1982-1990 | | 1991-2006 | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| G-Index * Low Friendly Ind48 | 0.003 | 0.003 | 0.001 | 0.000 | 0.004 | 0.005 |
| | (1.72) | (2.80) | (0.35) | (0.07) | (1.96) | (3.54) |
| G-Index | -0.019 | -0.011 | -0.016 | 0.003 | -0.020 | -0.017 |
| | (3.73) | (1.79) | (3.56) | (0.63) | (3.31) | (1.80) |
| G-Index * High Friendly Ind48 | -0.004 | -0.002 | -0.004 | -0.004 | -0.005 | -0.002 |
| | (2.15) | (1.82) | (1.77) | (2.08) | (2.00) | (1.30) |
| 48 Ind. % friendly, # | -0.24 | -0.28 | 0.41 | 0.22 | -0.45 | -0.50 |
| | (0.54) | (1.12) | (1.08) | (0.65) | (0.76) | (1.68) |
| | | | | | | |
| Other Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm F.E. | No | Yes | No | Yes | No | Yes |
| Industry F.E. | Yes | No | Yes | No | Yes | No |
| Year F.E. | Yes | Yes | Yes | Yes | Yes | Yes |
| N | 21,867 | 21,867 | 6,170 | 6,170 | 15,697 | 15,697 |
| R2 | 15.32% | 66.98% | 16.70% | 80.39% | 16.39% | 71.42% |

### TABLE VIII
### GOVERNANCE AND THE PROFITABILITY AND SALES GROWTH

The dependent variable is industry-adjusted ROA in Panel A, industry-adjusted NPM in Panel B, and industry-adjusted sales-growth in Panel C. We show results for the full 1978-2006 period as well as various sub-periods. ROA is the firm's return on assets, defined as the net income divided by the book value of total assets. NPM is the firm's net profit margin, defined as the net income divided by the total sales. Sales growth is the growth in total sales in the last 5 years. ROA, NPM and Sales Growth are all in percentage points (i.e., multiplied by a factor 100). All controls in Table IV are included as well in all regressions; see Table I for a description. All specifications include year fixed effects, and (except for column 1) either 48 industry group or firm fixed effects. T-statistics are based on robust standard errors clustered at the firm-level and are given between parentheses.

| | 1978-2006 | | | 1978-1989 | | 1990-2006 | | 1990-1999 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| **Panel A. Industry-adjusted ROA as the dependent** | | | | | | | | | |
| G-Index | -0.02 | -0.02 | -0.03 | 0.17 | 0.08 | -0.05 | -0.13 | -0.07 | -0.07 |
| | (0.29) | (0.38) | (0.47) | (2.40) | (0.93) | (1.13) | (1.72) | (1.38) | (0.75) |
| N | 24,339 | 24,339 | 24,339 | 6,559 | 6,559 | 17,780 | 17,780 | 11,492 | 11,492 |
| R2 | 13.05% | 42.18% | 72.35% | 31.63% | 70.58% | 48.86% | 78.17% | 44.68% | 80.79% |
| **Panel B. Industry-adjusted NPM as the dependent** | | | | | | | | | |
| G-Index | -0.05 | -0.10 | -0.10 | 0.01 | 0.03 | -0.12 | -0.14 | -0.12 | -0.04 |
| | (0.53) | (1.90) | (0.97) | (0.12) | (0.33) | (2.19) | (1.01) | (2.36) | (0.31) |
| N | 24,724 | 24,724 | 24,724 | 6,585 | 6,585 | 18,139 | 18,139 | 11,761 | 11,761 |
| R2 | 8% | 51% | 71% | 27% | 53% | 64% | 79% | 57% | 78% |
| **Panel C. Industry-adjusted Sales Growth as the dependent** | | | | | | | | | |
| G-Index | -0.16 | -0.18 | -0.19 | -0.10 | -0.24 | -0.20 | -0.30 | -0.17 | -0.34 |
| | (2.52) | (2.94) | (1.55) | (0.85) | (1.19) | (2.77) | (1.44) | (1.96) | (1.19) |
| N | 24,722 | 24,722 | 24,722 | 6,585 | 6,585 | 18,137 | 18,137 | 11,758 | 11,758 |
| R2 | 1.91% | 2.87% | 19.37% | 5.47% | 25.69% | 3.07% | 21.47% | 3.43% | 32.16% |
| Other Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm F.E. | No | No | Yes | No | Yes | No | Yes | No | Yes |
| Industry F.E. | No | Yes | No | Yes | No | Yes | No | Yes | No |
| Year F.E. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |

TABLE IX

G-INDEX EXCESS AND ABNORMAL RETURNS

Panel A presents excess returns and abnormal return results as measured by the Fama-French-Carhart four-factor model, with portfolios weighted by stock's market capitalization. Panel B presents excess and abnormal return (Alpha) results with portfolios that are equally weighted. Both excess and abnormal returns are annualized and t-statistics are given below the returns. We use four different time periods. Q1 and Q5, respectively, are the results for the portfolio with the 20% lowest and highest G-Index stocks at portfolio formation, while Q1-Q5 is the long-short portfolio that buys stocks in Q1 and sells stocks in Q5. D1, D10 and D1-D10 are the analogous results for sorting stocks into deciles according to their G-Index levels.

PANEL A. VALUE-WEIGHTED PORTFOLIOS

| G-Index Group | 1978:7 - 2007:6 | | 1978:7 - 1990:8 | | 1990:9 - 2007:6 | | 1990:9 - 1999:12 | |
|---|---|---|---|---|---|---|---|---|
| | Excess Returns | Carhart Alphas | Excess Returns | Carhart Alphas | Excess Returns | Carhart Alphas | Excess Returns | Carhart Alphas |
| Q1 | 8.79% | 1.59% | 7.80% | 1.82% | 9.50% | 1.80% | 16.64% | 1.87% |
| | (0.59) | (2.45) | (0.47) | (2.05) | (0.70) | (1.95) | (1.26) | (1.96) |
| Q5 | 8.81% | -0.12% | 8.12% | 1.78% | 9.31% | 0.89% | 12.03% | -2.47% |
| | (0.57) | (0.10) | (0.43) | (1.38) | (0.73) | (0.59) | (0.92) | (1.60) |
| Q1-Q5 | -0.02% | 1.71% | 0.31% | 0.04% | 0.19% | 0.91% | 4.61% | 4.34% |
| | (0.00) | (1.30) | (0.05) | (0.03) | (0.02) | (0.53) | (0.78) | (2.13) |
| D1 | 10.21% | 2.37% | 10.42% | 3.68% | 10.06% | 2.48% | 17.09% | 2.46% |
| | (0.66) | (2.40) | (0.58) | (2.65) | (0.74) | (1.91) | (1.23) | (1.60) |
| D10 | 8.40% | -1.56% | 7.72% | 0.81% | 8.89% | -0.95% | 9.40% | -6.00% |
| | (0.52) | (1.07) | (0.39) | (0.42) | (0.67) | (0.55) | (0.69) | (2.72) |
| D1-D10 | 1.82% | 3.93% | 2.71% | 2.87% | 1.17% | 3.43% | 7.69% | 8.46% |
| | (0.21) | (2.43) | (0.34) | (1.23) | (0.13) | (1.66) | (0.81) | (2.81) |

PANEL B. EQUALLY-WEIGHTED PORTFOLIOS

| G-Index Group | 1978:7 - 2007:6 | | 1978:7 - 1990:8 | | 1990:9 - 2007:6 | | 1990:9 - 1999:12 | |
|---|---|---|---|---|---|---|---|---|
| | Excess Returns | Carhart Alphas | Excess Returns | Carhart Alphas | Excess Returns | Carhart Alphas | Excess Returns | Carhart Alphas |
| Q1 | 12.68% | 3.09% | 11.93% | 5.55% | 13.23% | 2.40% | 18.50% | 3.40% |
| | (0.73) | (3.43) | (0.60) | (5.46) | (0.87) | (2.16) | (1.24) | (2.22) |
| Q5 | 10.75% | -0.17% | 8.60% | 1.71% | 12.31% | 0.56% | 16.94% | 1.56% |
| | (0.63) | (0.15) | (0.43) | (1.48) | (0.86) | (0.41) | (1.20) | (0.90) |
| Q1-Q5 | 1.93% | 3.26% | 3.33% | 3.84% | 0.92% | 1.84% | 1.56% | 1.84% |
| | (0.35) | (3.64) | (0.75) | (2.88) | (0.15) | (1.64) | (0.32) | (1.33) |
| D1 | 13.25% | 3.53% | 14.93% | 8.64% | 12.04% | 1.36% | 16.54% | 2.02% |
| | (0.76) | (3.10) | (0.73) | (5.82) | (0.81) | (1.05) | (1.14) | (1.19) |
| D10 | 10.42% | -1.05% | 8.49% | 0.73% | 11.82% | -0.18% | 15.86% | 0.19% |
| | (0.60) | (0.80) | (0.41) | (0.52) | (0.81) | (0.11) | (1.08) | (0.09) |
| D1-D10 | 2.83% | 4.58% | 6.45% | 7.91% | 0.21% | 1.54% | 0.69% | 1.83% |
| | (0.43) | (3.88) | (0.96) | (3.96) | (0.03) | (1.10) | (0.11) | (0.92) |

## TABLE X
### INDUSTRY-ADJUSTED G-INDEX ABNORMAL RETURNS

This table presents results for portfolios sorted on the level of the G-Index, using abnormal returns (Alphas) from the four-factor Fama-French-Carhart model adjusted for industry-matched portfolios at the 3-digit SIC level (as done in Johnson, Moorman & Sorescu (2008)) in panel A, and at the 48 Fama-French industry groups level in panel B. See the text for an explanation for industry-adjusting procedures. We show results both for portfolios weighted by stock's market capitalization (VW) and for portfolios that are equally weighted (EW). The abnormal returns are annualized and t-statistics are given below the returns. We use four different time periods. Q1 and Q5, respectively, are the results for the portfolio with the 20% lowest and highest G-Index stocks at portfolio formation, while Q1-Q5 is the long-short portfolio that buys stocks in Q1 and sells stocks in Q5. D1, D10 and D1-D10 are the analogous results for sorting stocks into deciles according to their G-Index levels.

**PANEL A. INDUSTRY-ADJUSTED ALPHAS USING 3-DIGIT SIC-MATCHED PORTFOLIOS**

| G-Index Group | 1978:7 - 2007:6 | | 1978:7 - 1990:8 | | 1990:9 - 2007:6 | | 1990:9 - 1999:12 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Ind-Adjusted Alphas | | Ind-Adjusted Alphas | | Ind-Adjusted Alphas | | Ind-Adjusted Alphas | |
| | VW | EW | VW | EW | VW | EW | VW | EW |
| Q1 | 0.14% | 1.72% | 1.41% | 4.45% | -1.06% | 0.03% | 0.47% | 0.50% |
| | (0.11) | (2.44) | (1.10) | (5.29) | (0.49) | (0.03) | (0.14) | (0.39) |
| Q5 | 0.33% | 0.05% | 0.39% | 0.07% | 0.79% | 0.59% | -0.64% | -0.37% |
| | (0.39) | (0.07) | (0.32) | (0.07) | (0.67) | (0.69) | (0.41) | (0.32) |
| Q1-Q5 | -0.19% | 1.67% | 1.02% | 4.38% | -1.86% | -0.55% | 1.11% | 0.87% |
| | (0.12) | (1.90) | (0.60) | (3.65) | (0.78) | (0.46) | (0.30) | (0.56) |
| D1 | 0.42% | 3.42% | 2.58% | 7.72% | 0.20% | 1.05% | -2.14% | 0.32% |
| | (0.29) | (3.64) | (1.82) | (5.65) | (0.09) | (0.91) | (0.67) | (0.21) |
| D10 | -0.66% | 0.09% | 0.66% | 0.53% | -1.17% | 0.21% | -1.20% | 0.54% |
| | (0.61) | (0.10) | (0.37) | (0.36) | (0.86) | (0.17) | (0.64) | (0.33) |
| D1-D10 | 1.08% | 3.32% | 1.93% | 7.19% | 1.37% | 0.84% | -0.94% | -0.22% |
| | (0.58) | (2.57) | (0.80) | (3.51) | (0.50) | (0.51) | (0.24) | (0.10) |

**PANEL B. INDUSTRY-ADJUSTED ALPHAS USING 48 FF INDUSTRY GROUP-MATCHED PORTFOLIOS**

| G-Index Group | 1978:7 - 2007:6 | | 1978:7 - 1990:8 | | 1990:9 - 2007:6 | | 1990:9 - 1999:12 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Ind-Adjusted Alphas | | Ind-Adjusted Alphas | | Ind-Adjusted Alphas | | Ind-Adjusted Alphas | |
| | VW | EW | VW | EW | VW | EW | VW | EW |
| Q1 | 1.02% | 2.26% | 1.72% | 4.49% | 0.75% | 1.02% | 1.83% | 0.87% |
| | (1.02) | (3.11) | (1.53) | (5.55) | (0.50) | (0.97) | (1.09) | (0.70) |
| Q5 | -0.35% | 0.08% | -0.16% | 0.64% | 0.39% | 0.49% | -0.90% | 0.01% |
| | (0.40) | (0.11) | (0.13) | (0.60) | (0.34) | (0.57) | (0.60) | (0.00) |
| Q1-Q5 | 1.37% | 2.18% | 1.88% | 3.85% | 0.36% | 0.53% | 2.73% | 0.87% |
| | (1.09) | (2.54) | (1.15) | (3.02) | (0.20) | (0.47) | (1.24) | (0.66) |
| D1 | 0.75% | 2.66% | 2.92% | 6.94% | 0.60% | 0.50% | -0.04% | -0.82% |
| | (0.68) | (2.83) | (2.31) | (5.03) | (0.39) | (0.45) | (0.02) | (0.60) |
| D10 | -0.91% | -0.26% | 0.74% | 0.43% | -1.22% | -0.06% | -2.10% | -0.06% |
| | (0.81) | (0.29) | (0.40) | (0.30) | (0.89) | (0.05) | (1.13) | (0.04) |
| D1-D10 | 1.66% | 2.92% | 2.18% | 6.51% | 1.81% | 0.56% | 2.07% | -0.75% |
| | (1.06) | (2.46) | (1.01) | (3.31) | (0.82) | (0.38) | (0.69) | (0.38) |

TABLE XI
E-INDEX ABNORMAL RETURNS

This table presents abnormal returns (Alphas) from the four-factor Fama-French-Carhart model for portfolios sorted on the level of the E-Index. We show results both for portfolios weighted by stock's market capitalization (VW) and for portfolios that are equally weighted (EW). The abnormal returns are annualized and t-statistics are given below the returns. We use four different time periods. Q1 and Q5, respectively, are the results for the portfolio with the 20% lowest and highest E-Index stocks at portfolio formation, while Q1-Q5 is the long-short portfolio that buys stocks in Q1 and sells stocks in Q5. D1, D10 and D1-D10 are the analogous results for sorting stocks into deciles according to their E-Index levels.

| E-Index Group | 1978:7 - 2007:6 Carhart Alphas | | 1978:7 - 1990:8 Carhart Alphas | | 1990:9 - 2007:6 Carhart Alphas | | 1990:9 - 1999:12 Carhart Alphas | |
|---|---|---|---|---|---|---|---|---|
| | VW | EW | VW | EW | VW | EW | VW | EW |
| Q1 | 2.60% | 1.96% | 0.53% | 3.08% | 4.44% | 2.70% | 3.36% | -0.49% |
| | (3.23) | (2.09) | (0.98) | (3.71) | (3.35) | (2.15) | (2.31) | (0.33) |
| Q5 | -0.96% | -0.49% | 1.90% | 2.11% | -1.35% | -0.23% | -2.44% | -3.57% |
| | (1.02) | (0.43) | (2.11) | (2.11) | (1.21) | (0.18) | (1.81) | (2.04) |
| Q1-Q5 | 3.56% | 2.45% | -1.37% | 0.97% | 5.78% | 2.93% | 5.80% | 3.08% |
| | (2.67) | (3.14) | (1.12) | (0.93) | (3.08) | (2.80) | (2.37) | (2.21) |
| D1 | 2.60% | 1.96% | 0.53% | 3.08% | 4.44% | 2.70% | 3.57% | -0.49% |
| | (3.23) | (2.09) | (0.98) | (3.71) | (3.35) | (2.15) | (2.54) | (0.33) |
| D10 | -1.31% | -0.43% | 1.20% | 2.04% | -1.38% | -0.09% | -4.09% | -3.60% |
| | (1.36) | (0.38) | (1.16) | (1.96) | (1.27) | (0.07) | (2.94) | (1.98) |
| D1-D10 | 3.91% | 2.39% | -0.67% | 1.04% | 5.81% | 2.79% | 7.66% | 3.10% |
| | (2.92) | (2.92) | (0.52) | (0.93) | (3.15) | (2.55) | (3.13) | (2.11) |

TABLE XII

G-INDEX FIRM-LEVEL ABNORMAL RETURNS POOLED PANEL REGRESSIONS

The table presents pooled panel regressions with year and firm fixed effects, of firm-level annualized abnormal returns as measured by the Fama-French-Carhart four-factor model on the level of the G-Index plus controls. Column 3 is the only specification that includes industry-fixed effects that change each year ('Industry x Year F.E.'), using 48 Fama-French industry groups. In order to improve beta estimates, we employ daily returns, and add lagged factors to account for trading non-synchronicity (price staleness), bid-ask bounces or other microstructure issues, effectively using an 8-factor model. As we update the G-Index every year for 1978-1990, for those years, each period over which abnormal returns are calculated runs from the beginning of July until the end of June the following year, so each 'period' lasts 12 months. After 1990, we change the portfolio formation at the end of the month that new data became available from IRRC, and each period over which abnormal returns are calculated starts at the beginning of the next month and runs until the month that new data again becomes available (typically about 2 years). The controls are Lagged Alpha (the annualized abnormal return from the previous period), Market Size (market capitalization of outstanding shares in millions), IO (percentage of institutional ownership as recorded by the Thompson database of quarterly 13F filings), ROE (ratio of net income over book value of equity, both from Compustat), Sales Growth (measured over a 5-year period, from ExecuComp), Herfindahl (herfindahl index of the 48 Fama-French industry group, using all firms in Compustat, based on total sales), Dividend Yield (ratio of dividend payments over past 12 months over market capitalization), S&P 500 dummy (equal to one if the firm is included in the S&P 500 index) and Q (ratio of market to book value of the firm). All controls are taken at the end of the fiscal year preceding the start of the period over which abnormal returns are calculated. T-statistics based on robust standard errors clustered by firm are given below the regression coefficients.

| | Full period, 1978-2007 | | | 1978-1989 | | 1990-2007 | | 1990-1999 | |
|---|---|---|---|---|---|---|---|---|---|
| Dependent Variable: Firm-level Carhart Alpha | | | | | | | | | |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| G-Index | -0.0038 | -0.0058 | -0.0055 | -0.0086 | -0.0093 | -0.0043 | -0.0053 | -0.0063 | -0.0071 |
| | -(1.98) | -(2.53) | -(2.24) | -(2.28) | -(2.14) | -(1.41) | -(1.42) | -(1.34) | -(1.21) |
| Lagged Alpha | | -0.12 | -0.13 | | -0.17 | | -0.17 | | -0.29 |
| | | -(8.56) | -(7.23) | | -(8.52) | | -(7.82) | | -(9.44) |
| Market Size | | -0.51 | -0.74 | | -22.04 | | -0.93 | | -0.59 |
| | | -(2.88) | -(3.13) | | -(3.22) | | -(3.92) | | -(1.13) |
| IO | | -0.10 | -0.08 | | -0.10 | | -0.12 | | -0.14 |
| | | -(2.90) | -(2.34) | | -(1.38) | | -(3.11) | | -(2.04) |
| ROE | | 0.01 | 0.00 | | 0.03 | | -0.001 | | -0.05 |
| | | (0.59) | (0.02) | | (0.91) | | -(0.06) | | -(1.94) |
| Sales Growth | | 0.01 | -0.01 | | -0.06 | | 0.03 | | -0.02 |
| | | (0.43) | -(0.31) | | -(1.92) | | (1.67) | | -(0.53) |
| Herfindahl | | 0.09 | -2.64 | | 0.00 | | 0.11 | | 0.20 |
| | | (0.89) | -(5.25) | | (0.01) | | (0.78) | | (0.67) |
| Dividend Yield | | 13.47 | 11.26 | | 13.85 | | -18.27 | | -10.80 |
| | | (0.50) | (0.42) | | (0.48) | | -(0.25) | | -(0.13) |
| S&P 500 dummy | | -0.06 | -0.07 | | -0.05 | | -0.08 | | 0.003 |
| | | -(4.16) | -(4.19) | | -(1.43) | | -(4.48) | | (0.10) |
| Q | | -0.04 | -0.05 | | -0.14 | | -0.04 | | -0.08 |
| | | -(6.72) | -(6.70) | | -(4.68) | | -(4.93) | | -(6.96) |
| | | | | | | | | | |
| Year Dummies | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes |
| Firm Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Industry x Year F.E. | No | No | Yes | No | No | No | No | No | No |
| N | 12,826 | 10,448 | 10,448 | 4,933 | 3,962 | 7,893 | 6,475 | 4,553 | 3,415 |
| R2 | 23.59% | 25.47% | 39.43% | 22.35% | 29.89% | 33.56% | 35.67% | 52.21% | 53.75% |

# EXHIBIT  F

# Corporate Governance, Investor Protection, and Performance in Emerging Markets

**Leora F. Klapper**
The World Bank

**Inessa Love**
The World Bank

### Abstract:

Recent research studying the link between law and finance has concentrated on country-level investor protection measures and focused on differences in legal systems across countries and legal families. We use recent data on firm-level corporate governance rankings across 14 emerging markets and find that there is wide variation in firm-level governance across countries in our sample and that the average firm-level governance is lower in countries with weaker legal systems. We explore the determinants of firm-level governance and find that governance is correlated with the extent of the asymmetric information and contracting imperfections that firms face. We also find that better corporate governance is highly correlated with better operating performance and market valuation. Finally, we provide evidence that firm-level corporate governance provisions matter more in countries with weak legal environments. These results suggest that firms can partially compensate for ineffective laws and enforcement by establishing good corporate governance and providing credible investor protection.

JEL Classifications: G3, F3

Keywords: Corporate Governance, International Finance, Law and Finance

World Bank Policy Research Working Paper 2818, April 2002

*The Policy Research Working Paper Series disseminates the findings of work in progress to encourage the exchange of ideas about development issues. An objective of the series is to get the findings out quickly, even if the presentations are less than fully polished. The papers carry the names of the authors and should be cited accordingly. The findings, interpretations, and conclusions expressed in this paper are entirely those of the authors. They do not necessarily represent the view of the World Bank, its Executive Directors, or the countries they represent. Policy Research Working Papers are available online at http://econ.worldbank.org.*

Corresponding author: Leora Klapper, The World Bank, 1818 H Street, NW, Washington, DC, 20433, tel: 202-473-8738, fax: 202-522-1155, email:lklapper@worldbank.org.

We thank Geert Bekaert, Stijn Claessens, Asli Demirguc-Kunt, Simeon Djankov, Olivier Fremond, Mariassunta Giannetti, Christian Harm, Charles Himmelberg, Simon Johnson, and Rohan Williamson for useful discussions. We also thank Victor Sulla for providing excellent research assistance.

## 1. Introduction

Previous research studying the link between law and finance has concentrated on corporate governance around the world and focused on differences in legal systems across countries and legal families. This rapidly developing body of literature began with the finding that the laws that protect investors differ significantly across countries, in part because of differences in legal origins (see La Porta, Lopez-de-Silanes, Shleifer, and Vishny, 1998). Recent literature finds that cross-country differences in laws and their enforcement affect ownership structure, dividend payout, availability and cost of external finance, and market valuations.[1]

However, many provisions in country-level investor protection laws may not be binding since firms have the flexibility in their corporate charters and bylaws to either choose to "opt-out" and decline specific provisions or adopt additional provisions not listed in their legal code (see Easterbrook and Fischel, 1991; Black and Gilson, 1998). For example, firms could improve investor protection rights by increasing disclosure, selecting well-functioning and independent boards, imposing disciplinary mechanisms to prevent management and controlling shareholders from engaging in expropriation of minority shareholders, etc. Therefore, it is likely that firms within the same country will offer varying degrees of protection to their investors.

A number of recent papers have studied firm-level corporate governance mechanisms, but most of these studies have concentrated almost exclusively on OECD and US countries (see Shleifer and Vishny, 1997, and Maher and Andersson, 2000, for comprehensive surveys). For example, a recent paper by Gompers, Ishi, and Metrick (2001) used differences in takeover defense provisions to create a corporate governance index of US firms and found that firms with stronger shareholder rights have better operating performance, higher market valuation, and are

more likely to make acquisitions. However, until recently there was no empirical evidence on the differences in firm-level governance mechanisms across firms in emerging markets. An exception is Black (2000), which found that the governance practices of Russian corporations are strongly related to implied value ratios.

In addition to the recent attention given to differences in legal systems across countries, another interesting empirical question is whether there is variation in firm-level governance standards within countries and the relationship between firm-specific governance mechanisms and country-level laws governing investor protection. The relationship between the country-level legal infrastructure and firm-level corporate governance mechanisms is far from obvious. One supposition is that firms in countries with weak laws would want to adopt better firm-level governance to counterbalance the weaknesses in their country's laws and their enforcement and signal their intentions to offer greater investor rights. This would suggest a negative correlation between the strength of firm-level governance and country-level laws. A second possibility is that in countries with weak laws the degree of flexibility of firms to affect their own governance is likely to be smaller (i.e. the firm is likely be constrained by the country-level legal provisions), which would imply a positive correlation. This question has not previously been empirically studied.

The second question that we address is *which* firms within countries have relatively better governance? LLSV (1998) argued that greater investor protection increases investors' willingness to provide financing and should be reflected in lower costs and greater availability of external financing. This suggests that we should find that firms with the greatest needs for financing in the future will find it the most beneficial to adopt better governance mechanisms

[1] For example, La Porta, Lopez-de-Silanes, Shleifer, and Vishny (1999a, 1999b, and 2000, further referred to as LLSV), Claessens, Djankov, and Lang (2000), Berkowitz, Pistor, and

today. Finally, we address the most important – and difficult – question, which is whether or not firm-level differences in corporate governance matter for future performance, market valuation, and access to external finance. This paper is a first attempt to address some of these questions and suggest avenues for future research.

The surge of interest in the topic of corporate governance among investment banks, rating agencies, and other specialized financial institutions has made it possible to address these questions empirically as a number of private firms have started to collect firm-level data on differences in corporate governance across firms in different countries.[2] In a recent report, Credit Lyonnais Securities Asia (further referred as CLSA) calculated an index with corporate governance rankings for 495 firms across 25 emerging markets and 18 sectors.[3] The descriptive statistics presented in the CLSA report show that companies ranked high on the governance index have better operating performance and higher stock returns. We use the governance rankings produced by CLSA to further investigate the relationship between firm-level governance, other firm-level characteristics, and the country-level legal environment.

Our study proceeds in two parts. In the first part we investigate the determinants of firm-level governance. First, we observe that there is wide variation in firm-level governance, although the degree of variation is not systematically related to countries' legal environments. In other words, we find that there are well-governed firms in countries with weak legal systems and badly governed firms in countries with strong legal systems. However, we find that the overall level of firm-level governance is strongly positively related to country-level measures of investor

---

Richard (2002), Lombardo and Pagano (2000), and Beck, Demirguc-Kunt, and Levine (2001).

[2] In addition to the data used for this paper, described below, similar governance rankings were produced by Deutche Bank for Latin American countries, Deminor Rating for Western European countries, and more recently S&P 500 has entered the governance ranking market and is producing rankings for both developed and emerging markets.

protection, i.e. average governance is higher in countries with stronger legal protection. For example, increasing the country-level index of efficiency of the legal system from the low to the median value increases the average firm-level governance by about half a standard deviation, a large and economically significant effect. This supports the argument that firms have limited flexibility to affect their governance, which implies that improving the country-level efficiency of the legal system is likely to lead to an increase in the average firm-level governance.

Next, we investigate the firm-level determinants of governance and find support for the hypothesis that a growing firm with large needs for outside financing has more incentive to adopt better governance practices in order to lower its cost of capital. We also investigate whether differences in firm-level contracting environments affect a firm's choice of governance mechanisms, in line with arguments put forth in Himmelberg, Hubbard, and Palia (1999). They argued that some firms would find it easier to expropriate from minority shareholders due to the nature of their operations; therefore, these firms would find it optimal to impose ax-ante stricter governance mechanisms to prevent ex-post expropriation. For example, the composition of the assets of a firm will affect its contracting environment because it is easier to monitor and harder to steal fixed assets (i.e. machinery and equipment) then "soft" capital (i.e. intangibles, R&D capital, and short-term assets, such as inventories.) Therefore, firms operating with higher proportions of intangible assets may find it optimal to adopt stricter governance mechanisms to signal to investors that they intend to prevent the future misuse of these assets. We find support for this hypothesis using a capital intensity measure, which is significantly negatively correlated with governance.

---

[3] Credit Lyonnais Securities Asia report entitled "Saints and Sinners: Who's got religion", April 2001.

In the second part of our paper we investigate the relationship between governance and performance. We find that better corporate governance is associated with higher operating performance (ROA) and higher Tobin's-Q. After including country fixed effects we find that the correlation of performance measures with governance becomes twice as large and statistically more significant. This suggests that improvements in governance *relative* to the country-average are more important than the absolute value of the index.

Finally, we explore the cross-country nature of our sample and look at the interaction of firm-level governance and country-level investor protection. We test whether good corporate governance matters more or less in countries with weak shareholder protection and judicial efficiency. One hypothesis is that in countries with weak judicial efficiency, additional charter provisions would not be enforced and therefore firms would be powerless to independently improve their investor protection. In this case we should find that firm-level governance matters less in countries with weak legal systems. An alternative hypothesis is that in countries with weak legal systems, investors would welcome even small improvements in governance relative to other firms, in which case we should find that good governance matters more in bad legal environments. This is consistent with the assertion in Doidge, Karolyi, and Stulz (2001) that by establishing good governance mechanisms the controlling shareholders give up more of their benefits of control in countries where such benefits are high (i.e. investor protection is low), which will be reflected in measures of performance and market valuation. Our results suggest that good governance practices are more important in countries with weak shareholder rights and inefficient enforcement. This finding has strong policy implications and suggests that recommending to firms to adopt good governance practices is even more important in countries with weak legal systems.

An important caveat on our results showing the link between governance and performance is the likely endogeneity of corporate governance practices. For example, as we have already argued, a growing firm with large needs for outside financing has more incentive to adopt better governance practices in order to lower its cost of capital. These growth opportunities would also be reflected in the market valuation of the firm, thus inducing a positive correlation between governance and Tobin's-Q.[4] Since our governance data have no time-variation we cannot address the issue of causality directly and leave this issue for future research. However, we attempt to mitigate this problem by adding several control variables that could proxy for growth opportunities such as size, average growth in sales, and the rate of investment and find that our governance results are not spuriously caused by these omitted variables. We also control for capital intensity in our performance regressions and the governance results remain significant. Thus, although the concern of reverse causality is a clear drawback of our governance-performance results, at a minimum we confirm that our results are not caused by omitted variable bias and leave establishment of causality for further research.

The paper proceeds as follows: Section 2 describes the CLSA corporate governance survey and summarizes our firm- and country-level data. Section 3 discusses the potential endogeneity of governance and reports results on the determinants of corporate governance behavior. Section 4 reports our results, which include correlation tests between measures of corporate governance and legality, Tobin's-Q, and return on assets (ROA.) Section 5 concludes.

---

4   Similar endogeneity problem arises in the studies of ownership and performance, as argued by Himmelberg, Hubbard, and Palia (1999) who propose panel data techniques and instrumental

## 2. Data

The CLSA report includes corporate governance (CG) rankings on 495 companies in 25 countries. The CLSA sample is selected based on two criteria – firm size and investor interest.[5] The CG ranking compiled by CLSA is a composite of 57 qualitative, binary (yes/no) questions, designed to avoid subjectivity. Appendix 1 reports an abbreviated version of the questionnaire. Each question is constructed such that answer 'Yes' adds one point to the governance score. The analysts were given strict instructions to answer negatively if they had any doubts or if there were any unresolved controversies. According to CLSA, about 70% of the questions are based on objective facts and the remaining questions represent analysts' opinions. Unfortunately, reliance on analysts' opinions worsens the endogeneity problem in the governance-performance regressions, as it is possible that analysts could rely on past performance to form their opinions.[6] However, most of the subjective questions refer to the historical experience of the firm and specifically ask whether there have been any violations or controversial disputes over shareholder rights in the past, usually within the past five years (for example, questions 6, 20, 36-38, 40, 42, 47). These questions are likely to reflect the reputation of the company, i.e. whether in past years the company had established a reputation for respecting minority shareholder rights. Such reputational characteristics can be considered a part of corporate governance practices and, if past behavior is any indication of future behavior, could serve as a useful measure of corporate governance behavior.

---

variables to address this question.

[5] A recent paper by Khanna, Korgan, and Palepu (2001) uses this data to study convergence of corporate governance practices across countries and confirms the sample selection criteria based on their detailed study of India.

[6] This bias is likely to be worse for regressions including past returns since analysis answering the questions are most concerned with return performance, as it appears that the main purpose of the CLSA original report was to give buy/sell recommendations based on the governance rankings. This is the main reason why we do not study returns as a measure of performance.

The questions in the CLSA report cover seven broad categories: management discipline, transparency, independence, accountability, responsibility, fairness, and social awareness. A representative questions for each category is listed below:

1. Discipline: *Is expected remuneration for executive(s) tied to the value of the shares?*
2. Transparency: *Does the company publish its Annual Report within four months of the end of the financial year?*
3. Independence: *Is the Chairman an independent, non-executive director?*[7]
4. Accountability: *Are the board members and members of the executive/management committee substantially different?*
5. Responsibility: *Does the company have a known record of taking effective measures in the event of mismanagement? Are there mechanisms to allow punishment of the executive/management committee in the event of mismanagement?*
6. Fairness: *Are voting methods easily accessible (i.e. proxy voting)? Do all equity holders have the right to call General Meetings?*
7. Social Awareness: *Is the company explicitly environmentally conscious?*

Our main governance index, further referred to as GOV, is the sum of first six categories and excludes the social awareness category, which is not relevant for corporate governance (although our results are robust to the inclusion of this category). Furthermore, we do not study the disaggregated indices, since the categories seem to overlap and are categorized with some subjectivity. (For example, question 28 could easily belong to the Independence section; questions 37 and 39 could belong to the Discipline section; question 45 to Transparency section; etc.) Also, the distinction between the Independence and Accountability sections is imprecise and the Responsibility and Fairness sections both reflect minority shareholder rights (as are the questions 20 and 22 from the Independence section).

In order to include firm-level accounting data, we merged the CLSA data with Worldscope data (June 2001). To avoid the anomalous period of the Asian Crisis we included

---

[7] Independence of directors must be demonstrated by either being appointed through nomination of non-major shareholders or having on record voted on certain issues against the rest of the Board. If no evidence of independence, other than being stated to be so by the company and the director(s), then answer "No".

only firms that had available accounting data beginning in at least 1998.[8] We began with 451 firms with non-missing accounting data. After excluding 50 banks, 20 firms in Eastern Europe and China (excluded because of unavailable legal indices), and seven firms in countries with less than three firms each (Argentina, Columbia, Greece and Mexico), our sample was reduced to 374 firms in 14 countries – Brazil, Chile, Hong Kong, India, Indonesia, Korea, Malaysia, Pakistan, Philippines, Singapore, South Africa, Taiwan, Thailand, and Turkey. We also excluded some outlier observations in the individual regressions, which we describe in the relevant sections.[9] We also added a dummy indicating if a firm trades American Depository Receipts (ADRs) in the United States.[10]

The distribution of our GOV index across countries is shown in Table 1, Panel A. As shown, our sample is not equally distributed across countries - 68% of firms are in East Asia, 19% of firms are in South Asia, and 11% of firms are in Latin America. Mean GOV rankings overall are 54.16 and vary from a country average of 31.85 in Pakistan to 66.53 in South Korea. There is also great variation within countries – for example, the corporate governance ranking of firms in Pakistan varies from 17.25 to 66.68. These summary statistics highlight the firm-level variations in corporate governance practices even within countries and families of legal origins.

---

[8] Our sample contains 29 firms with 1998 as the last available data. We include in all regressions a dummy for year 1998 to control for time effects. The dummy is always negative and significant (it is not reported) but does not affect the significance of our governance results.

[9] As is commonly found, the distribution of Tobin's-Q is significantly skewed to the right with some firms having extremely high values, which could significantly influence our results without representing the common patterns. Therefore, we excluded firms with Tobin's Q above 10 (which excludes 17 firms - slightly less than 5% of the sample) and firms with ROA above the 99th and below the 1st percentiles (6 firms). To use as many observations as possible we exclude only Q outliers in Q regressions and ROA outliers in ROA regressions – therefore the sample in ROA regressions is slightly different from the sample in Q regressions. In addition, some of the control variables are missing for some observations, which further causes slight variation in the sample size across regressions.

[10] We identify ADRs traded on the NYSE, AMEX, and NASDAQ using the JP Morgan website: www.adr.com.

We use three country-level measures of legal efficacy. The first is Judicial Efficiency, which is an index constructed by the International Country Risk Guide (2000). The second is Shareholder Rights, which is the sum of dummies identifying one-share/one-vote, proxy by mail, unblocked shares, cumulative vote/proportional representation, preemptive rights, oppressed minority, and percentage of shares needed to call a shareholders meeting (LLSV, 1998.) The third is Legality, which is an index of the strength of the legal system and institutional environment constructed as a weighted average of Judicial Efficiency (identical to our first index), Rule of Law, Corruption, Risk of Expropriation, and Risk of Contract Repudiation (this index is constructed using principal components analysis by Berkowitz, Pistor, and Richard, 2002.) We use three different measures in order to cover separately the existence of laws (Shareholder Rights) and the effectiveness of their implementation (Judicial Efficiency), as well as the overall legal environment (Legality). Summary statistics and sample distributions for the legal indicators are given in Table 1, Panel A.

We use two main performance measures: Tobin's-Q as a measure of market valuation of the firm and return on assets (ROA) as a measure of operating performance.[11] Summary statistics and sample distributions for Tobin's-Q and ROA are given in Table 1, Panel B. For 1999, the average Tobin's-Q is 2.09 and varies from country-average 1.16 in Turkey to 3.67 in Taiwan. The median Q (1.39) is slightly higher then the median reported in other studies (for example LLSV, 1999) reflecting the overall good performance of the global economy in 1999. The standard deviation is 1.68, reflecting the significant variation in performance across firms. The

---

[11] Tobin's-Q is defined as the market value of assets (calculated as book value of assets minus book value of equity plus market value of equity) over book value of assets, and return on assets (ROA) is defined as net income over total assets. Other measures of operating performance – such as gross margin and return on equity – give similar results.

country-average ROA is 0.08, with the highest average performance of 0.11 in India and the lowest performance of 0.01 in Brazil.

## 3. Determinants of Governance

### 3.1. Hypotheses

As discussed in the introduction, corporate governance is likely to be endogenously determined. In this section we discuss variables that in theory could be associated with firms adopting better governance mechanisms and present empirical results in support of these theories. We deliberately do not include any performance-related measures as governance determinants as we will study governance-performance relationships in the next section. Recognizing the endogeneity of the governance, we can only interpret all our results as partial correlations. However, the exercise in this section helps us better understand the potential sources of this endogeneity.

Our discussion closely follows Himmelberg, Hubbard, and Palia (1999), who argued that the degree of managerial ownership is endogenously determined by a firm's contracting environment and therefore ownership-performance regressions could spuriously pick up the effect of this unobserved heterogeneity. As managerial ownership is only one of many governance mechanisms, this argument could be easily transferred to other mechanisms such as managerial compensation, board structure, disclosure, and other minority shareholder protections that are included in our governance index.

We consider several causes for the variation in contracting environments. The most obvious is the overall country-level measure of shareholder rights and their enforcement. For example, if a country's laws offer weak shareholder protection it might be costly for firms to adopt different provisions in their corporate charters because it will be difficult for investors and

judges to understand non-standard contracts, as argued by LLSV (1998). Therefore, firms in countries with overall weak legal environments may not have much flexibility to improve their own investor protection and may consequently have lower corporate governance indices, on average. In this case we should expect a positive relationship between the quality of country-level legal systems and the average of firm-level governance indices within each country. In the extreme case, for example, firms would be completely powerless to change the overall legal environment with internal governance mechanisms. In another extreme, if firms could completely "overwrite" the legal code in their own contracts, we would observe better governance in countries with bad legal systems as these firms would be more in "need" of good governance mechanisms to compensate for their bad legal systems. In this case we would observe a negative relationship between country-level legal systems and firm-level governance mechanisms. However, this case is very unlikely as a large body of evidence shows that the legal system does matter, most likely because if the enforcement of contracts is weak, then firms will be unable to "overwrite" their country's legal system and their flexibility to improve their corporate governance would be limited.[12]

In addition to country-level differences in legal efficiency, it is likely that there will be variations across firms within contracting environments, as initially proposed by Himmelberg, et al. (1999) and further developed by Himmelberg, Hubbard, and Love (2001). These papers suggest that firm-level characteristics affect the level of investor protection. For example, the composition of a firm's assets will affect its contracting environment because it is easier to monitor and harder to steal fixed assets (i.e. machinery and equipment) then "soft" capital (intangibles, R&D capital, and some short-term assets, such as inventories). Therefore, a firm

---

[12] In a related study Dimitrov (2001) shows that firms in countries with weak legal environments are less likely to have independent directors, since firms are unable to show credible

operating with a higher proportion of intangible assets may find it optimal to adopt stricter governance mechanisms to prevent misuse of these assets, i.e. we should observe negative correlation between the proportion of fixed assets and governance. It is important to keep this relationship in mind when we later estimate the effect of governance on performance, since the level of intangibles may also result in higher Tobin's-Q since, in general, the market values intangibles higher than their book values. Similarly, operating performance should be higher since the denominator (for example, total assets) does not fully account for all intangibles. In our performance regressions we control for asset composition and find that the effect of governance on performance is not driven by this source of heterogeneity. We use fixed capital (i.e. property plant and equipment) to total sales ratio, denoted K/S, as a measure of the relative importance of fixed capital in the firm's output.[13]

Another source of endogeneity could arise because of differences in unobserved growth opportunities. Firms with good growth opportunities will need to raise external financing in order to expand and may therefore find it optimal to improve their governance mechanisms as better governance and better minority shareholder protection will be likely to lower their costs of capital.[14] For example, if Tobin's-Q is higher for firms with good growth opportunities, this could also be a cause of endogeneity of governance in the performance regressions and result in positive spurious correlations with governance. Unfortunately there is no good measure of the growth opportunities besides Tobin's-Q. As an arguably imperfect measure, we use the average

---

commitments not to expropriate.

[13] Himmelberg, et al. (1999) also used research and development intensity (R&D) and advertising expenses as additional measures of the "intangibility" of the assets. Unfortunately, the Worldscope database does not include advertising expenses as an independent variable and R&D amounts are reported as missing for most firms in our sample.

[14] See La Porta, et al. (1999a), Lombardo and Pagano (2000) and Himmelberg, Hubbard, and Love (2001) among others on the relationship between investor protection and the cost of capital.

real growth rate in sales for the last three years, denoted SalesGR, as a proxy for future growth (and growth opportunities).[15]

We also explore the effects of differences in firm size on governance. The effect of size is ambiguous as large firms may have greater agency problems (because it is harder to monitor them or because of the "free cash flows" argument of Jensen, 1986) and therefore need to compensate with stricter governance mechanisms. Alternatively, small firms may have better growth opportunities and, as implied by the argument above, greater need for external finance and better governance mechanisms. For this reason we also use size as a control variable in the Tobin's-Q regressions. We use the natural log of sales (in US$), denoted Log(SalesUS) as a measure of firm size.

We also include a dummy indicating if a firm trades American Depository Receipts (ADRs). There are several reasons to expect that firms that trade in the US should have better corporate governance rankings. First, firms listed on a US exchange are required to comply with US GAAP accounting standards, which might improve their transparency.[16] Second, firms that list shares on a US exchange are subject to many SEC laws and regulations that protect minority shareholders. Cofee (1999), Stulz (1999) and Reese and Wesibach (2001) find that firms in countries with weak minority shareholder rights list in the US in order to better protect foreign investors. We expect that since reporting standards and investor protection in the US are much

---

[15] Past growth rates will be correlated with future growth if there are investment adjustment costs, "time to build" (i.e. it takes several periods to make new investment fully operational), or if the shocks to productivity are serially correlated.

[16] For example, recent papers by Cantale (1996), Fuerst (1998) and Moel (1999) argue that firms list in the US in order to signal their higher quality to investors through greater disclosure and transparency and higher accounting standards.

higher than in most other countries, firms in emerging markets would be required to improve their corporate governance provisions in order to list overseas.[17]

Finally we test whether the relationship between ADR issuance and governance varies with differences in country-level investor protection and enforcement. For example, in a country with a weak legal system, a firm issuing ADRs would need to make more changes to its governance to be able to meet the more stringent disclosure and investor protection requirements. This suggests that the increase in the governance index for ADR firms will be larger in countries with weaker legal system, i.e. the interaction of ADR and Efficiency is expected to be negative.

To summarize, our model to study governance determinants is given by:

$$GOV_f = \beta_1 \, Log(Sales)_f + \beta_2 \, SalesGr_f + \beta_3 \, K/S_f + \beta_4 \, LegalSystem_c + \beta_5 ADRs_f$$
$$+ \beta_6 ADRs_f{}^*LegalSystem + \gamma. \qquad\qquad (1)$$

As previously implied, we expect $\beta_2 > 0$, $\beta_3 < 0$, $\beta_4 > 0$, $\beta_5 > 0$, $\beta_6 < 0$ and $\beta_1$ is ambiguous. We have three different country-level indicators for the Legal System: the laws on the book (Shareholder Rights) and the effectiveness of their implementation (Judicial Efficiency), as well as the overall legal environment (Legality). Since Efficiency and Legality measures are both indicators of the quality of legal enforcement, we do not include them together, but we include shareholder rights in combinations with either Efficiency or Legality.

*3.2 Evidence*

We begin our exploration of the relationship between the distribution of firm-level governance and country-level indicators with graphs and descriptive statistics. Figure 1 presents

---

[17] Unfortunately, we are unable to establish causality – it is possible that only the firms with good governance issue ADR's, so our results should be interpreted as a partial correlation and not a causal relationship.

a Box-and-Whisker plot of governance by country and shows that there is wide variation in the governance rankings in most countries in our sample. The countries are sorted based on their index of Legality and the plot shows that the degree of the variation in governance within countries does not appear to be systematically related to the country-level measures of legal effectiveness. Figure 2 presents a plot of country-average values of the firm-level governance index plotted against the legality index. The relationship is strongly positive, indicating that countries with better legal systems have on average higher firm-level governance. The correlations presented in Panel C confirm the evidence in the figures. The correlations of country-average governance with any of the legal indicators are significantly positive, while the correlations of standard deviations and the interquartile range with legal indicators are (marginally) insignificantly negative, indicating that, if anything, there is more variation in firm-level governance in countries with weaker legal systems.

We next begin a more formal investigation. Table 2 reports our estimates of the governance determinants and finds all signs consistent with our hypotheses. In Column 1 we include only our three firm-level variables and find that size is positive and marginally significant, while average growth rate and capital intensity have predicted signs and are significant at 1%. However, the explanatory power of this regression is low, with an adjusted $R^2$ of only 0.06. In Column 2 we add an ADR dummy, which is significant, confirming our prior that firms that list in the US have relatively higher corporate governance standards. The size variable is no longer significant, but this is not surprising since larger firms are more likely to list abroad.

In Column 3 we include country-level measures of the legal environment – shareholder rights and efficiency of the legal system – and the coefficients of these variables are positive and

significant, although shareholder rights is weakly significant at 10% (using the Legality index instead of Efficiency produces very similar results). Adding these country-level variables doubles the explanatory power of the regression ($R^2$ raises to 0.15). Thus, we can conclude that firms in countries with weak overall legal system have on average lower governance rankings. The coefficients from the regression of governance on the efficiency index alone (not reported) imply that an increase in efficiency from the country with the lowest efficiency (Indonesia) to the country with the median efficiency (South Africa) results in an improvement in average governance ranking of 7.7, or about half a standard deviation, which is an economically significant effect. These results support the theoretical arguments in Shleifer and Wolfenson (2002) that firms are unable to completely replicate a good legal environment on their own, but must depend on a supporting efficient judicial system.

In Column 4 we add the ADR dummy and the interaction of the ADR dummy and Efficiency and find that the interaction term is significantly negative (at 5%). This confirms our intuition that firms that issue ADRs have better governance, and the effect is stronger in countries with weak legal systems.[18] In Column 5 we include both firm-level and country-level variables together and find that sales growth, capital intensity, and both measures of enforcement remain significant while size and shareholder rights become insignificant at conventional levels (size becomes insignificant in Column 4 and shareholder rights in Column 5). Finally, instead of country-level legal indicators we run a regression with country dummies in Column 7 and find that capital intensity and growth rates are still significant while size is not. The $R^2$ in this model is much larger, implying that unobserved country effects account for large differences in the

---

[18] These results are larger and more significant for firms that trade on a US exchange (NYSE, AMEX or NASDAQ) than for firms that trade 144a or OTC. This is not surprising as exchange listed firms are likely to have greater disclosure and shareholder protection requirements and is consistent with findings in Doidge, et al., 2001.

17

variation in governance rankings. However, over 60% of this variation is not explained by country effects, suggesting that firms have enough flexibility to affect their corporate governance and investor protection.

To summarize, we find that (1) firms in countries with weak overall legal systems on average have lower governance rankings, however there is no systematic relationship between the variation in firm-level rankings and country-level legal efficiency; (2) past growth rates are positively associated with good governance; (3) firms with higher proportions of fixed assets have lower governance; and (4) firms that trade shares in the US have higher governance rankings, especially so in countries with weak legal systems. These results confirm our intuition of the endogeneity of governance and emphasize that it is important to control for these factors in our performance regressions to ensure that the governance effect on performance is not spuriously caused by any of these omitted factors.

## 4. Governance and Performance

### 4.1. Hypotheses

In this section we study the relationship between firm-level governance, the country-level legal environment, and firm performance. Our first hypothesis tests the correlation between firm governance and equity valuation:

$$Q_f = \alpha + \beta_1(Gov_f) + \gamma, \qquad (2)$$

Where $Q_f$ equals Tobin's-Q and $Gov_f$ equals the firm-level corporate governance ranking. To test the robustness of this relationship we sequentially add 1-digit industry dummies, country dummies and other firm-level control variables discussed in Section 3. We then repeat the same exercise using ROA as an alternative performance measure.

18

Second, we test whether the country-level legal environment is correlated with market and operating performance and whether firm-level governance is robust to controlling for country-level legal efficiency. Regardless of individual firm-level investor protection, firms are also subject to country-level regulatory and legal environments that differ in laws and enforcement. Previous literature has shown the legal environment to be related to firm performance on the international, country, and state levels (Lombardo and Pagano, 2000, La Porta et al., 1999, and Daines, 2001, respectively). This relationship can be explained for a number of reasons: First, block shareholders are more likely to exploit minority shareholders in countries that have weaker protection of minority shareholders. Second, firm-level protection of minority rights is less likely to be effective if legal enforcement and judicial efficiency is weak. We address this concern by first, replacing the firm-level governance index in our model with country-level legal indicators and second, including the two measures simultaneously to test for their relative importance.

Our third hypothesis tests the effect of the effect of the interaction of corporate governance and judicial efficiency on firm valuation. We include in this regression:

$$Q_f = \alpha + \beta_1(Gov_f) + \beta_2(Eff_c) + \beta_3(Gov_f*Eff_c)_f + \gamma, \qquad (3)$$

where $Gov$ equals the firm-level corporate governance ranking; $Eff_c$ equals the country-level judicial efficiency; and $(Gov*Eff)_f$ equals the interaction. We interpret the interaction term to identify whether corporate governance matters more or less in countries with weak legal enforcement (an alternative interpretation is explored below). There are two alternative hypotheses relating to the differential effect of governance in countries with different levels of investor protection. One hypothesis is that in countries with weak law enforcement the adoption of firm-specific governance-related provisions could be less effective then in countries with good

enforcement (because the provisions are not enforceable and additional mechanisms such as independent board of directors or audit committees will be powerless to discipline the insiders). Therefore, we could find that governance matters less in countries with weak legal system (i.e. a positive interaction). An alternative hypothesis is that governance matters more in countries with weak legal systems. One reason for this relationship could be that investors in countries with weak legal systems will reward more a firm that establishes a good corporate governance framework – as even a little bit of improvement *relative* to other firms in a country will make a big difference for investors – which will improve market valuation and decrease the cost of capital (and subsequently improve operating performance).

Another reason for a negative interaction effect is suggested in a recent paper by Doidge, Karolyi, and Stulz (2001). Their argument is based on the mounting evidence that controlling shareholders have more incentives to expropriate from minority shareholders in countries with less investor protection and therefore the benefits of control are greater in countries with weaker rule of law, as recently evidenced by Nenova (2002). By establishing good governance mechanisms, the controlling shareholders give up more of their benefits of control in countries where such benefits are high (i.e. investor protection is low), which will be reflected in the firm's performance and market valuation.

Because our empirical exploration is not based on a structural model and the interaction term treats governance and legality as symmetric variables, an alternative interpretation of the interaction term is to test for which firms the legal environment matters more. For example, the negative interaction term would suggest that a good legal environment matters more for firms with weak firm-level governance. In other words, investors in firms with weak governance must rely more on the enforcement of country-level laws and the efficiency of the courts to uphold

their rights, while investors in well-governed firms are less dependent on their countries' legal systems.

### 4.2 Evidence

Table 3 reports our first set of results. Panel A uses Tobin's-Q as the dependent variable and finds a significant positive correlation with our governance indicator. This supports our hypothesis that firms with better corporate governance have higher market valuation. Columns 2 and 3 show that this result becomes stronger with the inclusion of country dummies (Column 2) and does not change much with addition of 1-digit SIC code dummies (Column 3). It is interesting to note that the governance coefficient doubles in magnitude after including country dummies, which suggests that relative governance (i.e. relative to the country average) is more important than the absolute value of the index. The magnitude of this effect is large, as one standard deviation change in governance results in about a 23% increase in the value of Tobin's-Q.

To test whether this relationship could be spuriously caused by some omitted variables, we add the variables that we found in Section 3 to be associated with higher governance rankings. Column 4 shows that our results are robust to the inclusion of log sales, which suggests that the relationship between good governance and market valuation holds regardless of firm size. Column 5 adds the average growth rate of real sales, SalesGR, which is significantly positive, in line with our intuition discussed in Section 3 that past sales growth is likely to be correlated with future growth opportunities and therefore increases market valuation. Column 6 adds our measure of capital intensity, K/S, which is significantly negative, suggesting that firms with more intangible assets (i.e. lower capital intensity) have higher Tobin's-Q. However,

governance is robust to the inclusion of these additional controls, which makes us confident that the relationship is not spuriously caused by any of the omitted variables.[19]

Table 3, Panel B also shows a similar positive correlation between corporate governance behavior and firm performance, as estimated by ROA. These results are consistent with results found in Gompers et al. (2001), which find that firms with weaker corporate governance have relatively lower profits in the US. However, ours is the first evidence that a relationship between corporate governance and firm performance holds across several emerging markets, which unlike the US are categorized by more concentrated ownership and weaker legal environments.

Table 4 extends the previous regressions to include the effect of legal indicators, with Tobin's-Q as the dependent variable. We include three measures of legal performance: Panel A includes Judicial Efficiency, which indicates the implementation of laws; Panel B includes Shareholders Rights, which indicates the existence of laws protecting investors; and Panel C includes Legality, which is an overall measure of the legal environment.

Table 4, Column 1 shows tests of Tobin's-Q and legal indicators (all regressions include 1-digit SIC code and year1998 dummies.) We find only a significant correlation with Legality, which is the broadest measure of a good legal environment.[20] Column 2 shows that good corporate governance continues to be significantly related to valuation, even after correcting for the legal environment. This suggests that even though our governance measure is significantly

---

[19] The results are unchanged when we add all three additional controls simultaneously (not reported, available on request)– governance and all control variables remain significant at 1% level. We have also experimented with Investment to Assets ratio as another proxy for the future growth opportunities. It was not significant and did not affect our governance results. Finally, we included a dummy indicating firms that trade ADRs in all performance regressions, which was insignificant and did not affect our other results.

[20] However, when we add the interaction with governance in column 4 we find that all three legal indicators are significant at least at 10% or better. This is consistent with La Porta, et al (2002) that finds evidence in 27 high-income countries that firms with better protection of minority shareholders have higher market valuation.

correlated with country-level legal indicators (as shown in Section 3), firm-specific governance measures are of greater importance than the constraints of country-level laws in determining market valuation.

In Table 4, Column 3 we include the interaction of firm-level governance and a measure of country-level legal efficiency.[21] We find that this interaction is negative, which indicates that governance is more important in countries with overall weak legal systems.[22] As discussed above, the alternative interpretation of this interaction term is that the legal system matters less for the well-governed firms, which is plausible because firms with better governance will have less need to rely on the legal system to resolve governance conflicts. In Column 3 the interaction is only significant for the measure of Judicial Efficiency. However, when we include the Latin dummy in Column 4 the interaction becomes significant for all three legal indicators (significant at 1% for Efficiency and 10% for Shareholder Rights and Legality). We also obtain similar results (i.e. all legal indicators are significant at least at 10%) when we exclude these two Latin American countries from our regressions. We argue that the two Latin American countries in our sample (Chile and Brazil) are different from the rest of the sample because they have the lowest mean and median Q in the sample (except for Turkey) and relatively low ROA, however they have relatively strong governance indicators and country-level indices of investor protection. One explanation may be that the governments of Brazil and Chile both enacted in

---

[21] An important caveat for our interaction results is the small sample – 14 countries may not be a large enough sample to properly test this hypothesis. We therefore should be cautious in attaching strong interpretations to these results and encourage further research.

[22] Our finding of the negative interaction effect parallels that of Doidge, Karolyi and Stulz (2001) who find that the premium associated with ADR issuance is larger for firms in countries with weaker investor protection.

2000 new laws offering greater protection to minority shareholders and these recent improvements in governance would not be correlated with 1999 data.[23]

Table 5 reproduces these results with ROA as the dependent variable. With the exception of the results including Shareholder Rights, we find a strong correlation between governance and ROA, and a significantly negative correlation with the interaction of judicial effectiveness. The weaker results of Shareholder Rights could reflect the smaller variation within this variables as well as the possible weaker importance of actual laws relative to their implementation.

The results in Tables 4 and 5 suggest that firm-level investor protection is more important for firm valuation in countries with weaker investor protection from the courts. In terms of magnitude, a one standard deviation improvement in governance increases Tobin's-Q by 33% of its standard deviation if the Efficiency score is five, and improves Tobin's-Q by 18% of its standard deviation if the Efficiency score is eight. Although an improvement in firm-level governance always improves performance and market valuation, the improvements are higher in countries with weaker legal and judicial infrastructures.

## 5. Conclusion

Although it is well established that country-level shareholder rights and judicial efficiency affects firm value, in this paper we explore the differences in firm-level governance mechanisms, their relationship with the country-level legal environment, and the correlations between governance and performance. We use data from a recent report by Credit Lyonnais Securities Asia (CLSA) that constructed corporate governance rankings for 495 firms across 25 emerging markets and 18 sectors. We find that (1) firms in countries with weak overall legal

---

[23] This includes "Rule 345" in Brazil and the OPA law in Chile, which protect minority shareholders during acquisitions, and the Corporate Law bill in Brazil, which provide broad

systems have on average lower governance rankings, (2) firm-level governance is correlated with variables related to the extent of the asymmetric information and contracting imperfections that firms face, which we proxy with firm size, sales growth (proxy for the growth opportunities) and intangibility of assets, (3) firms that trade shares in the US have higher governance rankings, especially so in countries with weak legal systems, (4) good governance is positively correlated with market valuation and operating performance and (5) this relationship is stronger in countries with weaker legal systems.

One interpretation of the last result is that firm-level corporate governance matters more in countries with weak shareholder protection and poor judicial efficiency. An alternative interpretation is that the legal system matters less for the well-governed firms, which is plausible because firms with better governance will have less need to rely on the legal system to resolve governance conflicts.

Our results suggest that firms in countries with poor investor protection can improve their corporate governance, which may improve their performance and valuation. Our results do not attempt to imply that firm-level corporate governance is a replacement for country-level judicial reform. For example, we also find that firms have on average significantly lower governance rankings in countries with weak legal systems, which suggests that firms cannot completely compensate for the absence of strong laws and good enforcement. Although we do find that firms can independently improve their investor protection and minority shareholder rights to a certain degree, this adjustment mechanism is a second best solution and does not fully substitute for the absence of a good legal infrastructure.

Our results also have important policy implications. Although the task of reforming investor protection laws and improving judicial quality is difficult, lengthy, and requires the

protections to minority shareholders.

support of politicians and other interest groups, improving corporate governance on a firm-level is a feasible goal. Our results suggest that even prior to legal and judicial reform, firms can still reduce their cost of capital by establishing credible investor protection provisions. Our paper proposes that firms in countries with poor investor protection can use provisions in their charters to improve their corporate governance, which may improve their performance and valuation. However, the task of reforming the legal systems should remain a priority on the policymaker's agenda.

**Appendix 1: Abbreviated CLSA questionnaire**

**Discipline (15%)[24]**
1. Has the company issued a "mission statement" that explicitly places a priority on good corporate governance? <...>[25]?
2. Is senior management incentivised to work towards a higher share price for the company eg, <...> expected remuneration for the top executive(s) is tied to the value of the shares?
3. Does management stick to clearly defined core businesses? (Any diversification into an unrelated area in last 3 years would count as "No".)
4. <...> Is management's view of its cost of equity within 10% of a CAPM derived estimate?
5. <...> Is management's estimate of its cost of capital within 10% of our estimate based on its capital structure?
6. Over the past 5 years, is it true that the Company has not issued equity, or warrants for new equity, for acquisitions and/or financing new projects where there was any controversy over whether the acquisition/project was financially sound? <...>
7. Does senior management use debt for investments/capex only where ROA (or average ROI) is clearly higher than cost of debt and where interest cover is no less than 2.5x? <...>
8. Over the past 5 years, is it true that the company has not built up cash levels <...>?
9. Does the company's Annual Report include a section devoted to the company's performance in implementing corporate governance principles?

**Transparency (15%)**
10. Has management disclosed three- or five-year ROA or ROE targets? <...>
11. Does the company publish its Annual Report within four months of the end of the financial year?
12. Does the company publish/announce semiannual reports within two months of the end of the half-year?
13. Does the company publish/announce quarterly reports within two months of the end of the quarter?
14. Has the public announcement of results been no longer than two working days of the Board meeting? <...>
15. Are the reports clear and informative? (Based on perception of analyst.) <...>
16. Are accounts presented according to IGAAP? <...>
17. Does the company consistently disclose major and market sensitive information punctually? <...>
18. Do analysts have good access to senior management? Good access implies accessibility soon after results are announced and timely meetings where analysts are given all relevant information and are not misled.
19. Does the Company have an English language web-site where results and other announcements are updated promptly (no later than one business day)?

**Independence (15%)**
20. Is it true that there has been no controversy or questions raised over whether the board and senior management have made decisions in the past five years that benefit them, at the expense of shareholders? (Any loans to group companies/Vs, non-core/non-controlled group-investments, would mean "No").
21. Is the Chairman an independent, non-executive director?
22. Does the company have an executive or management committee <...> which is substantially different from members of the Board and not believed to be dominated by major shareholders? (ie, no more than half are also Board members and major shareholder not perceived as dominating executive decision making.)
23. Does the company have an audit committee? Is it chaired by a perceived genuine independent director?
24. Does the company have a remuneration committee? Is it chaired by a perceived genuine independent director?
25. Does the company have a nominating committee? Is it chaired by a perceived genuine independent director?
26. Are the external auditors of the company in other respects seen to be completely unrelated to the company?
27. Does the board include no direct representatives of banks and other large creditors of the company? (Having any representatives is a negative.)

---

[24] Percents reflect the weight in the CLSA weighted average index.

[25] We kept the wording of the questions exactly as specified in the CLSA report, however to save the space and without loss of contents we cut out portions of the questions, these cuts are marked with <...> . For example we removed all clarifications as to how the analysts should answer the questions and endings such as "as far as the analyst can tell".

**Accountability (15%)**

28. Are the board members and members of the executive/management committee substantially different <...>? (ie, no more than half of one committee sits on the other?)
29. Does the company have non-executive drectors who are *demonstrably and unquestionably* independent? (Independence of directors must be demonstrated by either being appointed through nomination of non-major shareholders or having on record voted on certain issues against the rest of the Board. <...>)
30. Do independent, non-executive directors account for more than 50% of the Board?
31. Are there any foreign nationals on the Board <...>?
32. Are full Board meetings held at least once a quarter?
33. Are Board members well briefed before Board meetings? <...>(Answers 33-35 must be based on direct contact with an independent Board member. If no access is provided <...> answer "No" to each question.)
34. Does the audit committee nominate and conduct a proper review the work of external auditors <...>?
35. Does the audit committee supervise internal audit and accounting procedures <...>?

**Responsibility (15%)**

36. If the Board/senior management have made decisions in recent years seen to benefit them at the expense of shareholders (cf Q20 above), has the Company been seen as acting effectively against individuals responsible and corrected such behavior promptly, ie, within 6 months? (If no such case, answer this question as "Yes".)
37. <...> Over the past five years, if there were flagrant business failures or misdemeanors, were the persons responsible appropriately and voluntarily punished? (If no cases <...> then answer "No.")
38. Is there any controversy or questions over whether the Board and/or senior management take measures to safeguard the interests of all and not just the dominant shareholders? <...>
39. Are there mechanisms to allow punishment of the executive/management committee in the event of mismanagement <...>?
40. Is it true that there have been no controversies/ questions over whether the share trading by Board members have been fair, fully transparent, and well intentioned? <...>
41. <...> Is the board small enough to be efficient and effective? (If more than 12, answer "No".)

**Fairness (15%)**

42. Is it true that there have not been any controversy or questions raised over any decisions by senior management in the past 5 years where majority shareholders are believed to have gained at the expense of minority shareholders?
43. Do all equity holders have the right to call General Meetings? <...>
44. Are voting methods easily accessible (eg proxy voting)?
45. Are all necessary <...> information for General Meetings made available prior to General Meeting?
46. Is senior management unquestionably seen as trying to ensure fair value is reflected in the market price of the stock <...>?
47. Is it true that there have been no questions or perceived controversy over whether the Company has issued depositary receipts that benefited primarily major shareholders <...>?
48. Does the majority shareholder group own less than 40% of the company?
49. Do foreign portfolio managers, and/or domestic portfolio investors who have a track record in engaging management on CG issues, own at least 20% of the total shares with voting rights?
50. Does the head of Investor Relations report to either the CEO or a Board member?
51. <...> Over the past five years, is it true that total directors remuneration has not increased faster than net profit after exceptionals? <...>

**Social awareness (10%)**

52. Does the company have an explicit (clearly worded) public policy statements that emphasize strict ethical behavior: ie, one that looks at the spirit and not just the letter of the law?
53. Does the company have a policy/culture that prohibits the employment of the under-aged <...>?
54. Does the company have an explicit equal employment policy <...>?
55. Does the Company adhere to specified industry guidelines on sourcing of materials <...>?
56. Is the company explicitly environmentally conscious? <...>
57. Is it true that the company has no investments operations in Myanmar?

## References

Beck, T, A. Demirguc-Kunt, and R. Levine, 2001. Law, politics and finance. Unpublished working paper. World Bank no. 2585.

Berkowitz, D., K. Pistor, and J. Richard, 2002. Economic development, legality, and the transplant effect. Forthcoming in the European Economic Review.

Black, B., 2001, The corporate governance behavior and market value of Russian firms. Forthcoming as Does corporate governance matter? A crude test using Russian data. University of Pennsylvania Law Review, 149.

Black, B. and R. Gilson, 1998. Venture capital and the structure of capital markets: Banks versus stock markets. Journal of Financial Economics 47, 243-77.

Cantale, S., 1996. The choice of a foreign market as a signal. Unpublished working paper. Tulane University.

Claessens, S., S. Djankov, and L. Larry, 2000. The separation of ownership and control in East Asian corporations. Journal of Financial Economics v58, 81-112.

Coffee, J., 1999. The future as history: The prospects for global convergence in corporate governance and its implications. Northwestern University Law Review 93, 641-708.

Daines, R., 2001. Does Delaware law improve firm value? Forthcoming in the Journal of Financial Economics.

Dimitrov, O., 2001. Controlling shareholders on the board of directors: A cross-country comparison. Unpublished working paper. Purdue University.

Doidge, C., A. Karolyi, and R. Stulz, 2001. Why are foreign firms listed in the US worth more? Unpublished working paper. NBER no. 8538.

Easterbrook, F. and D. Fischel, 1991. The Economic Structure of Corporate Law. Harvard University Press, Cambridge, Massachusetts.

Fuerst, O., 1998. A theoretical analysis of the investor protection regulations argument for global listing of stocks. Unpublished working paper. Yale University.

Gompers, P., J. Ishi, and A. Metrick, 2001. Corporate governance and equity prices. Unpublished working paper. NBER no. 8449.

Himmelberg, C., R. G. Hubbard, and I. Love, 2001. Investor protection, ownership and the cost of capital. Unpublished working paper. Columbia University.

Himmelberg, C., R. G. Hubbard, and D. Palia, 1999. Understanding the determinants of managerial ownership and the link between ownership and performance. Journal of Financial Economics 53, 353-384.

Jensen, M., 1986. Agency costs of free cash flows, corporate finance and takeovers. American Economic Review 76, 323-329.

Jensen, M., and W. Meckling, 1976. Theory of the firm: Managerial behavior, agency costs, and ownership structure. Journal of Financial Economics 3, 305-360.

International Country Risk Guide, 2000.

Khanna, T., J. Korgan, and K. Palepu, 2001. Globalization and corporate governance convergence? A cross-country analysis. Unpublished working paper. Harvard University.

La Porta, R., F. Lopez-de-Silanes, A. Shleifer, and R. Vishny, 1997. Legal determinants of external finance. Journal of Finance 52, 1131-1150.

La Porta, R., F. Lopez-de-Silanes, A. Shleifer, and R. Vishny, 1998. Law and finance. Journal of Political Economy 106, 1113-1155.

La Porta, R., F. Lopez-de-Silanes, A. Shleifer, and R. Vishny, 1999. Corporate ownership around the world. Journal of Finance 54, 471-517.

La Porta, R., F. Lopez-de-Silanes, A. Shleifer, and R. Vishny, 2000. Investor protection and corporate governance. Journal of Financial Economics 58, 3-27.

La Porta, R., F. Lopez-de-Silanes, A. Shleifer, and R. Vishny, 2002. Investor protection and corporate valuation. Forthcoming in Journal of Finance.

Lombardo, D. and M. Pagano, 2000. Legal determinants of the return on equity. Unpublished manuscript.

Maher, M. and T. Andersson, 2000. Convergence and Diversity of Corporate Governance Regimes and Capital Markets, Oxford University Press, Oxford.

Moel, A., 1999. The role of information disclosure on stock market listing decisions: The case of foreign firms listing in the US. Unpublished working paper. Harvard Business School.

Nenova, T., 2002. The value of corporate voting rights and control: a cross-country analysis. Forthcoming in Journal of Financial Economics.

Reese, W. and M. Weisbach, 2001. Protection of minority shareholder interests, cross-listings in the United States and subsequent equity offerings, Unpublished working paper. NBER.

Shleifer, A. and R. Vishny, 1997. A survey of corporate governance. Journal of Finance 52, 737-783.

Shleifer, A. and D. Wolfenson, 2002. Investor protection and equity markets. Forthcoming in Journal of Financial Economics.

Stulz, R., 1999. Globalization, corporate finance, and the cost of capital. Journal of Applied Corporate Finance 12, 8-25.

## Table 1: Summary Statistics

*Governance* is CLSA's firm-level corporate governance rankings. *Tobin's-Q* is defined as the market value of equity plus total liabilities divided by total assets. *ROA* is a firm-level measure of firm performance and is defined as net income plus interest expense divided by total assets. *Legality* is an index of legal and economic development constructed as a weighted average of Efficiency of the Judiciary, Rule of Law, Corruption, Risk of Expropriation, and Risk of Contract Repudiation. (Berkowitz, et al., 2002). *Shareholder Rights* is the sum of dummies identifying one-share/one-vote, proxy by mail, unblocked shares, cumulative vote/proportional representation, preemptive rights, oppressed minority, and percentage of shares needed to call an ESM (Shleifer, et al., 1999). *Judicial Efficiency* is from the International Country Risk Guide (2000). The Mean, Standard deviation, and Range of firm-level governance are calculated separately for each country. All correlations are based on 14 country-level observations. P-values are in parenthesis.

### *Panel A: Firm-Level Corporate Governance Index and Country-Level Legal Indicators*

| | | Firm-Level Governance Index | | | | | Country-Level Indices | | |
|---|---|---|---|---|---|---|---|---|---|
| | Obs | Mean | Median | Min. | Max. | Std Dev | Legality | Shareholder Rights | Judicial Efficiency |
| *All Sample* | *374* | *54.11* | *54.97* | *11.77* | *92.77* | *14.00* | *13.88* | *3.57* | *6.30* |
| Brazil | 24 | 57.26 | 59.87 | 43.08 | 68.22 | 7.99 | 14.07 | 3.00 | 5.75 |
| Chile | 13 | 61.63 | 60.62 | 48.22 | 69.25 | 5.18 | 14.68 | 5.00 | 7.25 |
| Hong Kong | 35 | 58.27 | 59.73 | 30.90 | 92.77 | 14.80 | 19.09 | 5.00 | 10.00 |
| India | 68 | 52.78 | 51.07 | 32.33 | 92.52 | 10.76 | 12.78 | 5.00 | 8.00 |
| Indonesia | 16 | 37.81 | 38.52 | 11.77 | 62.85 | 12.91 | 9.14 | 2.00 | 2.50 |
| Malaysia | 40 | 54.44 | 58.64 | 21.63 | 78.30 | 14.40 | 16.65 | 4.00 | 9.00 |
| Pakistan | 9 | 31.85 | 26.83 | 17.25 | 66.68 | 15.56 | 8.96 | 5.00 | 5.00 |
| Philippines | 17 | 40.72 | 34.08 | 19.40 | 64.35 | 13.66 | 8.50 | 3.00 | 4.75 |
| Singapore | 38 | 65.34 | 66.10 | 45.37 | 85.97 | 9.82 | 19.51 | 4.00 | 10.00 |
| South Africa | 32 | 66.53 | 67.16 | 42.62 | 80.38 | 8.55 | 14.32 | 5.00 | 6.00 |
| South Korea | 18 | 40.66 | 39.73 | 33.00 | 55.82 | 5.73 | 14.21 | 2.00 | 6.00 |
| Taiwan | 37 | 53.45 | 53.13 | 38.95 | 74.52 | 8.39 | 17.60 | 3.00 | 6.75 |
| Thailand | 18 | 53.54 | 49.69 | 28.33 | 79.02 | 14.53 | 12.92 | 2.00 | 3.25 |
| Turkey | 9 | 43.04 | 46.58 | 23.43 | 56.77 | 12.90 | 11.82 | 2.00 | 4.00 |

**Table 1: Summary Statistics (cont.)**

*Panel B: Firm-Level Performance Variables, 1999*

| | Tobin's-Q: | | | | ROA: | | | |
|---|---|---|---|---|---|---|---|---|
| | Obs | Mean | Median | Std Dev | Obs | Mean | Median | Std Dev |
| All Sample | 336 | 2.09 | 1.39 | 1.68 | 357 | 0.08 | 0.06 | 0.16 |
| Brazil | 24 | 1.27 | 1.10 | 0.67 | 24 | 0.01 | 0.02 | 0.05 |
| Chile | 12 | 1.38 | 1.20 | 0.65 | 12 | 0.04 | 0.05 | 0.04 |
| Hong Kong | 29 | 1.95 | 1.37 | 1.67 | 33 | 0.09 | 0.06 | 0.09 |
| India | 55 | 2.82 | 1.66 | 2.26 | 66 | 0.11 | 0.09 | 0.08 |
| Indonesia | 16 | 2.23 | 1.89 | 1.28 | 16 | 0.10 | 0.08 | 0.10 |
| Malaysia | 39 | 1.84 | 1.45 | 1.06 | 39 | 0.10 | 0.08 | 0.08 |
| Pakistan | 9 | 1.49 | 1.46 | 0.47 | 9 | 0.06 | 0.09 | 0.11 |
| Philippines | 17 | 1.46 | 1.36 | 0.65 | 17 | 0.04 | 0.04 | 0.05 |
| Singapore | 35 | 1.73 | 1.19 | 1.37 | 37 | 0.05 | 0.04 | 0.05 |
| South Africa | 32 | 1.90 | 1.37 | 1.40 | 29 | 0.09 | 0.07 | 0.07 |
| South Korea | 16 | 1.58 | 1.09 | 1.32 | 16 | 0.03 | 0.02 | 0.04 |
| Taiwan | 30 | 3.67 | 3.12 | 2.31 | 31 | 0.10 | 0.07 | 0.07 |
| Thailand | 16 | 2.07 | 1.50 | 1.50 | 15 | 0.05 | 0.04 | 0.09 |
| Turkey | 6 | 1.16 | 1.16 | 0.53 | 7 | 0.05 | 0.00 | 0.08 |

*Panel C. Correlations of Country-level governance statistics and Legal Indicators*

| | Mean of Governance | St. Dev. of Governance | Interquartile Range of Governance | Legality | Efficiency |
|---|---|---|---|---|---|
| St. Dev. Governance | -0.42 | | | | |
| | (0.14) | | | | |
| Interquartile Range Governance | -0.39 | 0.74 | | | |
| | (0.16) | (0.00) | | | |
| Legality | 0.77 | -0.30 | -0.43 | | |
| | (0.00) | (0.29) | (0.13) | | |
| Efficiency | 0.64 | -0.14 | -0.45 | 0.81 | |
| | (0.01) | (0.64) | (0.11) | (0.00) | |
| Shareholder Rights | 0.47 | 0.00 | -0.39 | 0.28 | 0.64 |
| | (0.09) | (1.00) | (0.17) | (0.33) | (0.01) |

## Table 2: Governance Determinants

The dependent variable is *Governance,* which is CLSA's firm-level corporate governance ranking. *Log(SalesUS)* is Log of Sales in US$. *SalesGR* is 3-year average growth rate of sales (in US$). *K/S* is the ratio of the 3-year average of fixed capital (property plant and equipment) to sales. *ADR Dummy* equals one if the firm lists in the US, 0 otherwise. *Judicial Efficiency* is from the International Country Risk Guide (2000). *Shareholder Rights* is the sum of dummies identifying one-share/one-vote, proxy by mail, unblocked shares, cumulative vote/proportional representation, preemptive rights, oppressed minority, and percentage of shares needed to call an ESM (La Porta et al., 1999). Firm-level data is for 1999 except for 29 firms whose last available data is 1998. All regressions include a year dummy for firms whose last available data is 1998 (not shown). T-statistics are in parenthesis, *, **, and *** indicate significance at 10%, 5%, and 1% respectively.

|  | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|
| Log(SalesUS) | 0.98*<br>(1.84) | 0.39<br>(0.69) |  |  | 0.52<br>(0.90) | 0.47<br>(0.82) | 0.38<br>(0.81) |
| SalesGR | 9.98***<br>(2.6) | 9.96***<br>(2.63) |  |  | 8.61***<br>(2.38) | 8.62***<br>(2.38) | 6.86**<br>(2.11) |
| K/S | -1.48***<br>(-2.97) | -0.99**<br>(-2.09) |  |  | -1.05***<br>(-2.64) | -0.96***<br>(-2.51) | -0.89**<br>(-2.12) |
| ADR Dummy |  | 5.18***<br>(3.23) |  | 4.49***<br>(2.68) | 4.47***<br>(3.03) | 5.27***<br>(2.79) | 2.39*<br>(1.68) |
| Judicial Efficiency |  |  | 1.65***<br>(3.56) | 2.11***<br>(4.03) | 1.77***<br>(3.71) | 2.22***<br>(4.16) |  |
| Shareholder Rights |  |  | 1.67**<br>(1.96) | 1.56*<br>(1.85) | 0.63<br>(0.69) | 0.94<br>(1.04) |  |
| Judicial Efficiency *ADR Dummy |  |  |  | -1.45**<br>(-2.04) |  | -1.52**<br>(-2.14) |  |
|  |  |  |  |  |  |  |  |
| Intercept | 42.5***<br>(6.1) | 47.99***<br>(6.59) | 34.76***<br>(12.82) | 31.48***<br>(9.79) | 31.44***<br>(3.94) | 27.68***<br>(3.33) | —— |
| Country Dummies | No | No | No | No | No | No | Yes |
|  |  |  |  |  |  |  |  |
| Adjusted R^2 | 0.06 | 0.07 | 0.13 | 0.16 | 0.17 | 0.18 | 0.39 |
| # of Firms | 335 | 335 | 374 | 374 | 335 | 335 | 335 |

## Table 3: Corporate Governance and Firm Valuation

The dependent variable in Panel A, *Tobin's-Q*, measures expected market performance and is defined as the market value of equity plus total liabilities divided by total assets. The dependent variable in Panel B, *ROA*, measures the return on assets and is calculated as net income plus interest expense divided by total assets. *Governance* is CLSA's firm-level corporate governance rankings. *Log(SalesUS)* is the natural log of total sales. *SalesGR* is 3-year average growth rate of sales (in US$). *K/S* is the ratio of the 3-year average of fixed capital (property plant and equipment) to sales. Firm-level data is for 1999 except for 29 firms whose last available data is 1998. All regressions include a year dummy for firms whose last available data is 1998 (not shown.) T-statistics are in parenthesis. *, **, and *** indicate significance at 10%, 5%, and 1% respectively.

| *Panel A: Dependent Variable = Tobin's-Q* | | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Intercept | 1.56*** (4.99) | ——— | ——— | ——— | ——— | ——— |
| Governance | 0.011** (1.94) | 0.023*** (3.12) | 0.023*** (3.36) | 0.025*** (3.54) | 0.021*** (2.97) | 0.0196*** (2.76) |
| Log(SalesUS) | | | | -0.25*** (-4.24) | | |
| SalesGR | | | | | 1.58*** (3.91) | |
| K/S | | | | | | -0.24*** (-4.49) |
| Country dummies | No | Yes | Yes | Yes | Yes | Yes |
| 1-Digit SIC dummies | No | No | Yes | Yes | Yes | Yes |
| | | | | | | |
| Adjusted R^2 | 0.03 | 0.21 | 0.30 | 0.34 | 0.30 | 0.33 |
| # of Firms | 336 | 336 | 336 | 334 | 323 | 333 |

| *Panel B: Dependent Variable = ROA* | | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Intercept | 2.3 (1.59) | ——— | ——— | ——— | ——— | ——— |
| Governance | 0.08*** (2.83) | 0.14*** (3.58) | 0.13*** (3.48) | 0.13*** (3.52) | 0.12*** (3.17) | 0.11*** (2.84) |
| Log(SalesUS) | | | | -0.26 (-0.85) | | |
| SalesGR | | | | | 0.05** (2.13) | |
| K/S | | | | | No | -0.01*** (-4.48) |
| Country dummies | No | Yes | Yes | Yes | Yes | Yes |
| 1-Digit SIC dummies | No | No | Yes | Yes | Yes | Yes |
| | | | | | | |
| Adjusted R^2 | 0.03 | 0.19 | 0.25 | 0.25 | 0.26 | 0.28 |
| # of Firms | 351 | 351 | 351 | 347 | 335 | 346 |

35

## Table 4: Corporate Governance, Legality and Firm Valuation

The dependent variable, *Tobin's-Q* is defined as the market value of equity plus total liabilities divided by total assets. *Governance* is CLSA's firm-level corporate governance rankings. *Legality* is an index of legal and economic development constructed as a weighted average of Efficiency of the Judiciary, Rule of Law, Corruption, Risk of Expropriation, and Risk of Contract Repudiation (Berkowitz, et al., 2002). *Judicial Efficiency* is from the International Country Risk Guide (2000). *Shareholder Rights* is the sum of dummies identifying one-share/one-vote, proxy by mail, unblocked shares, cumulative vote/proportional representation, preemptive rights, oppressed minority, and % of shares needed to call an ESM (Shleifer, et al., 1999). Latin Dummy is equal to 1 if the country is in Latin America, 0 otherwise. Firm-level data is for 1999 except for 29 firms whose last available data is 1998. All regressions include 336 firms, 1-digit SIC dummies and a year dummy for firms whose last available data is 1998 (not shown.) T-statistics are in parenthesis, *, **, and *** indicate significance at 10%, 5%, and 1% respectively.

| Panel A: | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Judicial Efficiency | 0.02 | -0.02 | 0.22** | 0.27** |
| | (0.62) | (-0.53) | (2.14) | (2.61) |
| Governance | | 0.019*** | 0.049*** | 0.066*** |
| | | (3.20) | (3.44) | (4.31) |
| Judicial Efficiency* Governance | | | -0.004** | -0.006*** |
| | | | (-2.25) | (-2.98) |
| Latin Dummy | | | | -1.05 |
| | | | | (-5.62) |
| Adjusted R^2 | 0.11 | 0.13 | 0.14 | 0.19 |

| Panel B: | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Shareholder Rights | 0.44 | -0.02 | 0.39 | 0.43* |
| | (0.58) | (-0.30) | (1.49) | (1.68) |
| Governance | | 0.02*** | 0.05*** | 0.06*** |
| | | (3.19) | (2.33) | (2.82) |
| Shareholder Rights* Governance | | | -0.01 | -0.01* |
| | | | (-1.52) | (-1.84) |
| Latin Dummy | | | | -1.15*** |
| | | | | (-6.26) |
| Adjusted R^2 | 0.11 | 0.13 | 0.14 | 0.18 |

| Panel C: | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Legality | 0.47** | 0.17 | 0.08 | 0.14* |
| | (2.05) | (0.67) | (1.18) | (1.87) |
| Governance | | 0.017*** | 0.03* | 0.06*** |
| | | (2.71) | (1.74) | (2.74) |
| Legality*Governance | | | -0.001 | -0.003* |
| | | | (-0.92) | (-1.79) |
| Latin Dummy | | | | -1.18*** |
| | | | | (-6.16) |
| Adjusted R^2 | 0.12 | 0.13 | 0.14 | 0.18 |

## Table 5: Corporate Governance, Legality and Firm Performance

The dependent variable, *ROA*, measures the return on assets and is calculated as net income plus interest expense divided by total assets. *Governance* is CLSA's firm-level corporate governance rankings. *Legality* is an index of legal and economic development constructed as a weighted average of Efficiency of the Judiciary, Rule of Law, Corruption, Risk of Expropriation, and Risk of Contract Repudiation (Berkowitz, et al., 2002). *Judicial Efficiency* is from the International Country Risk Guide (2000). *Shareholder Rights* is the sum of dummies identifying one-share/one-vote, proxy by mail, unblocked shares, cumulative vote/proportional representation, preemptive rights, oppressed minority, and % of shares needed to call an ESM (Shleifer, et al., 1999). Latin Dummy is equal to 1 if the country is in Latin America, 0 otherwise. Firm-level data is for 1999 except for 29 firms whose last available data is 1998. All regressions include 348 firms, 1-digit SIC dummies and a year dummy for firms whose last available data is 1998 (not shown.) T-statistics are in parenthesis, *, **, and *** indicate significance at 10%, 5%, and 1% respectively.

| Panel A: | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | | | | |
| Judicial Efficiency | 0.39** (1.95) | 0.20 (0.96) | 1.2** (1.97) | 0.01** (2.38) |
| Governance | | 0.09*** (2.87) | 0.22*** (2.67) | 0.31*** (3.56) |
| Judicial Efficiency* Governance | | | -0.019 (-1.38) | -0.028** (-2.44) |
| Latin Dummy | | | | -6.1*** (-5.69) |
| Adjusted R^2 | 0.12 | 0.14 | 0.15 | 0.20 |

| Panel B: | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | | | | |
| Shareholder Rights | 1.2*** (3.15) | 0.95** (2.27) | 1.7 (1.31) | 1.8 (1.34) |
| Governance | | 0.08*** (2.55) | 0.14 (1.31) | 0.18* (1.79) |
| Shareholder Rights* Governance | | | -0.01 (-0.53) | -0.02 (-0.81) |
| Latin Dummy | | | | -5.4*** (-5.50) |
| Adjusted R^2 | 0.14 | 0.16 | 0.16 | 0.20 |

| Panel C: | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | | | | |
| Legality | 0.15 (1.22) | -0.03 (-0.25) | 0.71* (1.62) | 0.98** (2.20) |
| Governance | | 0.10*** (3.14) | 0.31*** (2.47) | 0.43*** (3.31) |
| Legality*Governance | | | -0.014* (-1.79) | -0.021*** (-2.55) |
| Latin Dummy | | | | -6.4*** (-6.09) |
| Adjusted R^2 | 0.11 | 0.14 | 0.15 | 0.20 |

**Figure 1: Box –and-Whisker Plot of the Distribution of Governance Rankings, by Country**



Notes: Countries are sorted in the order of increasing index of Legality.

**Figure 2: Scatterplot of Average Governance and Index of Legality, by Country**



Notes: Plotted are country-means of firm-level governance rankings against index of Legality.