# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

-------------------------------------------------------------------------x

**IN RE ABBOTT-DEPAKOTE SHAREHOLDER**    **:**
**DERIVATIVE LITIGATION**    **:**   **CASE NO: 1:11-cv-08114**
   **:**   **Hon. Virginia M. Kendall**

-------------------------------------------------------------------------x

**DECLARATION OF ROBERT M. ROSEMAN IN SUPPORT OF LEAD
PLAINTIFF'S MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT
AND AWARD OF ATTORNEYS' FEES AND EXPENSES**

I, ROBERT M. ROSEMAN declare as follows:

1.      I am a member of the law firm of Spector Roseman Kodroff & Willis, P.C. ("Lead Counsel" or "Spector Roseman"). Spector Roseman was appointed as Lead Counsel and its client, Jacksonville Police & Fire Pension Fund ("Jacksonville Police & Fire"), was appointed as Lead Plaintiff in the above-captioned shareholder derivative litigation by order of this Court dated April 13, 2012 (the "Lead Plaintiff Order"). I have personal knowledge of the matters set forth herein based upon my personal direction of all material aspects of the prosecution and settlement of this litigation.

2.      I submit this declaration in support of Lead Plaintiff's motion, pursuant to Fed. R. Civ. P. 23.1, for final approval of the proposed Settlement with the Defendants[1] that will resolve the claims asserted in *In re Abbott-Depakote Shareholder Derivative Litigation*, Case No. 1:11-cv-08114 (N.D. Ill.) (the "Action"). The Court preliminarily approved the proposed Settlement on March 13, 2014 (the "Preliminary Approval Order").

3.      I also respectfully submit this Declaration in support of Lead Counsel's application for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Application").

## I.      OVERVIEW OF THE LITIGATION AND THE CLAIMS ASSERTED

### A.      Abbott's Off-Label Marketing of Depakote

4.      Depakote was first approved by the U.S. Food and Drug Administration ("FDA") in 1983 for the treatment of epileptic seizures, and was subsequently approved for the treatment of manic bipolar disorder and migraines.

---

[1] The term "Defendants" refers to the Individual Defendants and Nominal Defendant, Abbott Laboratories.

1

5.      As described in the Agreed Statement of Facts (the "ASF") attached to Abbott's plea agreement with the U.S. Government, in June 1997, Abbott developed its 1998 Strategic Marketing Plan, which discussed the Company's overall positioning, strategy, and message in the illegal off-label marketing of Depakote. The Plan's "core strategy" called for Depakote to be the "first-line choice for dementia with behavioral disturbance" and established it as the "first-line treatment in practice guidelines of key pharmacy providers and managed care plans." With the 1998 Strategic Marketing Plan approved, Abbott commenced the off-label marketing of Depakote by employing numerous marketing schemes.

6.      The Second Consolidated Verified Amended Shareholder Derivative Complaint (the "SAC") alleged that Depakote was marketed as a treatment for, among other things, seizure and stroke, withdrawal from narcotics, epilepsy in children under 10, mood disorders, Attention Deficit/Hyperactivity Disorder, bipolar disorder, schizophrenia, and even "developmental delay" in children under 18 – uses that were not approved by the FDA.

7.      The SAC further alleged that, from 1998 through at least December 31, 2008, Abbott drove the off-label marketing of Depakote through a number of machinations including, among others:

- Formation of the Long Term Care Sales Force, which was dedicated to promoting Depakote for the off-label purposes of treating agitation and aggression in elderly patients suffering from dementia;

- Instructing sales representatives to approach physicians regarding the Center for Medicare and Medicaid Services' 2006 guidance on the Omnibus Budget Reconciliation Act of 1987's ("OBRA-87") restrictions on "unnecessary drugs" to inform them that the regulation would not apply if their patients were coded as having bipolar conditions or seizure conditions;

- Using illegal kickbacks, including sports tickets, dinners, golf outings, speaker honoraria and long term consulting agreements, to persuade "key opinion

2

leaders" to provide advocacy and key market feedback in support of off-label uses of Depakote;

- Entering into contracts with Long Term Care Pharmacy Providers that included payment of rebates to these providers based on the increased use of Depakote in nursing homes for, among other things, the treatment of agitation and aggression in elderly dementia patients; and,

- Improperly influencing Continuing Medical Education programs by molding them into public promotional events for off-label uses of Depakote.

8.      As Lead Plaintiff alleged, there is no question that Depakote was a boon for Abbott, generating approximately $13.8 billion in revenues for the Company between 1998 and 2008 and, between 2005 and 2008, Depakote's sales accounted for roughly 8% to 11% of Abbott's total domestic revenue.

### B.      The *Qui Tam* Actions and the U.S. Government's Investigation of Abbott's Sales and Marketing Practices Relating to Depakote

9.      Between October 2007 and January 2010, former sales representatives of Abbott filed four separate *qui tam* lawsuits (the "*Qui Tam* Actions")[2] describing a "widespread, centralized scheme" at Abbott to engage in the off-label marketing of Depakote between 1998 and 2009 that was "condoned by the highest levels of Abbott management."  The relators in the *Qui Tam* Actions made highly specific factual allegations that caught the attention of the U.S. Government and triggered criminal and civil investigations (subsequently joined by numerous state authorities) into whether Abbott's conduct violated the Federal False Claims Act, the Food, Drug, and Cosmetic Act (the "FDCA"), and the Anti-Kickback Statute in connection with Medicare and/or Medicaid reimbursement to third parties.

---

[2] Collectively, the *Qui Tam* Actions refer to the amended complaint filed in *United States ex rel. McCoyd v. Abbott Laboratories*, No. 1:07-cv-00081-SGW (W.D. Va.); the complaint filed in *United States ex rel. Dietzler v. Abbott Laboratories*, No. 09 CV 2118 (N.D. Ill.); the second amended complaint filed in *United States ex rel. Spetter v. Abbott Laboratories, Inc.*, No. 1:10-cv-6 (W.D. Va.); and the amended complaint filed in *United States ex rel. Mulcahy, et al. v. Abbott Laboratories*, No. 1:08-cv-00054 (W.D. Va.).

10.     On April 17, 2008, the United States Attorney's Office for the Western District of Virginia sent correspondence to Abbott's legal department requesting that it "advise the company, its employees, agents. . . to preserve and not destroy any records related in any way to Depakote and/or its marketing and promotion" (the "Preservation Letter").  The Preservation Letter confirmed that Abbott's legal department "would accept subpoenas for company records" and that "multiple subpoenas" would be served at a later date.

11.     After the Preservation Letter was sent, the U.S. Government served the first of at least 31 subpoenas on Abbott through the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG-HHS") on July 10, 2008, requesting documents from the Company, including documents from its employees, present and former officers, directors, and representatives from January 1, 1997 through the date of service.  The categories of materials sought included, among other things, documents pertaining to marketing, promotional, educational, or continuing medical education materials based on certain clinical trials/studies regarding Depakote to treat agitation, aggression, or any other condition or symptom associated with long term care residents or other elderly persons.  As the U.S. Government's investigation intensified, the additional subpoenas seeking documents related to Abbott's marketing practices for Depakote followed.

12.     After almost two years of investigating the off-label marketing of Depakote, on February 1, 2011, the U.S. Government intervened in the *Qui Tam* Actions and noticed its intent to proceed with the allegations.  Also, upon request by the U.S. Government, the *Qui Tam* Actions were unsealed and redacted versions of the *McCoyd* and *Spetter* complaints were filed on February 4, 2011 – making the allegations against Abbott and its unlawful promotion of Depakote known to the public for the first time.

4

13.     On October 19, 2011, Abbott filed a Form 8-K with the Securities and Exchange Commission ("SEC"), attaching as an exhibit a press release issued that day announcing, among other things, that it had reserved $1.5 billion "related to ongoing settlement discussions in the previously disclosed investigation by the [U.S. Government] … related to Depakote."

14.     On May 7, 2012, Abbott announced that it had pleaded guilty and agreed to pay $1.6 billion to "U.S. federal and 49 state authorities, plus the District of Columbia, to resolve all outstanding issues" arising from the Company's unlawful promotion of Depakote for uses not approved as safe and effective by the FDA.  This agreement required Abbott to pay $800 million to resolve civil claims for the negotiated period 1998 through December 31, 2008, and $700 million in criminal penalties for the negotiated period 1998 through December 21, 2006.  Abbott also paid $100 million to several states to resolve various consumer protection matters.  The settlement also required Abbott to implement additional compliance measures as part of its criminal plea agreement.

15.     Abbott also entered into a Corporate Integrity Agreement (the "Depakote CIA") with the OIG-HHS as part of the settlement.  The Depakote CIA was to govern Abbott's compliance program for five years.[3]

## II.     HISTORY OF THE ACTION

### A.     Commencement of the Litigation and Appointment of Lead Plaintiff and Lead Counsel

16.     After news broke on October 21, 2011, that Abbott had reserved approximately $1.5 billion in connection with settlement discussions regarding claims brought by the U.S.

---

[3] On January 1, 2013, Abbott completed the separation of its research-based pharmaceuticals business through the distribution of the issued and outstanding common stock of AbbVie Inc. to Abbott's shareholders.  Once the transaction was effectuated, the Depakote CIA transferred in its entirety and became fully binding on AbbVie.

Government and several states, seven shareholder derivative actions were filed between November 2011 and April 2012 on behalf of Abbott[4] against members of Abbott's Board of Directors, former directors, and certain current and former officers of the Company.[5] These actions alleged that the Individual Defendants breached their fiduciary duties by causing or allowing Abbott to engage in the off-label marketing of Depakote.

17. Prior to filing its lawsuit, Jacksonville Police & Fire and Lead Counsel undertook an extensive investigation into the allegations reviewing, among other things: (i) Abbott's filings with the SEC; (ii) the Company's Corporate Governance Principles, Code of Business Conduct, and the Board's Committees' charters; (iii) submissions with the FDA; (iv) press releases; (v) FDA Warning Letters sent to the Company; (vi) materials relating to the U.S. Government's investigation; (vii) materials, including the unsealed complaints, relating to the *Qui Tam* Actions; and (viii) news articles from the business press and analyst reports.

18. In addition to filing a comprehensive and well-researched complaint, Lead Counsel submitted a request for documents to the FDA pursuant to the Freedom of Information Act, 5 U.S.C. § 55, *et seq*. ("FOIA"). As a result of Lead Counsel's efforts, the FDA produced nearly 2,000 pages including: correspondence to the FDA regarding a petition to change

---

[4] The cases are styled: *Chester County Employees Retirement Fund v. White, et al.*, 1:11-cv-08114; *Jacksonville Police & Fire Pension Fund v. White, et al.*, 1:11-cv-08383; *Pinchuck, et al. v. White, et al.*, 1:11-cv-08499; *Louisiana Municipal Police Employees' Retirement System v. White, et al.*, 1:11-cv-08631; *Pipefitters Local Union 537 Pension Fund v. White, et al.*, 1:11-cv-08886; *Public School Retirement System of The School District of Kansas City, Missouri v. White, et al.*, 1:12-cv-00355; and *Pipefitters Local Union No. 120 Pension Fund v. White, et al.*, 1:12-cv-02624. Additionally, two shareholder derivative actions were filed in the Circuit Court of Lake County, Illinois: *Patricia Goodman v. White, et al.*, No. 11CH5243, and *William Bojan v. White, et al.*, 11CH5498.

[5] In response to the filing of motions seeking appointment of lead plaintiff and lead counsel, on February 9, 2012, West Virginia Pipe Trades Health and Welfare Fund ("West Virginia") and Montini Family Trust ("Montini") submitted a notice to the Court noting that they had submitted a books and records request under § 805 ILCS 5/7.75(b) to Abbott and that selection of a lead plaintiff at this time would be premature until the inspection process was completed. Neither West Virginia, nor Montini moved to become lead plaintiff.

Depakote's label or remove it from the market; clinical reviews of Depakote which include analyses of labeling and discussions about changes to labeling; a petition to the FDA to pull Depakote from the market; general statements and comments by consumers regarding the marketing of Depakote; several letters from the FDA to Abbott concerning misleading information or a lack of information in a Depakote "flashcard"; an FDA memorandum analyzing the recommended usages of Depakote in children and adolescents; and agendas, minutes, and transcripts from meetings of the Pediatric Advisory Committee at which Depakote was discussed.

19.    Jacksonville Police & Fire and Lead Counsel also promoted judicial efficiency from the outset of the litigation by coordinating with all other plaintiffs to reduce duplication of effort and other inefficiencies.   These efforts were successful, as Lead Counsel obtained the support of plaintiffs Louisiana Municipal Police Employees Retirement System, the Public School Retirement System of the School District of Kansas City, Missouri, Warren Pinchuck, and Roy Sapir, who agreed that this case should be led by Jacksonville Police & Fire.

20.    On April 13, 2012, the Court consolidated these actions and appointed Jacksonville Police & Fire as Lead Plaintiff.   The Court also approved Jacksonville Police & Fire's selection of Spector Roseman as Lead Counsel and the law firm of Susman Heffner & Hurst LLP as Local Counsel.

**B.    The Filing of the Consolidated Verified Amended Shareholder
Derivative Complaint and Its Dismissal**

21.    It was evident as Lead Counsel's theory of the case developed that documentation reflecting Abbott's directors' knowledge of the illegal off-label marketing scheme for Depakote would be a critical component of pleading both the cause of action for breach of fiduciary duty

and compliance with the demand futility pleading requirements of Fed. R. Civ. P. 23.1. As a result, Lead Counsel again conducted a thorough and extensive investigation into the matter. In addition to the materials reviewed for Lead Plaintiff's initial complaint, this investigation also included, among other things, a review of documents produced by the FDA pursuant to the FOIA request and analysis of additional documents produced by Abbott to Lead Plaintiff.[6]

22.     The theory developed by Lead Counsel was that, under Illinois law, which would likely track Delaware law, it is the responsibility of a board to ensure that there is in place a reporting system to enable it to determine if the company is violating the law and, if such a system is in place, whether the proper reports are being generated. Thus, the Consolidated Verified Amended Shareholder Derivative Complaint (the "FAC") alleged that Abbott's corporate governance mechanisms in place during the Relevant Period[7] ensured that, as a matter of affirmative obligation, key information would be conveyed to the Board. The FAC also described in detail the highly developed network of monitoring and reporting mechanisms that arose out of both the 2003 Corporate Integrity Agreement (the "2003 CIA") (related to resolution of federal criminal claims with the Company's Ross Products Division), as well as modifications to Abbott's Public Policy Committee charter as a result of other shareholder derivative litigation in 2004 and 2005. Lead Plaintiff alleged, with this governance machinery in place, Abbott's Board then either was aware of or failed to recognize a number of red flags related to the off-label marketing of Depakote including, among others, FDA Warning Letters, the U.S. Government's scrutiny of the Company's marketing practices for Depakote, alleged historical

---

[6] These documents were previously produced to Pipefitters Local Union No. 120 Pension Fund pursuant to a books and records request under § 805 ILCS 5/7.75(b) and provided to Lead Counsel following execution of a confidentiality agreement.

[7] The Relevant Period alleged in the FAC commenced in 1998 through the filing of the complaint on June 1, 2012.

wrongdoing involving violations of FDA regulations and law, and the filing of the *Qui Tam* Actions.

23.    With respect to damages, Lead Counsel's theory flowed from the belief that the inability of Abbott's Board to exercise its required oversight permitted the off-label marketing of Depakote to develop and continue to the point where criminal and civil investigations by the U.S. Government were triggered – leading to the $1.6 billion settlement.

24.    The state of the law with respect to pleading demand pursuant to Fed. R. Civ. P. 23.1 is not particularly accommodating to shareholder claims of demand futility where the director defendants were, in the traditional manner, "disinterested."  Lead Plaintiff did not make a demand on Abbott's Board to seek recompense on the Company's behalf and, therefore, Lead Plaintiff was required to plead, with specificity, that demand was futile.  Because there were no traditional hallmarks of "interest" – for example, selling of stock by a majority of the directors, or a self-dealing transaction that was being challenged – Lead Counsel had the significant burden of establishing, on the pleadings, that Abbott's directors, a majority of whom were "outside" directors, were not capable of exercising their independent, untainted judgment in deciding whether or not to pursue these claims.  Lead Counsel's burden became even more difficult because of Abbott's Articles of Incorporation, which indemnify its directors from personal liability for monetary damages for a breach of the duty of care.  Thus, going forward Lead Plaintiff faced a heavy burden – to develop sufficient evidence to prove to a jury that a majority of Abbott's then-current directors were personally liable by consciously failing to act in the face of known warning signals that Abbott was not in compliance with applicable federal laws and regulations pertaining to healthcare between 1998 and 2012 and, as a result, faced serious adverse consequences.

25.     On June 1, 2012, Lead Plaintiff filed the FAC based upon the detailed facts developed through Lead Counsel's investigation.  The FAC alleged breaches of fiduciary duty, mismanagement, gross mismanagement, and unjust enrichment on behalf of and for the benefit of Abbott against certain current and former officers and directors.  The Individual Defendants were alleged to have breached their fiduciary duties to Abbott and its shareholders by causing or allowing Abbott to illegally market Depakote over a significant period of time.  This resulted in Abbott suffering significant damage when it agreed to pay $1.6 billion to resolve criminal and civil charges brought by the U.S. Government and several states.  Thus, Abbott itself was named in the FAC only as a nominal defendant and the relief sought was for the direct benefit of Abbott.

26.     On July 16, 2012, Abbott and the Individual Defendants moved to dismiss the FAC.  The Defendants persuasively argued that Lead Plaintiff failed to meet its burden of pleading demand futility with the particularity required by both Rule 23.1 and 805 ILCS 5/7.80(b) and that Abbott's Articles of Incorporation protected directors from personal liability in the circumstances pleaded in the FAC.  In particular, Abbott stated that, as part of its settlement with the U.S. Government, it pleaded guilty to a criminal Information alleging that Abbott introduced into interstate commerce misbranded Depakote products, in violation of the FDCA, from January 1998 to December 2006.  Abbott argued that neither the ASF nor the misdemeanor guilty plea covered any conduct after December 2006, and thus, did not implicate a majority of the then-current Board, which was not appointed until April 2007 – months after the misconduct allegedly ceased.

27.     On August 30, 2012, Lead Plaintiff filed its memorandum of law in opposition to the Defendants' motion to dismiss the FAC.  First, Lead Plaintiff argued that the asserted

Relevant Period lasted until at least the end of 2011 and, as a result, a majority of the Board faced a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith. This was premised on Abbott's own internal business records, the pleadings filed in the *Qui Tam* Actions, facts in the ASF, and documents obtained from the FDA. Moreover, Lead Plaintiff stated that the FAC alleged numerous instances of wrongdoing occurring after December 2006 (which would have implicated the current Board) and before 2006 that did not appear in the ASF. Second, Lead Plaintiff contended that the FAC alleged a number of warnings and existing protocols that should have alerted – or did, in fact, alert – Abbott's Board to the unlawful conduct, but which went unheeded.

28. On September 20, 2012, the Defendants filed their reply arguing, *inter alia*, that the presence of compliance mechanisms did not establish a risk of substantial liability and that none of the red flags identified by Lead Plaintiff pointed to any knowledge by the Board that Abbott was illegally marketing Depakote.

29. Also, during this time, with the Court's permission, Lead Counsel served third-party subpoenas to certain individuals and entities that Lead Counsel's investigation revealed may have information relevant to the allegations. These subpoenas, and an accompanying letter stating that the recipients were not required to respond or produce documents but to preserve all responsive documents in the event Lead Plaintiff's claims were sustained, were issued to: (i) PharmaCare Strategies; (ii) Dr. Pierre Tariot; (iii) Insight Therapeutics; (iv) The McGraw-Hill Companies; and (v) ABcomm, Inc.

30. On November 8, 2012, the Court granted the motion to dismiss the FAC. In doing so, the Court determined, among other things, that six out of ten of Abbott's directors were not appointed until April 2007 or later, concluding that these directors could not be personally

11

liable for conduct that occurred before they were appointed. Although the Court acknowledged Abbott's highly developed network of monitoring and reporting mechanisms and the red flags alleged by Lead Plaintiff, it nonetheless concluded that the lion's share of misconduct that occurred in connection with the illegal marketing of Depakote occurred well before the appointment of the Board in place at the time the FAC was filed. To emphasize this, the Court pointed to the ASF, which identified the period of wrongdoing from 1998 through the end of 2006. The Court suggested that the ASF was not a red flag that impermissible activity occurred after the covered period, but quite the opposite – that the U.S. Government investigated Abbott and concluded that the off-label marketing practices concluded at the end of 2006. In addition to "stale allegations," the Court found that there was no allegation that the Board received notice of any post-April 2007 misconduct, indicating that pleading the existence of compliance mechanisms was insufficient to establish knowledge or awareness.

**C.      The Second Consolidated Verified Amended Shareholder Derivative Complaint is Filed and Sustained**

31.     In its Memorandum and Opinion, the Court found that the FAC should *not* be dismissed *with prejudice*, recognizing that Lead Plaintiff may have had knowledge of other facts or details that were not initially pled and, having described the pleading deficiencies, Lead Plaintiff may be able to address them by pleading additional facts.

32.     With the opportunity to amend the FAC, Lead Counsel reviewed again all of the materials it previously analyzed to determine whether it could add new information or emphasize older information, viewed in a different light, to address the pleading deficiencies identified by the Court. Lead Counsel focused on the U.S. Government's investigation and its eventual settlement with Abbott. For example, Lead Counsel spoke with both counsel for the U.S.

Government and counsel for certain relators in the *Qui Tam* Actions to obtain relevant information that would not be deemed confidential, subject to court order, or in violation of any attorney-client privilege. Lead Counsel also met with prominent *qui tam* lawyers on several occasions to develop an understanding of the U.S. Government's investigatory process and its connection to *qui tam* litigation. With new information gleaned from multiple sources, Lead Plaintiff filed the Second Consolidated Verified Amended Shareholder Derivative Complaint (the "SAC") on December 6, 2012, which it believed addressed the concerns of the Court when it dismissed the FAC.

33. In one respect, the Court dismissed the FAC largely because it concluded that, based on the Criminal Plea Agreement, the wrongful conduct ended in 2006 and, thus, the Board could not be held accountable for it. Based on this, the SAC placed more focus on the Civil Settlement Agreement (which resolved claims brought by the U.S. Government and the *Qui Tam* Actions) rather than relying more heavily on the criminal matter. For example, the Civil Settlement Agreement made it plausible that Abbott's illegal off-label marketing of Depakote continued through at least December 31, 2008, which covered a significant period during which a majority of Abbott's Board was in place.[8] Thus, in the SAC, Lead Plaintiff alleged that, through the Civil Settlement Agreement, Abbott specifically admitted that, through December 31, 2008, it promoted Depakote off-label: (1) to healthcare providers in nursing homes for the control of agitation and aggression of dementia patients and (2) for the treatment of schizophrenia, both which caused the submission of hundreds of millions of dollars in reimbursement claims to federal healthcare programs including Medicare and Medicaid. Lead

---

[8] Between the filing of the FAC and the SAC, the Board composition changed, with two new members being added and one member leaving. Now, the Board consisted of eleven members (previously ten), a majority of whom did not begin serving until January 2008.

13

Plaintiff also asserted that the Civil Settlement Agreement covered a range of misconduct involving the off-label promotion of Depakote through December 31, 2008 including, among others: knowingly promoting the sale and use of Depakote for uses that were not approved by the FDA and marketing Depakote to healthcare professionals for use with dementia patients in nursing homes; offering and paying illegal remuneration to healthcare professionals and long term care pharmacy providers in violation of the federal Anti-Kickback Statute; knowingly aiding and abetting nursing home operators in circumventing OBRA-87's restrictions on "unnecessary drugs"; and instructing personnel to promote Depakote for off-label uses by providing false or misleading data.

34. In another respect, the Court questioned not only whether any of the red flags alleged in the FAC reached the Board after April 2007, but whether those red flags conveyed any information about the off-label marketing of Depakote. To strengthen the allegations concerning the Board's knowledge of wrongdoing, Lead Plaintiff emphasized how the Company's oversight mechanisms were substantially bolstered by the 2003 CIA – borne from the resolution of prior similar illegal conduct – and the U.S. Government's unyielding investigation into the off-label marketing of Depakote. To accomplish this, Lead Counsel scoured filings by Abbott and the U.S. Government in the dockets of the criminal case and *Qui Tam* Actions that eventually yielded an indication that Abbott was instructed to preserve Company documents some time in 2007 or 2008 and that several subpoenas were served on the Company beginning in July 2008.[9] Thus, in the SAC, Lead Plaintiff alleged that the yet-to-be produced Preservation Letter was a critical link between the Board and its knowledge of the improper marketing of Depakote. It also appeared to Lead Counsel from the developing evidence that the Board did not seek out

---

[9] Lead Counsel did not see, or have access to, the Preservation Letter until it was attached as an exhibit to the Defendants' motion to dismiss the SAC.

14

additional information about the off-label marketing of Depakote, based even on the facts presented to it at various times during the period between 1998 and at least December 31, 2008.

35.     On January 18, 2013, the Defendants moved to dismiss the SAC.  The Defendants contended that the allegations that the Board had notice of off-label marketing through board presentations, government subpoenas to Abbott employees, and the Preservation Letter were insufficient to establish demand futility because they relied on speculation and inferences unsupported by particularized allegations of fact.  For instance, the Defendants asserted that Lead Plaintiff did not allege with particularity that any member of the Board ever saw or was aware of the Preservation Letter or, alternatively, even if the Preservation Letter reached the Board, it did not create a substantial risk of liability for a majority of the Board because it asked Abbott to preserve documents related to conduct that had already occurred.  The Defendants also argued that the Civil Settlement Agreement only suggested that the U.S. Government asserted it had civil claims against Abbott through December 31, 2008.  Moreover, the Defendants underscored that Abbott did not admit that improper conduct continued until December 31, 2008, but, in fact, denied the U.S. Government's allegations.  Finally, the Defendants contended that the scope of the release in the Civil Settlement Agreement did not establish that wrongful conduct occurred throughout the period covered by the release but, as usually done with civil settlements, Abbott negotiated a broad release to cover the date through which the U.S. Government alleged that it had certain civil claims, here December 31, 2008.

36.     On March 1, 2013, Lead Plaintiff filed its memorandum of law in opposition to the Defendants' motion to dismiss the SAC.  First, Lead Counsel asserted that Abbott admitted in the Civil Settlement Agreement to vast amounts of misconduct through at least December 31, 2008 including having illegally promoted Depakote such that "hundreds of millions of dollars"

in claims were improperly submitted to federal healthcare programs, including the Medicare and Medicaid programs. Second, even though the Civil Settlement Agreement included a broad-based denial by Abbott, the unavoidable reality was that the U.S. Government had a factual basis to allege that all such conduct persisted through December 31, 2008 – and Abbott agreed to pay $800 million to resolve such claims. Third, even though Defendants maintained that the Civil Settlement Agreement admitted to no wrongdoing through December 31, 2008, Lead Counsel asserted that the agreement was just another data point that formed the basis for particularized allegations from which this Court would be permitted to draw reasonable inferences. Fourth, with respect to the Board's knowledge of the misconduct, Lead Counsel asserted that the Preservation Letter required affirmative action by Abbott's law department to advise, among others, certain of the Company's current and past directors "to preserve and not destroy any records related in any way to Depakote and/or its marketing and promotion." In other words, at that time, Abbott's Board was placed on notice that the U.S. Government was investigating the ongoing illegal marketing and promotion of Depakote. Finally, the subpoenas, served on Abbott starting in July 2008 and continuing through at least December 2009, consistently requested documents from 1997 or 1998 "through the present" – a clear indication that the U.S. Government was looking beyond the date of the Preservation Letter and examining conduct that was still ongoing.

37. The Defendants filed their reply on March 22, 2014, steadfastly maintaining that Lead Plaintiff misinterpreted the terms of the Civil Settlement Agreement and that the alleged "red flags" did not reach the Board, nor did they alert the Board to ongoing wrongdoing within the Company.

38.     On June 5, 2013, the Court issued its Memorandum Opinion and Order (the "June 5, 2013 Opinion") denying the Defendants' motion to dismiss the SAC.  In doing so, it found that by incorporating the Civil Settlement Agreement into the SAC, "it is now reasonable for this Court to infer that the off-label marketing scheme did not stop in 2006 as it previously found in Depakote I."  *In re Abbott Depakote Shareholder Deriv. Litig.*, No. 11 C 8114, 2013 WL 2451152, at *7 (N.D. Ill. June 5, 2013).  In other words, "[b]ased on the incorporation of these allegations into the [SAC], the myriad particularized allegations demonstrating that Abbott marketed Depakote for off-label uses through 2008 are plausible."  *Id.* at *8.  The Court acknowledged that it was "not deciding whether illegal conduct occurred through 2008; rather, it only decides whether Plaintiffs sufficiently allege that it did."  *Id.* at *9.  Moreover, "[s]ince the Plaintiffs have alleged that Abbott engaged in a scheme to illegally market Depakote in an off-label manner and to pay illegal remuneration to physicians to prescribe and promote Depakote for eleven years, including for an entire year in which a majority of the [] Board served as directors, Plaintiffs have alleged a scheme of magnitude and duration substantial enough to warrant the inference that the Board was aware of it."  *Id.* at *9.  Finally, the Court determined that even without that inference, Lead Plaintiff alleged additional "red flags" in the SAC "from which it could be reasonably inferred that a majority of the [] Board has notice of the off-label marketing scheme."  *Id.* at *10.  Based on this, the Court concluded that "Plaintiffs have sufficiently raised a reasonable doubt that the Board's inaction will not be afforded the protection of the business judgment rule."  *Id.* at *11.

39.     Not satisfied with this result, on June 17, 2013, the Defendants moved for reconsideration of the June 5, 2013 Opinion, contending that it contained two manifest errors of law.  One, the Court accepted Lead Plaintiff's unproven conclusory allegation that the U.S.

17

Government's recital in the Civil Settlement Agreement indicated that it had a legal claim through December 31, 2008. And, two, even if Lead Plaintiff sufficiently alleged in non-conclusory terms that off-label misconduct occurred through 2008, the June 5, 2013 Opinion erroneously assumed that the Board consciously decided to allow off-label marketing to continue after the Board allegedly received notice of such conduct through the Preservation Letter and July 10, 2008 subpoena.

40. On July 8, 2013, Lead Plaintiff filed its memorandum of law in opposition to Defendants' motion for reconsideration arguing that not only did the Defendants fail to meet the pleading requirements for such an extraordinary remedy, but the Court's reasoning for denying the Defendants' motion to dismiss was unassailable.

41. On July 15, 2013, the Defendants filed their reply maintaining their position that the Court's June 5, 2013 Opinion contained two manifest errors of law and that Lead Plaintiff's opposition failed to adequately address them. The Court denied the motion for reconsideration on September 12, 2013, after the parties had already entered settlement discussions.

**D.** **Settlement Discussions are Initiated**

42. The negotiation of the settlement with the Defendants was the result of numerous in-person meetings, conference calls, and emails between Lead Counsel and Settlement Counsel from Kirkland & Ellis.[10]

43. Abbott's Settlement Counsel contacted Lead Counsel in late August 2013 about the possibility of initiating settlement discussions and requested that Lead Counsel provide a settlement proposal in anticipation of what would be the first of five face-to-face meetings at the

---

[10] Nominal defendant Abbott was represented by Kirkland & Ellis during the litigation. However, a separate team of lawyers from that firm were designated to determine if a settlement was plausible and, if so, to negotiate its terms. Spector Roseman was in contact with both sets of lawyers, handling litigation matters with one and continuing settlement discussions with the other.

18

offices of counsel for Abbott in Washington, D.C. and sixteen telephonic meetings. Lead Counsel immediately interviewed and then retained Professor Jeffrey Gordon of Columbia University School of Law, a leading expert on corporate governance who has written extensively on the board's role in corporate governance (and the expert retained by the plaintiffs in *In re Pfizer Inc. S'holder Derivative Litig.*, No. 09 Civ. 7822 (JSR) (S.D.N.Y.), which also involved off-label marketing of prescription drugs). Professor Gordon was retained to: (a) evaluate the corporate governance mechanisms in place at Abbott at the time this action was filed to identify, among other things, any potential enhancements to its internal controls and the Board's supervision of the Company and (b) assist Lead Counsel in designing reforms to strengthen Abbott's Board oversight, particularly with regard to healthcare legal and regulatory compliance. Working with Professor Gordon, Lead Counsel designed detailed settlement proposals directed at both the Board and management levels. Notably, Professor Gordon was retained and became intricately involved from the beginning of the settlement negotiation process. He was not retained after a settlement was reached simply to bless the terms of that settlement.

44.     During the course of settlement negotiations, Lead Counsel met with Professor Gordon several times in New York while drafting proposed reforms. Eventually, Lead Counsel presented Defendants with a demand and a comprehensive settlement proposal that included significant corporate governance reforms. Lead Counsel also spoke with Professor Gordon telephonically after each meeting with the Defendants to confer on counter-proposals.

45.     The parties agreed to set the first meeting for October 24, 2013 at Kirkland & Ellis's office in Washington, D.C. (where all of the face-to-face meetings took place). This initial meeting lasted several hours. The parties asserted the strengths of each of their positions and painstakingly scrutinized each of the points in the settlement proposal. During this meeting,

19

the parties agreed on a few minor points, such as revisions to Abbott's Code of Business Conduct and certain management communications concerning healthcare compliance, but remained distinctly far apart on major issues, including the adoption of a recoupment policy and how to implement changes to the Lead Director's role, and the Board's Public Policy Committee. In other words, the meeting was productive, but resolution of the action was still far off.

46. The parties met again less than a week later, on October 29, 2013. Although agreement was reached on numerous reforms, the parties continued to wrestle with the language on some of the settlement proposal terms and, by this time, identified fundamental differences in four critical areas: (i) the adoption of the Quality and Legal and Regulatory Compliance Core Value; (ii) certain enhancements to the Lead Director role; (iii) material changes to the Public Policy Committee charter; and (iv) adoption of a recoupment policy that was triggered by more than a financial restatement and that also included officers who had a supervisory role over an employee engaged in wrongdoing. The parties ended the meeting without an agreement, particularly on those four areas of dispute, but agreed to discuss any counterproposals with each of their clients.

47. On November 13, 2013, the parties met for the third time, during which significant progress was made on the overarching terms of the settlement, but specific detailed language still needed to be negotiated for certain points. For instance, the parties agreed to specific changes to Abbott's Public Policy Committee, including new oversight responsibilities with respect to legal and regulatory compliance concerning healthcare, and strengthening the flow of information to the committee and the entire Board. However, certain language still needed to be refined, such as when new reporting obligations would be triggered. The

20

recoupment policy, however, remained in dispute and threatened to upend the settlement negotiation process.

48.     Less than two weeks later, on November 22, 2013, the parties participated in a conference call where significant developments began to emerge.  For example, Abbott agreed to keep the proposed reforms in place for at least four years and agreed to some form of recoupment, but only for an "officer who personally engaged in misconduct constituting substantial and intentional participation in a significant violation of law" – leaving, in Lead Counsel's mind, supervisors to turn a blind eye to misconduct in their own departments. Although the inclusion of this type of recoupment policy was viewed as a step in the right direction, Lead Plaintiff remained steadfast that any such recoupment policy include those that serve in a supervisory role.

49.     After several conference calls, by December 4, 2013, Abbott and Lead Plaintiff reached an agreement on the last issue, the implementation of a "supervisory role trigger" in the recoupment policy and an accord was reached on all other terms in dispute.  On the following day, a draft Memorandum of Understanding (the "MOU") was circulated by Abbott's Settlement Counsel to Lead Counsel in anticipation of another face-to-face meeting.

50.     On December 6, 2013, Abbott's Settlement Counsel and Lead Counsel met again to negotiate the terms of the MOU, such as the process by which Court approval of the settlement would be obtained, when the settlement would be announced, the notice protocol, and confirmatory discovery.

51.     Finally, after the terms of the MOU were negotiated, the parties began to discuss the amount of fees to be paid to Lead Counsel, which included a review of fees approved by courts in other shareholder derivative cases, (in particular, a number of recent cases that involved

other pharmaceutical companies accused by the U.S. Government of illegally off-label marketing FDA approved prescription drugs) and the benefits conferred to Abbott through the corporate governance reforms. The arm's-length negotiation over the attorneys' fees and reimbursement of out-of-pocket expenses, like the Settlement, was hard fought and was conducted for more than a month. Significantly, the parties did not engage in any discussions regarding the payment of attorneys' fees or expenses prior to having reached an agreement as to the terms of the proposed Settlement.

52. On December 30, 2013, Lead Counsel served Abbott with a request for production of documents and a notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6) in order to allow Abbott sufficient time to collect responsive documents and identify an employee that was knowledgeable about the flow of information to the Board concerning Abbott's regulatory compliance for Depakote as a corporate designee. Abbott's Settlement Counsel and Lead Counsel were still in the process of negotiating certain terms in the MOU before it could be executed by the parties.

53. Again, after several conference calls, the parties met for a fifth and final time in Washington, D.C., to discuss several issues concerning the MOU, which was executed by Lead Counsel and counsel for Abbott on January 22, 2014. The MOU set forth, among other things, the proposed corporate governance terms, as well as the process by which the parties would seek preliminary approval of the proposed Settlement by the Court, notify shareholders of the proposed Settlement, conduct confirmatory discovery, and seek final judicial approval of the Settlement by the Court. During a status conference with the Court on the same day, the parties notified the Court that a settlement had been reached and the parties were preparing a stipulation of settlement to be presented with a motion for preliminary approval. The parties also advised

22

the Court that Lead Plaintiff would conduct confirmatory discovery before entering into the stipulation of settlement.

54.     The Stipulation and Agreement of Settlement, which included the agreed-upon corporate governance provisions, was executed on March 6, 2014.  Under the agreement, Abbott must effect, enhance, and/or maintain the Corporate Governance Terms for a period of at least *four* years.  The following are the key Corporate Governance Terms contained in the Settlement:

- strengthen the "tone from the top" to foster a culture of legal and regulatory compliance with federal law and healthcare programs and adopt stronger corporate governance measures as "core values";

- enact a compensation recoupment policy that goes beyond what is required under the clawback provision in Section 954 of the Dodd-Frank Act of 2010;

- revise the Public Policy Committee's charter and expand its duties to essentially become a legal and regulatory compliance committee to ensure that the Board fulfills its oversight responsibility with respect to legal, regulatory, and healthcare compliance issues;

- strengthen the role of the Lead Director with additional responsibilities to create a visible check on non-independent directors;

- foster additional communication by Abbott's senior management on compliance issues;

- maintain and strengthen internal compliance governance by requiring the Business Conduct Committee, which is chaired by the CECO, to report directly to the Chairman of the Board and the CEO concerning compliance programs at Abbott; and

- cultivate a reporting system designed to facilitate adherence to Abbott's compliance.

55.     With the parties having reached an agreement on the terms of the Settlement, Lead Plaintiff conducted discovery to confirm the fairness and reasonableness of the Settlement and that it was in the best interests of Abbott and its shareholders.  Along with documents previously provided by Abbott, Lead Plaintiff thus reviewed in this litigation nearly 4,000 pages

of documents including, but not limited to, minutes from Abbott's Board of Directors' meetings referencing Depakote and legal and regulatory compliance; correspondence with the FDA regarding Depakote marketing; guidelines governing the review and approval process for promotional materials; presentations to the Board by Abbott's CECO and others concerning Abbott's regulatory risks; and presentations and other materials concerning Depakote that were furnished to the Board by Abbott's Pharmaceutical Products Division during the Relevant Period. As part of confirmatory discovery, Lead Plaintiff also conducted: (1) a Rule 30(b)(6) deposition of Abbott, which designated a Divisional Vice President and Associate General Counsel for Legal, Regulatory and Compliance, an eight-year veteran of the Company, to testify on its behalf on topics related to Abbott's ethics and compliance program and Board reporting and specifically with respect to Depakote and (2) an extensive interview of the former Corporate Secretary and General Counsel of Abbott, who was in attendance at all or nearly all Board meetings and meetings of Board committees during the Relevant Period.

56.     There can be no doubt that the Settlement was the result of intense, arm's-length bargaining and compromise between the parties.

### E.     The Montini Family Trust Seeks to Enter the Litigation More Than Two Years After It Began

57.     On November 13, 2013 – two years after the first complaint in this action was filed and well after the Court sustained the SAC – plaintiffs in *Montini Family Trust v. White*, Case No. 13-CV-8187, filed a Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "*Montini* complaint"). This shareholder derivative lawsuit is effectively the same action brought by Lead Plaintiff Jacksonville Police & Fire:  it alleges the same breaches of fiduciary duty and it alleges the same

misconduct involving the off-label marketing of Depakote. The only difference is that it names two former officers as defendants in addition to those named by Lead Plaintiff.

58. On November 25, 2013, the Defendants filed an Unopposed Motion to Reassign Related Case, arguing that the *Montini* action should be reassigned to this Court because the *Montini* action and this Action are related cases, sharing the same key characteristics. On December 3, 2013, the Court granted the motion and ordered reassignment.

59. At a January 22, 2014 status conference for this Action, Lead Counsel and counsel for the Defendants informed the Court that they had reached an agreement in principle to settle the Action and would be seeking preliminary approval. It was clear that the resolution of the Action would resolve all claims alleged in the *Montini* action.

60. One week later, on January 29, 2014, Abbott and Lead Plaintiff jointly moved to have the *Montini* action consolidated with the Action and stayed based on the almost universal overlap between it and the Action. The motion to stay emphasized that the claims in both cases originated from the same core facts and relate to the same alleged course of conduct with respect to Abbott's marketing of Depakote. The only material difference between the SAC and the *Montini* complaint is that the latter named two additional defendants and that *Montini* proceeded under a different theory of standing. Yet standing is not even at issue here; the Court already ruled that demand on Abbott's Board was excused when it sustained the SAC. The *Montini* plaintiffs contended that their own standing was established on the basis that their demand on Abbott's Board to take action was allegedly wrongfully refused. In particular, they alleged that Abbott's Board wrongfully refused to consider *Montini's* demand to initiate litigation against the same officers and directors named in the Consolidated Action, a demand *Montini* served in September 2013, *after* the Court's June 5, 2013 Order finding that a pre-suit demand was

25

excused.  The *Montini* complaint was filed just weeks after Abbott informed Montini's counsel that the demand would be discussed at the next board meeting.

61.     On February 20, 2014, the *Montini* plaintiffs filed a response to the consolidation request.  They argued that their alleged basis for standing (*i.e.*, wrongful refusal) could still be relevant if the Settlement of the Action is not granted final approval.  They also argued that dissimilarities exist between their action and this Action (*i.e.*, the *Montini* action names two additional defendants).  Abbott and Lead Plaintiff filed their joint reply on February 27, 2014, asserting, among other things, that the alleged pleading differences are irrelevant to consolidation and that consolidation should not be affected by the fact that the *Montini* plaintiffs named two additional defendants.

62.     Pursuant to a minute order of the Court, on March 11, 2014, Lead Plaintiff and Abbott filed a supplement to their joint motion to consolidate, noting that the *Montini* plaintiffs' claims would be extinguished by the Settlement.  The *Montini* plaintiffs also supplemented their opposition to consolidation later that day, opting to attack the Settlement – mostly through mischaracterizations of its terms – rather than addressing the standards that govern consolidation, a critical issue of the motion.

63.     The Court heard oral argument on the motion to consolidate (and the motion for preliminary approval) on March 12, 2014.  On that same day, it granted Lead Plaintiff's and Abbott's joint motion and consolidated the *Montini* action with the Action.

**F.     The Court Grants Preliminary Approval of the Settlement**

64.     Also on March 12, 2014, the Court granted preliminary approval of the Settlement.  The Court signed an order to that effect on March 18, 2014, which the parties first received *via* ECF on March 21, 2014 (the "Preliminary Approval Order").

26

65.     The Preliminary Approval Order required that notice be disseminated to all current Abbott shareholders and beneficial owners of Abbott stock by Abbott: (i) filing the Notice with the SEC in a Form 8-K; (ii) maintaining a copy of the Notice on its corporate website until the date the Court enters judgment approving the Settlement; and (iii) publishing a summary form of the Notice on one occasion in the national editions of *The Wall Street Journal* and *USA Today*.  The parties timely effected notice in the manner required by the Court's Order. The Court found that the Notice complied with Rule 23.1 of the Federal Rules of Civil Procedure and due process in that it provided, *inter alia*, all necessary and required information concerning the Action, the proposed Settlement, the hearing date, the shareholders' rights to appear and object to the Settlement, the release of claims, and Lead Counsel's request for attorneys' fees and reimbursement of expenses.

66.     The Court set the deadline for objections to the proposed Settlement or to the application of attorneys' fees and reimbursement of expenses for May 8, 2014.

67.     The Preliminary Approval Order set a final approval hearing date of May 22, 2014.

68.     As of the date of this filing, three shareholders have contacted Lead Counsel to request information on the proposed Settlement.

## III.   <u>THE FEE APPLICATION</u>

69.     Lead Counsel is making an application for a fee award of $9.9 million, which <u>includes</u> the reimbursement of costs and expenses, for the benefits conferred on Abbott through the Settlement (the "Fee Application").  The attorneys' fees and expenses for which Lead Counsel is seeking approval from the Court were the subject of extensive, arm's-length negotiations after the terms of the proposed Settlement were agreed upon.

27

### A.      Lead Plaintiff Supports the Fee Application

70.      Lead Plaintiff, a sophisticated institutional investor with extensive experience in negotiating fees with counsel and in evaluating the results of shareholder actions, has evaluated the Fee Application and believes it to be fair and reasonable.  In coming to this conclusion, Lead Plaintiff was consulted with throughout the pendency of the Action, and advised of all aspects of, the prosecution of the Action and the negotiation of the Settlement.  Accordingly, Lead Plaintiff endorses Lead Counsel's application for an award of attorneys' fees and reimbursement expenses in the amount of $9.9 million.

71.      Consistent with Lead Plaintiff's endorsement, the Notice informed Abbott's shareholders of Lead Counsel's intent to apply for an award of attorneys' fees and reimbursement expenses in the amount of $9.9 million.

### B.      The Work and Experience of Plaintiffs' Counsel

72.      Attached to the Declaration of Robert M. Roseman Collecting All Plaintiffs' Counsel's Fee and Expense Reports as Exhibits 2-6 are declarations from Plaintiffs' Counsel[11] in support of the request for an award of attorneys' fees and reimbursement of litigation expenses. Included with each Plaintiff's Counsel's declaration is a schedule that summarizes the lodestar of the firm, as well as the expenses incurred by category (the "Fee and Expense Schedule").  The Fee and Expense Schedule and attached declarations indicate the amount of time spent by each attorney and para-professional employed by each Plaintiff's Counsel and the lodestar calculations based on their current billing rates.  As attested in each declaration, the declarations were prepared from contemporaneous daily time records regularly maintained and prepared by

---

[11] Plaintiffs' counsel includes Lead Counsel, Local Counsel, and the law firms of Kahn Swick & Foti; Labaton Sucharow; and the Law Offices of Bernard M. Gross, which performed work in this Action at the direction of Lead Counsel.

the respective firms, which are available at the request of the Court. The hourly rates for attorneys and para-professionals included in these schedules are commensurate with the hourly rates charged by lawyers and paraprofessionals performing similar services. For attorneys or para-professionals who are no longer employed by each Plaintiff's Counsel, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment.

73.     Plaintiffs' Counsel have expended 4,655.80 hours in the investigation and prosecution of this Action. The resulting lodestar is $2,738,003.75. Under the lodestar approach, the requested fee (minus expenses) yields a multiple of approximately 3.5.

74.     Plaintiffs' Counsel are experienced in prosecuting shareholder derivative actions and worked diligently and efficiently at the direction of Lead Counsel in prosecuting this Action. Plaintiffs' Counsel, as demonstrated by their firm resumes attached to their respective declarations, are among the most experienced and skilled practitioners in the shareholder derivative and securities litigation field, and have a long, successful track record in such cases.

**C.      Standing and Caliber of Defense Counsel**

75.     The quality of the work performed by Lead Counsel in attaining the Settlement should be evaluated in light of the quality of its opposition. Abbott and the Individual Defendants were represented by two of the country's most prestigious law firms: Kirkland & Ellis (Abbott) and Jones Day (Individual Defendants). These firms spared no effort in the defense of their clients. In the face of this knowledgeable, formidable, and well-financed opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Abbott and the Individual Defendants to settle the case on terms that will significantly benefit the Company and its shareholders.

**D.** **The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Derivative Cases**

76.     This prosecution was undertaken by Lead Counsel entirely on a contingent-fee basis.  The risks assumed by Lead Counsel in bringing these claims to a successful conclusion are described above.  Those risks are also relevant to an award of attorneys' fees.  Here, the risks assumed by Lead Counsel, and the time and expenses incurred without any payment, were extensive.

77.     From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of this Action, and that funds were available to compensate staff and to cover the considerable out-of-pocket costs that a case such as this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel and the other Plaintiffs' Counsel have received no compensation during the course of this Action and have incurred in the aggregate $194,957.90 in out-of-pocket expenses in prosecuting this Action for the benefit of Abbott and its shareholders.

78.     Lead Counsel also bore the risk that no recovery would be achieved.  From the outset, this case presented a number of risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.

30

79.     Lead Counsel knows from experience that the commencement of a shareholder derivative action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial or to induce sophisticated defendants with equally skilled attorneys to engage in serious settlement negotiations at meaningful levels.  Indeed, in this case, the FAC was dismissed by the Court, a development which required Lead Counsel to drill down deeper to uncover facts to satisfy the exacting standards for demand futility.

80.     Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in substantial benefits for Abbott and its shareholders.  In the opinion of Professor Gordon, "the Reforms embodied in the Proposed Settlement will significantly strengthen Board oversight of Abbott's compliance with the federal, state and foreign government regulatory regimes for the sale of drugs, nutritional products, medical devices and medical products and will produce other improvements to internal compliance and accountability" and "will thus provide significant value for the Company and its shareholders." In circumstances such as these, and in consideration of Lead Counsel's, Local Counsel's and the other Plaintiffs' Counsel's hard work and the extraordinary result achieved, the requested $9.9 million fee (which includes $194,957.90 for reimbursement of expenses) is reasonable and should be approved.

## IV.     REIMBURSEMENT OF THE REQUESTED LITIGATION EXPENSES IS FAIR AND REASONABLE

81.     Lead Counsel seeks reimbursement of $194,957.90 in litigation expenses reasonably and actually incurred by Plaintiffs' Counsel in connection with commencing and prosecuting the claims against the Defendants.

31

82.     From the beginning, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not compensate them for the lost use of funds advanced by them to prosecute the Action.  Thus, Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

83.     As set forth in the Fee and Expense Schedule (provided in Exhibit 1 to the Declaration of Robert M. Roseman Collecting All Plaintiffs' Counsel's Fee and Expense Reports), Plaintiffs' Counsel have incurred a total of $194,957.90 in unreimbursed litigation expenses in connection with the prosecution of this Action.  As attested to, these expenses are reflected on the books and records maintained by Plaintiffs' Counsel.  These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.  Plaintiffs' Counsel's expenses are set forth in detail in each firm's affidavit, each of which identifies the specific categories of expenses, *e.g.*, experts' fees, transcripts, travel costs, photocopying, telephone, fax, and postage expenses, and other costs actually incurred for which Plaintiffs' Counsel seeks reimbursement.  These expense items are billed separately by Plaintiffs' Counsel and such charges are not duplicated in the respective firms' billing rates.

84.     Lead Counsel maintained strict control over the litigation expenses.  In fact, the litigation expenses for which Lead Counsel seeks reimbursement were largely incurred for professional fees.

85.     Of the total amount of expenses, more than $129,100.50, or over 66%, was expended on experts in corporate governance and economic valuation.  As discussed more fully below, the expertise and assistance provided by these experts was critical to the prosecution and successful resolution of this Action.

86.     Lead Plaintiff retained Professor Jeffrey Gordon as a corporate governance expert to: (a) evaluate the corporate governance mechanisms in place at Abbott at the time this action was filed to identify, among other things, any potential enhancements to its internal controls and the Board's supervision of the Company, and (b) assist Lead Counsel in designing reforms to strengthen Abbott's Board oversight, particularly with regard to healthcare legal and regulatory compliance.  Working with Professor Gordon, Lead Counsel designed detailed settlement proposals directed at both the Board and management levels.  Professor Gordon provided substantial assistance to Lead Counsel in the settlement process by participating in the development of the corporate governance reforms that are reflected in the Settlement and by providing guidance on the Defendants' positions in response to the corporate governance proposals, including offering elements he thought were critical to a meaningful resolution. Professor Gordon's work required the review of extensive documents, including the SAC, relevant SEC filings of Abbott, Abbott's corporate governance documents, and materials from the U.S. Government's civil and criminal cases.  Professor Gordon's analysis and opinion of the Reforms are set forth in his Affidavit submitted in support of the final approval motion.

87.     Likewise, R. Alan Miller, President of the Philadelphia Investment Banking Company, the economic valuation expert, provided substantial assistance to Lead Counsel to derive the likely economic benefit of the corporate governance reforms designed to strengthen the Board's governance and avoid a recurrence of legal and regulatory compliance actions

similar to those brought by the U.S. Government and several states for the off-label marketing of Depakote. Mr. Miller conducted an economic analysis of the corporate governance reforms by first determining the financial damage to Abbott as a result of the misconduct by the Defendants and then calculating the benefits of avoiding such costs in the future. Mr. Miller's work required the review of extensive documents, including the SAC, relevant SEC filings of Abbott, Abbott's corporate governance documents, numerous business press and investment community articles, and literature pertaining to valuations of corporate governance. Mr. Miller's analysis and opinion of the Reforms are set forth in his Affidavit submitted in support of the Motion for Final Approval of the Settlement.

88. The other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, long distance telephone and facsimile charges, postage and delivery expenses, computerized research, overtime expenses, filing fees, document management, and a court reporter for discovery.

89. Lead Counsel also seeks reimbursement for travel expenses, which are also the type of expense that is necessarily incurred in litigation and routinely charged to clients billed by the hour. This Action involved travel for, among other things, court appearances, in-person settlement meetings, meeting with the experts, and discovery.

90. In view of the complex nature of the Action, all of the litigation expenses incurred, which total $194,957.90, were reasonable and necessary to the successful prosecution and resolution of the claims against the Defendants. These expenses have been reviewed and approved by Lead Plaintiff and the other Plaintiffs. Accordingly, Lead Counsel respectfully submits that the expenses incurred by Plaintiffs' Counsel should be reimbursed in full.

## V.    CONCLUSION

91.    In view of the substantial benefit achieved for Abbott and its shareholders, the very substantial risks of this litigation, the enormous efforts of Lead Counsel, Local Counsel, and other Plaintiffs' Counsel, the quality of work performed, the contingent nature of the fee, the complexity of the case and the standing and experience of Lead Counsel, Lead Counsel respectfully submits the Settlement should be approved as fair, reasonable and adequate; that a fee award of $9.9 million, which includes the reimbursement of costs and expenses, be awarded to Lead Counsel; and Plaintiffs' Counsel's litigation expenses be reimbursed in full.

I, ROBERT M. ROSEMAN, declare, under penalty of perjury, that the foregoing facts are true and correct.

Philadelphia, PA
April 24, 2014.


_____
Robert M. Roseman

35